**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
Durham Division**

| | |
|---|---|
| VICTOR VOE, by and through his parents and next friends, Vanessa Voe and Vance Voe; VANESSA VOE; VANCE VOE; RILEY SMITH, M.D., on behalf of his patients; PFLAG, INC.; AMERICAN ASSOCIATION OF PHYSICIANS FOR HUMAN RIGHTS, INC. d/b/a GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ+ EQUALITY, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> THOMAS MANSFIELD, in his official capacity as Chief Executive Officer of the North Carolina Medical Board; and MICHAUX R. KILPATRICK; CHRISTINE M. KHANDELWAL; DEVDUTTA G. SANGVAI; JOHN W. RUSHER; WILLIAM M. BRAWLEY; W. HOWARD HALL; N. MELINDA HILL-PRICE; SHARONA Y. JOHNSON; JOSHUA D. MALCOLM; MIGUEL A. PINEIRO; ANURADHA RAO-PATEL; ROBERT RICH, JR.; and DAVID P. SOUSA, in their official capacities as members of the North Carolina Medical Board; NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; KODY KINSLEY, in his official capacity as Secretary of the Department of Health and Human Services, <br><br> *Defendants*. | Civil No. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

Plaintiffs[1], by and through their attorneys, bring this Complaint against the above-named Defendants, and state the following in support thereof:

## PRELIMINARY STATEMENT

1. On June 29, 2023, the North Carolina General Assembly ratified House Bill 808 (the "Health Care Ban" or the "Ban"), which prohibits healthcare professionals from providing evidence-based, widely accepted, necessary, and potentially life-saving medical care to transgender adolescents. The Ban also prohibits the use of state funds, directly or indirectly, to support the provision of gender-affirming medical care or its coverage by a governmental health or insurance plan.[2] The law was passed over the sustained and robust opposition of medical experts and providers in North Carolina and across the country. It was also passed over the pleas of families across North Carolina who urged lawmakers not to interfere in the medical decision-making of parents, their adolescent children, and their doctors.

2. On July 5, Governor Roy Cooper vetoed the bill—recognizing that this treatment is not experimental or harmful but rather reflects "approved medical protocols,"

---

[1] As set forth in the concurrently-filed motion to proceed pseudonymously, Plaintiffs Victor Voe and his parents and next friends, Vanessa and Vance Voe, seek to proceed pseudonymously in order to protect Victor Voe's right to privacy given that he is a minor and the disclosure of his identity "would reveal matters of a highly sensitive and personal nature, specifically [Victor Voe]'s transgender status and his diagnosed medical condition—gender dysphoria." *Foster v. Andersen*, No. 182552-DDC-KGG, 2019 WL 329548, at *2 (D. Kan. Jan. 25, 2019).

[2] The Ban expressly provides that its public funding prohibition shall not apply to the State Health Plan for Teachers and State Employees while the permanent injunction, granted by Mem. Op. & Order, ECF No. 234, *Kadel v. Folwell*, No. 1:19-cv-272 (M.D.N.C. June 10, 2022), remains in place.

2

and that "North Carolina should continue to let parents and medical professionals make decisions about the best way to offer gender care for their children."[3]  But the North Carolina General Assembly overrode the Governor's veto on August 16, 2023, making the law effective immediately.  The law's passage has been devastating for North Carolina families with a transgender adolescent.  The Ban violates the rights of North Carolina adolescents and their parents under the Fourteenth Amendment and the Affordable Care Act, and unless this Court grants the relief that Plaintiffs seek, it will continue to cause severe and irreparable harm.

3.      Medical providers have long followed evidence-based and comprehensive clinical practice guidelines that recommend certain medical treatments for gender dysphoria, which is a serious medical condition characterized by clinically significant distress caused by incongruence between a person's gender identity and the sex they were designated at birth.  These guidelines provide a framework for the safe and effective treatment of gender dysphoria, which, if left untreated, can have dire and serious consequences for the health and wellbeing of transgender people, including adolescents.

4.      All major medical associations in the United States recognize these medical guidelines as authoritative and that adolescents with gender dysphoria may require medical interventions to treat clinically significant distress associated with their condition.

---

[3]     *See* Roy Cooper, *Governor Roy Cooper Objections and Veto Message* (July 5, 2023), https://webservices.ncleg.gov/ViewBillDocument/2023/6811/0/H808-BD-NBC-11125.

5.     The Health Care Ban interferes with the ability of doctors to follow these evidence-based protocols by prohibiting medical professionals from "prescrib[ing], provid[ing], and dispens[ing] puberty-blocking drugs or cross-sex hormones to a minor" for gender transition or from performing "surgical gender transition procedure[s] on a minor." N.C. Gen. Stat. § 90-21.151 (2023). In so doing, the Ban denies adolescents medically necessary treatment solely because it is provided for the purpose of "gender transition." *Id.* It also prevents parents from exercising their fundamental right to obtain medically necessary care for their adolescent children. Finally, the Ban prohibits doctors from treating their patients in accordance with well-established standards of care, and it also subjects doctors to draconian penalties for doing so—including the loss of their medical license and civil liability.

6.     While the Ban's sponsors contend that it is necessary to protect minors from supposedly "experimental" treatments, decades of clinical experience and research have shown that gender-affirming health care is safe and effective, and that it improves the health and well-being of adolescents with gender dysphoria.

7.     Moreover, and critically, the Health Care Ban does not seek to prohibit the medical treatments at issue for all medical conditions; rather, it prohibits the provision of these treatments *only* when they are performed for the purpose of "gender transition." *Id.* In other words, the Ban prohibits the provision of these treatments only when used to treat a transgender adolescent's gender dysphoria, even though the risks of the treatments are materially the same.

4

8.     The Health Care Ban was passed because of, and not in spite of, its differential treatment of transgender adolescents, like Victor Voe and Dr. Riley Smith's patients, depriving them of necessary, safe, and effective medical care, thereby interfering with and overriding the clinical and evidence-based judgment of medical providers and the decision-making of loving parents, like Vanessa and Vance Voe.

9.     The Ban has and will continue to have devastating consequences for transgender youth and their families in North Carolina.  Transgender adolescents with gender dysphoria will be unable to obtain the medical care that those who understand their medical needs—their doctors and parents—agree they need.  Untreated gender dysphoria is associated with severe harm, including anxiety, depression, and suicidality.  Cutting vulnerable adolescents off from treatment or withholding necessary care will inevitably cause significant harm.

10.     Some parents of transgender children are making plans to flee the State to protect their children's health and safety and to obtain the medical treatment their children need.  Those with the resources to do so will have to leave their jobs, businesses, extended families, and communities.  Others will have to shoulder the hardship of disruptive and expensive travel to secure medical care for their children, often at the expense of the child's time in school and the parents' time at work.

11.     Other families that do not have the resources or are otherwise unable to leave or travel are terrified about what will happen if the law continues to remain in effect.  This is especially true for families on Medicaid, who, by definition, have limited financial

resources. For these parents and hundreds of others across North Carolina, the Ban is creating a sense of desperation at the prospect of watching their children's suffering resume and symptoms possibly worsen as they are unable to access the critical medical care that they need.

12.     The Health Care Ban not only gravely threatens the health and wellbeing of transgender adolescents in North Carolina; it is also unconstitutional. The Ban violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against transgender minors on the basis of sex and transgender status. For similar reasons, the Ban's discrimination based on sex violates the Affordable Care Act. The Ban also violates the right to parental autonomy that is guaranteed to all parents by the Due Process Clause of the Fourteenth Amendment by depriving only the parents of transgender minors of their fundamental right to make decisions concerning the care, custody, and control of their children by seeking medical care for their children that healthcare providers have recommended.

13.     Given the grave harms imposed by the Ban, Plaintiffs urgently seek relief from this Court.

## THE PARTIES

### A.     Family Plaintiffs.

14.     Plaintiffs Vanessa Voe and Vance Voe (collectively referred to herein as the "Parent Plaintiffs"), and their nine-year-old son Victor Voe ("Minor Plaintiff") live in Durham County, North Carolina. Victor is transgender. He knew from a very young age

6

that his gender identity did not match his sex assigned at birth, and he generally lives as the boy he is in every aspect of life. However, with his puberty approaching, Victor will soon need medical care that is prohibited by the Health Care Ban.

### B. Provider Plaintiffs.

15. Plaintiff Dr. Riley Smith (the "Provider Plaintiff") is a physician licensed to practice medicine in North Carolina. Dr. Smith currently practices medicine at the University of North Carolina School of Medicine's Department of Family Medicine, which is located in Chapel Hill, North Carolina. Prior to the Health Care Ban, he provided gender-affirming medical care that the Ban now prohibits. Dr. Smith is bringing claims in his personal capacity on behalf of his patients.

### C. Association Plaintiffs.

16. Plaintiff PFLAG is a 501(c)(3) national membership nonprofit organization based in Washington, D.C. and incorporated in California. PFLAG is the first and largest organization dedicated to supporting, educating, and advocating for lesbian, gay, bisexual, transgender, and queer ("LGBTQ+") people, their parents and families, and allies. PFLAG has a network of nearly 350 local chapters throughout the United States, 17 of which are in North Carolina. This includes chapters in Alamance, Durham, Forsyth, and Guilford Counties. People who identify as LGBTQ+ and their parents, families, and allies become PFLAG members by joining the national organization directly or through one of its local chapters. Of more than 350,000 members and supporters nationwide, PFLAG has a roster of nearly 400 members in North Carolina, including many families of transgender youth

7

who currently receive or will soon need to access the medical treatment for gender dysphoria prohibited by the Ban. PFLAG's mission is to create a caring, just, and affirming world for LGBTQ+ people and those who love them. Encouraging and supporting parents and families of transgender and gender non-conforming people in affirming their children and helping them access the supports and care they need is central to PFLAG's mission. PFLAG asserts its claims in this lawsuit on behalf of its members. The Parent and Minor Plaintiffs are members of PFLAG.

17. Plaintiff GLMA is a 501(c)(3) national membership nonprofit organization based in Washington, D.C. and incorporated in California. GLMA's mission is to ensure health equity for LGBTQ+ people and equality for LGBTQ+ health professionals in their work and learning environments. GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health profession students, and other health professionals, including members in North Carolina. GLMA asserts its claims in this lawsuit on behalf of its members. Plaintiff Dr. Riley Smith is a member of GLMA.

**D.    Defendants.**

18. Defendant Thomas Mansfield is the Chief Executive Officer ("CEO") of the North Carolina Medical Board. Defendant Michaux R. Kilpatrick, M.D., Ph.D., is the President of the North Carolina Medical Board. Defendant Christine M. Khandelwal, D.O., M.H.P.E., is the President-Elect of the North Carolina Medical Board. Defendant Devdutta G. Sangvai, M.D., M.B.A., is the Secretary and Treasurer of the North Carolina

Medical Board. Defendants John W. Rusher, M.D., J.D.; William M. Brawley; W. Howard Hall, M.D.; N. Melinda Hill-Price, M.D., J.D.; Sharona Y. Johnson, Ph.D., FNP-BC; Joshua D. Malcolm, J.D.; Miguel A. Pineiro, PA-C, M.H.P.E.; Anuradha Rao-Patel, M.D.; Robert Rich, Jr., M.D.; and David P. Sousa, J.D., M.B.A. (collectively and together with Defendants Mansfield, Kilpatrick, Khandelwal, and Sangvai, the "Medical Board Defendants") are members of the North Carolina Medical Board.

19.     The North Carolina Medical Board ("Medical Board") licenses physicians and other health professionals. N.C. Gen. Stat. § 90-5.1 (2019). The Medical Board, including its CEO and its members, is charged with placing health professionals on probation and imposing sanctions for certain conduct, including suspending medical licenses for providing gender-affirming medical care to minor patients, pursuant to the Ban. N.C. Gen. Stat. § 90-21.153 (2023). The Medical Board Defendants are sued in their official capacities. The Medical Board Defendants are governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

20.     Defendant North Carolina Department of Health and Human Services ("DHHS") is the "single state agency" with direct responsibility for administration of the state Medicaid plan ("NC Medicaid"). 42 U.S.C. § 1396a(a)(5); N.C. Gen. Stat. § 108A-54 (2018).

21.     NC Medicaid supports the health and wellbeing of more than 2.3 million North Carolinians, nearly one in four people across the state, by providing critical health

insurance coverage for individuals and families with low income, as well as medically fragile children, children adopted through foster care, and people with severe disabilities. DHHS is a recipient of federal financial assistance.

22.     DHHS receives federal funding to support the NC Medicaid Program and uses the funds it receives from the federal government in part to cover healthcare services for persons enrolled in the NC Medicaid Program.   The state, through DHHS, is "responsible for the nonfederal share of the costs of medical services provided under the Program."  N.C. Gen. Stat. § 108A-54(a) (2018).  However, under the Ban, "[n]o State funds may be used, directly or indirectly, for the performance of or in furtherance of surgical gender transition procedures, or to provide puberty-blocking drugs or cross-sex hormones to a minor, or to support the administration of any governmental health plan or government-offered insurance policy offering surgical gender transition procedures, puberty-blocking drugs, or cross-sex hormones to a minor."  N.C. Gen. Stat. § 143C-6-5.6(b) (2023).  Thus, the Ban prohibits DHHS from administering Medicaid coverage for gender-affirming medical care to minors.

23.     Defendant Kody Kinsley is the Secretary of DHHS, which is the head of DHHS.  N.C. Gen. Stat. § 143B-139 (1997).  In this capacity, Defendant Kinsley oversees and directs all functions at DHHS, including its Medicaid operations.  Defendant Kinsley is responsible for ensuring that the operation of North Carolina's Medicaid program complies with both federal and state law, including any "parameters set by the General Assembly."  N.C. Gen. Stat. § 108A-54(f) (2018).  This includes the Ban's requirement

that "[n]o State funds may be used, directly or indirectly" for purposes of gender transition-related medical care. N.C. Gen. Stat. § 143C-6-5.6(b) (2023). Defendant Kinsley is sued in his official capacity. Defendant Kinsley is a governmental actor and/or employee acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

## JURISDICTION AND VENUE

24.     This action arises under the U.S. Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 18116(a).

25.     This Court has subject matter jurisdiction pursuant to Article III of the U.S. Constitution and 28 U.S.C. §§ 1331, 1343.

26.     This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

27.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims have and continue to occur in this district.

## FACTUAL BACKGROUND

### A.     Treatment Protocols for Adolescents with Gender Dysphoria

28.     Doctors in North Carolina use evidence-based, well-researched, and widely accepted clinical practice and medical guidelines to assess, diagnose, and treat adolescents with gender dysphoria. Decades of clinical experience and a large body of research have demonstrated that these treatments are safe and effective at treating gender dysphoria in adolescents, and consequently inform how this care is provided.

11

29.     Gender identity refers to a person's core sense of belonging to a particular gender, such as male or female.  Every person has a gender identity.

30.     Living in a manner consistent with one's gender identity is critical to the health and well-being of any person, including transgender people.

31.     Although the precise origin of gender identity is unknown, a person's gender identity is a fundamental aspect of human development.  There is a general medical consensus that there are significant biological roots to gender identity.

32.     A person's gender identity cannot be altered voluntarily or changed through medical intervention.

33.     A person's gender identity usually matches the sex they were designated at birth based on the appearance of their external genitalia.  The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because the physiological aspects of a person's sex are not always aligned with each other.  For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation but genital characteristics typically associated with a female sex designation.  For these reasons, the Endocrine Society, an international medical organization representing over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.[4]

_____

[4]     Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J.

34.     Most boys are designated male at birth based on their external genital anatomy, and most girls are designated female at birth based on their external genital anatomy.  But transgender people have a gender identity that differs from the sex they were designated at birth.  A transgender boy or man is someone who has a male gender identity but was designated a female sex at birth.  A transgender girl or woman is someone who has a female gender identity but was designated a male sex at birth.

35.     The health and wellbeing of all people, including those who are transgender, depends on their ability to live in a manner consistent with their gender identity.  For transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress or impairment in functioning.

36.     Gender dysphoria is the clinical diagnosis for the significant distress or functional impairment that results from the incongruity between one's gender identity and the sex they were designated at birth.  It is a serious medical condition, and it is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5-TR") (DSM-5 was released in 2013, and DSM-5-TR was released in 2022).

37.     Similarly, this medical condition is recognized in the World Health Organization's *International Classification of Diseases, 11th Revision*, which codifies the diagnosis of Gender Incongruence.

---

Clinical Endocrinology and Metabolism 3869, 3875 tbl. 1 (2017), *available at* https://academic.oup.com/jcem/article/102/11/3869/4157558 ("Endocrine Society Guideline").

Case 1:23-cv-00864   Document 1   Filed 10/11/23   Page 13 of 56

38.     According to the DSM-5-TR, to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

39.     Being transgender is not itself a medical condition to be cured.  But gender dysphoria is a serious medical condition that, if left untreated, can result in negative mental health outcomes including debilitating anxiety, severe depression, post-traumatic stress disorder, eating disorders, substance abuse, self-harm, and suicide.

40.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published evidence-based and widely accepted clinical practice guidelines for the assessment, diagnosis, and treatment of gender dysphoria.

41.     The medical treatment for gender dysphoria seeks to eliminate or alleviate the clinically significant distress by helping a transgender person live in alignment with their gender identity.   This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care."

42.     WPATH has issued Standards of Care for the Health of Transgender and Gender Diverse People ("WPATH Standards of Care") since 1979.  The current version is *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC 8"), published in 2022.[5]

---

[5]   E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health S1, S1–

14

43.     The WPATH Standards of Care provide guidelines for multidisciplinary care of transgender individuals, including children and adolescents, and describe criteria for medical interventions to treat gender dysphoria—including puberty-delaying medication, hormone treatment, and surgery when medically indicated—for adolescents and adults.

44.     Every major medical organization in the United States recognizes that these treatments can be medically necessary to treat gender dysphoria.

45.     The SOC 8 is based upon a rigorous, methodological, and evidence-based approach.  Its recommendations are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options, as well as expert consensus.  The SOC 8 incorporates recommendations on clinical practice guideline development from the National Academy of Medicine and the World Health Organization. SOC 8's recommendations were graded using a modified GRADE (Grading of Recommendations, Assessment, Development, and Evaluations) methodology considering the available evidence supporting interventions, risks and harms, and feasibility and acceptability.

46.     A clinical practice guideline from the Endocrine Society (the "Endocrine Society Guideline") provides protocols for the medically necessary treatment of gender dysphoria similar to those outlined in the WPATH Standards of Care.

_____

S258 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269. 2022.2100644 ("SOC 8").

Case 1:23-cv-00864   Document 1   Filed 10/11/23   Page 15 of 56

47.     The guidelines for the treatment of gender dysphoria outlined in the WPATH Standards of Care and in the Endocrine Society Guideline are comparable to guidelines that medical providers use to treat other conditions.  These clinical practice guidelines are widely accepted as best practices for the treatment of adolescents and adults diagnosed with gender dysphoria and have been recognized as authoritative by leading medical organizations, including the American Academy of Pediatrics, which agrees that this care is safe, effective, and medically necessary for many adolescents suffering from gender dysphoria.

48.     Doctors in North Carolina and throughout the country follow these widely accepted guidelines to diagnose and treat people with gender dysphoria.

49.     Medical guidance for clinicians differs depending on whether care is being provided to a pre-pubertal child, an adolescent, or an adult.  Before the onset of puberty, consistent with the WPATH Standards of Care and the Endocrine Society Guideline, the only healthcare that is recommended and provided is mental health counseling.  In other words, gender-affirming care does not include any pharmaceutical or surgical intervention before puberty.  Any transition before puberty is limited to "social transition," which means supporting a transgender child to live and be socially recognized in accordance with the child's persistently expressed gender identity.  Such care might include support around adopting a new name and pronouns, wearing clothes that feel more appropriate to a particular gender, changing one's hairstyle, and using restrooms and other sex-separated facilities aligned with their gender identity instead of the sex assigned to them at birth.

16

50.     Under SOC 8 and the Endocrine Society Guideline, medical interventions may become medically necessary and appropriate as transgender youth reach puberty. In all cases, the precise treatment recommended for gender dysphoria will depend upon each person's individualized needs. In providing medical treatments to adolescents, pediatric endocrinologists and other clinicians work with qualified mental health professionals experienced in diagnosing and treating gender dysphoria.

### 1.     *Puberty-Delaying Treatment*

51.     For many transgender adolescents, going through puberty in accordance with their sex designated at birth causes extreme distress. For these adolescents, puberty-delaying medication—known as gonadotropin-releasing hormone ("GnRH") agonists—can minimize and potentially prevent the heightened gender dysphoria and permanent, unwanted physical changes that puberty would cause.

52.     Under the Endocrine Society Guideline, transgender adolescents who have reached the onset of puberty may be eligible for puberty-delaying treatment if:

- A qualified [mental health professional] has confirmed that:

    o   the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed),

    o   gender dysphoria worsened with the onset of puberty,

    o   any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment,

17

- o the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment,

- And the adolescent:

  - o has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility,

  - o has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable law) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

  - o agrees with the indication for GnRH agonist treatment,

  - o has confirmed that puberty has started in the adolescent, . . .

  - o has confirmed that there are no medical contraindications to GnRH agonist treatment.[6]

53.     Similarly, the WPATH Standards of Care recommend that health professionals, including physicians and other health care providers assessing transgender adolescents, only recommend the provision of puberty-delaying medications as treatment when: (a) the adolescent meets the necessary diagnostic criteria; (b) the experience of gender incongruence is marked and sustained over time; (c) the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; (d) the adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and treatment have been addressed; (e) the

---

[6]    Endocrine Society Guideline at 3878 tbl. 5.

adolescent has been informed of the reproductive effects, including effects on fertility, and these have been discussed in the context of the adolescent's stage of pubertal development; and (f) the adolescent has reached Tanner stage 2 of puberty.[7] The SOC 8 further recommends that health professionals, including physicians and other health care providers, working with transgender adolescents "undertake a comprehensive biopsychosocial assessment of the adolescent" prior to initiating any medical treatment, and "that this be accomplished in a collaborative and supportive manner."[8]

54. Puberty-delaying treatment is safe and effective for the treatment of gender dysphoria in adolescents.

55. Puberty-delaying treatment works by pausing a person's endogenous puberty at the stage of pubertal development that the person has reached at the time of treatment. For transgender girls, this treatment pauses the physiological changes typical of male puberty and prevents the development of associated secondary sex characteristics like facial hair and a pronounced "Adam's apple." It also prevents the deepening of the young person's voice and genital growth. For transgender boys, puberty-delaying treatment prevents the development of breasts and menstruation. The use of these interventions soon after the onset of puberty can eliminate or reduce the need for surgery later in life. If gender-affirming hormones are prescribed to initiate hormonal puberty consistent with

---

[7] SOC 8 at S48.
[8] *Id.* at S50–S51.

gender identity after puberty-delaying treatment, transgender adolescents will develop secondary sex characteristics typical of peers with their gender identity.

56. On its own, puberty-delaying treatment does not permanently affect fertility.

57. Because puberty-delaying treatment followed by gender-affirming hormone therapy can affect fertility, patients are counseled about the risks and benefits of treatment and provided information about fertility preservation.

58. Puberty-delaying treatment is reversible. If puberty-delaying treatment is stopped and no gender-affirming hormone therapy is provided, there are no lasting effects of the treatment. Endogenous puberty resumes and patients undergo puberty in a timeline typical of their peers.

59. If gender-affirming hormone treatment is provided after puberty-delaying treatment, patients undergo puberty consistent with their gender identity on a timeline typical of their peers.

2. *Hormone Therapy*

60. For some adolescents, it may be medically necessary and appropriate to treat their gender dysphoria with gender-affirming hormone therapy (testosterone for transgender boys, and testosterone suppression and estrogen for transgender girls).

61. Under the Endocrine Society Guideline, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified [mental health professional] has confirmed:
    - o the persistence of gender dysphoria,

20

- any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment,

- the adolescent has sufficient mental capacity . . . to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment,

- And the adolescent:

  - has been informed of the [partly] . . . irreversible . . . effects and side effects of treatment (including potential loss of fertility and options to preserve fertility),

  - "has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable laws) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

  - agrees with the indication for sex hormone treatment,

  - has confirmed that there are no medical contraindications to sex hormone treatment.[9]

62.     As with puberty-delaying medications, the WPATH Standards of Care recommend that health professionals, including physicians and other health care providers, assessing transgender adolescents only recommend the provision of gender-affirming hormones as treatment when: (a) the adolescent meets the necessary diagnostic criteria; (b) the experience of gender incongruence is marked and sustained over time; (c) the

---

[9]    Endocrine Society Guideline at 3878 tbl. 5.

Case 1:23-cv-00864   Document 1   Filed 10/11/23   Page 21 of 56

adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; (d) the adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and treatment have been addressed; and (e) the adolescent has been informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.[10] Again, a comprehensive biopsychosocial assessment of the adolescent prior to initiating any medical treatment is recommended.[11]

63. For transgender boys, hormone therapy involves treatment with testosterone and for transgender girls, treatment with testosterone suppression and estrogen.

64. Through decades of clinical experience and research, gender-affirming hormone therapy has been shown to be safe and effective at treating gender dysphoria in adolescents.

65. Side effects from gender-affirming hormone therapy are rare when treatment is provided under clinical supervision.

66. Gender-affirming hormone therapy does not necessarily result in a loss of fertility, and many individuals treated with hormone therapy can still conceive and produce children.

---

[10]  SOC 8 at S48.
[11]  *Id.* at S50–S51.

67.     As with all medications that could affect fertility, transgender adolescents and their parents or guardians are counseled on the potential risks of the medical intervention, and the treatment is only initiated where parents and adolescents are properly informed and consent/assent to the care.

68.     Adolescents who first receive treatment later in puberty and are treated only with gender-affirming hormone therapy (and not puberty-delaying treatment) also go through a hormonal puberty consistent with their gender identity.  However, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy or even surgery later in life.

### 3.     Surgery

69.     Under the WPATH Standards of Care, transgender adolescents also may receive medically necessary chest reconstructive surgeries before the age of majority.  Such surgeries are rare and require that the adolescent has lived in their affirmed gender for a significant period of time.[12]

* * *

70.     Medical treatment recommended for and provided to transgender adolescents with gender dysphoria can substantially reduce lifelong gender dysphoria and eliminate the medical need for surgery or other medical interventions later in life.

71.     Providing gender-affirming medical care can be lifesaving treatment and positively change the short- and long-term health outcomes for transgender adolescents.

---

[12]   *Id.* at S66.

72.     Puberty-delaying medications and gender-affirming hormones are prescribed only after a comprehensive psychosocial assessment by a qualified health professional who: (i) assesses for the diagnosis of gender dysphoria and any other co-occurring diagnoses; (ii) ensures the child can assent, and the parents/guardians can consent to the relevant intervention after a thorough review of the risks, benefits, and alternatives of the intervention; and (iii) ensures that, if co-occurring mental health conditions are present, they do not interfere with the accuracy of the diagnosis of gender dysphoria or impair the ability of the adolescent to assent to care.

**B.      The Banned Treatment Is Permitted for Other Purposes.**

73.     The Health Care Ban prohibits the use of well-established treatments for gender dysphoria in transgender adolescents—including puberty-delaying treatment, hormone therapy, and chest surgery—but the Ban allows these same treatments for other purposes.

74.     For instance, puberty-delaying medication is commonly used to treat central precocious puberty.  Central precocious puberty is the premature initiation of puberty by the central nervous system—before 8 years of age in people designated female at birth and before 9 years of age in people designated male.  When untreated, central precocious puberty can lead to the impairment of final adult height, as well as antisocial behavior and lower academic achievement.  The Ban permits puberty-delaying treatment for central precocious puberty because it is not provided "for the purpose of effecting a gender transition."  N.C. Gen. Stat. § 90-21.150(11) (2023).

75.     Likewise, the Ban prohibits hormone therapy when the treatment is used to treat transgender adolescents with gender dysphoria but allows that same hormone therapy when prescribed to non-transgender patients. For example, non-transgender boys with delayed puberty may be prescribed testosterone if they have not begun puberty by 14 years of age. Without testosterone, for most of these patients, puberty would eventually initiate naturally. However, testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as their peers. Likewise, non-transgender girls with primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen. Moreover, non-transgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants.

76.     The side effects of the proscribed treatments are comparable when used to treat gender dysphoria and when used to treat other conditions. The use of these treatments for gender dysphoria is not any riskier than for other conditions and diagnoses for which the same treatments are regularly used. In each circumstance, doctors advise patients and their parents about the risks and benefits of treatment and tailor recommendations to the individual patient's needs. For adolescents, parents must consent to treatment, and the

patient must give their assent.  Treatment cannot be administered without agreement from doctors, parents, and the transgender adolescent.

### C. The General Assembly's Enactment of the Health Care Ban.

77. On June 28, 2023, the North Carolina General Assembly passed the Health Care Ban.  The bill, which was ratified the next day, was vetoed by the governor on July 5, 2023, and the General Assembly overrode the veto on August 16, 2023.

78. The Ban makes it unlawful for a medical professional to "prescribe, provide, or dispense puberty-blocking drugs or cross-sex hormones to a minor" for the purpose of "gender transition," or to "perform a surgical gender transition procedure on a minor." N.C. Gen. Stat. § 90-21.151 (2023).

79. The Ban defines "gender transition" as "[t]he process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex," which "may involve social, legal, or physical changes."  N.C. Gen. Stat. § 90-21.150(5) (2023). The Ban further defines "biological sex" as "[t]he biological indication of male and female in the context of reproductive potential or capacity, such as sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth, without regard to an individual's psychological, chosen, or subjective experience of gender."  *Id.* at (1).

80. The Ban exempts the same care above for purposes of "continuing or completing a course of treatment for a minor," so long as all three of the following

26

requirements are met: "(1) the course of treatment commenced prior to August 1, 2023, and was still active as of that date"; "(2) in the reasonable medical judgment of the medical professional, it is in the best interest of the minor for the course of treatment to be continued or completed"; and "(3) The minor's parents or guardians consent to the continuation or completion of treatment." N.C. Gen. Stat. § 90-21.152(b).

81. But apart from those circumstances, the Ban does not allow medical professionals to initiate a new course of treatment for a minor that includes the administration of puberty-blocking or cross-sex hormones for the purpose of gender transition or a surgical gender transition procedure. *See id.*

82. The Ban also imposes draconian penalties on medical professionals who provide these critically important healthcare services. First, the Ban would revoke the medical license of any professional who provides gender-affirming care by providing that "[a] violation of any of the provisions of this Article by a medical professional ***shall be*** considered unprofessional conduct and ***shall result*** in the revocation of the medical professional's license to practice." N.C. Gen. Stat. § 90-21.153 (2023) (emphases added).

83. Finally, the Ban also prohibits any state funds (including state Medicaid funding) from being used "directly or indirectly," to "provide puberty-blocking drugs or cross-sex hormones to a minor" for the purpose of "gender transition," "in furtherance of surgical gender transition procedures," "or to support the administration of any governmental health plan or government-offered insurance policy offering surgical gender

27

transition procedures, puberty-blocking drugs, or cross-sex hormones to a minor."  N.C. Gen. Stat. § 143C-6-5.6(b) (2023).[13]

84.     At various points, legislative committees either refused to hear the concerns of parents and adolescents opposing the bill or passed the bill despite receiving testimony and information about the bill's defiance of the medical consensus regarding treatment of gender dysphoria within the standards of care.

85.     For example, the House Health Committee passed the bill without questions or debate.   The House Health Committee held no public comment, to the extreme disappointment of many in attendance who drove to Raleigh from all corners of the state to speak in opposition to the bill.  Opponents showed up in such volume that there was not enough room in the committee room for all who tried to attend—although the Committee refused to hear from any of them.[14]

---

[13]  The Ban has a carve-out from subsection (b) for "the State Health Plan for Teachers and State Employees."  *Id.* at (c).  This carve-out is presumably due to the permanent injunction granted by Mem. Op. & Order, ECF No. 234, *Kadel v. Folwell*, No. 1:19-cv-272 (M.D.N.C. June 10, 2022), where the court enjoined the enforcement of an exclusion in the State Health Plan for Teachers and State Employees for treatments "leading to or in connection with sex changes or modifications," after finding that this exclusion discriminates based on sex and transgender status in violation of the Equal Protection Clause, and that it discriminates because of sex in violation of Title VII. That ruling is currently on appeal in the Fourth Circuit (Case No. 22-1721).

[14]  Rachel Crumpler, *House Health Committee, disallows public comment, passes restrictions on gender-affirming surgeries for youth without debate*, NC Health News (May 3, 2023), https://www.northcarolinahealthnews.org/2023/05/03/house-health-committee-disallows-public-comment-passes-restrictions-on-gender-affirming-surgeries-for-youth-without-debate/.

28

86.     The General Assembly passed the Ban despite an open letter from hundreds of health care professionals about the lifesaving benefits of the banned care for their patients and the grave harm to their patients' health and well-being if they are prohibited from receiving this care.[15]   The letter warned that not only would the legislation ban potentially life-saving care and represent an extreme intrusion into the patient-provider relationship, but it would also discourage talented providers from remaining in the state and providing all manner of healthcare within North Carolina.

87.     The General Assembly passed the Ban despite hearing testimony from transgender North Carolinians who shared their experiences of years of struggle, feelings of hopelessness, and desires to end their lives prior to receiving gender-affirming care, and the positive and transformational impact that gender-affirming medical treatment had on their health and overall well-being.

88.     The General Assembly also passed the Ban despite hearing testimony of parents of transgender children with gender dysphoria, who pleaded with lawmakers not to risk their children's health by stripping them of the medical care that enables them to thrive. Parents spoke about the torment of worrying that their child would be at risk for dying by suicide without access to gender-affirming treatment and about the relief that comes from watching their child's despair lessen with gender-affirming treatment.

---

[15]    *Id.* ("More than 660 health care professionals across the state have signed an open letter opposing North Carolina legislation aimed at restricting gender-affirming care."); Open Letter from North Carolina Health Care Professionals to the North Carolina General Assembly, *available at* https://docs.google.com/document/d/1bN8yqn7Ao5N-riZaD3xELuIQgkEqR4ZtWqIhBZ74y88/edit.

89.     Comments from the Ban's primary sponsors in discussing the Ban showed a marked anti-transgender animus, as well as disregard for the well-established, evidence-based protocols and practices for the treatment of gender dysphoria.

90.     For example, Representative Ken Fontenot (one of the Ban's primary sponsors), published an op-ed on June 14, 2023 in which he compared gender-affirming medical care to Tuskegee medical experiments done in the 1920s and the sterilization of poor Black women in North Carolina in the 1960s.[16]  He also compared gender-affirming medical care to discredited treatments like lobotomies and shock therapy.[17]

91.     During floor debates, Representative Fontenot also referred to gender-affirming care as "experimental"—a position with which professional medical associations uniformly disagree, as further detailed below—and described them as "atrocities."  He also said that he is "against children being preyed upon"—implying that medical professionals who provide this important healthcare treatment to minors are predators.

92.     Other legislators were highly dismissive of being transgender, with Senator Newton referring to it as a "fad" and Representative Fontenot touting a wholly debunked theory that being transgender is the product of "social contagion."

---

[16]  *See* Ken Fontenot, *We've been here before on 'compassionate' experimental medical treatments*, The Carolina Journal (June 14, 2023), https://www.carolinajournal.com/opinion/weve-been-here-before-on-compassionate-experimental-medical-treatments/.

[17]  *See* Laura Leslie, *Ban on gender-affirming care for transgender minors in NC heads to Gov. Cooper's desk*, WRAL (June 28, 2023), https://www.wral.com/story/ban-on-gender-affirming-care-for-transgender-minors-in-nc-heads-to-gov-cooper-s-desk/20932217/ ("'In the 50s and 60s, we also agreed with frontal lobotomies, and the atrocities that caused.  At the same time, we agreed with shock therapy and the atrocities that caused,' Fontenot said.").

30

93.     Representative Hugh Blackwell (another primary sponsor of the Ban) was equally dismissive of the extensive scientific support for gender dysphoria treatment by comparing gender dysphoria care to getting a "tattoo" or "body piercing."

94.     The Health Care Ban is just one piece of a discriminatory legislative agenda targeting transgender persons that the General Assembly passed in this session.  H.B. 574 (the so-called "Fairness in Women's Sports Act") prohibits transgender girls from playing on middle school, high school, and college sports teams designated for girls.  S.B. 49 (the so-called "Parents' Bill of Rights") requires public school teachers to alert parents before they call a student by a different name or pronoun and prohibits instruction about gender identity and sexuality in K-4 classrooms, with an exception for student-initiated questions. Although Governor Cooper vetoed each of these bills, the General Assembly overrode the vetoes on August 16, 2023—the same day it overrode the veto of the Health Care Ban. Indeed, the General Assembly moved these bills as a package and as part of a purposeful agenda to restrict the rights of transgender people in North Carolina.

95.     These legislative enactments are but mere exemplars of the long history of discrimination that transgender people have faced, and continue to face, in North Carolina and throughout the country.  Notwithstanding that a person's transgender status has no bearing on the person's ability to contribute to society, transgender people are often the target of discrimination and discriminatory laws.

31

**D.     There Are No Legitimate Justifications for the Health Care Ban.**

96.     During floor debates, the Ban's sponsors (Representatives Fontenot and Blackwell) claimed that the Ban was supposedly necessary to protect minors from being "preyed upon" and from "experimental" treatment akin to lobotomies or shock therapy.

97.     To start, these purported concerns do not justify prohibiting medical treatments (like prescribing puberty-delaying medications) only when they are used to provide gender-affirming care to treat transgender adolescents, when the Ban still permits those same treatments for purposes other than gender dysphoria treatment.

98.     Moreover, the treatment at issue is not "experimental"—rather, the safety and efficacy of this care is supported by decades of research and clinical evidence.  Indeed, the body of research that supports the safety and efficacy of the banned care is comparable to the research supporting many other treatments, but only gender-affirming medical care for adolescents is targeted by the Ban.

99.     Even if the banned treatments were "experimental in nature" (which they are not), experimental treatments are permitted in North Carolina and are not banned.  Wrongly labeling gender-affirming medical care as "experimental" cannot justify categorically banning only this one form of allegedly "experimental" treatment.

100.    Any purported interest in protecting minors from potential physical and emotional risks associated with the medical treatment at issue likewise cannot justify the Ban.  The majority of potential risks and side effects related to puberty-delaying treatment, hormone therapy, and chest surgeries for gender dysphoria are comparable to those risks

32

and side effects when such treatments are used for other indications. But the Ban does not target other forms of medical care that have similar risks (such as other treatments that carry fertility risks), further indicating that the point of the Ban is not to protect minors from these risks but to discriminate on the basis of sex and transgender status.

101. Indeed, every medical intervention carries potential risks and potential benefits. Weighing the potential benefits and risks of the treatment for gender dysphoria is a prudential judgment similar to other judgments made by healthcare providers, adolescent patients, and their parents. Adolescent patients and their parents often make decisions about treatments with less evidence and/or greater risks than the treatments prohibited by the Ban.

102. The current clinical practice guidelines for treating gender dysphoria in minors are consistent with general ethical principles of informed consent. Existing clinical practice guidelines for providers extensively discuss the potential benefits, risks, and alternatives to treatment, and providers' recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's decision-making capacity. In fact, in vetoing the Ban on July 5, Governor Cooper recognized that the treatments at issue are not experimental and that they instead reflect "approved medical protocols."[18]

---

[18] *See* Roy Cooper, *Governor Roy Cooper Objections and Veto Message* (July 5, 2023), https://webservices.ncleg.gov/ViewBillDocument/2023/6811/0/H808-BD-NBC-11125.

33

103.    In short, there is nothing unique about any of the medically accepted treatments for adolescents with gender dysphoria that justify singling out these treatments for prohibition based on a concern about adolescents' inability to assent or their parents' inability to consent to the care.

104.    The Health Care Ban subjects medical care for transgender adolescents with gender dysphoria to a double standard.  The law singles out such care for sweeping prohibitions while permitting the same medical treatments carrying the same potential risks when prescribed to treat non-transgender patients for any other purpose.

**E.    The Health Care Ban Will Cause Severe Harm to Transgender Youth.**

105.    Withholding gender-affirming medical treatment from adolescents with gender dysphoria when it is medically indicated puts them at risk of severe irreversible harm to their health and well-being.

106.    Adolescents with untreated gender dysphoria can suffer serious medical consequences, including possible self-harm and suicidal ideation.  In one survey, more than half of transgender youth who participated had seriously contemplated suicide.[19]  Studies have found that as many as 40% of transgender people have attempted suicide at some point in their lives.[20]

---

[19]    Trevor Project, *National Survey on LGBTQ Youth Mental Health 2022* at 6 (2022), *available at* https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022 survey_final.pdf (59 percent of transgender boys, 48 percent of transgender girls, and 53 percent of nonbinary youth considered suicide in the past year).

[20]    Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Report of the 2015 U.S. Transgender Survey* 5 (2016), *available at* https://transequality.org/sites/default/files/ docs/usts/USTS-Full-Report-Dec17.pdf.

34

107. When adolescents have access to puberty-delaying medication and hormone therapy, which prevents them from going through endogenous puberty and allows them to go through puberty consistent with their gender identity, their dysphoria decreases, and their mental health improves. Both clinical experience and multiple medical and scientific studies confirm that for many young people, this treatment is not only safe and effective, but it is positively transformative. Indeed, transgender adolescents able to access this medically necessary and evidence-based medical care often go from painful suffering to becoming thriving young persons.

108. If patients are not able to start puberty-delaying drugs or hormone therapy due to the Ban, patients will be forced to experience their endogenous puberty. This will result in extreme distress for patients who would rely on medical treatments to prevent the secondary sex characteristics that come with their endogenous puberty. These bodily changes are extremely distressing for transgender adolescents with gender dysphoria that otherwise would have been relieved by medical treatment.

109. The effects of undergoing one's endogenous puberty may not be reversible, even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in adolescent patients who are unable to access gender-affirming medical care. For instance, bodily changes from puberty as to stature, bone structure, genital growth, voice, and breast development can be impossible or more difficult to counteract.

110.     Laws like the Ban that prohibit access to medically necessary health care in and of themselves gravely and directly threaten the mental health and physical wellbeing of transgender adolescents in North Carolina.

111.     Medical treatment in adolescence can reduce life-long gender dysphoria, possibly eliminating the need for surgical intervention in adulthood, and can improve mental health outcomes significantly.

112.     Gender-affirming medical care can be a beneficial and lifesaving treatment for transgender minors experiencing gender dysphoria.  The major medical and mental health associations support the provision of such care and recognize that the mental and physical health benefits to receiving this care outweigh the risks.

113.     These associations include the American Academy of Pediatrics, the American Medical Association, the Endocrine Society, the Pediatric Endocrine Society, the American Psychological Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the National Association of Social Workers, and WPATH.

**F.     The Impact of the Health Care Ban on Plaintiffs.**

114.     *The Voe Family*: Vanessa Voe and Vance Voe are parents to Victor Voe, their nine-year-old son, and a five-year-old daughter.  Vanessa and Vance have called North Carolina home for over nine years.  Vance was born in North Carolina, and Vanessa attended graduate school and is licensed to practice health care in North Carolina.  Over

the past nine years, Vanessa and Vance have formed a community of family and friends who are close enough to claim as unofficial family members in the state they call home.

115. Victor is a smart, curious, and kind child. He loves video games, he is passionate about music, and he hopes to be a marine biologist when he grows up.

116. Victor is transgender. Although Victor was assigned female at birth, at a very young age, Victor expressed to Vanessa and Vance that his gender identity is not female. At three years old, Victor asked Vanessa and Vance if they could stop using "she" and "her" pronouns for him. In the winter of 2019, at five years old, Victor let Vanessa and Vance know that he is a boy and that he would like to go by "he" and "him" pronouns.

117. Vanessa and Vance were not surprised to learn that Victor is transgender. Victor would become visibly upset when people referred to him using "she" and "her," and would say that he did not feel seen.

118. When Vanessa and Vance began using "he" and "him" pronouns for Victor, he was visibly excited that they were doing so. Over the next few months, they kept checking in with him to see how those pronouns felt, and he kept affirming that they should continue using them.

119. Victor began wearing boy's clothes, got a short haircut, and made friends with mostly boys in his class. For months, he asked Vanessa and Vance to buy him boxer briefs, and when they finally bought them for him, he was overjoyed and beaming.

120.    Victor has been seeing a mental health provider since May of 2021, who evaluated him for and diagnosed him with gender dysphoria.  Victor continues to see that provider once a month.

121.    At the start of 2023, when Victor began approaching adolescence, Vanessa and Vance took him to see a doctor who specializes in working with transgender people, and they recommended that Victor visit the gender clinic at Duke University to discuss options for care, which was the same recommendation made by his therapist.

122.    In March of 2023, Vanessa, Vance, and Victor had an appointment with a team of providers at Duke Child and Adolescent Gender Care Clinic.  They conducted blood work to monitor Victor's hormone levels.  Vanessa and Vance had the opportunity to ask questions about puberty-delaying treatment, and to learn about how it would impact Victor's body and the various associated risks.  At that appointment, the doctor informed Vanessa and Vance that based on a physical exam, Victor was showing early signs of puberty.  Based on Victor's lab work, the doctor informed Vanessa and Vance that although Victor's puberty has not begun and he is not ready to start treatment, he needs to be monitored closely as it is possible that he will need to start treatment sooner than the lab work indicates.

123.    Although Victor has a follow-up appointment scheduled with Duke for October 2023, in August of 2023, the clinic let Vanessa know that they would not be able to prescribe puberty-delaying treatment to Victor once he is ready due to the Health Care Ban.

38

124.    Victor is terrified of going through a puberty that is completely foreign to him.  With his puberty quickly approaching, his anxiety is growing.  Vanessa and Vance are consumed by fear that the care that their child soon needs is no longer accessible in the state they call home.

125.    Since Victor has lived as the boy he is, Vanessa and Vance have noticed a change in Victor's demeanor.  Before transitioning, Victor did not talk much with others, and was easily upset, especially in group settings.  Now, Victor is a much more confident child, calmer and happier, and makes friends very easily.

126.    Vanessa and Vance cannot bear to witness their child go through physical changes that will profoundly harm him.  Without access to puberty-delaying medication, there will be devastating harm to Victor's mental health and irreversible physical harm associated with development that is inconsistent with his gender.  However, Vanessa and Vance have sown their roots in North Carolina and do not wish to uproot their lives, nor can they imagine bearing the long-term financial costs associated with leaving the state to get care for Victor, who is subject to the harms of the Ban for nine more years.

127.    Should the Health Care Ban continue to take effect, the Voe family will have their lives turned upside down.

128.    **_Dr. Riley Smith_**:  Dr. Smith is a physician licensed to practice medicine in North Carolina and board certified in family medicine.  He attended the Ohio State University College of Medicine, and graduated _magna cum laude_ in 2018 with a Medical Doctorate.  Dr. Smith completed his residency in family medicine at the University of

39

Colorado, Denver Health Track, Department of Family Medicine in 2021, and from 2020-2021, served as the Department's Chief Resident. Dr. Smith currently practices medicine at the University of North Carolina School of Medicine's Department of Family Medicine, which is located in Chapel Hill, North Carolina.

129. Dr. Smith brings his claims on behalf of his patients.

130. Dr. Smith began providing gender-affirming medical care during his first year of residency and is going into his sixth year of providing this care. As a healthcare provider at UNC, he is the primary care provider for approximately 500 patients, of whom approximately 65 are transgender. Of those 65 patients, approximately 31 are adolescents, and several of his patients depend on Medicaid to fund their healthcare.

131. Dr. Smith provides masculinizing or feminizing gender-affirming hormone therapy to his patients, and treats them in accordance with well-established standards of care. He follows a rigorous informed consent process and evaluates his patients independently to confirm the existence of any co-occurring diagnoses. After gender-affirming hormone therapy is initiated, Dr. Smith carefully monitors his patients over a period of several years to confirm that the dosing is within the physiologic (normal) range for their gender and to minimize side effects.

132. The hormone treatment medications that Dr. Smith prescribes his transgender patients are also commonly used by cisgender patients for a variety of reasons. Because this care is administered to both cisgender and transgender patients, the risks and

benefits of the medications are well-understood, as are the processes for appropriate monitoring to ensure the continuing safety of each prescription.

133. If the Health Care Ban takes effect, Dr. Smith will be prohibited from providing these treatments to his transgender adolescent patients because they relate "to identifying with and living as a gender different from [one's] biological sex," as defined by the Ban, but he will be able to continue providing the same treatments to his non-transgender patients. N.C. Gen. Stat. § 90-21.150(5).

134. The Health Care Ban places Dr. Smith in the painful conundrum of either fully complying with the law and therefore abandoning his transgender patients, or risking the loss of his medical license, which will deprive him of the ability to care for all of his patients and negatively impact his livelihood. Moreover, the Ban places Dr. Smith in direct conflict with the accepted, evidence-based guidelines for treating his transgender patients with gender dysphoria.

135. As a medical provider for patients who experience gender dysphoria, Dr. Smith has developed a close relationship with both his patients and their families. Seeking and receiving treatment for gender dysphoria is a profoundly personal and informed decision based on a person's innermost sense of self and individual needs. It is also a subject that remains very misunderstood by the public at large. Many of his patients therefore require complete privacy, and Dr. Smith believes that, as a medical provider, it is his duty and obligation to advocate on behalf of his patients who are unable to publicly advocate for themselves.

136. Dr. Smith knows from his personal experience of treating adolescents with gender dysphoria that the Health Care Ban has and will continue to significantly compromise the health and well-being of his patients.

137. The Health Care Ban bars Dr. Smith from providing hormone therapy to treat gender dysphoria in his adolescent patients. Dr. Smith is deeply concerned for his current and future transgender adolescent patients because his experience leads him to believe that denying his patients access to gender-affirming hormone therapy will likely lead to depression, increased anxiety, and suicidal ideation.

138. In addition, Dr. Smith provides care to minor patients who receive their health coverage through Medicaid. As such, Dr. Smith is concerned about the health and wellbeing of his transgender adolescent patients on Medicaid who will be unable to access the medical care they need without such coverage.

139. Dr. Smith fears that by prohibiting the provision of medical treatment for gender dysphoria for his transgender adolescent patients, and coverage thereof for his patients on Medicaid, the Ban will negatively impact the mental health and wellbeing of his patients by, for example, leading to worsening depression, increased anxiety, and possibly suicidal ideation.

140. *PFLAG*: Founded in 1973, Plaintiff PFLAG is the first and largest organization for LGBTQ+ people, their parents and families, and allies. A Section 501(c)(3) nonprofit membership organization, PFLAG's mission is to create a caring, just, and affirming world for LGBTQ+ people and those who love them.

141.    PFLAG has chapters in 47 states and the District of Columbia.

142.    Supporting LGBTQ+ young people and strengthening their families has been central to PFLAG's work since its founding, and that objective includes encouraging and supporting parents and families of transgender and gender expansive people in affirming their children and helping them access the social, psychological, and medical supports they need.

143.    PFLAG carries out that commitment through supporting the development and work of the PFLAG Chapter Network, engaging in policy advocacy for equitable and protective laws and policies, forming coalitions with organizations who share PFLAG's goals, developing trainings and educational materials, and engaging with the media.  More specifically, it includes working with PFLAG families to encourage love for and support of their transgender and gender expansive children and to help them ensure that their children's needs are met.

144.    PFLAG has 17 chapters across the State of North Carolina with nearly 400 members.

145.    Those members include families with transgender youth who would otherwise be receiving, or would in the future receive, the medical care H.B. 808 prohibits as treatment under the standards of care for gender dysphoria, including Plaintiff Victor Voe and his family.

146.    The Ban's passage has had a dramatic impact on PFLAG families.  These families have already begun seeking support and resources from their PFLAG chapters,

43

making contingency plans for how to access medical care outside North Carolina, and pursuing mental health support for the fear, distress, and anxiety they and their children are experiencing at the prospect of being denied this medically necessary care, as well as coverage for the care. The harms inflicted by H.B. 808 are widespread for PFLAG families. Some have had appointments for scheduled care cancelled and/or are losing access to medical providers who are leaving North Carolina. PFLAG families have also lost the ability to make medical decisions for their children, and lost access to medical treatments their children need solely because they are treatments for gender dysphoria.

147. The Ban puts those PFLAG families who have the resources to do so in the terrible position of having to flee North Carolina, split up their family, or travel regularly out of state to obtain medical care. Families without such resources, including many families enrolled in Medicaid, will have even fewer options.

148. Being unable, due to the Ban's strictures, to obtain the medical care that has helped them thrive, the children of PFLAG families will be put at risk of the serious mental and physical harm for which those families sought medical care in the first place.

149. **GLMA:** Founded in 1981, GLMA is the world's largest and oldest association of LGBTQ+ and allied healthcare professionals.

150. GLMA is a § 501(c)(3) nonprofit membership organization whose mission is to ensure health equity for LGBTQ+ individuals and equality for LGBTQ+ medical providers in their working and learning environments. GLMA seeks to achieve this

44

mission by utilizing the scientific expertise of its diverse, multidisciplinary membership to inform and drive advocacy, education, and research.

151.    GLMA's membership includes approximately 1,000 member physicians, nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral health specialists, health profession students, and other health professionals. GLMA's members reside and work across the United States, including North Carolina, and in several other countries.  Their practices represent the major health care disciplines and a wide range of health specialties, including endocrinology, internal medicine, family practice, psychiatry, obstetrics/gynecology, emergency medicine, neurology, and infectious diseases.

152.    As part of its mission to ensure health equity for the LGBTQ+ community as well as equality for LGBTQ+ medical providers, GLMA is committed to breaking down barriers to comprehensive medical care for the LGBTQ+ community.  This includes GLMA's steadfast commitment to ensure that transgender individuals receive the medical treatment for gender dysphoria they want, need, and deserve.

153.    As such, GLMA adopted in 2018, and later affirmed in 2021, a formal policy statement on "Transgender Healthcare," which states that therapeutic treatments, such as hormone therapy and gender-affirming surgeries, are medically necessary for the purpose of treatment of gender dysphoria, and that they should be covered by all public and private insurance plans.

154.    In addition, in 2019, GLMA, in conjunction with the American Medical Association, published an issue brief titled "Health insurance coverage for gender-affirming medical care of transgender patients," which discusses both the positive effects and outcomes of gender-affirming medical care for transgender patients, as well as the negative effects and serious health consequences that transgender patients face when they are denied access to medically indicated treatment for gender dysphoria.

155.    GLMA considers laws such as H.B. 808 to be an affront to healthcare ethics and the principles of equality and inclusivity that should govern healthcare practices.

156.    GLMA's members and their patients are and will continue to be negatively affected by H.B. 808.

157.    The Ban places GLMA's medical provider members in the untenable position of choosing to comply with H.B. 808 and endanger the health and wellbeing of their transgender adolescent patients or to follow their medical or professional best judgment and duty to their patients and violate H.B. 808 by providing their adolescent patients with the care they need.

158.    This directly harms GLMA's medical provider members, including Plaintiff Dr. Smith, who is a GLMA member living and practicing medicine in North Carolina. H.B. 808's harms include, but are not limited to, mandatory revocation of licensure for any health care provider who provides medical treatment for gender dysphoria to adolescents, in addition to other penalties.

## CAUSES OF ACTION

### COUNT ONE
**THE HEALTH CARE BAN VIOLATES THE FOURTEENTH AMENDMENT'S
GUARANTEE OF EQUAL PROTECTION UNDER THE LAW
(ALL PLAINTIFFS AGAINST MEDICAL BOARD DEFENDANTS,
AND PROVIDER PLAINTIFF AND PLAINTIFF GLMA
AGAINST DEFENDANT KINSLEY)**

159.	Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 158 as if fully set forth herein.

160.	Medical Board Defendants and Defendant Kinsley are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

161.	The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

162.	The Ban makes it unlawful for a medical professional to "prescribe, provide, or dispense puberty-blocking drugs or cross-sex hormones to a minor" for the purpose of "gender transition," or to "perform a surgical gender transition procedure on a minor...." N.C. Gen. Stat. § 90-21.151.  It permits the use of these same treatments for other purposes because it only prohibits use of puberty-blocking drugs and surgical.

163.	In addition, the Ban prohibits the use of state funds, "directly or indirectly, for the performance of or in furtherance of surgical gender transition procedures, or to provide puberty-blocking drugs or cross-sex hormones to a minor, or to support the

47

administration of any governmental health plan or government-offered insurance policy offering surgical gender transition procedures, puberty-blocking drugs, or cross-sex hormones to a minor." N.C. Gen. Stat. § 143C-6-5.6(b). The Ban thus prohibits Medicaid coverage for transgender adolescents with gender dysphoria, such as the patients cared for by the Provider Plaintiff and Plaintiff GLMA's members.

164. In doing so, the Ban explicitly discriminates against transgender adolescents, including Minor Plaintiff Victor Voe, Plaintiff PFLAG's minor members, the patients cared for by the Provider Plaintiff, and Plaintiff GLMA's members, based on their transgender status and sex, including their failure to conform to stereotypes and expected behavior associated with their sex designated at birth. The Ban also discriminates against the parents of transgender youth, such as Parent Plaintiffs and Plaintiff PFLAG's parent members, denying them the same ability to secure urgently needed medical care for their child that other parents can obtain, and does so on the basis of transgender status- and sex-based grounds.

165. In addition to facially discriminating based on sex and transgender status, the Ban was also passed because of its effects on transgender people, not in spite of them.

166. The Ban was enacted with the specific intent to discriminate against transgender people.

167. Discrimination based on transgender status and sex is subject to heightened scrutiny under the Equal Protection Clause and is therefore presumptively unconstitutional,

48

placing a demanding burden of justification upon the State to provide at least an exceedingly persuasive justification for the differential treatment.

168. Transgender people have obvious, immutable, and distinguishing characteristics that define that class as a discrete group. These characteristics bear no relation to transgender people's abilities to perform in or contribute to society.

169. Transgender people have historically been subject to discrimination in North Carolina and across the country and remain a very small minority of the American population that lacks political power.

170. Gender identity is a core, defining trait that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

171. The Ban does nothing to protect the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying them access to necessary care.

172. The Ban's discriminatory treatment of healthcare for transgender adolescents is not adequately tailored to any sufficiently important government interest, nor is it even rationally related to any legitimate government interest.

173. The asserted justifications for the Ban make no sense in light of how other medical treatments are regulated by the State.

174. The Ban's targeted prohibition on medically necessary care for transgender adolescents is based on generalized fears, negative attitudes, stereotypes, and moral

49

disapproval of transgender people, which are not legitimate bases for unequal treatment under any level of scrutiny.

175.    The Ban violates the equal protection rights of the Minor Plaintiff and his parents, the equal protection rights of the Provider Plaintiff's current and future adolescent patients, and the equal protection rights of members of Plaintiffs PFLAG and GLMA.

**COUNT TWO**
**THE HEALTH CARE BAN VIOLATES THE RIGHT TO**
**PARENTAL AUTONOMY GUARANTEED BY THE**
**FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE**
**(PARENT PLAINTIFFS AGAINST MEDICAL BOARD DEFENDANTS)**

176.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 158 as if fully set forth herein.

177.    Medical Board Defendants are all governmental actors and/or employees acting under color of State law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

178.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

179.    That fundamental right of parents includes the right to seek and to follow medical advice to protect the health and well-being of their minor children.

180.    Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

181.    The Health Care Ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria deprives North Carolina parents of their fundamental right to make decisions concerning the care of their children.  The Ban also discriminates against the Parent Plaintiffs and Plaintiff PFLAG's parent members with respect to the exercise of this fundamental right.

182.    The Ban does nothing to protect the health or well-being of minors.  To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying their parents the ability to obtain necessary medical care for them.

183.    The Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest, nor is it rationally related to any legitimate government interest.

184.    The Health Care Ban violates the fundamental rights of the Parent Plaintiffs and Plaintiff PFLAG's parent members.

**COUNT THREE**
**THE HEALTH CARE BAN VIOLATES SECTION 1557**
**OF THE AFFORDABLE CARE ACT**
**(PROVIDER PLAINTIFF AND PLAINTIFF GLMA**
**AGAINST DEFENDANT DHHS)**

185.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 158 as if fully set forth herein.

186.    Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, provides, in relevant part that, "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 et seq.)"—which prohibits

51

discrimination "on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance. . . ." 42 U.S.C. § 18116(a); *see* 45 C.F.R. § 92.3.

187.    Discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics are all forms of discrimination encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

188.    NC Medicaid is a government program administered by Defendant DHHS that receives federal financial assistance such that it is a "covered entity" for purposes of Section 1557 of the ACA.   The Centers for Medicare & Medicaid Services ("CMS"), operating within the U.S. Department of Health and Human Services ("HHS"), provides federal financial assistance to NC Medicaid, which is a health program that is responsible for many aspects of public health in North Carolina and provides health services to North Carolinians across the state.

189.    A covered entity, such as Defendant DHHS, cannot provide or administer health coverage that categorically prohibits coverage for gender-affirming medical care or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination on the basis of sex.

52

190.    Minor transgender Medicaid beneficiaries, including the patients cared for by the Provider Plaintiff and Plaintiff GLMA's members, have a right under Section 1557 to receive Medicaid coverage through DHHS free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

191.    Minor transgender Medicaid beneficiaries in North Carolina, including the patients cared for by the Provider Plaintiff and Plaintiff GLMA's members, will be denied access to NC Medicaid benefits and subjected to facial and as-applied discrimination on account of their sex because the Health Care Ban prohibits any state funds, including Medicaid funding, from being used "for the performance of or in furtherance of surgical gender transition procedures, or to provide puberty-blocking drugs or cross-sex hormones to a minor, or to support the administration of any governmental health plan or government-offered insurance policy offering surgical gender transition procedures, puberty-blocking drugs, or cross-sex hormones to a minor." N.C. Gen Stat. § 143C-6-5.6(b).

192.    The Ban necessarily requires NC Medicaid to violate Section 1557 by requiring that it discriminate on the basis of sex and transgender status to the substantial injury of minor transgender Medicaid beneficiaries who will be deprived of coverage for necessary medical care.

193.    As a result of the Ban, minor transgender Medicaid beneficiaries in North Carolina, including the patients cared for by the Provider Plaintiff and Plaintiff GLMA's members, have and will continue to suffer harm, such as distress, humiliation,

53

embarrassment, emotional pain and anguish, violation of their dignity, and harms to their short- and long-term health and wellbeing from being denied access to medical necessary healthcare.

194.   As a result of the Ban, minor transgender Medicaid beneficiaries in North Carolina, including the patients cared for by the Provider Plaintiff and Plaintiff GLMA's members, have incurred or will incur costs to change providers or costs for travel out of state for access to treatments.

195.   Accordingly, the Provider Plaintiff and Plaintiff GLMA are entitled to declaratory and injunctive relief.

196.   Without injunctive relief from the discriminatory Ban, Plaintiffs will continue to suffer irreparable harm in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.   Enter a judgment declaring that House Bill 808, which categorically prohibits the provision and state-funded coverage of medically necessary gender-affirming medical care for the treatment of gender dysphoria, both on its face and as applied to Plaintiffs:

> i.   violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against (1) transgender adolescents and their parents, and all those similarly situated individuals on the basis of sex and transgender status, and (2) the parents of transgender children with regards to (a) their exercise of the right to parental autonomy and (b)

their ability to secure necessary medical care for their children that other parents can obtain based on sex and transgender status, and is therefore unenforceable;

    ii.    violates the Due Process Clause of the Fourteenth Amendment by infringing upon parents' fundamental right to make decisions concerning the care of their children, and is therefore unenforceable; and

    iii.    violates Section 1557 of the Affordable Care Act by discriminating against transgender adolescents on the basis of sex, and is therefore unenforceable;

B.    Issue preliminary and permanent injunctions enjoining Defendants, their employees, agents, and successors in office and those in active concert or participation with them from implementing or enforcing the Health Care Ban;

C.    Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

D.    Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and all other applicable statutes and sources of law; and

E.    Grant such other relief as the Court deems just and proper.

* * *

Dated: October 11, 2023

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson (N.C. Bar 28768)
Lauren E. Snyder (N.C. Bar 54150)
HWG LLP
333 Fayetteville Street, Suite 1500
Raleigh, NC 27601
Telephone: (919) 429-7386
Facsimile: (202) 730-1301
arichardson@hwglaw.com
lsnyder@hwglaw.com

Deepika H. Ravi*
HWG LLP
919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Telephone: (202) 730-1300
Facsimile: (202) 730-1301
dravi@hwglaw.com

Dmitriy Tishyevich*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: (212) 547-5534
Facsimile: (646) 417-7668
dtishyevich@mwe.com

Anna Fosberg*
MCDERMOTT WILL & EMERY
The Brandywine Bldg.
1000 N West Street, Suite 1400
Wilmington, DE 19801
Phone: (302) 485-3936
Facsimile: (302) 351-8711
afosberg@mwe.com

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
Sruti J. Swaminathan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (212) 658-9721
ogonzalez-pagan@lambdalegal.org
sswaminathan@lambdalegal.org

Abigail Coursolle*
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
Telephone: (310) 736-1652
coursolle@healthlaw.org

Catherine McKee*
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
Telephone: (984) 278-7666
mckee@healthlaw.org

* Notice of special appearance pursuant to
L.R. 83.1(d) forthcoming.

*Counsel for Plaintiffs*

56