IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Durham Division

| | |
|---|---|
| VICTOR VOE, *et al.*, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> THOMAS MANSFIELD, *et al.*, <br><br> *Defendants*. | Civil No. 1:23-cv-864 |

# DECLARATION OF DR. RILEY SMITH, M.D.

I, Riley Smith, M.D., pursuant to 28 U.S.C. §1746, declare as follows:

1. I make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the matters stated herein.

2. I am a Plaintiff in this action. I am asserting claims on behalf of my patients.

3. I am licensed to practice medicine in North Carolina and am board certified in family medicine. I currently practice medicine at the University of North Carolina School of Medicine's Department of Family Medicine, which is located in Chapel Hill, North Carolina.

4. I am a member of GLMA: Health Professionals Advancing LGBTQ+ Equality, as well as the World Professional Association for Transgender Health ("WPATH").

1

5. As a family medicine doctor, I provide outpatient primary care to patients of all ages, from prenatal and infant care to geriatric care. I also provide inpatient care, such as delivering babies and caring for hospitalized adults. Part of my family medicine practice involves providing gender-affirming medical care, including gender-affirming hormone therapy for gender dysphoria in adolescent and adult patients.

6. I grew up in Raleigh, North Carolina. In 2014, I graduated *cum laude* from Northwestern University with a Bachelor of Arts in Gender and Sexuality Studies. I then attended the Ohio State University College of Medicine, and graduated *magna cum laude* in 2018 with a Medical Doctorate. I completed my residency in family medicine at the University of Colorado, Denver Health Track, Department of Family Medicine in 2021, and from 2020-2021, I served as the Department's Chief Resident. In 2021, I received the University of Colorado Family Medicine Residency Advocacy Award.

7. From 2020-2021, I served as a part-time medical care provider at CareNow Urgent Care in Denver, Colorado. I also served as a Clinical Instructor at the Denver Health and Hospital Authority's Department of Family Medicine from 2021-2022. In 2022, I moved back to North Carolina and began working as an Assistant Professor at the University of North Carolina, Chapel Hill ("UNC") Department of Family Medicine, where I continue to work today. This declaration reflects my personal opinions and beliefs and is not made as a representative of UNC or its Department of Family Medicine.

8. I became a family physician because I was drawn to the idea of building relationships to improve the health of individuals and communities. In college, I

researched and learned about health disparities impacting the LGBT community, and I gained additional exposure to this issue in medical school. As a transgender man, I have also experienced firsthand the stark disparities that transgender people face as a direct result of discrimination and bias in society and the healthcare system, and I knew that caring for my community would be an integral part of my career. I view gender-affirming medical care as a routine part of the health care I provide as a family medicine doctor, just like the prenatal care, monitoring for patients with diabetes, and other care I offer to my patients.

9. I began providing gender-affirming medical care during my first year of residency and am going into my sixth year of providing this care. Currently, as a healthcare provider at UNC, I am the primary care provider for approximately 500 patients, of whom approximately 65 are transgender. Currently, approximately 31 of my transgender patients are adolescents. Several of my transgender patients rely on Medicaid to fund their health care. Overall, in the last five years I have been the primary care provider for over 100 transgender patients, of whom over 50 were adolescents.

10. Providing gender-affirming medical care has provided me with meaningful interactions with my patients. Through years of providing gender-affirming medical care, I have experienced the privilege of bearing witness to one of the most profound, life changing processes that a person can go through. My adolescent transgender patients are creative, thoughtful, resilient, and remarkable in every way. I have cared for some of them for years and have seen the immense positive changes that gender-affirming hormones bring to their wellbeing.

11. When I treat my transgender patients, I rely on my training and clinical experience, as well as evidence-based, widely accepted clinical practice guidelines such as the *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, which is peer-reviewed and was published by WPATH in 2022, *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, which is peer-reviewed and was published by Endocrine Society in 2017, and the *Guidelines for the Primary Care of Transgender and Gender Nonbinary People*, published by the University of California, San Francisco (UCSF) Center of Excellence for Transgender Care in 2016 and which are also evidence-based and widely recognized in the medical field. I also refer to the diagnostic criteria for the diagnosis of "Gender Dysphoria in Adolescents and Adults" set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR), published by the American Psychiatric Association in 2013 and revised in 2022.

12. When treating transgender patients under 18, consistent with clinical practice guidelines, I require that the patient be diagnosed with Gender Dysphoria under criteria set forth in the DSM-5-TR and that they are assessed as clinically appropriate prior to initiating medical treatment. For patients under the age of 18, I also require verbal consent to treatment from all parents or guardians, and written consent to treatment from at least one parent or guardian. Typically, patients who come to me seeking gender-affirming medical care are already receiving care from a mental health provider. If their therapist is, like me, within the UNC health system I will review the therapist's notes, and if the therapist is

outside of the UNC health system I will communicate with their therapist by phone or email. I also independently evaluate my patients for other co-occurring diagnoses, such as depression and anxiety.

13. I provide gender-affirming hormone therapy to my adolescent transgender patients when clinically appropriate and consistent with the patient's and family's goals of care. After hormone therapy is initiated, I typically will see the patient again in about a month. At minimum, I will see the patient again two months after that, and then again every three months. These appointments continue for several years. At these appointments, I ask the patient to describe, among other things, what changes they've experienced; how they are feeling about those changes, including whether they are experiencing any discomfort with the changes; whether they have experienced any side effects; and whether they have experienced any discomfort with the mode of delivering the hormones. I also monitor the patient's laboratory tests every three months. If the hormone therapy involves a change in dosage, I also check the patient's laboratory tests three months after the dose change.

14. To date, none of my transgender patients have expressed to me that they regret seeking gender-affirming medical care or receiving gender-affirming medical treatment for their gender dysphoria.

15. The hormone treatment medications that I prescribe my transgender patients are also commonly used among cisgender patients for a variety of reasons and are within my scope to prescribe as a family physician. For example, estrogen and progesterone are

5

used for contraceptive purposes and to treat dysmenorrhea, menorrhagia, and polycystic ovary syndrome (PCOS). Spironolactone is used to treat acne, heart failure, and hypertension, and testosterone to treat hypogonadism. The risks and benefits of these medications are well-understood, as are the processes for appropriate monitoring to ensure the continuing safety of each prescription, and they are no different whether the medications are prescribed to cisgender or transgender patients.

16. I understand North Carolina House Bill 808 (the "Health Care Ban") to mean that unless enforcement of the law is enjoined, I am barred from providing gender-affirming medical care to treat gender dysphoria to any new patients who are under the age of 18 and who have not previously initiated a course of care for gender dysphoria.

17. I also understand the Health Care Ban to mean that unless enforcement of the law is enjoined, adolescent patients enrolled in Medicaid no longer have coverage for gender-affirming medical care, meaning many if not all of them are losing the ability to access this care altogether as a result.

18. I also understand that if the Health Care Ban is not blocked from being enforced, providing gender-affirming medical care to my patients that is barred by the law will result in revocation of my license to practice medicine, and could result in other disciplinary actions against me, as well.

19. If the Health Care Ban is not enjoined, I will be forced to choose between complying with the law and abandoning the patients who come to me seeking gender-

6

affirming care, or continuing to provide this medically necessary care and risk losing my medical license and facing disciplinary action as a result.

20. The Health Care Ban is in direct conflict with the oath I swore as a doctor. This has personally caused my colleagues and me a great deal of distress and confusion, as it is unclear how we can comply with the Ban without violating either current medical, ethical, or legal standards of care. The Health Care Ban forces me to practice substandard care that ignores nationally and internationally recommended standards of care.

21. The Health Care Ban seeks to prohibit evidence-based, safe, and effective medical care for transgender adolescents in a discriminatory manner that is arbitrary and completely at odds with clinical practice guidelines and the practice of medicine more generally. The Health Care Ban is in direct contradiction with our obligations as physicians and health care providers, including our obligation to treat all patients in a manner consistent with their best interests to achieve the best possible health results for them.

22. I am alarmed and deeply distressed that the Health Care Ban bars me from providing my patients with medically necessary gender-affirming medical care. Supporting young people through this journey is the greatest part of my job, and I cannot begin to describe the fear I have for the well-being of my patients without the ability to access this care.

23. Access to gender-affirming medical care can be lifesaving. It is difficult to overemphasize the mental and physical health benefits of gender-affirming medical care. Access to gender-affirming medical care leads to decreases in self-harm and suicidal

ideation. Adolescent patients become happier and more confident, and are more likely to participate in school. Parents of transgender children who have accessed gender-affirming medical care feel like their children become more true and authentic versions of themselves. In short, transgender adolescents thrive when they receive this care. I have observed these benefits of gender-affirming care in my own patients, as well as in medical data on larger patient populations.

24. Based on my personal experience in treating adolescents with gender dysphoria, I believe that the Health Care Ban, if permitted to remain in effect, will significantly and severely compromise the health of my patients.

25. When access to gender-affirming medical care is restricted, patients experience profound rates of depression, self-harm, suicidal ideation and suicide attempts. Some adolescent patients refuse to attend school because they cannot exist as their authentic selves there. Others experience a profound and consistent discomfort with their secondary sex characteristics that can impair basic functioning, making it difficult, for example, even to shower because of dysphoria with their body's appearance and development.

26. The Health Care Ban will lead to, at a minimum, delays in transgender adolescents from being able to access this potentially life-saving healthcare, and may result in many going without care for years. Moreover, it blocks access to this care altogether for adolescent patients enrolled in Medicaid, who are some of my patients most vulnerable to health disparities and who for the most part lack the resources to otherwise access this care.

27. I have already seen the impact of the Health Care Ban on patients' wellbeing. Adolescent patients have been in tears about the Health Care Ban. Parents are worried for their child's well-being, and even for their lives, with access to gender-affirming medical care blocked. I have patients who have not yet started hormone therapy, but who are ready to do so from my medical perspective. If the patient, their parents, their mental health provider(s), and I collectively feel they would benefit from initiating gender-affirming hormones, initiating treatment is time sensitive given the evidence on gender-affirming medical care and its significant, life-saving benefits. But the Health Care Ban blocks me from being able to do so.

28. In working with adolescents and their parents as a family physician, I have developed a close relationship with both my adolescent patients and their parents. Based on these relationships, I am aware that many of my patients would be unable to vindicate their own legal rights through litigation for a variety of reasons. Many of my patients are not widely known as transgender in their daily lives, including because of entrenched societal stigma and hostility towards transgender people. As a result, many families keep this information completely private to protect the safety of their child. I feel a strong sense of duty to advocate on behalf of my patients who are unable to raise their own voice and advocate for themselves.

29. Being able to provide gender-affirming medical care is critically important to my work as a clinician. Gender-affirming medical care provides life-saving

9

Case 1:23-cv-00864-LCB-LPA   Document 14-8   Filed 10/11/23   Page 9 of 11

intervention. I have seen a profound difference in adolescents who can access gender-affirming medical care—in my experience, when patients receive this care, they thrive.

30. I view providing this care as a core part of the oath I took to care for my patients. If the Court were to enjoin H.B. 808 from being enforced, I would continue to provide the gender-affirming medical treatment that H.B. 808 seeks to ban.

\* \* \*

I declare under penalty of perjury the foregoing is true and correct.

Executed this 7 day of October 2023 in Chapel Hill, North Carolina.

_____
Dr. Riley Smith, MD

11