**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Durham Division**

VICTOR VOE, *et al.*,

    *Plaintiffs*,

    *v.*

THOMAS MANSFIELD, *et al.*,

    *Defendants.*

Civil No. 1:23-cv-864

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................1

STATEMENT OF FACTS ...........................................................................................3

I.   Protocols for the Treatment of Adolescents with Gender Dysphoria. ..........3

II.  The Ban. ......................................................................................................5

ARGUMENT ..............................................................................................................8

I.   Preliminary Injunction Standard. ................................................................8

II.  Plaintiffs are Likely to Succeed on Their Equal Protection Claim. ............8

     A.   Heightened Scrutiny Applies Because the Ban Discriminates
         Based on Transgender Status and Sex. ...........................................9

          1.   HB808 Facially Discriminates Based on Transgender Status....9

          2.   HB808 Facially Discriminates Based on Sex. .........................10

          3.   The Ban Was Passed for the Purpose of Discriminating Based on Sex
              and Transgender Status...........................................................11

     B.   The Ban Fails Any Level of Review. .............................................12

III.  Plaintiffs are Likely to Succeed on Their ACA Claim. ..............................17

IV.  Plaintiffs Are Likely to Succeed on Their Claim That HB808 Violates Parents'
    Right to Parental Autonomy. .....................................................................18

     A.   Strict Scrutiny Applies to Plaintiffs' Due Process Claim. ...............19

     B.   The Ban Cannot Survive Strict Scrutiny. .......................................20

V.   A Preliminary Injunction is Necessary. .....................................................21

     A.   Plaintiffs Will Suffer Immediate and Irreparable Harm While HB808
         is in Effect. ....................................................................................21

     B.   The Balance of Equities Favors Plaintiffs and a Preliminary Injunction
         is in the Public Interest. ..................................................................24

VI.  A Facial Statewide Injunction is Necessary. .............................................24

CONCLUSION.........................................................................................................25

Plaintiffs respectfully submit this memorandum of law in support of their motion for preliminary injunction.

## NATURE OF THE CASE

House Bill 808, codified in North Carolina Code Annotated § 90-21.150 *et seq.*, (hereinafter "HB808" or the "Ban") contains a sweeping prohibition on the provision of medically necessary and potentially lifesaving healthcare to transgender adolescents, even though the same treatments remain available to cisgender adolescents. The law was passed despite pleas of families not to interfere in the medical decision-making of parents, adolescents, and expert doctors; and not to subject these families to the torment of watching their adolescent suffer without essential healthcare. The law ignores the medical consensus about the standard of care for treatment of transgender adolescents, and places medical providers in the impossible position of abandoning their patients or losing their medical license. The legislature accelerated the law's effective date as the law got closer to passage, and the provisions of the law challenged here took effect immediately upon the legislature's August 16, 2023 vote to override the Governor's veto.

Plaintiffs are a transgender minor and his parents, a family physician who provides gender-affirming medical care to transgender adolescents, and nonprofit associations whose members stand to be negatively impacted by HB808 just like Minor Plaintiff and his parents and Provider Plaintiff's patients. Absent intervention by this Court, HB808 will inflict irreparable harm and misery on transgender adolescents and their families, who

1

now must suffer without this essential healthcare or go to extreme lengths to secure it elsewhere.

All relevant considerations strongly weigh in favor of preliminary injunctive relief. *First*, Plaintiffs are likely to succeed on the merits of their claims. The Ban discriminates against transgender adolescents based on their transgender status and sex in violation of the Equal Protection Clause and deprives parents of their fundamental right to seek appropriate medical care for their children in violation of the Due Process Clause. It also discriminates based on sex in violation of Section 1557 of the Affordable Care Act.

*Second*, the Ban will cause immediate and irreparable harm to all the Plaintiffs. The Minor Plaintiff,[1] PFLAG's minor members, and the patients of GLMA's health professional members, including Provider Plaintiff, will experience anxiety, distress, and potentially permanent physiological changes if they are denied the critical gender-affirming medical care they need for gender dysphoria. The Parent Plaintiffs and PFLAG's parent members will have their parental judgment and decision-making authority usurped by the government and will either have to disrupt their lives at great cost to seek care out of state, or endure watching their child suffer without the medical treatment they need.

*Third*, the balance of the equities and the public interest both heavily favor a preliminary injunction. The Ban will cause immediate and irreparable harm if allowed to

---

[1] Unless otherwise defined, capitalized terms shall have the meanings ascribed in the Complaint.

Case 1:23-cv-00864-LCB-LPA   Document 16   Filed 10/12/23   Page 4 of 30

take effect, but the State will not incur any harm if the *status quo* is maintained while this case proceeds.

## STATEMENT OF FACTS

### I. Protocols for the Treatment of Adolescents with Gender Dysphoria.

"Gender identity" refers to a person's core sense of belonging to a particular gender. Adkins Decl. ¶15; Karasic Decl. ¶31. A person's gender identity, which has biological roots, cannot be changed voluntarily. Karasic Decl. ¶32; Adkins Decl. ¶20. Everyone has a gender identity. Karasic Decl. ¶31. People whose gender identity matches their sex designated at birth are cisgender. Adkins Decl. ¶18; Olson-Kennedy Decl. ¶26. People whose gender identity differs from their sex designated at birth are transgender. Adkins Decl. ¶19; Olson-Kennedy Decl. ¶26. Being transgender is not itself a condition to be cured. Karasic Decl. ¶35; Adkins Decl. ¶22. But the clinically significant distress that arises from the incongruence transgender people experience between their gender identity and their sex designated at birth—called "gender dysphoria"—often requires medical treatment. Adkins Decl. ¶21; Karasic Decl. ¶40; Olson-Kennedy Decl. ¶30.

Gender dysphoria is a serious medical condition that, if left untreated, can result in severe anxiety and depression, self-harm and suicidality. Karasic Decl. ¶¶41, 45; Adkins Decl. ¶22. Treatment for gender dysphoria is provided in accordance with evidence-based clinical guidelines. Karasic Decl. ¶51. The Endocrine Society and the World Professional Association for Transgender Health ("WPATH") have published widely accepted clinical standards and guidelines for diagnosing and treating gender dysphoria. Adkins Decl. ¶25;

3

Karasic Decl. ¶¶47, 49. Every major medical organization in the United States agrees that gender-affirming medical treatments—which can include puberty-delaying medication, hormone treatment, and surgery—can be medically necessary to treat gender dysphoria. Karasic Decl. ¶¶52, 87.

Under the WPATH Standards of Care and the Endocrine Society Guideline (the "Protocols"), gender-affirming medical care is only provided when an adolescent patient has: (i) gender incongruence that is both marked and sustained over time; (ii) a diagnosis of gender dysphoria; (iii) sufficient emotional and cognitive maturity to understand the potential side effects and provide informed consent; (iv) actually provided informed consent (of both the adolescent and their parent(s)); and (v) the absence or mitigation of any countervailing mental health concerns. Karasic Decl. ¶62. For adolescents, parental consent is also required. Adkins Decl. ¶¶34, 36.

Under the Protocols, no medical treatments are provided before the onset of puberty. Adkins Decl. ¶31; Karasic Decl. ¶59. If medically indicated, adolescents with gender dysphoria who have entered puberty may be prescribed puberty-delaying medications (GnRH agonists) to prevent the distress of developing permanent, physical characteristics that do not align with their gender identity. Adkins Decl. ¶32; Karasic Decl. ¶60; Olson-Kennedy Decl. ¶43. Puberty-delaying medications allow the adolescent time to better understand their gender identity, while delaying distress from the development of secondary sex characteristics such as breasts or facial hair. Adkins Decl. ¶32; Karasic Decl. ¶60; Olson-Kennedy Decl. ¶43.

4

Pubertal suppression is reversible and if the treatment is discontinued, endogenous puberty will resume. Adkins Decl. ¶34; Olson-Kennedy Decl. ¶44.

In some cases, a healthcare provider may determine it is medically necessary for adolescent patients to be treated with hormone therapy. Adkins Decl. ¶35. These treatments—testosterone for adolescent transgender boys and testosterone suppression and estrogen for adolescent transgender girls—facilitate physiological changes consistent with the adolescent's gender identity. *Id.*; Olson-Kennedy Decl. ¶54.

Gender-affirming medical treatments in adolescence can drastically minimize dysphoria later in life and may eliminate the need for surgery. Adkins Decl. ¶46. A delay in treatment, on the other hand, can result in significant distress, including anxiety and escalating suicidality, as well as in physical changes from puberty that can either require surgical treatment to reverse later in life, or that are permanent. *Id.* ¶69. The safety and efficacy of gender affirming medical care in improving mental health outcomes for adolescents suffering from gender dysphoria is supported by "a substantial body of evidence," including cross-sectional and longitudinal studies, as well as the clinical expertise of providers over decades. Olson-Kennedy Decl. ¶¶45-50, 56-65, 69-71; Karasic Decl. ¶¶75-78.

## II. The Ban.

5

HB808, entitled "An Act to Prohibit Gender Transition Procedures for Minors," was ratified by the legislature and sent to the Governor's desk on June 30, 2023.[2]  Prior versions set an effective date of October 1, 2023, but as debate drew to a close the legislature accelerated the effective date to August 2023.  The Governor vetoed the bill, noting that a "doctor's office is no place for politicians" and "[o]rdering doctors to stop following approved medical protocols … is dangerous for vulnerable youth and their mental health."[3]  The legislature overrode the veto on August 16, 2023, and the bill took effect immediately.

Plaintiffs challenge Sections 1 and 3 of HB808.  Section 1 makes it "unlawful for a medical professional to perform a surgical gender transition procedure on a minor or to prescribe, provide, or dispense puberty-blocking drugs or cross-sex hormones to a minor" for purposes of gender transition.  N.C. GEN. STAT. § 90-21.151.  A violation of Section 1 of HB808 "shall be considered unprofessional conduct and shall result in the revocation of the medical professional's license to practice."  N.C. GEN. STAT. § 90-21.153.  Notwithstanding that prohibition, HB808 also provides that providers are not barred from "continuing or completing a course of treatment for a minor that includes a surgical gender transition procedure, or the administration of puberty-blocking drugs or cross-sex hormones, if all of the following apply:

(1) The treatment commenced prior to, and was active as of, August 1, 2023.

---

[2]  *See* https://www.ncleg.gov/BillLookUp/2023/hb808.

[3]  *See* https://webservices.ncleg.gov/ViewBillDocument/2023/6811/0/H808-BD-NBC-11125.

6

(2) In the reasonable medical judgment of the medical professional, it is in the best interest of the minor for the course of treatment to be continued or completed.

(3) The minor's parents consent to the continuation or completion of treatment." N.C. GEN. STAT. § 90-21.152(b).[4]

Treatment by licensed mental health professionals is exempt. N.C. GEN. STAT. § 90-21.152(c).

Section 3 of HB808 provides that "[n]o State funds may be used, directly or indirectly" for gender transition treatment, "or to support the administration of any governmental health plan or government-offered insurance policy offering surgical gender transition procedures, puberty-blocking drugs, or cross-sex hormones to a minor." N.C. GEN. STAT. § 143C-6-5.6(b). Thus, it prohibits the North Carolina Medicaid program from covering gender-affirming medical care for minor beneficiaries. Section 3 carves out the State Employee Health Plan, but only until and unless the permanent injunction in *Kadel v. Folwell*, 620 F.Supp.3d 339 (M.D.N.C. 2022) is no longer in force. N.C. GEN. STAT. § 143C-6-5.6(c).

While both transgender and cisgender adolescents could receive puberty-delaying

---

[4] The Ban also exempts treatment for patients with differences of sex development; treatment of health conditions "caused or exacerbated" by gender-affirming care; "[b]reast reduction procedures for a female patient causing a physical disorder"; a procedure for a "physical disorder, physical injury, or physical illness that would, as certified by a physician, place the individual in imminent danger of death or impairment of major bodily function unless surgery is performed"; and any surgery that a "physician certifies is medically necessary to treat a physiological condition." N.C. GEN. STAT. § 90-21.152(1)-(6).

7

treatment, hormone therapy, and surgery—when medically indicated and subject to informed consent requirements—before the enactment of HB808, after HB808 transgender adolescents are categorically prohibited from initiating any new course of treatment (or from receiving Medicaid coverage for any treatment) if related to "gender transition." The ability of cisgender adolescents to continue accessing these treatments (and receive state-funded coverage for these treatments) is left untouched by HB808.

## ARGUMENT

## I. Preliminary Injunction Standard.

A preliminary injunction is warranted where a plaintiff (1) is likely to succeed on the merits, (2) is likely to suffer irreparable harm in the absence of preliminary relief, (3) can show that the balance of hardships weighs in her favor, and (4) can show that the injunction is in the public interest. *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "When a preliminary injunction is sought against the government, … the last two factors merge." *Mayor & City Council of Baltimore v. Azar*, 392 F.Supp.3d 602, 619 (D. Md. 2019). All factors weigh in favor of a preliminary injunction here. Because the Ban disturbs the status quo, Plaintiffs seek a prohibitory preliminary injunction to maintain the status quo prior to the Ban. *League of Women Voters*, 769 F.3d at 236 (4th Cir. 2014).

## II. Plaintiffs are Likely to Succeed on Their Equal Protection Claim.

Transgender adolescents in North Carolina were able to access medical care for treatment of gender dysphoria before HB808. The Ban changes that, singling out this

8

group for a categorical prohibition on medical treatments that remain available to others. The Ban classifies based on transgender status and sex, thereby triggering heightened equal protection scrutiny. The Ban cannot survive this "exacting" test, *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 555 (1996), but fails even the most deferential standard of review.

## A. Heightened Scrutiny Applies Because the Ban Discriminates Based on Transgender Status and Sex.

To determine the level of scrutiny, "we look to the basis of the distinction between the classes of persons." *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020). Because the Ban facially discriminates based on transgender status and sex, and was passed with a discriminatory purpose, it is subject to at least heightened equal protection scrutiny. *Id.* at 611-13.

### 1. HB808 Facially Discriminates Based on Transgender Status.

HB808's discrimination against transgender adolescents is plain from the face of the statute. The title of the law itself—"An Act to Prohibit Gender Transition Procedures For Minors"—states the explicit purpose to strip transgender adolescents of the medical care needed for transition as treatment for gender dysphoria. Only transgender people can suffer gender dysphoria. Olson-Kennedy Decl. ¶30; *see also Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022) (observing as a matter of constitutional avoidance that the Court has "little trouble concluding that a law excluding" gender dysphoria from protection "would discriminate against transgender people as a class").

A transgender person is, by definition, someone whose sex designated at birth is different from their gender identity. Karasic Decl. ¶33; Adkins Decl. ¶19; Olson-Kennedy

9

Decl. ¶26.  Accordingly, by banning care specifically for the process of gender transition, which involves treating gender dysphoria by aligning one's body with a gender identity different from one's sex assigned at birth, the Ban expressly and exclusively targets transgender people.  *See, e.g.*, *Fain v. Crouch*, 618 F.Supp.3d 313, 324-25 (S.D.W. Va. 2022) ("inherent in a gender dysphoria diagnosis is a person's identity as transgender" because "a person cannot suffer from gender dysphoria without identifying as transgender").  Because cisgender adolescents may continue receiving the very same puberty-delaying, hormonal, and surgical treatments that HB808 denies to transgender adolescents, the law "transparently discriminates against … transgender" people.  *Kadel*, 620 F.Supp.3d at 376.

### 2. HB808 Facially Discriminates Based on Sex.

The Ban also must be subjected to heightened scrutiny because it discriminates facially based on sex.  A policy that "cannot be stated without referencing sex" "necessarily rests on a sex classification."  *Grimm*, 972 F.3d at 608.  Here, the Ban prohibits medically necessary care when provided in a manner that the state deems "different" from the adolescent's sex designated at birth.  N.C. GEN. STAT. § 90-21.150(5).  HB808 compounds this distinction by defining "sex" in a way that writes transgender adolescents out of that term.  *Id.* (defining sex solely in terms of sex designated at birth).  "By discriminating against transgender persons," the Ban "unavoidably discriminates against persons with one sex identified at birth and another today."  *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1746 (2020).

The Ban likewise discriminates based on a person's failure to conform to sex stereotypes or expectations associated with a particular sex designated at birth. As *Grimm* recognized, "policies [that] punish transgender persons for gender non-conformity" constitute impermissible sex stereotyping. 972 F.3d at 608. This is what the Ban does. If an adolescent conforms with their sex assigned at birth, they can access medically necessary (and even cosmetic) care without restriction under HB808. Adkins Decl. ¶¶ 56-58. But if the care is for a gender transition—to live in accordance with a gender that diverges from sex assigned at birth—the law strictly prohibits any new course of care for that purpose. Accordingly, the Ban "tethers [people] to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel*, 446 F.Supp.3d at 14; *Boyden v. Conlin*, 341 F.Supp.3d 979, 997 (W.D. Wis. 2018).

Finally, discrimination based on gender transition is necessarily discrimination based on sex. *Schroer v. Billington*, 577 F.Supp.2d 293, 306-308 (D.D.C. 2008); *accord Fabian v. Hosp. of Cent. Connecticut*, 172 F.Supp.3d 509, 527 (D. Conn. 2016). The same is true here, because as HB808 explains in its title, the Ban is explicitly intended to "prohibit gender transition procedures for minors."

### 3. The Ban Was Passed for the Purpose of Discriminating Based on Sex and Transgender Status.

Even if the Ban did not explicitly discriminate based on transgender status and sex, it would still be subject to heightened scrutiny as a law passed "'because of,' not 'in spite of,'" its effects on transgender youth. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "Put another way, state action is unconstitutional when it creates arbitrary or

11

irrational distinctions between classes of people out of "a bare ... desire to harm a politically unpopular group." *Grimm*, 972 F.3d at 607 (cleaned up). The title of the law openly declares that its aim is to "prohibit gender transition procedures." Enforcing state-mandated gender conformity was not an incidental effect of the statute, but rather its purpose.

This is underscored by the fact that the Ban was only one part of a larger legislative strategy to discriminate against transgender youth particularly and LGBTQ people more broadly. Just this session, the General Assembly also enacted legislation authorizing parents to bring legal action against schools they believe have provided "instruction" on gender identity to K-4th grade students (SB49) and banning transgender girls from participating in middle school and high school athletics (HB574). The measures enacted by the General Assembly are part of a national campaign targeting LGBTQ people, and transgender people particularly, for discrimination. More than 500 bills were introduced in 2023 nationwide targeting LGBTQ people for discrimination, and more than 80 have become law so far, which is unprecedented.[5]

### B. The Ban Fails Any Level of Review.

Heightened scrutiny requires that Defendants provide an "exceedingly persuasive justification" for the Ban's classifications. *VMI*, 518 U.S. at 531. The "burden of justification is demanding"—not "deferential"—and it "rests entirely on the State." *VMI*,

---

[5] *See* ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights.

518 U.S. at 533, 555. Defendants cannot possibly carry their demanding burden because of the broad medical consensus on the medical necessity for gender-affirming medical care and the absence of evidence-based alternatives to treat gender dysphoria. Nor is there any justification for treating gender-affirming health care differently from all other health care posing similar risks and benefits and supported by comparable evidence of efficacy.

Tellingly, HB808 includes no legislative findings whatsoever, so it is not apparent what interest purportedly is advanced by the Ban other than discriminatory animus towards transgender people. It is clear, however, that HB808 does not protect minors; rather, it harms them.

Gender-affirming medical care is neither harmful nor experimental. Antommaria Decl. ¶31; *Dekker*, 2023 WL 4102243, at *6. To the contrary, the medical interventions prohibited by HB808 are safe, effective, and evidence based. Karasic Decl. ¶25; Olson-Kennedy Decl. ¶¶50, 56. Gender dysphoria often intensifies if left untreated, leading to depression, anxiety, and suicidality. Adkins Decl. ¶22; Karasic Decl. ¶45; Olson-Kennedy Decl. ¶78. The scientific literature supporting gender-affirming care for gender dysphoria includes cross-sectional and longitudinal studies, and extensive clinical experience. Karasic Decl. ¶¶75-78; Olson-Kennedy Decl. ¶¶45-50, 56-65, 69-71. This evidence base "is comparable to the level of evidence supporting many other pediatric medical treatments." Antommaria Decl. ¶30; Adkins Decl. ¶30; Karasic Decl. ¶¶48, 99. And, in fact, "evidence suggesting these treatments are ineffective is nonexistent." *Dekker*, 2023 WL 4102243, at *15; *see also Kadel*, 620 F.Supp.3d at 380 ("Defendants' belief that

gender affirming care is ineffective and unnecessary is simply not supported by the record."); Adkins Decl. ¶51.

Additionally, providing gender-affirming medical care to adolescents with gender dysphoria is consistent with professional medical standards. "The WPATH Standards of Care outline appropriate treatments for persons with gender dysphoria." *Grimm*, 972 F.3d at 596. And the overwhelming weight of medical authority supports treatment of transgender patients with gender-affirming medical care, if indicated. The Protocols for the treatment of gender dysphoria, published by WPATH and the Endocrine Society, are well-established, have been recognized as best practices by the major medical and mental health professional associations in the United States, and are widely followed by clinicians. *See* Adkins Decl. ¶¶25, 28; Antommaria Decl. ¶32; Karasic Decl. ¶¶52, 87; Olson-Kennedy Decl. ¶34. They "represent the consensus approach of the medical and mental health community, and have been recognized by various courts, including [the Fourth Circuit], as the authoritative standards of care." *Grimm*, 972 F.3d at 595 (cleaned up). "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Grimm*, 972 F.3d at 595–96 (cleaned up); *see also* Karasic Decl. ¶54; Olson-Kennedy Decl. ¶74.

That there are risks associated with gender-affirming medical care does not justify the Ban. "All medical treatment comes with risk, and there can be side effects with any medication." Adkins Decl. ¶64; *see also* Antommaria Decl. ¶47. A medical professional, however, "will not offer gender-affirming medical treatments unless they have concluded

14

after weighing the risks and benefits of care that treatment is appropriate." Karasic Decl. ¶83; Adkins Decl. ¶45; Olson-Kennedy Decl. ¶55.

The potential risks of gender affirming medical care "are comparable to the risks parents and adolescents are permitted to assume in numerous other treatment decisions, including decisions explicitly authorized by this legislation." Antommaria Decl. ¶54. Indeed, the medical treatments prohibited by HB808, when prescribed to transgender adolescents, are used to treat other conditions in non-transgender adolescents and carry comparable risks and side effects regardless of the indication for which they are prescribed. *See* Adkins Decl. ¶¶50, 54-58; Antommaria Decl. ¶¶36, 54; *see also Brandt*, 2023 WL 4073727, at *18.

Ordinarily, "*doctors and patients*, when fully aware of the risks and elusive benefits of available treatments, should decide if medicine or surgery is necessary." *Kadel*, 620 F.Supp.3d at 380 (citing state expert's testimony). "This is Plaintiffs' request: that they and their doctors, not their sex or transgender status, determine when their treatments are appropriate." *Id.* "There is nothing unique about the risks of gender-affirming medical care for adolescents that warrants taking this medical decision out of the hands of adolescent patients, their parents, and their doctors." *Brandt*, 2023 WL 4073727, at *18.

Further, while all medical treatment comes with risk, decades of research and clinical experience show that any risks are greatly outweighed by the benefits of the care. Adkins Decl. ¶64; Antommaria Decl. ¶60; Karasic Decl. ¶¶25, 75, 82; Olson-Kennedy Decl. ¶¶45-53, 56-66, 69-71, 77. Indeed, the existing treatment protocols carefully address

potential risks through a robust informed consent process that is tailored to the maturity of the adolescent and requires consent by the adolescent's parents or guardian. Adkins Decl. ¶42; Antommaria Decl. ¶45; Karasic Decl. ¶¶72, 83; Olson-Kennedy Decl. ¶67.

What is clear, however, is that the harms to transgender adolescents from not being able to access medically-necessary gender-affirming care are severe and irreparable. Adkins Decl. ¶¶22, 67-69; Karasic Decl. ¶¶45, 53, 102; Olson-Kennedy Decl. ¶78. The denial of gender-affirming medical care to transgender people when medically indicated "not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality," as well as "directly contributes to poorer mental health outcomes." Karasic Decl. ¶102. "Prohibiting this care would require transgender adolescents to undergo endogenous puberty, causing potentially severe or life-threatening distress, and in many cases irreversible changes to the body." Adkins Decl. ¶69.

Simply put, gender-affirming medical care greatly improves the health and wellbeing of adolescent patients with gender dysphoria. It does not harm transgender youth. Rather, it allows them to thrive. "Without evidence that the treatments are ineffective to treat gender dysphoria, Defendants cannot meet their burden to show that the risks substantially outweigh the benefits so as to justify their sex- and transgender-based policy." *Kadel*, 620 F.Supp.3d at 380.

There is not even a rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their

doctors all agree is medically necessary "would threaten legitimate interests of [North Carolina] in a way that" allowing other types of care "would not." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people). Even under rational basis review, any of the possible justifications for the Ban "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

## III. Plaintiffs are Likely to Succeed on Their ACA Claim.

"Section 1557 of the Affordable Care Act forbids any health program or activity receiving federal financial assistance from subjecting an individual to discrimination on a ground prohibited under … title IX of the Education Amendments of 1972." *Kadel*, 12 F.4th at 430 (citing 42 U.S.C. § 18116(a) (cleaned up)). Here, it cannot seriously be disputed that NC Medicaid is a health program or activity that receives federal financial assistance. *See Kadel v. Folwell*, No. 1:19-cv-272, 2022 WL 17415050, at *2-3 (M.D.N.C. Dec. 5, 2022). The only remaining question is whether transgender adolescents enrolled in NC Medicaid, like the patients of Provider Plaintiff and GLMA's members, are being discriminated against based on sex. The answer is yes.

"The test announced in *Bostock* is [] the appropriate test to determine whether a policy discriminates in violation of the ACA." *Kadel*, 620 F.Supp.3d at 388; *see also Fain*, 618 F.Supp.3d at 330. And for the same reasons HB808 discriminates based on sex in

17

violation of the Fourteenth Amendment, it discriminates based on sex in violation of Section 1557. *See Kadel*, 620 F.Supp.3d at 388; *Fain*, 618 F.Supp.3d at 331. Indeed, "[w]hether there is medical consensus about transgender care in general is immaterial as to whether [Defendants have] discriminated against the Plaintiffs based on sex." *C.P. by & through Pritchard v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17788148, at *9 (W.D. Wash. Dec. 19, 2022).

Multiple courts have found similar policies barring Medicaid coverage of gender-affirming medical care to violate Section 1557. *See, e.g.*, *Fain*, 618 F.Supp.3d at 331; *Dekker*, 2023 WL 4102243, at *19; *Flack v. Wisconsin Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1014-15 (W.D. Wis. 2019).

## IV. Plaintiffs Are Likely to Succeed on Their Claim That HB808 Violates Parents' Right to Parental Autonomy.

The Due Process Clause of the Fourteenth Amendment protects "against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children— is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). It includes parents' "fundamental right to direct "medical care for their children … in conjunction with their adolescent child's consent and their doctor's recommendation." *Brandt*, 551 F.Supp.3d at 892–93, *aff'd*, 47 F.4th 661; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (parents' right to raise their child includes the ability "to recognize symptoms of illness and to seek and follow medical

18

advice"); *Treistman ex rel. AT v. Greene*, 754 F. App'x 44, 47 (2d Cir. 2018) ("[P]arents have a right to determine the medical care their children receive and the government's interference in that right can violate due process.").

Given that the Ban infringes on a parent's fundamental right to direct the medical care of their child by banning medical treatments given for particular purposes, the Ban triggers strict scrutiny. Consequently, the Parent Plaintiffs are likely to succeed on the merits of their substantive due process claim. *Brandt*, 2023 WL 4073727, *36 ("Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary").

## A.    Strict Scrutiny Applies to Plaintiffs' Due Process Claim.

When a fundamental right is recognized, "any statute restricting the right is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest." *Bostic v. Schaefer*, 760 F.3d 352, 377 (4th Cir. 2014) (cleaned up). Proponents of a law that burdens a fundamental right "bear the burden of demonstrating that the [law]" is "justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Id.*

Although "the State must play its part as parents patriae" in promoting the wellbeing of minors, *Schall v. Martin*, 467 U.S. 253, 265 (1984), no such interest is implicated here. When parents, their children, and their children's medical providers align on a particular course of care—care that has been recognized by every major medical association as safe,

19

effective, and necessary—that decision should be protected against state interference. That is the context here: There is no situation where a minor will access medical treatment for gender dysphoria without the consent of their legal guardian, and a parent may never decide *for* their child that gender-affirming care is needed over the minor's objection. *See* Adkins Decl. ¶¶34, 36. The Ban inescapably substitutes the judgment of the State for the aligned wishes of the parent and child. *See Brandt*, 551 F.Supp.3d at 892 (finding that Arkansas' health care ban infringed "right to seek medical care for their children … in conjunction with their adolescent child's consent and their doctor's recommendation"). *Cf. Santosky v. Kramer*, 455 U.S. 745, 760–61 (1982) (heightened evidentiary standards required where the "vital interest" of the parent and child in preserving their relationship "coincide.").

**B.  The Ban Cannot Survive Strict Scrutiny.**

As discussed above, the Ban, which intrudes upon the fundamental rights bestowed on Parent Plaintiffs, cannot survive any level of review, let alone strict scrutiny. North Carolina's ban on gender affirming care for minors is nowhere near the "least restrictive" means to address its purported interest. *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984). In fact, the Ban is not narrowly tailored to *any* interest, compelling or not. Without any findings or justifications for legislation that impedes upon the fundamental right of parent to care for their child, "the State could not withstand either heightened scrutiny or rational basis review." *Brandt*, 551 F.Supp.3d at 893.

20

## V.     A Preliminary Injunction is Necessary.

### A.     Plaintiffs Will Suffer Immediate and Irreparable Harm While HB808 is in Effect.

If permitted to remain in effect, the Ban will continue to inflict severe and irreparable harm on Plaintiffs for which no adequate remedy at law exists. As discussed above, the Ban violates the constitutional rights of adolescents and their parents, which is itself irreparable harm. "Because there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). But the irreparable harm here is far greater than just the deprivation of the Plaintiffs' constitutional rights. By enforcing the Ban, Defendants deny patients potentially lifesaving medical care by either preventing the initiation of treatment or cutting patients off from treatment; force families to watch their children suffer or incur the significant expense of regular travel or relocation out-of-state to access care; and compel medical providers to abandon their patients while also threatening their medical licenses. The severe and irreparable harms caused by HB808 include the following:

*Plaintiffs Vanessa Voe and Vance Voe*, and their nine-year-old son *Victor Voe* live in Durham County, North Carolina. Voe Decl. ¶2. Victor is transgender. *Id.* ¶5. He knew from a very young age that his gender identity did not match his sex assigned at birth, and he has lived as the boy that he is for years. *Id.* ¶¶6, 19. However, with his puberty approaching, Victor will soon need puberty-delaying treatment care that is prohibited by the Health Care Ban. *Id.* ¶15. Victor is "terrified" about going through "the wrong puberty," and the emotional distress Victor faces will be compounded by undergoing

physiological changes that may later require surgery to reverse or be irreversible. *Id.* ¶16; Adkins Decl. ¶ 69. Vanessa and Vance are also overwhelmed at the thought of bearing the long-term financial costs associated with leaving their home state to access care for Victor. *Id.* ¶21.

**Plaintiff Dr. Riley Smith** is a family medicine physician practicing with the University of North Carolina School of Medicine. Smith Decl. ¶3. Dr. Smith treats more than 30 adolescent transgender patients and knows firsthand how critical gender-affirming care is to reduce depression, anxiety, and suicidality, and to allow transgender adolescents to thrive. *Id.* ¶¶9, 23, 25. But the Ban violates the oath Dr. Smith swore as a doctor, requiring him to withhold this vitally necessary medical care and therefore to practice substandard medicine by ignoring the standards of care. *Id.* ¶20. The Ban irreparably harms Dr. Smith's patients by requiring him either to follow the law (and in so doing violate his professional obligations by sacrificing the health and wellbeing of his patients) or provide potentially lifesaving, medically-necessary care to his patients (and in so doing risk the loss of his medical license and his livelihood). Smith Decl. ¶¶18-21.

**PFLAG, Inc.** ("PFLAG") is a national nonprofit organization with nearly 350 chapters across the country, including 17 in North Carolina, and more than 350,000 members and supporters nationwide. Bond Decl. ¶4, 8. PFLAG has members in North Carolina whose children, like Minor Plaintiff, are being or will be monitored for the appropriate time to begin puberty blockers, are currently or soon will be on puberty

22

blockers, and are currently or soon will be on hormone therapy, all as part of a medically prescribed course of care for gender dysphoria. *Id.* ¶14.

If HB808 remains in effect, current and future PFLAG members with transgender children will be denied the right to make medical decisions for their adolescent child because medically necessary care has been deemed unlawful. *Id.* ¶15. Those members will be prevented from obtaining gender-affirming medical care when medically indicated for their adolescent children solely because it is treatment for the purpose of gender transition. *Id.* The Ban threatens the care of not only the Minor Plaintiff and his parents, who are members of PFLAG, but also the rights of other families with transgender adolescents across North Carolina who are not Plaintiffs in this action but are members of the organization PFLAG. *Id.* ¶¶14-15; Voe Decl. ¶18.

**GLMA** is a national nonprofit organization whose membership includes approximately 1,000 medical providers and researchers who live and work all across the United States, including North Carolina, and in several other countries. Sheldon Decl. ¶9. If not enjoined, HB808 will harm the young transgender people that GLMA's medical professional members in North Carolina, like Provider Plaintiff, treat by denying them potentially lifesaving care. Smith Decl. ¶4. It also forces GLMA's medical provider members to forsake their ethical obligation to prioritize patient care and wellbeing, placing them in the untenable position of choosing between compliance with the Ban, endangering the health and wellbeing of their transgender minor patients as a result, or following their

23

medical and professional duties at the risk of losing their license and livelihood.  Sheldon

Decl. ¶¶21-23.

Considering the severe and irreparable harms that HB808 will inflict if it is

permitted to remain in effect, a preliminary injunction is warranted and necessary.

**B.    The Balance of Equities Favors Plaintiffs and a Preliminary Injunction
is in the Public Interest.**

The balance of equities weighs heavily in favor of Plaintiffs.  The harms inflicted

by HB808 far outweigh any potential harms that Defendants might face if preliminary

injunctive relief is granted, as Defendants would only temporarily lose the ability to *disrupt*

the *status quo* with a new law that does not advance any legitimate state interest and is

likely to be held unconstitutional.  "[A] state is in no way harmed by issuance of a

preliminary injunction which prevents the state from enforcing restrictions likely to be

found unconstitutional.  If anything, the system is improved by such an injunction."

*Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citations omitted).  Similarly, granting an

injunction in this case will undoubtedly serve the public interest.  As the Fourth Circuit has

made clear, "it is well-established that the public interest favors protecting constitutional

rights."  *Id.*; *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir.

2013).

**VI.    A Facial Statewide Injunction is Necessary.**

Although a court's powers to determine the contours of injunctive relief are not

boundless, the scope of relief "rests within the sound discretion of the district court."

*Mayor of Baltimore v. Azar*, 973 F.3d 258, 293 (4th Cir. 2020) (cleaned up).  The scope "is

24

dictated by the extent of the violation established," which here is statewide. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971).

Although an injunction should be no more burdensome than necessary to provide complete relief to plaintiffs, *Azar*, 973 F.3d at 293, the breadth of the Ban—including its statewide impacts on PFLAG's and GLMA's members—makes statewide relief necessary. The Ban impacts a broad swath of medical providers, parents, and adolescents across North Carolina in addition to the individual Plaintiffs. This includes members of PFLAG's 17 chapters throughout the state, and GLMA's members who provide gender-affirming medical care to adolescent patients across the state. Bond Decl. ¶17; Shelton Decl. ¶9. As the Fourth Circuit has recognized, a statewide injunction is permissible exercise of the district court's discretion, and the Court should exercise its discretion to afford that relief here. *Azar*, 973 F.3d at 294. Alternatively, at a minimum any injunction should provide relief to all named Plaintiffs and all members of Plaintiffs PFLAG and GLMA.

## CONCLUSION

Plaintiffs respectfully request that the Court enjoin Defendants from enforcing HB808, namely, Sections 1 and 3, during the pendency of this litigation.

\* \* \*

25

Respectfully submitted,

/s/ Amy E. Richardson
Amy E. Richardson (N.C. Bar 28768)
Lauren E. Snyder (N.C. Bar 54150)
HWG LLP
333 Fayetteville Street, Suite 1500
Raleigh, NC 27601
Telephone: (919) 429-7386
Facsimile: (202) 730-1301
arichardson@hwglaw.com
lsnyder@hwglaw.com

Deepika H. Ravi*
HWG LLP
919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Telephone: (202) 730-1300
Facsimile: (202) 730-1301
dravi@hwglaw.com

Dmitriy Tishyevich*
MCDERMOTT WILL & EMERY
One Vanderbilt Avenue
New York, NY 10017-3852
Phone: (212) 547-5534
Facsimile: (646) 417-7668
dtishyevich@mwe.com

Anna Fosberg*
MCDERMOTT WILL & EMERY
The Brandywine Bldg.
1000 N West Street, Suite 1400
Wilmington, DE 19801
Phone: (302) 485-3936
Facsimile: (302) 351-8711
afosberg@mwe.com

Dated: October 11, 2023

Tara L. Borelli*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: (404) 897-1880
Facsimile: (404) 897-1884
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
Sruti J. Swaminathan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: (212) 809-8585
Facsimile: (212) 658-9721
ogonzalez-pagan@lambdalegal.org
sswaminathan@lambdalegal.org

Abigail Coursolle*
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
Telephone: (310) 736-1652
coursolle@healthlaw.org

Catherine McKee*
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
Telephone: (984) 278-7666
mckee@healthlaw.org

* Appearing by special appearance
pursuant to L.R. 83.1(d).

*Counsel for Plaintiffs*

26

**CERTIFICATE OF WORD COUNT**

The undersigned hereby certifies that the foregoing complies with the type-volume requirements of L.R. 7.3(d)(1) and contains 6,241 words, excluding those portions exempted by the rule.

Dated: October 11, 2023

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HWG LLP
333 Fayetteville Street, Suite 1500
Raleigh, NC 27601
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com

# CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2023 I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record. In addition, I served each Defendant via certified mail.

Dated: October 11, 2023

/s/ Amy E. Richardson
Amy E. Richardson
N.C. State Bar No. 28768
HWG LLP
333 Fayetteville Street, Suite 1500
Raleigh, NC 27601
Telephone: 919-429-7386
Facsimile: 202-730-1301
arichardson@hwglaw.com