**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| VICTOR VOE, *et al.,*<br><br>     *Plaintiff*s,<br><br> v.<br><br>THOMAS MANSFIELD, *et al.,*<br><br>     *Defendants.* | Case No. 1:23-cv-864<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA** |

## INTRODUCTION

The North Carolina General Assembly recently enacted a statute that prohibits the provision of, and use of state funds to pay for, medically necessary care to young people because of their sex and because they are transgender. North Carolina House Bill 808, 2023 N.C. Sess. Laws 111 (codified at N.C. Gen. Stat. §§ 90-21.150-54, 143C-6-5.6) ("H.B. 808"). As a result, medical professionals in North Carolina are prohibited from administering medically necessary care for transgender minors diagnosed with gender dysphoria—even where the minors' parents or guardians have consented to such care— while leaving non-transgender minors free to receive the same procedures and treatments. Similarly, medically necessary care for transgender minors diagnosed with gender dysphoria is excluded from coverage under any publicly funded health insurance or health coverage plan. The United States respectfully submits this Statement of Interest

1

under 28 U.S.C. § 517[1] to advise the Court of its view that, by denying transgender minors—and only transgender minors—access to medically necessary and appropriate care and health coverage, H.B. 808 violates the Equal Protection Clause of the Fourteenth Amendment. Accordingly, Plaintiffs are likely to succeed on the merits of their equal protection claim. *See* Pls.' Mot. for Prelim. Inj., Doc. # 14.[2]

## INTEREST OF THE UNITED STATES

The United States has a strong interest in protecting both individual and civil rights, including the rights of transgender persons. Executive Order 13,988 recognizes the right of all people to be "treated with respect and dignity," "to access healthcare . . . without being subjected to sex discrimination," and to "receive equal treatment under the law, no matter their gender identity or sexual orientation." 86 Fed. Reg. 7023 (Jan. 25, 2021).

The United States has, for example, intervened in litigation challenging state laws restricting gender-affirming medical care for minors. *See* U.S. Compl. in Intervention, Doc. # 38-1, *L.W. v. Skrmetti*, No. 3:23-cv-00376 (M.D. Tenn. Apr. 26, 2023); U.S. Am. Compl. in Intervention, Doc. # 92, *Eknes-Tucker v. Ivey*, No. 2:22-cv-184-LCB-SRW

---

[1] The Attorney General is authorized "to attend to the interests of the United States" in any case pending in federal court. 28 U.S.C. § 517.

[2] The United States expresses no views on any issues in this case other than those set forth herein.

(M.D. Ala. May 4, 2022). The United States has also filed numerous Statements of Interest and amicus briefs related to state laws banning gender-affirming medical care. *See* Br. for the U.S. as Amicus Curiae in of Supp. Pls.-Appellees, *K.C. v. Individual Members of the Med. Licensing Bd. of Ind.*, No. 23-2366 (7th Cir. Sept. 27, 2023); Br. for the U.S. as Amicus Curiae in of Supp. Pls.-Appellees, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. Jan. 25, 2022); U.S. Statement of Interest, Doc. # 45, *Poe v. Labrador*, No. 1:23-cv-00269-BLW (D. Idaho Aug. 23, 2023); U.S. Statement of Interest, Doc. # 61, *Poe v. Drummond*, No. 4:23-cv-00177-JFH-SH (N.D. Okla. June 9, 2023); U.S. Statement of Interest, Doc. # 37, *Doe v. Thornbury*, No. 3:23-cv-00230-DJH (W.D. Ky. May 31, 2023); U.S. Statement of Interest, Doc. # 19, *Brandt v. Rutledge*, No. 4:21-cv-00450-JM (E.D. Ark. June 17, 2021).

## BACKGROUND

## I.     Transgender Youth and Their Need for Medically Appropriate Gender-Affirming Care

A transgender person is a person who has a gender identity that differs from their sex assigned at birth.[3] A transgender boy is a minor who was assigned a female sex at birth but whose gender identity is male; a transgender girl is a minor who was designated a male sex at birth but whose gender identity is female. By contrast, a non-transgender, or

---

[3] Expert Decl. of Deanna Adkins, MD, Doc. # 14-1, ¶ 19 [hereinafter Adkins Decl.]; s*ee also Karnoski v. Trump*, 926 F.3d 1180, 1187 n.1 (9th Cir. 2019).

cisgender, minor has a gender identity that corresponds with the sex the minor was assigned at birth. A person's gender identity is integral to one's identity and cannot be voluntarily changed.[4]

According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders,[5] "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of "clinically significant distress" resulting from the lack of congruence between their gender identity and the sex designated to them at birth.[6] To be diagnosed with gender dysphoria, the incongruence between one's sex assigned at birth and one's gender identity must persist for at least six months and be accompanied by clinically significant distress or impairment in occupational, social, or other important areas of functioning.[7] The delay or denial of medically necessary treatment for gender dysphoria causes many transgender minors to develop serious co-occurring mental health conditions, such as anxiety, depression, and suicidality.[8] The

---

[4] Adkins Decl. ¶ 20.

[5] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., Text Revision 2022) [hereinafter DSM-5-TR].

[6] DSM-5-TR at 511-15; Adkins Decl. ¶ 21; *see also* Expert Decl. of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C, Doc. # 14-3, ¶ 17 [hereinafter Antommaria Decl.].

[7] DSM-5-TR at 511-15; Adkins Decl. ¶ 21.

[8] DSM-5-TR at 515 ("Adolescents and adults with gender dysphoria before gender-affirming treatment . . . are at increased risk for mental health problems including suicidal ideation, suicide attempts, and suicides."); Adkins Decl. ¶ 22; Antommaria Decl. ¶ 50;

inability of transgender youth to live consistent with their gender identity due to the physical changes that accompany puberty can cause severe or life-threatening distress in every aspect of life, poorer mental health outcomes, and irreversible changes to the body.[9]

Well-established medical organizations, including the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published standards of care for treating transgender youth diagnosed with gender dysphoria.[10] The American Academy of Pediatrics ("AAP") recommends that transgender youth have "access to comprehensive, gender-affirming, and developmentally appropriate health care."[11] WPATH and Endocrine Society standards of

---

*see also* Expert Decl. of Dan H. Karasic, MD, Doc. # 14-4, ¶¶ 45, 102 [hereinafter Karasic Decl.]; Substance Abuse and Mental Health Services Administration (SAMHSA), *Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGTBQI+ Youth*, SAMHSA Publication No. PEP2203-12-001 (2023), at 14, https://perma.cc/2SJU-8K66 [hereinafter *SAMHSA Report*] ("Withholding timely gender-affirming medical care when indicated . . . can be harmful because these actions may exacerbate and prolong gender dysphoria." (footnotes omitted)).

[9] Adkins Decl. ¶¶ 23, 69.

[10] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2022) [hereinafter *WPATH Standards*]; Jason Rafferty et al.; Wylie Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism 3869 (2017) [hereinafter *ES Standards*].

[11] *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) Pediatrics 1 (2018) [hereinafter *AAP Statement*] (reaffirmed August 2023).

5

care provide a framework based on the best available science and clinical experience, and are widely accepted and endorsed for the treatment of gender dysphoria in children and adolescents.[12] Generally, these organizations recommend that pre-pubertal children with gender dysphoria receive treatments that may include supportive therapy, encouraging support from loved ones, and assisting the young person through elements of a social transition.[13] What social transition means for an individual may evolve and can include a name change, pronoun change, bathroom, and locker use, personal expression, and communication of affirmed gender to others.[14]

Medical organizations such as WPATH and the Endocrine Society recommend that additional treatments involving medications may be appropriate for some adolescents.[15] After the onset of puberty, treatment options include the use of gonadotropin-releasing hormone agonists to prevent progression of pubertal development (also called "puberty blockers") and hormonal interventions such as testosterone and estrogen administration using a gradually increasing dosage schedule.[16] The guidelines make clear that gender-affirming medical care for transgender adolescents diagnosed with gender dysphoria

---

[12] Adkins Decl. ¶ 25; Antommaria Decl. ¶ 32; Karasic Decl. ¶¶ 47-49, 52.

[13] *See WPATH Standards* at S75-76; *AAP Statement* at 4-6; Adkins Decl. ¶ 31.

[14] *See WPATH Standards* at S76; *AAP Statement* at 6; Adkins Decl. ¶ 31.

[15] Adkins Decl. ¶¶ 34-37; Karasic Decl. ¶¶ 56-57.

[16] Adkins Decl. ¶¶ 33, 35; Karasic Decl. ¶¶ 57, 60; *WPATH Standards* at S114-16.

should be recommended only when certain criteria are met.[17] These criteria include: when the adolescent meets the diagnostic criteria of gender dysphoria as confirmed by a qualified mental health professional; when the experience of gender dysphoria is marked and sustained over time; when gender dysphoria worsens with the onset of puberty; when the adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment; when the adolescent's other mental health concerns (if any) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and when the adolescent has been informed of any risks.[18] WPATH's guidelines also emphasize that an individualized approach to clinical care for transgender adolescents is both ethical and necessary and recommends a multidisciplinary approach.[19] The guidelines state that the available data reveal that pubertal suppression for transgender youth generally leads to improved psychological functioning in adolescence and young adulthood.[20]

Like all medical interventions, puberty blockers and hormone therapies carry risks of side effects, but the evidence in these cases shows that the risks are low, usually can be

---

[17] *See WPATH Standards* at S59-S66; *ES Standards* at 3878; *AAP Statement* at 4-5.

[18] *See id.*

[19] *See WPATH Standards* at S45 and S56.

[20] *See id.* at S47; *ES Standards* at 3882; *AAP Statement* at 5; *see also SAMHSA Report* at 37 ("Access to gender affirmation can reduce gender dysphoria and improve mental and physical health outcomes among transgender and gender-diverse people . . . .").

7

mitigated, and are outweighed by the treatments' benefits, when clinically indicated.[21] And—like all medical interventions—physicians are required to fully inform transgender youth and their parents or guardians of potential side effects so that they may determine for themselves whether the potential risks outweigh the benefits.[22]

## II.    North Carolina House Bill 808 (2023 Session)

On June 29, 2023, the North Carolina legislature ratified H.B. 808. On July 5, 2023, Governor Roy Cooper vetoed the bill, stating that "[a] doctor's office is no place for politicians, and North Carolina should continue to let parents and medical professionals make decisions about the best way to offer gender care for their children. Ordering doctors to stop following approved medical protocols sets a troubling precedent and is dangerous for vulnerable youth and their mental health. The government should not make itself both the parent and the doctor."[23] On August 16, 2023, the legislature overrode the Governor's veto and H.B. 808 went into effect immediately. 2023 N.C. Sess. Laws 111. The statute proscribes access to medically necessary care for transgender minors by: (1) prohibiting the provision of gender-affirming care and (2) prohibiting the use of state funds for such care.

---

[21] Adkins Decl. ¶ 64.

[22] Adkins Decl. ¶ 42; Antommaria Decl. ¶ 6; Karasic Decl. ¶¶ 72, 83; Expert Decl. of Johanna Olson-Kennedy, Doc. # 14-5, ¶ 67 [hereinafter Olson-Kennedy Decl.].

[23] Objections and Veto Message, House Bill 808, Roy Cooper, Governor, North Carolina (July 5, 2023), https://perma.cc/5W46-7CJD.

8

## A.    H.B. 808's Prohibition on the Provision of Gender-Affirming Care

H.B. 808 makes it unlawful for any medical professional (defined as anyone licensed to practice medicine or licensed to prescribe or dispense drugs by the State under N.C. Gen. Stat. Chapter 90) to "perform a surgical gender transition procedure on a minor or to prescribe, provide, or dispense puberty-blocking drugs or cross-sex hormones to a minor." N.C. Gen. Stat. §§ 90-21.150(11), 90-21.151. Subject to this limitation, treatment by a licensed mental health professional provided within their scope of practice is not prohibited. *Id.* § 90-21.152(c). A medical professional is also not prohibited from "continuing or completing a course of treatment for a minor that includes a surgical gender transition procedure, or the administration of puberty-blocking drugs or cross-sex hormones, if all of the following apply:

(1) The course of treatment commenced prior to August 1, 2023, and was still active as of that date.

(2) In the reasonable medical judgment of the medical professional, it is in the best interest of the minor for the course of treatment to be continued or completed.

(3) The minor's parents or guardians consent to the continuation or completion of treatment."

*Id.* § 90-21.152(b). There is no mandated end date for the continuation of treatment. However, H.B. 808 provides that no hospital or other healthcare institution shall be required to allow the use of its facilities for the provision of such continuing care and

9

cannot be held liable for refusing to do so, thereby allowing for the limitation of the availability of continuing care. *Id.* § 90-21.152(d). This provision does not apply to any course of treatment commenced after August 1, 2023, regardless of whether it is deemed medically necessary to treat transgender minors diagnosed with gender dysphoria, determined to be in the best interest of said minors by a medical professional, and consented to by the minor's parents. *See id.* § 90-21.152(b)(1).

The statute's definitions make clear that its prohibitions apply only to transgender youth.[24] Nothing in H.B. 808 prevents health care providers from administering these same medical treatments to non-transgender youth for other purposes. The statute expressly states that its prohibitions do not apply to the treatment of minors born with certain conditions, such as those "born with a medically verifiable disorder of sex development," or when a "physician has determined through genetic or biochemical testing that the person does not have normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action." *Id.* § 90-21.152(a)(1), (2).

Violation of H.B. 808 by a medical professional is considered "unprofessional conduct and shall result in the revocation of the medical professional's license to

---

[24] For example, "Cross-sex hormones" are defined as "[s]upraphysiologic doses of testosterone or other androgens to members of the female biological sex or supraphysiologic doses of estrogen or synthetic compounds with estrogenic activity to members of the male biological sex when used for the purpose of assisting an individual with a gender transition." N.C. Gen. Stat. § 90-21.150(2). The statute's other definitions, *id.* § 90-21.150(1)-(11), also establish that H.B. 808 applies only to transgender youth.

10

practice." *Id.* § 90-21.153. In addition, it provides for a private right of action by a minor (or parent or guardian of a minor) who "suffers an injury" due to the medical procedures regulated by the statute. *Id.* § 90-21.154.

### B.     H.B. 808's Total Prohibition on the Use of State Funds of Gender-Affirming Care

H.B. 808 also provides that "[n]o State funds may be used, directly or indirectly, for the performance of or in furtherance of surgical gender transition procedures, or to provide puberty-blocking drugs or cross-sex hormones to a minor, or to support the administration of any governmental health plan or government-offered insurance policy offering surgical gender transition procedures, puberty-blocking drugs, or cross-sex hormones to a minor." *Id.* § 143C-6-5.6(b). This provision applies across the board to all gender-affirming care for all transgender minors—there is no exception for treatment initiated prior to the statute's passage. The greatest impact of this ban will be on transgender minors covered under North Carolina Medicaid, funded through the federal Medicaid program, and NC Health Choice, funded through the federal Children's Health Insurance Program. Section 5 of H.B. 808 expressly recognizes that this provision does not currently apply to the State Health Plan for Teachers and State Employees ("N.C. State Health Plan"), due to this Court's ruling in *Kadel v. Folwell*, 620 F. Supp. 3d 339

11

(M.D.N.C. Aug. 10, 2022), *rehearing en banc granted*, No. 22-1721 (4th Cir. Apr. 12, 2023) (oral argument held Sept. 21, 2023) (argued with *Fain v. Crouch*, No. 22-1927).[25]

## DISCUSSION

H.B. 808 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[26] The Constitution prohibits discrimination against transgender individuals on the basis of their sex and membership in a quasi-suspect class. H.B. 808's ban on the provision and coverage of gender-affirming care for transgender minors subjects them to a categorical ban based on their sex and their transgender status. Accordingly, the law is subject to heightened scrutiny, which it fails because it is not

---

[25] In *Kadel*, this Court permanently enjoined the State from enforcing a general exclusion on coverage of gender-affirming care for transgender individuals who receive health care coverage through the N.C. State Health Plan. The exclusion of the state plan shall expire 30 days after the Memorandum and Order, dated June 10, 2022, in *Kadel*, or the permanent injunction ordered therein is vacated, overturned, or is no longer in force. N.C. Gen. Stat. § 143C-6-5.6(c), 2023 N.C. Sess. Laws 111.

[26] In this action, Plaintiffs also allege that H.B. 808 violates Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), which prohibits discrimination on the basis of sex in various health programs, including those in receipt of Federal financial assistance. This Court has expressly held that the logic of the Supreme Court's decision in *Bostock* applies equally to the sex discrimination prohibitions under Section 1557 to include discrimination against people who are transgender. *Kadel*, 620 F. Supp. 3d at 388 ("The test announced in *Bostock* is . . . the appropriate test to determine whether a policy discriminates in violation of the ACA."); *see also Kadel v. Folwell*, No. 1:19CV272, 2022 WL 17415050, at *1 (M.D.N.C. Dec. 5, 2022) (same).

substantially related to an important government interest. Plaintiffs are likely to succeed

on the merits of their claim that the statute is unconstitutional.

I.      **H.B. 808's Ban on Gender-Affirming Care and Coverage Warrants Heightened Scrutiny Under the Equal Protection Clause.**

H.B. 808 prohibits transgender youth from obtaining medically necessary gender-affirming care but leaves other minors eligible for the same treatments by prohibiting not only the provision of such care by medical professionals but also the use of public funds to pay for such care. The statute's ban on gender-affirming care and coverage is subject to intermediate scrutiny for two reasons: (1) it discriminates on the basis of sex; and (2) it discriminates against transgender individuals, a quasi-suspect class.

A.      **H.B. 808's Ban on Gender-Affirming Medical Care and Coverage is Subject to Heightened Scrutiny Because It Discriminates on the Basis of Sex.**

When evaluating whether a law violates the Equal Protection Clause by discriminating on the basis of sex, courts apply "heightened" or "intermediate" scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("Between the[] extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny . . . ."). Heightened scrutiny is appropriate here because discrimination against individuals because they are transgender is a form of discrimination based on sex.

Indeed, Fourth Circuit precedent requires as much. In *Grimm v. Gloucester County*, the Fourth Circuit explained that discrimination against a person on the basis of

13

transgender status is discrimination on the basis of sex under the Equal Protection Clause and held that heightened scrutiny was the appropriate standard, 972 F.3d 586, 609 (4th Cir. 2020). That case examined a school policy limiting access to sex-specific facilities based on sex assigned at birth, the Fourth Circuit reasoned that the school policy both "necessarily rests on a sex classification" and "cannot be stated without referencing sex." *Id.* at 608. Indeed, as the Supreme Court has opined, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020). Other circuits have similarly held that discrimination against transgender individuals constitutes discrimination on the basis of sex under the Constitution. *See*, *e.g.*, *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023), *pet. for reh'g en banc filed,* No. 20-35815 (9th Cir. Aug. 31, 2023); *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 669-70 (8th Cir. 2022), *reh'g en banc granted*, No. 23-2681 (8th Cir. Oct. 6, 2023); *Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017), *cert. dismissed*, 138 S. Ct. 1260 (2018), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020)); *accord A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023) (applying *Whitaker*).

The Sixth and Eleventh Circuits recently declined to apply intermediate scrutiny to challenges to state gender-affirming care bans for minors, but those opinions are both

14

nonbinding and wrongly decided. *See L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023);

*Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1210 (11th Cir. 2023). In those cases,

both courts incorrectly held that, because the respective gender-affirming care bans apply

equally to all minors, regardless of sex at birth, heightened scrutiny is not required.

*Skrmetti*, 73 F.4th at 419; *Eknes-Tucker*, 80 F.4th at 1227-28. Both cases misapply the

equal protection standard for discrimination on the basis of sex. That the medical

procedures that H.B. 808 regulates—puberty blockers and cross-sex hormones as a

treatment for gender dysphoria—are "themselves sex-based" does not change the

analysis. *See Eknes-Tucker*, 80 F.4th at 1228. This distorted framing analyzes the statute

at the wrong level of abstraction and bakes into the equal-protection comparison the very

classification being scrutinized. The Court should decline to apply that flawed and

nonbinding reasoning here. Policies that limit treatment for gender dysphoria, while they

may appear gender-neutral on their face, are not so. Rather, "the exclusion[s] operate[] to

disadvantage transgender persons." *See M.H. v. Jeppesen*, No. 1:22-CV-00409-REP,

2023 WL 4080542, at *12 (D. Idaho June 20, 2023), *appeal filed*, No. 23-35485 (9th Cir.

July 19. 2023); *see also K.C. v. Individual Members of Med. Licensing Bd. of Indiana*,

No. 123CV00595JPHKMB, 2023 WL 4054086, at *8 (S.D. Ind. June 16, 2023)

(rejecting analogy to *Geduldig v. Aiello*, 417 U.S. 484 (1974)); *Dekker v. Weida*, No.

4:22-cv-325-RH-MAF, 2023 WL 4102243, at *13 (N.D. Fla. June 21, 2023), *appeal filed,*

No. 23-12155 (11th Cir. Jun. 27, 2023) (same); *Fain v. Crouch*, 618 F. Supp. 3d 313, 327

(S.D. W. Va. 2022), *rehearing en banc granted*, No. 22-1927 (4th Cir. Apr. 12, 2023) (oral argument held Sept. 21, 2023) (argued with *Kadel,* No. 22-1721) (same).

Following the *Grimm* decision, this Court held that an exclusion prohibiting coverage of gender-affirming care in a state-sponsored health insurance plan was discriminatory on the basis of sex. *Kadel*, 620 F. Supp. 3d at 376. This Court found that a determination as to whether the exclusion applied could not be made "without using the words man, woman, or sex (or some other synonym)." *Id.* (quoting *Bostock*, 140 S. Ct. at 1746). Additionally, this Court found the exclusion to be "textbook sex discrimination" based on the exclusion's mandated denial of treatment—even if medically necessary—"if it would change or modify" an individual's physiology in a way that does not match their sex assigned at birth. *Id.*

This Court should likewise conclude that H.B. 808 discriminates on the basis of sex because whether a minor is permitted to receive the banned medical treatments depends on the sex the minor was assigned at birth. Other courts have held the same in similar contexts. *See Brandt*, 47 F.4th 661 at 669-70; *Doe v. Ladapo*, No. 4:23cv114-RH-MAF, 2023 WL 3833848, at *8 (N.D. Fla. June 6, 2023), *appeal filed*, No. 23-12159 (11th Cir. Jun. 27, 2023); *K.C.*, 2023 WL4054086, at *9. Courts have also found that Medicaid coverage bans on gender-affirming care discriminate on the basis of sex. *See Dekker*, 2023 WL 4102243, at *10-12; *Fain*, 618 F. Supp. 3d at 327; *Flack v. Wis. Dep't*

16

*of Health Servs.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018).

Under H.B. 808, the medical treatments available to a minor expressly depend on "biological indication of male and female in the context of reproductive potential or capacity, such as sex chromosomes, naturally occurring sex hormones, gonads, and nonambiguous internal and external genitalia present at birth"—*i.e.*, the minor's sex assigned at birth. N.C. Gen. Stat. § 90-21.150(1). The statute prohibits medical providers from performing a "surgical gender transition procedure on a minor," *id.* § 90-21.151, and from prescribing, providing, or dispensing medications for the purpose of assisting an individual with "identifying with and living as a gender *different from his or her biological sex*," *id.* §§ 90-21.150(2), (5), (10); 90-21.151 (emphasis added). H.B. 808 defines the prohibited surgical procedures as those that "instill or create physiological or anatomical characteristics that resemble a sex *different from the individual's biological sex.*" *Id.* § 90-21.150(4) (emphasis added). It similarly prohibits such care from being paid for by publicly funded health care coverage. *Id.* § 143C-6-5.6.

Here, the medical care and coverage that H.B. 808 prohibits explicitly depends on a sex-based classification, as the scope of its ban on certain types of medical care and coverage is limited to people with gender dysphoria. To determine whether a treatment is permissible or covered, one must know the sex assigned at birth of the person being treated. "[T]his is a line drawn on the basis of sex, plain and simple." *Dekker*, 2023 WL

17

4102243, at *12. Because H.B. 808 "cannot be stated without referencing sex," it "necessarily rests on a sex classification." *Grimm*, 972 F.3d at 608 (citing *Whitaker*, 858 F.3d at 1051). In crafting the statute, the legislature could not "writ[e] out instructions" to identify the medical procedures banned from care or coverage "without using the words man, woman, or sex (or some synonym)." *Bostock*, 140 S. Ct. at 1746. Indeed, the statute defines "biological sex," "cross-sex hormones," and "gender transition" in sex-based terms, and then "phrases its prohibitions in terms that repeatedly rely on those definitions." *K.C.*, 2023 WL 4054086, at *82; *see also Whitaker*, 858 F.3d at 1051; *Brandt*, 47 F.4th at 669; *Hecox*, 79 F.4th at 1021.[27]

Accordingly, the Equal Protection Clause requires North Carolina to justify under heightened scrutiny its denial of those treatments to certain individuals on the basis of sex assigned at birth.

---

[27] H.B. 808 also discriminates on the basis of sex because it conditions the provision and coverage of particular medical procedures on compliance with sex stereotypes. N.C. Gen. Stat. § 90-21.150(4) (conditioning medical care and coverage on whether the care would alter "physical or anatomical characteristics or features that are *typical for* the individual's biological sex) (emphasis added). Multiple circuits have held that discrimination against transgender individuals based on their gender nonconformity is sex discrimination. *See, e.g.*, *Grimm*, 972 F.3d at 611-13 (concluding that school board's policy prohibiting transgender students from using restrooms that match their gender identity constitutes sex-based discrimination and transgender persons constitute quasi-suspect class).

18

**B. H.B. 808's Ban on Gender-Affirming Medical Care and Coverage is Subject to Heightened Scrutiny Because It Discriminates Against Transgender People, a Quasi-Suspect Class.**

Heightened scrutiny applies to H.B. 808 because it discriminates against transgender people, and because the Fourth Circuit has held that transgender people constitute "at least a suspect class." *Grimm*, 972 F.3d at 610-11; *Kadel*, 620 F. Supp. 3d at 376; *see also Hecox*, 79 F.4th at 1026. Similar to this Court's finding that the N.C. State Health Plan's categorical exclusion of coverage for treatments related to gender transition "transparently discriminates" against transgender members, a quasi-suspect class, and was therefore subject to heightened scrutiny, *Kadel*, 620 F. Supp. 3d at 376-77 (citing *Grimm*, 972 F.3d at 594), so too is H.B 808's prohibition on the care and coverage of such treatments for minors.

Accordingly, Fourth Circuit precedent and the Equal Protection Clause require North Carolina to justify under heightened scrutiny its denial of those treatments to certain individuals on the basis of their transgender status.

**II. H.B. 808's Ban on Gender-Affirming Medical Care and Coverage Cannot Survive Heightened Scrutiny Because it is not Substantially Related to Achieving North Carolina's Important Governmental Interests.**

To withstand heightened scrutiny, a defendant must show that the challenged action "serves important governmental objectives" and that the "discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia* (*VMI*), 518 U.S. 515, 524 (1996) (quoting *Miss. Univ. for Women v. Hogan*,

19

458 U.S. 718, 724 (1982)) (requiring an "exceedingly persuasive justification" for a sex-based classification); *see also Craig v. Boren*, 429 U.S. 190, 197 (1976). "The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 U.S. at 533. The heightened scrutiny inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that a legal classification results from impermissible prejudice or stereotypes. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion).

Moreover, the "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation," and it "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533; *see also Hecox*, 79 F.4th at 1030 (finding that the sweeping prohibition on transgender female athletes was too overbroad to satisfy heightened scrutiny); *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 482 (9th Cir. 2014); *Glenn v. Brumby*, 663 F.3d 1312, 1321 (11th Cir. 2011). A classification does not withstand heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Miss. Univ. for Women*, 458 U.S. at 730.

H.B. 808's purported purpose to protect "vulnerable" youth from harm[28] cannot withstand heightened scrutiny, even assuming this asserted interest is genuine, because

---

[28] 2023 Bill Text N.C. H.B. 808 (as introduced on April 19, 2023), https://perma.cc/SWD3-9S9E (originally entitled "An Act to Protect Minors from Administration of Puberty Blockers and Cross-Sex Hormones and Other Related Actions, Procedures, and Treatments").

H.B. 808 is not, either on its face or as explained by the legislative record, substantially related to that goal. A prohibition on providing transgender youth certain forms of medically necessary gender-affirming care is not "substantially related" to protecting vulnerable youth. *See VMI*, 518 U.S. at 533. Rather, it is a pretextual justification lacking accurate scientific or medical basis that ultimately harms—not helps—the minors it purports to protect. *See Hecox*, 79 F.4th at 1028 ("the Act's means . . . are not substantially related to, and in fact undermine," the purported legislative objectives). Prohibiting these forms of gender-affirming care will have devastating effects on many transgender youth while providing no countervailing benefit to them or anyone else. *See Kirchberg v. Feenstra*, 609 F.2d 727, 734 (5th Cir. 1979).

The legislation's text and history contradict the purported purpose of H.B. 808 and strongly suggest that North Carolina's asserted interest is pretextual. The reasons provided in support of the state's objective of protecting youth are belied by current medical standards. These include: (1) gender dysphoria among youth is not permanent and transgender youth will likely outgrow the discordance between sex and identity; (2) some in the medical community are aggressively pushing for gender dysphoria treatment; (3) the treatments for gender dysphoria are "unproven" and "experimental;" and (4) puberty blockers, hormones, and surgical procedures cause "permanent sterility."[29] These

---

[29] 2023 Bill Text N.C. H.B. 808 (as introduced on April 19, 2023), https://perma.cc/SWD3-9S9E.

justifications demonstrate bias because well-established guidelines and standards of care from leading medical authorities on gender dysphoria illustrate the contrary.

It is well-established that the provision of gender-affirming medical care to treat gender dysphoria is helpful, not harmful, to transgender youth. Contrary to North Carolina legislators' assertions that gender-affirming care for transgender youth is harmful or experimental,[30] every major medical association has recognized that gender-affirming care is safe, effective, and medically necessary treatment for the health and wellbeing of some youth diagnosed with gender dysphoria.[31] In fact, studies strongly suggest that attempts to prevent youth from identifying as transgender are harmful and ineffective.[32] Transgender minors who do not receive gender-affirming care face increased rates of victimization, substance abuse, depression, anxiety, and suicidality.[33]

---

[30] *Id.* (describing gender-affirming medical care as an "unproven, poorly studied series of interventions [that] results in numerous harmful effects for minors").

[31] Adkins Decl. ¶ 25; Antommaria Decl. ¶ 32; Karasic Decl. ¶¶ 47, 49, 52, 87.

[32] *AAP Statement* at 4.

[33] *See* Jack L. Turban, et al., *Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults*, 17(1) PLoS ONE 1, 1-15 (2022); Jack L. Turban, et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics 1, 1-8 (2020); Nat'l Academies Scis., Eng'g, and Med., *Understanding the Well-Being of LGBTQI+ Populations* 363-64 (2020); Adkins Decl. ¶ 22; Antommaria Decl. ¶ 50; Karasic Decl. ¶¶ 45, 102.

22

The medical community overwhelmingly agrees that gender-affirming care is medically necessary for some transgender youth.[34] The American Medical Association recognizes that "standards of care and accepted medically necessary services that affirm gender or treat gender dysphoria may include mental health counseling, non-medical social transition, gender-affirming hormone therapy, and/or gender-affirming surgeries," and that "[e]very major medical association in the United States recognizes the medical necessity of transition-related care for improving the physical and mental health of transgender people."[35] Clinicians have used these standards of care, which are peer-reviewed and based on reviews of scientific literature, for decades.[36] Puberty blockers have been prescribed for many years to treat gender dysphoria, and for 40 years to treat medical conditions such as precocious puberty.[37]

---

[34] *See, e.g.*, Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care,* 5(2) Pediatrics 1 (2022); Luke R. Allen et al., *Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones,* 7(3) Clinical Practice in Pediatric Psychology 302-11 (2019).

[35] Letter from James L. Madara, CEO and EVP, American Medical Association, to Bill McBride, Executive Director, National Governors Association, *AMA to States: Stop Interfering in Health Care of Transgender Children*, AMA (April 26, 2021), https://perma.cc/7JYQ-FW2P.

[36] *See* Meredith McNamara, MD, MS, et al., "A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria," at 5 (July 8, 2022), https://perma.cc/2LLH-EDYU.

[37] Adkins Decl. ¶ 50.

Further, H.B. 808 was one of several bills introduced and passed during the 2023 North Carolina legislative session that target transgender youth in the state.[38] "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean" that the desire to express moral disapproval of "a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). That is exactly what North Carolina has done here, by attempting to conceal its moral disapproval and bias in the guise of "protecting" youth.

In sum, H.B. 808 prevents transgender minors diagnosed with gender dysphoria from receiving care that they, their physicians, and their parents agree is appropriate and medically necessary. It therefore does not substantially achieve the legislature's asserted interest in protecting youth and fails heightened scrutiny.

## III. H.B. 808's Ban on Gender-Affirming Medical Care and Coverage Cannot Even Survive Under Rational Basis Review.

Under the rational basis standard of review, the court only seeks "the assurance that the classification at issue bears some fair relationship to a legitimate public

---

[38] *See, e.g.*, H.B. 574, 2023 N.C. Sess. Laws 109 (2023) (prohibiting transgender girls and women from competing on teams that do not match the gender they were assigned at birth, effectively barring them from participating in athletic teams designated for girls or women in middle school, high school, and college); S.B. 49, 2023 N.C. Sess. Laws 106 (2023) (as part of a Parents Bill of Rights, requires parents be notified "prior to any changes in the name or pronoun used for a student in school records or by school personnel," as well as prohibits instruction on "gender identity, sexual activity, or sexuality" in kindergarten through fourth grade).

24

purpose." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). However, even such a highly deferential standard cannot be met here were it to be applied. No matter how legitimate and worthy the protection of children may be, this law bears no reasonable relationship to it. Prohibiting access to gender-affirming care for youth experiencing gender dysphoria—through its prohibition or by making it financially inaccessible by limiting health care coverage—does not protect them. In actuality, the overwhelming majority of evidence demonstrates that rather than protecting transgender youth, bans such as H.B. 808 serve to only damage their wellbeing. As the Northern District of Florida noted when examining a similar law with similar justifications, the state's proffered reasons do not withstand meaningful analysis when subject to *meaningful* rational-basis scrutiny. *Doe*, 2023 WL 3833848, *9 (discussing *Cleburne*, 473 U.S. 432).

## CONCLUSION

H.B. 808 prohibits the care and coverage of medically necessary care for transgender minors, while leaving non-transgender minors free to receive the same procedures and treatments and have them paid for with state funds. H.B. 808 violates the Equal Protection Clause of the Fourteenth Amendment, and Plaintiffs are likely to succeed on the merits of their equal protection claim.

Dated: October 27, 2023

Respectfully submitted,

SANDRA J. HAIRSTON
United States Attorney
Middle District of North Carolina

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Chief
Federal Coordination & Compliance Section

COTY MONTAG
Deputy Chief
Federal Coordination & Compliance Section

/s/ Cassie Crawford
CASSIE CRAWFORD
(NC Bar No. 45396)
Assistant United States Attorney

Middle District of North Carolina
101 South Edgeworth St., 4th Floor
Greensboro, NC 27401
(336) 333-5351
Cassie.Crawford@usdoj.gov

/s/ Dylan N. de Kervor
DYLAN N. DE KERVOR
(CA Bar No. 269169)
MONA H. SIDDIQUI
(VA Bar No. 46455)
Trial Attorneys
United States Department of Justice
Civil Rights Division
Federal Coordination & Compliance Section
950 Pennsylvania Avenue NW—4CON
Washington, DC 20530
Tel.: (202) 305-2222
Dylan.deKervor@usdoj.gov

*Attorneys for the United States of America*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2023, the foregoing document was electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record.

/s/ Cassie Crawford_____
CASSIE CRAWFORD

27