# Exhibit 3

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT FOR
 2            THE MIDDLE DISTRICT OF NORTH CAROLINA
     ------------------------------x
 3   VICTOR VOE, by and through
     his parents and next
 4   friends, Vanessa Voe and
     Vance Voe; et al.,
 5
 6   Plaintiffs,
 7              v.                      CASE NO. 1:23-cv-864
 8   THOMAS MANSFIELD, in his
     official capacity as Chief
 9   Executive Officer of the
     North Carolina Medical
10   Board; et al.,
11   Defendants.
12   And
13   PHILIP E. BERGER, in his
     official capacity as President
14   Pro Tempore of the North
     Carolina Senate, and TIMOTHY
15   K. MOORE, in his official
     capacity as Speaker of the
16   North Carolina House of
     Representatives,
17
     Intervenor-Defendants.
18   ------------------------------x
19         Zoom Deposition of MICHAEL K. LAIDLAW, MD
20               (Taken by the Plaintiffs)
21                  Rocklin, California
22               Friday, September 6, 2024
23
24   Reported by:    Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
25
```

Case 1:23-cv-00864-LCB-LPA    Document 150-4    Filed 10/11/24    Page 2 of 38

 1   APPEARANCE OF COUNSEL BY ZOOM:

 2   For the Plaintiffs:

 3          OMAR GONZALEZ-PAGAN, ESQ.

 4          Lambda Legal Defense and Education Fund, Inc.

 5          120 Wall Street, 19th Floor

 6          New York, NY 10005

 7          212-809-8585

 8          ogonzalez-pagan@lambdalegal.org

 9                    -and-

10          TARA L. BORELLI, ESQ.

11          Lambda Legal Defense and Education Fund, Inc.

12          1 West Court Square, Suite 105

13          Decatur, GA 30030

14          404-897-1880

15          tborelli@lambdalegal.org

16   Also Present by Zoom:  DENISE SCOTT, Paralegal

17

18   For the Medical Board Defendants:

19          HYRUM HEMINGWAY, ESQ.

20          MICHAEL WOOD, ESQ.

21          North Carolina Department of Justice

22          114 W. Edenton Street

23          Raleigh, NC 27603

24          hhemingway@ncdoj.gov

25          mwood@ncdoj.gov

Case 1:23-cv-00864-LCB-LPA   Document 150-4   Filed 10/11/24   Page 3 of 38

Page 3

```
 1   APPEARANCES BY ZOOM (Continued):
 2            CATHERINE McKEE, ESQ.
 3            National Health Law Program
 4            1512 E. Franklin St, Ste 110
 5            Chapel Hill, NC 27514
 6            919-968-6308
 7            nhelp@healthlaw.org
 8                     -and-
 9            ABIGAIL COURSOLLE, ESQ.
10            National Health Law Program
11            3701 Wilshire Blvd, Suite 315
12            Los Angeles, CA 90010
13            310-204-6010
14
15   For the Intervenor-Defendants:
16            JOHN RAMER, ESQ.
17            CLARK L. HILDABRAND, ESQ.
18            Cooper Kirk
19            1523 New Hampshire Avenue, N.W.
20            Washington, DC 20036
21            202-220-9600
22            jramer@cooperkirk.com
23            childabrand@cooperkirk.com
24
25
```

                                                    Page 4

1    APPEARANCES BY ZOOM (Continued):

2    For the Intervenor Defendants (Continued):

3              CRAIG D. SCHAUER, ESQ.

4              Dowling Firm

5              3801 Lake Boone Trail, Suite 260

6              Raleigh, NC 27607

7              919-529-3351

8              cschauer@dowlingfirm.com

9

10   Also Present by Zoom:  ERIC DELLON, McDermott Will & Emery
                            Paralegal

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1

2

3                    o0o

4

5

6            Zoom Deposition of MICHAEL K. LAIDLAW, MD,

7    taken by the Plaintiffs, at Rocklin, California, on the

8    6th day of September, 2024 at 12:09 p.m., before Marisa

9    Munoz-Vourakis, Registered Merit Reporter, Certified

10   Realtime Reporter and Notary Public.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S
2              THE COURT REPORTER:  Will all parties
3        acknowledge that in lieu of an oath
4        administered remotely, the witness will
5        verbally declare his testimony in this
6        matter is true under penalty of perjury, and
7        all parties and their counsel consent to
8        this arrangement, waive any objections to
9        this manner of reporting, and the witness
10        has verified that he is in fact MICHAEL K.
11        LAIDLAW, MD.
12              Please indicate your agreement by
13        stating your name and your agreement on the
14        record.
15              MR. GONZALEZ-PAGAN:  Hi, this is Omar
16        Gonzalez-Pagan from Lambda Legal, the
17        plaintiffs, and we agree to the stipulation.
18              MR. RAMER:  This is John Ramer of
19        Cooper & Kirk on behalf of the intervenor
20        defendants, and we agree to the stipulation.
21              THE WITNESS:  This is Michael Laidlaw,
22        and I agree to the stipulation.
23              MR. HEMINGWAY:  My name is Hyrum
24        Hemingway, I'm here on behalf of the North
25        Carolina Department of Justice.  I represent

1      the North Carolina Department of Health and

2      Human Services and Secretary Kinsley, who is

3      the head of that agency.  I am fine with the

4      stipulation.

5      Whereupon,  MICHAEL K. LAIDLAW, MD, having

6      testified under penalty of perjury, was examined

7      and testified as follows:

8          EXAMINATION BY COUNSEL FOR PLAINTIFFS

9          BY MR. GONZALEZ-PAGAN:

10    Q.    All right.  Well, I will say it's good

11  afternoon, but it's good morning for you, doctor.

12    A.    Good morning.

13    Q.    We're operating different time zones.

14        As I stated, I represent the plaintiffs in

15  this matter.  I will be asking you some questions about

16  your appearance in this case.

17        You and I have previously done this dance

18  before about two years ago.  Do you recall?

19    A.    Yes.  Good to see you.

20    Q.    So good to see you.

21        I will go over some ground rules, most of

22  them the court reporter just went over with you prior

23  to the start of this deposition.  But just as a

24  refresher, and my hope is that we can actually do this

25  fairly short today, given that we have been through

Case 1:23-cv-00864-LCB-LPA   Document 150-4   Filed 10/11/24   Page 8 of 38

1    thousands of dollars, but I don't know offhand the

2    number.

3         Q.    I understand.  Thank you.

4              Previously you've testified that less than

5    five percent of your patients are under the age of 18,

6    is that right?

7         A.    Yes.

8         Q.    Does that still hold true today?

9         A.    Yes, I believe so.

10        Q.    You previously have testified that you do

11   not treat gender dysphoria with medical interventions,

12   is that right?

13        A.    Yes.

14        Q.    Does that still hold true today?

15        A.    Yes.

16        Q.    And previously you've testified that the

17   extent of your experience relating to medical treatment

18   of gender dysphoria, at least as of when we last spoke,

19   was limited to the refilling of the hormone

20   prescription for one patient, and a patient that you

21   had who was re-transitioning or no longer identifying

22   as transgender, is that right?

23             MR. RAMER:  Objection to the form.

24        A.    Well, I think when I answered previously --

25   I mean, just to clarify that I saw -- the patient we're

1    specific medical treatment in terms of medications for

2    either gender dysphoria or consequences say of gender

3    dysphoria, there were two.

4        Q.     Thank you.  And that still holds true

5    today?

6        A.     Yes.

7        Q.     And I think you've already stated this, but

8    just for clarity of the record, you don't diagnosis

9    gender dysphoria, is that right?

10       A.     That's correct.  That's a psychological

11   diagnosis.  It's not an endocrine diagnosis.

12       Q.     In 2022, have you conducted any original

13   research relating to the treatment of gender dysphoria?

14            MR. RAMER:  Objection to the form.

15       A.     If you could -- I think we've gone through

16   this before.  Can you just re-explain, when you say

17   original research, could you just explain what you mean

18   by that.

19       Q.     Sure.  I think we went further last time,

20   and I called it primary research.  So I was -- I mean

21   an actual study, where you do original gathering of

22   data, as opposed to a systematic review or narrative

23   literature review.

24       A.     I see.  Yeah, so -- and the question is

25   have I done any of that in, what did you say, 2022?

1      Q.      Since 2022.

2      A.      Since 2022, no.  The answer is no.

3      Q.      Have you conducted or published any

4  systematic review or narrative literature review since

5  2022?

6      A.      There's --

7      Q.      Let me specify, in relation to the

8  treatment of gender dysphoria?

9      A.      There's nothing published as of the moment.

10     Q.      Do any of your reports identify all the

11 documents or publications on which you relied to

12 formulate your opinions?

13     A.      Sorry, I missed that.  Will you repeat

14 that, please?

15     Q.      Do your reports or all three of them

16 identify all of the documents or publications upon

17 which you relied to formulate your opinions?

18     A.      I believe, to the best of my ability, I

19 included those, yes.

20     Q.      Have you reviewed the reports authored by

21 Dr. James Cantor in this case?

22     A.      Could you repeat that, please?

23     Q.      Have you reviewed the report authored by

24 Dr. James Cantor in this case?

25     A.      Not directly.

1    talking about potentially different stages of

2    development.

3                So, for example, a four-year old who has

4    central precocious puberty, they have an endocrine

5    disorder, GnRH analogues are being given to treat an

6    endocrine disorder, where they have early puberty, and

7    the goal is to allow puberty to proceed once they're

8    more typical pubertal age, say age 11.  And so under

9    those specific circumstances, those individuals, it

10   appears, have restoration or will have fertility that

11   for the main part is intact.  But that's very different

12   than giving GnRH analogues to kids who have normal

13   physiologic development and have gender dysphoria,

14   which is a psychological condition, are being treated

15   with a medication that will alter their pubertal

16   development in a few ways; one is that it will -- so

17   long as they're taking it, they will remain at that

18   stage of puberty.  If it's early stage of puberty, say

19   stage two, tanner stage two, they will be infertile.

20   If they continue on to, I don't know what you want to

21   call cross or opposite sex hormones, their inherent

22   biological puberty will not advance, and so they'll

23   remain infertile.

24                And so those patients, in that scenario,

25   will be infertile and possibly permanently sterilized.

1      Q.      These desistence studies that you cite all

2   deal with preadolescent children?

3      A.      Let's see, let me just refresh my memory

4   here.  I think I discuss -- maybe not here -- that

5   there's different kind of definitions.  There's a

6   psychological definition for adolescents, seems to be

7   around age 12, and then I have another citation

8   somewhere where adolescents begin -- begins, but which

9   is different than pubertal tanner stages.  So I make a

10   distinction there.

11      Q.      Yes.  Taking your definition of

12   adolescents, all of these studies pertain to

13   preadolescents?

14      A.      I guess there's an overlap.  You know, I

15   think American Academy of Pediatrics might use age 11.

16   So there's some -- like at the upper end of that age

17   range, there's probably some people who could be

18   considered adolescents, but the majority would be

19   preadolescent by the definition.

20      Q.      And the studies that you are citing to

21   pertain to subjects that were diagnosed with gender

22   identity disorder under the DSM-4 or earlier versions,

23   as opposed to gender dysphoria under the DSM-5, is that

24   right?

25      A.      Yes.  To my knowledge, the DSM-5 was not

Case 1:23-cv-00864-LCB-LPA    Document 150-4    Filed 10/11/24    Page 13 of 38

1    available or hadn't been written yet at the time of

2    these studies in Restory(sic).

3          Q.     Have you reviewed the diagnostic criteria

4    for gender dysphoria in childhood in children in the

5    DSM-5?

6          A.     In the DSM-5?

7          Q.     Yes.

8          A.     Yes, I have.

9          Q.     Have you reviewed the diagnostic criteria

10   for gender identity disorder under the DSM-4?

11         A.     At some point I had, yes.

12         Q.     Are you aware that the gender identity

13   diagnosis in childhood did not require that the child

14   express a desire to be, or that they are a gender

15   different from that which they were assigned at birth?

16               MR. RAMER:  Objection to the form.

17         A.     You know, I know in general there are

18   certain variations between the two.  I think the key

19   thing to me is that these are kids who are under

20   distress, because they believe that they're -- what

21   they perceive their gender differed from their physical

22   body.

23               So over time, the psychological description

24   of that has changed, for example, now there's ICD 11,

25   which has another category.  And so it keeps jumping

1    around.

2              But to me the similarity is you've got kids

3    in distress because of incongruence between gender --

4    as a general term incongruence between gender and their

5    natal sex.

6         Q.    All right.  I've introduced what is

7    Exhibit 8.

8                   (The document referred to was marked

9              Plaintiff's Exhibit Number 8 for

10             identification.)

11        Q.    P8.

12        A.    Okay.  I'm attempting to get a hold of it

13   here.  Okay.

14        Q.    Do you see the document?

15        A.    I do.

16        Q.    Okay.  This is an article Archives of

17   Sexual Behavior in 2013.  Do you recognize the journal

18   Archives of Sexual Behavior?

19        A.    I do.

20        Q.    It's a peer-reviewed journal, is that

21   right?

22        A.    To my knowledge, yes.

23        Q.    Okay.  And one of the coauthors, the first

24   listed author is Kenneth Zucker.  Do you recognize this

25   name?

Case 1:23-cv-00864-LCB-LPA    Document 150-4    Filed 10/11/24    Page 15 of 38

1      A.      I do.

2      Q.      And the article is titled Memo Outlining

3   Evidence for Change of Gender Identity Disorder in the

4   DSM-5.  Do you see that?

5      A.      Yes.

6      Q.      Okay.  Let's turn to table 2 on page 905 of

7   the --

8      A.      Found it.

9      Q.      Okay.  The bold face indicates a change in

10  the diagnostic criteria for children.  Do you see that?

11     A.      Yes.

12     Q.      At the bottom of table 2, it actually says:

13  The proposed changes are in both cases, is that right?

14     A.      Correct.

15     Q.      Okay.  And one of those changes is that the

16  criterion called A1 must be met in order for the

17  diagnosis to be made.  Do you see that?

18     A.      Where does it say it must be met?

19     Q.      Well, it says, as manifested by at least

20  six of the following indicators, including A1.

21              Do you see that?

22     A.      Yes.

23     Q.      Then if we go to table 3 in the next page,

24  it shows similarly, the proposed changes in both stages

25  for criteria in both adolescents and adults.

1               Do you see that?

2       A.      Yes.

3       Q.      And essentially they are pretty much all

4    new or rewritten?

5       A.      Yeah, the a majority of it or all of it

6    looks to be in boldface.

7       Q.      So if we go back to page 904, the last

8    paragraph on the page, it starts it was.

9               Do you see that?

10      A.      Last paragraph on the page, yes.

11      Q.      It states:  It was, therefore, argued that

12   in DSM-5, the currently proposed A1 criterion be a

13   necessary symptom in making the GD diagnosis.  We

14   contend that the presence of this symptom will, if

15   anything, make the diagnosis more restrictive and

16   conservative.  Zucker 2010.  Given the critiques

17   leveled at the DSM-4 criteria, it was deemed that

18   reduction of false positives is preferable to false

19   negatives.  Did I read that correctly?

20      A.      Yes.

21      Q.      Okay.  So based on this, would you agree

22   then that it's possible that at least some of the youth

23   discussing the desistence studies that you referenced,

24   were never transgender in the first place?

25              MR. RAMER:  Objection to the form.

1        A.      You know, I'm just rereading.

2                (Pause.)

3        A.      To me, as I read this, this is my first

4    time reading this particular document, so just taking a

5    look at the paragraph at the bottom of 904, it doesn't

6    look to me like Dr. Zucker, or anyone had done any

7    primary research to support his contentions.  It's just

8    an expert opinion of Dr. Zucker and the author.

9                So I don't know if there's any firm

10   scientific foundation for that.

11       Q.      Okay.  Are you familiar with an article by

12   Julia Temple Newhook looking at the desistence studies?

13       A.      I may have come across it.  I can't think

14   of it offhand.

15       Q.      I have introduced what's been marked as

16   Exhibit P9.

17                    (The document referred to was marked

18              Plaintiff's Exhibit Number 9 for

19              identification.)

20       Q.      Let me know when you have access to it.

21       A.      Okay.  Give me a minute.

22                (Pause.)

23       A.      Okay.

24       Q.      Have you seen this paper before?

25       A.      Let me just look at it a moment.

1    have, you know, other mental health incapacities and so

2    forth, yes.

3         Q.    Parents who provide informed consent can,

4    do that, right, or legal guardians?

5         A.    Well, yeah, there's a distinction made

6    between informed consent and informed assent.  I've

7    made the argument that parents cannot even consent to

8    their child having lifelong infertility when the child

9    is -- you know, again, given the nature of this

10   treatment.

11        Q.    So it's not a matter of capacity, it's the

12   nature of the treatment that prevents the ability to

13   provide consent?

14             MR. RAMER:  Objection to the form, and

15         you can answer.

16        A.    Yeah, so part of it is capacity.  I'm not

17   saying it doesn't have to do with capacity.  Part of it

18   is capacity.  Then once capacity is established, then

19   one has to look at basically risk versus benefit ratio.

20   And here the risks are very high, the benefits are very

21   low, and the child is not in a position to understand

22   what they might want at age 25 or age 30 in terms of,

23   you know, pregnancy or having children, breast feeding,

24   so forth.

25        Q.    In your opinion, is gender-affirming

1  medical treatment, medical interventions as treatment

2  for gender dysphoria, ever appropriate for a person

3  regardless of age?

4           MR. RAMER:  Objection to the form.

5      A.     I think that the data show that there are

6  many harms from gender affirmative therapy to the

7  physical body.  Also I would argue mental health in

8  some cases.

9           So as a professional, you know, medical

10  expert, I would not advise having those treatments.

11     Q.     Would it be appropriate for the state to

12  ban such treatments for adults?

13          MR. RAMER:  Objection to the form.

14     A.     I think when you say bans, I would have to

15  know exactly what you mean by that.

16     Q.     Sure.  Take this law and just take out the

17  word minor.

18          MR. RAMER:  Objection to the form.

19     A.     Yeah, I don't have -- I've been looking at

20  many different laws.  I don't know specific -- I don't

21  recall the specifics of this law.  I would take a look

22  and see -- you know, compare it, if you'd like.

23     Q.     Can the state prohibit the provision of

24  gender-affirming medical interventions in the form of

25  hormones, surgery or GnRH analogues for adults?

1    you know, as a physician, I'm not going to be forced to

2    prescribe it, but if some consenting adult went to a

3    physician who felt that, you know, they were willing to

4    take the liability risk and do that, then that's up to

5    them.

6         Q.    Let's turn to your supplemental report,

7    your confidential report, Exhibit 2.

8         A.    Okay.

9         Q.    You're not a member of WPATH, right?

10        A.    I am not a member of WPATH, that's correct.

11        Q.    You did not participate in the development

12   or promulgation of the standard of care version 8, is

13   that right?

14        A.    That is correct.

15        Q.    Have you participated in the development or

16   promulgation of any clinical practice guidelines?

17        A.    Not that I know of.

18        Q.    Have you done any original study pertaining

19   to the promulgation of the clinical practice

20   guidelines?

21             MR. RAMER:  Objection to form.

22        A.    Well, I've been studying clinical practice

23   guidelines since, you know, I would say in medical

24   school, but at least residency and fellowship, whether

25   they had to do with osteoporosis or diabetes or, you

1    know, thyroid nodules and such.  So I have a long

2    experience of looking at clinical guidelines and

3    assessing them and evaluating them and critiquing them,

4    you know, within my expertise as an endocrinologist or

5    as an end user.

6         Q.    Have you done -- have you performed or

7    published a systematic review or study regarding

8    clinical practice guidelines?

9         A.    I mean, I have a letter to the editor of

10   JCDM published criticizing their guidelines.  I include

11   that in the broad category of something published

12   regarding guidelines.

13        Q.    My question is whether you have done a

14   study looking at differences in quality of guidelines

15   and the development process guidelines?

16        A.    I have no published study about that.

17        Q.    This supplemental report is based on your

18   review of redacted communications within WPATH, as well

19   as some communications from HHS that were produced in

20   discovery, is that right?

21        A.    I think I mainly agree with you.  I

22   redacted -- I think it was some parts were redacted, or

23   yes, there were names redacted, if I recall, so yes.

24        Q.    And you were not a party to any of those

25   WPATH communications, is that right?

 1      A.      Meaning what?  Was I -- my email in there?

 2  Like someone was emailing me about the communications,

 3  is that what you're saying?

 4      Q.      You were not a participant in those

 5  communications?

 6      A.      Oh, that's correct.

 7      Q.      In this report, you criticize the process

 8  by which WPATH association was developed, a fair

 9  statement, I would think?

10      A.      Yes.

11              MR. RAMER:  Objection to the form.

12       Sorry, I couldn't hear you toward the end

13        there, Omar.

14              MR. PAGAN:  I just said, I would

15        think.

16      Q.      So I want to turn to page six specifically.

17      A.      Okay.

18      Q.      There, one of your criticisms, paragraphs

19  28 through 35, pertains to the fact, or your argument

20  that WPATH did not follow the grade process faithfully,

21  and did not include graded values indicating the

22  quality of evidence for the recommendations, is that a

23  fair summary?

24      A.      Yeah, I was critical of -- certainly

25  critical of the fact that they didn't include the

1    graded values and how they use grade.

2        Q.      Understood.  Thank you.

3                In your affirmative report, and I don't

4    think you need to go back to it for this purpose, but I

5    will note that it's paragraph 204, you cite the Cass

6    report in support of your opinions.  Do you recall

7    that?  This is the Cass review's file report on May 4?

8        A.      Yes.

9        Q.      Okay.  The Cass report included a number of

10   recommendations within it, is that right?

11       A.      Yes.

12       Q.      Were there recommendations made by the Cass

13   report made consistent with the grade process?

14               MR. RAMER:  Objection to the form.

15       A.      My understanding -- I don't think the Cass

16   report used grade, that I recollect.  They used

17   something, or they relied on studies.  They used a

18   different method, or they did -- whatever they relied

19   on, there were several things they relied on out of

20   York, University of York did not use the grade method

21   with, you know, the four levels of gradation as such,

22   to my knowledge.

23       Q.      Okay.  And I do want to distinguish between

24   the York underlying articles and the actual report

25   itself, for purposes of this conversation.

1    single guideline has to use grade?  No.  They can use

2    other alternative systems.  But it's just the fact if

3    you say you're going to do something, and there's

4    precedent for having done so, you need to follow

5    through and show people like me saying should I use

6    this evidence-based guideline allegedly or not?  I need

7    to know as an end user.  I don't feel that WPATH did.

8    They did a horrible job on it.

9        Q.    Understood.  To be fair, you've never

10   really been an end user of this guideline, right?

11       A.    Well, I am.  Well, when I say end user, I'm

12   using it in the sense of I'm reading it and making a

13   determination am I going to do this or not?  You know,

14   what I mean, in the general sense.  I have to make an

15   assessment.

16       Q.    Are you familiar with the guidelines

17   from -- promulgated in or promulgated in Sweden?

18       A.    I reference Sweden in my report, if that's

19   what you're referring to.

20       Q.    Well, have you taken a look at the

21   guidelines that were published in Sweden?

22       A.    I probably did at some point, but I don't

23   think I include that in my report.

24       Q.    To your knowledge, did those guidelines

25   grade the evidence or issue a recommendation made?

1      A.     I don't know.

2      Q.     Are you familiar with the representations

3   that were issued by an agency in Finland?

4      A.     I think I talk about Finland in here.

5      Q.     It was UCOM?

6      A.     I've probably looked at it.

7      Q.     Yeah, they were published by COHERE, does

8   that make sense?

9      A.     I feel like I reference it somewhere, but I

10  don't see it in this paragraph, or maybe I do, Counsel

11  for Choice, maybe that's the same.

12     Q.     Yeah, Counsel for Choice, yeah.

13     A.     Yes.

14     Q.     Okay.  So you've reviewed --

15            MR. RAMER:  Just to slow down here.

16       You're talking about Sweden, because you

17        said UCOM, which I believe is Norway.

18            MR. PAGAN:  I apologize.  It was

19        COHERE, he corrected me.

20     Q.     So we're referring to the COHERE

21  recommendations from Finland?

22     A.     Yeah, I have a reference to that.  We're on

23  the same page, paragraph 200 for me.

24     Q.     Okay.  To your knowledge, did the COHERE

25  recommendations -- did the COHERE document include a

1    grading of the evidence for each recommendation?

2         A.    I don't think so, but I'm not -- I don't

3    recall offhand.  I don't think so.

4         Q.    I'm going to show you what's been marked as

5    P10.

6                   (The document referred to was marked

7              Plaintiff's Exhibit Number 10 for

8              identification.)

9         Q.    It should be publishing.  Let me know once

10   you have it.

11        A.    Hang on, please.

12              (Pause.)

13        A.    Yes, Exhibit 10, P00 -- whatever, yeah, 10.

14        Q.    Have you ever seen this paper before?

15        A.    Let me look for a sec here.

16              (Pause.)

17        A.    I don't know if I've seen this one.  I

18   referenced something similar from the Endocrine

19   Society.

20        Q.    Okay.  So this is an article PLOS One.

21              Do you recognize that journal?

22        A.    Yes.

23        Q.    That's one that's a peer-reviewed journal?

24        A.    I believe so, yes.

25        Q.    Okay.  If you look at the methods,

1    ECRIA criteria.

2              So I'm not surprised that this study or any

3    other study found problems with methodologies and so

4    forth.

5         Q.    And this position from the Endocrine

6    Society that, you know, was adopted in 2022, is that

7    right?

8         A.    This was published in 2022.

9         Q.    Okay.  And the WPATH Centers of Care, those

10   guidelines were published in 2022, is that right?

11        A.    Standard of care eight.

12        Q.    Yes.

13        A.    Yes, I believe it was 2022.

14        Q.    Okay.  And that's after a multiyear

15   process, is that correct?

16        A.    They took several years to develop their

17   guidelines, as I understand.

18        Q.    So I just want to back up and reask the

19   question, and I appreciate the context that you've

20   provided, but --

21        A.    Okay.

22        Q.    -- would you agree that it is not uncommon

23   then for clinical practice guidelines to deviate from

24   grade?

25              MR. RAMER:  Objection to form.

Page 105

1        A.      Well, to my knowledge, not all clinical

2    practice guidelines use grade.  So you can't deviate

3    from it if you're not using it.

4                So for that subset that use it, I'm not

5    surprised, but that's not -- that's not a point in

6    their favor, if that's the case.  It's a point against

7    their guideline.

8                MR. RAMER:  Omar, I don't know if

9          you're continuing down this line, we've been

10         going about an hour?

11               MR. PAGAN:  No, yeah, I want to ask

12         just a couple more questions, if you don't

13         mind, and then there's actually like a very

14         natural stop for us to do a lunch break.

15               THE WITNESS:  Sounds good to me.

16       Q.      I actually want to turn to your rebuttal

17   report, Exhibit 3.

18       A.      Yes.

19       Q.      Can you turn to paragraph 18?

20       A.      Yes.

21       Q.      Okay.  There you state, I believe it's the

22   last sentence:  In my opinion, a mental health

23   professional would need to be trained at the level of

24   board-certified psychologist or psychiatrist to fulfill

25   this criteria.

1    to find it.  I quote Dr. Zucker, who we looked at

2    something from him earlier, as this being a possible --

3              (Off the record at 4:34 p.m.)

4              (On the record at 4:34 p.m.)

5         A.    In my primary report, paragraph 55, I

6    wrote:  Social transition of the child has been noted

7    by an expert researcher in the field of child gender

8    dysphoria, Ken Zucker, to itself be a form of

9    iatrogenic harm, quoting Zucker in 2020.

10             So I believe that social transition can be

11   a form of iatrogenic harm.

12        Q.    Let me just follow up on that.

13             And the follow-up sentence that you have

14   there is:  This is because the social transition

15   process may solidify the young person's belief that

16   they are in fact the sex opposite of their biological

17   sex.  Did I read that correctly?

18        A.    Yes.

19        Q.    Why is a person having a cross-gender

20   identification an iatrogenic harm?

21             MR. RAMER:  Objection to form.

22        A.    Let me just look at my sentence again here.

23             (Pause.)

24        A.    Well, I was talking about the social

25   transition process.  To try to give an example, let's

Page 127

1    medication, you know, discounted and such.

2              So, I mean, both of these are -- these are

3    two examples, right in this case, of plaintiffs who had

4    socially transitioned, and the parents were working

5    very hard to get puberty blockers for the kids.

6              So it seems, at least in this case, it's a

7    hundred percent of the patients involved.

8         Q.    Okay.  Well, I'm not asking about just

9    these two people.  I'm asking about the literature.

10             Are you aware that the percentage of --

11   whether the percentage of transgender adolescents with

12   access puberty blockers is actually a minority of

13   transgender adolescents, who are receiving

14   gender-affirming medical care?

15             MR. RAMER:  Objection to the form.

16        A.    I don't know the statistics on that

17   specifically.

18        Q.    Okay.  Did you review the Cass report?

19        A.    I've reviewed the Cass report before, yes.

20        Q.    Okay.  What percentage of transgender

21   adolescents in the United Kingdom acts as puberty

22   blockers vis-a-vie getting care?

23             MR. RAMER:  Objection to form.

24        A.    Well, that's a different question.  Now

25   we're talking about United Kingdom, socialized health

1    system, which, by nature, they have their own set of

2    data and things that they're looking at.  And so are we

3    talking about United Kingdom, or are we talking about

4    North Carolina?

5        Q.    I'm just trying to ascertain where you get

6    the idea that care is just linear?  I mean, again,

7    doctor, I'm not trying to be difficult here with you.

8    I'm just trying to get a common understanding.

9             Like you would agree that there are some

10   transgender adolescents who just start with hormones

11   and not puberty blockers, right?

12            MR. RAMER:  Objection to the form.

13       A.    I mean, I've read, you know, cases where

14   adolescents, usually because they're already at advance

15   stage of natal puberty, if you will, start with

16   hormones.  But they may have been already socially

17   trans -- I feel like the majority of cases that I've

18   read, they have also socially transitioned.

19       Q.    Well, you would agree that in order for

20   somebody to access medical care, they first have to

21   come out to their family and then get their support to

22   go get the medical care, right?

23            MR. RAMER:  Objection to the form.

24       A.    I guess if we're talking about minors who

25   have to be with their parents to access medical care,

1    clause of the sentence.  I'm not reading the whole

2    sentence.  Did I read that first clause correctly?

3          A.     Yes.  The first clause, yes.

4          Q.     This medical record documents that Joy Doe

5    has been diagnosed with gender dysphoria, correct?

6          A.     I've written in my report why there's flaws

7    with the diagnosis.

8          Q.     I understand that.  I'm just asking whether

9    this medical record documents that she has been

10   diagnosed with gender dysphoria?

11         A.     I would say it misdocuments.

12         Q.     Okay.  You have never met Joy Doe, right?

13         A.     No.

14         Q.     You have never met Joy Doe's parents,

15   right?

16         A.     Correct.

17         Q.     And you have not personally assessed Joy

18   Doe?

19         A.     That's correct.

20         Q.     Okay.  I'm going to turn to Victor Voe.

21                If you can turn to paragraph 136, of your

22   report.

23         A.     This is the rebuttal, you said?

24         Q.     Correct.

25         A.     Got it, yes.

1    gender dysphoria in adolescents and adults on the

2    DSM-5?

3         A.    Yes.

4         Q.    Just for the record, you have never met

5    Victor Voe, right?

6         A.    That's correct.

7         Q.    You have never met Victor Voe's parents?

8         A.    I have not.

9         Q.    You have not personally assessed Victor

10   Voe?

11        A.    That's correct.

12        Q.    Okay.

13              MR. GONZALEZ-PAGAN:  I am just going

14         to go through a quick check.  I've got

15         another line of questioning, probably go

16         like another hour, maybe a little less.  Do

17         people want to break now or break later?

18              MR. RAMER:  I was going to say

19         whatever gets us fastest.

20              MR. GONZALEZ-PAGAN:  Let's go for it.

21        Q.    If you can turn back to paragraph 2 of your

22   initial report, Exhibit 1?

23        A.    Yes.

24        Q.    In it, you state that you're a

25   board-certified endocrinologist, is that right?

1      identification.)

2      Q.      Well, I'll represent to you that this is in

3  landscape, and you will need to rotate the version to

4  view the document once it's published.

5      A.      Okay.

6      Q.      You should have P15.  There's a little icon

7  next to the printer in the view, it has like a little

8  page with a year on it.  If you click on that, there's

9  a page orientation section that allows you to rotate.

10     A.      15, yes, I see it in proper mode.

11     Q.      Okay, great.  This is an email from Andre

12  Van Mol.

13             First of all, have you seen this document

14  before?

15     A.      I assume I'm one of the ones it's addressed

16  to.

17     Q.      Second line.

18     A.      I was just looking to see my name.  I

19  probably have seen it, since my name is on it.

20     Q.      Okay.  It's an email from Andre Van Mol to

21  a number of individuals, including yourself, subject,

22  and it starts Hola Team SD.  What is Team SD?

23     A.      My guess is that it's(sic) probably --

24  means South Dakota, but I'm not sure.

25     Q.      Are these individuals that you were working

Page 148

1  with in -- towards the law that -- prohibiting

2  gender-affirming medical interventions for minors in

3  South Dakota?

4          A.      I think there were like -- I don't know

5  every single person that was involved in that, to be

6  honest with you.  But that would be Dr. Van Mol's

7  classification as Team SD.  I'm not sure who really

8  that consists of, but I do recall working with people

9  that are on that email list.

10         Q.      What was your role as it pertained to the

11 bill in South Dakota?

12         A.      I have to think.  Let me just think about

13 it a minute.  As I recall, it's been a few years now,

14 but I think -- I think the bill -- well, the bill's

15 sponsor was Fred Deutsch, as I recall, and I think he

16 asked me, because he knew of some of the work I had

17 done, to be involved with making sure whatever medical

18 hormonal type statements were made, if you will, within

19 the bill, was something that made, you know, good

20 medical sense.  So that was my role --

21         Q.      Did you contribute -- sorry, apologies.

22                 Can you repeat that last part?

23         A.      I just said that was my role, as I saw it.

24         Q.      Did you contribute then to the editing or

25 drafting of that bill?

Page 149

1      A.      I believe I did, yes.

2      Q.      I represent to you that the whole next set

3  of exhibits all require you to do the rotation of the

4  documents.

5      A.      Okay.  I'll have to turn my head sideways.

6      Q.      You should have what's now been marked as

7  P16.

8              (The document referred to was marked

9          Plaintiff's Exhibit Number 16 for

10         identification.)

11     A.      Okay.  Hang on, please.

12             (Pause.)

13     A.      Okay.

14     Q.      This is an email thread beginning on

15  December 23, 2019, that would be on page three, from

16  Fred Deutsch is the representative you had testified,

17  is that correct?

18     A.      This is from Vernadette Broyles to Fred

19  Deutsch.

20     Q.      If you go to the last page, it's a short

21  email on December 23, 2019 at 7:43 p.m.

22     A.      Oh, okay, I see it.  Sorry, Fred Deutsch

23  wrote, okay, yes, SD legislature, I think that's the

24  same Fred Deutsch.

25     Q.      And the top email, the last one in the

Page 184

1                    C E R T I F I C A T E

2        I, Marisa Munoz-Vourakis, Stenographic Reporter, RMR,

3    CRR and Notary Public, certify that on September 6, 2024,

4    in Rocklin, California, having produced satisfactory

5    evidence of identification, and having testified under

6    penalty of perjury, according to the emergency video

7    notarization requirements contained in G.S. 10B-25, to

8    tell the truth, thereupon testified as set forth in the

9    preceding pages, exclusive of errata sheet and signature

10   page, if required, the examination being reported by me

11   verbatim and reduced to typewritten form by me personally.

12       I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties to this

14   action in which this proceeding was conducted, and

15   further, that I am not a relative or employee of any

16   attorney or counsel employed by the parties thereof, nor

17   financially or otherwise interested in the outcome of the

18   action.

19

20   IN WITNESS WHEREOF, I have hereunto subscribed my name

21   this 9th of September, 2024.

22                                

23                           MARISA MUNOZ-VOURAKIS

24   Notary #20032900127

25