# Exhibit 4

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF F WASHINGTON

AT TACOMA

_____

C.P., by and through his parents,  )

Patricia Pritchard and Nolle       )

Pritchard and PATRICIA PRITCHARD,  )

      Plaintiffs,               )

  vs.                              ) No. 3:20-cv-06145-RJB

BLUE CROSS BLUE SHIELD OF          )

ILLINOIS,                          )

      Defendant.                )

_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL LAIDLAW

_____

9:00 a.m.

September 2, 2022

REPORTED BY:  Pat Lessard, CCR #2104

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com            206.622.6661            800.657.1110

```
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3          MS. ELEANOR HAMBURGER
 4          Sirianni, Youtz, Spoonemore & Hamburger
 5          3101 Western Avenue, Suite 350
 6          Seattle, Washington 98121
 7          206.223.0303
 8          ele@sylaw.com
 9          MR. OMAR GONZALEZ-PAGAN, pro hac vice
10          Lamda Legal Defense and Education Fund
11          120 Wall Street, 19th Floor
12          New York, NY 1005
13          212.809.9585
14          ogonzalez-pagan@lambdalegal.org
15
16   FOR THE DEFENDANT:
17          MS. GWENDOLYN PAYTON
18          Kilpatrick Townsend
19          1420 Fifth Avenue, Ste. 3700
20          Seattle, WA 98101
21          206.467.9600
22          gpayton@kilpatricktownsend.com
23
24   ALSO PRESENT:
25          MR. PATRICK NORTON, Videographer
```

1    MICHAEL LAIDLAW,          being duly sworn, testified

2                              upon oath, as follows:

3              E X A M I N A T I O N

4    BY MR. GONZALEZ-PAGAN:

5         Q.   All right.  I think we're good to proceed.

6              Good morning, Dr. Laidlaw, thank you for

7    joining us today.  It's afternoon for me; I'm in New

8    York.

9         A.   Okay.

10        Q.   Are you in California today?

11        A.   Correct.

12        Q.   Okay.  So as you might have heard, I

13   represent the plaintiffs in this matter and I will be

14   asking you some questions about your opinions in this

15   case.

16        A.   Okay.

17        Q.   First I just want to go over some ground

18   rules for the deposition which will make it easier for

19   everyone and most importantly for our court reporter.

20             You understand that you're under oath

21   today, is that correct?

22        A.   Yes.

23        Q.   We cannot speak at the same time because the

24   court reporter needs to be able to take down what each

25   of us says.

1      Q.   And that's in Canada, is that correct?

2      A.   Correct.

3      Q.   Did you testify at deposition or trial in

4   this matter?

5      A.   I did not testify.  I only wrote a report.

6      Q.   Did this matter have to do with gender

7   dysphoria or transgender issues?

8      A.   Yes.

9      Q.   What is the subject matter of this case?

10     A.   It was a minor person having a mastectomy

11  surgery.

12     Q.   What was the substance of your expert

13  opinion in that case?

14     A.   The substance was similar, that the patient

15  could not consent, didn't have the judgment capacity

16  to consent for the surgery given her age.

17          And that was pretty much the substance of

18  it.

19     Q.   You used the "given her age."

20          If it was a mastectomy this would have been

21  for a transgender male, is that right?

22     A.   Yes, correct.

23     Q.   Any reason why you used the female pronoun

24  for a transgender male?

25     A.   I did not interview the patient so I don't

1    know the background as to the exact -- the patient was

2    clinically diagnosed through a psychiatrist or a

3    psychologist.

4         Q.   But you did not interview the patient, is

5    that right?

6         A.   I did not interview the patient.

7         Q.   Do you know the outcome of the case?

8         A.   I don't recall.  I don't think it was --

9    let's see.  I don't believe it went in favor of the

10   plaintiff.

11        Q.   Who was the plaintiff in that matter?

12        A.   I believe it was the mother of the person

13   seeking surgery.

14        Q.   And the mother was objecting?

15        A.   Yes.  Well, the mother wanted it.  I think

16   it was the mother wanted -- it's been a while, but I

17   think the mother wanted to obtain medical records

18   regarding the case -- I don't remember all of the

19   specifics -- and was being blocked because the minor

20   was -- there was a question whether they were

21   emancipated or whether the mother could look at the

22   records, that sort of thing.

23        Q.   Let's turn to DH and DOE v Snyder. That's

24   the next one over.

25             That's pending in federal court in Arizona,

1    on existing publications and preexisting data.

2              I think that's the distinction that you were

3    drawing in your answer as well, is that correct?

4         A.   Yes.

5         Q.   So would you be comfortable with that

6    understanding, that shared understanding of -- do you

7    know what I mean by primary research?

8         A.   Yes, I understand your meaning.

9         Q.   Have you performed any primary research?

10        A.   Yes.

11        Q.   On what?  On what matters?

12        A.   There were two studies.  One was a magnesium

13   study that had to -- we're looking for an association

14   of low magnesium leading to osteoporosis.

15             And the other study was regarding thyroid

16   cancer where we were looking at thyroid globulin tumor

17   markers and how they correlated with ultrasound

18   findings of the neck.

19        Q.   And when did you perform this research?

20        A.   This was during my -- it may have begun

21   during my -- I think it began during my residency and

22   then I continued into fellowship.

23        Q.   Have you performed any primary research

24   regarding gender dysphoria?

25        A.   No.

1      Q.   Have you performed any primary research

2   relating to transgender people?

3      A.   No.

4      Q.   Have you performed any primary research

5   relating to gender identity?

6      A.   No.

7      Q.   Do you have any peer-reviewed publications?

8      A.   Yes.

9      Q.   Do you have a copy of your CV with you?

10     A.   No.

11     Q.   I will show you what's been marked as

12   Exhibit 2.

13     A.   Okay.

14     Q.   And this is a copy of your CV, right?

15          Well, it's not showing yet.  This is a copy

16   of your CV, right?

17     A.   Yes.  It's the one we looked at earlier.

18     Q.   And you have here a section titled

19   "Research, Publications, and Expert Witness Work," is

20   that right?

21     A.   Yes.

22     Q.   And we can scroll through it but just go

23   area by area.

24          Can you tell me which the -- within the

25   screen showing right now which of these publications

1    listed here are peer-reviewed?

2           MS. PAYTON:  Object to the form of the

3    question.  And the blue print on the question on the

4    screen here, I'm not sure that's easy to follow.

5           But go ahead and answer.

6           THE WITNESS:  Understood.

7       Q.   (By Mr. Gonzalez-Pagan)  Dr. Laidlaw, you

8    have marked in your CV some of these as expert

9    witness --

10      A.   Yes.

11      Q.   -- brief of Amicus Curiae, Expert Witness,

12   et cetera, is that correct?

13      A.   Yes.

14      Q.   Okay.  So there's a publication listed for

15   2021 --

16      A.   Uh-huh.

17      Q.   -- it's a Letter to the Editor --

18      A.   Uh-huh.

19      Q.   -- titled "Erythrocytosis in a Large Cohort

20   of Trans Men Using Testosterone:  A Long-Term

21   Follow-Up Study on Prevalence, Determinants and

22   Exposure Years," is that right?

23      A.   Yes.

24      Q.   It's a Letter to the Editor pertaining to

25   that separate article, is that correct?

1          A.    That's right.

2          Q.    And is a Letter to the Editor a peer

3     reviewed publication?

4          A.    I don't know.  It has to be accepted before

5     they publish it, so I don't know what process they go

6     through.  It may be or it may not be.

7          Q.    There's another listing or a publication in

8     2020 titled "Correction Transgender Surgery Provides

9     No Mental Health Benefit," is that right?

10         A.    Yes.

11         Q.    And you're a coauthor of this piece, is that

12    right?

13         A.    Yes.

14         Q.    It was published in the Public Discourse, is

15    that correct?

16         A.    That's correct.

17         Q.    Is this a peer-reviewed publication?

18         A.    Not to my knowledge.

19         Q.    There's another publication just below it,

20    in 2020, titled Gender-Affirmation surgery conclusion

21    lacks evidence (letter)."

22               And you're a coauthor of this publication,

23    is that right?

24         A.    That's right.

25         Q.    This was another letter, is that correct?

1        A.    Yes, it's a Letter to the Editor.

2        Q.    Okay.  Is this peer-reviewed?

3        A.    I don't know.  It has to be accepted for

4    publication, like I said, so I don't know what process

5    they go through.

6        Q.    Below that there's another publication

7    titled "The Pediatric Endocrine Society's Statement on

8    Puberty Blockers isn't just Deceptive.  It's

9    Dangerous."

10            And you're the sole author of this

11   publication, is that right?

12       A.    Yes.

13       Q.    And it was published in Public Discourse, is

14   that correct?

15       A.    That's correct.

16       Q.    And the next page, the next publication

17   listed is "The Right to Best Care for Children does

18   Not Include the Right to Medical Transition," is that

19   right?

20       A.    Yes.

21       Q.    And you're a coauthor of this piece?

22       A.    Yes.

23       Q.    And this is an opinion piece, is that

24   correct?

25            MS. PAYTON:  Object to the form.

1      A.   My understanding is it's a peer-reviewed

2  piece, but that's the one I would say has to be

3  peer-reviewed to be published but I don't know their

4  process.

5      Q.   (By Mr. Gonzalez-Pagan)  But is it an

6  opinion piece or is it a research piece?

7           MS. PAYTON:  Object to the form.

8      A.   I mean it's the Journal of Bioethics, so

9  it's not -- if you're asking is it based on primary

10  research?  Because there's two different things.  You

11  could have a peer-reviewed -- peer review doesn't

12  necessarily mean it's primary research, to my

13  understanding.

14      Q.   No.  Understood.

15           I'm asking the question is the Journal of

16  Bioethics a peer-reviewed publication?

17      A.   That's my understanding, yes.  I mean all

18  the medical journals that you have listed are peer

19  reviewed publications.  The exact process they use, I

20  don't know.

21      Q.   And this piece in 2019 for which you are a

22  coauthor in the American Journal of Bioethics is not a

23  piece of original research, is that correct?

24      A.   When you say that, do you mean did we have

25  patients doing -- collecting data on individual

1    patients?  Is that what you mean by that?

2         Q.   Yes.  Do you have an understanding of what

3    primary research meant?  So I guess I would ask it

4    that way.

5              Is this article based on primary research

6    you conducted?

7         A.   It's not based on primary research I

8    conducted.

9         Q.   Thank you.  There's another publication.

10   It's a Letter to the Editor, "Endocrine Treatment of

11   Gender-Dysphoric/Gender Incongruent Persons: An

12   Endocrine Society Clinical Practice Guideline," is

13   that correct?

14        A.   Correct.

15        Q.   And you're a coauthor of this piece?

16        A.   Yes.

17        Q.   And this is another Letter to the Editor,

18   correct?

19        A.   Yes.

20        Q.   Just below that there's a publication titled

21   "The Gender Identity Phantom," and you are the sole

22   author, is that right?

23        A.   Correct.

24        Q.   And it appears to be published in the

25   gdworkinggroup.org, is that right?

1        A.    Yes, I think so.

2        Q.    What's the gdworkinggroup.org?

3        A.    They're a collection of different

4   psychologists, psychiatrists and other mental health

5   professionals, and there may have been other

6   physicians, but who were writing pieces with concerns

7   or criticisms about the care of people with gender

8   identity conditions.

9        Q.    Is this a publication posting on a

10  discussion board?

11       A.    Could you repeat that?

12       Q.    Is this a publication posting within a

13  discussion board?

14       A.    No.  Are you asking me like can you just

15  post something as part of a discussion or are you

16  asking can people discuss the topic below your

17  article?  Is that what you're asking?

18       Q.    I'm asking if it's a discussion forum for

19  professionals where you are set up, made a post, or

20  whether it's an article.

21       A.    Oh, it's an article against -- each author

22  can write -- you have to be a member to be an author

23  and you have to be an author to put something up

24  there.

25            So not just any general member of the public

1   could write something, if that clarifies it.

2        Q.   Okay.  Is this peer-reviewed?

3        A.   No.

4        Q.   The next publication is titled  "Gender

5   Dysphoria and Children: An Endocrinologist's

6   evaluation of 'I am Jazz,'" and you're the sole

7   author, is that right?

8        A.   That's correct.

9        Q.   And it was published in Public Discourse, is

10  that correct?

11       A.   Yes.

12       Q.   Are there any other publications that you

13  have in relation to gender dysphoria or transgender

14  issues?

15       A.   Not that I can think of.  I did have this --

16  I think I put it somewhere with my subpoena response,

17  but there's gendersanity.org where I explained myself

18  and coauthors explained the most recent Letter to the

19  Editor.

20       Q.   Sorry?  What is that?

21       A.   Gendersanity.org I believe is the name.

22       Q.   And is that a self-published website?

23       A.   Yes.

24       Q.   We've established that three of your

25  publications are for Public Discourse, is that

1    correct?

2              MS. PAYTON:  Object to the form.

3         A.    Yeah.   Three -- I think it was three, yeah,

4    three publications for Public Discourse.

5         Q.   (By Mr. Gonzalez-Pagan)   Who publishes,

6    Public Discourse?

7         A.    I believe at the time I submitted my

8    articles that -- I don't know who the publisher is but

9    the editor was Ryan Anderson, I believe.

10        Q.    Are you familiar with the Witherspoon

11   Institute?

12        A.    Only that I saw their name associated with

13   Public Discourse.

14        Q.    I'm going to show you what's been marked as

15   Exhibit 4.

16        A.    Okay.

17              (Marked Deposition Exhibit No. 4.)

18        Q.   (By Mr. Gonzalez-Pagan)   Do you see the

19   document in front of you?

20        A.    Yes.

21        Q.    This is the Mission Statement for Public

22   Discourse, is that right?

23        A.    It says "Our Mission," so I suppose it is.

24        Q.    Okay.   And just to clarify, this is a

25   printout on September 2nd, 2022, 8:30 a.m., off the

1    website www.the public discourse.com/our mission, is

2    that correct?

3              MS. PAYTON:  Object to the form, foundation.

4         A.   You are posting -- or I can see on the

5    screen a mission statement from Public Discourse as of

6    today.  Today is the first time I've ever seen it.

7         Q.   (By Mr. Gonzalez-Pagan)  Yes.  On the

8    screen?

9         A.   Yeah.

10        Q.   And do you understand Public Discourse to be

11   an online journal?

12        A.   Yes.

13        Q.   And are you aware that their mission is to

14   enhance public understanding of the moral foundations

15   of free society?

16             MS. PAYTON:  Object to the form.

17        A.   You know, I'm looking at it now and I can

18   say you just read what is on there.  But I don't have

19   any affiliation with them in particular.

20             I think, but I don't recall exactly, that

21   anything I publish at the bottom, I think, says

22   something like "This does not necessarily represent

23   the views of the Public Discourse," so --

24        Q.   Is there any reason why you chose to publish

25   in the Public Discourse?

Page 42

```
 1              THE VIDEOGRAPHER:  We're going off the
 2    record at 10:00 a.m.
 3                  (Recess.)
 4              THE VIDEOGRAPHER:  We're back on the record
 5    at 10:07 a.m.
 6         Q.   (By Mr. Gonzalez-Pagan)  We left off
 7    discussing your publications.  Do you recall that,
 8    Dr. Laidlaw?
 9         A.   Yes, I do.
10         Q.   Just to sum up, none of your publications
11    pertaining to gender dysphoria are based on original
12    primary research, is that correct?
13         A.   That's correct.
14         Q.   And with the exception of the piece in the
15    Journal of Bioethics none of your publications
16    pertaining to gender dysphoria are peer-reviewed?
17         A.   Well, a number are published in peer-reduced
18    journals.
19         Q.   Sorry.  The Letters to the Editor, is that
20    right?
21         A.   The Letters to the Editors are in
22    peer-reviewed journals, yes.
23         Q.   We've established that you have a private
24    practice dedicated to endocrinology, is that correct?
25         A.   That's correct.
```

1       Q.   As part of your practice do you treat any
2   pediatric patients?
3       A.   I have some patients who are under the age
4   of 18, so later teens or mid teens.
5       Q.   What percentage of your practice are
6   patients under the age of 18?
7       A.   Probably, like, less than five percent.
8       Q.   Have you ever provided care to a transgender
9   patient?
10      A.   Yes.
11      Q.   Have you provided them with care relating to
12  their gender dysphoria?
13      A.   Only once.
14      Q.   What care did you provide that one patient?
15      A.   The patient needed a refill of estrogen.
16      Q.   Did you provide them with the refill?
17      A.   Yes.
18      Q.   About how many transgender patients have you
19  treated for other conditions besides this one patient
20  for gender dysphoria?
21      A.   So I would say that in my practice I have
22  patients with, I would use a more general term and say
23  "gender incongruence," who I'm seeing for other
24  conditions.
25           For example, they may have a pituitary

1      A.    Or there would be one who had -- well, I

2  would say two because the detransition person I am

3  treating as a consequence of gender dysphoria.  So I

4  would say two.

5      Q.    Okay.  So there's the one person who has

6  detransitioned and then the one person who you

7  provided a refill for estrogen, is that correct?

8      A.    Those are two patients who received hormones

9  related to a gender incongruence condition.

10     Q.    How old was the patient that detransitioned?

11     A.    In his 20s.  He was diagnosed in his early

12 teens.

13     Q.    Do you know how this patient came about

14 connecting with you?

15     A.    He has had a very difficult time finding an

16 endocrinologist who will treat him.  He had an

17 orchiectomy or testicles removed and vaginal plasty.

18          He had a difficult time finding a physician

19 who would prescribe testosterone so he had made a

20 search and somehow found me.

21     Q.    Have you ever diagnosed any patient with

22 gender dysphoria?

23     A.    Being that it's a psychological diagnosis, I

24 do not make psychological diagnoses, so no.

25     Q.    Have you ever diagnosed a person with gender

1    identity disorder?

2          A.    The same answer.  A psychological, you know,

3    diagnosis that I do not make.

4          Q.    Just to clarify, for the patient who

5    detransitioned, you're not providing care for

6    treatment of gender dysphoria, is that correct?

7          A.    Well, I guess it depends how you define

8    treatment for gender dysphoria.

9          Q.    Well, what do you understand gender

10   dysphoria to be?

11         A.    Well, this would be a discomfort arising

12   from a person's, you know, true feeling of their

13   gender identity versus their physical body.

14               So I don't think this person has fully

15   resolved that issue within himself, but he feels very

16   poorly not receiving testosterone so I'm treating him.

17   So in a sense I am treating his gender -- I mean he

18   feels better.  He's doing better.

19               So I believe I am treating his gender

20   dysphoria.  That's not my primary purpose but it's a

21   secondary consequence.

22         Q.    Are you working in conjunction with a mental

23   health therapist or mental health provider in

24   providing this care to this individual?

25         A.    He just moved to Southern California and in

1   my understanding is he's found some mental health help

2   in his location.

3       Q.   Did you require a mental health assessment

4   of this individual prior to providing testosterone

5   that would be in keeping with his desire to have a

6   more masculine body?

7       A.   He had received some testosterone at some

8   point so I continued the treatment.

9       Q.   So let me restate the question, though.

10          Did you ask for, did you ascertain whether

11  this person had received a mental health assessment

12  prior to providing testosterone in order to -- in

13  keeping with his desire to have a more masculine body?

14      A.   I discussed with him his mental health

15  condition during the course of my visit.

16      Q.   Are you a mental health provider?

17      A.   No.

18      Q.   And is the answer "No" to the question as to

19  whether did you request a mental health assessment by

20  a mental health provider?

21      A.   He had already been seen by a mental health

22  provider.

23      Q.   Did you discuss the care with the mental

24  health provider?

25      A.   He moved to a different location since that

1   DSM-5 diagnosis.

2            MS. PAYTON:  Are you finished, Dr. Laidlaw,

3   with your answer?

4            THE WITNESS:  Yes.

5            MS. PAYTON:  Okay.  We can go off.

6            THE VIDEOGRAPHER:  We're going off the

7   record at 11:27 a.m.

8                (Discussion off the record.)

9            THE VIDEOGRAPHER:  One moment, please.

10            We're back on the record at 11:28 a.m.

11       Q.   (By Mr. Gonzalez-Pagan)  Dr. Laidlaw, you

12   mentioned that gender dysphoria is a diagnosis within

13   the DSM5, is that correct?

14       A.   Yes.

15       Q.   And it is the diagnosis pertaining to a

16   clinically significant distress -- the significant

17   clinical distress that a person experiences based on

18   the incongruence between their gender identity and you

19   said their body characteristics.

20       A.   I mean there's a full definition in the

21   DSM-5 but that's a summary that I would agree with.

22       Q.   Okay.  So the diagnosis pertains to the

23   distress, not to whether -- every person has a gender

24   identity, would you agree with me on that?

25       A.   Every person has a gender identity?  I have

1    last two sentences.  It states "WPATH claims to be a

2    scientific organization while explicitly acting as an

3    advocacy group.  These are incompatible goals."

4         A.    Yes.

5         Q.    What is the basis for your opinion that a

6    scientific organization cannot engage in advocacy?

7         A.    I think a scientific organization can -- for

8    example, the American Cancer Society, which we talked

9    about earlier, they can advocate for eliminating

10   cancer or better treatments for cancer.  But they

11   would not -- one would expect them not to exclusively

12   follow one, say, politically based point of view.

13             There could be a variety of points of view

14   within the American Cancer Society, I'm just giving

15   you an example, or Endocrine Society.  Whatever the

16   society is should be open to a variety of points of

17   view.

18             And what I've seen is that the WPATH is not.

19        Q.    You're not a member of WPATH, is that right?

20        A.    That's correct.

21        Q.    Do you know, are you privy to the debates

22   that occur within WPATH?

23        A.    I've seen some online debates.  I've spoken

24   to a psychologist who was a member and quit basically

25   because of this problem.

1       Q.   But you're not privy to the actual internal
2   conversations of WPATH, is that correct?
3       A.   I've spent time looking at the WPATH
4   standards of care.
5       Q.   That wasn't my question, though.  Have you
6   participated in any WPATH conferences?
7       A.   I do not participate in WPATH conferences.
8   I'm not a member.
9       Q.   Have you participated in internal discussion
10  forums?
11      A.   I do not participate with WPATH.  I'm not a
12  member.
13      Q.   So what is the basis for your opinion that
14  there are no diverse -- no differences of opinion
15  within WPATH?
16      A.   I'm basing it on their standards of care.
17      Q.   The Endocrine Society has a variety of
18  clinical practice guidelines, is that not correct?
19      A.   They do.
20      Q.   Some people disagree with many of those
21  variety of clinical practice guidelines, is that not
22  correct?
23      A.   Are you saying that the members of the
24  Endocrine Society disagree with practice guidelines?
25      Q.   Yes.

1   allowed for a variety of viewpoints in my opinion.

2        Q.   (By Mr. Gonzalez-Pagan)  And I'm asking

3   whether you know whether, know from a first hand basis

4   whether WPATH allows for a variety of opinions?

5        A.   My impression is that they do not.

6        Q.   What's the basis for your impression?

7        A.   Their standards of care and my conversation

8   with the psychologist that I mentioned.

9        Q.   So the standards of care itself is proof

10  there's no debate?

11       A.   Right.  Because it doesn't offer any

12  alternatives.

13       Q.   Let's turn to page 31 -- sorry, paragraph 31

14  of your report.

15       A.   Okay.

16       Q.   There you state -- is there an echo?  There

17  you state that the assertion by Dr. Etner that a

18  growing assemblage of research documents that gender

19  identity is immutable and biologically based lacks

20  scientific support and therefore impairs the

21  credibility of Dr. Etner's opinions?

22       A.   Yes.

23       Q.   Okay.  Are you saying that gender identity

24  is not biologically based?

25       A.   I'm saying there's no evidence of it at this

1      A.   I'm not sure.  I think some of the earlier

2  studies were in the United States but I'm not a

3  hundred percent sure.

4      Q.   Are you aware that the desistance studies

5  only involve youth that were diagnosed or were sub

6  threshold for gender identity disorder rather than

7  gender dysphoria?

8      A.   Well, the gender dysphoria diagnosis was

9  not, you know, hadn't been published at that point,

10  so.

11      Q.   It didn't exist at that time, is that

12  correct?

13      A.   Well, I mean it may have existed but it

14  didn't exist as a term in the DSM.

15      Q.   Sure.  What I'm trying to say, the gender

16  dysphoria diagnosis as contained within the DSM-5 did

17  not exist at the time that these studies were

18  conducted?

19      A.   Yes.

20      Q.   Okay.  And the diagnostic criteria of gender

21  identity disorder contained in the DSM-3 and 4 is

22  different than the diagnostic criteria for gender

23  dysphoria in the DSM-5, is that correct?

24      A.   At that time I believe they had a term

25  gender identity disorder.

1      Q.   Yes.  And I'm asking whether the diagnostic

2   criteria are different.

3      A.   There were different diagnostic criteria, to

4   my knowledge.

5      Q.   I'm going to show you what's been marked as

6   Plaintiffs' Exhibit 6.

7                (Marked Deposition Exhibit No. 6.)

8      Q.   (By Mr. Gonzalez-Pagan)  I apologize.  This

9   is actually a pretty enormous PDF.

10               Can you see my screen?

11     A.   Yes.

12               This is a publication titled "Understanding

13   the Well-Being of LGBTQI Populations," from 2020,

14   published by the National Academies of Sciences,

15   Engineering and Medicine.

16               Do you see that?

17     A.   I see it.

18     Q.   Are you familiar with this document?

19     A.   Only briefly looking at it this morning but

20   I had not heard of it before.

21     Q.   Okay.  And in your report you relied on

22   reported reviews from the United kingdom, Sweden and

23   Finland relating to the scientific evidence of the

24   care of gender dysphoria, is that right?

25     A.   Yes.

1    looked at primarily up to age twelve population.

2              So I'm asking if you know any desistance

3    rates or studies pertaining to desistance rates, you

4    know, above age twelve?

5        A.   Well, I don't -- well, let's say from the

6    age of 13 to 18 I'm not aware of any study that looks

7    at desistance.

8        Q.   Do you know of any study that looks at

9    desistance above age 18?

10       A.   I don't know if there's any published study.

11   I know there was a professor in the UK who wanted to

12   publish something and he was obstructed from doing

13   that.  I don't remember his name, Caspin, I think.

14             So I'm not aware that there's any out there.

15       Q.   (By Mr. Gonzalez-Pagan)  I'm going to refer

16   you again to Exhibit 6.  This is the National

17   Academies study report.  I'm on page 302 of the

18   document.

19             And it states that while interest in the

20   so-called desistance of transgender identity has been

21   informed by studies suggesting that as high as 80

22   percent of prepubertal youth presenting to pediatric

23   gender clinics ultimately do not identify as

24   transgender, many of the youth included in the studies

25   did not meet full DSM criteria for a gender

1    identification.

2              It sounds like they're speculating about

3    what might have happened.

4         Q.   Do you know where the recruitment occurred

5    in Lisa Littman's article?

6         A.   I know it was an online recruitment.

7              But having a question about medical care

8    doesn't, you know, invalidate their opinion.  But it

9    could be a skewed sample, I would say that that is

10   correct.

11        Q.   Okay.  Turn to paragraph 65 of your report.

12        A.   Yes.

13        Q.   In that paragraph you refer to various

14   approaches for modalities of treatment for gender

15   dysphoria, is that right?

16        A.   Yes.

17        Q.   One of these is -- one is psychosocial

18   treatment that helps the young person align their

19   internal sense of gender with their physical sex, is

20   that right?

21        A.   Yes.

22        Q.   And the other one would be to watch and wait

23   and allow time and maturity to help the young person

24   align sex and gender through natural desistance.

25        A.   Yes.

1        Q.    And the third option is referred to as

2   gender affirming, affirmative therapy, or GAT, and is

3   the approach recommended by WPATH, is that right?

4        A.    Yes.

5        Q.    Okay.  Is the first approach using

6   psychosocial treatment to help the young person align

7   their internal sense of gender with their physical

8   sex, is that which you would refer -- to which other

9   people would refer as reparative therapy?

10       A.    I don't know.

11       Q.    And you cite to Zucker.  Is that Ken Zucker?

12       A.    Ken Zucker, that's correct.

13       Q.    Do you know what model Dr. Ken Zucker uses

14  as a form of treatment for gender dysphoria?

15       A.    I don't know if he's actively treating

16  children for gender dysphoria currently.

17       Q.    Do you know what model of treatment he used

18  previously?

19       A.    I know that it included -- I would say the

20  first two, although I'm not an expert on Ken Zucker's

21  approach.  But I know that he believed that desistance

22  was possible.

23             That, like the DSM states, that many of

24  these children would grow up to be, say, gay or

25  Lesbian, and that, therefore, medical treatments to

1   change their bodies would not be something that should

2   be approached in early childhood.

3       Q.   Just to clarify children, you're referring

4   to those studies in the 80s and 90s prior to the

5   diagnosis of gender dysphoria being in existence, is

6   that right?

7       A.   Can you repeat that?

8       Q.   When you say these children are you

9   referring to those that were studied in the 80s and

10  90s up to the age of twelve prior to the existence of

11  the diagnosis of gender dysphoria?

12      A.   These are children who came to their clinic

13  with what we would call now gender incongruence.

14      Q.   But you don't know if they were children

15  that showed up or would have met the criteria for

16  gender dysphoria?

17      A.   There would be no way to know that.

18      Q.   I'm going to show you what's been marked as

19  Exhibit 8.

20              (Marked Deposition Exhibit No. 8.)

21      Q.   (By Mr. Gonzalez-Pagan)  Can you see the

22  screen?

23      A.   Yes.

24      Q.   This is an article "Gender nonconforming

25  youth: current perspectives."

1            It is authored by Diane Ehrensaft, published

2    in 2017 in the Journal Adolescent Health, Medicine and

3    Therapeutics, is that right?

4        A.   Yes.

5        Q.   Are you aware of who Dr. Ehrensaft is?

6        A.   Yes.

7        Q.   She's a psychologist, is that right?

8        A.   I believe so.

9        Q.   Are you familiar with the Journal of

10   Adolescent Health, Medicine and Therapeutics?

11       A.   I have probably seen it.  I don't read it on

12   a regular basis.

13       Q.   Is that a peer-reviewed journal?

14       A.   Presumably.

15       Q.   I'm going to turn to page 61 of the exhibit.

16            This article is discussing here the "live in

17   your own skin" model.

18            Do you see that?

19       A.   Yes.

20       Q.   Okay.  "As mentioned earlier, this model was

21   developed by Drs. Susan Bradley and Ken Zucker at the

22   Center for Alcoholism and Mental Health gender clinic

23   in Toronto.  The treatment goal of facilitating a

24   young child accepting the gender identity matching the

25   sex assigned to that child at birth is based on the

1    supposition that younger children, in contrast to

2    older youth, have a malleable gender brain, is tied to

3    a medical-social rationale."

4           And then, later, it states, "If by the

5    arrival of puberty a child is still exhibiting

6    cross-gender identifications and expressing a

7    cross-gender identity, that child should be supported

8    in transitioning to the affirmed gender, including

9    receiving puberty blockers and hormones, once it is

10   assessed through clinical interviews and psychometric

11   testing that the affirmed gender identity is

12   authentic."

13          Did I read that correctly?

14      A.   Yeah.

15      Q.   This is a description of the "live in your

16   own skin" model developed by Dr. Zucker, is that

17   right?

18      A.   You know, I don't know.  'Live in your own

19   skin,' is that something Dr. Zucker -- is it a quote

20   from Dr. Zucker?  I don't know.

21          Or is that Dr. Ehrensaft's interpretation?

22   I haven't come across it.

23      Q.   Well, she's describing the model used, the

24   modality of treatment used by Dr. Ken Zucker.

25      A.   She's describing it with her own words, as

1    far as I can tell.  Because I don't -- a malleable

2    gender brain?  I don't know what that is.  I don't

3    know what she's talking about.

4         Q.   Do you have any reason to dispute that under

5    Dr. Zucker's own modality of treatment by the arrival

6    of puberty there is the provision of puberty blockers

7    and hormones if the person is exhibiting cross-gender

8    identity?

9         A.   Can you repeat that, please.

10        Q.   Sure.  Do you have any reason to dispute

11   that under Dr. Zucker's modality of treatment puberty

12   blockers and hormones are provided once there is the

13   arrival of puberty and the child is still exhibiting

14   cross-gender identification?

15        A.   So what you're saying is that under

16   Dr. Zucker's model if the person has not -- hasn't

17   aligned, say, their gender identity with their

18   physical body, that under Dr. Zucker's model the next

19   step would be puberty blockers and hormones?

20             Is that what you're asking me?

21        Q.   That's what the article says and I'm asking

22   do you have any reason to dispute that?

23        A.   If by the arrival of puberty -- it's the

24   same problem.  This is the problem with the

25   psychological literature is that they confuse puberty

1   and adolescence.  Dr. Ehrensaft has the same problem.

2            So, you know, I think Dr.Zucker uses age

3   twelve, so some of them had already arrived at

4   puberty.  So I don't think that statement is correct.

5        Q.   Okay.  In your statement that Dr. Zucker

6   uses age twelve as the marker, if by age twelve a

7   child continued to exhibit cross-gender

8   identification, would Dr. Zucker -- under Dr. Zucker's

9   model would puberty blockers and hormones be provided?

10       A.   I don't know that that would be the case

11   every time.  I believe they had used that at their

12   clinic, or at least referred.  The problem is

13   Dr. Zucker and Dr. Ehrensaft don't prescribe puberty

14   blockers.  They can't.

15       Q.   Both Dr. Zucker and Dr. Ehrensaft worked in

16   multidisciplinary clinics, is that right?

17       A.   I guess so.  I don't know for sure.

18       Q.   The second method described is the watch and

19   wait method, is that right?

20       A.   Yes.

21       Q.   Is this also known as the watchful waiting

22   model?

23       A.   Sometimes.

24       Q.   And in speaking of the watchful waiting

25   model are you talking about the model developed at the

1    Amsterdam clinic?

2         A.    No.

3         Q.    To what model are you referring to?

4         A.    Just the gender approach to watching and

5    waiting with observation and psychological support to

6    see what will happen with a person's gender identity.

7    It's just a general medical terminology.

8         Q.    Okay.  Are you aware that the watchful

9    waiting model has been described as the one designed

10   by members of the interdisciplinary team at the

11   Amsterdam Center for Expertise on Gender Dysphoria,

12   under the leadership of Dr. Peggy Cohen-Kettenis?

13        A.    Dr. Kettenis, what are you saying?  She did

14   what now?

15        Q.    She is the lead in the center that developed

16   the watchful waiting model.

17        A.    Okay.  What's the question about it?

18        Q.    Well, I'm just asking you about the watchful

19   waiting model.  It's a very specific term but it's

20   used in reference to the model applied at this center

21   in Amsterdam.

22        A.    Okay.

23        Q.    And I'm just asking you if you disagree with

24   that statement?

25        A.    I know that from the Dutch study they had

1    waited to age twelve to start puberty blockers, if

2    that's what you're referencing.

3         Q.   Okay.  So under this model, the Dutch

4    watchful waiting model, they would wait until age

5    twelve and if-cross-gender identification persisted at

6    that period of time they would initiate medical care,

7    is that right?

8         A.   No.

9         Q.   No?

10        A.   No, that's not right.

11        Q.   Why?

12        A.   Because it depends on other factors,

13   psychological condition of the child, home situation.

14   There are a lot of other factors involved before they

15   went on to prescribe puberty blockers.

16        Q.   I'm going to read some more description of

17   the model by Dr. Ehrensaft.  If a child's cross-gender

18   identification and affirmation are persistent over

19   time, interventions are made available for a child to

20   consolidate a transgender identity, once it is

21   assessed through therapeutic intervention and

22   psychometric assessment as in the best interests of

23   the child.  These interventions include social

24   transition, the shift from one gender to another,

25   including possible name change, gender marker change,

1  gender pronoun changes, puberty, blockers and later

2  hormones and possible gender affirming surgeries.

3           Is that right, did I read that correctly?

4       A.   You read it correctly.

5       Q.   Okay.  Is that consistent with your

6  understanding of the watchful waiting model?

7       A.   I'm rereading this.  I would say these

8  interventions "may" include these things.

9           So I think the sentence needs to be

10  clarified.  It's not 100 percent.

11       Q.   Let me ask you this.  You say that the watch

12  and wait model allows time and maturity to help the

13  young person align sex and gender from natural

14  desistance.

15           At what point in time in the watch and wait

16  model that you described is medical intervention

17  appropriate?

18       A.   Well, I mean, just to be clear, I'm not --

19  I'm not using the watch and wait as a term that's

20  synonymous with the Dutch approach.  I'm using it as a

21  general medical term for any sort of condition where

22  you watch with observation and support, not simply

23  leaving a person in the lurch, so to speak.  Yeah.

24       Q.   I get -- I'm not trying to cut you off.

25       A.   Okay.

1        Q.   I get that.  My question is under your

2   description of a watch and wait model at which point

3   in time is medical intervention appropriate?

4        A.   I would say it could be considered once they

5   reach -- a person reaches the age of majority.

6        Q.   So no person before the age of majority

7   under that model would be ever able to obtain medical

8   care for gender dysphoria?

9             MS. PAYTON:  Object to the form.

10       A.   These people could obtain medical care, but

11  if you're talking about puberty blockers, cross-sex

12  hormones, surgeries, there's not good evidence and

13  there are certainly risks of harm so that they should

14  not -- they would not be able to do that, to consent

15  to the types of harm, the sterilization, you know,

16  inability to breastfeed, until they reach the age of

17  majority.

18       Q.   (By Mr. Gonzalez-Pagan)  Okay.  So just to

19  clarify, under the watch and wait model as you've

20  described it --

21       A.   Yes.

22       Q.   -- no person under the age of majority would

23  be prescribed puberty blockers, hormones or surgery as

24  treatment for gender dysphoria?

25       A.   Correct.

1       Q.   To what scientific literature do you cite in

2   support of this model?

3       A.   Pretty much my whole declaration is in

4   support of this model.

5       Q.   Yes.  What I'm asking is any peer-reviewed

6   article, clinical guideline, anything in scientific

7   literature that recommends and describes this model.

8       A.   This would be an opinion of myself based on

9   my clinical experience and research on the topic.

10      Q.   And your clinical experience is limited

11  to -- in the treatment of gender dysphoria is limited

12  to one person for whom you prescribed estrogen and one

13  person which you've been seeing since May for

14  detransition, is that right?

15      A.   Well, the issue -- I mean there's -- the

16  reason I opine on this topic is because as an adult

17  endocrinologist patients can, and one already has,

18  come to me who's been through these medical

19  interventions.

20          So I have to A, be aware of them, B, be

21  aware of any type of side effects or complications,

22  endocrine complications, anatomical complications that

23  result from that.

24          So I have to make that assessment.  In other

25  words, if someone comes to me who is, say, age 20, on

1    this treatment I have to know was it assessed properly

2    and what are the risks to them for the future.  And so

3    as I make this assessment, which is really what I'm

4    saying in my report, the evidence is poor and the risk

5    of harms are great, and so that's why it's best to

6    watch and wait.

7         Q.   Okay.  But you mentioned in your response

8    the presentation of somebody aged 20 to you.

9         A.   Okay.

10        Q.   Would you not provide or would you object to

11   the provision of medical treatment such as hormones or

12   surgery for their gender dysphoria?

13        A.   I would have to look on a case-by-case

14   basis.

15        Q.   And aside from that one person that required

16   estrogen, has anybody presented to you requesting the

17   provision of hormone treatment or puberty blockers for

18   their gender dysphoria?

19        A.   I have not, like, done a history and

20   physical for such a patient but I'm prepared for such

21   a patient.

22        Q.   So in your opinion it hasn't occurred?

23        A.   Right.

24        Q.   And the first mode of treatment that you

25   discussed was the psychosocial treatment that helps

 1    the young person align their internal sense of gender

 2    with their physical sex, right?

 3         A.   Yes.

 4         Q.   And I believe I asked this question and you

 5    answered this question but please remind me.

 6         A.   Okay.

 7         Q.   I honestly don't recall the answer.

 8              So is this what some would term reparative

 9    or conversion therapy?

10         A.   I don't know.

11         Q.   Are you aware that the American Psychiatric

12    Association opposes conversion therapy efforts?

13         A.   What -- I don't know, conversion therapy,

14    what -- could you explain that further?  Or do you

15    have a quote that I can look at or something?

16         Q.   I'm going to show you what's been marked as

17    Plaintiffs' Exhibit 9.

18                   (Marked Deposition Exhibit No. 9.)

19         Q.   (By Mr. Gonzalez-Pagan)  Do you see the

20    screen?

21         A.   Yes.

22         Q.   It's a Position Statement on Conversion

23    Therapy on LGBTQ Patients adopted by the American

24    Psychiatric Association, is that right?

25         A.   Yes.

1        Q.    Okay.  And it was approved by the Assembly

2    of the American Psychiatric Association November 2018

3    and the Board of Trustees on December 2018, is that

4    right?

5        A.    Yes.

6        Q.    The third point of the resolution states

7    that the American Psychiatric Association encourages

8    psychotherapies which affirm individuals' sexual

9    orientations and gender identities.

10            Is that right?

11       A.    That's what it says.

12       Q.    It also states, "Along a similar vein,

13   gender diverse patients have been shown to benefit

14   from gender-affirming therapies, and given the

15   documented harm of 'reparative' or conversion

16   therapies regarding sexual orientation, it would

17   likely be seen as unethical to research reparative

18   therapy outcomes with gender diverse populations."

19            Do you see that?

20       A.    I see that.

21       Q.    I'm going to show you what's been marked as

22   Plaintiffs' Exhibit 10.

23                (Marked Deposition Exhibit No. 10.)

24       Q.    (By Mr. Gonzalez-Pagan)  This is a

25   resolution by the American Psychological Association

1   on gender identity change efforts and it was adopted

2   in February 2021.

3              Do you see that?

4       A.   Yes.

5       Q.   And it describes gender-identity change

6   efforts as referring to a range of techniques used by

7   mental health professionals and nonprofessionals with

8   the goal of changing gender identity, gender

9   expression or associated components of these to be in

10  alignment with gender role behaviors that are

11  stereotypically associated with sex assigned at birth.

12             Is that right?

13      A.   Yes.  That's what it says.

14      Q.   And then it states on the third page that

15  "Be it therefore resolved that consistent with the APA

16  definition of evidence-based practice, the APA affirms

17  that scientific evidence and clinical experience

18  indicate that gender identity change efforts put

19  individuals at a significant risk of harm."

20             Did I read that correctly?

21      A.   Yes.  You read it correctly.

22      Q.   Then "Be it further resolved that the APA

23  opposes gender identity change efforts because such

24  efforts put individuals at significant risk of harm

25  and encourages individuals, families, health

1    professionals and organizations to avoid gender

2    identity change efforts."

3              Did I read that correctly?

4        A.   Yes.

5        Q.   So the American Psychiatric Association and

6    the American Psychological Association both oppose a

7    modality of treatment that seeks to encourage a young

8    person to align their gender identity with their sex

9    assigned at birth?

10             Is that right?

11       A.   Can you repeat that?

12             MS. PAYTON:  I'll object to the form.

13             Go ahead.

14       Q.   (By Mr. Gonzalez-Pagan)  Based on what we

15   have discussed. would you agree that the American

16   Psychiatric Association and the American Psychological

17   Association oppose a modality of treatment that

18   encourages young people to align their internal sense

19   of gender with their sex assigned at birth?

20             MS. PAYTON:  Object to the form of the

21   question.

22       A.   I mean my understanding of this is that

23   people are opposed to, as they should be, like

24   electroshock treatments or shaming people or, you

25   know, forcing girls, ripping trucks out of their hands

1    and putting Barbies in their hands.  And I would agree

2    with all of those things.  Those are bad.

3            But if the idea is that we're going to wait

4    a few years and see if on their own, not through any

5    effort but watching and waiting, a child or adolescent

6    gender identity on its own changes, I don't know that

7    they are opposed to that based on what I've read.

8        Q.   (By Mr. Gonzalez-Pagan)  Okay.  But that

9    wasn't my question, Dr. Laidlaw.

10           To be clear, I'm asking not about the wait

11   and see model.

12       A.   Okay.

13       Q.   I'm asking you about the first model of

14   treatment that you described, which is the

15   psychosocial treatment that helps the young person

16   align their internal sense of gender with their

17   physical sex.

18           And you've described that as one of the

19   modalities of treatment.  And I'm asking if, based on

20   what we have reviewed, the American Psychiatric

21   Association and the American Psychological Association

22   oppose the very modality of treatment that you discuss

23   as the first of three modalities of treatment in that

24   paragraph?

25           MS. PAYTON:  Object to the form of the

1  question.

2        A.    I think the thing is what you presented to

3  me is not in a peer-reviewed journal, if we want to go

4  down that road.  It's not peer-reviewed that I can

5  tell.

6              It's some committee probably wrote it up and

7  purports to represent thousands and thousands of

8  people across the country that may have never looked

9  specifically at this situation.

10             So I don't put much credence into this.

11       Q.    (By Mr. Gonzalez-Pagan)  I understand that

12  you don't put much credence.  That's not my question.

13             The question is does the APA, as in the

14  American Psychiatric Association, the American

15  Psychological Association, oppose the very first

16  modality of treatment that you described on paragraph

17  65?

18       A.    Well, I don't think they're describing the

19  same thing.

20       Q.    You're describing psychosocial treatments

21  that help the young person align their internal sense

22  of gender with their physical sex.

23       A.    Right.

24       Q.    Are you talking about active encouragement

25  or are you talking about letting them wait and see?

1      A.   Well, it's their internal sense of gender

2  which for a young person is going to be ambiguous.

3           That's different than saying someone who is,

4  you know, 24 -- throwing out a number -- 24, natal

5  female has a gender identity of a male.  I think it's

6  two different situations.

7      Q.   What's your reason for stating that a young

8  person's internal sense of gender is not firm or set?

9      A.   Because it can change over time, just like a

10 lot of things.  They might think they're a butterfly

11 for a while.  I was the $6 million man for a little

12 while.

13          It's just the nature of kids.

14     Q.   Is there any peer-reviewed literature that

15 you can cite to in support of that opinion?

16     A.   It's just an observation that anyone would

17 see, I think, with children.

18     Q.   You spoke to a model and I just want to make

19 sure I understand your opinion as to what you would

20 recommend.

21          And I just want to clarify, is that the

22 case?

23     A.   My purpose there was to list three different

24 types of approaches to -- more so kids or young people

25 with gender dysphoria.  I'm not advocating any

1      Q.   In your report you discuss and somewhat

2  criticize the provision of puberty blockers as

3  treatment for gender dysphoria, is that correct?

4      A.   I describe complications as a result of

5  puberty blockers for gender dysphoria.

6      Q.   And by puberty blockers we're talking about

7  generation analogs, is that right?

8      A.   For the most part, yes.

9      Q.   Puberty blockers are routinely prescribed

10 for the treatment of precocious puberty, is that

11 correct?

12     A.   Yes.

13     Q.   Do you consider the use of puberty blockers

14 as treatment for precocious puberty to be

15 experimental?

16     A.   No.

17     Q.   Have you yourself prescribed puberty

18 blockers for the treatment of central precocious

19 puberty?

20     A.   No.

21     Q.   I'm going to show you what's been marked as

22 Exhibit 11.

23               (Marked Deposition Exhibit No. 11.)

24     Q.   (By Mr. Gonzalez-Pagan)  Can you see this on

25 the screen?

Page 186

1      Q.   Turn to paragraph 213.  In the second

2  sentence and the third you state as follows, "C.P. had

3  not had enough time and maturity to grasp this

4  complication.  Thirteen-year-old girls are generally

5  not thinking about their future family planning as

6  they are still children themselves under the care of

7  another."

8           I just wanted to clarify, are you referring

9  to C.P. as a girl?

10          MS. PAYTON:  Object to the form.

11     A.   The problem with this -- well, one of the

12  many problems with the medical care in this

13  circumstance is that there was no known mental health

14  evaluation at the onset to determine if the patient

15  had gender dysphoria.

16          So therefore, knowing that a large portion

17  of minors will desist, therefore, and knowing that

18  C.P. is a natal female, therefore, probability-wise

19  the person would have otherwise identified as a girl.

20     Q.   (By Mr. Gonzalez-Pagan)  C.P. identifies as

21  a boy, is that correct?

22     A.   C.P. has undergone puberty blockers and

23  testosterone so this complicates the situation.

24     Q.   Not my question.  My question is, C.P.

25  identifies as a boy?

1       A.    That's my understanding.

2       Q.    Okay.   Is there any reason why you wouldn't

3   refer to him as a boy?

4       A.    Well, the comparison is really about

5   biological function, because C.P. was born with eggs.

6   And if C.P. is to become pregnant in the future this

7   will be because C.P. has eggs which can be fertilized

8   by sperm, which is what happens to, let's see, natal

9   females when they eventually become adults, which

10  would be girls.

11             MS. PAYTON:   Omar, we can't hear you.   Omar,

12  we couldn't hear you.

13      Q.    (By Mr. Gonzalez-Pagan)   I said let's go to

14  paragraph 222 of your report.

15      A.    Okay.

16      Q.    The last sentence states, "Again, from the

17  records it does not appear that C.P. had an adequate

18  assessment by a qualified psychiatrist or psychologist

19  prior to signing a consent form for a mastectomy

20  procedure."

21             Did I read that correctly?

22      A.    Yes.

23      Q.    To what guideline do you refer to in

24  requiring an assessment by a psychiatrist or a

25  psychologist?

1                    C E R T I F I C A T E

2    STATE OF WASHINGTON    )
                            ) ss.
3    COUNTY OF KING         )

4          I, the undersigned Washington Certified Court

5    Reporter, hereby certify that the foregoing deposition upon

6    oral examination of MICHAEL LAIDLAW was taken

7    stenographically by me on September 2, 2022, and transcribed

8    under my direction;

9          That the witness was duly sworn by me pursuant to

10   RCW 5.28.010 to testify truthfully; that the transcript of

11   the deposition is a full, true, and correct transcript to

12   the best of my ability; that I am neither attorney for nor

13   relative or employee of any of the parties to the action or

14   any attorney or counsel employed by the parties hereto, nor

15   am I financially interested in its outcome.

16          I further certify that in accordance with

17   CR 30(e) the witness was given the opportunity to examine,

18   read and sign the deposition within 30 days upon its

19   completion and submission, unless waiver of

20   signature was indicated in the record.

21          IN WITNESS WHEREOF, I have hereunto set my hand this

22   12th day of September, 2022.

23                    _____

24                    Pat Lessard,
                      pat@court-reporter.com
25