# IDRX 4 -

# Olson-Kennedy *Misanin* Deposition Transcript

## (Public document)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

STERLING MISANIN, et al.,      )
                               )
            Plaintiffs,        )
                               )
       vs.                     )Case No.
                               )   2:24-cv-04734-BHH
ALAN WILSON, in his official   )
capacity as the Attorney       )
General of South Carolina,     )
et al.,                        )
                               )
            Defendants.        )
_____ )

VIDEOTAPED DEPOSITION OF JOHANNA OLSON-KENNEDY, M.D.,
taken on behalf of Plaintiffs, at ACLU of Southern
California, 1313 West Eighth Street, Suite 200,
Los Angeles, California 90017, beginning at
9:43 a.m., and ending at 1:31 p.m., on Monday,
October 7, 2024, before Marceline F. Noble, RPR, CRR,
Certified Shorthand Reporter No. 3024.

Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:
Marceline F. Noble
CSR No. 3024

Job No. 1213502



1 APPEARANCES:
2 For Plaintiffs:
3 AMERICAN CIVIL LIBERTIES UNION
   LGBTQ & HIV PROJECT
4 HARPER SELDIN, ESQ.
   SRUTI SWAMINATHAN, ESQ.
5 125 Broad Street
   New York, New York 10004
6 212.549.2500
   hseldin@aclu.org
7 sswaminathan@aclu.org
8 -and-
9 SELENDY GAY PLLC
   AINE CAROLAN, ESQ.
10 JULIE SINGER, ESQ.
    1290 Avenue of the Americas
11 New York, New York 10104
    212.390.9000
12 212.390.9399 Fax
    acarolan@selendygay.com
13 jsinger@selendygay.com
14 For Defendants:
15 COOPER & KIRK, ESQ.
   JOHN D. RAMER, ESQ. (Pro Hac Vice)
16 1523 New Hampshire Avenue, N.W.
   Washington, D.C. 20036
17 (202) 220-9600
   (202) 220-9601 Fax
18 jramer@cooperkirk.com
19 -and-
20 OFFICE OF THE ATTORNEY GENERAL
   EMORY SMITH, ESQ.
21 (Via Zoom videoconference)
   P.O. Box 11549
22 Columbia, South Carolina 29211
   803-734-4127
23 emorysmith@scag.gov
24
25 ///

1 APPEARANCES: (continued)
2
3 Also Present:
4 BRIAN KIELHACK, Videographer
5 (Via Zoom videoconference:)
6 BEN McGRAY, South Carolina Office
   of the Attorney General
7
   ABBY TABACHINI
8 GARREN MORTON
   JUSTIN TERRANOVA
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 INDEX
2 WITNESS EXAMINATION
3 JOHANNA OLSON-KENNEDY, M.D.
4 By Mr. Ramer 8
5
6
7
8 EXHIBITS
9 NUMBER DESCRIPTION PAGE
10 1 Declaration of Dr. Olson-Kennedy 9
11 2 Deposition Transcript of 13
   Dr. Olson-Kennedy, Noe vs. Parson
12
   3 Errata Sheet from Transcript of 13
13 Dr. Olson-Kennedy, Noe vs. Parson
14 4 Copy of Deposition of 14
   Dr. Olson-Kennedy,
15 Voe vs. Mansfield
16 5 Errata Sheet from Transcript of 15
   Dr. Olson-Kennedy,
17 Voe vs. Mansfield
18 6 Amicus Brief, United States 15
   vs. Skrmetti
19
20 7 DMS-5-TR Cover and Chapter 23
   re Gender Dysphoria
21 8 British Medical Journal Report 46
22 9 Clinical Consent Forms 49
23 10 National Institutes of Health 71
   Grant Application (submitted 2014)
24
25 ///

1 EXHIBITS (continued)
2 NUMBER DESCRIPTION PAGE
3 11 A Taylor Systematic Review 101
4 12 New York Times Article entitled 116
5 "Biden Administration Opposes
   Surgery for Transgender Minors"
6 13 Transcript from Dr. Turban's 121
   Podcast
7
8 14 Expert Declaration of 130
   Dr. Olson-Kennedy in
   Dekker vs. Marstiller
9
10
11
12
13 INSTRUCTION NOT TO ANSWER
14 (None)
15
16
17
18
19
20
21
22
23
24
25



1        LOS ANGELES, CALIFORNIA
2        MONDAY, OCTOBER 7, 2024
3        9:43 a.m. - 1:31 p.m.
4
5      THE VIDEOGRAPHER:  Ready to go?
6      MR. RAMER:  Yes.
7      THE VIDEOGRAPHER:  We are now on the record.
8  This begins videotape No. 1 in the
9  deposition of Dr. Johanna Olson-Kennedy, in the
10 matter of Sterling Misanin versus Alan Wilson, in the
11 United States District Court, for the District of
12 South Carolina, Charleston Division.
13     Case No. 2:24-cv-4734[sic]-BHH.
14     Today is October 7th, 2024, and the time is
15 9:43 a.m.
16     This deposition is being taken at ACLU of
17 Southern California in Los Angeles, California 90017.
18     My name is Brian Kielhack of Magna Legal
19 Services, and I will be your videographer for today.
20     Our court reporter is Marceline Noble.
21     Counsel, at this time I ask that you
22 introduce yourselves, starting with our noticing
23 attorney.
24     MR. RAMER:  I am John Ramer of Cooper
25 & Kirk, on behalf of defendants.

1      MR. SELDIN:  Harper Seldin of the ACLU, on
2  behalf of plaintiffs.
3      MS. CAROLAN:  Aine Carolan of Selendy Gay,
4  also on behalf of plaintiffs.
5      THE VIDEOGRAPHER:  May counsel via Zoom --
6  go ahead.
7      THE WITNESS:  I'm --
8      Sorry.
9      THE VIDEOGRAPHER:  No.  Go ahead.
10     MR. SMITH:  I'm Emory Smith online, counsel
11 for the defendants, with the South Carolina
12 Attorney General's office.
13     And my understanding is, without objection,
14 I have three interns with me, Abby Tabachini, Garren
15 Morton, and Justin Terranova.  They will be observing
16 part of the deposition.
17     MR. McGRAY:  My name is Ben McGray with the
18 South Carolina's Attorney General's office.  I'm not
19 counsel of record.
20     I'm awaiting bar results, but I'm listening
21 in by Zoom.
22     MS. SWAMINATHAN:  Hi, there.  My name is
23 Sruti Swaminathan, counsel for plaintiffs, from the
24 ACLU.
25     THE REPORTER:  Who is Julie Singer?

1      MR. SELDIN:  Julie Singer is for -- counsel
2  with plaintiffs, with Selendy Gay.
3
4      JOHANNA OLSON-KENNEDY, M.D.,
5  having been first duly sworn, was examined and
6  testified as follows:
7
8      THE REPORTER:  Thank you.
9
10       EXAMINATION
11 BY MR. RAMER:
12     Q.  Good morning, Dr. Olson-Kennedy.
13     A.  Good morning.
14     Q.  I know you've been deposed before, so this
15 will be the same drill as usual.  We'll try not to
16 talk over one another.
17     I'll ask questions.  If you don't understand
18 my questions, just let me know.
19     And I know you're familiar with this, but
20 according to the local rules, I'm supposed to
21 instruct you that you should ask me rather than your
22 own counsel for clarifications, definitions or
23 explanations of any words, questions or documents
24 presented during the course of the deposition.
25     Do you understand that?

1      A.  I do.
2      Q.  I'm going to aim to take breaks around the
3  hour, but if you ever need a break at any point, just
4  let me know.  My only request is that you'd answer
5  any pending questions.
6      Does that make sense?
7      A.  Yes.
8      MR. RAMER:  And we'll just start with some
9  housekeeping.  I'm going to hand the court reporter a
10 document to be marked Olson-Kennedy Exhibit 1.
11     (Deposition Exhibit 1 was marked for
12     identification by the court reporter.)
13     MR. SELDIN:  And, Mr. Ramer, before we get
14 into it, I just wanted to note for the record that I
15 believe we have left unresolved whether this
16 deposition time cuts into a total of seven hours for
17 Dr. Olson-Kennedy or separate and apart.  That's
18 fine.  The parties will sort it out later.
19     I just wanted to note that for the record.
20     MR. RAMER:  And, yes.  Defendants agree with
21 your understanding.
22     Q.  And, Dr. Olson-Kennedy, you've been handed
23 what's been marked as Olson-Kennedy 1; correct?
24     A.  Yes.
25     Q.  And is this the declaration that you



1  submitted in this case?
2      A. Yes.
3      Q. And do you have any corrections or updates
4  to it?
5      A. There are a handful of additional seminars
6  and lectures that I've given, as well as two
7  additional manuscripts that should be added to this.
8      I can provide that later.
9      Q. What are the topics of the manuscripts?
10     A. So the first one is a protocol for another
11  study that I am a co-investigator on, that is about
12  younger pre-pubertal trans and gender diverse youth,
13  children.
14      And then the second one is another
15  manuscript that comes from -- oh, no. That one's on
16  here.
17      Hold on a second. Let me try and remember
18  it.
19      I don't remember what the other one is, but
20  I can get that one as well.
21      Q. And the first one you mentioned regarding
22  the protocol for gender incongruence in children, can
23  you explain a little bit more what that's about.
24      A. So this is another multisite study that I'm
25  a part of. And that study is a prospective

1  longitudinal study looking at children who are
2  prepubertal and their mental health over time and
3  also their trajectories over time.
4      Q. When you say "trajectory," what do you mean
5  by that?
6      A. Just how they grow up, what happens to them
7  as they move into adolescence.
8      Q. And specifically do you mean their -- the
9  gender identity trajectory?
10     A. Yes. Their gender expression, their gender
11  identity, their mental health.
12      Q. And when you're measuring their mental
13  health outcomes over time, are you measuring that in
14  light of any particular intervention?
15     A. No.
16      Q. Do you consider social transition an
17  intervention?
18      MR. SELDIN: Object to form.
19      THE WITNESS: I don't know the answer to
20  that in this case. I think that in general, social
21  transition is an intervention.
22  BY MR. RAMER:
23      Q. And when you say you don't know the answer
24  to that in this case, what do you mean by that?
25     A. I am not certain if everybody who started

1  was socially transitioned at the beginning. And so
2  as an intervention that happens over the course of
3  time, I don't -- I just don't know.
4      Q. And so, in other words, in the study that
5  we're discussing, that is not a variable that's
6  counted for; is that right?
7      MR. SELDIN: Objection. Misstates
8  testimony.
9      THE WITNESS: It's an observational study,
10  so it's not an intervention study.
11  BY MR. RAMER:
12      Q. As part of this study, are you recording
13  whether the subjects were socially transitioned?
14     A. Yes.
15      MR. SELDIN: Object to form.
16      THE WITNESS: Yes.
17  BY MR. RAMER:
18      Q. And has that protocol been published?
19     A. That's the protocol paper that I'm talking
20  about.
21      Q. And so it has not been published.
22     A. It has been published. It's missing off my
23  C.V.
24      Q. Understood. Thank you.
25      And sticking with Exhibit 1, going to

1  page 4, paragraph 18.
2      The first case listed here is Noe v Parson
3  in Missouri state court; correct?
4      A. Yes.
5      MR. RAMER: I'm handing the court reporter a
6  document I'll ask to be marked as Olson-Kennedy
7  Exhibit 2.
8      (Deposition Exhibit 2 was marked for
9      identification by the court reporter.)
10      THE WITNESS: Thank you.
11  BY MR. RAMER:
12      Q. And, Dr. Olson-Kennedy, is this the
13  transcript of your deposition in Noe v Parson?
14     A. I would have to look through the whole thing
15  to make sure.
16      Would you like me to do that?
17      Q. Does it appear to be the deposition of
18  your -- excuse me -- the transcript of your
19  deposition in Noe v Parson?
20     A. Yes.
21      MR. RAMER: Now I'm handing the court
22  reporter a document I'll ask be marked as
23  Olson-Kennedy 3.
24      (Deposition Exhibit 3 was marked for
25      identification by the court reporter.)

MAGNA
LEGAL SERVICES

```
 1   BY MR. RAMER:
 2       Q.  And, Dr. Olson-Kennedy, you've been handed
 3   what's been marked as Olson-Kennedy Exhibit 3.
 4       Is this a copy of your errata sheet for your
 5   transcript of Noe v Parson?
 6       A.  Yes.
 7       Q.  And did you give truthful testimony during
 8   this deposition?
 9       A.  I did.
10       Q.  And you've also recently testified in a
11   deposition in Voe versus Mansfield, a case regarding
12   North Carolina's ban on medicalized transition for
13   minors; correct?
14       A.  Correct.
15       MR. RAMER:  I'm handing the court reporter
16   what I'll ask be marked as Olson-Kennedy Exhibit 4.
17       (Deposition Exhibit 4 was marked for
18       identification by the court reporter.)
19       THE WITNESS:  Thank you.
20       MR. SELDIN:  Thank you.
21   BY MR. RAMER:
22       Q.  And, Dr. Olson-Kennedy, does this appear to
23   be a copy of your deposition in Voe versus Mansfield?
24       A.  Yes.
25       MR. RAMER:  I'm handing the court reporter a
```

```
 1   document that I'll ask be marked as Olson-Kennedy
 2   Exhibit 5.
 3       (Deposition Exhibit 5 was marked for
 4       identification by the court reporter.)
 5       THE WITNESS:  Thank you.
 6   BY MR. RAMER:
 7       Q.  And, Dr. Olson-Kennedy, is this document
 8   that's been marked as Olson-Kennedy Exhibit 5, your
 9   errata sheet for your deposition in Voe versus
10   Mansfield?
11       A.  Yes.
12       MR. RAMER:  I'm handing the court reporter a
13   document and I'll ask be marked Olson-Kennedy
14   Exhibit 6.
15       (Deposition Exhibit 6 was marked for
16       identification by the court reporter.)
17       THE WITNESS:  Thank you.
18   BY MR. RAMER:
19       Q.  I'm sorry.  Before I turn to this document,
20   did you give truthful testimony during your
21   deposition in Voe versus Mansfield?
22       A.  I did.
23       Q.  And are you offering opinions in this case
24   that are consistent with the opinions you offered in
25   Voe versus Mansfield?
```

```
 1       A.  I am.
 2       Q.  Now, turning to the document that's been
 3   marked as Olson-Kennedy 6, is this the amicus brief
 4   that was submitted on your behalf in United States
 5   versus Skrmetti, Case No. 23-477, in the Supreme
 6   Court of the United States?
 7       A.  I don't know.  I would have to look through
 8   this more.
 9       Q.  Does it appear to be the amicus brief that
10   was submitted on your behalf in United States versus
11   Skrmetti, Case No. 23-477, in the Supreme Court of
12   the United States?
13       A.  Yes.
14       Q.  And you agree with everything stated in this
15   amicus brief?
16       A.  I have not read this in a long time, so I
17   would have to look through this.
18       I am assuming if I signed off on it, yes.
19   But I have not read this in a while.
20       Q.  Did you read it before it was filed?
21       A.  I'm not sure of the timing, but I think so.
22       Q.  What did you do to prepare for this
23   deposition?
24       A.  I reread my report.  I read the law that's
25   being -- that we are talking about in South Carolina.
```

```
 1       Q.  And did you review any other documents other
 2   than your report and the law at issue?
 3       A.  No.
 4       Q.  And did you meet with --
 5       Let me back up.
 6       Without revealing any conversation with
 7   counsel, did you meet with anyone in preparation for
 8   today's deposition?
 9       A.  Yes.
10       Q.  Who did you meet with?
11       A.  These two people right here.
12       MR. SELDIN:  I'll just note that it's
13   Harper Seldin and Aine Carolan, counsel for
14   plaintiffs.
15       THE WITNESS:  And I think Sruti, too.
16       MR. RAMER:  I'm sorry?
17       MR. SELDIN:  And also --
18       Well, you testify.
19       THE WITNESS:  And also Sruti, who's -- who's
20   on our video call.
21   BY MR. RAMER:
22       Q.  Did you meet with anybody else other than
23   those three people to prepare for today's deposition?
24       A.  No.
25       Q.  All right.  Sticking with Exhibit 6, which
```

1  is your amicus brief, I'd like to go to page 28 and
2  the last paragraph on the page.
3        And I'll read the first two sentences and
4  first ask if I've read them correctly.
5        It says:
6        "Instead, the review recognizes transgender
7  identity as real and states that gender-affirming
8  medical care is appropriate for certain transgender
9  youth before age 18.
10       "For example, the review notes that, 'for
11 some the best outcome will be transition,' while
12 also acknowledging as the WPATH Standards of Care in
13 the Endocrine Society Guidelines do, that
14 gender-affirming medical interventions are not
15 appropriate for all transgender adolescents."
16       Did I read that correctly?
17    A.  Yes.
18    Q.  And the review that's being discussed here
19 is the Cass, C-a-s-s, Review; correct?
20    A.  That's correct.
21    Q.  And in this part of the brief, the brief
22 suggests that the Cass Review says gender-affirming
23 medical care is appropriate for certain transgender
24 youth before age 18.
25       Correct?

1     A.  Yes.
2     Q.  Do you agree that science cannot currently
3  identify a specific biological basis for being
4  transgender or cisgender?
5        THE REPORTER:  I'm sorry.  Will you repeat
6  that, please.
7        MR. RAMER:  I'll restart.
8     Q.  Do you agree that science cannot currently
9  identify a specific biological basis for being
10 transgender or cisgender?
11       MR. SELDIN:  Object to form.
12       THE WITNESS:  Is there a biological marker?
13 Is that what you're asking?
14 BY MR. RAMER:
15    Q.  Yes.
16    A.  I agree.
17    Q.  You agree with what part?
18    A.  That there is not a biological marker that
19 we have discovered yet that can indicate if somebody
20 is cisgender or transgender.
21    Q.  And relatedly, you agree that there is no
22 medical test that can be used to predict whether
23 someone will identify as cisgender or transgender;
24 correct?
25       MR. SELDIN:  Object to form.

1        THE WITNESS:  I think that's what I was
2  trying to say in the previous question.
3  BY MR. RAMER:
4     Q.  And so you do agree there is no medical
5  test.
6     A.  Correct.
7     Q.  And you agree that the etiology of gender
8  and congruence is not fully understood; correct?
9        MR. SELDIN:  Object to form.
10       THE WITNESS:  Correct.
11 BY MR. RAMER:
12    Q.  And the ratio of the patients in your clinic
13 has shifted from 50 percent natal males and
14 50 percent natal females in 2015 to about two-thirds
15 natal females now; correct?
16       MR. SELDIN:  Object to form.
17       THE WITNESS:  About two-thirds of my
18 practice in our clinic, in general, are people that
19 are designated female at birth.
20 BY MR. RAMER:
21    Q.  And that is a shift that you've observed in
22 your time as a clinician from a 50 percent patient
23 mix; correct?
24    A.  Correct.
25    Q.  And was it about 2015 that you last recalled

1  the ratio being 50/50?
2        MR. SELDIN:  Object to form.
3        THE WITNESS:  I think that's when it
4  shifted.
5  BY MR. RAMER:
6     Q.  And you agree that the rise in the number of
7  people who present with gender dysphoria is a trend
8  that we do not fully understand scientifically;
9  correct?
10       MR. SELDIN:  Object to form and foundation.
11       THE WITNESS:  I don't -- I don't necessarily
12 know that I understand what you're asking.
13       I think that there are observable reasons
14 why there are an increase in the numbers of people
15 who are designated female at birth that identify as
16 masculine, male.
17 BY MR. RAMER:
18    Q.  And so you're talking about natal females or
19 female assigned at birth; correct?
20    A.  Correct.
21    Q.  And do you agree that we have seen a rise in
22 the number of people in that patient population who
23 present with gender dysphoria; correct?
24    A.  Yes.
25    Q.  And do you agree that we do not fully

1 understand why that number is rising?
2 MR. SELDIN: Object to form.
3 THE WITNESS: I -- I don't know if I know
4 how to answer your question.
5 There are reasons that we are seeing more
6 people in that ratio. Are they scientifically
7 proven?
8 No.
9 BY MR. RAMER:
10 Q. You agree that there can be times when an
11 adolescent receives a diagnosis for gender dysphoria
12 under the DSM-5, but the adolescent is not
13 transgender; correct?
14 MR. SELDIN: Object to form.
15 THE WITNESS: I agree that that could
16 happen, yes.
17 BY MR. RAMER:
18 Q. Do you agree that it has ever happened?
19 A. Yes.
20 Q. You agree that gender dysphoria shares
21 symptomatology with anxiety and depression; correct?
22 MR. SELDIN: Object to form.
23 THE WITNESS: Yes.
24 BY MR. RAMER:
25 Q. You do not view the DSM-5 as authoritative

1 with respect to the diagnosis of gender dysphoria;
2 correct?
3 MR. SELDIN: Object to form and foundation.
4 THE WITNESS: I would need more clarity on
5 that. I'm not sure.
6 The DSM is an authoritative text, and it
7 does have criteria for the diagnosis of gender
8 dysphoria.
9 BY MR. RAMER:
10 Q. Do you think that everything the DSM-5 says
11 about the diagnosis of gender dysphoria is accurate?
12 MR. SELDIN: Object to form.
13 THE WITNESS: I think that there are three
14 criteria in the DSM that are -- I have skepticism
15 about, because they have to do with very
16 stereotypical things that are not necessarily
17 applicable to humans in 2024.
18 MR. RAMER: I'm going to hand the court
19 reporter a document that I'll ask to be marked as
20 Olson-Kennedy Exhibit 7.
21 (Deposition Exhibit 7 was marked for
22 identification by the court reporter.)
23 BY MR. RAMER:
24 Q. And, Dr. Olson-Kennedy, you've been handed
25 what's been marked as Olson-Kennedy Exhibit 7.

1 And I will represent to you that this
2 exhibit is the cover of the DSM-5.
3 And then do you agree that part of it is
4 what appears to be the chapter from the DSM-5
5 regarding gender dysphoria.
6 A. Yes.
7 Q. And I'd like to go to the page that has 516
8 on it. It's about the fifth page into the exhibit.
9 Do you see that?
10 A. I do.
11 Q. And toward the bottom, there's a paragraph
12 that has percentages in it.
13 Do you see that?
14 A. I do.
15 Q. And the last sentence of that paragraph --
16 I'll read it and ask if I read it correctly.
17 It says:
18 "Early social transition may also be a
19 factor in persistence of gender dysphoria in
20 adolescence."
21 Did I read that correctly?
22 A. You did.
23 Q. And you disagree with the DSM-5 on that
24 issue; correct?
25 MR. SELDIN: Object to form. Foundation.

1 THE WITNESS: I think that the assumption of
2 the causality, the way that people talk about this
3 sentence is incorrect.
4 Do I think that social transition is a
5 factor?
6 Yes, I do.
7 BY MR. RAMER:
8 Q. During your deposition in Voe versus
9 Mansfield, when you were asked whether you agree with
10 that statement I just read, you said you do not;
11 correct?
12 A. The statement if its meaning early social
13 transition causes gender dysphoria in adolescence, I
14 do not agree with that.
15 Do I agree that it's a factor?
16 I do.
17 Q. What is the difference between something
18 being a factor and something being part of a cause?
19 A. I don't think that social transition in
20 childhood leads to a transgender identity in
21 adolescence.
22 I think that for the most part -- and again,
23 this is -- there's a lot of ways that social
24 transition is described historically and
25 contemporaneously -- I don't think that social

1   transition in childhood leads to a continued identity
2   as a cause of it.
3          I think that people who are socially
4   transitioned in childhood, the majority of them are
5   trans. And then that is why they continue to assert
6   a transgender identity in adolescence.
7      Q. And just to confirm -- because I'm -- I'm
8   not sure I heard an answer to this precise question.
9          But during your deposition in Voe versus
10  Mansfield, when you were asked whether you agree with
11  this statement, you said you do not; correct?
12         MR. SELDIN: I object to form. Foundation.
13         THE WITNESS: I think that the way the --
14  the -- there's -- the way that this is -- this
15  sentence is perceived and it's the way that it's
16  exactly written.
17         So the way the sentence is written is the
18  flavor of it is that early social transition may be a
19  cause in the persistence of gender dysphoria in
20  adolescence.
21         I agree that it's a factor, in that it is
22  related. But is it a cause of persistence? I think
23  that that is the flavor of what this document is
24  saying, and that I do not agree with.
25  ///

1   BY MR. RAMER:
2      Q. And can you go to Olson-Kennedy Exhibit 4,
3   which is your deposition transcript from Voe versus
4   Mansfield. And specifically go to page 62.
5      A. 62 is like the little numbers?
6      Q. Correct.
7      A. Okay.
8      Q. And beginning at line 8 --
9      A. Yes.
10     Q. -- you see you were asked about this
11  particular sentence. And at line 13, you are asked,
12  do you agree with that statement?
13         And at line 14, you answered "I do not."
14         Correct?
15     A. Correct.
16     Q. And, Dr. Olson-Kennedy, you are not aware of
17  any study that looks at the desistance rate among
18  adolescence who do not receive puberty blockers;
19  correct?
20         MR. SELDIN: Object to form.
21         THE WITNESS: Oh, my gosh. Can you --
22  that's a lot of things in that sentence.
23         Can we go back? Could you say it slower?
24  BY MR. RAMER:
25     Q. Absolutely.

1          You were not aware of any study that looks
2   at the desistance rate among adolescents who do not
3   receive puberty blockers; correct?
4      A. Correct.
5          MR. SELDIN: Object to form.
6          THE WITNESS: Correct.
7   BY MR. RAMER:
8      Q. And have any studies demonstrated that
9   gender affirmation in childhood does not lead to a
10  child being transgender who otherwise might not have
11  been transgender?
12         MR. SELDIN: Object to form.
13         THE WITNESS: One more time.
14  BY MR. RAMER:
15     Q. Have any studies demonstrated that gender
16  affirmation in childhood does not lead to a child
17  being transgender who otherwise might not have been
18  transgender?
19         MR. SELDIN: Same objection.
20         THE WITNESS: Can you describe what you mean
21  by "gender affirmation" here?
22  BY MR. RAMER:
23     Q. Social transition.
24     A. So complete social transition or a partial
25  social transition?

1      Q. Can you explain the distinction you're
2   drawing?
3      A. Sure.
4          So when social transition first started
5   being described in the Netherlands, they made a
6   distinction between a partial and a complete social
7   transition.
8          So, in other words, children who changed
9   things like their hair and their clothing were
10  considered to be partially socially transitioned.
11  And children who had changed their name, their
12  pronouns and their clothing and potentially other
13  things, like their hair and things like that, were
14  complete -- considered to be completely socially
15  transitioned.
16     Q. Let's take any understanding of social
17  transition along the lines you just described.
18         Have any studies demonstrated that social
19  transition in childhood does not lead to a child
20  being transgender who otherwise might not have been?
21         MR. SELDIN: Object to form.
22         THE WITNESS: The -- no. I think -- I think
23  that I understand all of the --
24         What I can tell you is that there are people
25  who are socially transitioned in childhood who do not



1  continue to have a transgender identity, both
2  personally in my clinic and also from the work by
3  Christina Olson.
4  　　But I think specifically what you're talking
5  about, I don't think I've seen a study like that.
6  BY MR. RAMER:
7  　　Q.  And I think you've already touched on this,
8  but you think that some of the diagnostic criteria in
9  the DSM-5 are outdated.
10 　　Correct?
11 　　MR. SELDIN:  Object to form.  Foundation.
12 　　THE WITNESS:  Just for clarity, do you mean
13 the diagnosis in adolescence?  In adulthood or in
14 childhood?
15 BY MR. RAMER:
16 　　Q.  Let's start with childhood.
17 　　A.  Yes.
18 　　Q.  And so let's return to Olson-Kennedy
19 Exhibit 7.
20 　　And on -- the third page of the document has
21 a 512 number, is the beginning of the diagnostic
22 criteria for gender dysphoria in children; correct?
23 　　A.  Yes.
24 　　Q.  And starting with A-6 on this page, you
25 agree that this criterion is outdated; correct?

1  　　MR. SELDIN:  Object to form.  Foundation.
2  　　THE WITNESS:  I do.
3  BY MR. RAMER:
4  　　Q.  And it's outdated because it requires
5  stereotyping, clothing, toys and games by gender;
6  correct?
7  　　MR. SELDIN:  Object to form.
8  　　THE WITNESS:  Yes.
9  BY MR. RAMER:
10 　　Q.  And criterion A-2, that also requires
11 stereotyping clothing; correct?
12 　　A.  It does.
13 　　Q.  And criterion A-3 requires stereotyping
14 roles in make-believe or fantasy play; correct?
15 　　MR. SELDIN:  Object to form.
16 　　THE WITNESS:  Yes.
17 BY MR. RAMER:
18 　　Q.  And criterion A-4 requires stereotyping
19 toys, games and activities; correct?
20 　　MR. SELDIN:  Object to form.
21 　　THE WITNESS:  Yes.  But at least that's
22 written in the actual sentence.  Yes.
23 BY MR. RAMER:
24 　　Q.  When you say "it," you're referring to the
25 word stereotypically?

1  　　A.  Correct.
2  　　Q.  And so these criteria we just discussed are
3  outdated as well; correct?
4  　　MR. SELDIN:  Object to form.
5  　　THE WITNESS:  Yes.
6  BY MR. RAMER:
7  　　Q.  And as part of your practice, you sometimes
8  diagnose gender dysphoria in children; correct?
9  　　A.  Not usually.  In prepubertal children, I
10 will most often use a different diagnostic code than
11 gender dysphoria.
12 　　Q.  What diagnostic code do you use?
13 　　A.  I use gender identity uncertainty.
14 Sometimes I will use a code that is called "Worried
15 Well."  So that means a family comes in with a lot of
16 questions, but there's -- there's not really anything
17 medically concerning with that young person.
18 　　So in most children, they're prepubertal,
19 that is the diagnosis I use.
20 　　Q.  And did you say worried well as in
21 W-o-r-r-i-e-d Well?
22 　　A.  W-e-l-l, yes.
23 　　Q.  Thank you.
24 　　Have you ever diagnosed a patient with
25 gender dysphoria in childhood?

1  　　A.  I have.
2  　　Q.  And to do that, you are required to
3  stereotype at least some clothing, toys or
4  activities; correct?
5  　　MR. SELDIN:  Object to form.
6  　　THE WITNESS:  That's correct.
7  　　I would like to give some context to that.
8  I started doing this work 18 years ago, and it was
9  before I had really started thinking a lot about
10 these things that are in the diagnostic criteria in a
11 very critical way or thinking about the stereotyping,
12 because over the last 18 years, it's changed a lot.
13 　　I think we see, for example, like, Target,
14 there's much less division of clothes.  There's much
15 less division of toys.  And I think that's been a
16 shift over time in our society.
17 　　I think 18 years ago, there was a lot of
18 distinction here.
19 　　So I would say that my utilizing this code
20 over time has changed.
21 BY MR. RAMER:
22 　　Q.  When you say "Target," are you referring to
23 the store?
24 　　A.  I am referring to the store.
25 　　Q.  And what do you think the diagnostic

1 criteria should be?
2     MR. SELDIN: Object to form.
3     THE WITNESS: I think that the diagnostic
4 criteria should be gender incongruence. That's the
5 first part.
6     I think that the utility of a diagnosis of
7 gender dysphoria in prepubertal children is not
8 necessary, necessarily.
9     I have not spent a lot of time thinking
10 about that because that is a very small number of
11 people that I see in my practice.
12 BY MR. RAMER:
13     Q. And the diagnostic criteria for gender
14 incongruence does not require the presence of
15 distress; correct?
16     MR. SELDIN: Object to form.
17     THE WITNESS: That's correct. That's my
18 understanding of it. We don't use that in the
19 United States.
20 BY MR. RAMER:
21     Q. But you think that should be the diagnosis
22 that is used for children; correct?
23     MR. SELDIN: Object to form.
24     THE WITNESS: I think this is more
25 complicated. I have thought sometimes that there

1 shouldn't be this diagnosis at all in children.
2     I think that there are some children that
3 experience distress.
4     But my observation has been that young --
5 young children who are talking about their gender,
6 who have their gender acknowledged and have gender
7 affirmation, depending -- well, what we talked about
8 a spectrum, oh, you can wear dresses at home or you
9 can wear them outside or you can use a different
10 name.
11     It is the case that a lot of people no
12 longer experience that distress after those things
13 have happened. And their distress reemerges when
14 they start puberty.
15     So I -- I don't know what you call that.
16 You call that a functioning person who maybe uses a
17 different name and pronouns. But I don't -- I don't
18 know that these criteria are necessary or necessarily
19 relevant during that time.
20     I think that there should be -- ideally,
21 there should be a code that says somebody has a
22 gender that's different than their assigned sex at
23 birth.
24     And that medical code then translates to any
25 potential interventions, but it also derails the

1 coupling of medical procedures that have to do with
2 body parts.
3     For example, if somebody changes -- if
4 somebody is assigned female at birth and they change
5 their gender marker to male, and then they go for
6 cervical screening, the insurance may not cover that
7 because the gender marker is different from the body
8 part, if that makes sense.
9     That's how I think it should be.
10 BY MR. RAMER:
11     Q. Is the answer the same for adolescents who
12 are gender incongruent?
13     MR. SELDIN: Object to form.
14     THE WITNESS: No.
15 BY MR. RAMER:
16     Q. Why is it different?
17     A. The criteria for gender dysphoria in -- in
18 adolescence is much more about bodies. And this is
19 one of the reasons you only have to meet two of the
20 criteria in adolescence and adulthood. Because that
21 diagnosis is primarily concerned with what you might
22 do for medical intervention.
23     Q. Do you think that the presence of distress
24 should be required?
25     MR. SELDIN: Object to form.

1     THE WITNESS: For a diagnosis of gender
2 dysphoria?
3 BY MR. RAMER:
4     Q. In adolescence. Correct.
5     A. Yes. Yes, I do.
6     Q. And why?
7     A. Because "dysphoria" means distress. And so
8 if you just are trans and you don't have gender
9 dysphoria, that's what I'm talking about. You
10 need -- there needs to be a medical code that allows
11 you to continue care with somebody even if they
12 aren't experiencing distress anymore.
13     And usually people who are not experiencing
14 stress are not coming for medical interventions.
15 They're coming for medical interventions because of
16 their distress, for the most part.
17     Q. And so in that answer you said "usually" and
18 "for the most part."
19     And so is it accurate to say that it is not
20 always the case that those seeking medical
21 interventions are suffering from distress?
22     MR. SELDIN: Object to form.
23     THE WITNESS: I think it largely depends how
24 you describe distress.
25     Do I think that there are people who are

MAGNA
LEGAL SERVICES

```
 1   coming for medical interventions for no reason
 2   whatsoever?  No.
 3        They're coming because there is a missing or
 4   a misalignment between their gender and their
 5   physicality.  That's why they're coming.
 6        That tension in and of itself is distressing
 7   for people.
 8        Does it cause functional impairment?  I
 9   don't think we ever know, because we don't know what
10   it would have been like for them to be cisgender.  So
11   we don't really know how they would function
12   otherwise.
13        My own interpretation is that -- and I --
14   the reason I say this is I know there are trans
15   people who do not have gender dysphoria.  But the
16   people coming to see me for medical intervention have
17   distress.
18   BY MR. RAMER:
19        Q.  And so there could never be a patient who is
20   gender incongruent but is not suffering from distress
21   as the DSM-5 discusses it; correct?
22        MR. SELDIN:  Object to form.  Foundation.
23   Misstates testimony.
24        THE WITNESS:  I think the problem with the
25   DSM is that clinically significant distress is not
```

```
 1   defined.
 2        And so, yes, there's a possibility that
 3   anybody could come -- there's infinite possibilities
 4   in medicine.  There -- always there are as many
 5   possibilities as there are humans.
 6        I think the challenge is that clinically
 7   significant distress is not really defined in the
 8   DSM.
 9   BY MR. RAMER:
10        Q.  So is the requirement of clinically
11   significant stress superfluous then?
12        MR. SELDIN:  Object to form.  Misstates
13   testimony.
14        THE WITNESS:  No.  It's not superfluous.
15   It's just not defined.
16   BY MR. RAMER:
17        Q.  But you agree that somebody can be --
18        Let me back up.
19        You agree that being gender incongruent, in
20   and of itself, is distressful; correct?
21        MR. SELDIN:  Object to form.  Misstates
22   testimony.
23        THE WITNESS:  I think there are people who
24   are gender incongruent who are not distressed.
25   ///
```

```
 1   BY MR. RAMER:
 2        Q.  And those people --
 3        Let me back up.
 4        For that category of patients, it would be
 5   inappropriate to give them any form of medical
 6   intervention; correct?
 7        MR. SELDIN:  Object to form.  Foundation.
 8        THE WITNESS:  I think that if people are
 9   not -- I think that if people are seeking medical
10   intervention, they have distress.
11   BY MR. RAMER:
12        Q.  And so nobody who is gender incongruent but
13   not distressed within the meaning of DSM-5, would
14   ever seek a medical intervention.
15        Is that what you're saying?
16        MR. SELDIN:  Object to form.  Foundation.
17   Misstates testimony.
18        THE WITNESS:  And this goes back to what I
19   was saying, is that:  What does "clinically
20   significantly distressed" mean?  What is clinical --
21   significantly clinically depressed?  I mean
22   distressed.
23        I don't know that clinically significant
24   stress or impairment is not defined in the DSM.  This
25   is a very commonly used phrase across the entire DSM,
```

```
 1   and it's not defined.
 2   BY MR. RAMER:
 3        Q.  How do you make a diagnosis under the DSM if
 4   you don't know what it means?
 5        MR. SELDIN:  Object to form.  Misstates
 6   testimony.
 7        THE WITNESS:  I know what distress means.
 8        But as it's defined here, "clinically
 9   significant," the DSM does not define that.  The
10   people that I see have distress.  That's how I define
11   it.
12        And when people have distress, they meet the
13   criteria.
14   BY MR. RAMER:
15        Q.  And you know they have distress because they
16   are seeking medical intervention; is that right?
17        MR. SELDIN:  Object to form.  Misstates
18   testimony.
19        THE WITNESS:  No.
20        I know that they have distress because I
21   have long conversations with people.
22   BY MR. RAMER:
23        Q.  And what is the product of those long
24   conversations?
25        MR. SELDIN:  Object to form.
```

11  (Pages 38 to 41)

1    THE WITNESS:  Sometimes the product of those
2  long conversations is -- well, all the time actually,
3  is understanding the areas that are distressful for
4  people.
5    Sometimes the conversation is what is it
6  that you're seeking from medical intervention?
7    Will medical intervention get you there?
8  Will it not do the things that you are seeking?
9    On the conversation span, a whole range of
10  topics.
11    The product of a conversation is
12  information.
13  BY MR. RAMER:
14    Q.  If a patient has an embodiment goal --
15  e-m-b-o-d-i-m-e-n-t -- and their body is not
16  presently aligned with that embodiment goal, is that
17  patient necessarily distressed?
18    MR. SELDIN:  Object to form.
19    THE WITNESS:  I think so, yes.
20  BY MR. RAMER:
21    Q.  Switching gears just a little bit to
22  international consensus.
23    Do you agree that the policies on
24  gender-affirming care in England, Sweden, Finland,
25  Australia and New Zealand, are more and more out of

1  step with WPATH Standards of Care 8?  Correct?
2    MR. SELDIN:  Object to form.  Foundation.
3    THE WITNESS:  I think that -- I can't answer
4  about New Zealand and Australia.  I'm not very
5  familiar with those protocols.
6    But the things that I have read, and I think
7  it's really important to distinguish this, that the
8  providers of care are not the same people as those
9  people who are publishing their thoughts and feelings
10  and recommendations about the care.
11    I think that there is a separation of those
12  two entities, and that's really important.  Because
13  when you talk about consensus, are we talking about
14  clinician consensus?  Or are we talking about report
15  consensus?
16  BY MR. RAMER:
17    Q.  During your deposition in Voe versus
18  Mansfield, when you were asked whether the policies
19  on gender-affirming care in England, Sweden, Finland,
20  Australia and New Zealand, are more and more out of
21  step with WPATH Standards of Care 8, you said yes;
22  correct?
23    MR. SELDIN:  Object to form.  Foundation.
24    THE WITNESS:  Yes.
25    MR. RAMER:  The policies.  I just want to

1  have real clarity about that.
2    Q.  And you do not know whether any adolescents
3  with gender dysphoria in Sweden are currently
4  obtaining gender-affirming care through a research
5  protocol; correct?
6    MR. SELDIN:  Object to form.
7    THE WITNESS:  Correct.
8  BY MR. RAMER:
9    Q.  You agree that the United Kingdom has in
10  fact banned the use of puberty blockers; correct?
11    MR. SELDIN:  Object to form.
12    THE WITNESS:  I do believe that I know that
13  now.
14  BY MR. RAMER:
15    Q.  And going to Olson-Kennedy Exhibit 6, which
16  is your amicus brief, I'd like to go to page 9.
17    A.  I just want to go back to this and say I've
18  never seen it in this format before.  But I recognize
19  this is the paper that we wrote about the
20  Cass Review, yes.
21    Q.  Just to confirm, this is not just a
22  copy-and-paste from your paper; correct?
23    A.  No.  There's additional -- there's
24  additional information.  Yes.
25    But I recognize these words.

1    Q.  And just so we're all on the same page,
2  let's go to page 5 of this brief first and look at
3  footnote 3.
4    And that footnote explains that there's
5  additional information in your paper that is not in
6  this brief; correct?
7    A.  Correct.
8    Q.  Okay.  Now, going to page 9.  And the very
9  last paragraph that carries over onto page 10, if you
10  could just take a moment to read that, and let me
11  know when you've read it.
12    MR. SELDIN:  Mr. Ramer, are you talking
13  about the paragraph that starts, "Notably the Cass
14  Review"?
15    MR. RAMER:  That's correct.
16    (Reporter clarification.)
17    MR. RAMER:  Counsel -- counsel was
18  confirming with me whether the paragraph that I've
19  asked Dr. Olson-Kennedy to read is the one that
20  begins with the phrase "Notably the Cass Review."
21    And I said yes.
22    THE WITNESS:  Yes.  I'm done reading that.
23  BY MR. RAMER:
24    Q.  And on page 10, in the final sentence of
25  that paragraph, the brief states that the



1    British Medical Association has called for a pause on
2    the U.K. ban on puberty blockers; correct?
3        A. Yes.
4        Q. And that sentence is no longer accurate, is
5    it?
6        MR. SELDIN: Object to form. Foundation.
7        THE WITNESS: I don't know.
8        MR. RAMER: I'm handing the court reporter
9    what I'll ask to be marked as Olson-Kennedy
10   Exhibit 8.
11       (Deposition Exhibit 8 was marked for
12       identification by the court reporter.)
13       THE WITNESS: I think this is the wrong
14   thing. It's just that single page.
15   BY MR. RAMER:
16       Q. And, Dr. Olson-Kennedy, you've been handed
17   what's been marked as Olson-Kennedy Exhibit 8; is
18   that correct?
19       A. Yes.
20       Q. And this appears to be a report published in
21   the BMJ; correct?
22       MR. SELDIN: Mr. Ramer, I would just like to
23   note that I don't believe that this was one of the
24   exhibits that you had noted in our correspondence you
25   intended to use.

1    So if we could just have a moment to read.
2    We don't need to leave the room, but it would be
3    helpful.
4        MR. RAMER: We'll go off the record.
5        MR. SELDIN: Thank you.
6        THE VIDEOGRAPHER: The time now is 10:36
7    a.m.
8        We are off the record.
9        (Off record.)
10       MR. RAMER: We'll go back on.
11       THE VIDEOGRAPHER: The time is 10:37 a.m.
12       We are back on the record.
13   BY MR. RAMER:
14       Q. And, Dr. Olson-Kennedy, the document that's
15   been marked as Olson-Kennedy Exhibit 8 is a report
16   published in the British Medical Journal; correct?
17       MR. SELDIN: Object to form.
18       THE WITNESS: That is what it looks like.
19   BY MR. RAMER:
20       Q. And the first sentence of this document,
21   I'll read it and ask if I read it correctly, says:
22       "The BMA has retracted its call for the U.K.
23   government to lift the ban on prescribing puberty
24   blockers to under 18s with gender dysphoria while the
25   association conducts an evaluation of the Cass

1    Review's recommendations."
2        Did I read that correctly?
3        A. Yes.
4        Q. And so returning to Exhibit 6, which is your
5    amicus brief, and page 10 in the final sentence of
6    the carry-over paragraph from page 9.
7        According to the report that we just read,
8    that sentence is incorrect; right?
9        MR. SELDIN: Object to form.
10       THE WITNESS: I guess I'm not understanding
11   the question at the time that this was prepared, that
12   is correct.
13       That has the BMA retracted, that's called,
14   yes.
15   BY MR. RAMER:
16       Q. And was this deposition the first that you
17   became aware of the BMA retracting that call?
18       A. Yes.
19       Q. And do you think that you should correct the
20   statement made on your behalf to the Supreme Court of
21   the United States?
22       MR. SELDIN: Object to form.
23       THE WITNESS: I don't know the answer to
24   that.
25       Yes. I mean, we want it to be accurate, of

1    course.
2        MR. RAMER: And I'm at a point where it's
3    kind of a good stopping point.
4        If this works for you, I'll take a short
5    little break. Does that work for you?
6        THE WITNESS: Sure. Yeah.
7        MR. RAMER: Go off.
8        THE VIDEOGRAPHER: The time now is 10:39
9    a.m.
10       We're now off the record.
11       (Short recess.)
12       MR. RAMER: Ready.
13       THE VIDEOGRAPHER: One moment, please.
14       The time is 10:52 a.m., and we're back on
15   the record.
16   BY MR. RAMER:
17       Q. Welcome back, Doctor.
18       A. Thank you.
19       MR. RAMER: I'm going to hand the court
20   reporter what I'll ask to be marked as Olson-Kennedy
21   Exhibit 9.
22       (Deposition Exhibit 9 was marked for
23       identification by the court reporter.)
24       THE WITNESS: Thank you.
25   ///



BY MR. RAMER:
1   Q. And, Dr. Olson-Kennedy, you've been handed
2 what's been marked as Olson-Kennedy Exhibit 9.
3       And these are the Informed Consent forms
4 used for patients receiving treatment at Children's
5 Hospital of Los Angeles; correct?
6   A. The first part of these are a consent and
7 assent forms for participating in a study.
8       The second part of this packet has consent
9 forms for medical interventions.
10   Q. And when you say "the second part of the
11 packet," can you direct me to what page you're
12 talking about?
13   A. The first one is the Informed Consent for --
14 form for feminizing medications. That's the
15 beginning of the clinical consent form.
16       These are not part of the study.
17   Q. Thank you.
18       And beginning with these Clinical Consent
19 forms, these are either the forms that you're using
20 today or are extremely close to what you're using
21 today; correct?
22       MR. SELDIN: Object to form.
23       THE WITNESS: Yes.
24 ///

BY MR. RAMER:
1   Q. And this first one, which is labeled
2 "Informed Consent Form for Feminizing Medications,"
3 parenthesis, "(transfeminine individuals on GnRH
4 Analogs)," this form would be used for natal males
5 who either had their endogenous --
6 e-n-d-o-g-e-n-o-u-s -- puberty blocked or who had not
7 yet experienced male pubertal development; correct?
8   A. Or were in their -- we would not be giving
9 hormones to somebody who had not yet started puberty
10 but if they were in early puberty.
11   Q. And so the answer to the question was yes,
12 and also for those who have not had a significant
13 amount of male pubertal development; is that right?
14       MR. SELDIN: Object to form. Misstates
15 testimony.
16       THE WITNESS: This form is for people who
17 either had GnRH analogs that were started in early
18 puberty or people who are starting hormones who have
19 not yet experienced a lot of their puberty.
20 BY MR. RAMER:
21   Q. Thank you.
22       And to your knowledge, this consent form is
23 accurate in its description of the risks of
24 feminizing medications; correct?

1   A. Yes.
2   Q. And so on this page down at No. 5, you agree
3 that a person who begins taking puberty blockers in
4 early puberty and then proceeds to feminizing
5 hormones will be infertile; correct?
6       MR. SELDIN: Object to form.
7       THE WITNESS: This is why the word "likely"
8 is in there.
9 BY MR. RAMER:
10   Q. And so is the answer yes?
11   A. They are likely to be infertile.
12   Q. And you agree that if a person is on puberty
13 blockers in early puberty and they stay on feminizing
14 hormones, they will not make mature sperm; correct?
15   A. Yes. If they stay on those interventions.
16   Q. Thank you.
17       Going to the next page, No. 6, you agree
18 that feminizing medications increase the risk of
19 blood clots; correct?
20       MR. SELDIN: Object to form.
21       THE WITNESS: Minimally, yes.
22 BY MR. RAMER:
23   Q. And you agree that feminizing medications
24 increase the risk of a pulmonary embolism; correct?
25       MR. SELDIN: Object to form.

1       THE WITNESS: Yes.
2 BY MR. RAMER:
3   Q. And a pulmonary embolism is a blood clot to
4 the lungs; correct?
5   A. That's correct.
6   Q. And a pulmonary embolism can cause permanent
7 lung damage or death; correct?
8   A. Correct.
9   Q. And then second bullet under 6, you agree
10 that feminizing medications increase the risk of
11 stroke; correct?
12       MR. SELDIN: Object to form.
13       THE WITNESS: These are the potential things
14 that can happen when somebody gets a blood clot.
15       MR. SELDIN: Mr. Ramer, I apologize for
16 interrupting.
17       The screen that has the Zoom appears to be
18 off. I wasn't sure --
19       MR. RAMER: It's -- want to go off?
20       MR. SELDIN: Yeah.
21       THE WITNESS: Oh, yeah.
22       THE VIDEOGRAPHER: The time is 10:58 a.m.
23 We're off the record.
24       (Off record.)
25       THE VIDEOGRAPHER: Let me know when you're

MAGNA
LEGAL SERVICES

1    ready.
2         MR. SELDIN:  Doctor, are you ready?
3         THE WITNESS:  Yes.  I'm ready.
4         THE VIDEOGRAPHER:  The time is 11:03 a.m.,
5    and we are back on the record.
6    BY MR. RAMER:
7         Q.  Okay.  Doctor, we are on Olson-Kennedy
8    Exhibit 9.  And we were looking at the second page of
9    the Informed Consent form for feminizing medications
10   for transfeminine individuals on GnRH analogs.
11        And we were looking at No. 6 on page 2 of
12   that form.  And we were on, I believe, the second
13   bullet.
14        And my question is:  You agree that
15   feminizing medications increase the risk of stroke;
16   correct?
17        MR. SELDIN:  Object to form.
18        THE WITNESS:  Estrogen increases the risk of
19   blood clots.  I have never seen a study that looked
20   at the incidence of any of these things, pulmonary
21   emboli, stroke, heart attack or chronic leg vein
22   problems.
23   BY MR. RAMER:
24        Q.  You agree that blood clots can result in
25   stroke; correct?

1         A.  Yes.
2         Q.  And you agree that a stroke may cause
3    permanent brain damage or death; correct?
4         A.  Yes.
5         Q.  And next bullet, you agree that feminizing
6    medications increase the risk of heart attack;
7    correct?
8         MR. SELDIN:  Object to form.
9         THE WITNESS:  Feminizing hormones increase
10   the risk of blood clots, which could potentially lead
11   to a heart attack, yes.
12   BY MR. RAMER:
13        Q.  And the next bullet, you agree that
14   feminizing medications increase the risk of chronic
15   leg vein problems; correct?
16        MR. SELDIN:  Object to form.
17        THE WITNESS:  Same issue.  That estrogen
18   specifically -- and I think this is important --
19   increases the risk of blood clots minimally which can
20   lead to chronic leg vein problems.
21   BY MR. RAMER:
22        Q.  Is it fair to say that a pulmonary embolism,
23   a stroke or a heart attack is detrimental to people's
24   physical health?
25        A.  Yes.

1         Q.  And same page, No. 7, further down the page,
2    the second bullet under No. 7.  You agree that
3    feminizing medications can lead to increased blood
4    pressure; correct?
5         MR. SELDIN:  Object to form.
6         THE WITNESS:  Yes.
7    BY MR. RAMER:
8         Q.  And next bullet, you agree that feminizing
9    medications can lead to increased risk of gallstones;
10   correct?
11        MR. SELDIN:  Object to form.
12        THE WITNESS:  Yes.
13   BY MR. RAMER:
14        Q.  And next bullet, you agree that feminizing
15   medications can lead to nausea and vomiting; correct?
16        MR. SELDIN:  Object to form.
17        THE WITNESS:  Yes.
18   BY MR. RAMER:
19        Q.  And next bullet, you agree that feminizing
20   medications can lead to headaches and migraines;
21   correct?
22        MR. SELDIN:  Object to form.
23        THE WITNESS:  Correct.
24   BY MR. RAMER:
25        Q.  Same page, No. 8.  You agree that feminizing

1    medications can cause tumors of the pituitary gland;
2    correct?
3         MR. SELDIN:  Object to form.
4         THE WITNESS:  Correct.
5    BY MR. RAMER:
6         Q.  And those tumors can damage vision and cause
7    headaches; correct?
8         MR. SELDIN:  Object to form.
9         THE WITNESS:  Correct.
10   BY MR. RAMER:
11        Q.  And so let's go two pages forward in
12   Olson-Kennedy Exhibit 9.
13        And at the top, it says "Informed Consent
14   Form for Feminizing Medications"; correct?
15        A.  Correct.
16        Q.  And this is the Informed Consent Form for
17   Feminizing Medications when used with natal males who
18   either are well into male puberty or have gone
19   through male puberty; correct?
20        MR. SELDIN:  Object to form.
21        THE WITNESS:  Correct.
22        Sorry.
23        MR. SELDIN:  I object to form.
24        You can answer.
25        THE WITNESS:  Correct.

MAGNA ▶
LEGAL SERVICES

1  BY MR. RAMER:
2      Q.  And does this form accurately -- excuse me.
3      Does this form accurately describe the risks
4  of feminizing medication?
5      A.  I have to go through it again, but yes,
6  basically.
7      We've changed some of our recommendations
8  based on our findings, particularly around
9  prolactinomas, which is bullet number --
10     9.  It's No. 9, not bullet point.
11     Q.  And what have you changed?
12     A.  We haven't changed it on our form yet.  But
13  they're -- we have not seen that.  And there have
14  been a couple of studies I think that have
15  demonstrated that this is no longer a finding.
16     Q.  What are those studies?
17     A.  I can't remember them offhand.  One of them
18  came from our team, the one that -- I think it's the
19  last one on my CV.
20     Q.  Apart from the number about prolactinomas,
21  does, this form accurately describe the risks of
22  feminizing medication?
23     A.  Yes.
24     Q.  And after this form, there's a form with the
25  title "Pubertal Blockers for Minors in Early

1  Adolescence."
2      Do you see that?
3      A.  I do.
4      Q.  And this is the form you would use for
5  people starting puberty blockers in early
6  adolescence; correct?
7      A.  This is the form that we would use for
8  anybody going on to puberty blockers at any point in
9  their development.
10     Q.  And in what scenario would you give somebody
11  who is not in early adolescence, puberty blockers?
12     MR. SELDIN:  Object to form.  Misstates
13  testimony.
14     THE WITNESS:  Sometimes puberty blockers are
15  used for just halting further development.
16     So, for example, if somebody was in maybe
17  Tanner Stage 4 and they didn't want to get additional
18  breast development and they wanted to stop having a
19  period, that they could go on puberty blockers for
20  those purposes.
21  BY MR. RAMER:
22     Q.  So why would you not just use the cross-sex
23  hormone for somebody at Tanner Stage 4?
24     A.  That's -- they're not at that place where
25  they want that yet.  That's not what they need in

1  that moment.  They want to take a pause and not have
2  additional development.  But they're not necessarily
3  wanting or ready for moving forward, or their parents
4  not -- might not be ready.
5      Q.  And when you say "that's not what they
6  need," that need is based on the patient's embodiment
7  goals; correct?
8      MR. SELDIN:  Object to form.
9      THE WITNESS:  Correct.
10  BY MR. RAMER:
11     Q.  Sticking with this form, next page, down
12  below the bold "Risks of Puberty Blockers," do you
13  see that?
14     A.  I do.
15     Q.  And looking at the first bullet, you agree
16  that the side effects and safety of puberty blockers
17  are not completely understood; correct?
18     A.  That's correct.
19     Q.  And you do not know whether delaying puberty
20  in an adolescent changes the adolescent's brain
21  development; correct?
22     MR. SELDIN:  Object to form.
23     THE WITNESS:  That's correct.
24  BY MR. RAMER:
25     Q.  And you agree that we do not have scientific

1  evidence about how pubertal suppression affects young
2  people's judgment in decision-making; correct?
3      MR. SELDIN:  Object to form.
4      THE WITNESS:  Only clinical experience.
5  BY MR. RAMER:
6      Q.  And so we do not have scientific evidence
7  about how puberty suppression affects young people's
8  judgment in decision-making; correct?
9      MR. SELDIN:  Object to form.  Asked and
10  answered.
11     THE WITNESS:  That's correct.
12  BY MR. RAMER:
13     Q.  And going forward three pages, there's a
14  form with the title "Informed Consent Form for
15  Testosterone Therapy."
16     Do you see that?
17     A.  Yes.
18     Q.  And on this page, No. 3, the first sentence
19  says:  "It is not known what the effects of
20  testosterone are on fertility"; correct?
21     A.  Yes.
22     Q.  And if a natal female begins taking
23  masculinizing hormones and later stops them, we don't
24  know whether that person will regain the ability to
25  be fertile; correct?



MAGNA
LEGAL SERVICES

```
 1          MR. SELDIN:  Object to form.
 2          THE WITNESS:  We don't know that.  But I
 3     think it's important to add that we didn't really
 4     know their fertility status before they started.
 5          And we also know that there are a lot of
 6     people who have stopped testosterone and carried
 7     pregnancies or harvested eggs.
 8     BY MR. RAMER:
 9          Q.  When you say we don't know their fertility
10     status before we started, what do you mean by that?
11          A.  That person could have not had the capacity
12     to get fertile.  I mean, they -- we don't know what
13     their capacity would've been to get pregnant at all.
14          Q.  Is that something that you assess in your
15     patients?
16          A.  No.
17          Q.  And sticking with this page -- I'm sorry --
18     next page, under "Risks of Testosterone," the first
19     bullet under that, you agree that masculinizing
20     medications can increase the risk of heart disease;
21     correct?
22          A.  Yes.
23          Q.  And on this page after that bullet, there
24     are three bullets.  Then there's a paragraph, and
25     then there's another bullet that begins with the
```

```
 1     phrase "Increase the red blood cells."
 2          Do you see that?
 3          A.  I do.
 4          Q.  And you agree that masculinizing medications
 5     increase the risk of stroke and heart attack;
 6     correct?
 7          MR. SELDIN:  Object to form.
 8          THE WITNESS:  Yes.
 9     BY MR. RAMER:
10          Q.  And next bullet, you agree that
11     masculinizing hormones increase the risk of diabetes;
12     correct?
13          MR. SELDIN:  Object to form.
14          THE WITNESS:  Yes.
15     BY MR. RAMER:
16          Q.  And next bullet, you agree that
17     masculinizing hormones can risk the HIV; correct?
18          MR. SELDIN:  Object to form.
19          THE WITNESS:  Yes.
20     BY MR. RAMER:
21          Q.  And next bullet, you agree that
22     masculinizing hormones can cause headaches or
23     migraines; correct?
24          MR. SELDIN:  Object to form.
25          THE WITNESS:  Yes.
```

```
 1     BY MR. RAMER:
 2          Q.  And next bullet, you agree that
 3     masculinizing hormones can lead to increased anger;
 4     correct?
 5          MR. SELDIN:  Object to form.
 6          THE WITNESS:  Yes.
 7     BY MR. RAMER:
 8          Q.  Is it fair to say that heart disease,
 9     diabetes and HIV are detrimental to people's physical
10     health?
11          A.  Yes.
12          Q.  And two pages later, there's a document
13     entitled "Informed Consent Form for Testosterone
14     Therapy," parenthesis, "(for Youth on GnRH Analogs)."
15          Do you see that?
16          A.  Yes.
17          Q.  And this form is used for young people who
18     have not been through endogenous female puberty;
19     correct?
20          A.  Correct.
21          Q.  And on the next page, there's the bold,
22     entitled "Risks of Testosterone."
23          Do you see that?
24          A.  Yes.
25          Q.  And do you agree that this form is accurate
```

```
 1     in describing the effects and risks of testosterone
 2     therapy for this population?
 3          A.  Similar to the Prolactin, that first bullet
 4     point about liver damage, there have also been -- and
 5     I can't tell you the exact papers -- but there --
 6     that particular thing has been put to rest about
 7     liver disease.
 8          Q.  And just so I understand your -- what you're
 9     saying, you're saying that Prolactinomas and liver
10     disease have been --
11          Let me back up.
12          You're saying that masculinizing hormones in
13     this context have been proven to not increase the
14     risk of liver disease; is that right?
15          A.  There have been several manuscripts that
16     have said testosterone does not lead to increasing
17     liver enzymes.
18          Q.  And you're confident enough in those studies
19     that you're going to be removing that from your
20     Informed Consent forms?
21          A.  In my clinical practice, yes.
22          Q.  And apart from liver disease with this form,
23     is the form accurate in describing the effects and
24     risks of testosterone therapy for this population?
25          A.  Yes.
```

1    Q.  And given all the risks that we just
2  discussed, you would agree that these medications are
3  not safe; correct?
4         MR. SELDIN:  Object to form.  Misstates
5  testimony.
6         THE WITNESS:  No.
7  BY MR. RAMER:
8    Q.  But we discussed that these side effects are
9  detrimental to people's physical health; correct?
10        MR. SELDIN:  Object to form.
11        THE WITNESS:  Correct.
12  BY MR. RAMER:
13    Q.  And when you were deposed in Voe versus
14  Mansfield, you explained that when you say
15  medications are safe, you mean that they are not
16  detrimental to people's physical health; correct?
17    A.  All medications have potential side effects.
18  They happen to be listed more explicitly in these
19  consent forms.
20    Q.  In your deposition in Voe versus Mansfield,
21  when you were asked what you meant by saying that
22  these interventions were safe, you said it means that
23  they have not been demonstrated to be detrimental to
24  people's physical health; correct?
25        MR. SELDIN:  Objection.  Foundation.

1         THE WITNESS:  Correct.
2  BY MR. RAMER:
3    Q.  And here, we've just discussed all these
4  increased risks of conditions that are detrimental to
5  people's physical health; correct?
6    A.  Correct.
7    Q.  And so using your definition of what it
8  means for medications to be safe, these medications
9  are not safe; correct?
10        MR. SELDIN:  Object to form.  Misstates
11  testimony.  Asked and answered.
12        THE WITNESS:  Same answer as before.
13  BY MR. RAMER:
14    Q.  Which was what?
15    A.  These medications are safe.  These are all
16  potential side effects.
17    Q.  What does that mean, a "potential side
18  effect"?
19    A.  Let's take Tylenol for an example.  Okay?
20  Tylenol can be very damaging to your liver.
21         Is Tylenol considered a safe medication?
22  Yes, it is.
23         And so like all medications, there are
24  potential side effects.  Does that mean we see them
25  happening a lot?  No.  In fact, the majority of

1  cases, we don't see that at all.
2         I've never seen these things in my patients,
3  nor have they been reported on.  In fact, for
4  example, there was a study that looked at heart
5  disease in transgender men who had been taking
6  testosterone.
7         What we tell patients is that their risk for
8  testosterone is higher than if they didn't take
9  testosterone, but it is not higher than cisgender
10  men.  It's actually just slightly lower.
11         That's what I mean.  All medications have
12  potential side effects.
13  BY MR. RAMER:
14    Q.  I'd like to go to Olson-Kennedy Exhibit 4,
15  which is your deposition in Voe versus Mansfield.
16  I'd like to go to page 151.
17         And beginning at line 12 on 151 and carrying
18  over to line 5 on page 152, here you are asked what
19  you mean when you say that gender-affirming medical
20  care as treatment for gender dysphoria, has been
21  shown to be safe.
22         And at page 152, line 3, you say:
23         "I mean that the use of these medications
24  is -- has not been demonstrated to be detrimental to
25  people's physical health."

1         Correct?
2         MR. SELDIN:  I'll just object to the
3  testimony on page 151, line 22.  The prompt was
4  "gender-affirming medical care as treatment" --
5         (Reporter clarification.)
6         MR. SELDIN:  "Gender-affirming medical care
7  as treatment for gender dysphoria, has been shown to
8  be safe and effective and is not experimental or
9  investigational."
10  BY MR. RAMER:
11    Q.  And my question for you, Doctor, is:  When
12  you were asked what you meant by saying the
13  medications were safe, page 152, line 3, you say:
14         "I mean that the use of these medications
15  is -- has not been demonstrated to be detrimental to
16  people's physical health."
17         Correct?
18         MR. SELDIN:  And I'll just object again, the
19  question in this deposition is more than just safe.
20         But you can answer if you understand.
21         THE WITNESS:  Yes.  I understand, and that's
22  correct.
23  BY MR. RAMER:
24    Q.  You began using puberty blockers to treat
25  gender dysphoria back in 2007; correct?

```
 1        A.  Correct.
 2        Q.  And was it around the same time that you
 3   first began using cross-sex hormones to treat gender
 4   dysphoria in minors?
 5        MR. SELDIN:  Object to form.
 6        THE WITNESS:  Do you mean me personally?  Or
 7   at our clinic?
 8   BY MR. RAMER:
 9        Q.  You personally.
10        A.  2006.
11        Q.  And what about at your clinic?
12        A.  1991.
13        Q.  And you would agree that when you personally
14   began using puberty blockers and cross-sex hormones
15   to treat gender dysphoria in adolescence, that
16   practice was based on very limited data; correct?
17        MR. SELDIN:  Object to form.
18        THE WITNESS:  The limited data was in their
19   use among people with gender dysphoria.  Yes.
20   BY MR. RAMER:
21        Q.  And so when you began using them with
22   adolescents to treat gender dysphoria, that practice
23   was based on very limited data; correct?
24        MR. SELDIN:  Object to form.
25        THE WITNESS:  In puberty blockers, yes.  Not
```

```
 1   gender-affirming hormones.
 2   BY MR. RAMER:
 3        Q.  For adolescents?
 4        A.  Correct.
 5        Q.  You think that there was more than limited
 6   data to use cross-sex hormones to treat gender
 7   dysphoria in adolescents in 2006?
 8        A.  I think there was a lot of clinical evidence
 9   and experience.
10        Q.  When you say "clinical evidence," what are
11   you referring to?
12        A.  I mean that in our center, we'd been
13   utilizing gender-affirming hormones for 15 years at
14   that point.
15        MR. RAMER:  I'm going to hand what's a very
16   large document to the court reporter to be marked as
17   Olson -- Olson-Kennedy Exhibit -- 10, I believe.
18        (Deposition Exhibit 10 was marked for
19        identification by the court reporter.)
20        MR. RAMER:  And for counsel, I did not print
21   out the entire document.  I printed out the cover and
22   then the one page that I'm going to be asking about,
23   to save paper.
24        THE WITNESS:  Thank you.
25        MR. SELDIN:  We appreciate that.  As I
```

```
 1   believe does the witness.
 2   BY MR. RAMER:
 3        Q.  And, Dr. Olson-Kennedy, this is a grant
 4   application that you submitted to the National
 5   Institutes of Health for our R 01, which is entitled
 6   "The Impact of Early Medical Treatment in Transgender
 7   Youth."
 8        Correct?
 9        A.  Correct.
10        Q.  And you submitted this in 2014; correct?
11        A.  Yes.
12        Q.  And I'd like to go to the page that is
13   numbered 163 at the bottom.
14        And let me know when you're at that page.
15        A.  Yes, I'm there.
16        Q.  And that page has a bold and all caps
17   "SPECIFIC AIMS" at the top; correct?
18        A.  Correct.
19        Q.  And the second paragraph -- I'll just read
20   the full paragraph into the record and ask if I read
21   it correctly.
22        "Current clinical practice guidelines aim to
23   decrease gender dysphoria and ameliorate potential
24   negative health outcomes.  Treatment recommendations
25   vary depending on the age and developmental stage of
```

```
 1   youth with gender dysphoria.
 2        "For those youth in the earliest stages of
 3   puberty technical development, Tanner 233, treatment
 4   with gonadotropin releasing hormone GRH agonists is
 5   recommended in order to suppress endogenous puberty
 6   and avoid the development of undesired secondary sex
 7   characteristics.
 8        "In older adolescents in the later stages of
 9   pubertal development, Tanner 4 through 5, treatment
10   with cross-sex hormones is recommended to induce
11   desired masculine or feminine features.
12        "While these guidelines have been used at
13   academic and community centers across the U.S., they
14   are based on very limited data.
15        "Furthermore, there are no available data
16   examining the physiologic and metabolic consequences
17   of cross-sex hormone treatment in youth.  This
18   represents a critical gap in knowledge that has
19   significant implications for clinical practice across
20   the U.S.
21        "In 2011 a report of the Institute of
22   Medicine called for the development of rigorous
23   research aimed at understanding the health
24   implications of hormone use and other
25   transgender-specific issues."
```



1  Leaving aside mispronunciations, did I read
2  that correctly?
3      A. Yes.
4      Q. And in the third and fourth sentences of
5  this paragraph, you are discussing using puberty
6  blockers and cross-sex hormones to treat gender
7  dysphoria in adolescents; correct?
8      A. Yes.
9      Q. And the next sentence says:
10     "While these guidelines have been used at
11 academic and community centers across the U.S., they
12 are based on very limited data."
13     Correct?
14     A. Correct.
15     Q. And you personally wrote that sentence;
16 correct?
17     A. I did.
18     Q. And the next sentence says:
19     "Furthermore, there are no available data
20 examining the physiologic and metabolic consequences
21 of cross-sex hormone treatment in youth."
22     Correct?
23     A. Correct.
24     Q. And you personally wrote that sentence;
25 correct?

1      A. I did.
2      Q. So by the time that you told NIH that these
3  interventions were based on very limited data, you
4  had already been providing them for the better part
5  of a decade; correct?
6      MR. SELDIN:  Object to form.
7      THE WITNESS:  Thirteen years.
8  BY MR. RAMER:
9      Q. What is 13 years?
10     A. We started in 1991 doing clinical care for
11 transgender youth.  This was written in 2014.
12     Q. And you first began giving puberty blockers
13 to patients to treat gender dysphoria in 2007;
14 correct?
15     A. Correct.
16     Q. And you first began using cross-sex hormones
17 to treat gender dysphoria in adolescents in 2006;
18 correct?
19     A. Personally, yes.
20     Q. And so then it's seven to eight years later
21 that you are telling NIH that these interventions
22 were based on very limited data; correct?
23     MR. SELDIN:  Object to form.
24     THE WITNESS:  The were based -- the
25 guidelines were based on little empirical data.

1  Clinical experience is a whole different thing that's
2  considered in the provision of care.
3  BY MR. RAMER:
4      Q. And so by the time that you told -- you told
5  NIH that these interventions were based on very
6  limited empirical data, you had already been
7  providing them for the better part of a decade;
8  correct?
9      MR. SELDIN:  Object to form.
10     THE WITNESS:  Correct.
11 BY MR. RAMER:
12     Q. Do you think that was ethical?
13     MR. SELDIN:  Object to form.
14     THE WITNESS:  Yes.
15 BY MR. RAMER:
16     Q. Why?
17     A. I think that clinical experience is a really
18 important part of making care decisions.  So what we
19 knew in 2007, the Dutch protocol had come out.  And
20 the Dutch had been using puberty blockers for gender
21 dysphoria since, I want to say, 1989, possibly
22 earlier.
23     When they came out with this protocol
24 because the use of puberty blockers had been
25 demonstrated to be safe in even a much younger

1  population, and that they were demonstrated to be
2  helpful in youth with gender dysphoria and we had
3  been using gender-affirming hormones since 1991, it
4  was ethical to offer this as an opportunity for young
5  people.
6  BY MR. RAMER:
7      Q. And that's true even if there's very limited
8  empirical data to support the use of those
9  interventions?
10     MR. SELDIN:  Object to the form.
11     THE WITNESS:  That is true with all areas of
12 medicine, clinical practice outpaces empirical data.
13 BY MR. RAMER:
14     Q. And so in your view, all you really needed
15 to know whether these interventions were safe and
16 effective, was the Dutch studies; is that right?
17     MR. SELDIN:  Object to form.  Misstates
18 testimony.
19     THE WITNESS:  The Dutch experience.
20 BY MR. RAMER:
21     Q. And so every piece of evidence that we've
22 obtained after 2006 and 2007, is just icing on a cake
23 already frosted; is that right?
24     MR. SELDIN:  Object to form.  To the
25 wind-up, misstates testimony.

1      THE WITNESS:  I think that's a
2  mischaracterization of how all of medicine works.
3  All of medicine starts with clinical practice.  And
4  when clinical practice, we have patients that we
5  can -- that are going to consent to studies and
6  enough people to make conclusions, then we add
7  empirical data.
8      This is true across the entire field of
9  medicine.  This is absolutely not different at all.
10 BY MR. RAMER:
11     Q.  And so how about the very first patients who
12 receive these interventions as part of clinical
13 practice with no empirical data, is that ethical?
14     MR. SELDIN:  Object to form.  Foundation.
15     THE WITNESS:  Are you asking me to make a
16 judgment about the Netherlands?
17 BY MR. RAMER:
18     Q.  I'm asking you to make a judgment about your
19 practice.
20     A.  Not unethical.  We did have empirical data,
21 and they had clinical experience.  Not without those
22 things.
23     Q.  And the empirical data is exclusively the
24 data coming from the Dutch researchers; is that
25 correct?

1      MR. SELDIN:  Object to form.  Misstates
2  testimony.
3      THE WITNESS:  That's correct.
4  BY MR. RAMER:
5      Q.  And that was sufficient for you to feel
6  justified in giving these interventions to patients;
7  correct?
8      MR. SELDIN:  Object to form.
9      THE WITNESS:  That experience, that
10 empirical data, and what we knew about the use of
11 central blockers in precocious puberty and other
12 indications.
13     For example, endometriosis in adolescence
14 and other things that I talk about in my report where
15 GnRH analogs are utilized for other reasons.
16 BY MR. RAMER:
17     Q.  And do you treat precocious puberty?
18     A.  I have treated precocious puberty twice
19 because there happened to be overlap with two
20 patients with gender dysphoria.
21     Q.  And those patients were also seeing an
22 endocrinologist; correct?
23     A.  That is correct.
24     Q.  Do you diagnosis precocious puberty?
25     A.  Not routinely.  But all you need for that

1  diagnosis is that somebody has started puberty before
2  a certain age.
3      Q.  And so, in other words, it's just a
4  physical -- it's a diagnosis that's based on physical
5  observation; is that right?
6      MR. SELDIN:  Object to form.
7      THE WITNESS:  There are also blood tests
8  that go along with that and sometimes bone age
9  studies that go along with that.
10 BY MR. RAMER:
11     Q.  And for a patient who is being treated for
12 central precocious puberty exclusively, the treatment
13 for that condition eventually calls for that patient
14 to cease taking puberty blockers and then proceed
15 through endogenous puberty; correct?
16     MR. SELDIN:  Object to form.  Foundation.
17     THE WITNESS:  Correct.
18 BY MR. RAMER:
19     Q.  You do not consider yourself an expert in
20 medical ethics; correct?
21     A.  That's correct.
22     Q.  And looking at your practice generally, you
23 have patients who range in age from four years old to
24 25 years old; correct?
25     A.  Yes.  Occasionally I will see someone older

1  than that if they have not been able to establish
2  care somewhere.
3      Q.  Because it's --
4      Let me back up.
5      Generally your practice is that at age 25,
6  your patients will transition to adult care; correct?
7      A.  That's correct.
8      Q.  And about 90 to 95 percent of your practice
9  is focused on treating children and adolescents with
10 gender dysphoria; correct?
11     A.  That's correct.
12     But I'd like to add context, because it's
13 not always about giving people medical interventions.
14 There are pieces of it that are about
15 psychoeducation.  There are pieces of it about
16 consultations.  I'm just providing information.
17     For example, I have seen parents with
18 children younger than four, but I don't necessarily
19 see the kid.  It really is discussion with parents.
20     Q.  And when you say "psychoeducation," what do
21 you mean by that?
22     A.  Talking to them about trajectories of
23 development, talking to them or working with them
24 around questions that they have about their child.
25     Q.  Do you do psychoeducation with the minor

MAGNA
LEGAL SERVICES

1    patients as well?
2        A.  Yes.
3        Q.  And what does that entail?
4        A.  Same thing.
5        So people are accessing services at all
6    different points in time relative to their
7    understanding of medical interventions or other
8    interventions that are available.  And so that
9    conversation doesn't look the same for everybody, but
10   it's really about providing information.  And that's
11   pretty similar across all of adolescent medicine.
12       Q.  And what does the other very small
13   percentage of your practice involve?
14       A.  Abnormal uterine bleeding, eating disorders,
15   intentional overdose, unintentional overdose, pelvic
16   problems, all things adolescent that adolescents may
17   experience from a medical perspective.
18       Q.  And for --
19       Or let me back up.
20       What percentage of patients are in your
21   research protocols?
22       A.  Very small percentage.
23       Q.  Less than 3 percent?  I know you're -- this
24   is an estimate, but I'm just -- just to get a
25   ballpark.

1        A.  Maybe 8 percent to 10 percent.
2        I don't know the exact numbers right now but
3    around that.
4        Are you talking about the NIH research or
5    are you talking about all research across the whole
6    Center For Transyouth Health and Development?
7        Q.  I was referring to your research protocols.
8        A.  Yeah.  Probably about 8 to 9 percent, or
9    something like that.
10       Q.  And of the patients that you're seeing for
11   gender dysphoria, upwards of 90 percent of those
12   patients are on some form of hormonal intervention;
13   correct?
14       A.  So for clarity, everybody that accesses
15   services is not on medical interventions.
16       But people that are being seen over time,
17   right -- because if somebody comes in on one
18   occasion, we have a conversation and they never
19   return, I'm not seeing them frequently, or maybe I'm
20   seeing them less frequently.
21       But for people that I'm seeing on a routine
22   basis, yes, they are undergoing interventions.
23       Q.  I guess what -- my question was about the
24   percentage of the patients you're seeing on an
25   ongoing basis for gender dysphoria.

1        A.  Mm-hmm.
2        Q.  And the question is:  What percentage of
3    those patients are on some form of hormonal
4    intervention?
5        A.  Probably about 90 percent.
6        Q.  And for your transmasculine patients who did
7    not have their puberty suppressed, nearly all of them
8    end up getting chest surgery; correct?
9        MR. SELDIN:  Object to form.
10       THE WITNESS:  I don't know the exact number,
11   but it's most of them.
12   BY MR. RAMER:
13       Q.  In your deposition in Voe versus Mansfield,
14   when you were asked what proportion roughly of your
15   transmasculine patients end up getting chest surgery,
16   you said nearly all of them who were not blocked in
17   early puberty; correct?
18       A.  Yes.
19       Q.  And as recently as last year, you referred
20   someone under the age of 18 for a genital surgery;
21   correct?
22       A.  I have to look at the timing.  I'm not sure
23   if it's within the last year.  It might have been
24   slightly before that.
25       The timing is -- I don't know.

1        Q.  What time frame are you thinking of?
2        A.  Well, I've only referred one person, and I
3    can't remember when I referred her, if it was more
4    than a year ago or less than a year ago.  It was very
5    close to a year ago.
6        Q.  And do you recall specifically what kind of
7    surgery that was?
8        A.  It was for vulvovaginoplasty.
9        Q.  And can you explain what that is?
10       A.  That is the creation of a vulva and a
11   vaginal canal.
12       Q.  And what tissue is used to create the vulva
13   and the vaginal canal?
14       A.  There are several different procedures.  I
15   can't remember which one this patient had, but I can
16   go through them.
17       Q.  Just give me a sense of generally what these
18   procedures -- not this particular patient, but these
19   procedures in general, what tissue is used for the
20   procedure?
21       A.  So largely dependence on how much puberty
22   that person has experienced.  So if somebody has gone
23   all the way through or mostly through endogenous
24   puberty, most frequently a procedure called an
25   inversion procedure is used, and they use the skin of



1  the shaft of the penis.
2      If somebody was blocked earlier, they use
3  different skin.  And it's largely dependent upon the
4  patient.  Sometimes they use the lining of the
5  peritoneal cavity.  And sometimes they use skin of
6  the scrotum.  And sometimes they use skin from the
7  outside lower groin.
8      And probably other things.  I'm not a
9  surgeon, but...
10     Q.  That's fair.
11         And in your practice, you think there can be
12  times where it's appropriate to prescribe cross-sex
13  hormones at the patient's first visit to your clinic;
14  correct?
15         MR. SELDIN:  Object to form.
16         THE WITNESS:  It can be.  But that would
17  be -- based on them either having had a complete
18  workup already, including their assessment and their
19  preliminary labs, that would be the only time that I
20  would find that appropriate.
21  BY MR. RAMER:
22     Q.  And it's possible that you have personally
23  prescribed cross-sex hormones on a patient's second
24  visit; correct?
25     A.  Correct.

1      Q.  And similarly, it's possible that you have
2  personally prescribed puberty blockers for a patient
3  as early as the second visit; correct?
4      A.  It's possible.  Again, similar to what I
5  talked about previously.
6      Q.  And there might be situations where someone
7  will be prescribed puberty blockers during their
8  first visit to your clinic; correct?
9          MR. SELDIN:  Object to form.
10         THE WITNESS:  Similar to what I said before,
11  they would've had to have had the majority of their
12  workup done in another place or for a variety of
13  reasons.
14  BY MR. RAMER:
15     Q.  And we were discussing this a little bit
16  before, but you --
17         Let me back up.
18         The general practice in your clinic is to
19  follow patients until they are 25 years old and then
20  transition to adult care; correct?
21     A.  Correct.
22     Q.  And at that point, unless those patients are
23  in your research protocols, you do not follow
24  patients from age 25 onward; correct?
25     A.  Correct.

1      Q.  And so you do not have clinical experience
2  related to your patient outcomes after 25 years of
3  age; correct?
4          MR. SELDIN:  Object to form.
5          THE WITNESS:  That's correct.
6  BY MR. RAMER:
7      Q.  When you prescribe a patient puberty
8  blockers, you do not expect an increase in body
9  satisfaction; correct?
10     A.  It's not the same for every patient.  Some
11  people have improvement and some people don't.
12         If you look at the overarching response, at
13  least what our data is demonstrating, it's pretty
14  much neutral.
15         That doesn't capture the variability in each
16  individual.
17     Q.  And so when you say that puberty blockers
18  are effective, all you mean by that is that they halt
19  endogenous puberty; correct?
20         MR. SELDIN:  Object to form.  Misstates
21  testimony.
22         THE WITNESS:  Well, like I said, it's an
23  individual thing.  So there are some people that
24  experience a lot of distress about going through
25  puberty or the idea of going through puberty.  And

1  for those patients, their anxiety and stress
2  diminishes because they don't have to think about
3  that anymore.
4      There are some people who go on puberty
5  blockers who experience a lot of anxiety about the
6  fact that they are not going through the puberty that
7  aligns with their gender.  So for them, they might
8  have increased anxiety.
9      That's why I'm saying there's variability
10  between individuals.
11  BY MR. RAMER:
12     Q.  But the purpose of prescribing the puberty
13  blockers as part of the sequence of gender-affirming
14  care, is not to decrease anxiety and distress;
15  correct?
16         MR. SELDIN:  Object to form.
17         THE WITNESS:  Correct.  It's to stop the
18  progress of their endogenous puberty.
19  BY MR. RAMER:
20     Q.  And there is no instrument for measuring
21  gender dysphoria; correct?
22         MR. SELDIN:  Object to form.
23         THE WITNESS:  There are a handful of scales
24  that attempt to do that and, for example -- but I
25  think the earliest ones that we see, the Utrecht



1 gender dysphoria scale does not.
2 I think that there are other scales that
3 I've talked about before -- I can't remember the
4 exact name. I will in a minute -- that have been
5 proposed and have been modified over time.
6 BY MR. RAMER:
7 Q. But you do not in your practice or research,
8 use an instrument that specifically measures gender
9 dysphoria; correct?
10 A. We use a combination of instruments for
11 that.
12 Q. What combination?
13 A. Well, we have not put this together formally
14 yet, but we utilize -- transgender congruence is one
15 of the most common scales that actually measures both
16 acceptance and appearance, which helps us understand
17 about the gap between someone's physicality and their
18 gender, which is the purpose of utilizing
19 gender-affirming hormones.
20 Does that capture all of gender dysphoria?
21 No. But it does capture this idea of minimizing this
22 gap to the best of our ability.
23 Q. And there is no instrument that you're aware
24 of that would fully minimize that gap; correct?
25 A. Well, the instrument that captures the gap

1 and the gap closing, is the transgender congruence
2 scale, appearance subscale. And that's why --
3 (Reporter clarification.)
4 THE WITNESS: The transgender congruence
5 scale, specifically the appearance congruence
6 subscale.
7 BY MR. RAMER:
8 Q. And when you were discussing the transgender
9 congruence scale, you measure -- excuse me -- you
10 mentioned both acceptance and appearance; correct?
11 A. Correct.
12 Q. And can you explain what you mean by
13 "acceptance"?
14 A. So the transgender congruence scale has
15 these two subscales. So the acceptance piece is
16 about --
17 I didn't know if you needed a minute.
18 Q. No. I'm sorry.
19 A. -- the pieces about self-acceptance.
20 Q. Self-acceptance of what?
21 A. Transexperience, transgender experience.
22 Q. And what is appearance measuring?
23 A. Appearance congruence? It's measuring how
24 aligned somebody's physicality is with their gender.
25 Q. And I think we've discussed this, but I want

1 to make sure, that for any particular patient, the
2 gender-affirming medical intervention that is
3 indicated, is driven by the patient's embodiment
4 goals; correct?
5 A. That's correct.
6 Q. And you think that gender-affirming care
7 includes a natal female receiving implants to have
8 larger breasts; correct?
9 MR. SELDIN: Object to form.
10 THE WITNESS: I think you might have said
11 that backwards.
12 Somebody who is designated female at birth
13 doesn't -- probably doesn't want or need implants.
14 BY MR. RAMER:
15 Q. During your deposition in Noe versus Parson,
16 you were asked if a natal female identifies as
17 female, but naturally has a very small chest and
18 wants a breast augmentation to better align her body
19 with her conception of her gender as female, would
20 that also be gender-affirming in your terminology,
21 and you answered "yes"; correct?
22 A. Yes.
23 Q. And so you think gender-affirming care
24 includes a natal female receiving implants to have
25 larger breasts; correct?

1 MR. SELDIN: Object to form.
2 THE WITNESS: Correct.
3 MR. RAMER: And I'm at a decent stopping
4 point.
5 THE WITNESS: Thank you.
6 MR. RAMER: Let's go off the record.
7 THE VIDEOGRAPHER: The time is 11:51 a.m.
8 We are off the record.
9 (Lunch recess.)
10 MR. RAMER: Ready to go.
11 THE VIDEOGRAPHER: One moment, please.
12 The time is 12:34 p.m.
13 We are back on the record.
14 BY MR. RAMER:
15 Q. Dr. Olson-Kennedy, welcome back.
16 A. Thank you.
17 Q. I'd like to return to Olson-Kennedy
18 Exhibit 6, which is your amicus brief.
19 And I'd like to go to page 20.
20 And under the bold No. 1, there's a
21 paragraph where the brief is talking about using the
22 GRADE, all caps, "METHODOLOGY FOR ASSESSING EVIDENCE
23 QUALITY."
24 Correct?
25 A. Yes.

MAGNA
LEGAL SERVICES

1    Q.  And you have never used the GRADE
2  methodology; correct?
3    A.  That's correct.
4    Q.  And you do not know how the GRADE
5  methodology considers expert opinion versus other
6  types of evidence; correct?
7    A.  I have heard people assert that over the
8  last handful of months.
9    Q.  Apart from those assertions, you do not have
10  an understanding of how the GRADE methodology
11  distinguishes between expert opinion and other types
12  of evidence; correct?
13    A.  That's correct.
14    Q.  And sticking with this brief, like to go to
15  page 4.
16    And first full paragraph on the page,
17  there's a sentence that begins with "First." Then
18  there's a citation, and then there's a sentence that
19  begins with "These reviews."
20    Do you see that?
21    A.  Yes.
22    Q.  And I'll first just ask -- I'll first read
23  it and ask if I read it correctly.
24    It says:
25    "These reviews are billed as systematic

1  reviews, a rigorous type of literature search
2  considered to be the gold standard for assessing the
3  quality of medical evidence, and were conducted by
4  authors affiliated with the University of York,"
5  parenthesis, "the York SRs."
6    Did I read that correctly?
7    A.  Yes.
8    Q.  And do you agree that systematic reviews are
9  the gold standard for assessing medical?
10    A.  I guess.
11    Q.  What do you mean you guess?
12    A.  I -- I mean, I'm not -- this is not my field
13  of study.  This is what is said in the general world.
14    But my concern is that systematic reviews
15  are very biased.
16    Q.  Biased in --
17    A.  Essentially very biased.
18    Q.  Biased in what way?
19    A.  So I think as we talk about in -- in this
20  report that we published, the criterion for
21  consideration in the review is subjective, so people
22  pick it.  Right?  That's a human being on the other
23  end of it that's picking the criteria.
24    So is it leaving out a lot of studies?
25  Yeah, like as witnessed by the York systematic

1  reviews.  They left out a lot of studies.  And they
2  left them out for reasons like, they -- they
3  considered under 18 and 18 and older, so they were
4  disqualified.  Right?
5    Or they didn't measure this specific outcome
6  that we identified as important.  Right?  That's --
7  that's a significant issue with systematic reviews.
8    Q.  And is that an issue with systematic reviews
9  generally or specifically with the systematic reviews
10  associated with the Cass Review?
11    A.  Generally they all are subjective in that
12  way.
13    Q.  And so do you consult systematic reviews as
14  part of your practice?
15    A.  Possibly in the past.  Not that I can recall
16  specifically.
17    Q.  And you've never conducted a systematic
18  review; correct?
19    A.  That's correct.
20    Q.  In your opinion, should a systematic review
21  look at the safety of the interventions under study?
22    MR. SELDIN:  Object to form.
23    THE WITNESS:  I think that depends on what
24  the systematic review is doing.
25  ///

1  BY MR. RAMER:
2    Q.  Can you explain what you mean by that?
3    A.  So if a systematic review is undertaking --
4  again, broadly conceptualizing what the purpose of
5  the systematic review is, is a really important part
6  of that question.
7    So if the systematic review overall is
8  saying, we want to look at all of the evidence, well,
9  what if it's not an intervention that's related to
10  safety?  Right?
11    What if it's an intervention that is
12  completely unrelated?  Then that wouldn't be an
13  important thing, necessarily.
14    But if they're looking at the -- they're
15  looking at the results of intervention specifically
16  related to medications or surgical things, then
17  safety is an important part of it.
18    Q.  How many systematic reviews have you read
19  that assess the quality of the evidence for using
20  medical interventions to treat gender dysphoria in
21  minors?
22    A.  Probably five or six.  I don't know the
23  exact number.
24    Q.  And do you recall which ones you read?
25    A.  I have read the York systematic reviews,

1 which I think -- well, I don't know if we call the
2 one that -- this is an exact example. Right? It's
3 analyzing standards of care. Right? I don't think
4 they were analyzing for the safety of the standards
5 of care development. That one.
6       There were two about blockers. There was
7 one about social transition. There was the one that
8 was from the Johns Hopkins group for the standards of
9 care development.
10       There's another one. I can't remember the
11 author. I'd have to look back, 'cause I think it
12 he's in my bibliography.
13       So, yeah, six or -- six or seven, something
14 like that.
15       Q. And do you recall generally what the
16 conclusions were of the systematic reviews that you
17 have read that assess the quality of evidence for
18 using medical interventions to treat gender dysphoria
19 in minors?
20       A. Well, it depends on the review. So I think,
21 like, this is another thing that was -- was
22 unexplained in the Cass report, that both of the
23 Taylor reviews, they actually found a moderate and
24 high quality evidence for the interventions. But
25 that wasn't really talked about very much in the

1 Cass Review.
2       Other reviews have also come to the
3 conclusion that there needs to be more data. And it
4 depends on the specific thing that they're looking
5 at.
6       Q. And are you able to name a single study
7 demonstrating that any form of medical transition
8 reduces the rate of completed suicide among any
9 population of minors?
10       MR. SELDIN: Object to form. Foundation.
11       THE WITNESS: I really don't know how a
12 study would look at rate of completed suicides and
13 their reasons. I just don't think that's possible.
14 BY MR. RAMER:
15       Q. And so you would say it's pointless to even
16 try to review literature on the connection between a
17 form of medical transition and death by suicide;
18 correct?
19       MR. SELDIN: Object to form. Misstates
20 testimony.
21       THE WITNESS: I am open to somebody
22 proposing how such a study would be done. But I have
23 never seen that, nor can I conceptualize how that
24 would be done.
25 ///

1 BY MR. RAMER:
2       Q. And during your deposition in
3 Noe versus Parson, you were asked whether you were
4 saying that it would be pointless to even try to
5 review literature on the connection between a form of
6 medical transition and death by suicide.
7       And your answer was "Correct, yes."
8       Correct?
9       A. Yes.
10       Q. And sticking with Exhibit 6, which is your
11 amicus brief, going to page 18.
12       And in the first paragraph -- excuse me --
13 in the first paragraph, about halfway down, you're
14 criticizing the Cass Review's use of the Newcastle
15 Ottawa scale; correct?
16       A. Correct.
17       Q. And you have never used the Newcastle Ottawa
18 scale; correct?
19       A. That's correct.
20       Q. And going to page 24, the same exhibit, the
21 first full sentence on this page says:
22       "Indeed the GRADE authors state explicitly
23 that technically low quality evidence can and does
24 support strong recommendations for clinical care."
25       Did I read that correctly?

1       A. Yes.
2       Q. You are not familiar with the paradigmatic
3 examples in which the GRADE system says one can make
4 a strong recommendation based on low quality
5 evidence; correct?
6       MR. SELDIN: Object to form.
7       THE WITNESS: I'm not sure I know what that
8 means.
9 BY MR. RAMER:
10       Q. And in your deposition in Noe versus Parson,
11 you were asked:
12       "Are you familiar with the developers of the
13 GRADE system providing the paradigm under which you
14 can make a strong recommendation based on low quality
15 evidence?"
16       And your answer was "no"; correct?
17       A. Correct.
18       THE REPORTER: 11.
19       (Deposition Exhibit 11 was marked for
20       identification by the court reporter.)
21 BY MR. RAMER:
22       Q. And, Dr. Olson-Kennedy, you've been handed
23 what's been marked Olson-Kennedy Exhibit 11; correct?
24       A. Correct.
25       Q. And is this one of the Taylor systematic



1 reviews you were referencing earlier?
2 A. Yes.
3 Q. And on the first page under the aim, you can
4 see that this was a systematic review conducted to
5 examine the quality and development of published
6 guidelines or clinical guidance containing
7 recommendations for managing gender
8 dysphoria/incongruence in children and/or adolescence
9 age zero to 18.
10 Correct?
11 A. Yes.
12 Q. And if you go to the second page of this
13 document, and the right column, under the blue
14 quality appraisal, there's a sentence, and then
15 there's a sentence that begins with "We used."
16 Do you see that?
17 A. I do.
18 Q. It says:
19 "We used the Appraisal of Guidelines for
20 REsearch & Evaluation (AGREE) II instrument to assess
21 quality"; correct?
22 A. Correct.
23 Q. And you're not familiar with the AGREE II
24 scale; correct?
25 A. I am not.

1 Q. And sticking with this exhibit, I'd like to
2 go to page 5 and specifically Table 1.
3 And do you see there is a column entitled
4 "Rigor of Development"?
5 A. Yes.
6 Q. And in that column, the highest scoring
7 guidelines for rigor of development are the
8 guidelines from the Swedish National Board of
9 Health & Welfare, 2022; correct?
10 A. Yes.
11 Q. You are not familiar with those guidelines,
12 are you?
13 A. I am not.
14 Q. And returning to Exhibit 6, which is your
15 amicus brief.
16 I'd like to go to page 21.
17 And second full paragraph, first two
18 sentences, I'll read them and ask if I read them
19 correctly.
20 It says:
21 "There are also ethical barriers to RCTs.
22 If participation in a research study is the only way
23 to access medically affirming interventions that have
24 substantial evidence demonstrating their
25 effectiveness, the result is coercion, which is

1 condemned by medical and scientific ethical rules."
2 Did I read that correctly?
3 A. Yes.
4 Q. And this is a point that is made in your
5 paper that's referenced in footnote 3 of this brief;
6 correct?
7 A. I'm sorry. You're going to have to walk me
8 back again. Which paper? This one?
9 Q. The paper that this brief is adapted from.
10 A. Oh, oh, oh. Okay.
11 Q. And my question is just this point that I
12 just read, that's something that's also made in your
13 paper; correct?
14 A. Yes.
15 Q. And that's a part of the paper that you
16 wrote; correct?
17 A. Correct.
18 Q. And would you agree that the point you make
19 in this paragraph assumes that medically affirming
20 interventions have substantial evidence demonstrating
21 their effectiveness?
22 MR. SELDIN: Object to form.
23 THE WITNESS: Yes.
24 BY MR. RAMER:
25 Q. And so if the purpose of the RCT is to

1 determine whether there is evidence of effectiveness,
2 there would not be an ethical barrier; correct?
3 MR. SELDIN: Object to form.
4 THE WITNESS: The ethical barrier is what's
5 recommended in --
6 The ethical barrier is twofold. The first
7 one is, you can't randomize someone to no treatment
8 when there is existing treatment. That has been
9 demonstrated both empirically and clinically to be
10 effective. That's the first piece.
11 The second piece that -- what you see here,
12 is talking about only making access available to
13 someone who participates in research because that's
14 coercion.
15 BY MR. RAMER:
16 Q. And it's only coercion, though, if the
17 intervention at issue has substantial evidence of
18 effectiveness; correct?
19 A. No. I don't think you can ever say to
20 someone, you can only access this if you're in a
21 research protocol. That's not how medicine works.
22 Going back to what I said before, is that
23 clinical care far outpaces empirical evidence. It --
24 there's more of an abundance of it. And it also has
25 to be a predecessor to scientific investigation.

1    So I don't really know how you would say to
2  someone, you can only have this access if you're in a
3  research trial.
4    Maybe in the case of cancer or something
5  like that, but I'm not familiar with that domain of
6  medicine.
7    But as far as I know, requiring people to be
8  in research is coercion.
9    Q. And that point applies not just to
10  gender-affirming medical interventions, but to all
11  medical interventions; correct?
12    A. I can't speak for every single medical
13  intervention. But in general, not allowing people
14  access to care except through a research protocol is
15  a problem.
16    Q. And I just -- to make sure we're not
17  quibbling over the word "care," when you use the word
18  "care," are you -- does the word "care" in your view
19  carry with it some sort of sense of established
20  evidence showing effectiveness?
21    A. As opposed to?
22    Q. A medical intervention where we don't know
23  whether it's effective or not.
24    A. I don't know. I haven't lived in the world.
25  I think the only place where that happens is like

1  experimental drugs and cancer treatment, where they
2  have, like, okay, we can try this, but we're not
3  guaranteeing it's going to work, or something like
4  that.
5    But that's not my field of expertise.
6    Q. Well, in the context of an experimental drug
7  where they're saying, we can try this, and it might
8  work, but it might not, do you think that limiting
9  the use of that experimental drug to research trials
10  is coercive?
11    MR. SELDIN: Object to form.
12    THE WITNESS: I don't know. I'd have to
13  think about it for a longer period of time.
14  BY MR. RAMER:
15    Q. What would you need to think about?
16    A. I'd have to think about a scenario in which
17  that happened, which I don't know of any. And so
18  that makes it hard for me to form an opinion about.
19    Q. And so if it were the case that
20  gender-affirming medical interventions did not have
21  substantial evidence demonstrating their
22  effectiveness, you could not say that limiting the
23  use of those interventions to a research trial is
24  coercive; correct?
25    MR. SELDIN: Object to form.

1    THE WITNESS: That was a long sentence.
2    I -- so, for example, I have no idea if
3  when, for example, the Dutch started using blockers
4  for youth with gender dysphoria, if everyone was
5  enrolled in a study.
6    My guess is probably what happened was that
7  they collected data routinely and then went back and
8  looked at it. In other words --
9    I don't know this for sure, but a lot of
10  times what happens is people are collecting data in
11  the course of their clinical care, and then they go
12  back and analyze it. And they don't say, we're
13  prospectively enrolling people and we're going to
14  watch what happens to them.
15    It's, we're -- we're doing this clinical
16  care, and we utilize these tools at different time
17  points.
18    I don't know if that's what they did or not.
19    I think that, again, the situation in these
20  countries that have a national health system, are
21  very different than the ones in the United States.
22  BY MR. RAMER:
23    Q. And so you think it's possible that the
24  Dutch researchers began --
25    Let me back up.

1    You think it's possible that the Dutch
2  clinicians began prescribing puberty blockers as a
3  treatment for gender dysphoria before they began
4  studying it as part of a research trial?
5    Is that correct?
6    MR. SELDIN: Object to form.
7    THE WITNESS: I know that the first thing
8  that the Dutch ever published was a case review, and
9  that's not a prospective trial. That's the situation
10  of one individual.
11    So I can't answer whether they did or not,
12  but I do know that their first publication about this
13  was not a prospective longitudinal trial.
14  BY MR. RAMER:
15    Q. Do you think it would be unethical to
16  conduct a research trial with two arms, where one
17  arm --
18    Let me back up.
19    In the context of adolescents with gender
20  dysphoria, do you think it would be ethical to
21  perform a research trial where there are two arms to
22  the trial. One arm is referring to psychotherapy;
23  one arm is receiving psychotherapy and medical
24  interventions?
25    A. Well, there have been studies like that that



1  have looked at exactly those comparisons.
2      But are you talking about like you never
3  giving me medical intervention and -- or over time,
4  you're going to get medical intervention?
5      I don't think it's ethical to say, you're
6  not going to get any medical intervention ever.  And
7  it's not only unethical, it's not feasible.
8      Q.  What's not feasible?
9      A.  To enroll people into a mental health only
10  arm.
11      Q.  Why is that not feasible?
12      A.  Because they wouldn't want to do it.
13      Q.  And when you say there have been studies
14  conducting that type of research, are you referring
15  to anything other than the Costa study?
16      A.  I think that -- I have to look through the
17  study specifically.  But I think Van Der Miesen did
18  this also.
19      Q.  And -- so you say it would -- just to back
20  up and answer -- the question is:  That type of
21  question is ethical; correct?
22      A.  The one -- the Costa study?  C-o-s-t-a?
23      Q.  If the Costa study is a study like the one
24  that I described of two arms, one arm receiving
25  psychotherapy, another receiving psychotherapy and

1  medical interventions, that study is ethical;
2  correct?
3      MR. SELDIN:  Object to form.
4      THE WITNESS:  I don't remember if the
5  follow-up with the psychotherapy-only arm was
6  intended to get treated.  I don't remember that.  I
7  have to go back to the paper.
8      If it was never intended to get care, I
9  would not think that was ethical actually.
10  BY MR. RAMER:
11      Q.  What if the study was designed that they
12  would receive care when they turn 18?
13      A.  Maybe.
14      Q.  Maybe what?
15      A.  Maybe that could be ethical.  I'd have to
16  see it to -- to make that determination.
17      Q.  Because what gives you concern about that
18  type of study?
19      A.  I think a type of study that does not allow
20  people access to care when they first engage in care,
21  is really problematic for people.  We know that
22  untreated gender dysphoria is really harmful.
23      And so what we're talking about is over, you
24  know, a hundred years or more, psychotherapy is the
25  sole intervention, as monotherapy is not effective.

1      There have never been studies demonstrating
2  that.  It is not effective in eradicating or
3  significantly decreasing gender dysphoria.
4      So now you're talking about randomizing an
5  arm of the study into something that we know is
6  harmful, which is gender dysphoria, with a treatment
7  that has never been proven to be successful.
8      Q.  So to break that down, for one, you could
9  conduct a study, like the one I'm describing, without
10  randomizing patients; correct?
11      A.  Yes, you could.
12      Q.  And did I understand in your answer -- did
13  you say something that there have been studies for a
14  century saying that psychotherapy doesn't work for
15  gender dysphoria?
16      A.  There have been -- the predominant issue,
17  when gender dysphoria, transgender experience moved
18  into the world of medicine and science, people
19  thought that psychotherapy was what would make people
20  not be trans anymore.  And that's never been
21  demonstrated to be true.
22      It did not talk about gender dysphoria in
23  the way that we're talking about it today.
24      But because being gender incongruent was
25  considered psychopathological, the efforts were aimed

1  at therapy, psychiatry, mental health therapy,
2  sexology.  All of those things.
3      And over that time, there has never been a
4  study demonstrating that psychotherapy alone manages
5  gender dysphoria.
6      Q.  Do you agree that there's a distinction
7  between psychotherapy with the purpose of making
8  someone not transgender and psychotherapy with the
9  purpose of resolving somebody's distress associated
10  with gender dysphoria?
11      A.  Yes, there's a difference between those
12  things.
13      Q.  And I'm talking about the latter category,
14  the psychotherapy that is done for the purpose of
15  resolving distress associated with gender dysphoria.
16      And my question is:  Do you think that
17  qualifies as care for gender dysphoria?
18      A.  Not by itself.  I think that psychotherapy
19  can help people manage their distress.  But I don't
20  think it is eliminating the consternation that they
21  feel about the misalignment.
22      Q.  What's the basis for that opinion that you
23  just gave?
24      A.  A hundred years of people trying to do that.
25  And when medications became available, people used

MAGNA ◆
LEGAL SERVICES

1  them to close that gap.  And have been for 90 years,
2  80, 90 years.
3       Q.  And so, just to make sure I understand.
4  Your opinion is that psychotherapy to help resolve
5  distress associated with gender dysphoria is
6  ineffective based on studies from the last 80 to
7  90 years; is that right?
8          MR. SELDIN:  Object to form.
9          THE WITNESS:  The lack of studies that
10  demonstrate that.
11         And there's not -- in the world of clinical
12  care, even people that this was their whole life's
13  work actually have not --
14         They -- maybe there's one example or two
15  examples, but there is not even scant evidence of
16  that.
17  BY MR. RAMER:
18       Q.  Scant evidence of what?
19       A.  Of psychotherapy resolving gender dysphoria.
20       Q.  Then why do we do it?
21       A.  Because it's partnered with medical
22  interventions.  Because you can help move that gap to
23  a closer place and help people manage their anxiety
24  related to it.
25         Those things can go hand-in-hand, and they

1  do, especially with youth care.  They go
2  hand-in-hand.  The -- it's -- it is not -- it's
3  not -- it's never been shown that psychotherapy alone
4  manages gender dysphoria.
5       Q.  And your opinion is that it has been
6  demonstrated that it does not; is that right?
7       A.  Yes.  That's correct.
8       Q.  And is it your opinion that the --
9         Just backing up.
10        If -- is it your opinion that medical
11  interventions are necessary in every patient to treat
12  gender dysphoria?
13         MR. SELDIN:  Object to form.
14         THE WITNESS:  I -- I can't possibly answer
15  that because I haven't met everybody with gender
16  dysphoria.
17         The people in my practice, they needed
18  medical interventions.
19  BY MR. RAMER:
20       Q.  All of them?
21       A.  The people with gender dysphoria, yeah.
22       Q.  And I'd like to return to your declaration,
23  which is Olson-Kennedy Exhibit 1.
24         And I'd like to go to page 9 and paragraph
25  34.

1         And there you say:
2         "Under the WPATH SOC and other well-accepted
3  clinical practice guidelines for the treatment of
4  gender dysphoria, care should be provided using an
5  individualized approach."
6         Did I read that correctly?
7       A.  Yes.
8       Q.  And can you explain what it means to use an
9  individualized approach to providing care?
10      A.  That the needs of each person are not
11  identical to the needs of each -- of other people;
12  that the recommendations that we make have to be
13  specific for the individual that's in front of us.
14      Q.  And so basically no two patients are the
15  same; is that right?
16      A.  That's correct.
17      Q.  And every patient has to be evaluated as an
18  individual based on the patient's history,
19  comorbidities and relationships, among many other
20  variables; correct?
21         MR. SELDIN:  Object to form.
22         THE WITNESS:  Correct.
23         THE REPORTER:  Exhibit 12.
24         (Deposition Exhibit 12 was marked for
25         identification by the court reporter.)

1  BY MR. RAMER:
2       Q.  And, Dr. Olson-Kennedy, you've been handed
3  what's been marked as Olson-Kennedy Exhibit 12;
4  correct?
5       A.  That's correct.
6         MR. SELDIN:  And, Mr. Ramer, I'm just going
7  to interrupt for a moment.
8         This appears to be something not included on
9  the list you recently disclosed.  I would just ask
10  that we have a couple minutes to review it.
11         MR. RAMER:  I'm fine with allowing you to
12  review it.  This was used as an exhibit during
13  Dr. Olson-Kennedy's Noe v Parson deposition, which is
14  included in the documents we identified.
15         But happy to go off the record and allow a
16  chance to review it.
17         MR. SELDIN:  No, I appreciate that
18  clarification.  Thank you.
19      A.  A minute would be fine, then.
20         MR. RAMER:  Go off.
21         THE VIDEOGRAPHER:  The time is 1:05 p.m.
22  We are off the record.
23         (Off record.)
24         MR. SELDIN:  We're fine now.
25         THE VIDEOGRAPHER:  One moment, please.



1    The time is 1:06 p.m.
2    We are back on the record.
3  BY MR. RAMER:
4    Q.  Dr. Olson-Kennedy, the document marked as
5  Olson-Kennedy Exhibit 12 is a New York Times article
6  entitled "Biden Administration Opposes Surgery for
7  Transgender Minors"; correct?
8    A.  Yes.
9    Q.  And you've seen this article before;
10 correct?
11   A.  I have.
12   Q.  And the first sentence below the you had
13 been granted access, starts with "the Biden
14 Administration."
15   Do you see that?
16   A.  I do.
17   Q.  And I'm going to read that sentence first
18 and ask whether I read it correctly.
19   It says:
20   "The Biden Administration said this week
21 that it opposed gender-affirming surgery for minors,
22 the most explicit statement to date on the subject
23 from a president who has been a staunch supporter of
24 transgender rights."
25   Did I read that correctly?

1    A.  You did.
2    Q.  And it's your understanding that this
3  statement had come from a staffer; correct?
4    A.  I had heard that.  I have no idea who the
5  statement came from, except from these authors at the
6  New York Times.
7    Q.  And where did you hear that it came from a
8  staffer?
9    A.  I don't remember.
10   I was trying to figure out where I could
11 even see this, and I couldn't find it.  And I saw a
12 lot of speculation online, so I have no idea.
13   And the speculation was that it came from a
14 staffer.  I don't really actually know what it means
15 when something comes from an administration.  I think
16 that's a very vague comment.
17   Q.  That's a fair point.
18   And so the assertion that it came from a
19 staffer, you were saying was something that you saw
20 online; is that right?
21   A.  Yes.
22   Q.  Are you familiar with Dr. Jack Turban?
23   A.  I -- I know Jack.
24   Q.  Do you know him well?
25   A.  I don't know about well.  I mean, we're --

1  we're colleagues, but...
2    Q.  Do you think he's a reliable source of
3  information?
4    A.  I do.
5    Q.  And have you spoken with him before?
6    A.  Yes.
7    Q.  Are you familiar with Dr. Helen Webberley?
8    A.  Yes.
9    Q.  Who is she?
10   A.  Helen Webberley was a -- is.  I shouldn't
11 say "was."  She's still alive.
12   She is a doctor in the U.K., who was
13 practicing gender-affirming care outside of the NHS.
14   Q.  And have you spoken with her before?
15   A.  Mm-hmm.
16   Q.  And --
17   A.  Yes.
18   Q.  Sorry.
19   Go ahead.
20   A.  Yes, I have.
21   Q.  And do you think that she's a reliable
22 source of information?
23   A.  I don't really know Helen that well.  I
24 think that my understanding generally of her, is that
25 she is a fine person.  I really can't comment further

1  than that.
2    Q.  Do you respect her as a medical
3  professional?
4    A.  Yes.
5    THE REPORTER:  Exhibit 13.
6    (Deposition Exhibit 13 was marked for
7    identification by the court reporter.)
8    THE WITNESS:  Thank you.
9  BY MR. RAMER:
10   Q.  And, Dr. Olson-Kennedy, you've been handed
11 what's been marked as Olson-Kennedy Exhibit 13, which
12 you can see at the top is from genderGP.com.
13   Do you see that?
14   A.  I do.
15   Q.  Have you seen this document before?
16   A.  I have not.
17   Q.  I'll represent to you that it's a transcript
18 from a podcast that Dr. Turban did with Dr. Webberley
19 and another individual.
20   And my questions relate to page 11 of this
21 document.
22   MR. SELDIN:  And, Mr. Ramer, has this been
23 previously marked at a deposition?
24   MR. RAMER:  It had -- not to my knowledge.
25   MR. SELDIN:  Okay.

MAGNA
LEGAL SERVICES

BY MR. RAMER:
Q. And on page 11, toward the bottom of the page, you see there's a paragraph that begins "Dr. Helen Webberley."
Do you see that?
A. Yes.
Q. And the second sentence starts with "I'd love to talk to you."
Do you see that?
A. Yes.
Q. And it says:
"I'd love to talk to you all day, but we haven't got all day, but Marianne and Abby and I went over to Los Angeles to listen to Johanna Olson-Kennedy, and Aiden and Darlene Tando to talk."
Did I read that correctly?
A. Yes.
Q. And who is Aiden?
A. I'm assuming that she's talking about my husband.
Q. And who is Darlene Tando?
A. She is a therapist in San Diego that works with transgender young people and their families.
Q. And what event is it that Dr. Helen Webberley would have attended where you, Aiden and

Darlene Tando were speaking?
A. Well, we speak together frequently. We do trainings together.
Q. Do you recall Dr. Helen Webberley attending one of your trainings?
A. Not really.
Q. And continuing with this paragraph, it says:
"In jest, I've said it before, I say it again. So inspirational, you know, absolutely.
"And so you said a couple of things, but if I was wanting to, if I was rewriting the rule book for transgender care, I think, you know, they've coined it, and you've added to it today.
"And basically Johanna has just said, look, if your kid -- if your kid tells you that they're trans, they most likely are. Just believe it."
Did I read that correctly?
A. You did.
Q. Is that something you said?
A. It could've been something I said. I don't remember this time specifically, but yes.
Q. That's something you believe, though?
A. Yes.
Q. And next paragraph below that, there's an answer from Dr. Jack Turban. And I'll just read the

first two sentences of that. It says:
"Yeah, I was really talking around it and not naming names, but that model does exist in the U.S., right? So Dr. Olson, that's her model."
Did I read that correctly?
A. You did.
Q. In an Informed Consent model of care, so long as the patient provides Informed Consent for an intervention, the provider will provide that intervention; correct?
MR. SELDIN: Object to form.
THE WITNESS: Yes.
BY MR. RAMER:
Q. And in a gatekeeping model, there may be times where a patient can provide Informed Consent, but the provider will determine that the patient is not a good candidate for a particular intervention; correct?
MR. SELDIN: Object to form.
THE WITNESS: I actually think that can happen in an Informed Consent model, too.
BY MR. RAMER:
Q. Can you explain how that's possible?
A. Well, I -- I think that there's this binary of -- there's these two models, Informed Consent and

gatekeeping.
But I don't think that's true because I don't follow either of those models.
I think that there is a model where an assessment happens, and recommendations are made based on that assessment.
So I think that -- I think of a gatekeeper model more as like the mental health provider that you're working with can keep somebody from getting care.
That feels really different to me than, oh, you're assessing somebody, and then you're making a recommendation based on what you've gleaned from that assessment.
Assessment, assessments, that's, in my -- in my model, that's what we utilize.
Q. What's a situation where a patient could provide Informed Consent or informed ascent, but you would deny the intervention based on the assessment?
MR. SELDIN: Object to form.
THE WITNESS: I think this goes back to what I was saying before, that if somebody thinks, for example, like, oh, I'm going to take medication and it's going to change "X," and -- and I say, well, no, it's not actually. This is not a good idea for you.

1      Then that would be an example.
2      BY MR. RAMER:
3         Q.   But a person who misunderstands what the
4      intervention actually does is not capable of
5      providing Informed Consent; right?
6         A.   Well, I think it's important here to
7      remember that Informed Consent models are really
8      about adult care.  There aren't adolescent
9      Informed Consent models, 'cause they can't legally
10     provide Informed Consent related to gender care.
11         Their parent or guardian has to do that.
12     They also sign the consent form, but that's not
13     legal.
14         Q.   When you say "that's not legal," you mean
15     that doesn't establish legal consent.  Is that what
16     you're saying?
17         A.   Correct.
18         Q.   And is there ever a situation where a minor
19     could provide informed ascent, the parent or
20     caretaker could provide Informed Consent, but you
21     would deny the intervention based on an assessment?
22         A.   Yes.
23         Q.   And what examples can you give me?
24         A.   It's rare.  Let me try to see if I can think
25     of some examples.

1         Somebody could, for example, have a
2      preexisting condition that might make the decision to
3      take hormones problematic.
4         I think that there are some times when
5      people cannot tolerate all the mechanisms of -- any
6      of the mechanisms of delivery, might be really
7      problematic.
8         I think sometimes people can't afford the
9      interventions if they're not covered by their
10     insurance.
11         There's probably others.
12         Q.   In the context of somebody with a
13     preexisting condition that would have a negative
14     interaction with hormones --
15         A.   Mm-hmm.
16         Q.   -- for example, what if the patient said, I
17     completely understand all of this, but the distress
18     I'm experiencing from my gender incongruence is so
19     severe, that to me it is worth the risk, would you
20     still deny the intervention?
21         MR. SELDIN:  Object to form.
22         THE WITNESS:  I think it depends on what the
23     risk is.
24     BY MR. RAMER:
25         Q.   What's an example of a risk where you would

1      deny the intervention?
2         A.   Like if somebody had a -- for example, a
3      clotting disorder.  Let's say they had a
4      hypercoagulable situation where they had the
5      experience of blood clots, and they wanted to take
6      estrogen.  This has been a time when we've denied
7      care.
8         Q.   So how do you treat that person?
9         A.   Well, usually what we would do is put them
10     maybe on an antiandrogen, something that would still,
11     for example, support their bone density but wouldn't
12     necessarily feminize their bodies.
13         There's been a -- there was a situation with
14     a patient that I had with androgen insensitivity
15     syndrome.
16         Well, would -- how are we going to
17     masculinize that person?  We just can't, because they
18     have no androgen receptors.  Testosterone is going to
19     be ineffective in their body.  And so we would not
20     give them interventions.
21         Those are just a few examples.
22         For people with coagu- -- coagulation
23     issues, we work with the hematologist to figure out
24     if there are ways.  Maybe that person goes on Heparin
25     or some kind of other blood thinner that minimizes

1      their risk of blood clots.
2         But there are some situations where
3      medically you either have to sort things out first,
4      or you -- there's nothing you can do.
5      BY MR. RAMER:
6         Q.   You can't provide them psychotherapy?
7         A.   Well, you can, but almost everybody gets
8      psychotherapy anyway.
9         Q.   And --
10        A.   Does that resolve their gender dysphoria?
11     No.
12        Q.   What happens to them if they cannot obtain
13     medical interventions but receive psychotherapy?
14        A.   Well, it's only happened once in my clinic.
15         One time with somebody with androgen
16     sensitivity syndrome.  And I never saw them after the
17     first visit, because medical interventions were off
18     the table for them.  That person could go on to get
19     chest surgery, and that would probably significantly
20     help their gender dysphoria, at least to have a flat
21     chest.
22        Q.   So what do you think Dr. Turban is talking
23     about when he says to Dr. Olson, "That's her model"?
24        A.   I -- I have no idea what he's talking about.
25        Q.   And are you familiar with the gender clinic

33 (Pages 126 to 129)

1    at Brown University?
2      A.  Very minimally.
3      Q.  Do you have an understanding of what their
4    clinical model is?
5      A.  Well, Brown's clinic, my understanding is
6    it's a clinic for adults.  And so there are several
7    clinics around the country for adult care that act on
8    an Informed Consent model.
9      Q.  And so if Dr. Turban were saying that you
10   operate on an Informed Consent model, that would be
11   incorrect; is that right?
12     A.  Yes.
13       MR. SELDIN:  Object to form.
14       THE WITNESS:  Oh, sorry.
15       Yes.
16       THE REPORTER:  Exhibit 14.
17       (Deposition Exhibit 14 was marked for
18    identification by the court reporter.)
19       THE WITNESS:  Thank you.
20       MR. RAMER:  And, Counsel, I'll represent
21   that the top of your copy was cut off, but that the
22   witness -- the exhibit has the case number at the
23   top.
24       MR. SELDIN:  Okay.  Thank you.
25   ///

1    BY MR. RAMER:
2      Q.  And, Dr. Olson-Kennedy, you've been handed
3    what's been marked as Olson-Kennedy Exhibit 14;
4    correct?
5      A.  Yes.
6      Q.  And this is an expert declaration that you
7    submitted in the case, Dekker v Marstiller; correct?
8      A.  Yes.
9      Q.  And I'd like to go to page 12 and the
10   carryover paragraph at the top, the first full
11   sentence.  I'll read it first and ask if I read it
12   correctly.
13       It says:
14       "The WPATH SOC have been endorsed and cited
15   as authoritative by most major medical associations
16   in the United States, including the American Medical
17   Association, the American Psychiatric Association,
18   the American Psychological Association, the Endocrine
19   Society, the Pediatric Endocrine Society, the
20   American College of Physicians and the American
21   Academy of Family Physicians, among others."
22       Did I read that correctly?
23      A.  Yes.
24      Q.  And going back to your declaration in this
25   case, Exhibit 1, on page 9, paragraph 32, I'll read

1    that and ask if I read it correctly.
2       It says:
3       "The WPATH SOC have been cited as
4    authoritative by the major medical associations in
5    the United States, including the American Academy of
6    Pediatrics, the American Medical Association, the
7    American Psychiatric Association, the American
8    Psychological Association, The Endocrine Society, the
9    Pediatric Endocrine Society, the American College of
10   Physicians, and the American Academy of Family
11   Physicians."
12       Did I read that correctly?
13      A.  Yes.
14      Q.  And so in Dekker, you said that all of these
15   organizations had endorsed the WPATH SOC, but you do
16   not say that in your declaration in this case;
17   correct?
18      A.  Correct.
19      Q.  And why did you remove the assertion that
20   the WPATH SOC were endorsed by these major medical
21   associations?
22       MR. SELDIN:  Object to form.
23       THE WITNESS:  Well, what happened was that I
24   think that in the process of one of these depositions
25   or something, it was brought to my attention that

1    endorsement is a technical -- actually rather than
2    than, like, oh, yeah, I endorse that, meaning I agree
3    with it.  Because it is a technical word, I wasn't
4    sure if they had, this is our endorsement of these
5    guidelines.
6       And so I took it out.
7    BY MR. RAMER:
8      Q.  And so do you agree that it was wrong in
9    Dekker to say that those organizations endorsed the
10   WPATH SOC?
11       MR. SELDIN:  Object to form.
12       THE WITNESS:  Just depends on how you're
13   using the word.
14    BY MR. RAMER:
15      Q.  If you think it could be used correctly, why
16   did you take it out of your declaration in this case?
17       MR. SELDIN:  Object to form.
18       THE WITNESS:  I just didn't want to confuse
19   anyone.  There's not -- like I said, there's not like
20   the stamp of endorsement on the -- the WPATH
21   guidelines.
22       I use the word "endorse" as a just
23   colloquialism for we agree with these, we think these
24   are a good idea.  That's why.
25   ///

MAGNA ◆
LEGAL SERVICES

BY MR. RAMER:
1    Q. And so it's your opinion that these medical
2    organizations have endorsed the WPATH SOC; is that
3    right?
4    A. With the colloquial meaning of "endorse,"
5    yes.
6    Q. And you're a member of the American Academy
7    of Pediatrics; correct?
8    A. I am.
9    Q. Were you involved with AAP's review of the
10   WPATH Standards of Care 8?
11   A. No.
12   Q. Do you know who was?
13   A. No.
14   Q. You don't know whether Jason Rafferty was
15   involved?
16   A. Yes. I -- that -- I didn't know that that
17   was the specific thing that he did.
18   Q. Are there any other names that were involved
19   that you know of?
20   A. I didn't actually even know that happened.
21       What I know is that Jason wrote something
22   about it. But I don't -- I didn't know that there
23   was a formal process where the AA- -- that's what I
24   mean by "endorsement."

1        I didn't know if there was a formal process
2    where the AAP said, let's look through the SOC 8 and
3    do whatever the word was that you described it.
4        MR. SELDIN: And, Mr. Ramer, I'm sorry to
5    interrupt.
6        I'll just note for the record that these two
7    lists are slightly different in terms of what's
8    included and what's not.
9        I know you read them out, but just --
10       (Reporter clarification.)
11       MR. SELDIN: I apologize.
12       I'm just noting for the record that
13   Mr. Ramer read out the different lists of medical
14   organizations across the declarations. I don't
15   believe they're exactly identical.
16       THE WITNESS: I think it might just be in
17   just a different order.
18       MR. SELDIN: American Academy of Pediatrics.
19       MR. RAMER: Got it. Thank you.
20       MR. SELDIN: Not to be that guy, but...
21       MR. RAMER: We're lawyers, we all have to
22   be.
23   Q. And do you know Jason Rafferty?
24   A. I do.
25   Q. Have you worked with him?

1    A. I have not.
2    Q. Have you ever discussed the use of puberty
3    blockers as a treatment for gender dysphoria with a
4    representative from a pharmaceutical company?
5    A. Yes.
6        MR. SELDIN: Object to --
7        THE WITNESS: Oh.
8        MR. SELDIN: Object to form.
9        You can answer.
10       THE WITNESS: Yes, I have.
11   BY MR. RAMER:
12   Q. Which company?
13   A. Endo Pharmaceuticals.
14   Q. And what was the context of that discussion?
15   A. Endo Pharmaceuticals asked me to come and
16   give a presentation to their reps. I actually don't
17   remember who the audience was, but it was
18   educational.
19   Q. Did you get paid for that?
20   A. I did.
21   Q. Do you recall how much?
22   A. No. It's a really long time ago.
23   Q. And do you know Dr. Kara Connelly?
24   A. I do.
25   Q. Was she at that event?

1    A. I have no memory of that.
2    Q. And what was the substance of your
3    presentation?
4    A. Transgender Care 101.
5    Q. And Endo Pharmaceuticals develops drugs that
6    are used as puberty blockers; correct?
7    A. Yes.
8    Q. And apart from the presentation that you
9    gave, you have never spoken about the use of puberty
10   blockers as a treatment for gender dysphoria with any
11   other representative of the pharmaceutical company;
12   is that correct?
13       MR. SELDIN: Object to form.
14       THE WITNESS: Many years ago, I discussed
15   the possibility of Endo Pharmaceuticals sponsoring a
16   study so that we could get FDA approval specifically
17   for gender dysphoria.
18       That's the only contact I've had with them.
19   BY MR. RAMER:
20   Q. What about any other pharmaceutical
21   companies?
22   A. I don't think so. Not that I can remember
23   offhand.
24   Q. And what was the result of the attempt to
25   get Endo to sponsor the study for FDA approval?

1     A.  They did not want to sponsor a study for the
2  FDA approval.
3     Q.  Do you recall why?
4     A.  They said that they did not want to tolerate
5  the bad press.
6     Q.  Do you think that is a good reason for not
7  sponsoring a study?
8        MR. SELDIN:  Object to form.
9        THE WITNESS:  A hundred percent no.
10  BY MR. RAMER:
11     Q.  And have you tried to persuade Endo
12  Pharmaceuticals since then, or any other
13  pharmaceutical company, to sponsor a study to get
14  FDA approval for puberty blockers?
15     A.  No, not that I recall.
16     Q.  Going from puberty blockers to cross-sex
17  hormones, have you ever discussed the use of
18  cross-sex hormones as a treatment for gender
19  dysphoria in minors with a representative from a
20  pharmaceutical company?
21     A.  The same thing that I just talked about,
22  Endo Pharmaceuticals.
23     Q.  The presentation and then the attempt to get
24  the study; is that right?
25     A.  Mm-hmm.  But the attempt to get the study

1  was not about gender-forming hormones.  It was just
2  about blockers.
3     Q.  And, Dr. Olson-Kennedy, I think that's all
4  the questions that I have for now.
5        And so I'll turn it over to pass the
6  witness.
7        MR. SELDIN:  Thank you.
8        I suspect that I have nothing, but if you'll
9  give me five minutes.
10        MR. RAMER:  Absolutely.
11        THE VIDEOGRAPHER:  Off the record then?
12        MR. RAMER:  Yes.
13        THE VIDEOGRAPHER:  The time is 1:30 p.m.
14  We are now off the record.
15        (Off record.)
16        THE VIDEOGRAPHER:  One moment, please.
17  The time is 1:32 [sic] p.m.
18  We are back on the record.
19        MR. SELDIN:  Counsel for plaintiffs does not
20  have any questions for Dr. Olson-Kennedy, but we will
21  read and sign.
22        MR. RAMER:  And thank you very much for your
23  time today, Dr. Olson-Kennedy.
24        THE WITNESS:  You're welcome.
25        THE VIDEOGRAPHER:  One moment, please, and

1  I'll take us off the record.
2        This concludes today's videotaped deposition
3  of Johanna Olson-Kennedy.
4  The time is 1:31 p.m.
5  We are now off the record.
6        THE REPORTER:  Mr. Seldin, are you ordering
7  a copy of the transcript?
8        MR. SELDIN:  Yes.  Thank you.
9        THE VIDEOGRAPHER:  And will you need video?
10        MR. SELDIN:  Yes, please.  I'll have what
11  he's having.
12        THE REPORTER:  Just to be clear, you want it
13  expedited also?
14        MR. SELDIN:  Yes.  Whenever they're getting
15  theirs, I would like it as well.
16        Thank you.
17
18
19
20
21
22
23
24
25

1
2        DECLARATION UNDER PENALTY OF PERJURY
3
4        I, JOHANNA OLSON-KENNEDY, M.D., do hereby
5  certify under penalty of perjury that I have read the
6  foregoing transcript of my deposition taken on
7  October 7, 2024; that I have made such corrections as
8  appear noted herein in ink, initialed by me; that my
9  testimony as contained herein, as corrected, is true
10  and correct.
11
12        DATED this _____ day of _____, 20___,
13  at _____, California.
14
15
16
17        _____
18        JOHANNA OLSON-KENNEDY, M.D.
19
20
21
22
23
24
25





1
2        REPORTER'S CERTIFICATION
3
4       I, Marceline F. Noble, a Certified Shorthand
5  Reporter in and for the State of California, do
6  hereby certify:
7
8      That the foregoing witness was by me duly sworn;
9  that the deposition was then taken before me at the
10  time and place herein set forth; that the testimony
11  and proceedings were reported stenographically by me
12  and later transcribed into typewriting under my
13  direction; that the foregoing is a true record of the
14  testimony and proceedings taken at that time.
15
16      IN WITNESS WHEREOF, I have subscribed my name
17  this 13th day of October, 2024.
18
19
20        _____
21      Marceline F. Noble, CSR No. 3024
22
23
24
25

1        DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE_____
25      JOHANNA OLSON-KENNEDY, M.D.

1      DEPOSITION ERRATA SHEET
2  Page No._____Line No._____Change to:_____
3  _____
4  Reason for change:_____
5  Page No._____Line No._____Change to:_____
6  _____
7  Reason for change:_____
8  Page No._____Line No._____Change to:_____
9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE_____
25      JOHANNA OLSON-KENNEDY, M.D.



**A**

**A-2**
31:10
**A-3**
31:13
**A-4**
31:18
**A-6**
30:24
**a.m**
1:16 6:3,15 47:7,11
49:9,14 53:22 54:4
93:7
**AA-**
134:24
**AAP**
135:2
**AAP's**
134:10
**Abby**
3:7 7:14 122:13
**ability**
61:24 90:22
**able**
81:1 99:6
**Abnormal**
82:14
**absolutely**
27:25 78:9 123:9
139:10
**abundance**
105:24
**academic**
73:13 74:11
**Academy**
131:21 132:5,10
134:7 135:18
**acarolan@selendy...**
2:12
**acceptance**
90:16 91:10,13,15
**access**
103:23 105:12,20
106:2,14 111:20
118:13

**accesses**
83:14
**accessing**
82:5
**accurate**
23:11 37:19 46:4
48:25 51:24 64:25
65:23
**accurately**
58:2,3,21
**acknowledged**
35:6
**acknowledging**
18:12
**ACLU**
1:14 6:16 7:1,24
**act**
130:7
**activities**
31:19 33:4
**actual**
31:22
**adapted**
104:9
**add**
62:3 78:6 81:12
**added**
10:7 123:13
**additional**
10:5,7 44:23,24 45:5
59:17 60:2
**administration**
5:4 118:6,14,20
119:15
**adolescence**
11:7 24:20 25:13,21
26:6,20 27:18 30:13
36:18,20 37:4 59:1
59:6,11 70:15 79:13
102:8
**adolescent**
22:11,12 60:20 82:11
82:16 126:8
**adolescent's**
60:20
**adolescents**

18:15 28:2 36:11
44:2 70:22 71:3,7
73:8 74:7 75:17
81:9 82:16 109:19
**adult**
81:6 87:20 126:8
130:7
**adulthood**
30:13 36:20
**adults**
130:6
**affiliated**
95:4
**affirmation**
28:9,16,21 35:7
**affirming**
103:23 104:19
**afford**
127:8
**age**
18:9,24 72:25 80:2,8
80:23 81:5 84:20
87:24 88:3 102:9
**ago**
33:8,17 85:4,4,5
136:22 137:14
**agonists**
73:4
**agree**
9:20 16:14 19:2,8,16
19:17,21 20:4,7
21:6,21,25 22:10,15
22:18,20 24:3 25:9
25:14,15 26:10,21
26:24 27:12 30:25
39:17,19 42:23 44:9
52:2,12,17,23 53:9
54:14,24 55:2,5,13
56:2,8,14,19,25
60:15,25 62:19 63:4
63:10,16,21 64:2,25
66:2 70:13 95:8
102:20,23 104:18
113:6 133:2,8,23
**ahead**
7:6,9 120:19

**Aiden**
122:15,18,25
**aim**
9:2 72:22 102:3
**aimed**
73:23 112:25
**AIMS**
72:17
**Aine**
2:9 7:3 17:13
**al**
1:5,9
**Alan**
1:8 6:10
**align**
92:18
**aligned**
42:16 91:24
**aligns**
89:7
**alive**
120:11
**allow**
111:19 117:15
**allowing**
106:13 117:11
**allows**
37:10
**ameliorate**
72:23
**American**
2:3 131:16,17,18,20
131:20 132:5,6,7,7
132:9,10 134:7
135:18
**Americas**
2:10
**amicus**
4:18 16:3,9,15 18:1
44:16 48:5 93:18
100:11 103:15
**amount**
51:14
**analogs**
51:5,18 54:10 64:14
79:15

analyze
108:12
analyzing
98:3,4
and-
2:8,19
and/or
102:8
androgen
128:14,18 129:15
Angeles
1:15 6:1,17 50:6
122:14
anger
64:3
answer
5:13 9:4 11:19,23
22:4 26:8 36:11
37:17 43:3 48:23
51:12 52:10 57:24
67:12 69:20 100:7
101:16 109:11
110:20 112:12
115:14 123:25
136:9
answered
27:13 61:10 67:11
92:21
antiandrogen
128:10
anxiety
22:21 89:1,5,8,14
114:23
anybody
17:22 39:3 59:8
anymore
37:12 89:3 112:20
anyway
129:8
apart
9:17 58:20 65:22
94:9 137:8
apologize
53:15 135:11
appear
13:17 14:22 16:9

141:8
appearance
90:16 91:2,5,10,22
91:23
APPEARANCES
2:1 3:1
appears
24:4 46:20 53:17
117:8
applicable
23:17
application
4:23 72:4
applies
106:9
appraisal
102:14,19
appreciate
71:25 117:17
approach
116:5,9
appropriate
18:8,15,23 86:12,20
approval
137:16,25 138:2,14
areas
42:3 77:11
arm
109:17,22,23 110:10
110:24 111:5 112:5
arms
109:16,21 110:24
article
5:4 118:5,9
ascent
125:18 126:19
aside
74:1
asked
25:9 26:10 27:10,11
43:18 45:19 61:9
66:21 67:11 68:18
69:12 84:14 92:16
100:3 101:11
136:15
asking

19:13 21:12 71:22
78:15,18
assent
50:8
assert
26:5 94:7
assertion
119:18 132:19
assertions
94:9
assess
62:14 97:19 98:17
102:20
assessing
93:22 95:2,9 125:12
assessment
86:18 125:5,6,14,15
125:19 126:21
assessments
125:15
assigned
21:19 35:22 36:4
associated
96:10 113:9,15 114:5
association
46:1 47:25 131:17,17
131:18 132:6,7,8
associations
131:15 132:4,21
assumes
104:19
assuming
16:18 122:19
assumption
25:1
attack
54:21 55:6,11,23
63:5
attempt
89:24 137:24 138:23
138:25
attended
122:25
attending
123:4
attention

132:25
attorney
1:8 2:20 3:6 6:23
7:12,18
audience
136:17
augmentation
92:18
Australia
42:25 43:4,20
author
98:11
authoritative
22:25 23:6 131:15
132:4
authors
95:4 100:22 119:5
available
73:15 74:19 82:8
105:12 113:25
Avenue
2:10,16
avoid
73:6
awaiting
7:20
aware
27:16 28:1 48:17
90:23

---

**B**

back
17:5 27:23 39:18
40:3,18 44:17 47:10
47:12 49:14,17 54:5
65:11 69:25 81:4
82:19 87:17 93:13
93:15 98:11 104:8
105:22 108:7,12,25
109:18 110:19
111:7 118:2 125:21
131:24 139:18
backing
115:9
backwards
92:11



**bad**
138:5
**ballpark**
82:25
**ban**
14:12 46:2 47:23
**banned**
44:10
**bar**
7:20
**barrier**
105:2,4,6
**barriers**
103:21
**based**
58:8 60:6 70:16,23
    73:14 74:12 75:3,22
    75:24,25 76:5 80:4
    86:17 101:4,14
    114:6 116:18 125:6
    125:13,19 126:21
**basically**
58:6 116:14 123:14
**basis**
19:3,9 83:22,25
    113:22
**began**
69:24 70:3,14,21
    75:12,16 108:24
    109:2,3
**beginning**
1:15 12:1 27:8 30:21
    50:16,19 68:17
**begins**
6:8 45:20 52:3 61:22
    62:25 94:17,19
    102:15 122:3
**behalf**
1:14 6:25 7:2,4 16:4
    16:10 48:20
**believe**
9:15 44:12 46:23
    54:12 71:17 72:1
    123:16,22 135:15
**Ben**
3:6 7:17

**best**
18:11 90:22
**better**
75:4 76:7 92:18
**biased**
95:15,16,17,18
**bibliography**
98:12
**Biden**
5:4 118:6,13,20
**billed**
94:25
**binary**
124:24
**biological**
19:3,9,12,18
**birth**
20:19 21:15,19 35:23
    36:4 92:12
**bit**
10:23 42:21 87:15
**bleeding**
82:14
**blocked**
51:7 84:16 86:2
**blockers**
27:18 28:3 44:10
    46:2 47:24 52:3,13
    58:25 59:5,8,11,14
    59:19 60:12,16
    69:24 70:14,25 74:6
    75:12 76:20,24
    79:11 80:14 87:2,7
    88:8,17 89:5,13
    98:6 108:3 109:2
    136:3 137:6,10
    138:14,16 139:2
**blood**
52:19 53:3,14 54:19
    54:24 55:10,19 56:3
    63:1 80:7 128:5,25
    129:1
**blue**
102:13
**BMA**
47:22 48:13,17

**BMJ**
46:21
**Board**
103:8
**bodies**
36:18 128:12
**body**
36:2,7 42:15 88:8
    92:18 128:19
**bold**
60:12 64:21 72:16
    93:20
**bone**
80:8 128:11
**book**
123:11
**bottom**
24:11 72:13 122:2
**Box**
2:21
**brain**
55:3 60:20
**break**
9:3 49:5 112:8
**breaks**
9:2
**breast**
59:18 92:18
**breasts**
92:8,25
**Brian**
3:4 6:18
**brief**
4:18 16:3,9,15 18:1
    18:21,21 44:16 45:2
    45:6,25 48:5 93:18
    93:21 94:14 100:11
    103:15 104:5,9
**British**
4:21 46:1 47:16
**Broad**
2:5
**broadly**
97:4
**brought**
132:25

**Brown**
130:1
**Brown's**
130:5
**bullet**
53:9 54:13 55:5,13
    56:2,8,14,19 58:9
    58:10 60:15 62:19
    62:23,25 63:10,16
    63:21 64:2 65:3
**bullets**
62:24

---
**C**
---

**C-a-s-s**
18:19
**C-o-s-t-a**
110:22
**C.V**
12:23
**cake**
77:22
**California**
1:15,15 6:1,17,17
    141:13 142:5
**call**
17:20 35:15,16 47:22
    48:17 98:1
**called**
32:14 46:1 48:13
    73:22 85:24
**calls**
80:13
**canal**
85:11,13
**cancer**
106:4 107:1
**candidate**
124:17
**capable**
126:4
**capacity**
1:8 62:11,13
**caps**
72:16 93:22
**capture**



88:15 90:20,21
**captures**
90:25
**care**
18:8,12,23 37:11
42:24 43:1,8,10,19
43:21 44:4 68:20
69:4,6 75:10 76:2
76:18 81:2,6 87:20
89:14 92:6,23 98:3
98:5,9 100:24
105:23 106:14,17
106:18,18 108:11
108:16 111:8,12,20
111:20 113:17
114:12 115:1 116:4
116:9 120:13
123:12 124:7
125:10 126:8,10
128:7 130:7 134:11
137:4
**caretaker**
126:20
**Carolan**
2:9 7:3,3 17:13
**Carolina**
1:2,9 2:22 3:6 6:12
7:11 16:25
**Carolina's**
7:18 14:12
**carried**
62:6
**carries**
45:9
**carry**
106:19
**carry-over**
48:6
**carrying**
68:17
**carryover**
131:10
**case**
1:7 6:13 10:1 11:20
11:24 13:2 14:11
15:23 16:5,11 35:11

37:20 106:4 107:19
109:8 130:22 131:7
131:25 132:16
133:16
**cases**
68:1
**Cass**
18:19,22 44:20 45:13
45:20 47:25 96:10
98:22 99:1 100:14
**category**
40:4 113:13
**causality**
25:2
**cause**
25:18 26:2,19,22
38:8 53:6 55:2 57:1
57:6 63:22 98:11
126:9
**causes**
25:13
**cavity**
86:5
**cease**
80:14
**cells**
63:1
**center**
71:12 83:6
**centers**
73:13 74:11
**central**
79:11 80:12
**century**
112:14
**certain**
11:25 18:8,23 80:2
**CERTIFICATION**
142:2
**Certified**
1:17 142:4
**certify**
141:5 142:6
**cervical**
36:6
**challenge**

39:6
**chance**
117:16
**change**
36:4 125:24 143:2,4
143:5,7,8,10,11,13
143:14,16,17,19,20
143:22 144:2,4,5,7
144:8,10,11,13,14
144:16,17,19,20,22
**changed**
29:8,11 33:12,20
58:7,11,12
**changes**
36:3 60:20
**chapter**
4:19 24:4
**characteristics**
73:7
**Charleston**
1:3 6:12
**chest**
84:8,15 92:17 129:19
129:21
**child**
28:10,16 29:19 81:24
**childhood**
25:20 26:1,4 28:9,16
29:19,25 30:14,16
32:25
**children**
10:13,22 11:1 29:8
29:11 30:22 32:8,9
32:18 34:7,22 35:1
35:2,5 81:9,18
102:8
**Children's**
50:5
**Christina**
30:3
**chronic**
54:21 55:14,20
**cisgender**
19:4,10,20,23 38:10
68:9
**citation**

94:18
**cited**
131:14 132:3
**CIVIL**
2:3
**clarification**
45:16 69:5 91:3
117:18 135:10
**clarifications**
8:22
**clarity**
23:4 30:12 44:1
83:14
**clear**
140:12
**clinic**
20:12,18 30:2 70:7
70:11 86:13 87:8,18
129:14,25 130:5,6
**clinical**
4:22 40:20 50:16,19
61:4 65:21 71:8,10
72:22 73:19 75:10
76:1,17 77:12 78:3
78:4,12,21 88:1
100:24 102:6
105:23 108:11,15
114:11 116:3 130:4
**clinically**
38:25 39:6,10 40:19
40:21,23 41:8 105:9
**clinician**
20:22 43:14
**clinicians**
109:2
**clinics**
130:7
**close**
50:21 85:5 114:1
**closer**
114:23
**closing**
91:1
**clot**
53:3,14
**clothes**

33:14
**clothing**
29:9,12 31:5,11 33:3
**clots**
52:19 54:19,24 55:10
55:19 128:5 129:1
**clotting**
128:3
**co-investigator**
10:11
**coagu-**
128:22
**coagulation**
128:22
**code**
32:10,12,14 33:19
35:21,24 37:10
**coercion**
103:25 105:14,16
106:8
**coercive**
107:10,24
**coined**
123:13
**colleagues**
120:1
**collected**
108:7
**collecting**
108:10
**College**
131:20 132:9
**colloquial**
134:5
**colloquialism**
133:23
**Columbia**
2:22
**column**
102:13 103:3,6
**combination**
90:10,12
**come**
39:3 76:19 99:2
119:3 136:15
**comes**

10:15 32:15 83:17
119:15
**coming**
37:14,15 38:1,3,5,16
78:24
**comment**
119:16 120:25
**common**
90:15
**commonly**
40:25
**community**
73:13 74:11
**comorbidities**
116:19
**companies**
137:21
**company**
136:4,12 137:11
138:13,20
**comparisons**
110:1
**complete**
28:24 29:6,14 86:17
**completed**
99:8,12
**completely**
29:14 60:17 97:12
127:17
**complicated**
34:25
**conception**
92:19
**conceptualize**
99:23
**conceptualizing**
97:4
**concern**
95:14 111:17
**concerned**
36:21
**concerning**
32:17
**concludes**
140:2
**conclusion**

99:3
**conclusions**
78:6 98:16
**condemned**
104:1
**condition**
80:13 127:2,13
**conditions**
67:4
**conduct**
109:16 112:9
**conducted**
95:3 96:17 102:4
**conducting**
110:14
**conducts**
47:25
**confident**
65:18
**confirm**
26:7 44:21
**confirming**
45:18
**confuse**
133:18
**congruence**
20:8 90:14 91:1,4,5,9
91:14,23
**connection**
99:16 100:5
**Connelly**
136:23
**consensus**
42:22 43:13,14,15
**consent**
4:22 50:4,7,9,14,16
50:19 51:3,23 54:9
57:13,16 61:14
64:13 65:20 66:19
78:5 124:7,8,15,21
124:25 125:18
126:5,7,9,10,12,15
126:20 130:8,10
**consequences**
73:16 74:20
**consider**

11:16 80:19
**consideration**
95:21
**considered**
29:10,14 67:21 76:2
95:2 96:3 112:25
**considers**
94:5
**consistent**
15:24
**consternation**
113:20
**consult**
96:13
**consultations**
81:16
**contact**
137:18
**contained**
141:9
**containing**
102:6
**contemporaneously**
25:25
**context**
33:7 65:13 81:12
107:6 109:19
127:12 136:14
**continue**
26:5 30:1 37:11
**continued**
3:1 5:1 26:1
**continuing**
123:7
**conversation**
17:6 42:5,9,11 82:9
83:18
**conversations**
41:21,24 42:2
**Cooper**
2:15 6:24
**copy**
4:14 14:4,23 130:21
140:7
**copy-and-paste**
44:22



44:22
**correct**
9:23 13:3 14:13,14
18:19,20,25 19:24
20:6,8,10,15,23,24
21:9,19,20,23 22:13
22:21 23:2 24:24
25:11 26:11 27:6,14
27:15,19 28:3,4,6
30:10,22,25 31:6,11
31:14,19 32:1,3,8
33:4,6 34:15,17,22
37:4 38:21 39:20
40:6 43:1,22 44:5,7
44:10,22 45:6,7,15
46:2,18,21 47:16
48:12,19 50:6,22
51:8,25 52:5,14,19
52:24 53:4,5,7,8,11
54:16,25 55:3,7,15
56:4,10,15,21,23
57:2,4,7,9,14,15,19
57:21,25 59:6 60:7
60:9,17,18,21,23
61:2,8,11,20,25
62:21 63:6,12,17,23
64:4,19,20 66:3,9
66:11,16,24 67:1,5
67:6,9 69:1,17,22
69:25 70:1,16,23
71:4 72:8,9,10,17
72:18 74:7,13,14,16
74:22,23,25 75:5,14
75:15,18,22 76:8,10
78:25 79:3,7,22,23
80:15,17,20,21,24
81:6,7,10,11 83:13
84:8,17,21 86:14,24
86:25 87:3,8,20,21
87:24,25 88:3,5,9
88:19 89:15,17,21
90:9,24 91:10,11
92:4,5,8,21,25 93:2
93:24 94:2,3,6,12
94:13 96:18,19
99:18 100:7,8,15,16

100:18,19 101:5,16
101:17,23,24
102:10,21,22,24
103:9 104:6,13,16
104:17 105:2,18
106:11 107:24
109:5 110:21 111:2
112:10 115:7
116:16,20,22 117:4
117:5 118:7,10
119:3 124:10,18
126:17 131:4,7
132:17,18 134:8
137:6,12 141:10
**corrected**
141:9
**corrections**
10:3 141:7
**correctly**
18:4,16 24:16,21
47:21 48:2 72:21
74:2 94:23 95:6
100:25 103:19
104:2 116:6 118:18
118:25 122:16
123:17 124:5
131:12,22 132:1,12
133:15
**correspondence**
46:24
**Costa**
110:15,22,23
**could've**
123:20
**counsel**
6:21 7:5,10,19,23 8:1
8:22 17:7,13 45:17
45:17 71:20 130:20
139:19
**counted**
12:6
**countries**
108:20
**country**
130:7
**couple**

58:14 117:10 123:10
**coupling**
36:1
**course**
8:24 12:2 49:1
108:11
**court**
1:1 6:11,20 9:9,12
13:3,5,9,21,25
14:15,18,25 15:4,12
15:16 16:6,11 23:18
23:22 46:8,12 48:20
49:19,23 71:16,19
101:20 116:25
121:7 130:18
**cover**
4:19 24:2 36:6 71:21
**covered**
127:9
**create**
85:12
**creation**
85:10
**criteria**
23:7,14 30:8,22 32:2
33:10 34:1,4,13
35:18 36:17,20
41:13 95:23
**criterion**
30:25 31:10,13,18
95:20
**critical**
33:11 73:18
**criticizing**
100:14
**cross-sex**
59:22 70:3,14 71:6
73:10,17 74:6,21
75:16 86:12,23
138:16,18
**CRR**
1:16
**CSR**
1:24 142:21
**Current**
72:22

**currently**
19:2,8 44:3
**cut**
130:21
**cuts**
9:16
**CV**
58:19

**D**

**D**
2:15
**D.C**
2:16
**damage**
53:7 55:3 57:6 65:4
**damaging**
67:20
**Darlene**
122:15,21 123:1
**data**
70:16,18,23 71:6
73:14,15 74:12,19
75:3,22,25 76:6
77:8,12 78:7,13,20
78:23,24 79:10
88:13 99:3 108:7,10
**date**
118:22 143:24
144:24
**DATED**
141:12
**day**
122:12,13 141:12
142:17
**death**
53:7 55:3 99:17
100:6
**decade**
75:5 76:7
**decent**
93:3
**decision**
127:2
**decision-making**
61:2,8

**decisions**
76:18
**declaration**
4:10 5:7 9:25 115:22
    131:6,24 132:16
    133:16 141:2
**declarations**
135:14
**decrease**
72:23 89:14
**decreasing**
112:3
**defendants**
1:10 2:14 6:25 7:11
    9:20
**define**
41:9,10
**defined**
39:1,7,15 40:24 41:1
    41:8
**definition**
67:7
**definitions**
8:22
**Dekker**
5:8 131:7 132:14
    133:9
**delaying**
60:19
**delivery**
127:6
**demonstrate**
114:10
**demonstrated**
28:8,15 29:18 58:15
    66:23 68:24 69:15
    76:25 77:1 105:9
    112:21 115:6
**demonstrating**
88:13 99:7 103:24
    104:20 107:21
    112:1 113:4
**denied**
128:6
**density**
128:11

**deny**
125:19 126:21
    127:20 128:1
**dependence**
85:21
**dependent**
86:3
**depending**
35:7 72:25
**depends**
37:23 96:23 98:20
    99:4 127:22 133:12
**deposed**
8:14 66:13
**deposition**
1:14 4:11,14 6:9,16
    7:16 8:24 9:11,16
    13:8,13,17,19,24
    14:8,11,17,23 15:3
    15:9,15,21 16:23
    17:8,23 23:21 25:8
    26:9 27:3 43:17
    46:11 48:16 49:22
    66:20 68:15 69:19
    71:18 84:13 92:15
    100:2 101:10,19
    116:24 117:13
    121:6,23 130:17
    140:2 141:6 142:9
    143:1 144:1
**depositions**
132:24
**depressed**
40:21
**depression**
22:21
**Der**
110:17
**derails**
35:25
**describe**
28:20 37:24 58:3,21
**described**
25:24 29:5,17 110:24
    135:3
**describing**

65:1,23 112:9
**description**
4:9 5:2 51:24
**designated**
20:19 21:15 92:12
**designed**
111:11
**desired**
73:11
**desistance**
27:17 28:2
**determination**
111:16
**determine**
105:1 124:16
**detrimental**
55:23 64:9 66:9,16
    66:23 67:4 68:24
    69:15
**developers**
101:12
**development**
51:8,14 59:9,15,18
    60:2,21 73:3,6,9,22
    81:23 83:6 98:5,9
    102:5 103:4,7
**developmental**
72:25
**develops**
137:5
**diabetes**
63:11 64:9
**diagnose**
32:8
**diagnosed**
32:24
**diagnosis**
22:11 23:1,7,11
    30:13 32:19 34:6,21
    35:1 36:21 37:1
    41:3 79:24 80:1,4
**diagnostic**
30:8,21 32:10,12
    33:10,25 34:3,13
**Diego**
122:22

**difference**
25:17 113:11
**different**
32:10 35:9,17,22
    36:7,16 76:1 78:9
    82:6 85:14 86:3
    108:16,21 125:11
    135:7,13,17
**diminishes**
89:2
**direct**
50:12
**direction**
142:13
**disagree**
24:23
**disclosed**
117:9
**discovered**
19:19
**discussed**
18:18 32:2 66:2,8
    67:3 91:25 136:2
    137:14 138:17
**discusses**
38:21
**discussing**
12:5 74:5 87:15 91:8
**discussion**
81:19 136:14
**disease**
62:20 64:8 65:7,10
    65:14,22 68:5
**disorder**
128:3
**disorders**
82:14
**disqualified**
96:4
**distinction**
29:1,6 33:18 113:6
**distinguish**
43:7
**distinguishes**
94:11
**distress**



MAGNA
LEGAL SERVICES

34:15 35:3,12,13
36:23 37:7,12,16,21
37:24 38:17,20,25
39:7 40:10 41:7,10
41:12,15,20 88:24
89:14 113:9,15,19
114:5 127:17
**distressed**
39:24 40:13,20,22
42:17
**distressful**
39:20 42:3
**distressing**
38:6
**District**
1:1,2 6:11,11
**diverse**
10:12
**division**
1:3 6:12 33:14,15
**DSM**
23:6,14 38:25 39:8
40:24,25 41:3,9
**DSM-5**
22:12,25 23:10 24:2
24:4,23 30:9 38:21
40:13
**duly**
8:5 142:8
**Dutch**
76:19,20 77:16,19
78:24 108:3,24
109:1,8
**dysphoria**
4:20 21:7,23 22:11
22:20 23:1,8,11
24:5,19 25:13 26:19
30:22 32:8,11,25
34:7 36:17 37:2,7,9
38:15 44:3 47:24
68:20 69:7,25 70:4
70:15,19,22 71:7
72:23 73:1 74:7
75:13,17 76:21 77:2
79:20 81:10 83:11
83:25 89:21 90:1,9
90:20 97:20 98:18

117:2,13 118:4
119:22 120:7
121:10,18,18 122:4
122:24 123:4,25
124:4 129:22,23
130:9 131:2 136:23
139:3,20,23
**drawing**
29:2
**dresses**
35:8
**drill**
8:15
**driven**
92:3
**drug**
107:6,9
**drugs**
107:1 137:5

108:4 109:3,20
111:22 112:3,6,15
112:17,22 113:5,10
113:15,17 114:5,19
115:4,12,16,21
116:4 129:10,20
136:3 137:10,17
138:19
**dysphoria/incongr...**
102:8

___

### E

**e-m-b-o-d-i-m-e-n-t**
42:15
**e-n-d-o-g-e-n-o-u-s**
51:7
**earlier**
76:22 86:2 102:1
**earliest**
73:2 89:25
**early**
24:18 25:12 26:18
51:11,18 52:4,13
58:25 59:5,11 72:6
84:17 87:3
**eating**
82:14
**educational**
136:18
**effect**
67:18
**effective**
69:8 77:16 88:18
105:10 106:23
111:25 112:2
**effectiveness**
103:25 104:21 105:1
105:18 106:20
107:22
**effects**
60:16 61:19 65:1,23
66:8,17 67:16,24
68:12
**efforts**
112:25
**eggs**

62:7
**eight**
75:20
**Eighth**
1:15
**either**
50:20 51:6,18 57:18
86:17 125:3 129:3
**eliminating**
113:20
**embodiment**
42:14,16 60:6 92:3
**emboli**
54:21
**embolism**
52:24 53:3,6 55:22
**Emory**
2:20 7:10
**emorysmith@scag....**
2:23
**empirical**
75:25 76:6 77:8,12
78:7,13,20,23 79:10
105:23
**empirically**
105:9
**Endo**
136:13,15 137:5,15
137:25 138:11,22
**Endocrine**
18:13 131:18,19
132:8,9
**endocrinologist**
79:22
**endogenous**
51:6 64:18 73:5
80:15 85:23 88:19
89:18
**endometriosis**
79:13
**endorse**
133:2,22 134:5
**endorsed**
131:14 132:15,20
133:9 134:3
**endorsement**



133:1,4,20 134:25
**engage**
111:20
**England**
42:24 43:19
**enroll**
110:9
**enrolled**
108:5
**enrolling**
108:13
**entail**
82:3
**entire**
40:25 71:21 78:8
**entities**
43:12
**entitled**
5:4 64:13,22 72:5
103:3 118:6
**enzymes**
65:17
**eradicating**
112:2
**errata**
4:12,16 14:4 15:9
143:1 144:1
**especially**
115:1
**ESQ**
2:4,4,9,10,15,15,20
**Essentially**
95:17
**establish**
81:1 126:15
**established**
106:19
**estimate**
82:24
**estrogen**
54:18 55:17 128:6
**et**
1:5,9
**ethical**
76:12 77:4 78:13
103:21 104:1 105:2

105:4,6 109:20
110:5,21 111:1,9,15
**ethics**
80:20
**etiology**
20:7
**evaluated**
116:17
**evaluation**
47:25 102:20
**event**
122:24 136:25
**eventually**
80:13
**everybody**
11:25 82:9 83:14
115:15 129:7
**evidence**
61:1,6 71:8,10 77:21
93:22 94:6,12 95:3
97:8,19 98:17,24
100:23 101:5,15
103:24 104:20
105:1,17,23 106:20
107:21 114:15,18
**exact**
65:5 83:2 84:10 90:4
97:23 98:2
**exactly**
26:16 110:1 135:15
**EXAMINATION**
4:2 8:10
**examine**
102:5
**examined**
8:5
**examining**
73:16 74:20
**example**
18:10 33:13 36:3
59:16 67:19 68:4
79:13 81:17 89:24
98:2 108:2,3 114:14
125:23 126:1 127:1
127:16,25 128:2,11
**examples**

101:3 114:15 126:23
126:25 128:21
**exclusively**
78:23 80:12
**excuse**
13:18 58:2 91:9
100:12
**exhibit**
9:10,11 12:25 13:7,8
13:24 14:3,16,17
15:2,3,8,14,15
17:25 23:20,21,25
24:2,8 27:2 30:19
44:15 46:10,11,17
47:15 48:4 49:21,22
50:3 54:8 57:12
68:14 71:17,18
93:18 100:10,20
101:19,23 103:1,14
115:23 116:23,24
117:3,12 118:5
121:5,6,11 130:16
130:17,22 131:3,25
**exhibits**
4:8 5:1 46:24
**exist**
124:3
**existing**
105:8
**expect**
88:8
**expedited**
140:13
**experience**
35:3,12 61:4 71:9
76:1,17 77:19 78:21
79:9 82:17 88:1,24
89:5 91:21 112:17
128:5
**experienced**
51:8,20 85:22
**experiencing**
37:12,13 127:18
**experimental**
69:8 107:1,6,9
**expert**

5:7 80:19 94:5,11
131:6
**expertise**
107:5
**explain**
10:23 29:1 85:9
91:12 97:2 116:8
124:23
**explained**
66:14
**explains**
45:4
**explanations**
8:23
**explicit**
118:22
**explicitly**
66:18 100:22
**expression**
11:10
**extremely**
50:21

---

**F**

**F**
1:16,23 142:4,21
**fact**
44:10 67:25 68:3
89:6
**factor**
24:19 25:5,15,18
26:21
**fair**
55:22 64:8 86:10
119:17
**familiar**
8:19 43:5 101:2,12
102:23 103:11
106:5 119:22 120:7
129:25
**families**
122:23
**family**
32:15 131:21 132:10
**fantasy**
31:14



**far**
105:23 106:7
**Fax**
2:12,17
**FDA**
137:16,25 138:2,14
**feasible**
110:7,8,11
**features**
73:11
**feel**
79:5 113:21
**feelings**
43:9
**feels**
125:11
**female**
20:19 21:15,19 36:4
   61:22 64:18 92:7,12
   92:16,17,19,24
**females**
20:14,15 21:18
**feminine**
73:11
**feminize**
128:12
**feminizing**
50:15 51:3,25 52:4
   52:13,18,23 53:10
   54:9,15 55:5,9,14
   56:3,8,14,19,25
   57:14,17 58:4,22
**fertile**
61:25 62:12
**fertility**
61:20 62:4,9
**field**
78:8 95:12 107:5
**fifth**
24:8
**figure**
119:10 128:23
**filed**
16:20
**final**
45:24 48:5

**find**
86:20 119:11
**finding**
58:15
**findings**
58:8
**fine**
9:18 117:11,19,24
   120:25
**Finland**
42:24 43:19
**first**
8:5 10:10,21 13:2
   18:3,4 29:4 34:5
   45:2 47:20 48:16
   50:7,14 51:2 60:15
   61:18 62:18 65:3
   70:3 75:12,16 78:11
   86:13 87:8 94:16,17
   94:22,22 100:12,13
   100:21 102:3
   103:17 105:6,10
   109:7,12 111:20
   118:12,17 124:1
   129:3,17 131:10,11
**five**
97:22 139:9
**flat**
129:20
**flavor**
26:18,23
**focused**
81:9
**follow**
87:19,23 125:3
**follow-up**
111:5
**follows**
8:6
**footnote**
45:3,4 104:5
**foregoing**
141:6 142:8,13
**form**
11:18 12:15 19:11,25
   20:9,16 21:2,10

22:2,14,22 23:3,12
24:25 26:12 27:20
28:5,12 29:21 30:11
31:1,7,15,20 32:4
33:5 34:2,16,23
36:13,25 37:22
38:22 39:12,21 40:5
40:7,16 41:5,17,25
42:18 43:2,23 44:6
44:11 46:6 47:17
48:9,22 50:15,16,23
51:3,5,15,17,23
52:6,20,25 53:12
54:9,12,17 55:8,16
56:5,11,16,22 57:3
57:8,14,16,20,23
58:2,3,12,21,24,24
59:4,7,12 60:8,11
60:22 61:3,9,14,14
62:1 63:7,13,18,24
64:5,13,17,25 65:22
65:23 66:4,10 67:10
70:5,17,24 75:6,23
76:9,13 77:10,17,24
78:14 79:1,8 80:6
80:16 83:12 84:3,9
86:15 87:9 88:4,20
89:16,22 92:9 93:1
96:22 99:7,10,17,19
100:5 101:6 104:22
105:3 107:11,18,25
109:6 111:3 114:8
115:13 116:21
124:11,19 125:20
126:12 127:21
130:13 132:22
133:11,17 136:8
137:13 138:8
**formal**
134:24 135:1
**formally**
90:13
**format**
44:18
**forms**
4:22 50:4,8,10,20,20

65:20 66:19
**forth**
142:10
**forward**
57:11 60:3 61:13
**found**
98:23
**foundation**
21:10 23:3 24:25
   26:12 30:11 31:1
   38:22 40:7,16 43:2
   43:23 46:6 66:25
   78:14 80:16 99:10
**four**
80:23 81:18
**fourth**
74:4
**frame**
85:1
**frequently**
83:19,20 85:24 123:2
**front**
116:13
**frosted**
77:23
**full**
72:20 94:16 100:21
   103:17 131:10
**fully**
20:8 21:8,25 90:24
**function**
38:11
**functional**
38:8
**functioning**
35:16
**further**
56:1 59:15 120:25
**Furthermore**
73:15 74:19

**G**

**gallstones**
56:9
**games**
31:5,19

**gap**
73:18 90:17,22,24,25
91:1 114:1,22
**Garren**
3:8 7:14
**gatekeeper**
125:7
**gatekeeping**
124:14 125:1
**Gay**
2:9 7:3 8:2
**gears**
42:21
**gender**
4:20 10:12,22 11:9
11:10,10 20:7 21:7
21:23 22:11,20 23:1
23:7,11 24:5,19
25:13 26:19 28:9,15
28:21 30:22 31:5
32:8,11,13,25 34:4
34:7,13 35:5,6,6,22
36:5,7,12,17 37:1,8
38:4,15,20 39:19,24
40:12 44:3 47:24
68:20 69:7,25 70:3
70:15,19,22 71:6
72:23 73:1 74:6
75:13,17 76:20 77:2
79:20 81:10 83:11
83:25 89:7,21 90:1
90:8,18,20 91:24
92:19 97:20 98:18
102:7 108:4 109:3
109:19 111:22
112:3,6,15,17,22,24
113:5,10,15,17
114:5,19 115:4,12
115:15,21 116:4
126:10 127:18
129:10,20,25 136:3
137:10,17 138:18
**gender-affirming**
18:7,14,22 42:24
43:19 44:4 68:19
69:4,6 71:1,13 77:3

89:13 90:19 92:2,6
92:20,23 106:10
107:20 118:21
120:13
**gender-forming**
139:1
**genderGP.com**
121:12
**general**
1:9 2:20 3:6 11:20
20:18 85:19 87:18
95:13 106:13
**General's**
7:12,18
**generally**
80:22 81:5 85:17
96:9,11 98:15
120:24
**genital**
84:20
**getting**
84:8,15 125:9 140:14
**give**
14:7 15:20 33:7 40:5
59:10 85:17 126:23
128:20 136:16
139:9
**given**
10:6 66:1
**gives**
111:17
**giving**
51:9 75:12 79:6
81:13 110:3
**gland**
57:1
**gleaned**
125:13
**GnRH**
51:4,18 54:10 64:14
79:15
**go**
6:5 7:6,9 18:1 24:7
27:2,4,23 36:5
44:16,17 45:2 47:4
47:10 49:7 53:19

57:11 58:5 59:19
68:14,16 72:12 80:8
80:9 85:16 89:4
93:6,10,19 94:14
102:12 103:2,16
108:11 111:7
114:25 115:1,24
117:15,20 120:19
129:18 131:9
**goal**
42:14,16
**goals**
60:7 92:4
**goes**
40:18 125:21 128:24
**going**
9:2,9 12:25 23:18
44:15 45:8 49:19
52:17 59:8 61:13
65:19 71:15,22 78:5
88:24,25 89:6
100:11,20 104:7
105:22 107:3
108:13 110:4,6
117:6 118:17
125:23,24 128:16
128:18 131:24
138:16
**gold**
95:2,9
**gonadotropin**
73:4
**good**
8:12,13 49:3 124:17
125:25 133:24
138:6
**gosh**
27:21
**government**
47:23
**GRADE**
93:22 94:1,4,10
100:22 101:3,13
**grant**
4:23 72:3
**granted**

118:13
**GRH**
73:4
**groin**
86:7
**group**
98:8
**grow**
11:6
**guaranteeing**
107:3
**guardian**
126:11
**guess**
48:10 83:23 95:10,11
108:6
**guidance**
102:6
**guidelines**
18:13 72:22 73:12
74:10 75:25 102:6
102:19 103:7,8,11
116:3 133:5,21
**guy**
135:20

**H**

**Hac**
2:15
**hair**
29:9,13
**halfway**
100:13
**halt**
88:18
**halting**
59:15
**Hampshire**
2:16
**hand**
9:9 23:18 49:19
71:15
**hand-in-hand**
114:25 115:2
**handed**
9:22 14:2 23:24

46:16 50:2 101:22
117:2 121:10 131:2
**handful**
10:5 89:23 94:8
**handing**
13:5,21 14:15,25
15:12 46:8
**happen**
22:16 53:14 66:18
124:21
**happened**
22:18 35:13 79:19
107:17 108:6
129:14 132:23
134:21
**happening**
67:25
**happens**
11:6 12:2 106:25
108:10,14 125:5
129:12
**happy**
117:15
**hard**
107:18
**harmful**
111:22 112:6
**Harper**
2:4 7:1 17:13
**harvested**
62:7
**headaches**
56:20 57:7 63:22
**health**
4:23 11:2,11,13
55:24 64:10 66:9,16
66:24 67:5 68:25
69:16 72:5,24 73:23
83:6 103:9 108:20
110:9 113:1 125:8
**hear**
119:7
**heard**
26:8 94:7 119:4
**heart**
54:21 55:6,11,23

62:20 63:5 64:8
68:4
**Helen**
120:7,10,23 122:4,24
123:4
**help**
113:19 114:4,22,23
129:20
**helpful**
47:3 77:2
**helps**
90:16
**hematologist**
128:23
**Heparin**
128:24
**Hi**
7:22
**high**
98:24
**higher**
68:8,9
**highest**
103:6
**historically**
25:24
**history**
116:18
**HIV**
2:3 63:17 64:9
**Hold**
10:17
**home**
35:8
**Hopkins**
98:8
**hormonal**
83:12 84:3
**hormone**
59:23 73:4,17,24
74:21
**hormones**
51:10,19 52:5,14
55:9 61:23 63:11,17
63:22 64:3 65:12
70:3,14 71:1,6,13

73:10 74:6 75:16
77:3 86:13,23 90:19
127:3,14 138:17,18
139:1
**Hospital**
50:6
**hour**
9:3
**hours**
9:16
**housekeeping**
9:9
**hseldin@aclu.org**
2:6
**human**
95:22
**humans**
23:17 39:5
**hundred**
111:24 113:24 138:9
**husband**
122:20
**hypercoagulable**
128:4

---

**I**

**icing**
77:22
**idea**
88:25 90:21 108:2
119:4,12 125:25
129:24 133:24
**ideally**
35:20
**identical**
116:11 135:15
**identification**
9:12 13:9,25 14:18
15:4,16 23:22 46:12
49:23 71:19 101:20
116:25 121:7
130:18
**identified**
96:6 117:14
**identifies**
92:16

**identify**
19:3,9,23 21:15
**identity**
11:9,11 18:7 25:20
26:1,6 30:1 32:13
**II**
102:20,23
**Impact**
72:6
**impairment**
38:8 40:24
**implants**
92:7,13,24
**implications**
73:19,24
**important**
43:7,12 55:18 62:3
76:18 96:6 97:5,13
97:17 126:6
**improvement**
88:11
**inappropriate**
40:5
**incidence**
54:20
**included**
117:8,14 135:8
**includes**
92:7,24
**including**
86:18 131:16 132:5
**incongruence**
10:22 34:4,14 127:18
**incongruent**
36:12 38:20 39:19,24
40:12 112:24
**incorrect**
25:3 48:8 130:11
**increase**
21:14 52:18,24 53:10
54:15 55:6,9,14
62:20 63:1,5,11
65:13 88:8
**increased**
56:3,9 64:3 67:4 89:8
**increases**



54:18 55:19
**increasing**
65:16
**INDEX**
4:1
**indicate**
19:19
**indicated**
92:3
**indications**
79:12
**individual**
88:16,23 109:10
116:13,18 121:19
**individualized**
116:5,9
**individuals**
51:4 54:10 89:10
**induce**
73:10
**ineffective**
114:6 128:19
**infertile**
52:5,11
**infinite**
39:3
**information**
42:12 44:24 45:5
81:16 82:10 120:3
120:22
**informed**
50:4,14 51:3 54:9
57:13,16 61:14
64:13 65:20 124:7,8
124:15,21,25
125:18,18 126:5,7,9
126:10,19,20 130:8
130:10
**initialed**
141:8
**ink**
141:8
**insensitivity**
128:14
**inspirational**
123:9

**Institute**
73:21
**Institutes**
4:23 72:5
**instruct**
8:21
**INSTRUCTION**
5:13
**instrument**
89:20 90:8,23,25
102:20
**instruments**
90:10
**insurance**
36:6 127:10
**intended**
46:25 111:6,8
**intentional**
82:15
**interaction**
127:14
**international**
42:22
**interns**
7:14
**interpretation**
38:13
**interrupt**
117:7 135:5
**interrupting**
53:16
**intervention**
11:14,17,21 12:2,10
36:22 38:16 40:6,10
40:14 41:16 42:6,7
83:12 84:4 92:2
97:9,11,15 105:17
106:13,22 110:3,4,6
111:25 124:9,10,17
125:19 126:4,21
127:20 128:1
**interventions**
18:14 35:25 37:14,15
37:21 38:1 50:10
52:15 66:22 75:3,21
76:5 77:9,15 78:12

79:6 81:13 82:7,8
83:15,22 96:21
97:20 98:18,24
103:23 104:20
106:10,11 107:20
107:23 109:24
111:1 114:22
115:11,18 127:9
128:20 129:13,17
**introduce**
6:22
**inversion**
85:25
**investigation**
105:25
**investigational**
69:9
**involve**
82:13
**involved**
134:10,16,19
**issue**
17:2 24:24 55:17
96:7,8 105:17
112:16
**issues**
73:25 128:23

**J**

**Jack**
119:22,23 123:25
**Jason**
134:15,22 135:23
**jest**
123:8
**Job**
1:25
**Johanna**
1:14 4:3 6:9 8:4
122:14 123:14
140:3 141:4,17
143:25 144:25
**John**
2:15 6:24
**Johns**
98:8

**Journal**
4:21 47:16
**jramer@cooperkir...**
2:18
**jsinger@selendyga...**
2:13
**judgment**
61:2,8 78:16,18
**Julie**
2:10 7:25 8:1
**justified**
79:6
**Justin**
3:8 7:15

**K**

**Kara**
136:23
**keep**
125:9
**kid**
81:19 123:15,15
**Kielhack**
3:4 6:18
**kind**
49:3 85:6 128:25
**Kingdom**
44:9
**Kirk**
2:15 6:25
**knew**
76:19 79:10
**know**
8:14,18,19 9:4 11:19
11:23 12:3 16:7
21:12 22:3,3 35:15
35:18 38:9,9,11,14
40:23 41:4,7,15,20
44:2,12 45:11 46:7
48:23 53:25 60:19
61:24 62:2,4,5,9,12
72:14 77:15 82:23
83:2 84:10,25 91:17
94:4 97:22 98:1
99:11 101:7 106:1,7
106:22,24 107:12



107:17 108:9,18
109:7,12 111:21,24
112:5 119:14,23,24
119:25 120:23
123:9,12 134:13,15
134:17,20,21,22,23
135:1,9,23 136:23
**knowledge**
51:23 73:18 121:24
**known**
61:19

## L

**labeled**
51:2
**labs**
86:19
**lack**
114:9
**large**
71:16
**largely**
37:23 85:21 86:3
**larger**
92:8,25
**law**
16:24 17:2
**lawyers**
135:21
**lead**
28:9,16 29:19 55:10
55:20 56:3,9,15,20
64:3 65:16
**leads**
25:20 26:1
**leave**
47:2
**leaving**
74:1 95:24
**lectures**
10:6
**left**
9:15 96:1,2
**leg**
54:21 55:15,20
**legal**

1:20 6:18 126:13,14
126:15
**legally**
126:9
**let's**
29:16 30:16,18 45:2
57:11 67:19 93:6
128:3 135:2
**LGBTQ**
2:3
**LIBERTIES**
2:3
**life's**
114:12
**lift**
47:23
**light**
11:14
**limited**
70:16,18,23 71:5
73:14 74:12 75:3,22
76:6 77:7
**limiting**
107:8,22
**line**
27:8,11,13 68:17,18
68:22 69:3,13 143:2
143:5,8,11,14,17,20
144:2,5,8,11,14,17
144:20
**lines**
29:17
**lining**
86:4
**list**
117:9
**listed**
13:2 66:18
**listen**
122:14
**listening**
7:20
**lists**
135:7,13
**literature**
95:1 99:16 100:5

**little**
10:23 27:5 42:21
49:5 75:25 87:15
**lived**
106:24
**liver**
65:4,7,9,14,17,22
67:20
**local**
8:20
**long**
16:16 41:21,23 42:2
108:1 124:8 136:22
**longer**
35:12 46:4 58:15
107:13
**longitudinal**
11:1 109:13
**look**
13:14 16:7,17 45:2
82:9 84:22 88:12
96:21 97:8 98:11
99:12 110:16
123:14 135:2
**looked**
54:19 68:4 108:8
110:1
**looking**
11:1 54:8,11 60:15
80:22 97:14,15 99:4
**looks**
27:17 28:1 47:18
**Los**
1:15 6:1,17 50:6
122:14
**lot**
25:23 27:22 32:15
33:9,12,17 34:9
35:11 51:20 62:5
67:25 71:8 88:24
89:5 95:24 96:1
108:9 119:12
**love**
122:8,12
**low**
100:23 101:4,14

**lower**
68:10 86:7
**Lunch**
93:9
**lung**
53:7
**lungs**
53:4

## M

**M.D**
1:14 4:3 8:4 141:4,17
143:25 144:25
**Magna**
1:20 6:18
**major**
131:15 132:4,20
**majority**
26:4 67:25 87:11
**make-believe**
31:14
**making**
76:18 105:12 113:7
125:12
**male**
21:16 36:5 51:8,14
57:18,19
**males**
20:13 51:5 57:17
**manage**
113:19 114:23
**manages**
113:4 115:4
**managing**
102:7
**Mansfield**
4:15,17 14:11,23
15:10,21,25 25:9
26:10 27:4 43:18
66:14,20 68:15
84:13
**manuscript**
10:15
**manuscripts**
10:7,9 65:15
**Marceline**



1:16,23 6:20 142:4
142:21
**Marianne**
122:13
**marked**
9:10,11,23 13:6,8,22
13:24 14:3,16,17
15:1,3,8,13,15 16:3
23:19,21,25 46:9,11
46:17 47:15 49:20
49:22 50:3 71:16,18
101:19,23 116:24
117:3 118:4 121:6
121:11,23 130:17
131:3
**marker**
19:12,18 36:5,7
**Marstiller**
5:8 131:7
**masculine**
21:16 73:11
**masculinize**
128:17
**masculinizing**
61:23 62:19 63:4,11
63:17,22 64:3 65:12
**matter**
6:10
**mature**
52:14
**McGRAY**
3:6 7:17,17
**mean**
11:4,8,24 28:20
30:12 40:20,21
48:25 62:10,12
66:15 67:17,24
68:11,19,23 69:14
70:6 71:12 81:21
88:18 91:12 95:11
95:12 97:2 119:25
126:14 134:25
**meaning**
25:12 40:13 133:2
134:5
**means**

32:15 37:7 41:4,7
66:22 67:8 101:8
116:8 119:14
**meant**
66:21 69:12
**measure**
91:9 96:5
**measures**
90:8,15
**measuring**
11:12,13 89:20 91:22
91:23
**mechanisms**
127:5,6
**medical**
4:21 18:8,14,23
19:22 20:4 35:24
36:1,22 37:10,14,15
37:20 38:1,16 40:5
40:9,14 41:16 42:6
42:7 46:1 47:16
50:10 68:19 69:4,6
72:6 80:20 81:13
82:7,17 83:15 92:2
95:3,9 97:20 98:18
99:7,17 100:6 104:1
106:10,11,12,22
107:20 109:23
110:3,4,6 111:1
114:21 115:10,18
121:2 129:13,17
131:15,16 132:4,6
132:20 134:2
135:13
**medicalized**
14:12
**medically**
32:17 103:23 104:19
129:3
**medication**
58:4,22 67:21 125:23
**medications**
50:15 51:3,25 52:18
52:23 53:10 54:9,15
55:6,14 56:3,9,15
56:20 57:1,14,17

62:20 63:4 66:2,15
66:17 67:8,8,15,23
68:11,23 69:13,14
97:16 113:25
**medicine**
39:4 73:22 77:12
78:2,3,9 82:11
105:21 106:6
112:18
**meet**
17:4,7,10,22 36:19
41:12
**member**
134:7
**memory**
137:1
**men**
68:5,10
**mental**
11:2,11,12 110:9
113:1 125:8
**mentioned**
10:21 91:10
**met**
115:15
**metabolic**
73:16 74:20
**methodology**
93:22 94:2,5,10
**Miesen**
110:17
**migraines**
56:20 63:23
**minimally**
52:21 55:19 130:2
**minimize**
90:24
**minimizes**
128:25
**minimizing**
90:21
**minor**
81:25 126:18
**minors**
5:5 14:13 58:25 70:4
97:21 98:19 99:9

118:7,21 138:19
**minute**
90:4 91:17 117:19
**minutes**
117:10 139:9
**misalignment**
38:4 113:21
**Misanin**
1:5 6:10
**mischaracterization**
78:2
**mispronunciations**
74:1
**missing**
12:22 38:3
**Missouri**
13:3
**misstates**
12:7 38:23 39:12,21
40:17 41:5,17 51:15
59:12 66:4 67:10
77:17,25 79:1 88:20
99:19
**misunderstands**
126:3
**mix**
20:23
**Mm-hmm**
84:1 120:15 127:15
138:25
**model**
124:3,4,7,14,21
125:4,8,16 129:23
130:4,8,10
**models**
124:25 125:3 126:7,9
**moderate**
98:23
**modified**
90:5
**moment**
45:10 47:1 49:13
60:1 93:11 117:7,25
139:16,25
**Monday**
1:16 6:2



**monotherapy**
111:25
**months**
94:8
**morning**
8:12,13
**Morton**
3:8 7:15
**move**
11:7 114:22
**moved**
112:17
**moving**
60:3
**multisite**
10:24

**N**

**N.W**
2:16
**name**
6:18 7:17,22 29:11
35:10,17 90:4 99:6
142:16
**names**
124:3 134:19
**naming**
124:3
**natal**
20:13,14,15 21:18
51:5 57:17 61:22
92:7,16,24
**national**
4:23 72:4 103:8
108:20
**naturally**
92:17
**nausea**
56:15
**nearly**
84:7,16
**necessarily**
21:11 23:16 34:8
35:18 42:17 60:2
81:18 97:13 128:12
**necessary**

34:8 35:18 115:11
**need**
9:3 23:4 37:10 47:2
59:25 60:6,6 79:25
92:13 107:15 140:9
**needed**
77:14 91:17 115:17
**needs**
37:10 99:3 116:10,11
**negative**
72:24 127:13
**Netherlands**
29:5 78:16
**neutral**
88:14
**never**
38:19 44:18 54:19
68:2 83:18 94:1
96:17 99:23 100:17
110:2 111:8 112:1,7
112:20 113:3 115:3
129:16 137:9
**New**
2:5,5,11,11,16 5:4
42:25 43:4,20 118:5
119:6
**Newcastle**
100:14,17
**NHS**
120:13
**NIH**
75:2,21 76:5 83:4
**Noble**
1:16,23 6:20 142:4
142:21
**Noe**
4:11,13 13:2,13,19
14:5 92:15 100:3
101:10 117:13
**North**
14:12
**Notably**
45:13,20
**note**
9:14,19 17:12 46:23
135:6

**noted**
46:24 141:8
**notes**
18:10
**noticing**
6:22
**noting**
135:12
**number**
4:9 5:2 21:6,22 22:1
30:21 34:10 58:9,20
84:10 97:23 130:22
**numbered**
72:13
**numbers**
21:14 27:5 83:2

**O**

**object**
11:18 12:15 19:11,25
20:9,16 21:2,10
22:2,14,22 23:3,12
24:25 26:12 27:20
28:5,12 29:21 30:11
31:1,7,15,20 32:4
33:5 34:2,16,23
36:13,25 37:22
38:22 39:12,21 40:7
40:16 41:5,17,25
42:18 43:2,23 44:6
44:11 46:6 47:17
48:9,22 50:23 51:15
52:6,20,25 53:12
54:17 55:8,16 56:5
56:11,16,22 57:3,8
57:20,23 59:12 60:8
60:22 61:3,9 62:1
63:7,13,18,24 64:5
66:4,10 67:10 69:2
69:18 70:5,17,24
75:6,23 76:9,13
77:10,17,24 78:14
79:1,8 80:6,16 84:9
86:15 87:9 88:4,20
89:16,22 92:9 93:1
96:22 99:10,19

101:6 104:22 105:3
107:11,25 109:6
111:3 114:8 115:13
116:21 124:11,19
125:20 127:21
130:13 132:22
133:11,17 136:6,8
137:13 138:8
**objection**
7:13 12:7 28:19
66:25
**observable**
21:13
**observation**
35:4 80:5
**observational**
12:9
**observed**
20:21
**observing**
7:15
**obtain**
129:12
**obtained**
77:22
**obtaining**
44:4
**occasion**
83:18
**Occasionally**
80:25
**October**
1:16 6:2,14 141:7
142:17
**offer**
77:4
**offered**
15:24
**offering**
15:23
**offhand**
58:17 137:23
**office**
2:20 3:6 7:12,18
**official**
1:8

**oh**
 10:15 27:21 35:8
  53:21 104:10,10,10
  125:11,23 130:14
  133:2 136:7
**okay**
 27:7 45:8 54:7 67:19
  104:10 107:2
  121:25 130:24
**old**
 80:23,24 87:19
**older**
 73:8 80:25 96:3
**Olson**
 30:3 71:17 124:4
  129:23
**Olson-Kennedy**
 1:14 4:3,10,11,13,14
  4:16 5:8 6:9 8:4,12
  9:10,17,22,23 13:6
  13:12,23 14:2,3,16
  14:22 15:1,7,8,13
  16:3 23:20,24,25
  27:2,16 30:18 44:15
  45:19 46:9,16,17
  47:14,15 49:20 50:2
  50:3 54:7 57:12
  68:14 71:17 72:3
  93:15,17 101:22,23
  115:23 117:2,3
  118:4,5 121:10,11
  122:15 131:2,3
  139:3,20,23 140:3
  141:4,17 143:25
  144:25
**Olson-Kennedy's**
 117:13
**once**
 129:14
**one's**
 10:15
**ones**
 89:25 97:24 108:21
**ongoing**
 83:25
**online**

 7:10 119:12,20
**onward**
 87:24
**open**
 99:21
**operate**
 130:10
**opinion**
 94:5,11 96:20 107:18
  113:22 114:4 115:5
  115:8,10 134:2
**opinions**
 15:23,24
**opportunity**
 77:4
**opposed**
 106:21 118:21
**Opposes**
 5:4 118:6
**order**
 73:5 135:17
**ordering**
 140:6
**organizations**
 132:15 133:9 134:3
  135:14
**Ottawa**
 100:15,17
**outcome**
 18:11 96:5
**outcomes**
 11:13 72:24 88:2
**outdated**
 30:9,25 31:4 32:3
**outpaces**
 77:12 105:23
**outside**
 35:9 86:7 120:13
**overall**
 97:7
**overarching**
 88:12
**overdose**
 82:15,15
**overlap**
 79:19

**P**
**p.m**
 1:16 6:3 93:12
  117:21 118:1
  139:13,17 140:4
**P.O**
 2:21
**packet**
 50:9,12
**page**
 4:9 5:2 13:1 18:1,2
  24:7,8 27:4 30:20
  30:24 44:16 45:1,2
  45:8,9,24 46:14
  48:5,6 50:12 52:2
  52:17 54:8,11 56:1
  56:1,25 60:11 61:18
  62:17,18,23 64:21
  68:16,18,22 69:3,13
  71:22 72:12,14,16
  93:19 94:15,16
  100:11,20,21 102:3
  102:12 103:2,16
  115:24 121:20
  122:2,3 131:9,25
  143:2,5,8,11,14,17
  143:20 144:2,5,8,11
  144:14,17,20
**pages**
 57:11 61:13 64:12
**paid**
 136:19
**paper**
 12:19 44:19,22 45:5
  71:23 104:5,8,9,13
  104:15 111:7
**papers**
 65:5
**paradigm**
 101:13
**paradigmatic**
 101:2
**paragraph**
 13:1 18:2 24:11,15
  45:9,13,18,25 48:6

 62:24 72:19,20 74:5
 93:21 94:16 100:12
  100:13 103:17
  104:19 115:24
  122:3 123:7,24
  131:10,25
**parent**
 126:11,19
**parenthesis**
 51:4 64:14 95:5
**parents**
 60:3 81:17,19
**Parson**
 4:11,13 13:2,13,19
  14:5 92:15 100:3
  101:10 117:13
**part**
 7:16 10:25 12:12
  18:21 19:17 24:3
  25:18,22 32:7 34:5
  36:8 37:16,18 50:7
  50:9,11,17 75:4
  76:7,18 78:12 89:13
  96:14 97:5,17
  104:15 109:4
**partial**
 28:24 29:6
**partially**
 29:10
**participates**
 105:13
**participating**
 50:8
**participation**
 103:22
**particular**
 11:14 27:11 65:6
  85:18 92:1 124:17
**particularly**
 58:8
**parties**
 9:18
**partnered**
 114:21
**parts**
 36:2

pass
139:5
patient
20:22 21:22 32:24
38:19 42:14,17
80:11,13 85:15,18
86:4 87:2 88:2,7,10
92:1 115:11 116:17
124:8,15,16 125:17
127:16 128:14
patient's
60:6 86:13,23 92:3
116:18
patients
20:12 40:4 50:5
62:15 68:2,7 75:13
78:4,11 79:6,20,21
80:23 81:6 82:1,20
83:10,12,24 84:3,6
84:15 87:19,22,24
89:1 112:10 116:14
pause
46:1 60:1
Pediatric
131:19 132:9
Pediatrics
132:6 134:8 135:18
pelvic
82:15
penalty
141:2,5
pending
9:5
penis
86:1
people
17:11,23 20:18 21:7
21:14,22 22:6 25:2
26:3 29:24 34:11
35:11 37:13,25 38:7
38:15,16 39:23 40:2
40:8,9 41:10,12,21
42:4 43:8,9 51:17
51:19 59:5 62:6
64:17 70:19 77:5
78:6 81:13 82:5

83:16,21 88:11,11
88:23 89:4 94:7
95:21 106:7,13
108:10,13 110:9
111:20,21 112:18
112:19 113:19,24
113:25 114:12,23
115:17,21 116:11
122:23 127:5,8
128:22
people's
55:23 61:2,7 64:9
66:9,16,24 67:5
68:25 69:16
perceived
26:15
percent
20:13,14,22 81:8
82:23 83:1,1,8,11
84:5 138:9
percentage
82:13,20,22 83:24
84:2
percentages
24:12
perform
109:21
period
59:19 107:13
peritoneal
86:5
perjury
141:2,5
permanent
53:6 55:3
persistence
24:19 26:19,22
person
32:17 35:16 52:3,12
61:24 62:11 85:2,22
116:10 120:25
126:3 128:8,17,24
129:18
personally
30:2 70:6,9,13 74:15
74:24 75:19 86:22

87:2
perspective
82:17
persuade
138:11
pharmaceutical
136:4 137:11,20
138:13,20
Pharmaceuticals
136:13,15 137:5,15
138:12,22
phrase
40:25 45:20 63:1
physical
55:24 64:9 66:9,16
66:24 67:5 68:25
69:16 80:4,4
physicality
38:5 90:17 91:24
Physicians
131:20,21 132:10,11
physiologic
73:16 74:20
pick
95:22
picking
95:23
piece
77:21 91:15 105:10
105:11
pieces
81:14,15 91:19
pituitary
57:1
place
59:24 87:12 106:25
114:23 142:10
plaintiffs
1:6,14 2:2 7:2,4,23
8:2 17:14 139:19
play
31:14
please
19:6 49:13 93:11
117:25 139:16,25
140:10

PLLC
2:9
podcast
5:6 121:18
point
9:3 49:2,3 58:10 59:8
65:4 71:14 87:22
93:4 104:4,11,18
106:9 119:17
pointless
99:15 100:4
points
82:6 108:17
policies
42:23 43:18,25
population
21:22 65:2,24 77:1
99:9
possibilities
39:3,5
possibility
39:2 137:15
possible
86:22 87:1,4 99:13
108:23 109:1
124:23
possibly
76:21 96:15 115:14
potential
35:25 53:13 66:17
67:16,17,24 68:12
72:23
potentially
29:12 55:10
practice
20:18 32:7 34:11
65:21 70:16,22
72:22 73:19 77:12
78:3,4,13,19 80:22
81:5,8 82:13 86:11
87:18 90:7 96:14
115:17 116:3
practicing
120:13
pre-pubertal
10:12

**precise**
26:8
**precocious**
79:11,17,18,24 80:12
**predecessor**
105:25
**predict**
19:22
**predominant**
112:16
**preexisting**
127:2,13
**pregnancies**
62:7
**pregnant**
62:13
**preliminary**
86:19
**preparation**
17:7
**prepare**
16:22 17:23
**prepared**
48:11
**prepubertal**
11:2 32:9,18 34:7
**prescribe**
86:12 88:7
**prescribed**
86:23 87:2,7
**prescribing**
47:23 89:12 109:2
**presence**
34:14 36:23
**present**
3:3 21:7,23
**presentation**
136:16 137:3,8
138:23
**presented**
8:24
**presently**
42:16
**president**
118:23
**press**

138:5
**pressure**
56:4
**pretty**
82:11 88:13
**previous**
20:2
**previously**
87:5 121:23
**primarily**
36:21
**print**
71:20
**printed**
71:21
**Pro**
2:15
**probably**
83:8 84:5 86:8 92:13
97:22 108:6 127:11
129:19
**problem**
38:24 106:15
**problematic**
111:21 127:3,7
**problems**
54:22 55:15,20 82:16
**procedure**
85:20,24,25
**procedures**
36:1 85:14,18,19
**proceed**
80:14
**proceedings**
142:11,14
**proceeds**
52:4
**process**
132:24 134:24 135:1
**product**
41:23 42:1,11
**professional**
121:3
**progress**
89:18
**PROJECT**

2:3
**Prolactin**
65:3
**prolactinomas**
58:9,20 65:9
**prompt**
69:3
**pronouns**
29:12 35:17
**proportion**
84:14
**proposed**
90:5
**proposing**
99:22
**prospective**
10:25 109:9,13
**prospectively**
108:13
**protocol**
10:10,22 12:18,19
44:5 76:19,23
105:21 106:14
**protocols**
43:5 82:21 83:7
87:23
**proven**
22:7 65:13 112:7
**provide**
10:8 124:9,15 125:18
126:10,19,20 129:6
**provided**
116:4
**provider**
124:9,16 125:8
**providers**
43:8
**provides**
124:8
**providing**
75:4 76:7 81:16
82:10 101:13 116:9
126:5
**provision**
76:2
**Psychiatric**

131:17 132:7
**psychiatry**
113:1
**psychoeducation**
81:15,20,25
**Psychological**
131:18 132:8
**psychopathological**
112:25
**psychotherapy**
109:22,23 110:25,25
111:24 112:14,19
113:4,7,8,14,18
114:4,19 115:3
129:6,8,13
**psychotherapy-only**
111:5
**pubertal**
51:8,14 58:25 61:1
73:9
**puberty**
27:18 28:3 35:14
44:10 46:2 47:23
51:7,10,11,19,20
52:3,4,12,13 57:18
57:19 59:5,8,11,14
59:19 60:12,16,19
61:7 64:18 69:24
70:14,25 73:3,5
74:5 75:12 76:20,24
79:11,17,18,24 80:1
80:12,14,15 84:7,17
85:21,24 87:2,7
88:7,17,19,25,25
89:4,6,12,18 109:2
136:2 137:6,9
138:14,16
**publication**
109:12
**published**
12:18,21,22 46:20
47:16 95:20 102:5
109:8
**publishing**
43:9
**pulmonary**



52:24 53:3,6 54:20
55:22
**purpose**
89:12 90:18 97:4
104:25 113:7,9,14
**purposes**
59:20
**put**
65:6 90:13 128:9

---

**Q**

**qualifies**
113:17
**quality**
93:23 95:3 97:19
98:17,24 100:23
101:4,14 102:5,14
102:21
**question**
20:2 22:4 26:8 48:11
51:12 54:14 69:11
69:19 83:23 84:2
97:6 104:11 110:20
110:21 113:16
**questions**
8:17,18,23 9:5 32:16
81:24 121:20 139:4
139:20
**quibbling**
106:17

---

**R**

**R**
72:5
**Rafferty**
134:15 135:23
**Ramer**
2:15 4:4 6:6,24,24
8:11 9:8,13,20
11:22 12:11,17 13:5
13:11,21 14:1,15,21
14:25 15:6,12,18
17:16,21 19:7,14
20:3,11,20 21:5,17
22:9,17,24 23:9,18
23:23 25:7 27:1,24

28:7,14,22 30:6,15
31:3,9,17,23 32:6
33:21 34:12,20
36:10,15 37:3 38:18
39:9,16 40:1,11
41:2,14,22 42:13,20
43:16,25 44:8,14
45:12,15,17,23 46:8
46:15,22 47:4,10,13
47:19 48:15 49:2,7
49:12,16,19 50:1
51:1,21 52:9,22
53:2,15,19 54:6,23
55:12,21 56:7,13,18
56:24 57:5,10 58:1
59:21 60:10,24 61:5
61:12 62:8 63:9,15
63:20 64:1,7 66:7
66:12 67:2,13 68:13
69:10,23 70:8,20
71:2,15,20 72:2
75:8 76:3,11,15
77:6,13,20 78:10,17
79:4,16 80:10,18
84:12 86:21 87:14
88:6 89:11,19 90:6
91:7 92:14 93:3,6
93:14 97:1 99:14
100:1 101:9,21
104:24 105:15
107:14 108:22
109:14 111:10
114:17 115:19
117:1,6,11,20 118:3
121:9,22,24 122:1
124:13,22 126:2
127:24 129:5
130:20 131:1 133:7
133:14 134:1 135:4
135:13,19,21
136:11 137:19
138:10 139:10,12
139:22
**randomize**
105:7
**randomizing**

112:4,10
**range**
42:9 80:23
**rare**
126:24
**rate**
27:17 28:2 99:8,12
**ratio**
20:12 21:1 22:6
**RCT**
104:25
**RCTs**
103:21
**read**
16:16,19,20,24 18:3
18:4,16 24:16,16,21
25:10 43:6 45:10,11
45:19 47:1,21,21
48:2,7 72:19,20
74:1 94:22,23 95:6
97:18,24,25 98:17
100:25 103:18,18
104:2,12 116:6
118:17,18,25
122:16 123:17,25
124:5 131:11,11,22
131:25 132:1,12
135:9,13 139:21
141:5
**reading**
45:22
**ready**
6:5 49:12 54:1,2,3
60:3,4 93:10
**real**
18:7 44:1
**really**
32:16 33:9 38:11
39:7 43:7,12 62:3
76:17 77:14 81:19
82:10 97:5 98:25
99:11 106:1 111:21
111:22 119:14
120:23,25 123:6
124:2 125:11 126:7
127:6 136:22

**reason**
38:1,14 138:6 143:4
143:7,10,13,16,19
143:22 144:4,7,10
144:13,16,19,22
**reasons**
21:13 22:5 36:19
79:15 87:13 96:2
99:13
**recall**
85:6 96:15 97:24
98:15 123:4 136:21
138:3,15
**recalled**
20:25
**receive**
27:18 28:3 78:12
111:12 129:13
**receives**
22:11
**receiving**
50:5 92:7,24 109:23
110:24,25
**receptors**
128:18
**recess**
49:11 93:9
**recognize**
44:18,25
**recognizes**
18:6
**recommendation**
101:4,14 125:13
**recommendations**
43:10 48:1 58:7
72:24 100:24 102:7
116:12 125:5
**recommended**
73:5,10 105:5
**record**
6:7 7:19 9:14,19 47:4
47:8,9,12 49:10,15
53:23,24 54:5 72:20
93:6,8,13 117:15,22
117:23 118:2 135:6
135:12 139:11,14



139:15,18 140:1,5
142:13
**recording**
12:12
**red**
63:1
**reduces**
99:8
**reemerges**
35:13
**referenced**
104:5
**referencing**
102:1
**referred**
84:19 85:2,3
**referring**
31:24 33:22,24 71:11
  83:7 109:22 110:14
**regain**
61:24
**regarding**
10:21 14:11 24:5
**relate**
121:20
**related**
26:22 88:2 97:9,16
  114:24 126:10
**relatedly**
19:21
**relationships**
116:19
**relative**
82:6
**releasing**
73:4
**relevant**
35:19
**reliable**
120:2,21
**remember**
10:17,19 58:17 85:3
  85:15 90:3 98:10
  111:4,6 119:9
  123:21 126:7
  136:17 137:22

**remove**
132:19
**removing**
65:19
**repeat**
19:5
**report**
4:21 16:24 17:2
  43:14 46:20 47:15
  48:7 73:21 79:14
  95:20 98:22
**reported**
1:23 68:3 142:11
**reporter**
1:17 6:20 7:25 8:8
  9:9,12 13:5,9,22,25
  14:15,18,25 15:4,12
  15:16 19:5 23:19,22
  45:16 46:8,12 49:20
  49:23 69:5 71:16,19
  91:3 101:18,20
  116:23,25 121:5,7
  130:16,18 135:10
  140:6,12 142:5
**REPORTER'S**
142:2
**represent**
24:1 121:17 130:20
**representative**
136:4 137:11 138:19
**represents**
73:18
**reps**
136:16
**request**
9:4
**require**
34:14
**required**
33:2 36:24
**requirement**
39:10
**requires**
31:4,10,13,18
**requiring**
106:7

**reread**
16:24
**research**
44:4 73:23 82:21
  83:4,5,7 87:23 90:7
  102:20 103:22
  105:13,21 106:3,8
  106:14 107:9,23
  109:4,16,21 110:14
**researchers**
78:24 108:24
**resolve**
114:4 129:10
**resolving**
113:9,15 114:19
**respect**
23:1 121:2
**response**
88:12
**rest**
65:6
**restart**
19:7
**result**
54:24 103:25 137:24
**results**
7:20 97:15
**retracted**
47:22 48:13
**retracting**
48:17
**return**
30:18 83:19 93:17
  115:22
**returning**
48:4 103:14
**revealing**
17:6
**review**
5:3 17:1 18:6,10,18
  18:19,22 44:20
  45:14,20 95:21
  96:10,18,20,24 97:3
  97:5,7 98:20 99:1
  99:16 100:5 102:4
  109:8 117:10,12,16

134:10
**Review's**
48:1 100:14
**reviews**
94:19,25 95:1,8,14
  96:1,7,8,9,13 97:18
  97:25 98:16,23 99:2
  102:1
**rewriting**
123:11
**right**
12:6 17:11,25 41:16
  48:8 51:14 65:14
  77:16,23 80:5 83:2
  83:17 95:22 96:4,6
  97:10 98:2,3 102:13
  114:7 115:6 116:15
  119:20 124:4 126:5
  130:11 134:4
  138:24
**rights**
118:24
**rigor**
103:4,7
**rigorous**
73:22 95:1
**rise**
21:6,21
**rising**
22:1
**risk**
52:18,24 53:10 54:15
  54:18 55:6,10,14,19
  56:9 62:20 63:5,11
  63:17 65:14 68:7
  127:19,23,25 129:1
**risks**
51:24 58:3,21 60:12
  62:18 64:22 65:1,24
  66:1 67:4
**roles**
31:14
**room**
47:2
**roughly**
84:14

MAGNA ▶
LEGAL SERVICES

**routine**
83:21
**routinely**
79:25 108:7
**RPR**
1:16
**rule**
123:11
**rules**
8:20 104:1

---

**S**

**safe**
66:3,15,22 67:8,9,15
67:21 68:21 69:8,13
69:19 76:25 77:15
**safety**
60:16 96:21 97:10,17
98:4
**San**
122:22
**satisfaction**
88:9
**save**
71:23
**saw**
119:11,19 129:16
**saying**
26:24 40:15,19 65:9
65:9,12 66:21 69:12
89:9 97:8 100:4
107:7 112:14
119:19 125:22
126:16 130:9
**says**
18:5,22 23:10 24:17
35:21 47:21 57:13
61:19 74:9,18 94:24
100:21 101:3
102:18 103:20
118:19 122:11
123:7 124:1 129:23
131:13 132:2
**scale**
90:1 91:2,5,9,14
100:15,18 102:24

**scales**
89:23 90:2,15
**scant**
114:15,18
**scenario**
59:10 107:16
**science**
19:2,8 112:18
**scientific**
60:25 61:6 104:1
105:25
**scientifically**
21:8 22:6
**scoring**
103:6
**screen**
53:17
**screening**
36:6
**scrotum**
86:6
**search**
95:1
**second**
10:14,17 50:9,11
53:9 54:8,12 56:2
72:19 86:23 87:3
102:12 103:17
105:11 122:7
**secondary**
73:6
**see**
24:9,13 27:10 33:13
34:11 38:16 41:10
59:2 60:13 61:16
63:2 64:15,23 67:24
68:1 80:25 81:19
89:25 94:20 102:4
102:16 103:3
105:11 111:16
118:15 119:11
121:12,13 122:3,5,9
126:24
**seeing**
22:5 79:21 83:10,19
83:20,21,24

**seek**
40:14
**seeking**
37:20 40:9 41:16
42:6,8
**seen**
21:21 30:5 44:18
54:19 58:13 68:2
81:17 83:16 99:23
118:9 121:15
**Seldin**
2:4 7:1,1 8:1 9:13
11:18 12:7,15 14:20
17:12,13,17 19:11
19:25 20:9,16 21:2
21:10 22:2,14,22
23:3,12 24:25 26:12
27:20 28:5,12,19
29:21 30:11 31:1,7
31:15,20 32:4 33:5
34:2,16,23 36:13,25
37:22 38:22 39:12
39:21 40:7,16 41:5
41:17,25 42:18 43:2
43:23 44:6,11 45:12
46:6,22 47:5,17
48:9,22 50:23 51:15
52:6,20,25 53:12,15
53:20 54:2,17 55:8
55:16 56:5,11,16,22
57:3,8,20,23 59:12
60:8,22 61:3,9 62:1
63:7,13,18,24 64:5
66:4,10,25 67:10
69:2,6,18 70:5,17
70:24 71:25 75:6,23
76:9,13 77:10,17,24
78:14 79:1,8 80:6
80:16 84:9 86:15
87:9 88:4,20 89:16
89:22 92:9 93:1,10
96:22 99:10,19
101:6 104:22 105:3
107:11,25 109:6
111:3 114:8 115:13
116:21 117:6,17,24

121:22,25 124:11
124:19 125:20
127:21 130:13,24
132:22 133:11,17
135:4,11,18,20
136:6,8 137:13
138:8 139:7,19
140:6,8,10,14
**Selendy**
2:9 7:3 8:2
**self-acceptance**
91:19,20
**seminars**
10:5
**sense**
9:6 36:8 85:17
106:19
**sensitivity**
129:16
**sentence**
24:15 25:3 26:15,17
27:11,22 31:22
45:24 46:4 47:20
48:5,8 61:18 74:9
74:15,18,24 94:17
94:18 100:21
102:14,15 108:1
118:12,17 122:7
131:11
**sentences**
18:3 74:4 103:18
124:1
**separate**
9:17
**separation**
43:11
**sequence**
89:13
**services**
1:20 6:19 82:5 83:15
**set**
142:10
**seven**
9:16 75:20 98:13
**severe**
127:19

**sex**
35:22 73:6
**sexology**
113:2
**shaft**
86:1
**shares**
22:20
**sheet**
4:12,16 14:4 15:9
  143:1 144:1
**shift**
20:21 33:16
**shifted**
20:13 21:4
**short**
49:4,11
**Shorthand**
1:17 142:4
**showing**
106:20
**shown**
68:21 69:7 115:3
**sic**
139:17
**side**
60:16 66:8,17 67:16
  67:17,24 68:12
**sign**
126:12 139:21
**SIGNATURE**
143:24 144:24
**signed**
16:18
**significant**
38:25 39:7,11 40:23
  41:9 51:13 73:19
  96:7
**significantly**
40:20,21 112:3
  129:19
**similar**
65:3 82:11 87:4,10
**similarly**
87:1
**Singer**

2:10 7:25 8:1
**single**
46:14 99:6 106:12
**situation**
108:19 109:9 125:17
  126:18 128:4,13
**situations**
87:6 129:2
**six**
97:22 98:13,13
**skepticism**
23:14
**skin**
85:25 86:3,5,6
**Skrmetti**
4:18 16:5,11
**slightly**
68:10 84:24 135:7
**slower**
27:23
**small**
34:10 82:12,22 92:17
**Smith**
2:20 7:10,10
**SOC**
116:2 131:14 132:3
  132:15,20 133:10
  134:3 135:2
**social**
11:16,20 24:18 25:4
  25:12,19,23,25
  26:18 28:23,24,25
  29:4,6,16,18 98:7
**socially**
12:1,13 26:3 29:10
  29:14,25
**society**
18:13 33:16 131:19
  131:19 132:8,9
**sole**
111:25
**somebody**
19:19 35:21 36:3,4
  37:11 39:17 51:10
  53:14 59:10,16,23
  80:1 83:17 85:22

86:2 92:12 99:21
  125:9,12,22 127:1
  127:12 128:2
  129:15
**somebody's**
91:24 113:9
**someone's**
90:17
**sorry**
7:8 15:19 17:16 19:5
  57:22 62:17 91:18
  104:7 120:18
  130:14 135:4
**sort**
9:18 106:19 129:3
**source**
120:2,22
**South**
1:2,9 2:22 3:6 6:12
  7:11,18 16:25
**Southern**
1:14 6:17
**span**
42:9
**speak**
106:12 123:2
**speaking**
123:1
**specific**
19:3,9 72:17 96:5
  99:4 116:13 134:18
**specifically**
11:8 27:4 30:4 55:18
  85:6 90:8 91:5 96:9
  96:16 97:15 103:2
  110:17 123:21
  137:16
**spectrum**
35:8
**speculation**
119:12,13
**spent**
34:9
**sperm**
52:14
**spoken**

120:5,14 137:9
**sponsor**
137:25 138:1,13
**sponsoring**
137:15 138:7
**SRs**
95:5
**Sruti**
2:4 7:23 17:15,19
**sswaminathan@ac...**
2:7
**staffer**
119:3,8,14,19
**stage**
59:17,23 72:25
**stages**
73:2,8
**stamp**
133:20
**standard**
95:2,9
**standards**
18:12 43:1,21 98:3,4
  98:8 134:11
**start**
9:8 30:16 35:14
**started**
11:25 29:4 33:8,9
  51:10,18 62:4,10
  75:10 80:1 108:3
**starting**
6:22 30:24 51:19
  59:5
**starts**
45:13 78:3 118:13
  122:7
**state**
13:3 100:22 142:5
**stated**
16:14
**statement**
25:10,12 26:11 27:12
  48:20 118:22 119:3
  119:5
**states**
1:1 4:18 6:11 16:4,6



16:10,12 18:7 34:19
45:25 48:21 108:21
131:16 132:5
**status**
62:4,10
**staunch**
118:23
**stay**
52:13,15
**stenographically**
142:11
**step**
43:1,21
**stereotype**
33:3
**stereotypical**
23:16
**stereotypically**
31:25
**stereotyping**
31:5,11,13,18 33:11
**Sterling**
1:5 6:10
**sticking**
12:25 17:25 60:11
62:17 94:14 100:10
103:1
**stop**
59:18 89:17
**stopped**
62:6
**stopping**
49:3 93:3
**stops**
61:23
**store**
33:23,24
**Street**
1:15 2:5
**stress**
37:14 39:11 40:24
89:1
**stroke**
53:11 54:15,21,25
55:2,23 63:5
**strong**

100:24 101:4,14
**studies**
28:8,15 29:18 58:14
58:16 65:18 77:16
78:5 80:9 95:24
96:1 109:25 110:13
112:1,13 114:6,9
**study**
10:11,24,25 11:1
12:4,9,10,12 27:17
28:1 30:5 50:8,17
54:19 68:4 95:13
96:21 99:6,12,22
103:22 108:5
110:15,17,22,23,23
111:1,11,18,19
112:5,9 113:4
137:16,25 138:1,7
138:13,24,25
**studying**
109:4
**subject**
118:22
**subjective**
95:21 96:11
**subjects**
12:13
**submitted**
4:23 10:1 16:4,10
72:4,10 131:7
**subscale**
91:2,6
**subscales**
91:15
**subscribed**
142:16
**substance**
137:2
**substantial**
103:24 104:20
105:17 107:21
**successful**
112:7
**suffering**
37:21 38:20
**sufficient**

79:5
**suggests**
18:22
**suicide**
99:8,17 100:6
**suicides**
99:12
**Suite**
1:15
**superfluous**
39:11,14
**support**
77:8 100:24 128:11
**supporter**
118:23
**supposed**
8:20
**suppress**
73:5
**suppressed**
84:7
**suppression**
61:1,7
**Supreme**
16:5,11 48:20
**sure**
13:15 16:21 23:5
26:8 29:3 49:6
53:18 84:22 92:1
101:7 106:16 108:9
114:3 133:4
**surgeon**
86:9
**surgery**
5:5 84:8,15,20 85:7
118:6,21 129:19
**surgical**
97:16
**suspect**
139:8
**Swaminathan**
2:4 7:22,23
**Sweden**
42:24 43:19 44:3
**Swedish**
103:8

**Switching**
42:21
**sworn**
8:5 142:8
**symptomatology**
22:21
**syndrome**
128:15 129:16
**system**
101:3,13 108:20
**systematic**
5:3 94:25 95:8,14,25
96:7,8,9,13,17,20
96:24 97:3,5,7,18
97:25 98:16 101:25
102:4

---

**T**

**Tabachini**
3:7 7:14
**table**
103:2 129:18
**take**
9:2 29:16 45:10 49:4
60:1 67:19 68:8
125:23 127:3 128:5
133:16 140:1
**taken**
1:14 6:16 141:6
142:9,14
**talk**
8:16 25:2 43:13
79:14 95:19 112:22
122:8,12,15
**talked**
35:7 87:5 90:3 98:25
138:21
**talking**
12:19 16:25 21:18
30:4 35:5 37:9
43:13,14 45:12
50:13 81:22,23 83:4
83:5 93:21 105:12
110:2 111:23 112:4
112:23 113:13
122:19 124:2



129:22,24
**Tando**
122:15,21 123:1
**Tanner**
59:17,23 73:3,9
**Target**
33:13,22
**Taylor**
5:3 98:23 101:25
**team**
58:18
**technical**
73:3 133:1,3
**technically**
100:23
**tell**
29:24 65:5 68:7
**telling**
75:21
**tells**
123:15
**tension**
38:6
**terminology**
92:20
**terms**
135:7
**Terranova**
3:8 7:15
**test**
19:22 20:5
**testified**
8:6 14:10
**testify**
17:18
**testimony**
12:8 14:7 15:20
38:23 39:13,22
40:17 41:6,18 51:16
59:13 66:5 67:11
69:3 77:18,25 79:2
88:21 99:20 141:9
142:10,14
**testosterone**
61:15,20 62:6,18
64:13,22 65:1,16,24

68:6,8,9 128:18
**tests**
80:7
**text**
23:6
**thank**
8:8 12:24 13:10
14:19,20 15:5,17
32:23 47:5 49:18,24
50:18 51:22 52:16
71:24 93:5,16
117:18 121:8
130:19,24 135:19
139:7,22 140:8,16
**theirs**
140:15
**therapist**
122:22
**therapy**
61:15 64:14 65:2,24
113:1,1
**thing**
13:14 46:14 65:6
76:1 82:4 88:23
97:13 98:21 99:4
109:7 134:18
138:21
**things**
23:16 27:22 29:9,13
29:13 33:10 35:12
42:8 43:6 53:13
54:20 68:2 78:22
79:14 82:16 86:8
97:16 113:2,12
114:25 123:10
129:3
**think**
11:20 16:21 17:15
20:1 21:3,13 23:10
23:13 25:1,4,19,22
25:25 26:3,13,22
29:22,22 30:4,5,7,8
33:13,15,17,25 34:3
34:6,21,24 35:2,20
36:9,23 37:23,25
38:9,24 39:6,23

40:8,9 42:19 43:3,6
43:11 46:13 48:19
55:18 58:14,18 62:3
71:5,8 76:12,17
78:1 86:11 89:2,25
90:2 91:25 92:6,10
92:23 95:19 96:23
98:1,3,11,20 99:13
105:19 106:25
107:8,13,15,16
108:19,23 109:1,15
109:20 110:5,16,17
111:9,19 113:16,18
113:20 119:15
120:2,21,24 123:12
124:20,24 125:2,4,7
125:7,21 126:6,24
127:4,8,22 129:22
132:24 133:15,23
135:16 137:22
138:6 139:3
**thinking**
33:9,11 34:9 85:1
**thinks**
125:22
**thinner**
128:25
**third**
30:20 74:4
**Thirteen**
75:7
**thought**
34:25 112:19
**thoughts**
43:9
**three**
7:14 17:23 23:13
61:13 62:24
**time**
6:14,21 9:16 11:2,3
11:13 12:3 16:16
20:22 28:13 33:16
33:20 34:9 35:19
42:2 47:6,11 48:11
49:8,14 53:22 54:4
70:2 75:2 76:4 82:6

83:16 85:1 86:19
90:5 93:7,12 107:13
108:16 110:3 113:3
117:21 118:1
123:21 128:6
129:15 136:22
139:13,17,23 140:4
142:10,14
**times**
5:4 22:10 86:12
108:10 118:5 119:6
124:15 127:4
**timing**
16:21 84:22,25
**tissue**
85:12,19
**title**
58:25 61:14
**today**
6:14,19 50:21,22
112:23 123:13
139:23
**today's**
17:8,23 140:2
**told**
75:2 76:4,4
**tolerate**
127:5 138:4
**tools**
108:16
**top**
57:13 72:17 121:12
130:21,23 131:10
**topics**
10:9 42:10
**total**
9:16
**touched**
30:7
**toys**
31:5,19 33:3,15
**trainings**
123:3,5
**trajectories**
11:3 81:22
**trajectory**



11:4,9
**trans**
10:12 26:5 37:8
38:14 112:20
123:16
**transcribed**
142:12
**transcript**
4:11,12,16 5:6 13:13
13:18 14:5 27:3
121:17 140:7 141:6
**Transexperience**
91:21
**transfeminine**
51:4 54:10
**transgender**
5:5 18:6,8,15,23 19:4
19:10,20,23 22:13
25:20 26:6 28:10,11
28:17,18 29:20 30:1
68:5 72:6 75:11
90:14 91:1,4,8,14
91:21 112:17 113:8
118:7,24 122:23
123:12 137:4
**transgender-specific**
73:25
**transition**
11:16,21 14:12 24:18
25:4,13,19,24 26:1
26:18 28:23,24,25
29:4,7,17,19 81:6
87:20 98:7 99:7,17
100:6
**transition,'**
18:11
**transitioned**
12:1,13 26:4 29:10
29:15,25
**translates**
35:24
**transmasculine**
84:6,15
**Transyouth**
83:6
**treat**

69:24 70:3,15,22
71:6 74:6 75:13,17
79:17 97:20 98:18
115:11 128:8
**treated**
79:18 80:11 111:6
**treating**
81:9
**treatment**
50:5 68:20 69:4,7
72:6,24 73:3,9,17
74:21 80:12 105:7,8
107:1 109:3 112:6
116:3 136:3 137:10
138:18
**trend**
21:7
**trial**
106:3 107:23 109:4,9
109:13,16,21,22
**trials**
107:9
**tried**
138:11
**true**
77:7,11 78:8 112:21
125:2 141:9 142:13
**truthful**
14:7 15:20
**try**
8:15 10:17 99:16
100:4 107:2,7
126:24
**trying**
20:2 113:24 119:10
**tumors**
57:1,6
**Turban**
119:22 121:18
123:25 129:22
130:9
**Turban's**
5:6
**turn**
15:19 111:12 139:5
**turning**

16:2
**twice**
79:18
**two**
10:6 17:11 18:3
36:19 43:12 57:11
64:12 79:19 91:15
98:6 103:17 109:16
109:21 110:24
114:14 116:14
124:1,25 135:6
**two-thirds**
20:14,17
**twofold**
105:6
**Tylenol**
67:19,20,21
**type**
95:1 110:14,20
111:18,19
**types**
94:6,11
**typewriting**
142:12

———————————
U
———————————

**U.K**
46:2 47:22 120:12
**U.S**
73:13,20 74:11 124:4
**uncertainty**
32:13
**undergoing**
83:22
**understand**
8:17,25 21:8,12 22:1
29:23 65:8 69:20,21
90:16 112:12 114:3
127:17
**understanding**
7:13 9:21 29:16
34:18 42:3 48:10
73:23 82:7 94:10
119:2 120:24 130:3
130:5
**understood**

12:24 20:8 60:17
**undertaking**
97:3
**undesired**
73:6
**unethical**
78:20 109:15 110:7
**unexplained**
98:22
**unintentional**
82:15
**UNION**
2:3
**United**
1:1 4:18 6:11 16:4,6
16:10,12 34:19 44:9
48:21 108:21
131:16 132:5
**University**
95:4 130:1
**unrelated**
97:12
**unresolved**
9:15
**untreated**
111:22
**updates**
10:3
**upwards**
83:11
**use**
32:10,12,13,14,19
34:18 35:9 44:10
46:25 59:4,7,22
68:23 69:14 70:19
71:6 73:24 76:24
77:8 79:10 85:25
86:2,4,5,6 90:8,10
100:14 106:17
107:9,23 116:8
133:22 136:2 137:9
138:17
**uses**
35:16
**usual**
8:15

**usually**
32:9 37:13,17 128:9
**uterine**
82:14
**utility**
34:6
**utilize**
90:14 108:16 125:16
**utilized**
79:15
**utilizing**
33:19 71:13 90:18
**Utrecht**
89:25

─── **V** ───

**v**
13:2,13,19 14:5
  117:13 131:7
**vaginal**
85:11,13
**vague**
119:16
**Van**
110:17
**variability**
88:15 89:9
**variable**
12:5
**variables**
116:20
**variety**
87:12
**vary**
72:25
**vein**
54:21 55:15,20
**versus**
6:10 14:11,23 15:9
  15:21,25 16:5,10
  25:8 26:9 27:3
  43:17 66:13,20
  68:15 84:13 92:15
  94:5 100:3 101:10
**Vice**
2:15

**video**
17:20 140:9
**videoconference**
2:21 3:5
**videographer**
3:4 6:5,7,19 7:5,9
  47:6,11 49:8,13
  53:22,25 54:4 93:7
  93:11 117:21,25
  139:11,13,16,25
  140:9
**videotape**
6:8
**videotaped**
1:14 140:2
**view**
22:25 77:14 106:18
**vision**
57:6
**visit**
86:13,24 87:3,8
  129:17
**Voe**
4:15,17 14:11,23
  15:9,21,25 25:8
  26:9 27:3 43:17
  66:13,20 68:15
  84:13
**vomiting**
56:15
**vs**
1:7 4:11,13,15,17,18
  5:8
**vulva**
85:10,12
**vulvovaginoplasty**
85:8

─── **W** ───

**W-e-l-l**
32:22
**W-o-r-r-i-e-d**
32:21
**walk**
104:7
**want**

43:25 44:17 48:25
  53:19 59:17,25 60:1
  76:21 91:25 92:13
  97:8 110:12 133:18
  138:1,4 140:12
**wanted**
9:14,19 59:18 128:5
**wanting**
60:3 123:11
**wants**
92:18
**Washington**
2:16
**wasn't**
53:18 98:25 133:3
**watch**
108:14
**way**
25:2 26:13,14,15,17
  33:11 85:23 95:18
  96:12 103:22
  112:23
**ways**
25:23 128:24
**we'll**
8:15 9:8 47:4,10
**we're**
12:5 45:1 49:10,14
  53:23 106:16 107:2
  108:12,13,15,15
  111:23 112:23
  117:24 119:25
  120:1 135:21
**we've**
58:7 67:3 77:21
  91:25 128:6
**wear**
35:8,9
**Webberley**
120:7,10 121:18
  122:4,25 123:4
**week**
118:20
**welcome**
49:17 93:15 139:24
**Welfare**

103:9
**well-accepted**
116:2
**went**
108:7 122:14
**West**
1:15
**whatsoever**
38:2
**WHEREOF**
142:16
**Wilson**
1:8 6:10
**wind-up**
77:25
**witness**
4:2 7:7 11:19 12:9,16
  13:10 14:19 15:5,17
  17:15,19 19:12 20:1
  20:10,17 21:3,11
  22:3,15,23 23:4,13
  25:1 26:13 27:21
  28:6,13,20 29:22
  30:12 31:2,8,16,21
  32:5 33:6 34:3,17
  34:24 36:14 37:1,23
  38:24 39:14,23 40:8
  40:18 41:7,19 42:1
  42:19 43:3,24 44:7
  44:12 45:22 46:7,13
  47:18 48:10,23 49:6
  49:24 50:24 51:17
  52:7,21 53:1,13,21
  54:3,18 55:9,17
  56:6,12,17,23 57:4
  57:9,21,25 59:14
  60:9,23 61:4,11
  62:2 63:8,14,19,25
  64:6 66:6,11 67:1
  67:12 69:21 70:6,18
  70:25 71:24 72:1
  75:7,24 76:10,14
  77:11,19 78:1,15
  79:3,9 80:7,17
  84:10 86:16 87:10
  88:5,22 89:17,23



91:4 92:10 93:2,5
96:23 99:11,21
101:7 104:23 105:4
107:12 108:1 109:7
111:4 114:9 115:14
116:22 121:8
124:12,20 125:21
127:22 130:14,19
130:22 132:23
133:12,18 135:16
136:7,10 137:14
138:9 139:6,24
142:8,16
**witnessed**
95:25
**word**
31:25 52:7 106:17,17
106:18 133:3,13,22
135:3
**words**
8:23 12:4 29:8 44:25
80:3 108:8
**work**
30:2 33:8 49:5 107:3
107:8 112:14
114:13 128:23
**worked**
135:25
**working**
81:23 125:9
**works**
49:4 78:2 105:21
122:22
**workup**
86:18 87:12
**world**
95:13 106:24 112:18
114:11
**worried**
32:14,20
**worth**
127:19
**would've**
62:13 87:11
**wouldn't**
97:12 110:12 128:11

**WPATH**
18:12 43:1,21 116:2
131:14 132:3,15,20
133:10,20 134:3,11
**written**
26:16,17 31:22 75:11
**wrong**
46:13 133:8
**wrote**
44:19 74:15,24
104:16 134:22
**www.MagnaLS.com**
1:21

---

**X**

**X**
125:24

---

**Y**

**yeah**
49:6 53:20,21 83:8
95:25 98:13 115:21
124:2 133:2
**year**
84:19,23 85:4,4,5
**years**
33:8,12,17 71:13
75:7,9,20 80:23,24
87:19 88:2 111:24
113:24 114:1,2,7
137:14
**York**
2:5,5,11,11 5:4 95:4
95:5,25 97:25 118:5
119:6
**young**
32:17 35:4,5 61:1,7
64:17 77:4 122:23
**younger**
10:12 76:25 81:18
**youth**
10:12 18:9,24 64:14
72:7 73:1,2,17
74:21 75:11 77:2
108:4 115:1

---

**Z**

**Zealand**
42:25 43:4,20
**zero**
102:9
**Zoom**
2:21 3:5 7:5,21 53:17

---

**0**

**01**
72:5

---

**1**

**1**
4:10 6:8 9:10,11,23
12:25 93:20 103:2
115:23 131:25
**1:05**
117:21
**1:06**
118:1
**1:30**
139:13
**1:31**
1:16 6:3 140:4
**1:32**
139:17
**10**
4:23 45:9,24 48:5
71:17,18 83:1
**10:36**
47:6
**10:37**
47:11
**10:39**
49:8
**10:52**
49:14
**10:58**
53:22
**10004**
2:5
**101**
5:3 137:4
**10104**
2:11

**11**
5:3 101:18,19,23
121:20 122:2
**11:03**
54:4
**11:51**
93:7
**11549**
2:21
**116**
5:4
**12**
5:4 68:17 116:23,24
117:3 118:5 131:9
**12:34**
93:12
**121**
5:6
**1213502**
1:25
**125**
2:5
**1290**
2:10
**13**
4:11,12 5:6 27:11
75:9 121:5,6,11
**130**
5:7
**1313**
1:15
**13th**
142:17
**14**
4:14 5:7 27:13
130:16,17 131:3
**15**
4:16,18 71:13
**151**
68:16,17 69:3
**152**
68:18,22 69:13
**1523**
2:16
**163**
72:13



**18**
13:1 18:9,24 33:8,12
33:17 84:20 96:3,3
100:11 102:9
111:12
**18s**
47:24
**1989**
76:21
**1991**
70:12 75:10 77:3

---
**2**
---
**2**
4:11 13:7,8 54:11
**2:24-cv-04734-BHH**
1:7
**2:24-cv-4734[sic]-...**
6:13
**20**
93:19 141:12
**200**
1:15
**20036**
2:16
**2006**
70:10 71:7 75:17
77:22
**2007**
69:25 75:13 76:19
77:22
**2011**
73:21
**2014**
4:23 72:10 75:11
**2015**
20:14,25
**202**
2:17,17
**2022**
103:9
**2024**
1:16 6:2,14 23:17
141:7 142:17
**21**
103:16

**212.390.9000**
2:11
**212.390.9399**
2:12
**212.549.2500**
2:6
**22**
69:3
**220-9600**
2:17
**220-9601**
2:17
**23**
4:19
**23-477**
16:5,11
**233**
73:3
**24**
100:20
**25**
80:24 81:5 87:19,24
88:2
**28**
18:1
**29211**
2:22

---
**3**
---
**3**
4:12 13:23,24 14:3
45:3 61:18 68:22
69:13 82:23 104:5
**3024**
1:17,24 142:21
**32**
131:25
**34**
115:25

---
**4**
---
**4**
4:14 13:1 14:16,17
27:2 59:17,23 68:14
73:9 94:15
**46**

4:21
**49**
4:22

---
**5**
---
**5**
4:16 15:2,3,8 45:2
52:2 68:18 73:9
103:2
**50**
20:13,14,22
**50/50**
21:1
**512**
30:21
**516**
24:7

---
**6**
---
**6**
4:18 15:14,15 16:3
17:25 44:15 48:4
52:17 53:9 54:11
93:18 100:10
103:14
**62**
27:4,5

---
**7**
---
**7**
1:16 4:19 6:2 23:20
23:21,25 30:19 56:1
56:2 141:7
**71**
4:23
**7th**
6:14

---
**8**
---
**8**
4:4,21 27:8 43:1,21
46:10,11,17 47:15
56:25 83:1,8 134:11
135:2
**80**
114:2,6

**803-734-4127**
2:22
**866-624-6221**
1:20

---
**9**
---
**9**
4:10,22 44:16 45:8
48:6 49:21,22 50:3
54:8 57:12 58:10,10
83:8 115:24 131:25
**9:43**
1:16 6:3,15
**90**
81:8 83:11 84:5
114:1,2,7
**90017**
1:15 6:17
**95**
81:8