# IDRX 9 -

# Antommaria *Misanin* Deposition Transcript

## (Public document)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION


STERLING MISANIN, on his      :
own behalf and on behalf of   :
those similarly situated,     :
et al.,                       :
                              :
            Plaintiffs,       :
                              :
        v.                    :   Case No.
                              :   2:24-cv-04734-BHH
ALAN WILSON, in his           :
official capacity as          :
Attorney General of           :
South Carolina, et al.,       :
                              :
            Defendants.       :


- - - - -

VIDEOTAPED DEPOSITION OF ARMAND ANTOMMARIA, M.D.

- - - - -

Taken at Mt. Auburn Presbyterian Church
103 William Howard Taft Road
Cincinnati, Ohio 45219

October 22, 2024, 9:01 a.m.
Reported By:   Susan M. Gee, RMR, CRR


- - - - -

Magna Legal Services

866-624-6221

www.MagnaLS.com

- - - - -

```
1            R E M O T E   A P P E A R A N C E S
2
   On behalf of the Plaintiffs:
3
   SELENDY GAY PLLC
4  BY:  ZACHARY SMITH, ESQUIRE
       1290 Avenue of the Americas
5      New York, New York  10104
       212.390.9000
6      zsmiht@selendygay.com
7
   AMERICAN CIVIL LIBERTIES UNION
8  BY:  SRUTI SWAMINATHAN, ESQUIRE
       125 Broad Street, Floor 18
9      New York, New York  10004
       212.549.2500
10     sswwaminathan@aclu.org
11
   On behalf of Defendants:
12
   COOPER & KIRK PLLC
13 BY:  JOHN D. RAMER, ESQUIRE
       1523 New Hampshire Avenue, N.W.
14     Washington, D.C.  20036
       202.220.9621
15     jramer@cooperkirk.com
16
17 ALSO PRESENT:  Jeff Sindiong, Videographer
18
19
20
21
22
23
24
25
```

```
1                   EXHIBITS
2  EXHIBIT       DESCRIPTION       MARKED
3  Exhibit 10   Deposition of Armand Antommaria,  13
              M.D., taken 9/5/24 in the Voe
4             v. Mansfield case
5  Exhibit 11   Errata sheet of Armand         13
              Antommaria, M.D., for the
6             Voe v. Mansfield case
7  Exhibit 12   Project Muse, "Decision-making  45
              for Adolescents with Gender
8             Dysphoria"
9  Exhibit 13   Article "Endocrine Treatment of  74
              Gender-Dysphoric/Gender-Incongruent
10            Persons:  An Endocrine Society
              Clinical Practice Guideline"
11
   Exhibit 14   Excerpt from International Journal  79
12            of Transgender Health, Chapter 6,
              Adolescents
13
   Exhibit 15   Journal of Clinical Epidemiology  85
14            "GRADE guidelines:  3.  Rating the
              quality of evidence"
15
   Exhibit 16   Journal of Clinical Epidemiology  101
16            "GRADE guidelines: 15.  Going from
              evidence to recommendation -
17            determinants of a recommendation's
              direction and strength"
18
   Exhibit 17   Excerpt from International Journal  108
19            of Transgender Health, Appendix A,
              Methodology
20
21                   - - -
22
23
24
25
```

```
1                   I N D E X
2                   - - -
3  WITNESS                          PAGE
4  ARMAND ANTOMMARIA, M.D.
5  Cross-Examination by Mr. Ramer     8
6
7                   EXHIBITS
8  EXHIBIT       DESCRIPTION       MARKED
9  Exhibit 1    Expert Declaration of Armand     7
              Antommaria, M.D.
10
   Exhibit 2    Deposition of Armand Antommaria,  8
11            M.D. in the Boe v. Marshall case
12 Exhibit 3    Errata for Deposition of         9
              Armand Antommaria, M.D. in the
13            Boe v. Marshall case
14 Exhibit 4    Excerpt of Transcript of         9
              Preliminary Injunction Hearing
15            Volume II 5/6/22
16 Exhibit 5    Expert Report of Armand          10
              Antommaria, M.D., in the Brandt
17            v. Rutledge case
18 Exhibit 6    Excerpt of Transcript of Bench    10
              Trial Volume 2, in the Brandt v.
19            Rutledge case
20 Exhibit 7    Excerpt of Transcript of Bench    11
              Trial in the Dekker v. Weida case
21
   Exhibit 8    Transcript of the Remote Video   12
22            Deposition of Armand Antommaria,
              M.D. taken 6/18/24 in the Noe case
23
   Exhibit 9    Errata of Armand Antommaria, M.D.  12
24            in the Noe v. Parson case
25
```

```
1        VIDEOGRAPHER:  We are now on the
2  record.  This begins the video deposition of
3  Dr. Armand Antommaria in the matter of
4  Sterling Misanin, et al., versus Alan Wilson,
5  et al., in the United States District Court
6  for the District of South Carolina, Charleston
7  Division.
8        Today is Tuesday, October 22nd, 2024,
9  and the time on the screen is 9:01 a.m.  This
10 deposition is being taken at Mt. Auburn
11 Presbyterian Church, Cincinnati, Ohio, at the
12 request of Cooper & Kirk, PLC.  The
13 videographer is Jeff Sindiong of Magna Legal
14 Services, and the court reporter is Sue Gee of
15 Magna Legal Services.
16       Will counsel and all parties present
17 state their appearances and whom they
18 represent?
19       MR. RAMER:  John Ramer of Cooper & Kirk
20 on behalf of defendants.
21       MR. SMITH:  This is Zachary Smith with
22 Selendy Gay on behalf of plaintiffs.
23       MR. SWAMINATHAN:  This is Sruti
24 Swaminathan with the ACLU on behalf of
25 plaintiffs.
```



1    VIDEOGRAPHER:  Anybody online?  The
2  court reporter will swear in the witness, and
3  we may continue.
4    ARMAND ANTOMMARIA, M.D.
5  of lawful age, a witness herein, being first duly
6  sworn as hereinafter certified, was examined and
7  deposed as follows:
8    CROSS-EXAMINATION
9  BY MR. RAMER:
10    Q.  Good morning.
11    MR. SMITH:  Sorry to interrupt,
12  Counsel.  Before we get started, I wanted to
13  note for the record, the parties have yet to
14  reach an agreement as to whether the time
15  spent with Dr. Antommaria will be taken from
16  the total seven hours that defendant have with
17  the witness, noting that plaintiffs' position
18  is that it will, and defendants' position is
19  that it will not.
20    MR. RAMER:  And, yes, defendants agree
21  with your summary of the current agreement.
22  BY MR. RAMER:
23    Q.  Good morning, Dr. Antommaria.
24    A.  Good morning.
25    Q.  And, Doctor, I know you've been deposed

1  several times before, so this will be the usual drill,
2  but under the local rules, I'm supposed to instruct
3  you that you should ask me rather than your own
4  counsel for clarifications, definitions, or
5  explanations of any words, questions or documents
6  presented during the course of the deposition.  Does
7  that make sense?
8    A.  Yes, it does.
9    Q.  And I'm going to aim for breaks roughly
10  on the hour.  If at any time you need a break, please
11  just let me know.  My only question -- or my only
12  request would be that you answer any pending questions
13  before we take that break.  Does that make sense?
14    A.  Yes, it does.
15    (Exhibit 1 was marked for
16    identification.)
17  BY MR. RAMER:
18    Q.  Dr. Antommaria, is this the declaration
19  that you've submitted in this case?
20    A.  Yes, it is.
21    Q.  Apart from any updates to appearances
22  or depositions with respect to litigation, are there
23  any corrections or updates to this declaration?
24    A.  So you'd have to help me understand
25  what you mean.  Do you mean specifically to my

1  curriculum vitae or to the text of the declaration,
2  sir?
3    Q.  Are there any changes to either of
4  those?
5    A.  So there are minor changes, updates to
6  my curriculum vitae in terms of some of my
7  professional activities not related to my depositions,
8  and there are no, there are no -- there have been no
9  changes, corrections to my declaration.
10    Q.  Have there been any additional
11  publications that you've published since the filing of
12  this on October -- excuse me, August 30?
13    A.  One moment, please.  So, no, there are
14  no new peer-reviewed publications since this was
15  filed, sir.
16    Q.  And sticking with Exhibit 1, I'd like
17  to go to page 5 and paragraph 19 at the bottom.
18    A.  Yes, sir.
19    Q.  And there, you list your participation
20  in the case Boe v. Marshall; is that correct?
21    A.  That is correct.
22    (Exhibit 2 was marked for
23    identification.)
24  BY MR. RAMER:
25    Q.  Doctor, does this appear to be a

1  transcript of your deposition in Boe versus Marshall?
2    A.  One moment, please.  It appears to be a
3  copy of my deposition absent the erratum that was
4  submitted.
5    (Exhibit 3 was marked for
6    identification.)
7  BY MR. RAMER:
8    Q.  And, Doctor, you've been handed what's
9  been marked as Exhibit 3.  Does this appear to be the
10  errata for your deposition in Boe versus Marshall?
11    A.  It does, sir.
12    Q.  And did you give truthful testimony
13  during your deposition in Boe versus Marshall?
14    A.  I did, sir.
15    Q.  You also testified at the preliminary
16  injunction hearing in that case, correct?
17    A.  Yes, sir.
18    (Exhibit 4 was marked for
19    identification.)
20  BY MR. RAMER:
21    Q.  And, Doctor, you've been handed what's
22  been marked as Exhibit 4.  Does this appear to be a
23  transcript excerpt of your testimony from that
24  hearing?
25    A.  One moment, sir.  Yes, sir.  It appears

3  (Pages 6 to 9)

1    to be.
2        Q.    And did you give truthful testimony at
3    that hearing?
4        A.    Yes, sir, I did.
5        Q.    And returning to Exhibit 1, your
6    declaration, sticking with page 5, paragraph 19, you
7    also list Brandt v. Griffin, correct?
8        A.    That's correct, sir.
9              (Exhibit 5 was marked for
10             identification.)
11   BY MR. RAMER:
12       Q.    You've been handed what's been marked
13   as Exhibit 5.  Does this appear to be a copy of a
14   report you submitted in that case?
15       A.    It does appear to be one of the reports
16   that I submitted in that case, sir.
17       Q.    And you testified at trial in that
18   case, correct?
19       A.    I did, sir.
20             (Exhibit 6 was marked for
21             identification.)
22   BY MR. RAMER:
23       Q.    You've been handed what's been marked
24   as Exhibit 6.  Does this appear to be a transcript,
25   excerpt of your testimony at the trial in Brandt?

1        A.    It does, sir.
2        Q.    Did you give truthful testimony at the
3    Brandt trial?
4        A.    Yes, sir, I did.
5        Q.    Returning to Exhibit 1, which is your
6    declaration in this case, I'm going now to page 6, the
7    carryover paragraph.  You list the Dekker,
8    D-e-k-k-e-r, case, correct?
9        A.    I do, sir.
10       Q.    And you testified at trial in Dekker,
11   correct?
12       A.    That's correct, sir.
13             (Exhibit 7 was marked for
14             identification.)
15   BY MR. RAMER:
16       Q.    Doctor, you've been handed what's been
17   marked as Exhibit 7.  Does this appear to be a
18   transcript, excerpt of your testimony at the trial in
19   Dekker?
20       A.    There's not a table of contents for
21   this, as there was for the others, sir.
22       Q.    Okay.  Does this appear to be a
23   transcript, excerpt of your testimony at the trial in
24   Dekker?
25       A.    I'm asking the other documents that

1    you've previously handed me had a table of contents.
2    It would have made it easier to verify what they were.
3    This one doesn't have that, sir.
4        Q.    Does it appear to be a transcript,
5    excerpt of your testimony at the trial in Dekker?
6        A.    That's what it appears to be, sir.
7        Q.    And returning to Exhibit 1, your
8    declaration, page 6, you also list Noe versus Parson,
9    correct?
10       A.    That's correct, sir.
11             (Exhibit 8 was marked for
12             identification.)
13   BY MR. RAMER:
14       Q.    Doctor, you've been handed what's been
15   marked as Exhibit 8.  Does this appear to be a copy of
16   the deposition transcript from Noe versus Parson?
17       A.    Yes, sir, again excluding the errata.
18             (Exhibit 9 was marked for
19             identification.)
20   BY MR. RAMER:
21       Q.    Doctor, you've been handed what's been
22   marked as Exhibit 9.  Does this appear to be the
23   errata sheet for your deposition in Noe versus Parson?
24       A.    Yes, sir.  It appears to be the
25   multiple errata sheets for that deposition.

1        Q.    I may have forgotten to ask this.  Did
2    you give truthful testimony at the Dekker trial?
3        A.    Yes, sir, I did.
4        Q.    And did you give truthful testimony
5    during your deposition in Noe versus Parson?
6        A.    Yes, sir, I did.
7        Q.    And you have also been deposed in Voe
8    versus Mansfield, correct?
9        A.    Sir, that's the case for North
10   Carolina?
11       Q.    Yes.
12       A.    Thank you.  Yes, sir, I have.
13             (Exhibit 10 was marked for
14             identification.)
15   BY MR. RAMER:
16       Q.    Doctor, you've been handed what's been
17   marked as Exhibit 10.  Does this appear to be a copy
18   of your deposition transcript from Voe versus
19   Mansfield?
20       A.    Yes, sir, it does.
21             (Exhibit 11 was marked for
22             identification.)
23   BY MR. RAMER:
24       Q.    Doctor, you've been handed what's been
25   marked as Exhibit 11.  Does this appear to be a copy

MAGNA
LEGAL SERVICES

1 of your errata sheet for your deposition in Voe versus
2 Mansfield?
3     A.    Yes, sir, it does.
4     Q.    And did you give truthful testimony
5 during your deposition in Voe versus Mansfield?
6     A.    Yes, I did.
7     Q.    Okay. Dr. Antommaria, what did you do
8 to prepare for your deposition today?
9     A.    To prepare for my deposition today, I
10 had a previous meeting with the lawyers who are
11 currently present, and I reviewed relevant material,
12 including my report.
13     Q.    Was there anyone in the meeting other
14 than the two lawyers for plaintiffs who are in the
15 room today?
16     A.    No, sir, there was not.
17     Q.    And how many times did you meet with
18 them?
19     A.    I met with them on one occasion, sir.
20     Q.    And how long was that meeting?
21     A.    Two hours, sir.
22     Q.    And when did that meeting take place?
23     A.    It occurred yesterday, sir.
24     Q.    Did you read any documents to prepare
25 for the deposition?

1     A.    I believe I stated, sir, that I
2 reviewed my report.
3     Q.    By your "report," do you mean your
4 declaration, Exhibit 1?
5     A.    Yes, my Exhibit 1, sir.
6     Q.    And did you review any other documents
7 other than your declaration?
8     A.    So by "documents," you mean, sir?
9     Q.    What's your understanding of the word
10 "document"?
11     A.    In some contexts, a document would be a
12 printed paper, sir.
13     Q.    Did you review any printed papers in
14 preparation for your deposition today?
15     A.    No, sir, I did not.
16     Q.    Did you review any electronic documents
17 in preparation for your deposition today?
18     MR. SMITH: Objection to form.
19     A.    I did not review -- in addition to my
20 declaration, I reviewed -- so, again, what a document
21 is is somewhat confusing to me, but I reviewed the
22 statute at issue, sir.
23 BY MR. RAMER:
24     Q.    Did you read anything else in
25 preparation for your deposition today?

1     A.    So I did several Internet searches to
2 determine whether there were updates related to
3 relevant information such whether there was any
4 further information related to a clinical trial for
5 GrNH analogues in the United Kingdom, sir.
6     Q.    And did you find any updates?
7     A.    No, sir.
8     MR. SMITH: Objection to form.
9     A.    No, sir, I did not.
10 BY MR. RAMER:
11     Q.    Do you know Dr. Daniel Shumer?
12     A.    I believe I've met Dr. Shumer on
13 occasions. So, yes, I've met him on several
14 occasions.
15     Q.    When was the last time you spoke to
16 him?
17     A.    I don't recall, sir.
18     Q.    Was it within the last month?
19     A.    I don't know, sir.
20     Q.    Have you spoken with Dr. Schumer within
21 the last week?
22     A.    No, sir, I have not.
23     Q.    Dr. Antommaria, you are not a
24 psychiatrist, correct?
25     A.    I am not board certified in psychiatry,

1 sir.
2     Q.    In your deposition in Noe versus
3 Parson, when you were asked, you are not a
4 psychiatrist, you answered correct. Right?
5     A.    I would have to refer to the
6 transcript, sir.
7     Q.    Let's go to Exhibit 8. Go to page 19.
8     A.    I'm sorry, sir. When you refer to page
9 19, the quarter-size page 19?
10     Q.    That's correct.
11     A.    I'm there, sir.
12     Q.    And line 11 through 13, you're asked,
13 "You're not a psychiatrist?" And your answer was,
14 "Correct." Right?
15     A.    You read that correctly, sir.
16     Q.    And you are not a psychologist,
17 correct?
18     A.    Are you again reading from the
19 transcript or are you asking an independent question,
20 sir?
21     Q.    No. I'm asking you. You're not a
22 psychologist, correct?
23     A.    That would be correct, sir.
24     Q.    And you're not a neuroscientist,
25 correct?



1          A.    I do not have a current degree in
2    neuroscience, sir.
3          Q.    And you are not an expert in cognition
4    or the study of cognitive development, correct?
5                MR. SMITH:  Objection to form.
6          A.    No, sir, I am not, although I have
7    knowledge related to aspects of cognition and
8    cognitive development as it relates to the field of
9    bioethics, sir.
10   BY MR. RAMER:
11         Q.    You are not an endocrinologist,
12   correct?
13         A.    I'm not board certified in the practice
14   of endocrinology, sir.
15         Q.    Is that your understanding of what it
16   means to be an endocrinologist?
17         A.    I think that that's one of the
18   potential understandings of what it means to be an
19   endocrinologist, sir.
20         Q.    And is that your understanding?
21         A.    I think that that's the common
22   understanding within the medical practice, sir.
23         Q.    This year, you published your first
24   peer-reviewed publication relating to transgender
25   medicine, correct?

1          A.    I believe that that's an accurate
2    characterization.  I have other publications related
3    to gender-affirming medical care, but those are not
4    peer-reviewed publications, sir.
5          Q.    By the time you published that first
6    peer-reviewed publication relating to transgender
7    medicine, you had already served as an expert witness
8    in multiple cases involving legislative bans on
9    gender-affirming care, correct?
10               MR. SMITH:  Objection to form.
11         A.    So, sir, I have significant experience
12   related to ethical issues related to gender-affirming
13   medical care.  My emphasis is as a bioethicist and
14   have previous publications related to gender-affirming
15   medical care prior to my service as an expert witness
16   but it is correct to say that my initial peer-reviewed
17   publication on the topic occurred after having
18   initially served as an expert witness, sir.
19   BY MR. RAMER:
20         Q.    Doctor, you have not been an
21   investigator in any study of the safety or efficacy of
22   any hormonal interventions as a treatment for gender
23   dysphoria, correct?
24               MR. SMITH:  Objection to form.
25         A.    So I believe that my expertise is

1    related to bioethics, and in that role, no, sir, I
2    have not been a principal investigator in a clinical
3    study related to the gender-affirming medical care.
4    BY MR. RAMER:
5          Q.    As part of your professional duties,
6    you have no role in diagnosing gender dysphoria,
7    correct?
8                MR. SMITH:  Objection to form.
9          A.    I would say that I believe that that's
10   not an apt characterization, sir.
11               MR. SMITH:  I'm not sure I heard your
12         answer.  Could you repeat it?
13         A.    I don't believe that that's an apt
14   characterization of my role as a pediatric
15   hospitalist, sir.
16   BY MR. RAMER:
17         Q.    Do you diagnose gender dysphoria in
18   patients?
19               MR. SMITH:  Objection to form.
20         A.    So I do not provide the initial
21   clinical diagnosis of gender dysphoria for individuals
22   with the condition, sir.
23   BY MR. RAMER:
24         Q.    And you do not actually treat patients
25   for gender dysphoria, correct?

1                MR. SMITH:  Objection to form.
2          A.    So in my role as a pediatric
3    hospitalist, I have admitted and cared for individuals
4    with gender dysphoria, sir.
5    BY MR. RAMER:
6          Q.    You do not treat patients for gender
7    dysphoria, correct?
8                MR. SMITH:  Objection to form.
9          A.    So, sir, as those individuals are
10   admitted to the hospital and potentially receiving
11   concurrent care for their gender dysphoria as well as
12   the clinical indications that caused them to be
13   admitted to a pediatric hospitalist service, there are
14   ways in which I continue to provide their care for
15   gender dysphoria.
16   BY MR. RAMER:
17         Q.    At trial in the Brandt case, you
18   testified that although you treat patients with gender
19   dysphoria, you do not treat them for gender dysphoria,
20   correct?
21         A.    Would you please indicate where that
22   is, sir?
23         Q.    I'm asking, first of all, did you say
24   that at trial in Brandt?
25         A.    I don't recall, sir.



1     Q.   Let's go to Exhibit 5. I'm sorry.
2 We'll go to Exhibit 6. We'll go to the page that has
3 411 at the top, and in lines 1 through 4, you state,
4 "So I do treat patients with gender dysphoria in my
5 clinical practice, as they present with other medical
6 conditions, but I do not treat them for gender
7 dysphoria per se." Correct?
8     A.   You read that correctly, sir, but if
9 you would continue on, it says, "So if a patient was
10 admitted to the hospital who was currently on
11 medication, I would continue it during their
12 hospitalization." And so I would take it in part that
13 is treating their gender dysphoria.
14     Q.   Then let's continue on to the next
15 page, 412. We'll go to line 6. And there, you said,
16 "So as a pediatrician, I don't treat patients for
17 gender dysphoria per se." Correct?
18     A.   You read that correctly, sir. Again,
19 there are other qualifications to that statement I'll
20 swear in the testimony, sir.
21     Q.   You do not provide clinical care at the
22 Transgender Health Clinic at Cincinnati Children's
23 Hospital, correct?
24     MR. SMITH: Objection to form.
25     A.   And by "clinical care," may I ask what

1 you mean, sir?
2 BY MR. RAMER:
3     Q.   What's your understanding of the phrase
4 "clinical care."
5     A.   Again, there are a variety of different
6 constructions that one could give to a term. One
7 possible construction would be to be a faculty or
8 staff member in regular attendance in the clinic who
9 provides ongoing care for patients seen in the clinic.
10     Q.   If you used the phrase "clinical care,"
11 what would you mean by that?
12     A.   It would depend on the context in which
13 I used the phrase, sir.
14     Q.   In your deposition in Noe versus
15 Parson, you stated that you do not provide -- excuse
16 me. You stated that you do not provide clinical care
17 in the Transgender Health Clinic at Cincinnati
18 Children's Hospital, correct?
19     A.   I don't recall, sir.
20     Q.   Let's go to Exhibit 8, and go to page
21 100 of the small pages. I'd like to go to line 11.
22 Starting there, you're asked whether there's "any
23 requirement in that center that clinicians include
24 that a person's identity is of a permanent nature
25 before they provide gender-transition interventions."

1 And you answer, "So, sir, I think it's difficult for
2 me to state what occurs in the clinic, because I don't
3 provide clinical care in the clinic." Is that
4 correct?
5     A.   You read that correctly, sir. So in
6 this context, clinical care would be providing --
7 being an individual who is assigned to the clinic and
8 provides ongoing care for patients within the clinic.
9 In other contexts, my role as an ethics consultant in
10 providing intermittent consultation within the clinic
11 might be understood to be a form of clinical care,
12 hence my ask, my request that you clarify how you
13 meant the term.
14     Q.   And using the understanding of clinical
15 care that you first described just now, you do not
16 provide clinical care at the Transgender Health Clinic
17 at Cincinnati Children's Hospital, correct?
18     MR. SMITH: Objection to form.
19     A.   So I'm not a faculty member assigned to
20 the clinic who provides ongoing continuity of care for
21 patients seen in the clinic, sir.
22 BY MR. RAMER:
23     Q.   Using the understanding of clinical
24 care that you were using during your deposition in Noe
25 versus Parson, you do not provide clinical care at the

1 Transgender Health Clinic at Cincinnati Children's
2 Hospital, correct?
3     MR. SMITH: Objection to form.
4     A.   Correct, sir.
5 BY MR. RAMER:
6     Q.   You do not make a determination whether
7 any particular patient should receive puberty blockers
8 as a treatment for gender dysphoria, correct?
9     MR. SMITH: Objection to form.
10     A.   Can you repeat your question, sir?
11 BY MR. RAMER:
12     Q.   You do not make a determination whether
13 any particular patient should receive puberty blockers
14 as a treatment for gender dysphoria, correct?
15     MR. SMITH: Same objection.
16     A.   As a general claim, I think that that's
17 an accurate statement, sir.
18 BY MR. RAMER:
19     Q.   Is there a more specific sense in which
20 that statement would not be accurate?
21     MR. SMITH: Objection to form.
22     A.   So, again, in my role as a clinical
23 ethics consultant, there might be situations in which
24 I'm consulted and would address ethical issues related
25 to the use of GnRH analogues, which might influence



1 whether or not they are prescribed. But as a
2 pediatric bioethicist, I do not make the initial
3 determination as to whether an individual should be
4 treated with gender -- with GnRH analogues.
5 BY MR. RAMER:
6      Q.    And you do not make an initial
7 determination whether any particular patient should
8 receive cross-sex hormones as a treatment for gender
9 dysphoria, correct?
10          MR. SMITH:  Objection to form.
11      A.    Again, with this and other
12 qualifications, sir, I think that that's an accurate
13 general claim.
14 BY MR. RAMER:
15      Q.    And you do not make an initial
16 determination whether any particular patient should
17 receive surgery as a treatment for gender dysphoria,
18 correct?
19          MR. SMITH:  Objection to form.
20      A.    Again, with the same qualifications,
21 sir, I think that that is generally an accurate claim.
22 BY MR. RAMER:
23      Q.    Excluding expert witness work, only
24 about 3 to 5 percent of your professional time is
25 committed to issues relating to gender-affirming care,

1 correct?
2          MR. SMITH:  Objection to form.
3      A.    So I think it is difficult to qualify
4 what percentage of my time is spent on those topics
5 during the time period in which I was writing the
6 peer-reviewed manuscript to which you previously
7 referred. A significant amount of my professional
8 time was spent on related issues related to
9 gender-affirming medical care, so it would depend on
10 the time frame to which you're referring, sir.
11 BY MR. RAMER:
12      Q.    In your deposition in Noe versus
13 Parson, when you were asked what percent of your job
14 duties are related to provision of what you call
15 gender-affirming care, you answered that it would be
16 maybe 3 to 5 percent of your time, correct?
17      A.    I don't recall, sir.
18      Q.    If you did say that, would that be
19 wrong?
20      A.    I think it may be an accurate
21 reflection of the amount of time that I was spending
22 at that particular point in time, sir. It varies over
23 time. Say, in particular, recently with the
24 implementation of Ohio's ban, a considerable -- a
25 greater amount of my time was spent on these issues

1 not related to my expert witness work but related to
2 my role as an employee at Cincinnati Children's. So,
3 again, it varies over time, sir.
4      Q.    And you consult on ethical issues
5 related to gender dysphoria for roughly two or three
6 patients a year; is that right?
7          MR. SMITH:  Objection to form.
8      A.    If, by "consult," you mean conduct a
9 formal clinical ethics consultation, the number of
10 consultations that I receive in a given year varies,
11 but that would be a generally accurate number.
12 BY MR. RAMER:
13      Q.    Are you familiar with the phrase
14 "transgender identity"?
15          MR. SMITH:  Objection to form.
16      A.    I'm more generally familiar with the
17 term "gender identity," sir.
18 BY MR. RAMER:
19      Q.    What does it mean to be transgender?
20          MR. SMITH:  Objection to form.
21      A.    In the broadest sense, it would be
22 having a gender identity that differed from one's sex
23 assigned at birth, sir.
24 BY MR. RAMER:
25      Q.    Have you heard the term "gender

1 incongruence"?
2          MR. SMITH:  Objection to form.
3      A.    Yes, sir, I have.
4 BY MR. RAMER:
5      Q.    What is your understanding of that
6 term?
7      A.    My understanding of the term or one of
8 my understandings of the term, sir, is that it's a
9 code within the -- I'm going to forget the
10 abbreviation momentarily, but of the gnoseology of
11 diagnoses promulgated by the World Health
12 Organization, sir.
13      Q.    Are you thinking of the ICD?
14      A.    Yes, sir. Thank you.
15      Q.    Not all individuals who are transgender
16 experience gender dysphoria, correct?
17      A.    That is correct, sir.
18      Q.    And not all individuals who experience
19 gender incongruence experience gender dysphoria,
20 correct?
21      A.    So gender dysphoria is a specific
22 diagnosis within the Diagnostic and Statistical
23 Manual, and it would be correct that all individuals
24 with gender incongruence do not necessarily experience
25 gender dysphoria.

8  (Pages 26 to 29)



1       Q.      There is no lab test or blood test for
2   gender dysphoria, correct?
3               MR. SMITH:  Objection to form.
4       A.      As there are no lab tests or blood
5   tests for many medical diagnoses, that is correct.
6   There is no lab test or blood test for gender
7   dysphoria, sir.
8   BY MR. RAMER:
9       Q.      You agree that in the last 15 years,
10  there has been an increase in the number of
11  adolescents in the United States presenting for
12  gender-affirming care, correct?
13              MR. SMITH:  Objection to form.
14      A.      It would be my understanding that in
15  the last several decades, the number of individuals
16  who've presented to health care institutions for
17  concerns related to gender dysphoria has increased,
18  sir.
19  BY MR. RAMER:
20      Q.      And do you agree that we do not fully
21  understand what has caused that increase?
22              MR. SMITH:  Objection to form.
23      A.      So, again, sir, the epidemiology of
24  many medical conditions changes over time, as there
25  has been a significant increase in the number of

1   individuals who have been diagnosed with autism in the
2   last several decades.  Yes, there's been an increase
3   in the number of individuals who've been diagnosed
4   with gender dysphoria.  There are some explanations
5   for that increase, but a comprehensive view of the
6   explanations or a comprehensive set of explanations
7   doesn't currently exist.
8   BY MR. RAMER:
9       Q.      Do you agree there has been a shift in
10  the epidemiology of adolescents diagnosed with gender
11  dysphoria from a majority of natal males to a majority
12  of natal females?
13              MR. SMITH:  Objection to form.
14      A.      So although I would not use the
15  terminology of natal males and natal females, I
16  believe that that's an accurate characterization of
17  the current epidemiology, sir.
18  BY MR. RAMER:
19      Q.      And do you agree that we do not fully
20  understand what has caused that shift?
21              MR. SMITH:  Objection to form.
22      A.      So, again, similar to the situation
23  with the increase in diagnoses of autism, it is not
24  uncommon to have incomplete explanations for changes
25  in epidemiology, and, yes, I believe it's accurate to

1   state that out of the four reasons for the changes in
2   what the literature might refer to as the sex ratio of
3   individuals diagnosed with gender dysphoria is not
4   fully known.
5   BY MR. RAMER:
6       Q.      You agree that social and cultural
7   factors contribute to gender incongruence, correct?
8               MR. SMITH:  Objection to form.
9       A.      Can you repeat your question, sir?
10  BY MR. RAMER:
11      Q.      You agree that social and cultural
12  factors contribute to gender incongruence, correct?
13              MR. SMITH:  Same objection.
14      A.      So I believe that the contributors to
15  gender incongruence are multifactorial and include
16  biological and potentially environmental factors.  So,
17  yes, there are social and cultural factors that
18  influence the diagnosis of gender incongruence,
19  including the availability of sites that can provide
20  the diagnosis.
21  BY MR. RAMER:
22      Q.      Can you explain what you mean by sites
23  available?  I'm not sure I understood that.
24      A.      One might have gender incongruence but
25  not have access to medical care in a way that allows

1   that diagnosis to be provided, so one of the potential
2   social or cultural factors is the availability of
3   health care to provide that diagnosis, sir.
4       Q.      How does the availability affect the
5   gender incongruence?
6               MR. SMITH:  Objection to form.
7       A.      Gender incongruence, sir, as we've
8   previously been discussing, is a medical diagnosis in
9   the ICD-9, so without a health care provider to
10  provide that diagnosis, it doesn't exist, sir.
11  BY MR. RAMER:
12      Q.      Do you think a person could have
13  undiagnosed gender incongruence?
14              MR. SMITH:  Objection to form.
15      A.      I think that an individual could have a
16  transgender identity as you've previously utilized the
17  term, sir, without having a medical diagnosis of
18  gender incongruence.
19  BY MR. RAMER:
20      Q.      Do you think a person could have
21  undiagnosed gender dysphoria?
22              MR. SMITH:  Objection to form.
23      A.      Yes, in the same way that someone could
24  have the symptoms of major depressive disorder but
25  never received a formal clinical diagnosis of major

MAGNA ▶
LEGAL SERVICES

1  depressive disorder. I think that an individual could
2  have the symptoms that would fulfill the diagnostic
3  criteria of gender dysphoria without having received
4  the medical diagnosis of gender dysphoria by a health
5  care provider, sir.
6  BY MR. RAMER:
7      Q.   And so if that's true, then, the
8  availability of care does not actually contribute to
9  whether somebody does or does not have gender
10 dysphoria, correct?
11         MR. SMITH: Objection to form.
12     A.   So having gender dysphoria, sir, I
13 think, is having the medical diagnosis of gender
14 dysphoria. So unless a provider gives that diagnosis,
15 I think there are ways in which they don't have gender
16 dysphoria, sir. One might describe it as having the
17 symptoms of gender dysphoria, but they've never
18 received the formal diagnosis, sir.
19 BY MR. RAMER:
20     Q.   So then a person cannot have
21 undiagnosed gender dysphoria?
22         MR. SMITH: Objection to form.
23     A.   So, again, I think that it is a -- so,
24 yes, as I think I've said, that they may have symptoms
25 of gender dysphoria, but they do not receive the

1  formal diagnosis. One could qualify that in some ways
2  as undiagnosed gender dysphoria, but I take that as a
3  separate categorization than the initial question that
4  you asked about an individual having gender dysphoria.
5  BY MR. RAMER:
6      Q.   Have you heard the term "social
7  transition"?
8          MR. SMITH: Objection to form.
9      A.   I'm familiar with that term, sir.
10 BY MR. RAMER:
11     Q.   What's your understanding of that term?
12     A.   So we use the terms "sex assigned at
13 birth" and "gender identity." One of the other terms
14 that is used in the field is "gender expression,"
15 meaning the outward manifestation of someone's gender
16 identity, and my understanding would be of a social
17 transition is that it typically is used in the context
18 of referring from an individual changing from a gender
19 expression that's consistent with their sex assigned
20 at birth to a gender expression that manifests a
21 transgender identity.
22     Q.   You agree that it's possible that
23 social transition in childhood could change the
24 trajectory of an individual's gender identity
25 development, correct?

1          MR. SMITH: Objection to form.
2      A.   Can you repeat your question, sir?
3  BY MR. RAMER:
4      Q.   You agree that it's possible that
5  social transition in childhood could change the
6  trajectory of an individual's gender identity
7  development, correct?
8          MR. SMITH: Same objection.
9      A.   So the potential effect of social
10 transition in childhood is outside of my expertise as
11 a pediatric hospitalist and as a bioethicist. I think
12 there are always a range of things that are possible
13 but that, determining how likely that possibility is,
14 is again outside of my expertise, sir.
15 BY MR. RAMER:
16     Q.   You're aware of the hypothesis that
17 using puberty blockers to treat gender dysphoria may
18 alter the trajectory of gender identity development,
19 correct?
20         MR. SMITH: Objection to form.
21     A.   I'm aware of that hypothesis, sir.
22 BY MR. RAMER:
23     Q.   Do you agree that -- let me back up.
24         You agree that almost all patients put
25 on puberty blockers to treat gender dysphoria continue

1  on to cross-sex hormones, correct?
2          MR. SMITH: Objection to form.
3      A.   It's my general understanding in the
4  literature, sir, that that is the case, that
5  individuals who, that the vast majority of individuals
6  who are treated with GrNH analogues do proceed to
7  treatment with gender-affirming hormone therapy.
8  BY MR. RAMER:
9      Q.   You agree that the question of whether
10 beginning puberty blockers during adolescence
11 effectively locks patients into a treatment pathway is
12 an important one, correct?
13         MR. SMITH: Objection to form.
14     A.   And by "important," sir, you mean what?
15 BY MR. RAMER:
16     Q.   Significant, worth knowing.
17     A.   I think that there are individuals who
18 have identified this issue as a hypothesis. I think
19 that there are many hypotheses that are being tested
20 in the field. I would say that I don't know that I
21 think that it's in the top five hypotheses, but I
22 think it's important to test or verify, sir.
23     Q.   Do you think it's in the top 10?
24     A.   I haven't given substantial thought to
25 that, sir.

1     Q.    But you know it's not in the top five?
2     A.    As I'm sitting here today and giving it
3 my initial consideration, sir, I would not say that,
4 of the important issues within the field, that it
5 would be within the top five, sir.
6     Q.    You agree that that question is
7 methodologically difficult to answer, correct?
8     MR. SMITH:  Objection to form.
9     A.    So, sir, I haven't given significant
10 consideration as to how one would evaluate that
11 hypothesis methodologically.
12 BY MR. RAMER:
13     Q.    In your deposition in Voe versus
14 Marshall, when you were asked whether you agree that
15 it is a difficult question whether the effect of
16 beginning puberty blockers during adolescence
17 effectively locks children and young people to a
18 treatment pathway, you said you would agree that it is
19 an important question and methodologically difficult
20 to answer, correct?
21     A.    I don't recall, sir.
22     Q.    Let's go to Exhibit 2.  Go to little
23 page number 239 and lines 2 through 12.  There, you
24 are asked, "Do you agree that it is a difficult
25 question whether the effect of beginning puberty

1 blockers during adolescence effectively locks children
2 and young people to a treatment pathway?"  And you
3 answered, "So I think it's difficult to assess the
4 statement in the Cass report that, quote, the most
5 difficult question is this one.  But I would agree
6 that it is an important question and methodologically
7 difficult to answer."  Did I read that correctly?
8     A.    You did, sir.
9     Q.    You are not aware of any study that has
10 disproven the hypothesis that using puberty blockers
11 to treat gender dysphoria may alter the trajectory of
12 gender-identity development, correct?
13     MR. SMITH:  Objection to form.
14     A.    Can you repeat your question, sir?
15 BY MR. RAMER:
16     Q.    You are not aware of any study that has
17 disproven the hypothesis that using puberty blockers
18 to treat gender dysphoria may alter the trajectory of
19 gender-identity development, correct?
20     MR. SMITH:  Same objection.
21     A.    So, sir, when you initially asked the
22 question, you characterized it as a hypothesis, and I
23 agreed that it is a hypothesis.  If I was aware of a
24 study that disproved it, it would no longer be a
25 hypothesis, sir.

1 BY MR. RAMER:
2     Q.    So you are not aware of a study that
3 disproves it; is that right?
4     A.    That's correct, sir.
5     Q.    And this next question is related but
6 perhaps from a different angle.  Are you aware of any
7 study assessing the likelihood that an adolescent with
8 gender dysphoria at Tanner stage 2 will desist if the
9 individual does not begin puberty suppression?
10     MR. SMITH:  Objection to form.
11     A.    Sir, to make sure that I'm answering
12 the question that you asked, would you please repeat
13 it?
14 BY MR. RAMER:
15     Q.    Are you aware of any study assessing
16 the likelihood that an adolescent with gender
17 dysphoria at Tanner stage 2 will desist if the
18 individual does not begin puberty suppression?
19     MR. SMITH:  Same objection.
20     A.    I'm not aware of a study that attempts
21 to evaluate the very specific question that you've
22 identified, sir.
23 BY MR. RAMER:
24     Q.    Are you familiar with a distinction
25 between what's called childhood-onset gender dysphoria

1 and adult-onset gender dysphoria?
2     A.    I'm generally familiar with that
3 distinction, sir.
4     Q.    You do not know the typical sexual
5 orientation for individuals with childhood-onset
6 gender dysphoria, correct?
7     MR. SMITH:  Objection to form.
8     A.    Again, can you repeat the question,
9 sir?
10 BY MR. RAMER:
11     Q.    You do not know the typical sexual
12 orientation for individuals with childhood-onset
13 gender dysphoria, correct?
14     MR. SMITH:  Same objection.
15     A.    I believe that that's correct, sir.
16 BY MR. RAMER:
17     Q.    And you do not know the typical sexual
18 orientation for individuals with adult-onset gender
19 dysphoria, correct?
20     MR. SMITH:  Objection to form.
21     A.    That's correct, sir.
22 BY MR. RAMER:
23     Q.    Do you agree that there is an
24 overrepresentation of individuals with an autism
25 spectrum disorder among children and adolescents with

11 (Pages 38 to 41)



1 gender dysphoria?
2     MR. SMITH: Objection to form.
3     A.    And by "overrepresentation," you mean
4 what, sir?
5 BY MR. RAMER:
6     Q.    Higher than in the standard population.
7     So, yes, sir, it's my understanding
8 that the percentage of individuals with gender
9 dysphoria who have autism is higher than the
10 percentage of individuals in the general population
11 who have autism.
12     Q.    And we do not know why that is,
13 correct?
14     A.    My understanding is that there are a
15 number of potential hypotheses for theories to provide
16 an explanation for that, but that is still an area of
17 active investigation.
18     Q.    You are not aware of any study
19 assessing whether outcomes from puberty blockers or
20 cross-sex hormones as a treatment for gender dysphoria
21 are different for children with an autism spectrum
22 disorder, correct?
23     MR. SMITH: Objection to form.
24     A.    I'm not aware of any studies that do
25 that specific subpopulation analyses, sir.

1 BY MR. RAMER:
2     Q.    In the context of gender dysphoria,
3 have you heard the term "gender fluidity"?
4     A.    I've generally heard the term referred
5 to individuals who describe their gender identity as
6 gender fluid, sir.
7     Q.    That term refers to individuals -- or
8 strike that.
9         That term refers to the experience of
10 an individual's gender identity changing over time,
11 correct?
12     A.    I believe that's a correct
13 characterization, sir.
14     Q.    In the context of gender dysphoria,
15 have you heard the term "nonbinary"?
16     A.    Yes, sir.
17     Q.    What is your understanding of that
18 term?
19     A.    It would be individuals whose gender
20 identity is not identified as either solely masculine
21 or feminine, sir.
22     MR. RAMER: And, actually, I'm at a
23 pretty good breaking point, if you want to
24 take a break. Go off the record.
25     VIDEOGRAPHER: We are now going off

1 record. The time is 9:59.
2     (A recess was taken from 9:59 to
3 10:12.)
4     VIDEOGRAPHER: We are now back on the
5 record. The time is 10:12. You may continue.
6 BY MR. RAMER:
7     Q.    Welcome back, Doctor. Switching gears
8 a little bit to talk about the medications at issue in
9 the case, and you agree that the use of puberty
10 blockers to treat gender dysphoria involves the risk
11 of diminished growth in bone density, correct?
12     MR. SMITH: Objection to form.
13     A.    So the use of GrNH analogues for the
14 treatment of gender dysphoria results in a decreased
15 rate of bone mineral deposition during the course of
16 treatment, yes.
17 BY MR. RAMER:
18     Q.    And you agree that it's currently
19 unclear if bone mineral density returns to normal
20 following hormone therapy, correct?
21     MR. SMITH: Objection to form.
22     A.    I believe that the current literature
23 supports that bone mineral density returns to the
24 normal range with the use of gender-affirming hormone
25 therapy, but there is some degree of uncertainty about

1 the matter.
2 BY MR. RAMER:
3     Q.    So do you agree that it's currently
4 unclear if bone mineral density returns to normal
5 following hormone therapy?
6     MR. SMITH: Same objection.
7     A.    So I think that the literature
8 generally supports that bone mineral density returns
9 to normal with the use of gender-affirming hormone
10 therapy. Again, I would not clarify that as unclear,
11 but it is based on the currently available -- my
12 conclusion is based on the currently available
13 evidence, which has some degree of limitation.
14     (Exhibit 12 was marked for
15 identification.)
16 BY MR. RAMER:
17     Q.    Doctor, you've been handed what's been
18 marked as Exhibit 12. And is this the paper that you
19 published earlier this year entitled "Decision-Making
20 for Adolescents with Gender Dysphoria"?
21     A.    Yes, it's the article with that title
22 that was published earlier this year by "Perspectives
23 in Biology and Medicine."
24     Q.    I'd like to go to page 247.
25     A.    One moment, please. Yes, sir.

MAGNA ▶
LEGAL SERVICES

1    Q.    And under the heading "Risks," the
2  second full sentence, I'm going to read it first and
3  ask if I read it correctly.  It says, "It is currently
4  unclear if bone mineral density returns to 'normal'
5  following hormone therapy."  Did I read that
6  correctly?
7    A.    You did, sir.
8    Q.    So you would actually characterize it
9  as unclear, wouldn't you?
10    A.    In the context of this article, I did,
11  sir.
12    Q.    And you agree that the effect, if any,
13  of puberty blockers on brain development and cognitive
14  function in humans is unknown, correct?
15        MR. SMITH:  Objection to form.
16    A.    Can you repeat your question, sir?
17  BY MR. RAMER:
18    Q.    You agree that the effect, if any, of
19  puberty blockers on the brain development and
20  cognitive function in humans is unknown, correct?
21    A.    So, sir, I would say that based on
22  clinical experience with the use of GrNH analogues for
23  the treatment of a variety of conditions, there are
24  things that we know about their effects, so I don't
25  know that I think that your characterization is

1  unknown is an accurate characterization of the
2  existing state of the knowledge.
3    Q.    Going to Exhibit 12, which is your
4  paper, I'd like to go to page 248 and the first full
5  paragraph, the last sentence --
6    A.    One moment, sir.  Okay.
7    Q.    I'm going to first read it and ask if I
8  read it correctly.  It says, "The effect, if any, of
9  GnRH analogues on brain development and cognitive
10  function in humans is unknown."  Did I read that
11  correctly?
12    A.    Yes.
13    Q.    Do you agree that the effect, if any,
14  of GnRH analogues on brain development and cognitive
15  function in humans is unknown?
16    A.    So, again, sir, you're reading a single
17  sentence from an article whose intention is not to
18  provide a comprehensive review of the topic, and the
19  space restrictions of publishing this article did not
20  allow me to provide the nuance that I provided in my
21  verbal answer to you.  So I think that both of the
22  claims can be the case, sir.
23    Q.    So that sentence is true; is that
24  right?
25    A.    So I think that that sentence in

1  general is true, but there is substantially more that
2  can be said about the topic of GnRH analogues'
3  potential effect on brain development and could be
4  explained in this manuscript, sir, or this published
5  paper, sir.
6    Q.    The use of testosterone as a treatment
7  for gender dysphoria involves cardiovascular risks
8  such as heart attack, correct?
9        MR. SMITH:  Objection to form.
10    A.    Yes, sir.
11  BY MR. RAMER:
12    Q.    And it also involves the risk of
13  stroke, correct?
14    A.    Yes, sir.
15    Q.    The use of estrogen as a treatment for
16  gender dysphoria involves the risks of -- let me start
17  again.  The use of estrogen as a treatment for gender
18  dysphoria involves the risk of blood clots, including
19  those that could cause heart attack or stroke,
20  correct?
21        MR. SMITH:  Objection to form.
22    A.    Yes, sir.
23  BY MR. RAMER:
24    Q.    And both testosterone and estrogen,
25  when used as a treatment for gender dysphoria, involve

1  risk of infertility, correct?
2        MR. SMITH:  Objection to form.
3    A.    Yes, sir.
4  BY MR. RAMER:
5    Q.    And a patient who begins puberty
6  blockers at Tanner's stage 2 and then progresses to
7  cross-sex hormones will be infertile, correct?
8        MR. SMITH:  Objection to form.
9    A.    So during the time in which they
10  continue to receive gender-affirming hormone therapy,
11  sir, yes, they would be anticipated to be infertile.
12  BY MR. RAMER:
13    Q.    And you agree that it's unknown whether
14  they would be able to regain fertility if hormone
15  therapy is discontinued, correct?
16    A.    So there are animal studies which would
17  suggest the ability to regain fertility, but I'm not
18  aware of particular data about, regarding humans in
19  this regard, sir.
20    Q.    With respect to a natal male or male
21  assigned, person assigned male at birth who begins
22  puberty blockers at Tanner's stage 2 and proceeds to
23  cross-sex hormones, you cannot say whether that
24  individual will ever be able to experience an orgasm,
25  correct?

13  (Pages 46 to 49)



1          MR. SMITH:  Objection to form.
2          A.     The ability to make predictions about
3    any particular individual is currently beyond the
4    scope of our knowledge, sir.
5    BY MR. RAMER:
6          Q.     And with respect to an individual who
7    is male assigned at birth who begins puberty blockers
8    at Tanner stage 2 and proceeds to cross-sex hormones,
9    you are unaware of any study assessing the possibility
10   of that individual being able to experience an orgasm,
11   correct?
12         MR. SMITH:  Objection to form.
13         A.     That is not a subject in which I've
14   conducted a literature review, sir, so given my
15   limited knowledge and familiarity with the topic, it
16   is accurate to say I'm not aware of a study, but I've
17   had no reason to currently search the literature in
18   order to determine if such a study exists.
19   BY MR. RAMER:
20         Q.     Why have you had no reason to search
21   the literature for an answer to that question?
22         MR. SMITH:  Objection to form.
23         A.     Because although I have discussed the
24   potential risks and benefits, the needing to
25   understand the risks and benefits at that level, that

1    particular risk at that level of detail has been
2    unnecessary in my work as a bioethicist or as an
3    expert witness to this point in time, sir.
4    BY MR. RAMER:
5          Q.     Is the answer to that question also
6    outside of your top five most important subjects?
7          MR. SMITH:  Objection to form.
8          A.     I think it's a question for the field,
9    sir, but I would not say that it is the most urgent
10   question for the field to address, sir.
11   BY MR. RAMER:
12         Q.     You agree that an individual's desire
13   for biological children might change from the time
14   that person is 12 years old to the time that person is
15   30 years old, correct?
16         MR. SMITH:  Objection to form.
17         A.     That is correct, sir, in the same way
18   that an individual's intention for having biological
19   children might change from the age of 25 to 35, sir.
20   BY MR. RAMER:
21         Q.     You are not aware of any study that
22   follows individuals to their 30th birthday when
23   measuring the safety or efficacy of puberty blockers
24   followed by cross-sex hormones, correct?
25         A.     Sir, I'm only aware of one study in the

1    entire literature that looks at longitudinal attitudes
2    toward having children in the general population, so I
3    would say that, in general, it's an under-researched
4    field, and I'm not aware of a specific study in the
5    population of individuals with gender dysphoria.
6          Q.     What question were you just answering?
7          MR. SMITH:  Objection to form.
8          A.     I believe I was answering your
9    question, sir.
10   BY MR. RAMER:
11         Q.     I'm asking if you can recall what
12   question I asked.
13         MR. SMITH:  Objection to form.  That's
14   argumentative.
15         A.     I believe that you asked the question
16   as to whether or not I was aware of a study that
17   looked at potential changes in the desire to have
18   biological children for individuals with gender
19   dysphoria in adolescence into adulthood, sir.
20   BY MR. RAMER:
21         Q.     I'm going to ask, reask the question,
22   because I don't think we were on the same page there.
23   The question is this:  You are not aware of any study
24   that follows individuals to their 30th birthday when
25   measuring the safety or efficacy of puberty blockers

1    followed by cross-sex hormones, correct?
2          MR. SMITH:  Objection to form.
3          A.     So to make sure that I'm answering your
4    question, sir, will you repeat it?
5    BY MR. RAMER:
6          Q.     You are not aware of any study that
7    follows individuals to their 30th birthday when
8    measuring the safety or efficacy of puberty blockers
9    followed by cross-sex hormones, correct?
10         MR. SMITH:  Same objection.
11         A.     I'm not aware of any studies with that
12   specific design, sir.
13   BY MR. RAMER:
14         Q.     In order to assess the risks and
15   benefits of gender-transition interventions, it's
16   necessary that a person have information about the
17   long-term effects of their effect on fertility,
18   correct?
19         MR. SMITH:  Objection to form.
20         A.     So, again, sir, I apologize.  Will you
21   repeat your question?
22   BY MR. RAMER:
23         Q.     In order to assess the risks and
24   benefits of gender-transition interventions, it's
25   necessary that a person have information about the



1   long-term effects of gender-transition interventions
2   on fertility, correct?
3         MR. SMITH:  Same objection.
4      A.   Sir, who's assessing the risks and
5   benefits and in what context, sir?
6   BY MR. RAMER:
7      Q.   How does your answer change based on
8   the response to that question?
9      A.   So, sir, if you're asking whether a
10  parent, in providing informed consent for
11  gender-affirming medical care and is making an
12  assessment of the risks and benefits, then, yes, that
13  would be relevant information.  If an individual
14  investigator is attempting to assess the effects of
15  gender-affirming medical care on bone mineral density,
16  then, no.
17      Q.   And so the first part of your answer
18  was that it would be relevant to parents of minors
19  with gender dysphoria; is that correct?
20         MR. SMITH:  Objection.
21  Mischaracterizes his testimony.
22      A.   If that parent were involved in
23  informed-consent process or in shared decision-making,
24  it would be one of the factors that should be
25  disclosed and discussed in the informed-consent

1   process or in the shared decision-making, sir.
2   BY MR. RAMER:
3      Q.   In that same context, in order to
4   assess the risks and benefits of gender-transition
5   interventions, it is necessary that a person have
6   information about the long-term effects of
7   gender-transition interventions on neurological
8   development, correct?
9         MR. SMITH:  Objection to form.
10      A.   To the extent particularly that we've
11  had conversations, say, about strokes and that that
12  would affect someone's neurologic condition, yes, sir,
13  it would be relevant to an informed-consent
14  discussion.
15  BY MR. RAMER:
16      Q.   Are you limiting your answer
17  exclusively to the discussion of strokes in the
18  context of the informed-consent process?
19         MR. SMITH:  Objection to form.
20      A.   I understood your question to be
21  exceptionally broad, sir, and I'm trying provide some
22  specificity to my answer, sir.
23  BY MR. RAMER:
24      Q.   Is there a situation where a parent, in
25  the context of the informed-consent process, would not

1   need information about the long-term effects of
2   gender-transition interventions on neurological
3   development?
4         MR. SMITH:  Objection.  Calls for
5     speculation.
6      A.   And, again, can you repeat your
7   question, sir?
8   BY MR. RAMER:
9      Q.   Is there a situation in the
10  informed-consent process where a parent would not need
11  information about the long-term effects of
12  gender-transition interventions on neurological
13  development?
14         MR. SMITH:  Same objection.
15      A.   So, again, sir, I think it's hard to
16  answer such a broad question.  If, for example, you're
17  discussing making decisions about the use of GnRH
18  analogues, that may be a different situation than
19  making a decision about the use of gender-affirming
20  hormone therapy, so it's hard to answer a question
21  with any degree of specificity with the broad scope in
22  which this question is asked.
23  BY MR. RAMER:
24      Q.   In either of the two narrower
25  situations that you just identified, is it necessary

1   that a parent, as part of the informed-consent
2   process, have information about the long-term effects
3   of gender-transition interventions on neurological
4   development?
5         MR. SMITH:  Objection to form.
6      A.   So I would say in the current political
7   politicized context, sir, it may be beneficial for
8   providers to disclose speculative concerns about the
9   effects of GnRH analogues on neurologic development as
10  part of the informed-consent process and that
11  individuals have raised concerns, but there's not
12  currently high-quality data in humans demonstrating
13  negative effects of GnRH analogues on neurologic
14  development and regarding the use of gender-affirming
15  hormone therapy.  Again, neurologic development is not
16  necessarily the terminology that I would use, but I
17  think it would be important for individuals to be
18  aware of the potential adverse effects on neurologic
19  function, such as the possibility of strokes.
20  BY MR. RAMER:
21      Q.   Why does the informed-consent process
22  change, based on the current political context?
23         MR. SMITH:  Objection to form.
24      A.   Because individuals may be aware of
25  information that is purveyed in the media and have



1   concerns or questions about it, which would not
2   otherwise be subject matters that would be discussed
3   as part of the informed-consent process, so that the
4   social context and the information that's available in
5   the media discussions may be important to shape
6   individuals, to shape the informed-consent process,
7   sir.
8   BY MR. RAMER:
9       Q.   Are you describing the media as
10   exclusive from the scientific literature?
11       MR. SMITH: Objection to form.
12       A.   In general, sir, I think one can draw
13   distinctions between the scientific literature and the
14   media, sir.
15   BY MR. RAMER:
16       Q.   And you think that the concern about
17   the long-term effects of gender-transition
18   interventions on neurological development is confined
19   to the media; is that right?
20       MR. SMITH: Objection.
21   Mischaracterizes his testimony.
22       A.   So, sir, I think that there are a
23   variety of different standards related to the
24   informed-consent process. One of the potential
25   standards would be the rational-person standard and

1   that it would be the general practice of health care
2   providers to disclose common risks as well as uncommon
3   but serious risks.
4       I would say that I don't believe that
5   there is sufficient information that GnRH analogues
6   have negative effects on neurodevelopment, that it
7   would normally be discussed by a provider as part of
8   the informed-consent process in that there are many
9   speculative risks of many medical interventions, but
10   because someone poses a potential risk and is
11   investigating potential risks, that those would not
12   necessarily be shared as part of the informed-consent
13   process.
14       Given that there is coverage of these
15   issues in -- outside of the medical literature that
16   patients and families may be aware of, it may be
17   important to raise the topic and address potential
18   concerns so that they are appropriately characterized
19   and framed as opposed to misinterpreted by patients
20   and families.
21   BY MR. RAMER:
22       Q.   Are there other examples where you have
23   altered the informed-consent process based on the
24   current political context?
25       MR. SMITH: Objection to form.

1       A.   So, certainly, there would be
2   situations in which there may be media coverage of,
3   say, early-phase experimentation that has not moved to
4   human trials, that because there's been recent
5   coverage, it may be important to discuss those issues
6   with patients and families to clarify
7   misunderstandings or misinterpretations, sir.
8   BY MR. RAMER:
9       Q.   As part of the informed-consent process
10   for puberty blockers with respect to patients with
11   gender dysphoria, should patients of adolescents with
12   gender dysphoria be told that the majority of
13   individuals who go on puberty blockers later proceed
14   to cross-sex hormones?
15       MR. SMITH: Objection to form.
16       A.   So it would be the general practice of
17   health care providers to provide information about the
18   diagnosis and prognosis and the general course of
19   treatment and that they would potentially disclose
20   that individuals commonly proceed to treatment with
21   gender-affirming hormone therapy. Yes, sir.
22   BY MR. RAMER:
23       Q.   And you think they should disclose that
24   information; is that right?
25       A.   I would say that that is a common

1   treatment plan and that individuals should be aware of
2   not a discrete element of the treatment plan but the
3   comprehensive treatment plan. For example, I believe
4   that the Endocrine Society, in its clinical practice
5   guideline, makes clear that individuals should be
6   aware of the potential risks and benefits of the
7   combined treatment with gender, with GnRH analogues
8   and gender-affirming hormone therapy at the initiation
9   of treatment with GnRH analogues, sir.
10       Q.   I'd like to go to Exhibit 4, which is
11   the Boe versus Marshall preliminary injunction
12   transcript, and I'd like to go to the page with the
13   small page number 229 on it.
14       A.   Yes, sir.
15       Q.   And starting at line 25, so at the very
16   bottom of that page and carrying over onto page 230,
17   line 5, I'm going to read that and then first ask if I
18   read it correctly.
19       It says, "Okay. My question was:
20   Wouldn't it be relevant for them to know that almost
21   everyone who starts on puberty blockers then goes on
22   to cross-sex hormones?
23       "Answer: I don't believe that that
24   would -- that category of information would be
25   relevant. I don't know that that specific framing



1  would be useful and informative to patients."
2      Did I read that correctly?
3      A.    You did, sir.
4      Q.    And that's the opposite of what you
5  just said, correct?
6      A.    One moment, sir.  So, sir, I draw a
7  distinction between the repeated question here
8  emphasizes the almost everyone that would be on 229,
9  line 19, and 230, line 1, and I believe that my answer
10  is focusing on the -- not the description of the
11  general course of treatment, including puberty
12  blockers and gender-affirming hormone therapy but the
13  focus specifically on conveying information about
14  almost everyone.
15      Q.    And so you think that your testimony
16  here is consistent with what you just said about
17  telling parents that the majority of individuals who
18  go on puberty blockers will later proceed to cross-sex
19  hormones?
20          MR. SMITH:  Objection to form.
21      Mischaracterizes his testimony.
22      A.    Can you repeat your question, sir?
23  BY MR. RAMER:
24      Q.    Do you think that your testimony in
25  this excerpt from the Boe v. Marshall preliminary

1  injunction hearing is consistent with the answer you
2  just gave to the question of whether, as part of the
3  informed-consent process, parents of adolescents with
4  gender dysphoria should be told that the majority of
5  individuals who go on puberty blockers later proceed
6  to cross-sex hormones?
7          MR. SMITH:  Same objection.
8      A.    So, sir, you've excerpted a section of
9  my testimony which occurs in the flow of testimony and
10  are comparing it to a question that you asked today,
11  which occurs in a different context, in a different
12  flow of testimony.  I would need -- I believe that my
13  positions are generally consistent across time and
14  that in order to fully characterize the way in which
15  they're consistent would need to reacquaint myself
16  with the context in which this question was asked in
17  the preliminary injunction hearing, but I do believe,
18  sir, that my answers to these questions are consistent
19  across time.
20  BY MR. RAMER:
21      Q.    And do you think that parents of
22  adolescents with gender dysphoria should be told, as
23  part of the informed-consent process, that the
24  majority of individuals who go on puberty blockers
25  later proceed to cross-sex hormones?

1      A.    So I believe that I previously stated
2  today, sir, that I think that it's important, in the
3  informed-consent process or the shared decision-making
4  process, for parents to be aware of the particular
5  course of treatment that's being potentially
6  recommended.  I think that the percentage of
7  individuals who proceed from the use of GnRH analogues
8  to the use of gender-affirming hormone therapy may be
9  relevant to some patients and families and not to
10  others.
11      Q.    What families would it not be relevant
12  to in the context of informed consent for puberty
13  blockers as a treatment for gender dysphoria?
14          MR. SMITH:  Objection to form.
15      A.    So, again, sir, I take the focus of
16  your question is around the very narrow question about
17  not describing the nature of gender dysphoria and the
18  treatments for gender dysphoria over time and
19  potentially in individuals at Tanner stage 2 that may
20  include the use of GnRH analogues, and at a later
21  period of time, it might include the use of
22  gender-affirming hormone therapy.
23          I take it that your, focus of question
24  is about the percentage of individuals who start on
25  GnRH analogues who proceed to gender-affirming hormone

1  therapy, and I think that describing the general
2  course of treatment without providing a specific focus
3  on that percentage may be adequate to obtain informed
4  consent, sir.
5  BY MR. RAMER:
6      Q.    I thought that you said the discussion
7  of the fact that the majority of individuals who go on
8  puberty blockers later proceed to cross-sex hormones
9  would be relevant to some families but not to others.
10  Did I misunderstand that?
11      A.    I believe that you've paraphrased my
12  statement correctly, sir.  I don't know that I think
13  that that's any different than saying that, for some
14  families, that they could provide, that the
15  information that you're emphasizing is not necessary
16  for adequate informed consent or can be consistent or
17  are consistent with one another, sir.  I think you're
18  focusing on very specific formulations of the language
19  rather than the overall content and concepts in a way
20  to suggest that there are inconsistencies that don't
21  exist.
22      Q.    And is there any situation where, as
23  part of the informed-consent process for puberty
24  blockers as a treatment for gender dysphoria, the
25  discussion of the fact that the majority of



1    individuals who start puberty blockers will proceed to
2    cross-sex hormones is not relevant to a particular
3    patient or family?
4              MR. SMITH:  Objection.  Asked and
5         answered, Counsel.  I think the witness has
6         answered this to the best of his ability.
7              MR. RAMER:  Please, no speaking
8         objections.
9    BY MR. RAMER:
10        Q.    You can answer the question.
11        A.    So, again, sir, if you're focusing on
12   particular terminology, you shifted your question to
13   the majority, and I would say that I think that it was
14   probably -- it would be fair to say that most
15   individuals who initiate treatment with GnRH analogues
16   do go on to receive or to decide to proceed to receive
17   gender-affirming hormone therapy.
18        Q.    Do you think parents of adolescents
19   with gender dysphoria should know that fact before
20   they provide consent to the treatment?
21             MR. SMITH:  Same objection.
22        A.    Sir, that fact is which fact, sir?
23   BY MR. RAMER:
24        Q.    The fact that the majority of
25   individuals who begin puberty blockers will proceed to

1    cross-sex hormones.
2         A.    In the construction of the majority,
3    and I think that that would be relevant information.
4         Q.    And you do not know whether providers
5    at the Transgender Health Clinic at Cincinnati
6    Children's Hospital inform parents of that fact,
7    correct?
8              MR. SMITH:  Objection to form.
9         A.    So I participated in the development of
10   the informed-consent documents for the clinic.  It has
11   been a period of time since those documents have been
12   reviewed, and I don't recall the answer to your
13   question, sir.
14   BY MR. RAMER:
15        Q.    Are you familiar with the phrase
16   "informed-consent approach" with respect to
17   gender-transition interventions?
18             MR. SMITH:  Objection to form.
19        A.    Yes, sir.
20   BY MR. RAMER:
21        Q.    And that terminology -- excuse me.
22   That terminology is generally limited to the adult
23   literature as opposed to the adolescent literature,
24   correct?
25             MR. SMITH:  Objection to form.

1         A.    So I understand the informed-consent
2    approach to be an approach to the clinical care of
3    individuals, some individuals with gender dysphoria,
4    and it generally referred to the clinical care of
5    adults, sir.
6    BY MR. RAMER:
7         Q.    And under that approach, a patient's
8    access to a medical intervention is determined by the
9    informed-consent process independent of a
10   psychological evaluation, correct?
11        A.    And by "psychological evaluation," you
12   mean what, sir?
13        Q.    If you use the phrase "psychological
14   evaluation," what would you mean by it?
15        A.    So in this context, sir, my
16   understanding, the informed-consent approach would be
17   that an individual would need to have medical
18   decision-making capacity and that there would have to
19   be an adequate informed-consent process.  So within
20   some constructs of a psychological evaluation,
21   determining whether an individual had medical
22   decision-making capacity would constitute a form of
23   psychological evaluation.
24        Q.    Have you heard the phrase "gatekeeping"
25   before?

1              MR. SMITH:  Objection to form.
2         A.    In a variety of different contexts,
3    I've heard the phrase "gatekeeping" used, sir.
4    BY MR. RAMER:
5         Q.    Have you heard the phrase "gatekeeping"
6    used in the context of treatment for gender dysphoria?
7         A.    Yes, sir.
8         Q.    What's your understanding of that
9    phrase?
10        A.    It's my understanding of the phrase is
11   that, historically, there's been significant criteria
12   or constraint for eligibility to proceed with various
13   forms of gender-affirming medical care, including
14   historically needing to live in the -- with a gender
15   expression consistent with one's gender identity for a
16   year prior to proceeding with gender-affirming
17   surgical care and that there is criticism of that.
18             Some of those requirements were
19   inordinate or inappropriate.  So, for example, that
20   living in one with a gender expression consistent with
21   one's gender identity in some context might create a
22   substantial risk of harm, physical harm to an
23   individual and is not always an appropriate criteria
24   prior to proceeding with gender-affirming surgical
25   care.



1     Q.   With respect to the informed-consent
2 approach, do you think there are ethical reasons why
3 that approach is not used with minors, correct?
4     MR. SMITH: Objection to form.
5     A.   So, in general, sir, medical
6 decision-making for minors is different than medical
7 decision-making for adults, including the role of
8 their parents in medical decision-making. So, yes,
9 there are reasons why an informed-consent approach is,
10 in general, inappropriate in the pediatric context.
11 BY MR. RAMER:
12     Q.   And could you explain a little bit more
13 what the ethical problem would be with using the
14 informed-consent approach with minors?
15     A.   So one of the potential limitations
16 would be that the informed-consent approach would say
17 that an individual was authorized to provide informed
18 consent for their treatment. In general, the
19 adolescents, minor individuals are not legally
20 authorized to provide informed consent. So in and of
21 itself, there's a significant legal and/or ethical
22 barrier to the informed-consent approach in
23 pediatrics, sir.
24     Q.   Would there be any barrier to using the
25 informed-consent approach if the parent provides

1 informed consent and the minor provides informed
2 assent?
3     MR. SMITH: Objection to form.
4     A.   Could you repeat your question, sir?
5 BY MR. RAMER:
6     Q.   Would there be any barrier to using the
7 informed-consent approach if the minor provides
8 informed assent and the parent provides informed
9 consent for a medical intervention to treat gender
10 dysphoria?
11     MR. SMITH: Same objection.
12     A.   And by "barrier," you mean what, sir?
13 BY MR. RAMER:
14     Q.   I was using the word that you used in
15 your answer of when there are barriers to using the
16 informed-consent approach with minors.
17     A.   So there -- in that regard, there might
18 not be -- the same legal prohibition might not exist,
19 but there might be other reasons not to utilize an
20 informed-consent approach, sir.
21     Q.   What would be those other reasons?
22     A.   So my general understanding of the
23 clinical practice guidelines for gender-affirming
24 medical care, particularly the World Professional
25 Association for Transgender Health's SOC-8 is that

1 under, individuals undergo a biopsychosocial
2 assessment prior to being eligible or being a
3 candidate for various forms of gender-affirming
4 medical care, which would be inconsistent with the
5 informed-consent approach.
6     Q.   Doctor, you're familiar with the term
7 "systematic review," correct?
8     A.   Yes, sir.
9     Q.   And you're familiar with the GRADE, all
10 caps, G-R-A-D-E system, correct?
11     A.   Yes, sir.
12     Q.   GRADE is the most widely used
13 methodology for developing clinical guidelines,
14 correct?
15     MR. SMITH: Objection to form.
16     A.   So I believe that it's a widely used
17 methodology, sir. I'm not aware of whether it's the
18 most widely used methodology.
19 BY MR. RAMER:
20     Q.   When you testified at the trial in
21 Brandt, you stated that the GRADE method was the most
22 widely used methodology for developing clinical
23 practice guidelines, correct?
24     A.   I don't recall, sir.
25     Q.   You have never conducted or supervised

1 a systematic review on the effects of a medical
2 intervention, correct?
3     MR. SMITH: Objection to form.
4     A.   Can you repeat your question, sir?
5 BY MR. RAMER:
6     Q.   You have never conducted or supervised
7 a systematic review on the effects of a medical
8 intervention, correct?
9     MR. SMITH: Same objection.
10     A.   That's correct, sir.
11 BY MR. RAMER:
12     Q.   And you, therefore, have never
13 conducted a systematic review in which you assessed
14 the quality of evidence using the GRADE methodology,
15 correct?
16     MR. SMITH: Objection to form.
17     A.   I have not used the GRADE methodology
18 to evaluate the quality of evidence of individual
19 studies, sir. That is correct.
20 BY MR. RAMER:
21     Q.   You agree that, as a general principle,
22 optimal clinical decision-making requires systematic
23 summaries of the best available evidence, correct?
24     MR. SMITH: Objection to form.
25     A.   Will you repeat your question, sir?



1    BY MR. RAMER:
2        Q.    You agree that, as a general principle,
3    optical clinical decision-making requires systematic
4    summaries of the best available evidence, correct?
5            MR. SMITH:  Same objection.
6        A.    It would be optimal in medical
7    decision-making to have such systematic review, sir.
8    BY MR. RAMER:
9        Q.    And, ideally, clinical practice
10   guidelines would be based on systematic reviews,
11   correct?
12           MR. SMITH:  Objection to form.
13       A.    That is the ideal, sir.
14   BY MR. RAMER:
15       Q.    And, ideally, those systematic reviews
16   would assess the evidence regarding patient important
17   outcomes, correct?
18           MR. SMITH:  Objection to form.
19       A.    If you mean assess the quality of the
20   evidence, yes, sir.
21           (Exhibit 13 was marked for
22           identification.)
23   BY MR. RAMER:
24       Q.    Dr. Antommaria, you've been handed
25   what's been marked as Exhibit 13.  Does this appear to

1    be the Endocrine Society guideline for treatment of
2    individuals with gender dysphoria or gender
3    incongruence?
4        A.    It appears to be the 2017 version of
5    that guideline, sir.
6        Q.    Is there a more recent version?
7        A.    No, sir.
8        Q.    The authors of this guideline
9    commissioned two systematic reviews in support of it,
10   correct?
11       A.    I believe that's correct, sir.
12       Q.    And one of those reviews was on the
13   effect of steroid use on lipids and cardiovascular
14   outcomes in transgender individuals, and the other was
15   on the effect of sex steroids on bone health in
16   transgender individuals, correct?
17       A.    I don't recall in that level of detail
18   off the top of my head, sir.  Would you like me to
19   review the manuscript, the article, to assure that
20   that's the case, sir?
21       Q.    No.  That's fine.  The authors did not
22   commission a systematic review regarding the effect of
23   interventions on gender dysphoria, correct?
24           MR. SMITH:  Objection to form.
25       A.    One moment, sir.  So the description of

1    the commission systematic reviews appears on page
2    3873.  They were related to the effect of sex-hormone
3    use on lipids and cardiovascular outcomes and on bone
4    health, as you previously stated, sir.
5    BY MR. RAMER:
6        Q.    The authors did not commission a
7    systematic review regarding the effect of
8    interventions on gender dysphoria, correct?
9            MR. SMITH:  Objection to form.
10       A.    They did not commission a systematic
11   review that looked at that specific outcome.  That's
12   correct, sir.
13   BY MR. RAMER:
14       Q.    It would be fair to say that the
15   absence of that systematic analysis is concerning when
16   it comes to relying on this guideline, correct?
17           MR. SMITH:  Objection to form.
18       A.    So, sir, the authors, in making their
19   recommendations to review the relevant literature,
20   they evaluate the quality of the evidence and the
21   strength of recommendations.  I believe that their
22   methodology is adequate to support their
23   recommendations, sir.
24   BY MR. RAMER:
25       Q.    It would be fair to say that the

1    absence of a systematic review regarding the effect of
2    interventions on gender dysphoria is concerning when
3    it comes to relying on this guideline, correct?
4            MR. SMITH:  Objection to form.
5        A.    So, sir, I would not agree with your
6    characterization that it would be quote, unquote,
7    concerning.
8    BY MR. RAMER:
9        Q.    During your deposition in Voe versus
10   Marshall, when you were asked whether a reasonable
11   scientist could be concerned that the authors of this
12   guideline didn't systematically look at the effect of
13   interventions on gender dysphoria, you said that might
14   be a reasonable concern, correct?
15       A.    I don't recall, sir.
16       Q.    Go to Exhibit 2 and small page 133.
17       A.    I'm on page 133, sir.
18       Q.    And beginning at line 20, it says,
19   "Could a reasonable scientist be concerned that they
20   didn't systematically look at the effect of
21   interventions on gender dysphoria?"  And your answer
22   was:  "That might be a reasonable concern."  Correct?
23       A.    You read that correctly, sir, but
24   again, you're taking a question and an individual
25   answer out of an entire context, and in this case, the

1  question would be could a reasonable scientist be
2  concerned, which is different than the question that
3  you asked me here today.
4      Q.    Do you think a reasonable scientist
5  could be concerned that the authors of this guideline
6  didn't systematically look at the effect of
7  interventions on gender dysphoria?
8          MR. SMITH:  Objection to form.
9      A.    Yes, sir, but I think that that's
10  different than your characterization of it being
11  concerning.
12  BY MR. RAMER:
13      Q.    And the authors of the guideline in
14  Exhibit 13 did not commission a systematic review on
15  any psychosocial outcomes, correct?
16      A.    That is correct, sir.
17      Q.    And apart from this guideline, are you
18  aware of any systematic review on the efficacy of
19  puberty blockers and cross-sex hormones in improving
20  mental health?
21          MR. SMITH:  Objection to form.
22      A.    Sir, I believe that there are a variety
23  of systematic reviews on the effect of
24  gender-affirming medical care on individuals' mental
25  health.

1  BY MR. RAMER:
2      Q.    And can you name a couple of them?
3      A.    There was a relatively early systematic
4  review that was published in Pediatrics.  There have
5  been subsequent systematic reviews published by
6  governmental entities, including the UK's Nice, and
7  there were, have been most recently systematic reviews
8  that have been conducted as part of the Cass review by
9  the University of Sheffield under, I believe, the
10  direction of Professor Taylor.
11      Q.    What was the university?  Sheffield?
12      A.    I may be mistaken, but they were at a
13  particular university center.
14      Q.    Do you think the effect on mental
15  health is a patient-important outcome for individuals
16  with gender dysphoria?
17          MR. SMITH:  Objection to form.
18      A.    Yes, sir, I do.
19          (Exhibit 14 was marked for
20          identification.)
21  BY MR. RAMER:
22      Q.    Doctor, you've been handed what's been
23  marked as Exhibit 14.  Does this appear to be the
24  adolescent chapter of the WPATH Standards of Care 8?
25      A.    Yes, sir, it does.

1      Q.    I'd like to go to page S46.
2      A.    I'm on page S46, sir.
3      Q.    And left column, the carryover
4  paragraph, there is a sentence that begins with the
5  word "despite" in the middle of that paragraph.  Do
6  you see that?
7      A.    Yes, I do, sir.
8      Q.    I'm going to read that sentence and the
9  following sentence and first ask if I've read them
10  correctly.  It says, "Despite the slowly growing body
11  of evidence surrounding the effective of early medical
12  intervention, the number of studies is still low and
13  there are few outcome studies that follow youth into
14  adulthood.  Therefore, a systematic review regarding
15  outcomes of treatment in adolescents is not possible."
16  Did I read that correctly?
17      A.    You did, sir.
18      Q.    You agree that there are few outcome
19  studies that follow youth into adulthood, correct?
20          MR. SMITH:  Objection to form.
21      A.    I believe, in broad terms, that that's
22  an accurate characterization, sir.
23  BY MR. RAMER:
24      Q.    And you agree that one of the
25  limitations of studies in this area is the low number

1  of participants, correct?
2          MR. SMITH:  Objection to form.
3      A.    Can you repeat your question, sir?
4  BY MR. RAMER:
5      Q.    You agree that one of the limitations
6  of studies in this area is the low number of
7  participants, correct?
8          MR. SMITH:  Same objection.
9      A.    I believe that studies in this area
10  could be strengthened, sir, by having larger sample
11  sizes.
12  BY MR. RAMER:
13      Q.    In this paragraph on S46, the authors
14  of the chapter are saying that a systematic review is
15  not possible because there were too few studies,
16  correct?
17          MR. SMITH:  Objection to form.
18      A.    So they do state, sir, that a
19  systematic review is not possible.  The predicate of
20  that appears to be both the number of studies and the
21  duration of those studies, sir.
22  BY MR. RAMER:
23      Q.    Is that statement coherent?
24      A.    If you mean by "coherent," sir, that
25  one can understand the meaning that's expressed by the



1   sentence, yes, sir.
2        Q.   Is that a statement that anyone with a
3   proper understanding of a systematic review would
4   make?
5        MR. SMITH:  Objection to form.
6        A.   So I would distinguish the sentence
7   being coherent from the sentence being accurate, sir,
8   and that the sentence is not accurate.
9   BY MR. RAMER:
10       Q.   And why is it not accurate?
11       A.   Because one could undertake a
12  systematic review of any topic, and one of the
13  possible results of a systematic review is that no
14  studies were identified, and so there might be means
15  the author intended to express that could have been
16  expressed more clearly.
17       Q.   Well, they identified studies, right?
18       MR. SMITH:  Objection to form.
19       A.   So they -- the sentence that you didn't
20  read in the paragraph, sir, is, "A short narrative
21  review is provided instead."  So the authors did
22  provide a narrative review of available studies, sir.
23  BY MR. RAMER:
24       Q.   You agree that the recommendations in
25  the adolescent chapter of the SOC-8 are not based on a

1   systematic review of the evidence, correct?
2        MR. SMITH:  Objection to form.
3        A.   So as you've read, sir, the authors did
4   not conduct a systematic review.
5   BY MR. RAMER:
6        Q.   So then the recommendations in the
7   chapter are not based on a systematic review, correct?
8        A.   So, sir, I would say that I think that
9   that's a complicated question from the standpoint of
10  what do you mean.  There are a number of systematic
11  reviews that are available at this point in time, that
12  of which the authors of the chapter may be aware and
13  familiar.  So in the narrow sense of did the authors
14  conduct a systematic review, an independent systematic
15  review for the purposes of writing this chapter, the
16  answer would be no.
17       Q.   I'm sorry.  Can you repeat that last
18  part again?
19       A.   That if one understands this in terms
20  of your question, in terms of did they conduct an
21  independent systematic review for this chapter, the
22  answer is no.  They may, however, be aware and
23  familiar with other systematic reviews that are
24  available in the literature, sir.
25       Q.   In your deposition in Voe versus

1   Marshall, when you were asked whether you agree that
2   the recommendations in the adolescent chapter are not
3   based on a systematic review of the evidence, you
4   answered "that is correct," right?
5        A.   I don't recall, sir.
6        Q.   You are not aware of any clinical
7   practice guidelines that recommend medical
8   interventions for adolescents with gender dysphoria
9   based on a systematic review of the efficacy of either
10  puberty blockers or cross-sex hormones, correct?
11       MR. SMITH:  Objection to form.
12       A.   Can you repeat your question to make
13  sure I understand it, sir?
14  BY MR. RAMER:
15       Q.   You are not aware of any clinical
16  practice guidelines that medical interventions for
17  adolescents with gender dysphoria, based on a
18  systematic review of the efficacy of either puberty
19  blockers or cross-sex hormones, correct?
20       MR. SMITH:  Same objection.
21       A.   So the clinical practice guidelines, of
22  which I'm aware, are the Endocrine Societies and
23  WPATHs, and as we've discussed here this morning,
24  neither of them is based on a systematic review of
25  this particular topic.

1        MR. RAMER:  Good breaking point?  We've
2   been going about an hour.  Go off the record.
3        VIDEOGRAPHER:  We are now going off
4   record.  The time is 11:11.
5        (A recess was taken from 11:11 to
6   11:45.)
7        (Exhibit 15 was marked for
8   identification.)
9        VIDEOGRAPHER:  We are now back on the
10  record.  The time is 11:45.  You may continue.
11  BY MR. RAMER:
12       Q.   Welcome back, Doctor.  You've been
13  handed what's been marked as Exhibit 15, and it is
14  entitled, "GRADE guidelines:  3.  Rating the quality
15  of evidence."  Is that correct?
16       A.   That is correct, sir.
17       Q.   And you are familiar with this article,
18  correct?
19       A.   I am, sir.
20       Q.   And this article is part of a series
21  that provides an authoritative explanation of the
22  GRADE methodology, correct?
23       MR. SMITH:  Objection to form.
24       A.   So the GRADE group or the GRADE working
25  group has published a variety of different articles



1  related to their methodology, an early individual
2  article that appeared in the BMJ as well as this
3  series of articles and has more recent material
4  published subsequently, but they are all various
5  versions of authoritative statements of their
6  methodology.
7  BY MR. RAMER:
8      Q.   And just as a general matter, when we
9  are discussing rating the quality of evidence, we are
10  talking about determining how well we are able to
11  predict the effects of a tested intervention, correct?
12          MR. SMITH:  Objection to form.
13      A.   Can you repeat your question, sir?
14  BY MR. RAMER:
15      Q.   As a general matter, when we're talking
16  about rating the quality of evidence, we're talking
17  about determining how well we are able to predict the
18  effects of the tested intervention, correct?
19          MR. SMITH:  Same objection.
20      A.   How whether a particular intervention
21  produces a particular outcome, yes, sir.
22  BY MR. RAMER:
23      Q.   And in Exhibit 15, I'd like to go to
24  page 404.
25      A.   I'm on page 404, sir.

1      Q.   And at the top, there's Table 2.  Do
2  you see that?
3      A.   I do, sir.
4      Q.   And this table lists the four levels of
5  the quality level of evidence under GRADE, correct?
6      A.   It does, sir.
7      Q.   And so looking at this table, if
8  evidence for an intervention is low quality, that
9  means the actual effect of the intervention may be
10  substantially different from what the evidence is
11  telling us, correct?
12      A.   So it states the true effect may be
13  substantially different from the estimate of the
14  effect, sir.
15      Q.   And the estimate of the effect is
16  derived from the body of evidence that is being
17  reviewed, correct?
18      A.   Yes, sir.  It's distinguishing the true
19  effect from the estimated effect reported in the body
20  of evidence that the GRADE will be applied to.
21      Q.   And so if evidence for an intervention
22  is very low quality, that means the actual effect of
23  the intervention is likely to be substantially
24  different from what the evidence is telling us,
25  correct?

1      A.   From the estimate of the effects, yes,
2  sir.
3      Q.   Is there a distinction between the
4  estimate of the effect and the information that the
5  evidence is providing?
6      A.   So, sir, if we're talking about the
7  GRADE's definitions of the levels of quality of the
8  evidence, I think it's easier to just read directly
9  rather than trying to paraphrase if we're trying to
10  represent their views accurately, sir.
11      Q.   And the estimate of the effect would be
12  derived from reviewing the body of the evidence,
13  correct?
14      A.   Correct, sir.
15      Q.   And sticking with this page, Table 3
16  toward the bottom, do you see that?
17      A.   I do, sir.
18      Q.   This table is explaining how different
19  study designs can be rated up or rated down under the
20  GRADE methodology, correct?
21      A.   Yes.
22          MR. SMITH:  Objection to form.
23      A.   Yes.  It provides the initial
24  assignment and then factors to be considered in
25  potentially lowering and raising that assignment, sir.

1  BY MR. RAMER:
2      Q.   Do you agree that it's possible for an
3  observational study to produce high quality evidence,
4  correct?
5      A.   Yes, sir.
6      Q.   And the authors of the Endocrine
7  Society guideline that we were looking at earlier,
8  they report that they used the GRADE methodology,
9  correct?
10      A.   Yes.  That's correct, sir.
11      Q.   You have not personally applied the
12  GRADE methodology to the evidence cited in the
13  Endocrine Society guideline, correct?
14          MR. SMITH:  Objection to form.
15      A.   No, sir, I have not, but I am aware of
16  articles that are co-authored by members of the GRADE
17  working group who have and confirmed the accuracy of
18  those evaluations.
19  BY MR. RAMER:
20      Q.   Have you ever applied the GRADE
21  methodology to a body of evidence?
22          MR. SMITH:  Objection to form.
23      A.   No, sir, I have not.
24  BY MR. RAMER:
25      Q.   You are not familiar with the



1 Newcastle-Ottawa Scale, correct?
2 　　A.　I'm aware of the Newcastle-Ottawa
3 Scale's existence, sir.
4 　　Q.　You are not familiar with it at a high
5 level of detail, correct?
6 　　　　MR. SMITH:　Objection to form.
7 　　A.　If by "high level of detail," you mean
8 that I've actually applied it to a body of evidence,
9 that would be correct, sir.
10 BY MR. RAMER:
11 　　Q.　Have you ever assessed an individual
12 study for risk of bias?
13 　　　　MR. SMITH:　Objection to form.
14 　　A.　No, sir, I have not.
15 BY MR. RAMER:
16 　　Q.　A confounding fact --
17 　　A.　May I clarify?
18 　　Q.　Please.
19 　　A.　In the terms of, in the technical terms
20 of applying the GRADE methodology, as I read studies
21 as a clinician, I consider the potential risks of
22 biases in that study, but in terms of the technical
23 application of this methodology and evaluating a risk
24 of bias in terms of assigning a quality of evidence,
25 no, sir, I have not.

1 　　Q.　Outside of GRADE, have you used any
2 tool to assess risk of bias in an individual study?
3 　　　　MR. SMITH:　Objection to form.
4 　　A.　No, sir, I have not.
5 BY MR. RAMER:
6 　　Q.　Have you heard the phrase "confounding
7 factor"?
8 　　A.　Yes, sir, I have.
9 　　Q.　A confounding factor is an unmeasured
10 variable that potentially influenced an outcome,
11 correct?
12 　　A.　In general terms, yes, sir.
13 　　Q.　You agree that failure to adequately
14 control confounding is a potential study limitation,
15 correct?
16 　　　　MR. SMITH:　Objection to form.
17 　　A.　Yes, sir, it is.　As you will note in
18 the table that you're referring to, "all plausible
19 residual confounding" is a reason to rate the quality
20 of the study more highly.
21 BY MR. RAMER:
22 　　Q.　And have you heard the phrase "loss to
23 follow up"?
24 　　A.　Yes, sir.
25 　　Q.　Loss to follow up can be a potential

1 study limitation as well, correct?
2 　　A.　That's correct, sir.
3 　　Q.　You agree that regression to the mean
4 is a potential risk of bias in studies on mental
5 health, correct?
6 　　　　MR. SMITH:　Objection to form.
7 　　A.　Yes, sir.
8 BY MR. RAMER:
9 　　Q.　You have never looked at a study
10 attempting to measure the extent to which regression
11 to the mean affects results in studies on mental
12 health, correct?
13 　　　　MR. SMITH:　Objection to form.
14 　　A.　So I'm not a researcher in the field of
15 mental health, sir.　So, no, I've never had the
16 occasion to do that, sir.
17 BY MR. RAMER:
18 　　Q.　I'd like to return to Exhibit 13, which
19 is the Endocrine Society guideline, and I'd like to go
20 to page 3871.
21 　　A.　Yes, sir.
22 　　Q.　And in the left column, there's Section
23 "2.0, Treatment of Adolescents."　Do you see that?
24 　　A.　I see that section that's summarizing
25 the recommendations in the section for the treatment

1 of adolescents, sir.
2 　　Q.　And so for 2.1, it states, "We suggest
3 that adolescents who meet diagnostic criteria for
4 GD/gender incongruence, fulfill criteria for treatment
5 and are requesting treatment should initially undergo
6 treatment to suppress pubertal development."　Do you
7 see that?
8 　　A.　I believe you read that correctly, sir.
9 　　Q.　And the symbols following that sentence
10 indicate that the suggestion here is based on low
11 quality evidence, correct?
12 　　A.　That is what the two crosses within the
13 four circles represent, sir.
14 　　Q.　So that means that the actual effect of
15 you pubertal suppression may be substantially
16 different from what the evidence says, correct?
17 　　　　MR. SMITH:　Objection to form.
18 　　A.　One moment, sir.　Yes, sir.
19 BY MR. RAMER:
20 　　Q.　And --
21 　　A.　I think it's important to note the
22 terminology of "may be."
23 　　Q.　What do you mean?
24 　　A.　That it's not -- that the claim is that
25 it may be different, not that it is actually different

1    but that the possibility exists, sir.
2        Q.   And sticking with Exhibit 13, the
3    Endocrine Society guidelines, the same page we're on,
4    number 2.3 says, "We recommend that, where indicated,
5    GnRH analogues are used to suppress pubertal
6    hormones."  Do you see that?
7        A.   You read that correctly, sir.
8        Q.   And the symbols there indicate that the
9    recommendation to use GnRH analogues to suppress
10   puberty is also based on low quality evidence,
11   correct?
12       A.   That's correct, sir.
13       Q.   And so the actual effect of pubertal
14   suppression with GnRH analogues may be substantially
15   different from what the evidence says, correct?
16       MR. SMITH:  Objection to form.
17       A.   Yes, sir.
18   BY MR. RAMER:
19       Q.   And down to 2.4, it says, "In
20   adolescents who request sex hormone treatment (given
21   this is a partly irreversible treatment), we recommend
22   initiating treatment using a gradually increasing dose
23   schedule after a multidisciplinary team of medical and
24   MHPs has confirmed the persistence of GD/gender
25   incongruence and sufficient mental capacity to give

1    informed consent, which most adolescents have by age
2    16 years."  Do you see that?
3        A.   You read that correctly, sir.
4        Q.   And the symbols there indicate that
5    this recommendation is based on low quality evidence,
6    correct?
7        A.   That's correct, sir.
8        Q.   Now, with respect to WPATH's Standard
9    of Care 8, there are no GRADE assessments of the
10   quality of the evidence for the adolescent chapter,
11   correct?
12       A.   There's no formal rating of the quality
13   of the evidence associated with individual
14   recommendations, sir.
15       Q.   So we've been -- we've discussed
16   systematic reviews, and we've been discussing quality
17   of the evidence.  I'd now like to turn to
18   recommendations, and under a proper application of the
19   GRADE methodology, could clinical guideline developers
20   review the same evidence and reach different
21   recommendations?
22       MR. SMITH:  Objection to form.
23       A.   To my general understanding of the
24   GRADE approach, sir, both in terms of the quality of
25   the evidence and the strength of the recommendations

1    is that the GRADE approach provides a general
2    methodology that requires individuals to apply, and
3    that, in the process of application, individuals might
4    on occasion have reached emerging conclusions relative
5    to the quality of the evidence or the strength of the
6    recommendation.
7    BY MR. RAMER:
8        Q.   And they could reach divergent
9    conclusions, even though both of them are properly
10   applying the GRADE methodology, correct?
11       MR. SMITH:  Objection to form and calls
12      for speculation.
13       A.   Yes, applying the GRADE methodology is
14   not an algebra problem that produces a precise answer
15   and requires a degree of knowledge and experience,
16   sir.  And even at that point, sir, individuals might
17   have divergent conclusions.
18   BY MR. RAMER:
19       Q.   Under the GRADE methodology, when would
20   a recommendation for use only in research be
21   appropriate?
22       MR. SMITH:  Objection to form.
23       A.   So individuals are making, make
24   recommendations or determine recommendation based on
25   the quality of the evidence, the relative balance

1    between the risks and benefits on the knowledge of
2    individual preferences and the variability in those
3    preferences and, at times, in terms of resource
4    allocation.
5        The GRADE approach provides a couple of
6    different ways in which they formulate the difference
7    between strong and weak recommendations.  The strong
8    recommendations would be a recommendation that the
9    vast majority of individuals would adhere to, and a
10   weak recommendation is at times described as one in
11   which the majority of individuals would agree to but a
12   significant minority would not.  I don't recall that
13   they utilize a specific descriptor of only in
14   research, but, presumably, it would be a potential
15   recommendation that wouldn't fulfill either of those
16   two categories.
17   BY MR. RAMER:
18       Q.   Do you think there are situations where
19   it could be appropriate for clinical guideline
20   developers to recommend an intervention for use only
21   in research?
22       MR. SMITH:  Objection to form.  It
23      calls for speculation.
24       A.   That is one of the five potential
25   recommendations that the GRADE guidelines offer, and,

1  yes, that it's conceivably possible that a guideline
2  developer would utilize that category, sir.
3  BY MR. RAMER:
4      Q.    Returning to Exhibit 13, which is the
5  Endocrine Society guideline and the same page we were
6  on, which is 3871, and back to where we were in the
7  left column with the summary of the statements for the
8  treatment of adolescents, do you see that?
9      A.    I do, sir.
10     Q.    And in this section, there are some
11  strong recommendations based on low or very low
12  evidence, correct?
13         MR. SMITH:  Objection to form.
14     A.    So there appear to be two strong
15  recommendations based on low quality evidence, and one
16  is from recommendation based on very low quality
17  evidence, and the GRADE approach does provide criteria
18  for making strong recommendations based on low or very
19  low quality evidence, sir.
20  BY MR. RAMER:
21     Q.    Are those sometimes referred to as
22  discordant recommendations?
23     A.    I don't -- to the best of my recall at
24  this point in time, I don't know that the -- I don't
25  recall whether GRADE uses that terminology, but the

1  wider literature at times uses that terminology, sir.
2      Q.    You agree that it would be concerning
3  if a guideline made inappropriately strong
4  recommendations based on low or very low quality of
5  evidence, correct?
6          MR. SMITH:  Objection to form.
7      A.    So, again, sir, we've previously
8  discussed the language of being concerning that would
9  not necessarily be a way in which I would commonly
10  express myself.  I would believe that it would be
11  preferable for the developers of guidelines to use a
12  consistent approach and that, and that they should
13  utilize the justifications that the GRADE approach
14  provides for making strong recommendations based on
15  low or very low quality evidence.  And if a
16  recommendation doesn't fulfill those criteria, then it
17  would be preferable for them to re-evaluate the
18  strength of the recommendation, sir.
19  BY MR. RAMER:
20     Q.    In your deposition in Voe versus
21  Mansfield, you said you would agree that a guideline
22  that had many inappropriate discordant recommendations
23  would raise concerns, correct?
24     A.    I don't recall, sir.
25     Q.    Would you agree with that statement?

1      A.    Can you repeat the statement, sir?
2      Q.    A guideline that had many inappropriate
3  discordant recommendations would raise concerns.
4          MR. SMITH:  Objection.  Asked and
5  answered.
6      A.    I would think that there would be
7  questions as to how the developers of the guidelines
8  reached those conclusions and made those
9  recommendations, sir.
10  BY MR. RAMER:
11     Q.    Even if -- sorry.  My question is
12  assuming that the discordant recommendations were
13  inappropriate, and the question is:  Would a guideline
14  that had many inappropriate discordant recommendations
15  raise concerns?
16         MR. SMITH:  Objection to form.
17     A.    So if there was a guideline that made
18  many inappropriate discordant recommendations, one
19  would hope that the developers of that guideline
20  explain their methodology and why they deviated, then,
21  from an established methodology, sir.
22  BY MR. RAMER:
23     Q.    What are the situations where GRADE
24  says it is appropriate to make a strong recommendation
25  in the context of low or very low quality evidence?

1          MR. SMITH:  Objection to form.
2      A.    Sir, I haven't committed those six
3  criteria to memory.
4          (Exhibit 16 was marked for
5          identification.)
6  BY MR. RAMER:
7      Q.    Doctor, you've been handed what's been
8  marked as Exhibit 16, and this document is entitled,
9  "GRADE guidelines:  15.  Going from evidence to
10  recommendation - determinants of a recommendation's
11  direction and strength."  Correct?
12     A.    That's correct, sir.
13     Q.    And this is an article that was part of
14  the series that we were discussing earlier, correct?
15         MR. SMITH:  Objection to form.
16     A.    Yes.  The prior article is Number 3 in
17  the series, and this article is number 15 in the
18  series, sir.
19  BY MR. RAMER:
20     Q.    I'd like to go to page 732.
21     A.    Yes, sir.
22     Q.    And Table 4.  Does this table reflect
23  the "paradigmatic situations in which a strong
24  recommendation may be warranted despite low or very
25  low confidence in effect estimates" under the GRADE



1    methodology?
2        A.    With the exception of "under the GRADE
3    methodology," you read the title of the table
4    correctly, sir.
5        Q.    But is that what the table is telling
6    us?
7        A.    Yes, sir.  I think that's the function
8    of the title of the table.
9        Q.    And that's the function of the
10   substance of the table as well, correct?
11       A.    The function of the title of the table
12   is to indicate what the substance of the table is,
13   sir.
14       Q.    And returning to exhibit -- keep them
15   both in front of you, but returning to Exhibit 13,
16   page 3871, where we were before, and the same left
17   column, "2.0, Treatment of adolescents," which
18   situation applies to the discordant recommendations
19   for adolescents in the Endocrine Society guideline?
20           MR. SMITH:  Objection to form.
21       A.    Are you referring to a specific
22   recommendation, sir?
23   BY MR. RAMER:
24       Q.    The discordant ones in the treatment of
25   adolescents' section.

1        A.    Sir, I don't know off the top of my
2    head.
3        Q.    And the Endocrine Society did not
4    explain which situation they were relying on, correct?
5            MR. SMITH:  Objection to form.
6        A.    One moment, please.  So within the body
7    of the text in each section, the Endocrine Society
8    describes the evidence base, the values and
9    preferences and then makes remarks.
10           So regarding Recommendation 2.3, which
11   is a strong recommendation, based on low quality
12   evidence, they state that these recommendations place
13   a high value on avoiding unsatisfactory physical
14   outcome when secondary sexual characteristics become
15   manifest and irreversible, a higher value on
16   psychological well-being and a lower value on avoiding
17   potential harm from early pubertal suppression.  So
18   they provided justification for their recommendation.
19   But with respect to your narrow question, do they
20   specifically identify the situation number from Table
21   4.2 -- I'm sorry, from Table 4 in Exhibit 16, they do
22   not provide that level of detail, sir.
23   BY MR. RAMER:
24       Q.    And you've never independently
25   determined which situation from Table 4 in Exhibit 16

1    applies to the discordant recommendations in the
2    Endocrine Society guideline, correct?
3            MR. RAMER:  Objection to form.
4        A.    Sir, I haven't had a reason to.  I am
5    aware that authors of the -- some of the authors, as
6    related with the GRADE working group, did review, I
7    believe, the earlier version of this guideline as part
8    of a larger study of quote, unquote, discordant
9    recommendations and found that, that there was
10   justification for a number of the discordant
11   recommendations, sir.
12   BY MR. RAMER:
13       Q.    In your answer just now, you were
14   referring to a document that is different from
15   Exhibit 13, correct?
16       A.    The prior version of the guidelines,
17   sir, but I believe that some of the recommendations
18   were substantively similar, sir.
19       Q.    Are you aware of any situations
20   where -- let me start again.
21           Are you aware of any situations where
22   observational studies said an intervention was
23   beneficial, but higher quality studies subsequently
24   demonstrated that there was no benefit?
25           MR. SMITH:  Objection to form.

1        A.    Can you repeat your question again,
2    sir?
3    BY MR. RAMER:
4        Q.    Are you aware of any situations where
5    observational studies said an intervention was
6    beneficial, but higher quality studies subsequently
7    demonstrated that there was no benefit?
8            MR. SMITH:  Same objection.
9        A.    So I could not, off the top of my head,
10   cite you specific observational studies and specific
11   higher quality studies.  I am aware of general
12   categories of medical treatment in which I believe
13   that phenomena has occurred, sir.
14   BY MR. RAMER:
15       Q.    If there were a strong recommendation
16   against an intervention under the GRADE methodology,
17   do you think a state would be justified in banning the
18   use of that intervention?
19           MR. SMITH:  Objection to form.  It
20   calls for speculation.
21       A.    I don't know, sir.
22   BY MR. RAMER:
23       Q.    Do you think genital surgeries on
24   infants and young children with DSDs should be banned?
25           MR. SMITH:  Objection to form.

1    A.    So, again, sir, that's not a specific
2  topic on which I've formed a firm opinion, sir.
3  BY MR. RAMER:
4        Q.    Do you think they should be limited to
5  a research context?
6              MR. SMITH: Objection to form.
7        A.    So, in general, sir, I think that
8  medical decision-making best occurs in a shared
9  decision-making process between patients, their
10  parents and their health care providers, and in
11  general, guidelines are as such, guidelines that make
12  general recommendations and that there may be unique
13  situations in which differing from a guideline may be
14  indicated, so, in particular, as a general principle,
15  would see banning a procedure as inappropriately
16  interfering with a patient's and their provider's
17  clinical decision-making.
18  BY MR. RAMER:
19        Q.    Are you familiar with the phrase
20  "conversion therapy"?
21        A.    I am, sir.
22        Q.    What's your understanding of that
23  phrase?
24        A.    My understanding of the initial use of
25  that phrase was interventions such as shock therapy

1  that were used to potentially change an individual's
2  sexual orientation or to decrease homosexual desires,
3  sir.
4        Q.    Are you familiar with the use of the
5  phrase "conversion therapy" in the context of gender
6  dysphoria?
7        A.    Yes, sir.
8        Q.    What's your understanding of the use of
9  the phrase "conversion therapy" in the context of
10  gender dysphoria?
11        A.    It would be an analogous use as, in
12  this case, applying to, generally, psychological
13  interventions that seek to have individuals reidentify
14  with their sex assigned at birth, sir.
15        Q.    Do you think that practice should be
16  banned?
17              MR. SMITH: Objection to form.
18        A.    Again, this is another subject on which
19  I haven't developed a firm opinion, sir.
20  BY MR. RAMER:
21        Q.    You do not have an opinion as to
22  whether conversion therapy with respect to gender
23  dysphoria should be banned; is that correct?
24              MR. SMITH: Objection to form.
25        A.    So I think that my general

1  understanding is there's complexity in the details in
2  terms of being able to clearly specify what
3  constitutes conversion therapy and what does not
4  constitute conversion therapy, so that, in principle,
5  there would be justification for prohibiting
6  conversion therapy, particularly if it was utilized on
7  individuals who did not wish to reidentify with their
8  sex assigned at birth. But, again, I think that there
9  is complexity in terms of the ability to specify what
10  constitutes conversion therapy and what does not
11  constitute conversion therapy.
12  BY MR. RAMER:
13        Q.    You agree that it is important --
14  sorry, shifting topics just a little bit. You agree
15  that it is important for developers of clinical
16  practice guidelines to be transparent about their
17  policies for the management of conflicts of interest,
18  correct?
19              MR. SMITH: Objection to form.
20        A.    As a general principal, yes.
21  Developers of clinical practice guidelines should have
22  methods for addressing potential conflicts of interest
23  and be transparent regarding those processes.
24              (Exhibit 17 was marked for
25              identification.)

1  BY MR. RAMER:
2        Q.    Doctor, you've been handed what's been
3  marked as Exhibit 17. Does this appear to be Appendix
4  A to the WPATH SOC-8 entitled "Methodology"?
5        A.    Yes, sir, it does.
6        Q.    And on this first page, which is
7  numbered S247, the left column, first paragraph, the
8  last couple sentences, including the citation
9  sentence, I'm first going to read those and ask if I
10  read them correctly. It says, "The process for
11  development of the SOC-8 incorporated recommendations
12  on clinical practice guideline development from the
13  National Academies of Medicine and the World Health
14  Organization that addressed transparency, the
15  conflict-of-interest policy, committee composition and
16  group process. (Institute of Medicine Committee on
17  Standards for Developing Trustworthy Clinical
18  Practice, 2011; World Health Organization, 2019a)."
19  Did I read that correctly?
20        A.    You did, sir.
21        Q.    Are you familiar with the two documents
22  cited here?
23        A.    So, sir, you've provided me a copy of
24  the appendix, but you've not provided me a copy of the
25  references, so it'd be helpful, to answer your

1  question, to see the full reference for the two titles
2  which are cited.
3      Q.   Do you know whether the authors of the
4  SOC-8 adhered to the recommendations from the National
5  Academies of Medicine and the World Health
6  Organization with respect to managing conflicts of
7  interest?
8         MR. SMITH:  Objection to form.  Calls
9    for speculation.
10     A.   Sir, I have not had occasion to make
11  that formal comparison.
12  BY MR. RAMER:
13     Q.   Do you have any personal knowledge of
14  how the authors of the SOC-8 managed conflicts of
15  interest?
16         MR. SMITH:  Objection to form.
17     A.   I have no knowledge of how they managed
18  conflicts of interest beyond what's described in this
19  methodology appendix, sir.
20  BY MR. RAMER:
21     Q.   Sticking with Exhibit 17, I'd like to
22  go to S250.
23     A.   I'm on page S250, sir.
24     Q.   And the right column, there's a bold
25  "3.9. Grading criteria for statements."  Do you see

1  that?
2     A.   I do, sir.
3     Q.   And about halfway down the section,
4  there's the beginning of a sentence that says, "The
5  statements were classified as," and then there's a
6  colon, and then there's a number of bullets.  Do you
7  see where I'm referring to?
8     A.   I see a section that has two major
9  bullets and then, within those major bullets, a number
10  of sub-bullets, sir.
11     Q.   And the first -- well, beginning with
12  the first bullet after the phrase "The statements were
13  classified as," that first bullet says, "Strong
14  recommendations ('we recommend') are for those
15  interventions/therapy/strategies where."  Next bullet
16  says, "the evidence is of high quality," and the next
17  bullet says, "estimates of the effect of an
18  intervention/therapy/strategy (i.e., there is a high
19  degree of certainty effects will be achieved in
20  practice)."  Do you see that?
21     A.   I do, sir.
22     Q.   And so according to this appendix,
23  recommendations in the SOC-8 that begin with the
24  phrase "we recommend" were made when the evidence is
25  of high quality, correct?

1         MR. SMITH:  Objection to form.
2     A.   So, sir, as I read this listing, their
3  four criteria, the authors do not provide an and or an
4  or as to say whether or not all of the criteria are
5  necessary or only whether a subset of the criteria are
6  necessary.
7  BY MR. RAMER:
8     Q.   You would agree that the evidence base
9  for medical interventions to treat gender dysphoria in
10  adolescence is not high quality under GRADE, correct?
11         MR. SMITH:  Objection to form.
12     A.   So as a general matter and as reflected
13  by the Endocrine Society's clinical practice
14  guideline, the evidence is not high quality, nor is
15  the evidence high quality in the clinical practice
16  guidelines in a variety of areas, and as you've
17  previously read, sir, that strong recommendations may
18  be based on low or very low quality evidence,
19  particularly depending on the six criteria or the five
20  paradigmatic instances in the table that you referred
21  to, so, again, trying to place this statement within a
22  larger context, sir.
23  BY MR. RAMER:
24     Q.   In looking at the part of Section 3.9
25  in Exhibit 17 that we were just discussing, where it

1  says "the evidence is of high quality," and is it --
2  are you saying that you do not know whether this list
3  here is conjunctive or disjunctive?
4         MR. SMITH:  Objection to form.
5     A.   So, sir, it's my understanding of the
6  GRADE approach, which the authors of SOC-8 described
7  it as using, so reading at the beginning of 3.9, "Once
8  the statements passed the Delphi process, chapter
9  members graded each statement using a process adapted
10  from the Grading of Recommendations, Assessment,
11  Development and Evaluation framework."  I apologize
12  for reading so quickly.  Do you want me to go back?
13  Sorry.
14        "Once the statements passed the Delphi
15  process, chapter members graded each statement using a
16  process adapted from the Grading of Recommendations,
17  Assessment, Development and Evaluation," parentheses,
18  "(GRADE)" all in caps, closed parentheses,
19  "framework."  And Grading and Recommendations,
20  Assessment, Development and Evaluation are all
21  capitalized.
22       So they're making reference to the
23  GRADE approach, which we previously reviewed, and the
24  GRADE approach permits strong recommendations to, in
25  some instances, be based on low or very low quality

MAGNA
LEGAL SERVICES

1    evidence.  So I'm trying to reconcile those two
2    statements, sir, because it would be difficult for me
3    to believe that if they're using the GRADE approach,
4    they would exclusively say that strong recommendations
5    can only be made on high quality evidence.
6    BY MR. RAMER:
7        Q.    And so are you now saying that you
8    think that the list of bullets below "Strong
9    recommendations are for those
10   interventions/therapy/strategies where:," you're
11   saying you think that that list of bullets is
12   disjunctive?
13           MR. SMITH:  Objection to form.
14       A.    Sir, there are times in which the
15   estimated effect on the intervention/therapy/strategy
16   or the "few downsides of therapy/intervention or
17   strategy" may be sufficient based on those
18   paradigmatic examples to make a strong recommendation
19   based on low or very low quality evidence.
20           And so I think that there may be some
21   ways in which this list, in some instances, is
22   disjunctive.  I'm saying I don't know, because after
23   the third bullet point, there is not an and/or and or.
24   So, again, trying to reconcile the first paragraph
25   saying that they're using the GRADE approach with this

1    description and trying to fit those two parts of
2    their, the methodology that they're describing
3    together, sir.
4    BY MR. RAMER:
5        Q.    So the answer is you don't know what
6    they're saying, correct?
7            MR. SMITH:  Objection.  Asked and
8    answered.
9        A.    I understand parts of what they're
10   staying, sir, and there are residual parts that are
11   not entirely clear to me, sir.
12   BY MR. RAMER:
13       Q.    You agree there is some uncertainty as
14   to whether hormones are more effective in treating
15   gender dysphoria than psychotherapy alone, correct?
16           MR. SMITH:  Objection to form.
17       A.    Sir, the evidence base for
18   psychotherapy alone, to the best of my knowledge, is
19   based on anecdotal evidence, and that the evidence for
20   the use of gender-affirming hormone therapy is low or
21   very low quality evidence, which would be higher than
22   the quality of evidence for the use of psychotherapy
23   alone.  So there could be further improvements in the
24   evidence base to reduce the uncertainty, but I think
25   there is a reasonable level of certainty currently

1    that gender-affirming hormone therapy is preferable to
2    psychotherapy alone.
3    BY MR. RAMER:
4        Q.    Are you aware of any study comparing
5    the effectiveness of psychotherapy alone to the
6    effectiveness of hormone therapy as a treatment for
7    gender dysphoria?
8            MR. SMITH:  Objection to form.
9        A.    So I believe that there are studies
10   that provide indirect evidence regarding that topic,
11   although they are not, say, explicitly designed to
12   test that comparison, sir.
13   BY MR. RAMER:
14       Q.    And indirectness is a potential study
15   limitation under the GRADE methodology, correct?
16           MR. SMITH:  Objection to form.
17       A.    Indirectness, as used by the GRADE
18   approach, refers to something else, sir.  It's the
19   same term, but it means something else in GRADE.
20   Indirectness in the GRADE approach would mean that
21   there's a difference between the population that is
22   studied and the population in which the intervention
23   would be implemented.  So, for example, if a procedure
24   was only done on individuals with a body mass index
25   less than 30 and it was implemented in a population of

1    individuals whose body mass index was above 30, that
2    would be using the GRADE's terminology category of
3    indirectness, not in the way in which I used
4    indirectness in my earlier testimony, sir.
5    BY MR. RAMER:
6        Q.    And so what were the studies you were
7    referring to in answer to that question that you think
8    provides some form of indirect evidence?
9        A.    There are studies that compare
10   individuals who are receiving gender-affirming medical
11   care to individuals who remain on a wait list who are
12   presumably receiving mental health care during their
13   time on the wait list.
14       Q.    You are aware of multiple studies along
15   the lines you just described?
16       A.    I'm aware, off the top of my head right
17   now, of at least two such studies, sir.
18       Q.    Other than Costa, what study are you
19   referring to?
20       A.    There's a more recent, I believe,
21   randomized control trial of gender-affirming medical
22   care potentially -- again, I'd have to look --
23   potentially in adults that looked at individuals over
24   a three-month period of time, as they thought that was
25   the maximally ethically acceptable duration given



1   their existing wait list times.
2        Q.   And if that study is assessing adults,
3   then you would have an indirectness problem under the
4   GRADE methodology, correct?
5             MR. SMITH:  Objection to form.
6        A.   Yes, sir, which would not mean that the
7   result were meaningless or had no applicability, as
8   there are frequently the extrapolation of adult
9   studies to pediatric population.
10  BY MR. RAMER:
11       Q.   But it would be a potential study
12  limitation, correct?
13            MR. SMITH:  Objection to form.
14       A.   Yes, sir, it would.
15  BY MR. RAMER:
16       Q.   If there were a cohort study in which
17  researchers are comparing transgender adolescents
18  receiving cross-sex hormones to transgender
19  adolescents who, for whatever reason, are not
20  receiving cross-sex hormones, you could not say
21  unequivocally that that study would be unethical,
22  correct?
23            MR. SMITH:  Objection to form and calls
24       for speculation.
25       A.   Can you repeat your question, sir, just

1   so I understand it correctly?
2   BY MR. RAMER:
3        Q.   If there were a cohort study in which
4   researchers are comparing transgender adolescents
5   receiving cross-sex hormones to transgender
6   adolescents who, for whatever reason, are not
7   receiving cross-sex hormones, you could not say
8   unequivocally that that study would be unethical,
9   correct?
10            MR. SMITH:  Same objections.
11       A.   So, sir, that information that you're
12  providing is exceptionally thin.  If the cohort of
13  individuals who were receiving gender-affirming
14  hormone therapy had gender dysphoria and the
15  individuals who were not receiving gender-affirming
16  hormone therapy did not have gender dysphoria, in some
17  way, that might be ethical.  It would be hard for me
18  to construe that it would be meaningful but, yes, in
19  the exceptionally broad and vague terms that you
20  framed it.  I couldn't have a certainty that it would
21  be unethical, because there's not enough details
22  provided in order to draw such a specific conclusion.
23  BY MR. RAMER:
24       Q.   And the same will be true if it was the
25  same study design but for patients who are receiving

1   puberty blockers, correct?
2             MR. SMITH:  Objection to form.  Calls
3        for speculation.
4        A.   Again, sir, you're -- I believe that
5   you're asking for a question that asks me whether I
6   will have certainty.  It's not possible to have
7   certainty about such a vague hypothetical.
8   BY MR. RAMER:
9        Q.   And the question is so you are unable
10  to say that a study of that design is unequivocally
11  unethical, right?
12            MR. SMITH:  Objection to form and calls
13       for speculation.
14       A.   So, sir, having given considerable
15  thought to the hypothetical that you're framing, I
16  would say that I think that the situations in which
17  the design itself might not be quote, unquote,
18  unethical, that it might be meaningless, because it
19  would not provide any meaningful comparison between
20  the two groups and, therefore, be unethical, because
21  it would be unlikely to make meaningful contribution
22  to generalizable knowledge.
23            So as a case of first impression, I
24  think it would be highly unlikely that it would be
25  unethical for a variety of different reasons, but

1   again, it's difficult, on the first impression, to
2   answer with certainty, because I would anticipate you
3   wish me to be accurate and that the hypothetical is so
4   vague and general.
5   BY MR. RAMER:
6        Q.   So you don't believe you've ever been
7   asked that question before?
8             MR. SMITH:  Objection to form.
9        A.   To the best of my knowledge, sir, I
10  don't believe I've been asked that question before.
11  BY MR. RAMER:
12       Q.   If you had been asked that question
13  before, it is no longer a question of first impression
14  in this deposition, correct?
15            MR. SMITH:  Objection to form.
16       A.   Sir, I take it that a question of first
17  impression may have a technical sense in the law, and
18  I'm not a lawyer, but even if I had been asked that
19  question before doesn't mean that I've given
20  considerable attention to the question.  You may have
21  asked that question now, and I haven't given
22  considerable thought to it in this deposition and,
23  upon leaving this deposition, not give considerable
24  thought to it again and have no better answer should I
25  be asked the same question in a future deposition,

1   sir.
2   BY MR. RAMER:
3       Q.   A government regulation concluding
4   that, going forward, puberty blockers and cross-sex
5   hormones would be provided as a treatment for gender
6   dysphoria, only within a research context, would not
7   be unethical, correct?
8           MR. SMITH:  Objection to form.  Calls
9       for speculation.
10      A.   Again, sir, it's a broad question, and
11  I would say that in order to answer your question, it
12  would depend on the nature of the research, sir.
13      Q.   In your deposition in Boe versus
14  Marshall, you were -- when you were asked whether the
15  Swedish government's recommendation that, going
16  forward, puberty blockers and cross-sex hormones would
17  be provided only within a research context, you were
18  asked whether that recommendation was unethical, and
19  you said you do not think it is unethical, correct?
20          MR. SMITH:  Objection to form.
21      A.   So, again, sir, I don't recall what you
22  care to indicate where in the -- I'm sorry.  I don't
23  recall whether in your framing it was trial testimony
24  or in deposition where that question was raised.
25

1   BY MR. RAMER:
2       Q.   Let's go to Exhibit 2, which is your
3   deposition, small page 196 and line 18, running
4   through line 3 of page 197.
5       A.   One moment, please.
6       Q.   Well, I'll read it.
7       A.   No, no.  I'm just reading the
8   background information, the background questions.
9       Q.   Gotcha.
10      A.   Okay.  Go ahead, sir.
11      Q.   So beginning on page 196, line 18,
12  "Question: So the Swedish government is concluding
13  that going forward, puberty blockers and cross-sex
14  hormones should be provided only within a research
15  context; is that correct?
16          "Answer:  That is correct, sir.
17          "Question:  And you don't consider that
18  recommendation unethical, do you?
19          "Answer:  One minute.  I am just
20  reading the paragraphs.
21          "Question:  Sure.
22          "Answer:  So, in general, I don't sir."
23          Did I read that correctly?
24      A.   You did, sir, but, again, you're only
25  reading portions of the transcript.  So in the lines

1   immediately preceding this, the questioner states:
2   "All right.  Do you see about halfway down on the
3   page, it says:  To ensure that new knowledge is
4   gathered, the NBHW further deems that treatment with
5   GnRH analogues and sex hormones for young people
6   should be provided within a research context, which
7   does not necessarily imply the use of randomized
8   control trials, RCTs," with an S, which is small.  And
9   so there's additional context that provides additional
10  specificity to the question that's being asked, which
11  allows me to give a more accurate answer.
12          So in the question that you asked me
13  here today, you said research studies in general.  In
14  the context of this question, it was specifically
15  referring to potentially prospective observational
16  studies instead of randomized control trials, and that
17  degree of specificity enables me to provide an answer
18  in a larger context, sir.
19      Q.   So a government regulation concluding
20  that, going forward, puberty blockers and cross-sex
21  hormones, as a treatment for gender dysphoria, would
22  be provided only within a research context, including
23  observational studies, would not be unethical correct?
24          MR. SMITH:  Objection to form and calls
25      for speculation.

1       A.   I wouldn't say "including."
2   Potentially excluding randomized control trials would
3   be more likely to make it ethical, sir, or acceptable,
4   sir.
5   BY MR. RAMER:
6       Q.   You are not aware of any observational
7   study that draws causal conclusions about the safety
8   or efficacy of gender-transition interventions,
9   correct?
10          MR. SMITH:  Objection to form.
11      A.   So, sir, I don't understand the nature
12  of your question in terms of the language of both
13  causal in terms of safety and efficacy.
14  BY MR. RAMER:
15      Q.   Can a researcher -- let me start again.
16          Can an observational study provide
17  enough confidence that a researcher could say the
18  evidence from this observational study shows us that
19  the use of a particular medical intervention causes
20  improvement in mental health?
21          MR. SMITH:  Objection to form.
22      A.   So, sir, I believe that there are
23  increasing developments within study design and
24  statistical analysis have permitted causal inferences
25  to be drawn from observational studies.  I would say

32 (Pages 122 to 125)

1  in particular the Chen study analyzed their results to
2  look at a potential association between changes in an
3  individual's body as a result of gender-affirming
4  hormone therapy and its association with improvements
5  in mental health and found a positive association,
6  which would suggest potentially or provide evidence
7  for the fact that the gender-affirming hormone therapy
8  was a cause for the improvement in mental health as
9  opposed to other factors.
10     So to the question of what is
11  sufficient evidence, I think that that's often a
12  complex consideration, but there are ways in which
13  increasingly observational studies can provide some
14  degree of information about causes.
15  BY MR. RAMER:
16     Q.   And are you aware of any observational
17  study that expressly draws causal conclusions about
18  the effect of gender-transition interventions?
19        MR. SMITH: Objection to form.
20     A.   I don't recall the studies in which
21  I've read to that degree of specificity that I can
22  answer your question at this time, sir.
23        MR. RAMER: Time for a break. Been
24        going about an hour. Let's take a quick one.
25        We'll go off the record.

1        VIDEOGRAPHER: We are now going off
2  record. The time is 12:43.
3        (A recess was taken from 12:43 to
4        12:50.)
5        VIDEOGRAPHER: We are now back on the
6  record. The time is 12:50. You may continue.
7  BY MR. RAMER:
8     Q.   Welcome back, Doctor. You are a member
9  of AAP, correct?
10        MR. SMITH: Objection to form.
11     A.   I am a fellow of the American Academy
12  of Pediatrics.
13  BY MR. RAMER:
14     Q.   And that's what I mean when I say
15  "AAP." Were you involved with AAP's review of the
16  WPATH Standards of Care 8?
17     A.   No, sir. I was not.
18     Q.   You have never spoken personally with a
19  detransitioner, correct?
20        MR. SMITH: Objection to form.
21     A.   I have heard multiple individuals who
22  describe themselves as detransitioners speak and
23  testify but not had a personal conversation with such
24  an individual, sir.
25

1  BY MR. RAMER:
2     Q.   Can you name a study showing that
3  permanent suppression of endogenous puberty has no
4  negative effect on neurodevelopment?
5        MR. SMITH: Objection to form.
6     A.   Sir, what do you mean by "permanent
7  suppression of endogenous puberty"?
8  BY MR. RAMER:
9     Q.   What do you understand that phrase to
10  mean?
11     A.   I generally understand suppression of
12  endogenous puberty to be the effect of the use of GnRH
13  analogues. I generally understand the use of GnRH
14  analogues to be time limited. I guess I don't
15  generally think of the use of gender-affirming
16  hormones as the permanent suppression of endogenous
17  puberty, and that's why I was asking you to clarify,
18  sir, what you meant by that term.
19     Q.   A person who begins puberty suppression
20  at Tanner stage 2 and then proceeds on to cross-sex
21  hormones for the rest of their life will never go
22  through endogenous puberty, correct?
23        MR. SMITH: Objection to form.
24     A.   I believe that that situation could be
25  expressed in that way, sir.

1  BY MR. RAMER:
2     Q.   And can you name a study showing that
3  that process with respect to endogenous puberty has no
4  negative effect on neurodevelopment?
5        MR. SMITH: Objection to form.
6     A.   Meaning, for example, an autopsy study
7  of people after they've died, so lifelong being never
8  in their entire natural life, sir?
9  BY MR. RAMER:
10     Q.   I don't understand what you're asking.
11     A.   You're asking a question about this
12  hypothetical, potentially a hypothetical study of the
13  quote, unquote, permanent suppression of endogenous
14  puberty. Presumably, the permanent one only knows
15  that it's permanent if one dies in that state.
16        So are you asking -- I'm trying to
17  understand your question, sir. So are you asking me
18  am I aware of a study that is a, say, for example, a
19  postmortem study of individuals who have died having
20  started GnRH analogues at Tanner stage 2 and then
21  continued on gender-affirming hormone therapy until
22  their natural death? No, sir. I'm not aware of such
23  a study.
24     Q.   Can you name a study showing that
25  suppression of endogenous puberty past a person's 30th

1   birthday has no negative effect on neurodevelopment?
2        MR. SMITH:  Objection to form.
3        A.    So until recently, I'm not aware that
4   there were substantial concerns of the effect of such
5   treatment on neurodevelopment.  And, no, sir, I'm not
6   aware of any such study that looked at that as an
7   explicit outcome as opposed to potentially an implicit
8   outcome.  Given if there were substantial negative
9   effects on neurodevelopment, it might become apparent
10  in the individuals, say, well before their 30th
11  birthday while undergoing that treatment, sir.
12  BY MR. RAMER:
13       Q.    Have you ever discussed the use of
14  puberty blockers as a treatment for gender dysphoria
15  with a representative from a pharmaceutical company?
16       MR. SMITH:  Objection to form.
17       A.    No, sir, I have not.
18  BY MR. RAMER:
19       Q.    Have you ever discussed the use of
20  cross-sex hormones as a treatment for gender dysphoria
21  with a representative from a pharmaceutical company?
22       MR. SMITH:  Objection to form.
23       A.    No, sir, I have not, or to the best of
24  my knowledge, sir, I have not.
25

1   BY MR. RAMER:
2        Q.    Would you ever describe medicalized
3   transition for adolescents as life saving?
4        A.    Although I would have reason to believe
5   that, in certain instances, it might be life saving,
6   it would not be a typical description that I would
7   use, sir.
8        Q.    There is no evidence to support the
9   statement that medicalized transition for adolescents
10  is life saving, correct?
11       MR. SMITH:  Objection to form.
12       A.    And by "life saving," what do you mean,
13  sir?
14  BY MR. RAMER:
15       Q.    I'll ask it this way.  Can you name any
16  study demonstrating that medical transition for
17  adolescents reduces the rate of completed suicides
18  among any population of transgender adolescents?
19       MR. SMITH:  Objection to form.
20       A.    No, sir.  I'm not aware of such a
21  study.
22  BY MR. RAMER:
23       Q.    Would you tell patients that
24  medicalized transition for adolescents is life saving?
25       MR. SMITH:  Objection to form.

1        A.    Sir, I believe I previously stated I
2   would not.  So, in general, as we previously
3   discussed, it would be outside of the scope of my
4   practice to prescribe GnRH analogues or
5   gender-affirming hormone therapy.  So I would not
6   generally be in the position of describing these
7   treatment interventions to parents, particularly not
8   in the informed-consent process, but, in general, that
9   would not be language that I would utilize if I
10  were -- if I imagined myself in such a position, sir.
11  BY MR. RAMER:
12       Q.    I'd like to go to Exhibit 5, which is
13  your either report or one of your reports from the
14  Brandt case, and I'd like to go to page 19, paragraph
15  53 and the very last sentence.  I'll read it and ask
16  if I read it correctly.  It says, "For some
17  transgender adolescents, gender-affirming medical care
18  is lifesaving."  Did I read that correctly?
19       A.    You did, sir, and I think it's
20  consistent with what I've testified here today about
21  that the qualification here is some, and I take your
22  prior questions to be a general statement about the
23  entire population as opposed to a question about a
24  subpopulation, sir.
25       Q.    Why don't you say that it is lifesaving

1   in your declaration in this case?
2        MR. SMITH:  Objection to form.
3        A.    Can you repeat your question, sir?
4   BY MR. RAMER:
5        Q.    Why do you not say that medicalized
6   transition for adolescents is lifesaving in your
7   declaration that you filed in this case?
8        A.    I don't know, sir.  I don't know that
9   there was ever an intentional decision not to state
10  that as your question implies.  As I've previously
11  testified here today, it would not be a general way in
12  which I would describe gender-affirming medical care.
13       MR. RAMER:  Dr. Antommaria, thank you
14  very much for your time today.  Subject to any
15  follow up from, questions from your counsel,
16  those are all the questions that I have for
17  you today.
18       MR. SMITH:  No questions from us.
19       Can I just state for the record that
20  counsel for plaintiffs would like a copy of
21  the transcript and the rough, no video, and we
22  would like to have Dr. Antommaria review and
23  sign the transcript.
24       VIDEOGRAPHER:  All right.
25       MR. RAMER:  We can go off.

34  (Pages 130 to 133)

Page 134

1      VIDEOGRAPHER:  This concludes the
2  deposition of Dr. Antommaria.  The time on the
3  screen is 12:59, and we are now off record.
4          - - -
5      DEPOSITION CONCLUDED AT 12:59 P.M.
6          - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

1          C E R T I F I C A T E
2  State of Ohio     :
                     :   SS
3  County of Hamilton  :
4      I, Susan M. Gee, RMR, CRR, the undersigned,
5  a duly commissioned notary public within and for the
6  State of Ohio, do hereby certify that before the
7  giving of his aforesaid deposition, ARMAND ANTOMMARIA,
8  M.D., was by me first duly sworn to depose the truth,
9  the whole truth and nothing but the truth; that the
10  foregoing is the deposition given at said time and
11  place by ARMAND ANTOMMARIA, M.D.; that said deposition
12  was taken in all respects pursuant to stipulations of
13  counsel; that I am neither a relative nor employee
14  of any of their parties or their counsel, and have no
15  interest whatever in the result of the action; that I
16  am not, nor is the court reporting firm with which I
17  am affiliated, under a contract as defined in Civil
18  Rule 28(D).
19      IN WITNESS WHEREOF, I have hereunto set my
20  hand and official seal of office at Cincinnati, Ohio,
21  on this 28th day of October, 2024.
22
23      _____
    My commission expires: S/ Susan M. Gee, RMR, CRR
24  September 20, 2025.   Notary Public - State of Ohio
25



## A

**a.m**
1:19 5:9
**AAP**
127:9,15
**AAP's**
127:15
**abbreviation**
29:10
**ability**
49:17 50:2 66:6
108:9
**able**
49:14,24 50:10 86:10
86:17 108:2
**absence**
76:15 77:1
**absent**
9:3
**Academies**
109:13 110:5
**Academy**
127:11
**acceptable**
117:25 125:3
**access**
32:25 68:8
**accuracy**
89:17
**accurate**
19:1 25:17,20 26:12
26:21 27:20 28:11
31:16,25 47:1 50:16
80:22 82:7,8,10
121:3 124:11
**accurately**
88:10
**achieved**
111:19
**ACLU**
5:24
**action**
135:15
**active**
42:17

**activities**
8:7
**actual**
87:9,22 93:14 94:13
**adapted**
113:9,16
**addition**
15:19
**additional**
8:10 124:9,9
**address**
25:24 51:10 59:17
**addressed**
109:14
**addressing**
108:22
**adequate**
65:3,16 68:19 76:22
**adequately**
91:13
**adhere**
97:9
**adhered**
110:4
**admitted**
21:3,10,13 22:10
**adolescence**
37:10 38:16 39:1
52:19 112:10
**adolescent**
40:7,16 67:23 79:24
82:25 84:2 95:10
**adolescents**
4:7,12 30:11 31:10
41:25 45:20 60:11
63:3,22 66:18 70:19
80:15 84:8,17 92:23
93:1,3 94:20 95:1
98:8 102:17,19
118:17,19 119:4,6
131:3,9,17,18,24
132:17 133:6
**adolescents'**
102:25
**adult**
67:22 118:8

**adult-onset**
41:1,18
**adulthood**
52:19 80:14,19
**adults**
68:5 70:7 117:23
118:2
**adverse**
57:18
**affect**
33:4 55:12
**affiliated**
135:17
**aforesaid**
135:7
**age**
6:5 51:19 95:1
**agree**
6:20 30:9,20 31:9,19
32:6,11 35:22 36:4
36:23,24 37:9 38:6
38:14,18,24 39:5
41:23 44:9,18 45:3
46:12,18 47:13
49:13 51:12 73:21
74:2 77:5 80:18,24
81:5 82:24 84:1
89:2 91:13 92:3
97:11 99:2,21,25
108:13,14 112:8
115:13
**agreed**
39:23
**agreement**
6:14,21
**ahead**
123:10
**aim**
7:9
**al**
1:6,11 5:4,5
**Alan**
1:9 5:4
**algebra**
96:14
**allocation**

97:4
**allow**
47:20
**allows**
32:25 124:11
**alter**
36:18 39:11,18
**altered**
59:23
**American**
2:7 127:11
**Americas**
2:4
**amount**
27:7,21,25
**analogous**
107:11
**analogues**
16:5 25:25 26:4 37:6
44:13 46:22 47:9,14
56:18 57:9,13 59:5
61:7,9 64:7,20,25
66:15 94:5,9,14
124:5 128:13,14
129:20 132:4
**analogues'**
48:2
**analyses**
42:25
**analysis**
76:15 125:24
**analyzed**
126:1
**and/or**
70:21 114:23
**anecdotal**
115:19
**angle**
40:6
**animal**
49:16
**answer**
7:12 17:13 20:12
24:1 38:7,20 39:7
47:21 50:21 51:5
54:7,17 55:16,22

56:16,20 61:23 62:9
63:1 66:10 67:12
71:15 77:21,25
83:16,22 96:14
104:13 109:25
115:5 117:7 121:2
121:24 122:11
123:16,19,22
124:11,17 126:22
**answered**
17:4 27:15 39:3 66:5
66:6 84:4 100:5
115:8
**answering**
40:11 52:6,8 53:3
**answers**
63:18
**anticipate**
121:2
**anticipated**
49:11
**Antommaria**
1:15 3:4,9,10,12,16
3:22,23 4:3,5 5:3
6:4,15,23 7:18 14:7
16:23 74:24 133:13
133:22 134:2 135:7
135:11
**Anybody**
6:1
**apart**
7:21 78:17
**apologize**
53:20 113:11
**apparent**
130:9
**appear**
8:25 9:9,22 10:13,15
10:24 11:17,22 12:4
12:15,22 13:17,25
74:25 79:23 98:14
109:3
**appearances**
5:17 7:21
**appeared**
86:2

**appears**
9:2,25 12:6,24 75:4
76:1 81:20
**appendix**
4:19 109:3,24 110:19
111:22
**applicability**
118:7
**application**
90:23 95:18 96:3
**applied**
87:20 89:11,20 90:8
**applies**
102:18 104:1
**apply**
96:2
**applying**
90:20 96:10,13
107:12
**approach**
67:16 68:2,2,7,16
70:2,3,9,14,16,22
70:25 71:7,16,20
72:5 95:24 96:1
97:5 98:17 99:12,13
113:6,23,24 114:3
114:25 116:18,20
**appropriate**
69:23 96:21 97:19
100:24
**appropriately**
59:18
**apt**
20:10,13
**area**
42:16 80:25 81:6,9
**areas**
112:16
**argumentative**
52:14
**Armand**
1:15 3:4,9,10,12,16
3:22,23 4:3,5 5:3
6:4 135:7,11
**article**
4:9 45:21 46:10

47:17,19 75:19
85:17,20 86:2
101:13,16,17
**articles**
85:25 86:3 89:16
**asked**
17:3,12 23:22 27:13
35:4 38:14,24 39:21
40:12 52:12,15
56:22 63:10,16 66:4
77:10 78:3 84:1
100:4 115:7 121:7
121:10,12,18,21,25
122:14,18 124:10
124:12
**asking**
11:25 17:19,21 21:23
52:11 54:9 120:5
128:17 129:10,11
129:16,17
**asks**
120:5
**aspects**
18:7
**assent**
71:2,8
**assess**
39:3 53:14,23 54:14
55:4 74:16,19 91:2
**assessed**
73:13 90:11
**assessing**
40:7,15 42:19 50:9
54:4 118:2
**assessment**
54:12 72:2 113:10,17
113:20
**assessments**
95:9
**assigned**
24:7,19 28:23 35:12
35:19 49:21,21 50:7
107:14 108:8
**assigning**
90:24
**assignment**

88:24,25
**associated**
95:13
**association**
71:25 126:2,4,5
**assuming**
100:12
**assure**
75:19
**attack**
48:8,19
**attempting**
54:14 92:10
**attempts**
40:20
**attendance**
23:8
**attention**
121:20
**attitudes**
52:1
**Attorney**
1:10
**Auburn**
1:17 5:10
**August**
8:12
**author**
82:15
**authoritative**
85:21 86:5
**authorized**
70:17,20
**authors**
75:8,21 76:6,18
77:11 78:5,13 81:13
82:21 83:3,12,13
89:6 104:5,5 110:3
110:14 112:3 113:6
**autism**
31:1,23 41:24 42:9
42:11,21
**autopsy**
129:6
**availability**
32:19 33:2,4 34:8



**available**
32:23 45:11,12 58:4
  73:23 74:4 82:22
  83:11,24
**Avenue**
2:4,13
**avoiding**
103:13,16
**aware**
36:16,21 39:9,16,23
  40:2,6,15,20 42:18
  42:24 49:18 50:16
  51:21,25 52:4,16,23
  53:6,11 57:18,24
  59:16 61:1,6 64:4
  72:17 78:18 83:12
  83:22 84:6,15,22
  89:15 90:2 104:5,19
  104:21 105:4,11
  116:4 117:14,16
  125:6 126:16
  129:18,22 130:3,6
  131:20

—————————
**B**

**back**
36:23 44:4,7 85:9,12
  98:6 113:12 127:5,8
**background**
123:8,8
**balance**
96:25
**ban**
27:24
**banned**
105:24 107:16,23
**banning**
105:17 106:15
**bans**
19:8
**barrier**
70:22,24 71:6,12
**barriers**
71:15
**base**
103:8 112:8 115:17

  115:24
**based**
45:11,12 46:21 54:7
  57:22 59:23 74:10
  82:25 83:7 84:3,9
  84:17,24 93:10
  94:10 95:5 96:24
  98:11,15,16,18 99:4
  99:14 103:11
  112:18 113:25
  114:17,19 115:19
**beginning**
37:10 38:16,25 77:18
  111:4,11 113:7
  123:11
**begins**
5:2 49:5,21 50:7 80:4
  128:19
**behalf**
1:5,5 2:2,11 5:20,22
  5:24
**believe**
15:1 16:12 19:1,25
  20:9,13 31:16,25
  32:14 41:15 43:12
  44:22 52:8,15 59:4
  61:3,23 62:9 63:12
  63:17 64:1 65:11
  72:16 75:11 76:21
  78:22 79:9 80:21
  81:9 93:8 99:10
  104:7,17 105:12
  114:3 116:9 117:20
  120:4 121:6,10
  125:22 128:24
  131:4 132:1
**Bench**
3:18,20
**beneficial**
57:7 104:23 105:6
**benefit**
104:24 105:7
**benefits**
50:24,25 53:15,24
  54:5,12 55:4 61:6
  97:1

**best**
66:6 73:23 74:4
  98:23 106:8 115:18
  121:9 130:23
**better**
121:24
**beyond**
50:3 110:18
**bias**
90:12,24 91:2 92:4
**biases**
90:22
**bioethicist**
19:13 26:2 36:11
  51:2
**bioethics**
18:9 20:1
**biological**
32:16 51:13,18 52:18
**Biology**
45:23
**biopsychosocial**
72:1
**birth**
28:23 35:13,20 49:21
  50:7 107:14 108:8
**birthday**
51:22 52:24 53:7
  130:1,11
**bit**
44:8 70:12 108:14
**blockers**
25:7,13 36:17,25
  37:10 38:16 39:1,10
  39:17 42:19 44:10
  46:13,19 49:6,22
  50:7 51:23 52:25
  53:8 60:10,13 61:21
  62:12,18 63:5,24
  64:13 65:8,24 66:1
  66:25 78:19 84:10
  84:19 120:1 122:4
  122:16 123:13
  124:20 130:14
**blood**
30:1,4,6 48:18

**BMJ**
86:2
**board**
16:25 18:13
**body**
80:10 87:16,19 88:12
  89:21 90:8 103:6
  116:24 117:1 126:3
**Boe**
3:11,13 8:20 9:1,10
  9:13 61:11 62:25
  122:13
**bold**
110:24
**bone**
44:11,15,19,23 45:4
  45:8 46:4 54:15
  75:15 76:3
**bottom**
8:17 61:16 88:16
**brain**
46:13,19 47:9,14
  48:3
**Brandt**
3:16,18 10:7,25 11:3
  21:17,24 72:21
  132:14
**break**
7:10,13 43:24 126:23
**breaking**
43:23 85:1
**breaks**
7:9
**broad**
2:8 55:21 56:16,21
  80:21 119:19
  122:10
**broadest**
28:21
**bullet**
111:12,13,15,17
  114:23
**bullets**
111:6,9,9 114:8,11

—————————
**C**



**C**
2:1 135:1,1
**call**
27:14
**called**
40:25
**calls**
56:4 96:11 97:23
 105:20 110:8
 118:23 120:2,12
 122:8 124:24
**candidate**
72:3
**capacity**
1:10 68:18,22 94:25
**capitalized**
113:21
**caps**
72:10 113:18
**cardiovascular**
48:7 75:13 76:3
**care**
19:3,9,13,15 20:3
 21:11,14 22:21,25
 23:4,9,10,16 24:3,6
 24:8,11,15,16,20,24
 24:25 26:25 27:9,15
 30:12,16 32:25 33:3
 33:9 34:5,8 54:11
 54:15 59:1 60:17
 68:2,4 69:13,17,25
 71:24 72:4 78:24
 79:24 95:9 106:10
 117:11,12,22
 122:22 127:16
 132:17 133:12
**cared**
21:3
**Carolina**
1:2,11 5:6 13:10
**carrying**
61:16
**carryover**
11:7 80:3
**case**
1:8 3:11,13,17,19,20

3:22,24 4:4,6 7:19
8:20 9:16 10:14,16
10:18 11:6,8 13:9
21:17 37:4 44:9
47:22 75:20 77:25
107:12 120:23
132:14 133:1,7
**cases**
19:8
**Cass**
39:4 79:8
**categories**
97:16 105:12
**categorization**
35:3
**category**
61:24 98:2 117:2
**causal**
125:7,13,24 126:17
**cause**
48:19 126:8
**caused**
21:12 30:21 31:20
**causes**
125:19 126:14
**center**
23:23 79:13
**certain**
131:5
**certainly**
60:1
**certainty**
111:19 115:25
 119:20 120:6,7
 121:2
**certified**
6:6 16:25 18:13
**certify**
135:6
**change**
35:23 36:5 51:13,19
 54:7 57:22 107:1
**changes**
8:3,5,9 30:24 31:24
 32:1 52:17 126:2
**changing**

35:18 43:10
**chapter**
4:12 79:24 81:14
 82:25 83:7,12,15,21
 84:2 95:10 113:8,15
**characteristics**
103:14
**characterization**
19:2 20:10,14 31:16
 43:13 46:25 47:1
 77:6 78:10 80:22
**characterize**
46:8 63:14
**characterized**
39:22 59:18
**Charleston**
1:3 5:6
**Chen**
126:1
**childhood**
35:23 36:5,10
**childhood-onset**
40:25 41:5,12
**children**
38:17 39:1 41:25
 42:21 51:13,19 52:2
 52:18 105:24
**Children's**
22:22 23:18 24:17
 25:1 28:2 67:6
**Church**
1:17 5:11
**Cincinnati**
1:18 5:11 22:22
 23:17 24:17 25:1
 28:2 67:5 135:20
**circles**
93:13
**citation**
109:8
**cite**
105:10
**cited**
89:12 109:22 110:2
**Civil**
2:7 135:17

**claim**
25:16 26:13,21 93:24
**claims**
47:22
**clarifications**
7:4
**clarify**
24:12 45:10 60:6
 90:17 128:17
**classified**
111:5,13
**clear**
61:5 115:11
**clearly**
82:16 108:2
**clinic**
22:22 23:8,9,17 24:2
 24:3,7,8,10,16,20
 24:21 25:1 67:5,10
**clinical**
4:10,13,15 16:4 20:2
 20:21 21:12 22:5,21
 22:25 23:4,10,16
 24:3,6,11,14,16,23
 24:25 25:22 28:9
 33:25 46:22 61:4
 68:2,4 71:23 72:13
 72:22 73:22 74:3,9
 84:6,15,21 95:19
 97:19 106:17
 108:15,21 109:12
 109:17 112:13,15
**clinician**
90:21
**clinicians**
23:23
**closed**
113:18
**clots**
48:18
**co-authored**
89:16
**code**
29:9
**cognition**
18:3,7



**cognitive**
18:4,8 46:13,20 47:9
  47:14
**coherent**
81:23,24 82:7
**cohort**
118:16 119:3,12
**colon**
111:6
**column**
80:3 92:22 98:7
  102:17 109:7
  110:24
**combined**
61:7
**comes**
76:16 77:3
**commission**
75:22 76:1,6,10
  78:14 135:23
**commissioned**
75:9 135:5
**committed**
26:25 101:2
**committee**
109:15,16
**common**
18:21 59:2 60:25
**commonly**
60:20 99:9
**company**
130:15,21
**compare**
117:9
**comparing**
63:10 116:4 118:17
  119:4
**comparison**
110:11 116:12
  120:19
**completed**
131:17
**complex**
126:12
**complexity**
108:1,9

**complicated**
83:9
**composition**
109:15
**comprehensive**
31:5,6 47:18 61:3
**conceivably**
98:1
**concepts**
65:19
**concern**
58:16 77:14,22
**concerned**
77:11,19 78:2,5
**concerning**
76:15 77:2,7 78:11
  99:2,8
**concerns**
30:17 57:8,11 58:1
  59:18 99:23 100:3
  100:15 130:4
**CONCLUDED**
134:5
**concludes**
134:1
**concluding**
122:3 123:12 124:19
**conclusion**
45:12 119:22
**conclusions**
96:4,9,17 100:8
  125:7 126:17
**concurrent**
21:11
**condition**
20:22 55:12
**conditions**
22:6 30:24 46:23
**conduct**
28:8 83:4,14,20
**conducted**
50:14 72:25 73:6,13
  79:8
**confidence**
101:25 125:17
**confined**

58:18
**confirmed**
89:17 94:24
**conflict-of-interest**
109:15
**conflicts**
108:17,22 110:6,14
  110:18
**confounding**
90:16 91:6,9,14,19
**confusing**
15:21
**conjunctive**
113:3
**consent**
54:10 64:12 65:4,16
  66:20 70:18,20 71:1
  71:9 95:1
**consider**
90:21 123:17
**considerable**
27:24 120:14 121:20
  121:22,23
**consideration**
38:3,10 126:12
**considered**
88:24
**consistent**
35:19 62:16 63:1,13
  63:15,18 65:16,17
  69:15,20 99:12
  132:20
**constitute**
68:22 108:4,11
**constitutes**
108:3,10
**constraint**
69:12
**construction**
23:7 67:2
**constructions**
23:6
**constructs**
68:20
**construe**
119:18

**consult**
28:4,8
**consultant**
24:9 25:23
**consultation**
24:10 28:9
**consultations**
28:10
**consulted**
25:24
**content**
65:19
**contents**
11:20 12:1
**context**
23:12 24:6 35:17
  43:2,14 46:10 54:5
  55:3,18,25 57:7,22
  58:4 59:24 63:11,16
  64:12 68:15 69:6,21
  70:10 77:25 100:25
  106:5 107:5,9
  112:22 122:6,17
  123:15 124:6,9,14
  124:18,22
**contexts**
15:11 24:9 69:2
**continue**
6:3 21:14 22:9,11,14
  36:25 44:5 49:10
  85:10 127:6
**continued**
129:21
**continuity**
24:20
**contract**
135:17
**contribute**
32:7,12 34:8
**contribution**
120:21
**contributors**
32:14
**control**
91:14 117:21 124:8
  124:16 125:2



**conversation**
127:23
**conversations**
55:11
**conversion**
106:20 107:5,9,22
108:3,4,6,10,11
**conveying**
62:13
**Cooper**
2:12 5:12,19
**copy**
9:3 10:13 12:15
13:17,25 109:23,24
133:20
**correct**
8:20,21 9:16 10:7,8
10:18 11:8,11,12
12:9,10 13:8 16:24
17:4,10,14,17,22,23
17:25 18:4,12,25
19:9,16,23 20:7,25
21:7,20 22:7,17,23
23:18 24:4,17 25:2
25:4,8,14 26:9,18
27:1,16 29:16,17,20
29:23 30:2,5,12
32:7,12 34:10 35:25
36:7,19 37:1,12
38:7,20 39:12,19
40:4 41:6,13,15,19
41:21 42:13,22
43:11,12 44:11,20
46:14,20 48:8,13,20
49:1,7,15,25 50:11
51:15,17,24 53:1,9
53:18 54:2,19 55:8
62:5 67:7,24 68:10
70:3 72:7,10,14,23
73:2,8,10,15,19,23
74:4,11,17 75:10,11
75:16,23 76:8,12,16
77:3,14,22 78:15,16
80:19 81:1,7,16
83:1,7 84:4,10,19
85:15,16,18,22

86:11,18 87:5,11,17
87:25 88:13,14,20
89:4,9,10,13 90:1,5
90:9 91:11,15 92:1
92:2,5,12 93:11,16
94:11,12,15 95:6,7
95:11 96:10 98:12
99:5,23 101:11,12
101:14 102:10
103:4 104:2,15
107:23 108:18
111:25 112:10
115:6,15 116:15
118:4,12,22 119:9
120:1 121:14 122:7
122:19 123:15,16
124:23 125:9 127:9
127:19 128:22
131:10
**corrections**
7:23 8:9
**correctly**
17:15 22:8,18 24:5
39:7 46:3,6 47:8,11
61:18 62:2 65:12
77:23 80:10,16 93:8
94:7 95:3 102:4
109:10,19 119:1
123:23 132:16,18
**Costa**
117:18
**counsel**
5:16 6:12 7:4 66:5
133:15,20 135:13
135:14
**County**
135:3
**couple**
79:2 97:5 109:8
**course**
7:6 44:15 60:18
62:11 64:5 65:2
**court**
1:1 5:5,14 6:2 135:16
**coverage**
59:14 60:2,5

**create**
69:21
**criteria**
34:3 69:11,23 93:3,4
98:17 99:16 101:3
110:25 112:3,4,5,19
**criticism**
69:17
**Cross-Examination**
3:5 6:8
**cross-sex**
26:8 37:1 42:20 49:7
49:23 50:8 51:24
53:1,9 60:14 61:22
62:18 63:6,25 65:8
66:2 67:1 78:19
84:10,19 118:18,20
119:5,7 122:4,16
123:13 124:20
128:20 130:20
**crosses**
93:12
**CRR**
1:19 135:4,23
**cultural**
32:6,11,17 33:2
**current**
6:21 18:1 31:17
44:22 57:6,22 59:24
**currently**
14:11 22:10 31:7
44:18 45:3,11,12
46:3 50:3,17 57:12
115:25
**curriculum**
8:1,6

---
**D**

---
**D**
2:13 3:1
**D-e-k-k-e-r**
11:8
**D.C**
2:14
**Daniel**
16:11

**data**
49:18 57:12
**day**
135:21
**death**
129:22
**decades**
30:15 31:2
**decide**
66:16
**decision**
56:19 133:9
**decision-making**
4:7 45:19 54:23 55:1
64:3 68:18,22 70:6
70:7,8 73:22 74:3,7
106:8,9,17
**decisions**
56:17
**declaration**
3:9 7:18,23 8:1,9
10:6 11:6 12:8 15:4
15:7,20 133:1,7
**decrease**
107:2
**decreased**
44:14
**deems**
124:4
**defendant**
6:16
**defendants**
1:12 2:11 5:20 6:20
**defendants'**
6:18
**defined**
135:17
**definitions**
7:4 88:7
**degree**
18:1 44:25 45:13
56:21 96:15 111:19
124:17 126:14,21
**Dekker**
3:20 11:7,10,19,24
12:5 13:2



**Delphi**
113:8,14
**demonstrated**
104:24 105:7
**demonstrating**
57:12 131:16
**density**
44:11,19,23 45:4,8
  46:4 54:15
**depend**
23:12 27:9 122:12
**depending**
112:19
**depose**
135:8
**deposed**
6:7,25 13:7
**deposition**
1:15 3:10,12,22 4:3
  5:2,10 7:6 9:1,3,10
  9:13 12:16,23,25
  13:5,18 14:1,5,8,9
  14:25 15:14,17,25
  17:2 23:14 24:24
  27:12 38:13 44:15
  77:9 83:25 99:20
  121:14,22,23,25
  122:13,24 123:3
  134:2,5 135:7,10,11
**depositions**
7:22 8:7
**depressive**
33:24 34:1
**derived**
87:16 88:12
**describe**
34:16 43:5 127:22
  131:2 133:12
**described**
24:15 97:10 110:18
  113:6 117:15
**describes**
103:8
**describing**
58:9 64:17 65:1
  115:2 132:6

**description**
3:8 4:2 62:10 75:25
  115:1 131:6
**descriptor**
97:13
**design**
53:12 119:25 120:10
  120:17 125:23
**designed**
116:11
**designs**
88:19
**desire**
51:12 52:17
**desires**
107:2
**desist**
40:8,17
**despite**
80:5,10 101:24
**detail**
51:1 75:17 90:5,7
  103:22
**details**
108:1 119:21
**determinants**
4:17 101:10
**determination**
25:6,12 26:3,7,16
**determine**
16:2 50:18 96:24
**determined**
68:8 103:25
**determining**
36:13 68:21 86:10,17
**detransitioner**
127:19
**detransitioners**
127:22
**developed**
107:19
**developer**
98:2
**developers**
95:19 97:20 99:11
  100:7,19 108:15,21

**developing**
72:13,22 109:17
**development**
18:4,8 35:25 36:7,18
  39:12,19 46:13,19
  47:9,14 48:3 55:8
  56:3,13 57:4,9,14
  57:15 58:18 67:9
  93:6 109:11,12
  113:11,17,20
**developments**
125:23
**deviated**
100:20
**diagnose**
20:17
**diagnosed**
31:1,3,10 32:3
**diagnoses**
29:11 30:5 31:23
**diagnosing**
20:6
**diagnosis**
20:21 29:22 32:18,20
  33:1,3,8,10,17,25
  34:4,13,14,18 35:1
  60:18
**diagnostic**
29:22 34:2 93:3
**died**
129:7,19
**dies**
129:15
**differed**
28:22
**difference**
97:6 116:21
**different**
23:5 40:6 42:21
  56:18 58:23 63:11
  63:11 65:13 69:2
  70:6 78:2,10 85:25
  87:10,13,24 88:18
  93:16,25,25 94:15
  95:20 97:6 104:14
  120:25

**differing**
106:13
**difficult**
24:1 27:3 38:7,15,19
  38:24 39:3,5,7
  114:2 121:1
**diminished**
44:11
**direction**
4:17 79:10 101:11
**directly**
88:8
**disclose**
57:8 59:2 60:19,23
**disclosed**
54:25
**discontinued**
49:15
**discordant**
98:22 99:22 100:3,12
  100:14,18 102:18
  102:24 104:1,8,10
**discrete**
61:2
**discuss**
60:5
**discussed**
50:23 54:25 58:2
  59:7 84:23 95:15
  99:8 130:13,19
  132:3
**discussing**
33:8 56:17 86:9
  95:16 101:14
  112:25
**discussion**
55:14,17 65:6,25
**discussions**
58:5
**disjunctive**
113:3 114:12,22
**disorder**
33:24 34:1 41:25
  42:22
**disproved**
39:24



disproven
39:10,17
disproves
40:3
distinction
40:24 41:3 62:7 88:3
distinctions
58:13
distinguish
82:6
distinguishing
87:18
District
1:1,2 5:5,6
divergent
96:8,17
Division
1:3 5:7
Doctor
6:25 8:25 9:8,21
    11:16 12:14,21
    13:16,24 19:20 44:7
    45:17 72:6 79:22
    85:12 101:7 109:2
    127:8
document
15:10,11,20 101:8
    104:14
documents
7:5 11:25 14:24 15:6
    15:8,16 67:10,11
    109:21
dose
94:22
downsides
114:16
Dr
5:3 6:15,23 7:18 14:7
    16:11,12,20,23
    74:24 133:13,22
    134:2
draw
58:12 62:6 119:22
drawn
125:25
draws

125:7 126:17
drill
7:1
DSDs
105:24
duly
6:5 135:5,8
duration
81:21 117:25
duties
20:5 27:14
dysphoria
4:8 19:23 20:6,17,21
    20:25 21:4,7,11,15
    21:19,19 22:4,7,13
    22:17 25:8,14 26:9
    26:17 28:5 29:16,19
    29:21,25 30:2,7,17
    31:4,11 32:3 33:21
    34:3,4,10,12,14,16
    34:17,21,25 35:2,4
    36:17,25 39:11,18
    40:8,17,25 41:1,6
    41:13,19 42:1,9,20
    43:2,14 44:10,14
    45:20 48:7,16,18,25
    52:5,19 54:19 60:11
    60:12 63:4,22 64:13
    64:17,18 65:24
    66:19 68:3 69:6
    71:10 75:2,23 76:8
    77:2,13,21 78:7
    79:16 84:8,17 107:6
    107:10,23 112:9
    115:15 116:7
    119:14,16 122:6
    124:21 130:14,20

_____
E
_____

E
2:1,1,1,1 3:1 135:1,1
earlier
45:19,22 89:7 101:14
    104:7 117:4
early
79:3 80:11 86:1

103:17
early-phase
60:3
easier
12:2 88:8
effect
36:9 38:15,25 46:12
    46:18 47:8,13 48:3
    53:17 75:13,15,22
    76:2,7 77:1,12,20
    78:6,23 79:14 87:9
    87:12,14,15,19,19
    87:22 88:4,11 93:14
    94:13 101:25
    111:17 114:15
    126:18 128:4,12
    129:4 130:1,4
effective
80:11 115:14
effectively
37:11 38:17 39:1
effectiveness
116:5,6
effects
46:24 53:17 54:1,14
    55:6 56:1,11 57:2,9
    57:13,18 58:17 59:6
    73:1,7 86:11,18
    88:1 111:19 130:9
efficacy
19:21 51:23 52:25
    53:8 78:18 84:9,18
    125:8,13
either
8:3 43:20 56:24 84:9
    84:18 97:15 132:13
electronic
15:16
element
61:2
eligibility
69:12
eligible
72:2
emerging
96:4

emphasis
19:13
emphasizes
62:8
emphasizing
65:15
employee
28:2 135:13
enables
124:17
Endocrine
4:9,10 61:4 75:1
    84:22 89:6,13 92:19
    94:3 98:5 102:19
    103:3,7 104:2
    112:13
endocrinologist
18:11,16,19
endocrinology
18:14
endogenous
128:3,7,12,16,22
    129:3,13,25
ensure
124:3
entire
52:1 77:25 129:8
    132:23
entirely
115:11
entities
79:6
entitled
45:19 85:14 101:8
    109:4
environmental
32:16
epidemiology
4:13,15 30:23 31:10
    31:17,25
errata
3:12,23 4:5 9:10
    12:17,23,25 14:1
erratum
9:3
ESQUIRE



2:4,8,13
**established**
100:21
**estimate**
87:13,15 88:1,4,11
**estimated**
87:19 114:15
**estimates**
101:25 111:17
**estrogen**
48:15,17,24
**et**
1:6,11 5:4,5
**ethical**
19:12 25:24 28:4
70:2,13,21 119:17
125:3
**ethically**
117:25
**ethics**
24:9 25:23 28:9
**evaluate**
38:10 40:21 73:18
76:20
**evaluating**
90:23
**evaluation**
68:10,11,14,20,23
113:11,17,20
**evaluations**
89:18
**evidence**
4:14,16 45:13 73:14
73:18,23 74:4,16,20
76:20 80:11 83:1
84:3 85:15 86:9,16
87:5,8,10,16,20,21
87:24 88:5,8,12
89:3,12,21 90:8,24
93:11,16 94:10,15
95:5,10,13,17,20,25
96:5,25 98:12,15,17
98:19 99:5,15
100:25 101:9 103:8
103:12 111:16,24
112:8,14,15,18

113:1 114:1,5,19
115:17,19,19,21,22
115:24 116:10
117:8 125:18 126:6
126:11 131:8
**examined**
6:6
**example**
56:16 61:3 69:19
116:23 129:6,18
**examples**
59:22 114:18
**exception**
102:2
**exceptionally**
55:21 119:12,19
**excerpt**
3:14,18,20 4:11,18
9:23 10:25 11:18,23
12:5 62:25
**excerpted**
63:8
**excluding**
12:17 26:23 125:2
**exclusive**
58:10
**exclusively**
55:17 114:4
**excuse**
8:12 23:15 67:21
**exhibit**
3:8,9,10,12,14,16,18
3:20,21,23 4:2,3,5,7
4:9,11,13,15,18
7:15 8:16,22 9:5,9
9:18,22 10:5,9,13
10:20,24 11:5,13,17
12:7,11,15,18,22
13:13,17,21,25 15:4
15:5 17:7 22:1,2
23:20 38:22 45:14
45:18 47:3 61:10
74:21,25 77:16
78:14 79:19,23 85:7
85:13 86:23 92:18
94:2 98:4 101:4,8

102:14,15 103:21
103:25 104:15
108:24 109:3
110:21 112:25
123:2 132:12
**EXHIBITS**
3:7 4:1
**exist**
31:7 33:10 65:21
71:18
**existence**
90:3
**existing**
47:2 118:1
**exists**
50:18 94:1
**experience**
19:11 29:16,18,19,24
43:9 46:22 49:24
50:10 96:15
**experimentation**
60:3
**expert**
3:9,16 18:3 19:7,15
19:18 26:23 28:1
51:3
**expertise**
19:25 36:10,14
**expires**
135:23
**explain**
32:22 70:12 100:20
103:4
**explained**
48:4
**explaining**
88:18
**explanation**
42:16 85:21
**explanations**
7:5 31:4,6,6,24
**explicit**
130:7
**explicitly**
116:11
**express**

82:15 99:10
**expressed**
81:25 82:16 128:25
**expression**
35:14,19,20 69:15,20
**expressly**
126:17
**extent**
55:10 92:10
**extrapolation**
118:8

---

**F**

**F**
135:1
**fact**
65:7,25 66:19,22,22
66:24 67:6 90:16
126:7
**factor**
91:7,9
**factors**
32:7,12,16,17 33:2
54:24 88:24 126:9
**faculty**
23:7 24:19
**failure**
91:13
**fair**
66:14 76:14,25
**familiar**
28:13,16 35:9 40:24
41:2 67:15 72:6,9
83:13,23 85:17
89:25 90:4 106:19
107:4 109:21
**familiarity**
50:15
**families**
59:16,20 60:6 64:9
64:11 65:9,14
**family**
66:3
**fellow**
127:11
**females**



31:12,15
**feminine**
43:21
**fertility**
49:14,17 53:17 54:2
**field**
18:8 35:14 37:20
38:4 51:8,10 52:4
92:14
**filed**
8:15 133:7
**filing**
8:11
**find**
16:6
**fine**
75:21
**firm**
106:2 107:19 135:16
**first**
6:5 18:23 19:5 21:23
24:15 46:2 47:4,7
54:17 61:17 80:9
109:6,7,9 111:11,12
111:13 114:24
120:23 121:1,13,16
135:8
**fit**
115:1
**five**
37:21 38:1,5 51:6
97:24 112:19
**Floor**
2:8
**flow**
63:9,12
**fluid**
43:6
**fluidity**
43:3
**focus**
62:13 64:15,23 65:2
**focusing**
62:10 65:18 66:11
**follow**
80:13,19 91:23,25

133:15
**followed**
51:24 53:1,9
**following**
44:20 45:5 46:5 80:9
93:9
**follows**
6:7 51:22 52:24 53:7
**foregoing**
135:10
**forget**
29:9
**forgotten**
13:1
**form**
15:18 16:8 18:5
19:10,24 20:8,19
21:1,8 22:24 24:11
24:18 25:3,9,21
26:10,19 27:2 28:7
28:15,20 29:2 30:3
30:13,22 31:13,21
32:8 33:6,14,22
34:11,22 35:8 36:1
36:20 37:2,13 38:8
39:13 40:10 41:7,20
42:2,23 44:12,21
46:15 48:9,21 49:2
49:8 50:1,12,22
51:7,16 52:7,13
53:2,19 55:9,19
57:5,23 58:11 59:25
60:15 62:20 64:14
67:8,18,25 68:22
69:1 70:4 71:3
72:15 73:3,16,24
74:12,18 75:24 76:9
76:17 77:4 78:8,21
79:17 80:20 81:2,17
82:5,18 83:2 84:11
85:23 86:12 88:22
89:14,22 90:6,13
91:3,16 92:6,13
93:17 94:16 95:22
96:11,22 97:22
98:13 99:6 100:16

101:1,15 102:20
103:5 104:3,25
105:19,25 106:6
107:17,24 108:19
110:8,16 112:1,11
113:4 114:13
115:16 116:8,16
117:8 118:5,13,23
120:2,12 121:8,15
122:8,20 124:24
125:10,21 126:19
127:10,20 128:5,23
129:5 130:2,16,22
131:11,19,25 133:2
**formal**
28:9 33:25 34:18
35:1 95:12 110:11
**formed**
106:2
**forms**
69:13 72:3
**formulate**
97:6
**formulations**
65:18
**forward**
122:4,16 123:13
124:20
**found**
104:9 126:5
**four**
32:1 87:4 93:13
112:3
**frame**
27:10
**framed**
59:19 119:20
**framework**
113:11,19
**framing**
61:25 120:15 122:23
**frequently**
118:8
**front**
102:15
**fulfill**

34:2 93:4 97:15
99:16
**full**
46:2 47:4 110:1
**fully**
30:20 31:19 32:4
63:14
**function**
46:14,20 47:10,15
57:19 102:7,9,11
**further**
16:4 115:23 124:4
**future**
121:25

------

**G**

**G-R-A-D-E**
72:10
**gatekeeping**
68:24 69:3,5
**gathered**
124:4
**Gay**
2:3 5:22
**GD/gender**
93:4 94:24
**gears**
44:7
**Gee**
1:19 5:14 135:4,23
**gender**
4:7 19:22 20:6,17,21
20:25 21:4,6,11,15
21:18,19 22:4,6,13
22:17 25:8,14 26:4
26:8,17 28:5,17,22
28:25 29:16,19,19
29:21,24,25 30:2,6
30:17 31:4,10 32:3
32:7,12,15,18,24
33:5,7,13,18,21
34:3,4,9,12,13,15
34:17,21,25 35:2,4
35:13,14,15,18,20
35:24 36:6,17,18,25
39:11,18 40:8,16,25

41:1,6,13,18 42:1,8
42:20 43:2,3,5,6,10
43:14,19 44:10,14
45:20 48:7,16,17,25
52:5,18 54:19 60:11
60:12 61:7 63:4,22
64:13,17,18 65:24
66:19 68:3 69:6,14
69:15,20,21 71:9
75:2,2,23 76:8 77:2
77:13,21 78:7 79:16
84:8,17 107:5,10,22
112:9 115:15 116:7
119:14,16 122:5
124:21 130:14,20
**gender-affirming**
19:3,9,12,14 20:3
26:25 27:9,15 30:12
37:7 44:24 45:9
49:10 54:11,15
56:19 57:14 60:21
61:8 62:12 64:8,22
64:25 66:17 69:13
69:16,24 71:23 72:3
78:24 115:20 116:1
117:10,21 119:13
119:15 126:3,7
128:15 129:21
132:5,17 133:12
**Gender-Dysphoric...**
4:9
**gender-identity**
39:12,19
**gender-transition**
23:25 53:15,24 54:1
55:4,7 56:2,12 57:3
58:17 67:17 125:8
126:18
**general**
1:10 25:16 26:13
37:3 42:10 48:1
52:2,3 58:12 59:1
60:16,18 62:11 65:1
70:5,10,18 71:22
73:21 74:2 86:8,15
91:12 95:23 96:1

105:11 106:7,11,12
106:14 107:25
108:20 112:12
121:4 123:22
124:13 132:2,8,22
133:11
**generalizable**
120:22
**generally**
26:21 28:11,16 41:2
43:4 45:8 63:13
67:22 68:4 107:12
128:11,13,15 132:6
**genital**
105:23
**give**
9:12 10:2 11:2 13:2,4
14:4 23:6 94:25
121:23 124:11
**given**
28:10 37:24 38:9
50:14 59:14 94:20
117:25 120:14
121:19,21 130:8
135:10
**gives**
34:14
**giving**
38:2 135:7
**gnoseology**
29:10
**GnRH**
25:25 26:4 47:9,14
48:2 56:17 57:9,13
59:5 61:7,9 64:7,20
64:25 66:15 94:5,9
94:14 124:5 128:12
128:13 129:20
132:4
**go**
8:17 17:7,7 22:1,2,2
22:15 23:20,20,21
38:22,22 43:24
45:24 47:4 60:13
61:10,12 62:18 63:5
63:24 65:7 66:16

77:16 80:1 85:2
86:23 92:19 101:20
110:22 113:12
123:2,10 126:25
128:21 132:12,14
133:25
**goes**
61:21
**going**
4:16 7:9 11:6 29:9
43:25 46:2 47:3,7
52:21 61:17 80:8
85:2,3 101:9 109:9
122:4,15 123:13
124:20 126:24
127:1
**good**
6:10,23,24 43:23
85:1
**Gotcha**
123:9
**government**
122:3 123:12 124:19
**government's**
122:15
**governmental**
79:6
**GRADE**
4:14,16 72:9,12,21
73:14,17 85:14,22
85:24,24 87:5,20
88:20 89:8,12,16,20
90:20 91:1 95:9,19
95:24 96:1,10,13,19
97:5,25 98:17,25
99:13 100:23 101:9
101:25 102:2 104:6
105:16 112:10
113:6,18,23,24
114:3,25 116:15,17
116:19,20 118:4
**GRADE's**
88:7 117:2
**graded**
113:9,15
**Grading**

110:25 113:10,16,19
**gradually**
94:22
**greater**
27:25
**Griffin**
10:7
**GrNH**
16:5 37:6 44:13
46:22
**group**
85:24,25 89:17 104:6
109:16
**groups**
120:20
**growing**
80:10
**growth**
44:11
**guess**
128:14
**guideline**
4:10 61:5 75:1,5,8
76:16 77:3,12 78:5
78:13,17 89:7,13
92:19 95:19 97:19
98:1,5 99:3,21
100:2,13,17,19
102:19 104:2,7
106:13 109:12
112:14
**guidelines**
4:14,16 71:23 72:13
72:23 74:10 84:7,16
84:21 85:14 94:3
97:25 99:11 100:7
101:9 104:16
106:11,11 108:16
108:21 112:16

**H**

**halfway**
111:3 124:2
**Hamilton**
135:3
**Hampshire**

2:13
**hand**
135:20
**handed**
9:8,21 10:12,23
   11:16 12:1,14,21
   13:16,24 45:17
   74:24 79:22 85:13
   101:7 109:2
**hard**
56:15,20 119:17
**harm**
69:22,22 103:17
**head**
75:18 103:2 105:9
   117:16
**heading**
46:1
**health**
4:12,19 22:22 23:17
   24:16 25:1 29:11
   30:16 33:3,9 34:4
   59:1 60:17 67:5
   75:15 76:4 78:20,25
   79:15 92:5,12,15
   106:10 109:13,18
   110:5 117:12
   125:20 126:5,8
**Health's**
71:25
**heard**
20:11 28:25 35:6
   43:3,4,15 68:24
   69:3,5 91:6,22
   127:21
**hearing**
3:14 9:16,24 10:3
   63:1,17
**heart**
48:8,19
**help**
7:24
**helpful**
109:25
**hereinafter**
6:6

**hereunto**
135:19
**high**
89:3 90:4,7 103:13
   111:16,18,25
   112:10,14,15 113:1
   114:5
**high-quality**
57:12
**higher**
42:6,9 103:15 104:23
   105:6,11 115:21
**highly**
91:20 120:24
**historically**
69:11,14
**homosexual**
107:2
**hope**
100:19
**hormonal**
19:22
**hormone**
37:7 44:20,24 45:5,9
   46:5 49:10,14 56:20
   57:15 60:21 61:8
   62:12 64:8,22,25
   66:17 94:20 115:20
   116:1,6 119:14,16
   126:4,7 129:21
   132:5
**hormones**
26:8 37:1 42:20 49:7
   49:23 50:8 51:24
   53:1,9 60:14 61:22
   62:19 63:6,25 65:8
   66:2 67:1 78:19
   84:10,19 94:6
   115:14 118:18,20
   119:5,7 122:5,16
   123:14 124:5,21
   128:16,21 130:20
**hospital**
21:10 22:10,23 23:18
   24:17 25:2 67:6
**hospitalist**

20:15 21:3,13 36:11
**hospitalization**
22:12
**hour**
7:10 85:2 126:24
**hours**
6:16 14:21
**Howard**
1:17
**human**
60:4
**humans**
46:14,20 47:10,15
   49:18 57:12
**hypotheses**
37:19,21 42:15
**hypothesis**
36:16,21 37:18 38:11
   39:10,17,22,23,25
**hypothetical**
120:7,15 121:3
   129:12,12

---

**I**

**i.e**
111:18
**ICD**
29:13
**ICD-9**
33:9
**ideal**
74:13
**ideally**
74:9,15
**identification**
7:16 8:23 9:6,19
   10:10,21 11:14
   12:12,19 13:14,22
   45:15 74:22 79:20
   85:8 101:5 108:25
**identified**
37:18 40:22 43:20
   56:25 82:14,17
**identify**
103:20
**identity**

23:24 28:14,17,22
   33:16 35:13,16,21
   35:24 36:6,18 43:5
   43:10,20 69:15,21
**II**
3:15
**imagined**
132:10
**immediately**
124:1
**implementation**
27:24
**implemented**
116:23,25
**implicit**
130:7
**implies**
133:10
**imply**
124:7
**important**
37:12,14,22 38:4,19
   39:6 51:6 57:17
   58:5 59:17 60:5
   64:2 74:16 93:21
   108:13,15
**impression**
120:23 121:1,13,17
**improvement**
125:20 126:8
**improvements**
115:23 126:4
**improving**
78:19
**inappropriate**
69:19 70:10 99:22
   100:2,13,14,18
**inappropriately**
99:3 106:15
**include**
23:23 32:15 64:20,21
**including**
14:12 32:19 48:18
   62:11 69:13 70:7
   79:6 109:8 124:22
   125:1

MAGNA ➤
LEGAL SERVICES

incomplete
31:24
incongruence
29:1,19,24 32:7,12
32:15,18,24 33:5,7
33:13,18 75:3 93:4
94:25
inconsistencies
65:20
inconsistent
72:4
incorporated
109:11
increase
30:10,21,25 31:2,5
31:23
increased
30:17
increasing
94:22 125:23
increasingly
126:13
independent
17:19 68:9 83:14,21
independently
103:24
index
116:24 117:1
indicate
21:21 93:10 94:8
95:4 102:12 122:22
indicated
94:4 106:14
indications
21:12
indirect
116:10 117:8
indirectness
116:14,17,20 117:3,4
118:3
individual
24:7 26:3 33:15 34:1
35:4,18 40:9,18
49:24 50:3,6,10
54:13 68:17,21
69:23 70:17 73:18

77:24 86:1 90:11
91:2 95:13 97:2
127:24
individual's
35:24 36:6 43:10
51:12,18 107:1
126:3
individuals
20:21 21:3,9 29:15
29:18,23 30:15 31:1
31:3 32:3 37:5,5,17
41:5,12,18,24 42:8
42:10 43:5,7,19
51:22 52:5,18,24
53:7 57:11,17,24
58:6 60:13,20 61:1
61:5 62:17 63:5,24
64:7,19,24 65:7
66:1,15,25 68:3,3
70:19 72:1 75:2,14
75:16 79:15 96:2,3
96:16,23 97:9,11
107:13 108:7
116:24 117:1,10,11
117:23 119:13,15
127:21 129:19
130:10
individuals'
78:24
infants
105:24
inferences
125:24
infertile
49:7,11
infertility
49:1
influence
25:25 32:18
influenced
91:10
inform
67:6
information
16:3,4 53:16,25
54:13 55:6 56:1,11

57:2,25 58:4 59:5
60:17,24 61:24
62:13 65:15 67:3
88:4 119:11 123:8
126:14
informative
62:1
informed
54:10 64:12 65:3,16
70:17,20 71:1,1,8,8
95:1
informed-consent
54:23,25 55:13,18,25
56:10 57:1,10,21
58:3,6,24 59:8,12
59:23 60:9 63:3,23
64:3 65:23 67:10,16
68:1,9,16,19 70:1,9
70:14,16,22,25 71:7
71:16,20 72:5 132:8
initial
19:16 20:20 26:2,6
26:15 35:3 38:3
88:23 106:24
initially
19:18 39:21 93:5
initiate
66:15
initiating
94:22
initiation
61:8
injunction
3:14 9:16 61:11 63:1
63:17
inordinate
69:19
instances
112:20 113:25
114:21 131:5
Institute
109:16
institutions
30:16
instruct
7:2

intended
82:15
intention
47:17 51:18
intentional
133:9
interest
108:17,22 110:7,15
110:18 135:15
interfering
106:16
intermittent
24:10
International
4:11,18
Internet
16:1
interrupt
6:11
intervention
68:8 71:9 73:2,8
80:12 86:11,18,20
87:8,9,21,23 97:20
104:22 105:5,16,18
116:22 125:19
intervention/thera...
111:18 114:15
interventions
19:22 23:25 53:15,24
54:1 55:5,7 56:2,12
57:3 58:18 59:9
67:17 75:23 76:8
77:2,13,21 78:7
84:8,16 106:25
107:13 112:9 125:8
126:18 132:7
interventions/ther...
111:15 114:10
investigating
59:11
investigation
42:17
investigator
19:21 20:2 54:14
involve
48:25



**involved**
54:22 127:15
**involves**
44:10 48:7,12,16,18
**involving**
19:8
**irreversible**
94:21 103:15
**issue**
15:22 37:18 44:8
**issues**
19:12 25:24 26:25
27:8,25 28:4 38:4
59:15 60:5
**it'd**
109:25

**J**

**Jeff**
2:17 5:13
**job**
27:13
**John**
2:13 5:19
**Journal**
4:11,13,15,18
**jramer@cooperkir...**
2:15
**justification**
103:18 104:10 108:5
**justifications**
99:13
**justified**
105:17

**K**

**keep**
102:14
**Kingdom**
16:5
**Kirk**
2:12 5:12,19
**know**
6:25 7:11 16:11,19
37:20 38:1 41:4,11
41:17 42:12 46:24

46:25 61:20,25
65:12 66:19 67:4
98:24 103:1 105:21
110:3 113:2 114:22
115:5 133:8,8
**knowing**
37:16
**knowledge**
18:7 47:2 50:4,15
96:15 97:1 110:13
110:17 115:18
120:22 121:9 124:3
130:24
**known**
32:4
**knows**
129:14

**L**

**lab**
30:1,4,6
**language**
65:18 99:8 125:12
132:9
**larger**
81:10 104:8 112:22
124:18
**law**
121:17
**lawful**
6:5
**lawyer**
121:18
**lawyers**
14:10,14
**leaving**
121:23
**left**
80:3 92:22 98:7
102:16 109:7
**legal**
1:21 5:13,15 70:21
71:18
**legally**
70:19
**legislative**

19:8
**let's**
17:7 22:1,14 23:20
38:22 123:2 126:24
**level**
50:25 51:1 75:17
87:5 90:5,7 103:22
115:25
**levels**
87:4 88:7
**LIBERTIES**
2:7
**life**
128:21 129:8 131:3,5
131:10,12,24
**lifelong**
129:7
**lifesaving**
132:18,25 133:6
**likelihood**
40:7,16
**limitation**
45:13 91:14 92:1
116:15 118:12
**limitations**
70:15 80:25 81:5
**limited**
50:15 67:22 106:4
128:14
**limiting**
55:16
**line**
17:12 22:15 23:21
61:15,17 62:9,9
77:18 123:3,4,11
**lines**
22:3 38:23 117:15
123:25
**lipids**
75:13 76:3
**list**
8:19 10:7 11:7 12:8
113:2 114:8,11,21
117:11,13 118:1
**listing**
112:2

**lists**
87:4
**literature**
32:2 37:4 44:22 45:7
50:14,17,21 52:1
58:10,13 59:15
67:23,23 76:19
83:24 99:1
**litigation**
7:22
**little**
38:22 44:8 70:12
108:14
**live**
69:14
**living**
69:20
**local**
7:2
**locks**
37:11 38:17 39:1
**long**
14:20
**long-term**
53:17 54:1 55:6 56:1
56:11 57:2 58:17
**longer**
39:24 121:13
**longitudinal**
52:1
**look**
77:12,20 78:6 117:22
126:2
**looked**
52:17 76:11 92:9
117:23 130:6
**looking**
87:7 89:7 112:24
**looks**
52:1
**loss**
91:22,25
**low**
80:12,25 81:6 87:8
87:22 93:10 94:10
95:5 98:11,11,15,16



98:18,19 99:4,4,15
99:15 100:25,25
101:24,25 103:11
112:18,18 113:25
113:25 114:19,19
115:20,21
**lower**
103:16
**lowering**
88:25

## M

**M**
1:19 2:1 135:4,23
**M.D**
1:15 3:4,9,11,12,16
3:22,23 4:3,5 6:4
135:8,11
**Magna**
1:21 5:13,15
**major**
33:24,25 111:8,9
**majority**
31:11,11 37:5 60:12
62:17 63:4,24 65:7
65:25 66:13,24 67:2
97:9,11
**making**
54:11 56:17,19 76:18
96:23 98:18 99:14
113:22
**male**
49:20,20,21 50:7
**males**
31:11,15
**managed**
110:14,17
**management**
108:17
**managing**
110:6
**manifest**
103:15
**manifestation**
35:15
**manifests**

35:20
**Mansfield**
4:4,6 13:8,19 14:2,5
99:21
**Manual**
29:23
**manuscript**
27:6 48:4 75:19
**marked**
3:8 4:2 7:15 8:22 9:5
9:9,18,22 10:9,12
10:20,23 11:13,17
12:11,15,18,22
13:13,17,21,25
45:14,18 74:21,25
79:19,23 85:7,13
101:4,8 108:24
109:3
**Marshall**
3:11,13 8:20 9:1,10
9:13 38:14 61:11
62:25 77:10 84:1
122:14
**masculine**
43:20
**mass**
116:24 117:1
**material**
14:11 86:3
**matter**
5:3 45:1 86:8,15
112:12
**matters**
58:2
**maximally**
117:25
**mean**
7:25,25 15:3,8 23:1
23:11 28:8,19 32:22
37:14 42:3 68:12,14
71:12 74:19 81:24
83:10 90:7 92:3,11
93:23 116:20 118:6
121:19 127:14
128:6,10 131:12
**meaning**

35:15 81:25 129:6
**meaningful**
119:18 120:19,21
**meaningless**
118:7 120:18
**means**
18:16,18 82:14 87:9
87:22 93:14 116:19
**meant**
24:13 128:18
**measure**
92:10
**measuring**
51:23 52:25 53:8
**media**
57:25 58:5,9,14,19
60:2
**medical**
18:22 19:3,13,15
20:3 22:5 27:9 30:5
30:24 32:25 33:8,17
34:4,13 54:11,15
59:9,15 68:8,17,21
69:13 70:5,6,8 71:9
71:24 72:4 73:1,7
74:6 78:24 80:11
84:7,16 94:23
105:12 106:8 112:9
117:10,21 125:19
131:16 132:17
133:12
**medicalized**
131:2,9,24 133:5
**medication**
22:11
**medications**
44:8
**medicine**
18:25 19:7 45:23
109:13,16 110:5
**meet**
14:17 93:3
**meeting**
14:10,13,20,22
**member**
23:8 24:19 127:8

**members**
89:16 113:9,15
**memory**
101:3
**mental**
78:20,24 79:14 92:4
92:11,15 94:25
117:12 125:20
126:5,8
**met**
14:19 16:12,13
**method**
72:21
**methodologically**
38:7,11,19 39:6
**methodology**
4:19 72:13,17,18,22
73:14,17 76:22
85:22 86:1,6 88:20
89:8,12,21 90:20,23
95:19 96:2,10,13,19
100:20,21 102:1,3
105:16 109:4
110:19 115:2
116:15 118:4
**methods**
108:22
**MHPs**
94:24
**middle**
80:5
**mineral**
44:15,19,23 45:4,8
46:4 54:15
**minor**
8:5 70:19 71:1,7
**minority**
97:12
**minors**
54:18 70:3,6,14
71:16
**minute**
123:19
**Misanin**
1:5 5:4
**Mischaracterizes**



54:21 58:21 62:21
**misinterpretations**
60:7
**misinterpreted**
59:19
**mistaken**
79:12
**misunderstand**
65:10
**misunderstandings**
60:7
**moment**
8:13 9:2,25 45:25
47:6 62:6 75:25
93:18 103:6 123:5
**momentarily**
29:10
**month**
16:18
**morning**
6:10,23,24 84:23
**moved**
60:3
**Mt**
1:17 5:10
**multidisciplinary**
94:23
**multifactorial**
32:15
**multiple**
12:25 19:8 117:14
127:21
**Muse**
4:7

———————
**N**
**N**
2:1 3:1
**N.W**
2:13
**name**
79:2 128:2 129:2,24
131:15
**narrative**
82:20,22
**narrow**

64:16 83:13 103:19
**narrower**
56:24
**natal**
31:11,12,15,15 49:20
**National**
109:13 110:4
**natural**
129:8,22
**nature**
23:24 64:17 122:12
125:11
**NBHW**
124:4
**necessarily**
29:24 57:16 59:12
99:9 124:7
**necessary**
53:16,25 55:5 56:25
65:15 112:5,6
**need**
7:10 56:1,10 63:12
63:15 68:17
**needing**
50:24 69:14
**negative**
57:13 59:6 128:4
129:4 130:1,8
**neither**
84:24 135:13
**neurodevelopment**
59:6 128:4 129:4
130:1,5,9
**neurologic**
55:12 57:9,13,15,18
**neurological**
55:7 56:2,12 57:3
58:18
**neuroscience**
18:2
**neuroscientist**
17:24
**never**
33:25 34:17 72:25
73:6,12 92:9,15
103:24 127:18

128:21 129:7
**new**
2:5,5,9,9,13 8:14
124:3
**Newcastle-Ottawa**
90:1,2
**Nice**
79:6
**Noe**
3:22,24 12:8,16,23
13:5 17:2 23:14
24:24 27:12
**nonbinary**
43:15
**normal**
44:19,24 45:4,9
**normal'**
46:4
**normally**
59:7
**North**
13:9
**notary**
135:5,24
**note**
6:13 91:17 93:21
**noting**
6:17
**nuance**
47:20
**number**
28:9,11 30:10,15,25
31:3 38:23 42:15
61:13 80:12,25 81:6
81:20 83:10 94:4
101:16,17 103:20
104:10 111:6,9
**numbered**
109:7

———————
**O**
**O**
2:1
**objection**
15:18 16:8 18:5
19:10,24 20:8,19

21:1,8 22:24 24:18
25:3,9,15,21 26:10
26:19 27:2 28:7,15
28:20 29:2 30:3,13
30:22 31:13,21 32:8
32:13 33:6,14,22
34:11,22 35:8 36:1
36:8,20 37:2,13
38:8 39:13,20 40:10
40:19 41:7,14,20
42:2,23 44:12,21
45:6 46:15 48:9,21
49:2,8 50:1,12,22
51:7,16 52:7,13
53:2,10,19 54:3,20
55:9,19 56:4,14
57:5,23 58:11,20
59:25 60:15 62:20
63:7 64:14 66:4,21
67:8,18,25 69:1
70:4 71:3,11 72:15
73:3,9,16,24 74:5
74:12,18 75:24 76:9
76:17 77:4 78:8,21
79:17 80:20 81:2,8
81:17 82:5,18 83:2
84:11,20 85:23
86:12,19 88:22
89:14,22 90:6,13
91:3,16 92:6,13
93:17 94:16 95:22
96:11,22 97:22
98:13 99:6 100:4,16
101:1,15 102:20
103:5 104:3,25
105:8,19,25 106:6
107:17,24 108:19
110:8,16 112:1,11
113:4 114:13 115:7
115:16 116:8,16
118:5,13,23 120:2
120:12 121:8,15
122:8,20 124:24
125:10,21 126:19
127:10,20 128:5,23
129:5 130:2,16,22



131:11,19,25 133:2
**objections**
66:8 119:10
**observational**
89:3 104:22 105:5,10
124:15,23 125:6,16
125:18,25 126:13
126:16
**obtain**
65:3
**occasion**
14:19 92:16 96:4
110:10
**occasions**
16:13,14
**occurred**
14:23 19:17 105:13
**occurs**
24:2 63:9,11 106:8
**October**
1:19 5:8 8:12 135:21
**offer**
97:25
**office**
135:20
**official**
1:10 135:20
**Ohio**
1:18 5:11 135:2,6,20
135:24
**Ohio's**
27:24
**Okay**
11:22 14:7 47:6
61:19 123:10
**old**
51:14,15
**Once**
113:7,14
**one's**
28:22 69:15,21
**ones**
102:24
**ongoing**
23:9 24:8,20
**online**

6:1
**opinion**
106:2 107:19,21
**opposed**
59:19 67:23 126:9
130:7 132:23
**opposite**
62:4
**optical**
74:3
**optimal**
73:22 74:6
**order**
50:18 53:14,23 55:3
63:14 119:22
122:11
**Organization**
29:12 109:14,18
110:6
**orgasm**
49:24 50:10
**orientation**
41:5,12,18 107:2
**outcome**
76:11 79:15 80:13,18
86:21 91:10 103:14
130:7,8
**outcomes**
42:19 74:17 75:14
76:3 78:15 80:15
**outside**
36:10,14 51:6 59:15
91:1 132:3
**outward**
35:15
**overall**
65:19
**overrepresentation**
41:24 42:3

_____
P
_____
**P**
2:1,1
**P.M**
134:5
**page**

3:3 8:17 10:6 11:6
12:8 17:7,8,9 22:2
22:15 23:20 38:23
45:24 47:4 52:22
61:12,13,16,16 76:1
77:16,17 80:1,2
86:24,25 88:15
92:20 94:3 98:5
101:20 102:16
109:6 110:23 123:3
123:4,11 124:3
132:14
**pages**
23:21
**paper**
15:12 45:18 47:4
48:5
**papers**
15:13
**paradigmatic**
101:23 112:20
114:18
**paragraph**
8:17 10:6 11:7 47:5
80:4,5 81:13 82:20
109:7 114:24
132:14
**paragraphs**
123:20
**paraphrase**
88:9
**paraphrased**
65:11
**parent**
54:10,22 55:24 56:10
57:1 70:25 71:8
**parentheses**
113:17,18
**parents**
54:18 62:17 63:3,21
64:4 66:18 67:6
70:8 106:10 132:7
**Parson**
3:24 12:8,16,23 13:5
17:3 23:15 24:25
27:13

**part**
20:5 22:12 54:17
57:1,10 58:3 59:7
59:12 60:9 63:2,23
65:23 79:8 83:18
85:20 101:13 104:7
112:24
**participants**
81:1,7
**participated**
67:9
**participation**
8:19
**particular**
25:7,13 26:7,16
27:22,23 49:18 50:3
51:1 64:4 66:2,12
79:13 84:25 86:20
86:21 106:14
125:19 126:1
**particularly**
55:10 71:24 108:6
112:19 132:7
**parties**
5:16 6:13 135:14
**partly**
94:21
**parts**
115:1,9,10
**passed**
113:8,14
**pathway**
37:11 38:18 39:2
**patient**
22:9 25:7,13 26:7,16
49:5 66:3 74:16
**patient's**
68:7 106:16
**patient-important**
79:15
**patients**
20:18,24 21:6,18
22:4,16 23:9 24:8
24:21 28:6 36:24
37:11 59:16,19 60:6
60:10,11 62:1 64:9



106:9 119:25
131:23
**pediatric**
20:14 21:2,13 26:2
36:11 70:10 118:9
**pediatrician**
22:16
**pediatrics**
70:23 79:4 127:12
**peer-reviewed**
8:14 18:24 19:4,6,16
27:6
**pending**
7:12
**people**
38:17 39:2 124:5
129:7
**percent**
26:24 27:13,16
**percentage**
27:4 42:8,10 64:6,24
65:3
**period**
27:5 64:21 67:11
117:24
**permanent**
23:24 128:3,6,16
129:13,14,15
**permits**
113:24
**permitted**
125:24
**persistence**
94:24
**person**
33:12,20 34:20 49:21
51:14,14 53:16,25
55:5 128:19
**person's**
23:24 129:25
**personal**
110:13 127:23
**personally**
89:11 127:18
**Persons**
4:10

**Perspectives**
45:22
**pharmaceutical**
130:15,21
**phenomena**
105:13
**phrase**
23:3,10,13 28:13
67:15 68:13,24 69:3
69:5,9,10 91:6,22
106:19,23,25 107:5
107:9 111:12,24
128:9
**physical**
69:22 103:13
**place**
14:22 103:12 112:21
135:11
**plaintiffs**
1:7 2:5 5:22,25 14:14
133:20
**plaintiffs'**
6:17
**plan**
61:1,2,3
**plausible**
91:18
**PLC**
5:12
**please**
7:10 8:13 9:2 21:21
40:12 45:25 66:7
90:18 103:6 123:5
**PLLC**
2:3,12
**point**
27:22 43:23 51:3
83:11 85:1 96:16
98:24 114:23
**policies**
108:17
**policy**
109:15
**political**
57:6,22 59:24
**politicized**

57:7
**population**
42:6,10 52:2,5
116:21,22,25 118:9
131:18 132:23
**portions**
123:25
**poses**
59:10
**position**
6:17,18 132:6,10
**positions**
63:13
**positive**
126:5
**possibility**
36:13 50:9 57:19
94:1
**possible**
23:7 35:22 36:4,12
80:15 81:15,19
82:13 89:2 98:1
120:6
**postmortem**
129:19
**potential**
18:18 33:1 36:9
42:15 48:3 50:24
52:17 57:18 58:24
59:10,11,17 61:6
70:15 90:21 91:14
91:25 92:4 97:14,24
103:17 108:22
116:14 118:11
126:2
**potentially**
21:10 32:16 60:19
64:5,19 88:25 91:10
107:1 117:22,23
124:15 125:2 126:6
129:12 130:7
**practice**
4:10 18:13,22 22:5
59:1 60:16 61:4
71:23 72:23 74:9
84:7,16,21 107:15

108:16,21 109:12
109:18 111:20
112:13,15 132:4
**preceding**
124:1
**precise**
96:14
**predicate**
81:19
**predict**
86:11,17
**predictions**
50:2
**preferable**
99:11,17 116:1
**preferences**
97:2,3 103:9
**preliminary**
3:14 9:15 61:11
62:25 63:17
**preparation**
15:14,17,25
**prepare**
14:8,9,24
**Presbyterian**
1:17 5:11
**prescribe**
132:4
**prescribed**
26:1
**present**
2:17 5:16 14:11 22:5
**presented**
7:6 30:16
**presenting**
30:11
**presumably**
97:14 117:12 129:14
**pretty**
43:23
**previous**
14:10 19:14
**previously**
12:1 27:6 33:8,16
64:1 76:4 99:7
112:17 113:23



132:1,2 133:10
**principal**
20:2 108:20
**principle**
73:21 74:2 106:14
108:4
**printed**
15:12,13
**prior**
19:15 69:16,24 72:2
101:16 104:16
132:22
**probably**
66:14
**problem**
70:13 96:14 118:3
**procedure**
106:15 116:23
**proceed**
37:6 60:13,20 62:18
63:5,25 64:7,25
65:8 66:1,16,25
69:12
**proceeding**
69:16,24
**proceeds**
49:22 50:8 128:20
**process**
54:23 55:1,18,25
56:10 57:2,10,21
58:3,6,24 59:8,13
59:23 60:9 63:3,23
64:3,4 65:23 68:9
68:19 96:3 106:9
109:10,16 113:8,9
113:15,16 129:3
132:8
**processes**
108:23
**produce**
89:3
**produces**
86:21 96:14
**professional**
8:7 20:5 26:24 27:7
71:24

**Professor**
79:10
**prognosis**
60:18
**progresses**
49:6
**prohibiting**
108:5
**prohibition**
71:18
**Project**
4:7
**promulgated**
29:11
**proper**
82:3 95:18
**properly**
96:9
**prospective**
124:15
**provide**
20:20 21:14 22:21
23:15,16,25 24:3,16
24:25 32:19 33:3,10
42:15 47:18,20
55:21 60:17 65:14
66:20 70:17,20
82:22 98:17 103:22
112:3 116:10
120:19 124:17
125:16 126:6,13
**provided**
33:1 47:20 82:21
103:18 109:23,24
119:22 122:5,17
123:14 124:6,22
**provider**
33:9 34:5,14 59:7
**provider's**
106:16
**providers**
57:8 59:2 60:17 67:4
106:10
**provides**
23:9 24:8,20 70:25
71:1,7,8 85:21

88:23 96:1 97:5
99:14 117:8 124:9
**providing**
24:6,10 54:10 65:2
88:5 119:12
**provision**
27:14
**psychiatrist**
16:24 17:4,13
**psychiatry**
16:25
**psychological**
68:10,11,13,20,23
103:16 107:12
**psychologist**
17:16,22
**psychosocial**
78:15
**psychotherapy**
115:15,18,22 116:2,5
**pubertal**
93:6,15 94:5,13
103:17
**puberty**
25:7,13 36:17,25
37:10 38:16,25
39:10,17 40:9,18
42:19 44:9 46:13,19
49:5,22 50:7 51:23
52:25 53:8 60:10,13
61:21 62:11,18 63:5
63:24 64:12 65:8,23
66:1,25 78:19 84:10
84:18 94:10 120:1
122:4,16 123:13
124:20 128:3,7,12
128:17,19,22 129:3
129:14,25 130:14
**public**
135:5,24
**publication**
18:24 19:6,17
**publications**
8:11,14 19:2,4,14
**published**
8:11 18:23 19:5

45:19,22 48:4 79:4
79:5 85:25 86:4
**publishing**
47:19
**purposes**
83:15
**pursuant**
135:12
**purveyed**
57:25
**put**
36:24

**Q**

**qualification**
132:21
**qualifications**
22:19 26:12,20
**qualify**
27:3 35:1
**quality**
4:14 73:14,18 74:19
76:20 85:14 86:9,16
87:5,8,22 88:7 89:3
90:24 91:19 93:11
94:10 95:5,10,12,16
95:24 96:5,25 98:15
98:16,19 99:4,15
100:25 103:11
104:23 105:6,11
111:16,25 112:10
112:14,15,18 113:1
113:25 114:5,19
115:21,22
**quarter-size**
17:9
**question**
7:11 17:19 25:10
32:9 35:3 36:2 37:9
38:6,15,19,25 39:5
39:6,14,22 40:5,12
40:21 41:8 46:16
50:21 51:5,8,10
52:6,9,12,15,21,23
53:4,21 54:8 55:20
56:7,16,20,22 61:19

62:7,22 63:2,10,16
64:16,16,23 66:10
66:12 67:13 71:4
73:4,25 77:24 78:1
78:2 81:3 83:9,20
84:12 86:13 100:11
100:13 103:19
105:1 110:1 117:7
118:25 120:5,9
121:7,10,12,13,16
121:19,20,21,25
122:10,11,24
123:12,17,21
124:10,12,14
125:12 126:10,22
129:11,17 132:23
133:3,10
**questioner**
124:1
**questions**
7:5,12 58:1 63:18
100:7 123:8 132:22
133:15,16,18
**quick**
126:24
**quickly**
113:12
**quote**
39:4 77:6 104:8
120:17 129:13

─────── **R** ───────

**R**
2:1,1 135:1
**raise**
59:17 99:23 100:3,15
**raised**
57:11 122:24
**raising**
88:25
**Ramer**
2:13 3:5 5:19,19 6:9
6:20,22 7:17 8:24
9:7,20 10:11,22
11:15 12:13,20
13:15,23 15:23

16:10 18:10 19:19
20:4,16,23 21:5,16
23:2 24:22 25:5,11
25:18 26:5,14,22
27:11 28:12,18,24
29:4 30:8,19 31:8
31:18 32:5,10,21
33:11,19 34:6,19
35:5,10 36:3,15,22
37:8,15 38:12 39:15
40:1,14,23 41:10,16
41:22 42:5 43:1,22
44:6,17 45:2,16
46:17 48:11,23 49:4
49:12 50:5,19 51:4
51:11,20 52:10,20
53:5,13,22 54:6
55:2,15,23 56:8,23
57:20 58:8,15 59:21
60:8,22 62:23 63:20
65:5 66:7,9,23
67:14,20 68:6 69:4
70:11 71:5,13 72:19
73:5,11,20 74:1,8
74:14,23 76:5,13,24
77:8 78:12 79:1,21
80:23 81:4,12,22
82:9,23 83:5 84:14
85:1,11 86:7,14,22
89:1,19,24 90:10,15
91:5,21 92:8,17
93:19 94:18 96:7,18
97:17 98:3,20 99:19
100:10,22 101:6,19
102:23 103:23
104:3,12 105:3,14
105:22 106:3,18
107:20 108:12
109:1 110:12,20
112:7,23 114:6
115:4,12 116:3,13
117:5 118:10,15
119:2,23 120:8
121:5,11 122:2
123:1 125:5,14
126:15,23 127:7,13

128:1,8 129:1,9
130:12,18 131:1,14
131:22 132:11
133:4,13,25
**randomized**
117:21 124:7,16
125:2
**range**
36:12 44:24
**rate**
44:15 91:19 131:17
**rated**
88:19,19
**rating**
4:14 85:14 86:9,16
95:12
**ratio**
32:2
**rational-person**
58:25
**RCTs**
124:8
**re-evaluate**
99:17
**reach**
6:14 95:20 96:8
**reached**
96:4 100:8
**reacquaint**
63:15
**read**
14:24 15:24 17:15
22:8,18 24:5 39:7
46:2,3,5 47:7,8,10
61:17,18 62:2 77:23
80:8,9,16 82:20
83:3 88:8 90:20
93:8 94:7 95:3
102:3 109:9,10,19
112:2,17 123:6,23
126:21 132:15,16
132:18
**reading**
17:18 47:16 113:7,12
123:7,20,25
**reask**

52:21
**reason**
50:17,20 91:19 104:4
118:19 119:6 131:4
**reasonable**
77:10,14,19,22 78:1
78:4 115:25
**reasons**
32:1 70:2,9 71:19,21
120:25
**recall**
16:17 21:25 23:19
27:17 38:21 52:11
67:12 72:24 75:17
77:15 84:5 97:12
98:23,25 99:24
122:21,23 126:20
**receive**
25:7,13 26:8,17
28:10 34:25 49:10
66:16,16
**received**
33:25 34:3,18
**receiving**
21:10 117:10,12
118:18,20 119:5,7
119:13,15,25
**recess**
44:2 85:5 127:3
**recommend**
84:7 94:4,21 97:20
111:24
**recommend'**
111:14
**recommendation**
4:16 94:9 95:5 96:6
96:20,24 97:8,10,15
98:16 99:16,18
100:24 101:10,24
102:22 103:10,11
103:18 105:15
114:18 122:15,18
123:18
**recommendation's**
4:17 101:10
**recommendations**



76:19,21,23 82:24
83:6 84:2 92:25
95:14,18,21,25
96:24 97:7,8,25
98:11,15,18,22 99:4
99:14,22 100:3,9,12
100:14,18 102:18
103:12 104:1,9,11
104:17 106:12
109:11 110:4
111:14,23 112:17
113:10,16,19,24
114:4,9
**recommended**
64:6
**reconcile**
114:1,24
**record**
5:2 6:13 43:24 44:1,5
85:2,4,10 126:25
127:2,6 133:19
134:3
**reduce**
115:24
**reduces**
131:17
**refer**
17:5,8 32:2
**reference**
110:1 113:22
**references**
109:25
**referred**
27:7 43:4 68:4 98:21
112:20
**referring**
27:10 35:18 91:18
102:21 104:14
111:7 117:7,19
124:15
**refers**
43:7,9 116:18
**reflect**
101:22
**reflected**
112:12

**reflection**
27:21
**regain**
49:14,17
**regard**
49:19 71:17
**regarding**
49:18 57:14 74:16
75:22 76:7 77:1
80:14 103:10
108:23 116:10
**regression**
92:3,10
**regular**
23:8
**regulation**
122:3 124:19
**reidentify**
107:13 108:7
**related**
8:7 16:2,4 18:7 19:2
19:12,12,14 20:1,3
25:24 27:8,8,14
28:1,1,5 30:17 40:5
58:23 76:2 86:1
104:6
**relates**
18:8
**relating**
18:24 19:6 26:25
**relative**
96:4,25 135:13
**relatively**
79:3
**relevant**
14:11 16:3 54:13,18
55:13 61:20,25 64:9
64:11 65:9 66:2
67:3 76:19
**relying**
76:16 77:3 103:4
**remain**
117:11
**remarks**
103:9
**Remote**

3:21
**repeat**
20:12 25:10 32:9
36:2 39:14 40:12
41:8 46:16 53:4,21
56:6 62:22 71:4
73:4,25 81:3 83:17
84:12 86:13 100:1
105:1 118:25 133:3
**repeated**
62:7
**report**
3:16 10:14 14:12
15:2,3 39:4 89:8
132:13
**reported**
1:19 87:19
**reporter**
5:14 6:2
**reporting**
135:16
**reports**
10:15 132:13
**represent**
5:18 88:10 93:13
**representative**
130:15,21
**request**
5:12 7:12 24:12
94:20
**requesting**
93:5
**requirement**
23:23
**requirements**
69:18
**requires**
73:22 74:3 96:2,15
**research**
96:20 97:14,21 106:5
122:6,12,17 123:14
124:6,13,22
**researcher**
92:14 125:15,17
**researchers**
118:17 119:4

**residual**
91:19 115:10
**resource**
97:3
**respect**
7:22 49:20 50:6
60:10 67:16 70:1
95:8 103:19 107:22
110:6 129:3
**respects**
135:12
**response**
54:8
**rest**
128:21
**restrictions**
47:19
**result**
118:7 126:3 135:15
**results**
44:14 82:13 92:11
126:1
**return**
92:18
**returning**
10:5 11:5 12:7 98:4
102:14,15
**returns**
44:19,23 45:4,8 46:4
**review**
15:6,13,16,19 47:18
50:14 72:7 73:1,7
73:13 74:7 75:19,22
76:7,11,19 77:1
78:14,18 79:4,8
80:14 81:14,19 82:3
82:12,13,21,22 83:1
83:4,7,14,15,21
84:3,9,18,24 95:20
104:6 127:15
133:22
**reviewed**
14:11 15:2,20,21
67:12 87:17 113:23
**reviewing**
88:12



**reviews**
74:10,15 75:9,12
76:1 78:23 79:5,7
83:11,23 95:16
**right**
17:4,14 28:6 40:3
47:24 58:19 60:24
82:17 84:4 110:24
117:16 120:11
124:2 133:24
**risk**
44:10 48:12,18 49:1
51:1 59:10 69:22
90:12,23 91:2 92:4
**risks**
46:1 48:7,16 50:24
50:25 53:14,23 54:4
54:12 55:4 59:2,3,9
59:11 61:6 90:21
97:1
**RMR**
1:19 135:4,23
**Road**
1:17
**role**
20:1,6,14 21:2 24:9
25:22 28:2 70:7
**room**
14:15
**rough**
133:21
**roughly**
7:9 28:5
**Rule**
135:18
**rules**
7:2
**running**
123:3
**Rutledge**
3:17,19

─────── **S** ───────

**S**
2:1 124:8
**S/**

135:23
**S247**
109:7
**S250**
110:22,23
**S46**
80:1,2 81:13
**safety**
19:21 51:23 52:25
53:8 125:7,13
**sample**
81:10
**saving**
131:3,5,10,12,24
**saying**
65:13 81:14 113:2
114:7,11,22,25
115:6
**says**
22:9 46:3 47:8 61:19
77:18 80:10 93:16
94:4,15,19 100:24
109:10 111:4,13,16
111:17 113:1 124:3
132:16
**Scale**
90:1
**Scale's**
90:3
**schedule**
94:23
**Schumer**
16:20
**scientific**
58:10,13
**scientist**
77:11,19 78:1,4
**scope**
50:4 56:21 132:3
**screen**
5:9 134:3
**se**
22:7,17
**seal**
135:20
**search**

50:17,20
**searches**
16:1
**second**
46:2
**secondary**
103:14
**section**
63:8 92:22,24,25
98:10 102:25 103:7
111:3,8 112:24
**see**
80:6 87:2 88:16
92:23,24 93:7 94:6
95:2 98:8 106:15
110:1,25 111:7,8,20
124:2
**seek**
107:13
**seen**
23:9 24:21
**Selendy**
2:3 5:22
**sense**
7:7,13 25:19 28:21
83:13 121:17
**sentence**
46:2 47:5,17,23,25
80:4,8,9 82:1,6,7,8
82:19 93:9 109:9
111:4 132:15
**sentences**
109:8
**separate**
35:3
**September**
135:24
**series**
85:20 86:3 101:14,17
101:18
**serious**
59:3
**served**
19:7,18
**service**
19:15 21:13

**Services**
1:21 5:14,15
**set**
31:6 135:19
**seven**
6:16
**sex**
28:22 32:2 35:12,19
75:15 94:20 107:14
108:8 124:5
**sex-hormone**
76:2
**sexual**
41:4,11,17 103:14
107:2
**shape**
58:5,6
**shared**
54:23 55:1 59:12
64:3 106:8
**sheet**
4:5 12:23 14:1
**sheets**
12:25
**Sheffield**
79:9,11
**shift**
31:9,20
**shifted**
66:12
**shifting**
108:14
**shock**
106:25
**short**
82:20
**showing**
128:2 129:2,24
**shows**
125:18
**Shumer**
16:11,12
**sign**
133:23
**significant**
19:11 27:7 30:25



37:16 38:9 69:11
70:21 97:12
**similar**
31:22 104:18
**similarly**
1:6
**Sindiong**
2:17 5:13
**single**
47:16
**sir**
8:2,15,18 9:11,14,17
9:25,25 10:4,8,16
10:19 11:1,4,9,12
11:21 12:3,6,10,17
12:24 13:3,6,9,12
13:20 14:3,16,19,21
14:23 15:1,5,8,12
15:15,22 16:5,7,9
16:17,19,22 17:1,6
17:8,11,15,20,23
18:2,6,9,14,19,22
19:4,11,18 20:1,10
20:15,22 21:4,9,22
21:25 22:8,18,20
23:1,13,19 24:1,5
24:21 25:4,10,17
26:12,21 27:10,17
27:22 28:3,17,23
29:3,8,12,14,17,25
30:7,18,23 31:17
32:9 33:3,7,10,17
34:5,12,16,18 35:9
36:2,14,21 37:4,14
37:22,25 38:3,5,9
38:21 39:8,14,21,25
40:4,11,22 41:3,9
41:15,21 42:4,7,25
43:6,13,16,21 45:25
46:7,11,16,21 47:6
47:16,22 48:4,5,10
48:14,22 49:3,11,19
50:4,14 51:3,9,10
51:17,19,25 52:9,19
53:4,12,20 54:4,5,9
55:1,12,21,22 56:7

56:15 57:7 58:7,12
58:14,22 60:7,21
61:9,14 62:3,6,6,22
63:8,18 64:2,15
65:4,12,17 66:11,22
66:22 67:13,19 68:5
68:12,15 69:3,7
70:5,23 71:4,12,20
72:8,11,17,24 73:4
73:10,19,25 74:7,13
74:20 75:5,7,11,18
75:20,25 76:4,12,18
76:23 77:5,15,17,23
78:9,16,22 79:18,25
80:2,7,17,22 81:3
81:10,18,21,24 82:1
82:7,20,22 83:3,8
83:24 84:5,13 85:16
85:19 86:13,21,25
87:3,6,14,18 88:2,6
88:10,14,17,25 89:5
89:10,15,23 90:3,9
90:14,25 91:4,8,12
91:17,24 92:2,7,15
92:16,21 93:1,8,13
93:18,18 94:1,7,12
94:17 95:3,7,14,24
96:16,16 98:2,9,19
99:1,7,18,24 100:1
100:9,21 101:2,12
101:18,21 102:4,7
102:13,22 103:1,22
104:4,11,17,18
105:2,13,21 106:1,2
106:7,21 107:3,7,14
107:19 109:5,20,23
110:10,19,23 111:2
111:10,21 112:2,17
112:22 113:5 114:2
114:14 115:3,10,11
115:17 116:12,18
117:4,17 118:6,14
118:25 119:11
120:4,14 121:9,16
122:1,10,12,21
123:10,16,22,24

124:18 125:3,4,11
125:22 126:22
127:17,24 128:6,18
128:25 129:8,17,22
130:5,11,17,23,24
131:7,13,20 132:1
132:10,19,24 133:3
133:8
**sites**
32:19,22
**sitting**
38:2
**situated**
1:6
**situation**
31:22 55:24 56:9,18
65:22 102:18 103:4
103:20,25 128:24
**situations**
25:23 56:25 60:2
97:18 100:23
101:23 104:19,21
105:4 106:13
120:16
**six**
101:2 112:19
**sizes**
81:11
**slowly**
80:10
**small**
23:21 61:13 77:16
123:3 124:8
**Smith**
2:4 5:21,21 6:11
15:18 16:8 18:5
19:10,24 20:8,11,19
21:1,8 22:24 24:18
25:3,9,15,21 26:10
26:19 27:2 28:7,15
28:20 29:2 30:3,13
30:22 31:13,21 32:8
32:13 33:6,14,22
34:11,22 35:8 36:1
36:8,20 37:2,13
38:8 39:13,20 40:10

40:19 41:7,14,20
42:2,23 44:12,21
45:6 46:15 48:9,21
49:2,8 50:1,12,22
51:7,16 52:7,13
53:2,10,19 54:3,20
55:9,19 56:4,14
57:5,23 58:11,20
59:25 60:15 62:20
63:7 64:14 66:4,21
67:8,18,25 69:1
70:4 71:3,11 72:15
73:3,9,16,24 74:5
74:12,18 75:24 76:9
76:17 77:4 78:8,21
79:17 80:20 81:2,8
81:17 82:5,18 83:2
84:11,20 85:23
86:12,19 88:22
89:14,22 90:6,13
91:3,16 92:6,13
93:17 94:16 95:22
96:11,22 97:22
98:13 99:6 100:4,16
101:1,15 102:20
103:5 104:25 105:8
105:19,25 106:6
107:17,24 108:19
110:8,16 112:1,11
113:4 114:13 115:7
115:16 116:8,16
118:5,13,23 119:10
120:2,12 121:8,15
122:8,20 124:24
125:10,21 126:19
127:10,20 128:5,23
129:5 130:2,16,22
131:11,19,25 133:2
133:18
**SOC-8**
71:25 82:25 109:4,11
110:4,14 111:23
113:6
**social**
32:6,11,17 33:2 35:6
35:16,23 36:5,9

58:4
**Societies**
84:22
**Society**
4:10 61:4 75:1 89:7
89:13 92:19 94:3
98:5 102:19 103:3,7
104:2
**Society's**
112:13
**solely**
43:20
**somebody**
34:9
**someone's**
35:15 55:12
**somewhat**
15:21
**sorry**
6:11 17:8 22:1 83:17
100:11 103:21
108:14 113:13
122:22
**South**
1:2,11 5:6
**space**
47:19
**speak**
127:22
**speaking**
66:7
**specific**
25:19 29:21 40:21
42:25 52:4 53:12
61:25 65:2,18 76:11
97:13 102:21
105:10,10 106:1
119:22
**specifically**
7:25 62:13 103:20
124:14
**specificity**
55:22 56:21 124:10
124:17 126:21
**specify**
108:2,9

**spectrum**
41:25 42:21
**speculation**
56:5 96:12 97:23
105:20 110:9
118:24 120:3,13
122:9 124:25
**speculative**
57:8 59:9
**spending**
27:21
**spent**
6:15 27:4,8,25
**spoke**
16:15
**spoken**
16:20 127:18
**Sruti**
2:8 5:23
**SS**
135:2
**sswwaminathan@...**
2:10
**staff**
23:8
**stage**
40:8,17 49:6,22 50:8
64:19 128:20
129:20
**standard**
42:6 58:25 95:8
**standards**
58:23,25 79:24
109:17 127:16
**standpoint**
83:9
**start**
48:16 64:24 66:1
104:20 125:15
**started**
6:12 129:20
**starting**
23:22 61:15
**starts**
61:21
**state**

5:17 22:3 24:2 32:1
47:2 81:18 103:12
105:17 129:15
133:9,19 135:2,6,24
**stated**
15:1 23:15,16 64:1
72:21 76:4 132:1
**statement**
22:19 25:17,20 39:4
65:12 81:23 82:2
99:25 100:1 112:21
113:9,15 131:9
132:22
**statements**
86:5 98:7 110:25
111:5,12 113:8,14
114:2
**states**
1:1 5:5 30:11 87:12
93:2 124:1
**statistical**
29:22 125:24
**statute**
15:22
**staying**
115:10
**Sterling**
1:5 5:4
**steroid**
75:13
**steroids**
75:15
**sticking**
8:16 10:6 88:15 94:2
110:21
**stipulations**
135:12
**strategy**
114:17
**Street**
2:8
**strength**
4:17 76:21 95:25
96:5 99:18 101:11
**strengthened**
81:10

**strike**
43:8
**stroke**
48:13,19
**strokes**
55:11,17 57:19
**strong**
97:7,7 98:11,14,18
99:3,14 100:24
101:23 103:11
105:15 111:13
112:17 113:24
114:4,8,18
**studied**
116:22
**studies**
42:24 49:16 53:11
73:19 80:12,13,19
80:25 81:6,9,15,20
81:21 82:14,17,22
90:20 92:4,11
104:22,23 105:5,6
105:10,11 116:9
117:6,9,14,17 118:9
124:13,16,23
125:25 126:13,20
**study**
18:4 19:21 20:3 39:9
39:16,24 40:2,7,15
40:20 42:18 50:9,16
50:18 51:21,25 52:4
52:16,23 53:6 88:19
89:3 90:12,22 91:2
91:14,20 92:1,9
104:8 116:4,14
117:18 118:2,11,16
118:21 119:3,8,25
120:10 125:7,16,18
125:23 126:1,17
128:2 129:2,6,12,18
129:19,23,24 130:6
131:16,21
**sub-bullets**
111:10
**subject**
50:13 58:2 107:18

133:14
**subjects**
51:6
**submitted**
7:19 9:4 10:14,16
**subpopulation**
42:25 132:24
**subsequent**
79:5
**subsequently**
86:4 104:23 105:6
**subset**
112:5
**substance**
102:10,12
**substantial**
37:24 69:22 130:4,8
**substantially**
48:1 87:10,13,23
  93:15 94:14
**substantively**
104:18
**Sue**
5:14
**sufficient**
59:5 94:25 114:17
  126:11
**suggest**
49:17 65:20 93:2
  126:6
**suggestion**
93:10
**suicides**
131:17
**summaries**
73:23 74:4
**summarizing**
92:24
**summary**
6:21 98:7
**supervised**
72:25 73:6
**support**
75:9 76:22 131:8
**supports**
44:23 45:8

**supposed**
7:2
**suppress**
93:6 94:5,9
**suppression**
40:9,18 93:15 94:14
  103:17 128:3,7,11
  128:16,19 129:13
  129:25
**sure**
20:11 32:23 40:11
  53:3 84:13 123:21
**surgeries**
105:23
**surgery**
26:17
**surgical**
69:17,24
**surrounding**
80:11
**Susan**
1:19 135:4,23
**Swaminathan**
2:8 5:23,24
**swear**
6:2 22:20
**Swedish**
122:15 123:12
**Switching**
44:7
**sworn**
6:6 135:8
**symbols**
93:9 94:8 95:4
**symptoms**
33:24 34:2,17,24
**system**
72:10
**systematic**
72:7 73:1,7,13,22
  74:3,7,10,15 75:9
  75:22 76:1,7,10,15
  77:1 78:14,18,23
  79:3,5,7 80:14
  81:14,19 82:3,12,13
  83:1,4,7,10,14,14

83:21,23 84:3,9,18
  84:24 95:16
**systematically**
77:12,20 78:6

---
### T

**T**
2:1 135:1,1
**table**
11:20 12:1 87:1,4,7
  88:15,18 91:18
  101:22,22 102:3,5,8
  102:10,11,12
  103:20,21,25
  112:20
**Taft**
1:17
**take**
7:13 14:22 22:12
  35:2 43:24 64:15,23
  121:16 126:24
  132:21
**taken**
1:17 3:22 4:3 5:10
  6:15 44:2 85:5
  127:3 135:12
**talk**
44:8
**talking**
86:10,15,16 88:6
**Tanner**
40:8,17 50:8 64:19
  128:20 129:20
**Tanner's**
49:6,22
**Taylor**
79:10
**team**
94:23
**technical**
90:19,22 121:17
**tell**
131:23
**telling**
62:17 87:11,24 102:5
**term**

23:6 24:13 28:17,25
  29:6,7,8 33:17 35:6
  35:9,11 43:3,4,7,9
  43:15,18 72:6
  116:19 128:18
**terminology**
31:15 57:16 66:12
  67:21,22 93:22
  98:25 99:1 117:2
**terms**
8:6 35:12,13 80:21
  83:19,20 90:19,19
  90:22,24 91:12
  95:24 97:3 108:2,9
  119:19 125:12,13
**test**
30:1,1,6,6 37:22
  116:12
**tested**
37:19 86:11,18
**testified**
9:15 10:17 11:10
  21:18 72:20 132:20
  133:11
**testify**
127:23
**testimony**
9:12,23 10:2,25 11:2
  11:18,23 12:5 13:2
  13:4 14:4 22:20
  54:21 58:21 62:15
  62:21,24 63:9,9,12
  117:4 122:23
**testosterone**
48:6,24
**tests**
30:4,5
**text**
8:1 103:7
**thank**
13:12 29:14 133:13
**theories**
42:15
**therapy**
37:7 44:20,25 45:5
  45:10 46:5 49:10,15



56:20 57:15 60:21
61:8 62:12 64:8,22
65:1 66:17 106:20
106:25 107:5,9,22
108:3,4,6,10,11
115:20 116:1,6
119:14,16 126:4,7
129:21 132:5
**therapy/intervention**
114:16
**thin**
119:12
**things**
36:12 46:24
**think**
18:17,21 24:1 25:16
26:12,21 27:3,20
33:12,15,20 34:1,13
34:15,23,24 36:11
37:17,18,21,22,23
39:3 45:7 46:25
47:21,25 51:8 52:22
56:15 57:17 58:12
58:16,22 60:23
62:15,24 63:21 64:2
64:6 65:1,12,17
66:5,13,18 67:3
70:2 78:4,9 79:14
83:8 88:8 93:21
97:18 100:6 102:7
105:17,23 106:4,7
107:15,25 108:8
114:8,11,20 115:24
117:7 120:16,24
122:19 126:11
128:15 132:19
**thinking**
29:13
**third**
114:23
**thought**
37:24 65:6 117:24
120:15 121:22,24
**three**
28:5
**three-month**

117:24
**time**
5:9 6:14 7:10 16:15
19:5 26:24 27:4,5,8
27:10,16,21,22,23
27:25 28:3 30:24
43:10 44:1,5 49:9
51:3,13,14 63:13,19
64:18,21 67:11
83:11 85:4,10 98:24
117:13,24 126:22
126:23 127:2,6
128:14 133:14
134:2 135:10
**times**
7:1 14:17 97:3,10
99:1 114:14 118:1
**title**
45:21 102:3,8,11
**titles**
110:1
**today**
5:8 14:8,9,15 15:14
15:17,25 38:2 63:10
64:2 78:3 124:13
132:20 133:11,14
133:17
**told**
60:12 63:4,22
**tool**
91:2
**top**
22:3 37:21,23 38:1,5
51:6 75:18 87:1
103:1 105:9 117:16
**topic**
19:17 47:18 48:2
50:15 59:17 82:12
84:25 106:2 116:10
**topics**
27:4 108:14
**total**
6:16
**trajectory**
35:24 36:6,18 39:11
39:18

**transcript**
3:14,18,20,21 9:1,23
10:24 11:18,23 12:4
12:16 13:18 17:6,19
61:12 123:25
133:21,23
**transgender**
4:12,19 18:24 19:6
22:22 23:17 24:16
25:1 28:14,19 29:15
33:16 35:21 67:5
71:25 75:14,16
118:17,18 119:4,5
131:18 132:17
**transition**
35:7,17,23 36:5,10
131:3,9,16,24 133:6
**transparency**
109:14
**transparent**
108:16,23
**treat**
20:24 21:6,18,19
22:4,6,16 36:17,25
39:11,18 44:10 71:9
112:9
**treated**
26:4 37:6
**treating**
22:13 115:14
**treatment**
4:9 19:22 25:8,14
26:8,17 37:7,11
38:18 39:2 42:20
44:14,16 46:23 48:6
48:15,17,25 60:19
60:20 61:1,2,3,7,9
62:11 64:5,13 65:2
65:24 66:15,20 69:6
70:18 75:1 80:15
92:23,25 93:4,5,6
94:20,21,22 98:8
102:17,24 105:12
116:6 122:5 124:4
124:21 130:5,11,14
130:20 132:7

**treatments**
64:18
**trial**
3:18,20 10:17,25
11:3,10,18,23 12:5
13:2 16:4 21:17,24
72:20 117:21
122:23
**trials**
60:4 124:8,16 125:2
**true**
34:7 47:23 48:1
87:12,18 119:24
**Trustworthy**
109:17
**truth**
135:8,9,9
**truthful**
9:12 10:2 11:2 13:2,4
14:4
**trying**
55:21 88:9,9 112:21
114:1,24 115:1
129:16
**Tuesday**
5:8
**turn**
95:17
**two**
14:14,21 28:5 56:24
75:9 93:12 97:16
98:14 109:21 110:1
111:8 114:1 115:1
117:17 120:20
**typical**
41:4,11,17 131:6
**typically**
35:17

---

**U**

**UK's**
79:6
**unable**
120:9
**unaware**
50:9



**uncertainty**
44:25 115:13,24
**unclear**
44:19 45:4,10 46:4,9
**uncommon**
31:24 59:2
**under-researched**
52:3
**undergo**
72:1 93:5
**undergoing**
130:11
**undersigned**
135:4
**understand**
7:24 30:21 31:20
50:25 68:1 81:25
84:13 115:9 119:1
125:11 128:9,11,13
129:10,17
**understanding**
15:9 18:15,20,22
23:3 24:14,23 29:5
29:7 30:14 35:11,16
37:3 42:7,14 43:17
68:16 69:8,10 71:22
82:3 95:23 106:22
106:24 107:8 108:1
113:5
**understandings**
18:18 29:8
**understands**
83:19
**understood**
24:11 32:23 55:20
**undertake**
82:11
**undiagnosed**
33:13,21 34:21 35:2
**unequivocally**
118:21 119:8 120:10
**unethical**
118:21 119:8,21
120:11,18,20,25
122:7,18,19 123:18
124:23

**UNION**
2:7
**unique**
106:12
**United**
1:1 5:5 16:5 30:11
**university**
79:9,11,13
**unknown**
46:14,20 47:1,10,15
49:13
**unmeasured**
91:9
**unnecessary**
51:2
**unquote**
77:6 104:8 120:17
129:13
**unsatisfactory**
103:13
**updates**
7:21,23 8:5 16:2,6
**urgent**
51:9
**use**
25:25 31:14 35:12
44:9,13,24 45:9
46:22 48:6,15,17
56:17,19 57:14,16
64:7,8,20,21 68:13
75:13 76:3 94:9
96:20 97:20 99:11
105:18 106:24
107:4,8,11 115:20
115:22 124:7
125:19 128:12,13
128:15 130:13,19
131:7
**useful**
62:1
**uses**
98:25 99:1
**usual**
7:1
**utilize**
71:19 97:13 98:2

99:13 132:9
**utilized**
33:16 108:6

─────────
**V**

**v**
1:8 3:11,13,17,18,20
3:24 4:4,6 8:20 10:7
62:25
**vague**
119:19 120:7 121:4
**value**
103:13,15,16
**values**
103:8
**variability**
97:2
**variable**
91:10
**varies**
27:22 28:3,10
**variety**
23:5 46:23 58:23
69:2 78:22 85:25
112:16 120:25
**various**
69:12 72:3 86:4
**vast**
37:5 97:9
**verbal**
47:21
**verify**
12:2 37:22
**version**
75:4,6 104:7,16
**versions**
86:5
**versus**
5:4 9:1,10,13 12:8,16
12:23 13:5,8,18
14:1,5 17:2 23:14
24:25 27:12 38:13
61:11 77:9 83:25
99:20 122:13
**video**
3:21 5:2 133:21

**videographer**
2:17 5:1,13 6:1 43:25
44:4 85:3,9 127:1,5
133:24 134:1
**VIDEOTAPED**
1:15
**view**
31:5
**views**
88:10
**vitae**
8:1,6
**Voe**
4:3,6 13:7,18 14:1,5
38:13 77:9 83:25
99:20
**Volume**
3:15,18

─────────
**W**

**wait**
117:11,13 118:1
**want**
43:23 113:12
**wanted**
6:12
**warranted**
101:24
**Washington**
2:14
**way**
32:25 33:23 51:17
63:14 65:19 99:9
117:3 119:17
128:25 131:15
133:11
**ways**
21:14 34:15 35:1
97:6 114:21 126:12
**We'll**
22:2,2,15 126:25
**we're**
86:15,16 88:6,9 94:3
**we've**
33:7 55:10 84:23
85:1 95:15,15,16

99:7
weak
97:7,10
week
16:21
Weida
3:20
Welcome
44:7 85:12 127:8
well-being
103:16
WHEREOF
135:19
who've
30:16 31:3
widely
72:12,16,18,22
wider
99:1
William
1:17
Wilson
1:9 5:4
wish
108:7 121:3
witness
3:3 6:2,5,17 19:7,15
  19:18 26:23 28:1
  51:3 66:5 135:19
word
15:9 71:14 80:5
words
7:5
work
26:23 28:1 51:2
working
85:24 89:17 104:6
World
29:11 71:24 109:13
  109:18 110:5
worth
37:16
wouldn't
46:9 61:20 97:15
  125:1
WPATH

79:24 109:4 127:16
WPATH's
95:8
WPATHs
84:23
writing
27:5 83:15
wrong
27:19
www.MagnaLS.com
1:23
_____
        X
_____
X
3:1
_____
        Y
_____
year
18:23 28:6,10 45:19
  45:22 69:16
years
30:9 51:14,15 95:2
yesterday
14:23
York
2:5,5,9,9
young
38:17 39:2 105:24
  124:5
youth
80:13,19
_____
        Z
_____
Zachary
2:4 5:21
zsmiht@selendyga...
2:6
_____
        0
_____
_____
        1
_____
1
3:9 7:15 8:16 10:5
  11:5 12:7 15:4,5
  22:3 62:9
10

3:16,18 4:3 13:13,17
  37:23
10:12
44:3,5
100
23:21
10004
2:9
101
4:15
10104
2:5
103
1:17
108
4:18
11
3:20 4:5 13:21,25
  17:12 23:21
11:11
85:4,5
11:45
85:6,10
12
3:21,23 4:7 38:23
  45:14,18 47:3 51:14
12:43
127:2,3
12:50
127:4,6
12:59
134:3,5
125
2:8
1290
2:4
13
4:3,5,9 17:12 74:21
  74:25 78:14 92:18
  94:2 98:4 102:15
  104:15
133
77:16,17
14
4:11 79:19,23
15

4:13,16 30:9 85:7,13
  86:23 101:9,17
1523
2:13
16
4:15 95:2 101:4,8
  103:21,25
17
4:18 108:24 109:3
  110:21 112:25
18
2:8 123:3,11
19
8:17 10:6 17:7,9,9
  62:9 132:14
196
123:3,11
197
123:4
_____
        2
_____
2
3:10,18 8:22 38:22
  38:23 40:8,17 49:6
  49:22 50:8 64:19
  77:16 87:1 123:2
  128:20 129:20
2.0
92:23 102:17
2.1
93:2
2.3
94:4 103:10
2.4
94:19
2:24-cv-04734-BHH
1:9
20
77:18 135:24
20036
2:14
2011
109:18
2017
75:4
2019a



109:18
**202.220.9621**
2:14
**2024**
1:19 5:8 135:21
**2025**
135:24
**212.390.9000**
2:5
**212.549.2500**
2:9
**22**
1:19
**229**
61:13 62:8
**22nd**
5:8
**230**
61:16 62:9
**239**
38:23
**247**
45:24
**248**
47:4
**25**
51:19 61:15
**28(D)**
135:18
**28th**
135:21

--- **3** ---

**3**
3:12 4:14 9:5,9 26:24
27:16 85:14 88:15
101:16 123:4
**3.9**
110:25 112:24 113:7
**30**
8:12 51:15 116:25
117:1
**30th**
51:22 52:24 53:7
129:25 130:10
**35**

51:19
**3871**
92:20 98:6 102:16
**3873**
76:2

--- **4** ---

**4**
3:14 9:18,22 22:3
61:10 101:22
103:21,25
**4.2**
103:21
**404**
86:24,25
**411**
22:3
**412**
22:15
**45**
4:7
**45219**
1:18

--- **5** ---

**5**
3:16 8:17 10:6,9,13
22:1 26:24 27:16
61:17 132:12
**5/6/22**
3:15
**53**
132:15

--- **6** ---

**6**
3:18 4:12 10:20,24
11:6 12:8 22:2,15
**6/18/24**
3:22

--- **7** ---

**7**
3:9,20 11:13,17
**732**
101:20

**74**
4:9
**79**
4:11

--- **8** ---

**8**
3:5,10,21 12:11,15
17:7 23:20 79:24
95:9 127:16
**85**
4:13
**866-624-6221**
1:22

--- **9** ---

**9**
3:12,14,23 12:18,22
**9/5/24**
4:3
**9:01**
1:19 5:9
**9:59**
44:1,2