# IDRX 16 -

# Smith 2024 Deposition Transcript
## (Public document)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
CIVIL ACTION NO. 1:23-CV-864-LCB-LPA

VICTOR VOE, ET AL.,                    )
                                       )
              Plaintiffs,              )
                                       )
      vs.                              )
                                       )
THOMAS MANSFIELD, ET AL.,              )
                                       )
              Defendants,              )
                                       )
      and                              )
                                       )
PHILIP E. BERGER, ET AL.,              )
                                       )
              Intervenor-              )
              Defendants.              )

** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER **

VIDEOTAPED DEPOSITION

OF

RILEY SMITH, M.D.

September 13, 2024 - 9:01 a.m.

Raleigh, North Carolina


Stenographically
  Reported by:    Lisa A. Wheeler, RPR, CRR

MAGNA ⊳
LEGAL SERVICES

```
 1    A P P E A R A N C E S:
 2    On behalf of the Plaintiffs:
 3          Tara L. Borelli, Esquire
            Lambda Legal
 4          1 West Court Square, Suite 105
            Decatur, Georgia 30030
 5          (404) 897-1880
            tborelli@lambdalegal.org
 6
                -and-
 7
            Abigail Coursolle, Esquire
 8            (Appeared remotely)
            National Health Law Program
 9          3701 Wilshire Boulevard, Suite 315
            Los Angeles, California 90010
10          (310) 736-1652
            coursolle@healthlaw.org
11
                -and-
12
            Dmitriy Tishyevich, Esquire
13            (Appeared remotely)
            McDermott Will & Emery
14          One Vanderbilt Avenue
            New York, New York 10017-3852
15          (212) 547-5534
            dtishyevich@mwe.com
16
                -and-
17
            Deepika H. Ravi, Esquire
18            (Appeared remotely)
            HWG
19          919 M Street N.W., 8th Floor
            Washington, D.C. 20036
20          (202) 730-1300
            dravi@hwglaw.com
21
22
23
24
25
```

MAGNA ❯

LEGAL SERVICES

```
 1   A P P E A R A N C E S:  (Continued)
 2   On behalf of the Defendant Thomas Mansfield, in
     his official capacity as Chief Executive Officer
 3   of the North Carolina Medical Board, et al.:
 4        Michael E. Bulleri, Esquire
               (Appeared remotely)
 5        North Carolina Department of Justice
          114 West Edenton Street
 6        Raleigh, North Carolina 27603
          (704) 716-6400
 7        mbulleri@ncdoj.gov
 8
     On behalf of the Defendant North Carolina
 9   Department of Health and Human Services, et al.:
10        Colleen M. Crowley, Esquire
               (Appeared remotely)
11        North Carolina Department of Justice
          114 West Edenton Street
12        Raleigh, North Carolina 27603
          (704) 716-6400
13        ccrowley.gov
14
     On behalf of the Intervenor-Defendants:
15
          Brian W. Barnes, Esquire
16        Cooper & Kirk
          1523 New Hampshire Avenue, N.W.
17        Washington, D.C. 20036
          (202) 220-9600
18        bbarnes@cooperkirk.com
19             -and-
20        Craig D. Schauer, Esquire
          Dowling
21        3801 Lake Boone Trail, Suite 260
          Raleigh, North Carolina 27607
22        (919) 529-3351
          cschauer@dowlingfirm.com
23
24   Also Present: Brent Powell, Esquire, UNC Health
                    (Appeared remotely)
25                  Rob Patterson, Videographer
```



1    dysphoria, approximately how many of them are

2    assigned male at birth?

3              MS. BORELLI:  Object to form.

4        A.    That, I don't know off top of my head.

5        Q.    Okay.  Do you -- do you happen to know

6    if it's a majority?

7              MS. BORELLI:  Object to form.

8        A.    I -- I don't think it's a majority,

9    but, again, I have not counted that.  That's just

10   sort of generally thinking through them.

11       Q.    Okay.  Next sentence of the

12   declaration, Paragraph 9, you write, Several of

13   my transgender patients rely on Medicaid to fund

14   their healthcare.

15             Do you see that?

16       A.    Yes.

17       Q.    And how many of your transgenders [sic]

18   patients rely on Medicaid to fund their

19   healthcare?

20       A.    As of when?

21       Q.    As of today.

22       A.    I don't know the answer if we're

23   thinking all of my transgender patients because I

24   haven't -- I haven't counted the adults.  In

25   terms of minors who rely on Medicaid, I know



1    there are two who I can think for certain off the

2    top of my head right now.  It's tricky because

3    insurance status also changes so -- I can think

4    of another -- at least one who is -- used to have

5    Medicaid, most recently was listed as self-pay,

6    so I don't know what's going on with the

7    Medicaid.  Also complicated by 17-year-olds

8    tending to become 18-year-olds in which case I

9    know some of these patients who were on Medicaid

10   as minors are now adults who likely still have

11   Medicaid, but I haven't, again, counted through

12   all those numbers.

13        Q.   Okay.  So let's talk about the two that

14   you know for sure.  Is -- was either or both of

15   those two assigned male at birth?

16        A.   Yes.  Sorry.  That was a -- that was

17   multiple questions in one.

18        Q.   Sorry.

19        A.   One of them was assigned male at birth.

20        Q.   And the other was assigned female at

21   birth, is that right?

22        A.   Correct.

23        Q.   Okay.  So one of each?

24        A.   Yes.

25        Q.   And are those two patients currently



1    taking hormones to treat their gender dysphoria?

2            MS. BORELLI:  Object to form.

3        A.    Yes.

4        Q.    And what hormones are they taking?

5        A.    So one of them is taking estradiol and

6    the other one is taking testosterone.

7        Q.    Do you have any patients who are on

8    Medicaid who are currently taking puberty

9    blockers?

10       A.    If you're referencing GnRH agonists

11   like I believe is the language in the -- the

12   bill, then, no.

13       Q.    Okay.  And how old are the two patients

14   that you have on Medicaid that you just

15   referenced?

16       A.    One is 17 and the other is, I want to

17   say, 15.

18       Q.    Okay.  And the 17-year-old, was that

19   person assigned male at birth or assigned female

20   at birth?

21       A.    They were assigned male at birth.

22       Q.    Okay.  Paragraph 11, first sentence

23   there reads, When I treat my transgender

24   patients, I rely on my training and clinical

25   experience as well as evidence -- evidence-based,



1    widely accepted clinical practice guidelines.

2    And then you -- I won't read all the words, but

3    you give three examples, the WPATH Standards of

4    Care 8, the 2017 Endocrine Society guidelines,

5    and the 2016 UCSF guidelines.

6          Do I -- do I have that right?

7    A.   Yes.

8    Q.   And how do you know that the WPATH

9    Standard -- Standards of Care 8 are evidence

10   based?

11    A.   Well, they have a tremendously long

12   list of references or, you know, bibliography in

13   the standards of care document and when you read

14   through the standards, each recommendation has

15   multiple citations.  They go so far as to talk

16   about -- you know, sort of analyze each study

17   that they're basing their recommendation off of

18   and so that is the evidence that supports their

19   recommendations.

20    Q.   Anything else?

21    A.   I believe also just WPATH asserts --

22   you know, they -- they state that their

23   guidelines are evidence based, which they seem to

24   be.

25    Q.   Same question for the Endocrine Society

1    2017 guidelines, how do you know that those are

2    evidence based?

3         A.   So Endocrine Society, like other, you

4    know, healthcare professional societies, makes

5    their practice guidelines based off of the

6    evidence and so they similarly list, you know, a

7    tremendously long list of references and cite

8    studies off which they base their

9    recommendations.

10        Q.   Same question for the UCSF guidelines,

11   how -- how do you know that those are evidence

12   based?

13        A.   So same answer.  They cite their

14   references and they, you know, specify if they're

15   making a statement based more off sort of expert

16   opinion, which is still a very valid, you know,

17   basis off which to make a recommendation, or if

18   it's based off of a specific study, for example.

19        Q.   And the -- the three sets of practice

20   guidelines we've been talking about, I think you

21   also characterized them as widely accepted; is

22   that right?

23        A.   I believe that -- yes.  That's in the

24   first sentence here.

25        Q.   Okay.  And how do you know that they're

1 widely accepted?

2     A.   Because they are the guidelines that,

3 you know, the vast majority of professional

4 societies reference and support and that

5 providers of gender-affirming care certainly

6 across the U.S. and -- and, really, around the

7 world utilize in their clinical practice.

8     Q.   Do the WPATH Standards of Care 8

9 require some sort of mental health evaluation

10 before starting a minor on hormones to treat

11 gender dysphoria?

12         MS. BORELLI: Object to form.

13     A.   Yeah. And I'm -- I'm -- they phrase

14 most of their things as strong recommendations

15 and so I would need to review it to know the

16 specific verbiage they use but, yes.

17     Q.   They at least strongly recommend a

18 mental health evaluation; is that right?

19         MS. BORELLI: Object to form.

20     A.   Again, I -- I don't have them in front

21 of me and I -- you know, I would need to

22 reference them to know the exact verbiage that

23 they use, but I believe it is at least a -- a

24 strong recommendation.

25     Q.   Okay. And I guess the last sentence in

1        CERTIFICATE OF COURT REPORTER

2    North Carolina

3    Wake County

4        I, Lisa A. Wheeler, RPR, CRR, Notary Public

5    in and for the State of North Carolina, certify

6    that on September 13, 2024, in Raleigh, North

7    Carolina, RILEY SMITH, M.D., having produced

8    satisfactory evidence of identification and

9    having been first duly sworn by me to tell the

10   truth, thereupon testified as set forth in the

11   preceding 196 pages, exclusive of errata sheet

12   and signature page, if required, the examination

13   being reported by me verbatim and reduced to

14   typewritten form by me personally.

15       I further certify that I am not of counsel

16   or in the employ of the parties to this action;

17   that I am not related by blood nor connected by

18   marriage to the parties of this action; that I am

19   not interested in the outcome thereof; that the

20   foregoing is a true and accurate transcript of

21   said proceeding to the best of my ability and

22   understanding.

23       This the 17th day of September, 2024.

24   _____

25       Lisa A. Wheeler, RPR, CRR


```
1        - - - - - -
              E R R A T A
2        - - - - - -

3
```

| 4 PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|---|
| 5  16 | 18 | "may" | "can" | Transcription error |
| 6  23 | 21 | delete "kind of" | | Transcription error |
| 7  27 | 14 | "tran" | "trans" | Transcription error |
| 8  27 | 16 | "care in that" | "care for that" | Transcription error |
| 9  27 | 21 | "Probably." | "Probably?" | Transcription error |
| 10  28 | 4 | "came up" | "it came up" | Transcription error |
| 11  42 | 4 | "could be" | "could mean" | Transcription error |
| 12  51 | 3 | "lower in" | "lower than in" | Transcription error |
| 13  53 | 7-8 | "all their medications" | "all medications" | Transcription error |
| 14  62 | 6 | "and the" | "that the" | Transcription error |
| 15  79 | 22 | "who had" | "to move" | Transcription error |
| 16 105 | 11 | "talking" | "typing" | Transcription error |
| 17 110 | 12 | "print off" | "print it off" | Transcription error |
| 18 127 | 12 | "it" | "she" | Transcription error |
| 19 135 | 23 | "mu- -- what have" | "what must have" | Transcription error |
| 20 138 | 5 | "the healthcare" | "a healthcare" | Transcription error |
| 21 142 | 11 | "still" | "will" | Transcription error |
| 22 170 | 19 | "at documented" | "at what was documented" | Transcription error |
| 23 182 | 20 | "it would" | "it as it would" | Transcription error |
| 24 191 | 15 | "protection" | "release" | Transcription error |

**www.MagnaLS.com**                                      **866–624–6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103



1    ACKNOWLEDGMENT OF DEPONENT

2
    I, _Riley Smith_ , do

3    hereby certify that I have read the
    foregoing pages,  1 - PGS, and that the

4    same is a correct transcription of the
    answers given by me to the questions

5    therein propounded, except for the
    corrections or changes in form or

6    substance, if any, noted in the attached
    Errata Sheet.

7

8    _____  _10/2/24_
    WITNESS NAME      DATE

9

10    State of NC, County of Durham
    Subscribed and sworn

11    to before me this
    _2_ day of _October_ , 20_24_

12    My commission expires: _10/26/2025_

13

14    _____
    Notary Public

15

16

17

18

19

20

21

22

www.MagnaLS.com                                    866-624-6221

Seven Penn Center
1635 Market Street ~ 8th Floor
Philadelphia, PA 19103