Surreply Exhibit 1

Karasic *Misanin* Deposition Exhibit No. 3

# EXHIBIT F



Transcript of the Testimony of

# Dan H. Karasic, MD

Date:  7/13/2022

## C.P. vs BLUE CROSS BLUE SHIELD OF ILLINOIS



Phone: (425) 866-4250
production@nelsonreporters.com
www.nelsonreporters.com

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

C. P., by and through his          )
parents, Patricia Pritchard,       )
and Nolle Pritchard; and           )
PATRICIA PRITCHARD,                )
                                   )
        Plaintiffs,                )
                                   )
        vs.                        ) No. 3:20-cv-06145-RJB
                                   )
BLUE CROSS BLUE SHIELD OF          )
ILLINOIS,                          )
                                   )
        Defendant.                 )

REMOTE
VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
DAN H. KARASIC, MD
Wednesday, July 13, 2022 at 9:00 a.m.

Via Zoom Remote Videoconference
Witness location:  San Francisco, California

SIERRA ZANGHI, RSR, CCR #22004202
NELSON COURT REPORTERS, INC.
6513 132nd Avenue NE, #184
Kirkland, Washington 98033
(425) 866-4250
production@nelsonreporters.com

Dan H. Karasic, MD
7/13/2022

Page 2

```
1              A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS:
4       OMAR GONZALEZ-PAGAN  (Via videoconference)
        Lambda Legal Defense and Education Fund, Inc.
5       120 Wall Street, 19th Floor
        New York, NY 10005-3919
6       ogonzalez-pagan@lambdalegal.com
7
        ELEANOR HAMBURGER  (Via videoconference)
8       Sirianni Youtz Spoonemore Hamburger
        3101 Western Avenue, Suite 350
9       Seattle, WA 98121
        206-223-0303
10      ehamburger@sylaw.com
11
12  FOR THE DEFENDANT:
13      STEPHANIE N. BEDARD  (Via videoconference)
        Kilpatrick Townsend & Stockton LLP
14      1100 Peachtree NE, Suite 2800
        Atlanta, Georgia 30309
15      sbedard@kilpatricktownsend.com
        404-815-6039
16
17
18  ALSO PRESENT:
19      KURT SCHULTZ  (Via videoconference)
        Videographer
20
        REED FERGUSON  (Via videoconference)
21      Summer associate observing from Plaintiff's side
22
23
24
25
```

Page 4

```
1            E X H I B I T S (cont'd)
2   Exhibit 9, 12/6/2021 Psychological evaluation by    64
       Steve Tutty, MA, PhD, Bates No. PLA
3      003064-003075 plus handwritten notes,
       25 pages
4
    Exhibit 10, Polyclinic records, Bates No.           78
5      Pritchard POL 000001-000078, 78 pages
6   Exhibit 11, 8/30/2016 CMS Decision Memo,            101
       111 pages
7
    Exhibit 12, 6/16/2020 Recommendation by COHERE      106
8      Finland, 2 pages
9   Exhibit 13, 5/1/2021 Guideline Regarding            110
       Hormonal Treatment of Minors with Gender
10     Dysphoria at Tema Barn - Astrid Lindgren
       Children's Hospital, 3 pages
11
    Exhibit 14, February 2022, The Cass Review.         120
12     112 pages
13  Exhibit 15, June 2022 Florida Medicaid -            123
       Generally Accepted Professional Medical
14     Standards Determination on the Treatment of
       Gender Dysphoria, 46 pages
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                I N D E X
2   Pritchard, et al, v. Blue Cross Blue Shield of Illinois
    NO. 3:20-CV-06145-RJB
3   July 13, 2022
4
5
6              T E S T I M O N Y
7   DAN H. KARASIC, MD                        PAGE NO.
8     Examination by Atty. Bedard               6
9     Examination by Atty. Gonzalez-Pagan       131
10
11
12             E X H I B I T S
13  Exhibit 1, Deposition subpoena duces tecum to     8
       Dan H. Karasic, M.D. for 7/13/2022, 9 pages
14
    Exhibit 2, 6/16/2022 Expert Report of Dan H.      17
15     Karasic, M.D., 50 pages
16  Exhibit 3, Records from the Polyclinic, T-Scan    21
       Corporation, Bates No. Pritchard POL
17     000112-000155, 46 pages
18  Exhibit 5, November 2017 Clinical Practice        50
       Guideline by the Endocrine Society, from
19     the Journal of Clinical Endocrinology and
       Metabolism, 35 pages
20
    Exhibit 7, Medical Records from the Center for    56
21     Child and Family Therapy and the
       Polyclinic, Bates No. PLA 000982-001003,
22     22 pages
23  Exhibit 8, Records from the Center for Child and  61
       Family Therapy, Bates No. Pritchard
24     CFT 000001-000011, 11 pages
25                (Exhibits cont'd on next page)
```

Page 5

```
1       BE IT REMEMBERED that on Wednesday, July 13,
2   2022, in San Francisco, California, at 9:00 a.m.,
3   via Zoom remote videoconference, the deposition of
4   DAN H. KARASIC, MD was taken before Sierra Zanghi,
5   Certified Court Reporter.  The following proceedings
6   took place:
7                    --oOo--
8       THE VIDEOGRAPHER:  Today is July 13th, 2022.
9   The time is 9:01 a.m.  This is Volume I in the
10  deposition of Dr. Dan Karasic in the U.S. District
11  Court for the Western District in Tacoma in the
12  matter of C. P., et al, v. Blue Cross Blue Shield of
13  Illinois, Cause No. 3:20-cv-06145-RJB.
14      This is a remote Zoom deposition noticed by
15  Defense Attorney Stephanie Bedard.  My name is Kurt
16  Schultz.  I'm contracted by Royal Video Productions,
17  whose principal place of business is 950 Northwest
18  Firwood Boulevard, Issaquah, Washington 98027.  The
19  phone number is 425-391-6809.
20      At this time, I would ask counsel to identify
21  themselves.
22      ATTY. BEDARD:  Good morning.  My name is
23  Stephanie Bedard.  I'm counsel for Blue Cross Blue
24  Shield of Illinois.
25      ATTY. GONZALEZ-PAGAN:  Good morning.  Omar
```

Dan H. Karasic, MD
7/13/2022

Page 6

1   Gonzalez-Pagan, counsel for the plaintiffs with
2   Lambda Legal.
3       THE VIDEOGRAPHER: Thank you. Today's court
4   reporter is Sierra Zanghi of Nelson Court Reporters.
5   You may swear the witness in.
6
7   DAN H. KARASIC,    being first duly sworn to tell
8           the truth, the whole truth,
9           and nothing but the truth
10           testified as follows:
11
12           EXAMINATION
13   BY ATTY. BEDARD:
14   Q.  Good morning, Dr. Karasic. As you may have heard a
15   minute ago, my name is Stephanie Bedard, and I
16   represented Blue Cross Blue Shield of Illinois.
17   Before I say anything further, am I pronouncing your
18   name correctly, "Karasic"?
19   A.  Yes.
20   Q.  Okay, good. I just wanted to make sure. So as you
21   know, the plaintiff -- one of the plaintiffs in this
22   case is Casey Pritchard, but because Casey is a
23   minor, I'm going to be referring to him throughout
24   this deposition as "C. P." I just wanted to make
25   sure you understood who I was referring to when I

Page 7

1   said that.
2   A.  Yes.
3   Q.  Okay. Great. And you understand you're under oath
4   today?
5   A.  Yes.
6   Q.  Well, I understand you've had your deposition taken
7   before, but I don't know if that was in our Zoom
8   remote deposition era or not, so I'm going to go
9   over a few ground rules that will be particularly
10   important in this Zoom era.
11       And the first is to do our absolute best to try
12   not to talk over each other. It's easy to do in
13   person, and it's even easier to do via Zoom. So I
14   will do my best not to speak over you, and I would
15   ask that you do the same; does that work?
16   A.  Yes.
17   Q.  Okay, great. And also, because this is a remote
18   deposition, we'll need you to affirmatively answer
19   every question. Simply shaking your head yes or no,
20   while on the video, won't be picked up by the court
21   reporter. Does that make sense?
22   A.  Yes.
23   Q.  And if you need a break at any time through the
24   course of your deposition, feel free to raise your
25   hand, flag me down. I may finish a line of

Page 8

1   questioning or finish asking you about a specific
2   exhibit, but then we can certainly take a break.
3   A.  Yes.
4   Q.  Okay. Great. And I also, you know, I tend to try
5   to give everyone a break every hour or so. But
6   again, if you need something more frequent or
7   between those times, that's perfectly fine.
8       So if I ask you a question and you are confused
9   by it, please feel to ask me to rephrase. Does that
10   make sense?
11   A.  Yes.
12   Q.  Okay. Great. And by that same token, if you answer
13   my question, I will assume you have understood the
14   question asked. Does that make sense?
15   A.  Yes.
16   Q.  Great. Dr. Karasic, what is your current address?
17   Where do you currently reside?
18   A.  86 Montezuma Street, San Francisco, California
19   94110.
20   Q.  And is that where you're located today?
21   A.  Yes.
22       ATTY. BEDARD: Dr. Karasic, I am going to share
23   my screen and share with you what has been marked
24   as Defendant's Exhibit 1.
25       (Exhibit 1 marked for identification.)

Page 9

1   Q.  (BY ATTY. BEDARD) Can you see that exhibit?
2   A.  Yes.
3   Q.  Great. Have you seen this deposition subpoena
4   before today?
5   A.  Yes.
6   Q.  And how did you prepare for today?
7   A.  I reviewed my statement, reviewed a few of the
8   papers listed in my report, and I had two meetings
9   with counsel.
10   Q.  When were those meetings?
11   A.  One was on -- it would have been July 10th, and the
12   other one was July 8th.
13   Q.  And when you refer to your counsel, are you
14   referring to Mr. Gonzalez-Pagan who's sitting here
15   today?
16   A.  Yes.
17   Q.  Okay. Was anyone present during the course of your
18   meetings, other than the two of you?
19   A.  There were other members of the legal team.
20   Q.  Okay. Do you remember their names?
21   A.  No.
22   Q.  Was Ele Hamburger a part of that meeting as well?
23   A.  Yes.
24   Q.  Okay. Was there anyone in the meeting who was not
25   legal counsel?

Dan H. Karasic, MD
7/13/2022

Page 10

1  A.  No, I don't believe so.

2  Q.  And did you collect documents to provide to

3      plaintiff's counsel in advance of your deposition

4      today?

5  A.  Yes.  Well, I provided them with references to my

6      statement and the bibliography.

7  Q.  And are there any -- first, Dr. Karasic, when you're

8      referring to your "statement" -- I just want to make

9      sure we're on the same page -- this is your expert

10     disclosure that was disclosed to defense counsel on

11     June 27th, right?

12 A.  Yes.

13 Q.  Okay, great.  Just want to make sure we're talking

14     about the same document here.  So when you were

15     preparing and drafting your statement or your

16     disclosure, are there any documents that you

17     reviewed that you did not provide to plaintiff's

18     counsel?

19 A.  I'm sure -- I mean, I, you know, read widely in the

20     field of transgender health, and so there may be

21     other documents that shaped my opinion.  But the

22     kind of primary documents that I'm basing my opinion

23     on are in my report.

24 Q.  Okay.  And are there -- would you say that the

25     documents that you collected to provide to

Page 11

1      plaintiff's counsel, would those represent the

2      primary documents you relied on in your report?

3  A.  Yes.

4  Q.  Okay.  And what documents do you have in front of

5      you today?

6  A.  The only document I have in front of me is I have a

7      paper copy of my expert report for convenience, if

8      we refer to it.

9          ATTY. GONZALEZ-PAGAN:  And just to clarify for

10     the record, Stephanie, and completeness, Dr. Karasic

11     provided some documents.  We also collected some of

12     them ourselves from his bibliography that he

13     provided to us.  So I just wanted to make sure

14     there's clarity on the record.

15         ATTY. BEDARD:  Okay.  And just to clarify, the

16     production that was provided to defense counsel that

17     begins with Bates No. "KARASIC" includes those --

18         ATTY. GONZALEZ-PAGAN:  Right.  Well, it

19     includes the full body, yes.

20 Q.  (BY ATTY. BEDARD)  Okay, great.  And then

21     Dr. Karasic, just to circle back, the only paper

22     document you have in front of you today is your

23     expert report, right?

24 A.  Yes.

25 Q.  Okay.  And Dr. Karasic, I understand from that

Page 12

1      report that you have previously been deposed.  How

2      many times have you been deposed before today?

3  A.  So as I list in that document, in recent years, I've

4      been deposed three times.  I was also deposed

5      in 2014.  And a couple of times relating -- I was

6      deposed relating to patient care.  And each time, it

7      was a patient of mine in my practice many years ago

8      who was involved in a lawsuit where I was deposed

9      related to that lawsuit.

10 Q.  Okay.  So just to break down what I understand

11     you're saying, Dr. Karasic, let's start first with

12     the three times that you've recently been deposed.

13     For each of those three times, were you deposed as a

14     treating physician on behalf of someone you'd seen

15     in your practice?

16 A.  No.  The three times --

17 Q.  So --

18 A.  The three times --

19 Q.  I apologize, go ahead.

20 A.  The three times that are listed in my expert report

21     are the three times I was deposed as an expert.

22 Q.  Okay.  And what were the names of those three cases,

23     if you can recall?

24         (Atty. Hamburger joined the proceedings.)

25 A.  Sure.  So one is Kadel v. Folwell, and one is Fain

Page 13

1      v. Crouch, and one is Brandt v. Rutledge.

2  Q.  And in your capacity as an expert in each of those

3      three cases, were you providing expert testimony on

4      gender-related issues, gender-related care?

5  A.  Yes.

6  Q.  Okay.  So then in addition to those three cases in

7      which you were deposed that are included in your

8      expert report, you also mentioned just now that you

9      have previously been deposed as a treating

10     physician.  Can you walk us through each of those

11     times?

12 A.  Sure.  So they were many years ago.  I don't

13     remember all the details.  One was a patient that --

14     of mine at San Francisco General who was suing the

15     San Francisco Police Department for being injured by

16     a police officer.

17         And another as a treating physician was a

18     patient of mine who was engaged in litigation, and I

19     think I was essentially asked about the emotional

20     effect of the litigation on that person.

21         So those are the two that I can recall.  And

22     yeah, so that's the treating physician.

23 Q.  Did either of those two cases involve gender-related

24     issues?

25 A.  No.

Dan H. Karasic, MD
7/13/2022

Page 14

1  Q.  And those two cases are the only cases you recall
2      providing deposition testimony in a treating
3      capacity, right?
4  A.  Yes.
5  Q.  Okay.  And are these three cases where you discussed
6      providing deposition testimony in an expert
7      capacity, are those the only three cases where you
8      have provided deposition testimony in an expert
9      capacity?
10 A.  No.  I mentioned there was one in 2014 where I was
11     deposed as an expert.
12 Q.  Okay.  Can you tell us more about that case,
13     including the case name, if you remember?
14 A.  Sure.  It was Cabading v. Cal Baptist University.
15 Q.  And what do you recall about that case?
16 A.  Sure.  So there was a transgender woman who had been
17     admitted to Cal Baptist, to their nursing school,
18     and shortly prior to starting school, they found out
19     that she was transgender, and they revoked her
20     admission.
21 Q.  And you provided expert opinion in that case on
22     behalf of the plaintiff you referenced?
23 A.  Yes.  Yeah.
24 Q.  Okay.  In addition to the 2014 case you just
25     mentioned and the three cases we've already

Page 15

1      discussed, are there any other cases where you
2      provided testimony in an expert capacity?
3  A.  It wasn't as a -- in a deposition format, but I did
4      testify in the Province of Ontario, XY v. Ontario.
5      I testified in 2010.  I believe the case was -- the
6      decision was in 2012.  And it was before the
7      Province of Ontario Tribunal of Human Rights -- a
8      human rights court that some Canadian provinces
9      have.
10     THE VIDEOGRAPHER:  Stephanie, you're still
11     sharing that Exhibit.
12     ATTY. BEDARD:  That's fine.  Thank you.
13     THE VIDEOGRAPHER:  Okay.
14     ATTY. BEDARD:  I appreciate the reminder.  I do
15     tend to leave them up sometimes.
16 Q.  (BY ATTY. BEDARD)  So Dr. Karasic, in the XY case you
17     just mentioned, you were testifying in an expert
18     capacity, right?
19 A.  Yes.
20 Q.  And that was in court?
21 A.  It was in a human rights court, which they have in
22     Ontario.  I don't believe there is an equivalent in
23     the US.
24 Q.  But you were testifying in an expert capacity in
25     front of that tribunal?

Page 16

1      ATTY. GONZALEZ-PAGAN:  Objection to form.
2  A.  Yes.
3  Q.  (BY ATTY. BEDARD)  Were there any other instances in
4      which you testified in a Canadian court or tribunal?
5  A.  I did an expert statement in a case, CF v. Alberta,
6      but I did not -- I was not deposed, and I didn't
7      testify.  I just provided an expert statement which
8      was accepted.
9  Q.  Okay.  So just to backtrack a little bit.  Setting
10     aside the appearance in front of the Canadian Human
11     Rights Tribunal, we've previously discussed the
12     instances in which you provided deposition
13     testimony, either as an expert or as a treating
14     physician.  Can you please walk me now through any
15     instances in which you provided trial or other live
16     or in-court testimony?  Again, either as a treating
17     or as an expert -- treating physician or expert
18     witness.
19 A.  So I have not -- in the US, I have not provided live
20     in-court testimony.
21 Q.  Is there any other testimony you've provided in any
22     capacity that we have not yet talked about?
23 A.  Meaning deposition or live court testimony?
24 Q.  Good question.  Let me clarify.  Let me extend it as
25     well to expert reports.  Are there any expert

Page 17

1      reports you've provided in any case other than those
2      in which we've already spoken about today?
3  A.  Yes.  I did an expert report in a case in Ohio.  I
4      don't recall the name of the case right now, but I
5      did an expert report on that case.  And that would
6      have been in 2020, I think.  I think it may be on
7      my -- the case name may be on my CV.  Yeah, Drew
8      Glass v. City of Forest Park, 2021.  And so, yeah,
9      it's mentioned on my -- in my report.
10 Q.  And in that case, Dr. Karasic, you provided an
11     expert report, but you were not deposed, and you did
12     not or have not testified in court?
13 A.  Yes.
14 Q.  Okay.  Great.  And have you ever personally been
15     involved in litigation before, as a plaintiff?
16 A.  No.
17 Q.  What about as a defendant?
18 A.  No.
19 Q.  Dr. Karasic, I am now going to show you what has
20     been marked as Defendant's Exhibit 2.
21     (Exhibit 2 marked for identification.)
22 Q.  (BY ATTY. BEDARD)  Defendant's Exhibit 2 is the
23     expert disclosure that you have made in this case,
24     which you've been referring to as a statement, which
25     is fine.  Can you see that okay?

Dan H. Karasic, MD
7/13/2022

Page 18

1  A.  Yes, I was just pulling it up on my big screen.
2     Yes.
3  Q.  Are you able to see the one that I'm actually
4     sharing? The reason I ask is I may scroll through
5     it.
6  A.  Oh, okay. Yes.
7  Q.  Okay. Great. It'll probably just be easiest if
8     we're all looking at the same one, same page, same
9     paragraph, that type of thing. Did you draft this
10    report?
11       ATTY. GONZALEZ-PAGAN: And just for clarity of
12    what's been shown on the screen, it only shows the
13    caption. It doesn't show the document title.
14    Thanks.
15       THE WITNESS: Yes.
16       ATTY. BEDARD: So Omar, can you see the exhibit
17    now?
18       ATTY. GONZALEZ-PAGAN: Yes, yes. Now it shows,
19    thank you.
20       ATTY. BEDARD: Okay, great.
21  Q.  (BY ATTY. BEDARD) So Dr. Karasic, I'm going to
22    repeat my question again: Did you draft and prepare
23    this report?
24  A.  Yes.
25  Q.  Did anyone assist you in preparing it?

Page 19

1  A.  Yes.
2  Q.  Who was that?
3  A.  So Omar Gonzalez-Pagan assisted me. We had -- I'd
4     been an expert in a case that Omar had been involved
5     in, Kadel. And I had done another case, Fain, with
6     Lambda Legal. And so there are aspects of the
7     report that have kind of carried through from prior
8     reports, and Omar assisted in -- in that aspect of
9     kind of carrying over what I had provided as an
10    expert in these prior cases, working with Lambda
11    Legal.
12  Q.  And other than Omar and other individuals at Lambda
13    Legal, is there anyone else who assisted you in
14    preparing the report?
15  A.  No.
16  Q.  Did anyone other than Omar or someone at Lambda
17    Legal review the report before it was finalized?
18  A.  No.
19  Q.  And what documents did you review in preparing this
20    report?
21  A.  So I reviewed quite a number of documents. I don't
22    think I could list them in any complete way, but I'm
23    always reading, you know, in transgender health.
24    And so any review for this, you know, just overlaps
25    with, you know, my reading in transgender health.

Page 20

1     But certainly I reviewed a number of the papers I
2     cited in the report.
3  Q.  So in addition to medical literature on
4     gender-related issues, what documents did you review
5     that were specific to the plaintiff, C. P.?
6        ATTY. GONZALEZ-PAGAN: Objection to form.
7  A.  So I reviewed medical records that were provided to
8     me -- C. P.'s medical records.
9  Q.  (BY ATTY. BEDARD) Did those include medical records
10    from CHI Franciscan Health and Dr. Garza?
11  A.  They were from, as I recall, from Polyclinic, from
12    Dr. Hatfield; there was Dr. Garza, I believe; and
13    there was a -- I believe her name was Sharon Booker.
14    There was a mental health social worker's letter
15    that I reviewed.
16  Q.  It's my understanding, by the way, that Ms. Booker
17    works at the Center for Child and Family Therapy.
18    So I may refer to those records either as her
19    records or that facility's records.
20  A.  Sure.
21  Q.  Are there any other C. P.-specific records that you
22    reviewed?
23  A.  Not that I can recall.
24  Q.  Did you review a psychological evaluation of C. P.
25    from 2021?

Page 21

1  A.  Oh, yes. I did. The one -- I think it was in
2     regards to ADHD.
3  Q.  Okay. And did you review any records from Blue
4     Cross Blue Shield of Illinois in preparing your
5     report?
6  A.  The only material I reviewed from Blue Cross Blue
7     Shield of Illinois that I can recall was their
8     statement of provision of transgender care for their
9     policies that are not for self-insurance.
10  Q.  And Dr. Karasic, there were some new documents we
11    received from the Polyclinic recently, and recently
12    provided those to plaintiff's counsel. I don't know
13    whether you have seen these yet today. I'm going to
14    show them to you so that you can see them now.
15  A.  Okay.
16  Q.  Let me know if you've seen them previously.
17  A.  I don't know if I've seen them previously.
18  Q.  Okay.
19       ATTY. GONZALEZ-PAGAN: Stephanie, you're not --
20    you stopped sharing. Thank you.
21        (Exhibit 3 marked for identification.)
22  Q.  (BY ATTY. BEDARD) So Dr. Karasic, can you see the
23    document I'm showing you now that says "T-Scan
24    Corporation" at the top?
25  A.  Yes.

Dan H. Karasic, MD
7/13/2022

Page 22

1  Q.  I'm introducing what's been marked as Defendant's
2      Exhibit 3.  These are those new records from the
3      Polyclinic we received this week and which have been
4      provided to plaintiff's counsel.  We'll go through
5      these later today, but I just wanted to give you a
6      frame of reference of what I was talking about when
7      I refer to the "new Polyclinic records," as compared
8      to what you've previously reviewed.
9  A.  Okay.
10 Q.  And in particular, I wanted to draw your attention
11     to the PDF Page 30.  Do you see here where it says
12     "CONSENT FOR SURGERY" up at the top?
13 A.  Yeah.  Let me pull it up on a larger screen, because
14     the Zoom screen is a small one, so it's a little
15     hard for me to see.
16 Q.  Dr. Karasic, I'm happy to zoom in on my screen if
17     need be.  It will be easier if we can ensure we're
18     looking at the same document the whole time, rather
19     than you looking at your own version.
20 A.  Okay.
21 Q.  But if you can't see it, just let me know, we can
22     come up with another solution.  Is that better
23     there?  Can you see that?
24 A.  Okay.  Yeah.
25 Q.  Okay, great.  So do you see where it says "CONSENT

Page 23

1      FOR SURGERY"?
2  A.  Yes.
3  Q.  And that this is a record for C. P.?
4  A.  Yes.
5  Q.  I'm scrolling down.  It says that this consent
6      authorizes Dr. Jeffrey Kyllo to perform a bilateral
7      mastectomy?
8  A.  Yes.
9  Q.  Okay, great.  And we'll come back to this, but do
10     you see at the bottom where it says "Patient
11     Signature," and it has C. P.'s signature as the
12     patient signature?
13 A.  Yes.
14 Q.  With a witness signature as well, right?
15 A.  Of the parent, yes.
16 Q.  Yes.  Okay.  All right.
17         So Dr. Karasic, we've reviewed a bit of your
18     educational background and qualifications from
19     what's in your report, but if you would for a moment
20     tell me a bit about your educational background
21     first.  Can you let me know any schools you attended
22     and any degrees you received?
23 A.  Sure.  I received my bachelor's degree from
24     Occidental College in Los Angeles, and then went to
25     Yale University School of Medicine in New Haven.

Page 24

1      And then I trained in psychiatry at the UCLA
2      Neuropsychiatric Institute.  The last year of my
3      residency overlapped with an NIMH fellowship.  And
4      then in 1991, I started working as faculty at
5      University of California, San Francisco.
6  Q.  Okay.  And are you currently still employed as
7      faculty at UCSF?
8  A.  So I am an emeritus professor of psychiatry.  I
9      retired from being full-time employed by UCSF
10     in 2020.  Since then, I've done a small amount of
11     work for UCSF as recall faculty, which is something
12     I expect to continue, but just a very small amount
13     of, you know, paid work for UCSF, since 2020.
14 Q.  And since you obtained your psychiatry degree, have
15     you also been in private practice since that time?
16 A.  Yes.  So while I was at UCSF, as part of my work, I
17     did a faculty practice in addition to the clinics I
18     worked in.  And then in 2020, when I retired, I
19     started a private practice.  And that's my primary
20     employment now.
21 Q.  What is the name of that private practice?
22 A.  Just "Dan Karasic, MD."
23 Q.  Are there any other physicians within that private
24     practice with you?
25 A.  No.

Page 25

1  Q.  And you previously mentioned that you had testified
2      as a treating physician in the past.  So at those
3      times, where was your private practice located?
4      ATTY. GONZALEZ-PAGAN:  Objection.  Form.
5  A.  So at that time I was not in private practice.  I
6      did something like a private practice that was
7      called a faculty practice, because the money would
8      go to UCSF.  But most of my work while I worked at
9      UCSF was in various clinics.  So it was at a UCSF
10     clinic in each of those two cases where a patient in
11     that clinic was involved in litigation, and I was
12     deposed as a treating physician.
13 Q.  (BY ATTY. BEDARD)  So essentially, when we talk about
14     something along the lines of private practice, you
15     were in a faculty practice from the time that you
16     achieved your degree in psychiatry until 2020, and
17     it was in 2020 when you began your own private
18     practice outside of your faculty practice, right?
19 A.  Yeah.  I mean, the faculty practice refers to
20     something that is structured somewhat like a private
21     practice.  But I also -- much of my work was in --
22     as a psychiatrist in various clinics, various UCSF
23     and San Francisco Department of Public Health
24     clinics where it wasn't really like a private
25     practice.  It was going into a medical or mental

Dan H. Karasic, MD
7/13/2022

Page 26

1    health clinic and consulting or taking care of
2    patients.
3  Q.  And were any of those clinics specifically focused
4    on the provision of transgender-related or
5    gender-related care?
6  A.  Yes.  So I was the psychiatrist for the Dimensions
7    Clinic for trans youth from 2003 until 2020, when I
8    retired.  And I was also the co-lead and co-founder
9    of the gender team at UCSF Gender Alliance Health
10   Project, and that gender team started around 2011.
11   But even before that, we were not with a formal
12   team, we were taking care of transgender people.
13   USCF Alliance Health Project is a mental health
14   clinic of UCSF that provides mental health care for
15   LGBTQ patients.
16 Q.  And you also previously mentioned a fellowship.  Was
17   there a specific specialty for that fellowship?
18 A.  Yes.  It was in mental health services for people
19   with HIV/AIDS.
20 Q.  And are you a member of any professional
21   organizations?
22 A.  Yes.  I am a distinguished life fellow of the
23   American Psychiatric Association, and I am a member
24   of the World Professional Association for
25   Transgender Health.

Page 27

1  Q.  Is that commonly referred to as WPATH?
2  A.  Yes.
3  Q.  So walk me through, if you can, your involvement
4    with WPATH.  Are you a member?  Are you on the
5    board?  What's been the extent of your involvement
6    over the years?
7        ATTY. GONZALEZ-PAGAN:  Objection.  Form.
8  A.  Sure.  So I first joined as a member in 2001.  I
9    became involved in the late 2000s with committees
10   relating to DSM and ICD diagnoses WPATH committees.
11   And then I became involved as a co-author of WPATH's
12   Standards of Care, Version 7, which was written, I
13   would say, between 2009 and 2011.
14       And then from 2014 to 2018, I was on the board
15   of directors of WPATH.
16       THE COURT REPORTER:  And Counsel
17   Gonzalez-Pagan, did you have an objection?
18       ATTY. GONZALEZ-PAGAN:  Yes.  I said objection
19   to form prior to his answer.
20       THE COURT REPORTER:  Thank you.
21 Q.  (BY ATTY. BEDARD) And Dr. Karasic, what does -- what
22   was the extent of your involvement on the board of
23   directors of WPATH?
24 A.  We had a very active board, and so we had addressed
25   quite a number of issues relating to -- especially

Page 28

1    to organizing conferences, to providing trainings to
2    healthcare providers inside and outside of the US.
3    We provided consultation to international
4    organizations and government and governments outside
5    of the US, as well as the US.  And so it was an
6    active time in that regard.  I also -- we were
7    restructuring the organization to have regional
8    chapters, and I was the conference chair for the
9    first USPATH conference in 2017, which was
10   organized, actually, by WPATH because the USPATH
11   board wasn't elected until 2018.
12 Q.  (BY ATTY. BEDARD) And I understand you were on the
13   board of WPATH from 2014 to 2018.  So from 2018 to
14   the present, would you consider your involvement in
15   WPATH to be as a member or in a different capacity?
16       ATTY. GONZALEZ-PAGAN:  Object to form.
17 A.  So I'm a member.  I've also been the chapter lead
18   for the mental health chapter, which involves mental
19   health care for adults in Standards of Care 8.
20 Q.  (BY ATTY. BEDARD) What does it mean to be a chapter
21   lead?
22 A.  So I guess I would say in addition to that, I'm on
23   the larger committee for Standards of Care 8.  But
24   within the chapter, it involved, with the editors of
25   SOC 8, selecting other authors for the chapter, and

Page 29

1    then writing possible statements for Delphi
2    approval, which was a way of achieving kind of a
3    supermajority approval of each statement, and then
4    writing explanatory text.  And so the chapter lead
5    is the equivalent of a first author on a paper.  The
6    chapter was ultimately my responsibility, but I
7    worked with the other authors on the chapter.
8  Q.  And did you say that after you finished drafting a
9    chapter, it went for Delphi approval?  Did I hear
10   you correctly?
11 A.  Yes.  Delphi approval was not for the whole chapter,
12   but the previous standards of care were the --
13   standards of care had approval by consensus.
14   Standards of Care 8 grew too large for that, so
15   there would be -- there's a process which is called
16   Delphi process for coming to agreement on kind of
17   central statements of a document.
18       And so our chapter, with the editors, ended up
19   coming down to ten statements that we submitted for
20   Delphi approval from the 120 to 140 people involved
21   with Standards of Care 8 -- the other authors of
22   Standards of Care 8.  And a statement could receive
23   75-percent approval to be an approved statement.
24       If it received less than that, for each
25   statement, each reviewer, which was the 120 to 140

Dan H. Karasic, MD
7/13/2022

Page 30

1    people, could put down comments. And particularly,
2    if a statement received less than 75 percent, there
3    was an opportunity to modify the statement and bring
4    it back to Delphi.
5  Q.  Okay. So to make sure I understand how this process
6    works, there would be one or more primary drafters
7    of a specific statement in the next Standards of
8    Care version, and then it would go then out for
9    Delphi approval. And Delphi approval means weigh-in
10   on that statement by the 120 to 140 members who are
11   weighing in on that statement, right?
12      ATTY. GONZALEZ-PAGAN: Object to form.
13  A.  Yes -- yes, who are part of the Standards of Care 8
14   Committee, really, the authors of Standards of Care
15   8. So Standards of Care 8 is a much larger document
16   than the previous Standards of Care. And so there
17   were about 20 chapters. And so each chapter had
18   probably five to seven members, at least.
19      And so all of those people who were involved in
20   any of the chapters could -- were given a link to
21   weigh in and comment on each statement that may have
22   been drafted by a group.
23      So the statement would originally be drafted by
24   perhaps five to 17 people, led by a chapter lead, in
25   consultation with the three editors, and then that

Page 31

1    statement would be sent out to all of the authors.
2    And it was considered agreed upon if 75 percent of
3    people agreed upon it. If it was not agreed upon,
4    then the authors -- the original authors of the
5    statement had all of the comments, what people
6    disagreed with about the statement, and could -- had
7    an opportunity to later go back to the Delphi
8    process with a modified statement to see if that
9    would be approved.
10  Q.  (BY ATTY. BEDARD) So what is the current status of
11   the Standards of Care 8?
12  A.  My understanding is that it's done, and that it is
13   going to be released imminently. We have -- I was
14   asked to give a talk about the mental health chapter
15   at the WPATH conference in Montreal, which is in
16   September of this year. And so I don't know whether
17   they plan to do a public release during the
18   conference, but I would imagine -- or if the release
19   will be before that -- but I would imagine that the
20   document would be released by September.
21  Q.  And just taking a quick step back, we've discussed
22   membership in WPATH. Who is eligible to be a member
23   of WPATH?
24  A.  So yes. We discussed membership in WPATH, which is
25   different from membership on the Standards of Care 8

Page 32

1    Committee. So when I was referring to those members
2    of Standards of Care 8 Committee, people had to
3    apply with a CV and a statement. And so it was a
4    competitive process to be on one of the chapters of
5    Standards of Care 8.
6       To be a member of WPATH, one has to apply to
7    WPATH. To be a full member, one is supposed to be a
8    health professional or health-related academic.
9    There are a few lawyers who work with the interface
10   of the law and transgender health, I think, who are
11   full members. But otherwise, people are health
12   professionals, some who are also health academics,
13   some are -- many of the members are clinicians.
14  Q.  Is there any sort of degree requirement to be a
15   member of WPATH?
16  A.  So there's not a -- to be a full member of WPATH,
17   there's not a degree requirement, but to be a health
18   professional that would, you know, or an academic,
19   you would need a degree, certainly.
20       So there are student members. So there are
21   people who are working on degrees as student
22   members. They're not full members of WPATH. And
23   there is some associate membership -- I believe it's
24   a nonvoting membership that people can get who are
25   not health professionals.

Page 33

1  Q.  And Dr. Karasic, in addition to WPATH, are you also
2    familiar with the Endocrine Society?
3  A.  Yes.
4  Q.  And what is that?
5  A.  So it's -- the Endocrine Society is a professional
6    organization of endocrinology.
7  Q.  Is it specifically focused on gender-related issues?
8  A.  No. The Endocrine Society deals with endocrinology
9    and other aspects, aside from gender care.
10  Q.  So to make sure I understand this correctly, then,
11   the Endocrine Society looks at gender-related issues
12   but also has a scope that is broader than just
13   gender-related issues?
14  A.  Yes. Gender-related issues are just one of many
15   issues that the Endocrine Society addresses.
16  Q.  And to be a member of the Endocrine Society, do you
17   need to have a degree in endocrinology?
18  A.  So I'm not a member of the Endocrine Society, and I
19   can't say I know what their criteria are. But my
20   understanding is it's an organization of
21   endocrinologists, so largely people who have trained
22   first in internal medicine, and then in
23   endocrinology, or first to pediatrics and then in
24   pediatric endocrinology.
25  Q.  But is there some overlap between the two groups in

Dan H. Karasic, MD
7/13/2022

1    terms of the subject matter that they cover?

2  A.  Yes.  In terms of the Endocrine Society and WPATH?

3  Q.  Correct.

4  A.  Yeah.  So most people in WPATH are also part of

5      another organization.  So for example, I've been

6      active in the American Psychiatric Association as a

7      psychiatrist.  Somebody who's a family medicine

8      doctor might be in the American Academy of Family

9      Medicine; or a pediatrician, the American Academy of

10     Pediatrics.  And so endocrinologists who work in

11     gender health may well be a member of the Endocrine

12     Society, which -- related to endocrinology more

13     generally -- as well as being endocrinologists

14     within WPATH.

15 Q.  And you actually read my mind with what was going to

16     be my next question, which is -- since you're a

17     member of WPATH, you're a member of American

18     Psychology Association, I believe you said -- are

19     there any other professional organizations that you

20     are a member of?

21        ATTY. GONZALEZ-PAGAN:  Objection.

22 A.  So I'm a member --

23        THE COURT REPORTER:  Counsel -- one moment.

24     Counsel Gonzalez-Pagan, did you have an objection?

25     I wasn't able to hear it.

1        ATTY. GONZALEZ-PAGAN:  Objection to form.

2        THE COURT REPORTER:  Thank you.

3  A.  So I'm not a member of the American Psychological

4      Association, I'm a member of the American

5      Psychiatric Association.  And currently, I am only a

6      member of the American Psychiatric Association and

7      WPATH.

8  Q.  (BY ATTY. BEDARD)  And Dr. Karasic, let's talk for a

9      minute about what your current private practice

10     looks like.  So -- and I understand that your

11     private practice was first started in about 2020.

12     How many patients do you currently see per year?

13 A.  I don't have -- I don't have those numbers off the

14     top of my head.  Yeah.  I don't think I can tell

15     you.  I don't keep those statistics, although I

16     suppose I could, you know, review how many charts I

17     have, but I haven't.

18 Q.  Would you say that it's over 100 patients?

19 A.  Yes.

20 Q.  And somewhere less than 250 patients?

21 A.  I just hesitate to speculate under oath, in that I

22     don't know what the numbers are.

23 Q.  Understood.  That's fine.  We're not going to hold

24     you to a specific number today.

25        To the best of your knowledge, how many of your

1    current patients identify as transgender?

2  A.  So that was something I did look at, just a typical

3      week, and -- a little while back.  And about

4      two-thirds of my patients are transgender.

5  Q.  And how many of those transgender patients are

6      minors?

7  A.  And so about half of my transgender patients are

8      minors, or I started seeing as minors in 2020.  Some

9      may have turned 18 since then.  But when I -- the

10     reason I give those numbers is at one point I just

11     looked at my schedule, and just for a given week,

12     and saw it was about one-third transgender minors,

13     about one-third transgender adults, and about

14     one-third cisgender patients, mostly adults.

15 Q.  And throughout the course of your career and your

16     practice, have you ever worked with any physicians

17     from the Polyclinic?

18 A.  No.

19 Q.  Prior to reviewing C. P.'s medical records, were you

20     familiar with Dr. Kevin Hatfield?

21 A.  No.

22 Q.  And what about Dr. Jeffrey Kyllo?

23 A.  No.

24 Q.  The same question for Ms. Sharon Booker with the

25     Center for Child and Family Therapy.  Are you

1    familiar with that practice group?

2  A.  No.

3  Q.  And are you familiar with Ms. Booker?

4  A.  No.

5  Q.  And have you reviewed the reports of plaintiff's two

6      other experts in this case, Dr. Ettner and

7      Dr. Schechter?

8  A.  I actually don't believe I have.

9  Q.  Are you aware that Dr. Ettner and Dr. Schechter have

10     provided expert disclosures in this case?

11 A.  Yes.

12 Q.  And have you ever worked with either of them

13     previously?

14 A.  Yes.  I was on the WPATH board with both

15     Dr. Schechter and Dr. Ettner.  So I've not worked

16     clinically with them.  I've worked with both of them

17     on the board, and we have worked together on

18     educational projects -- on projects to train

19     healthcare providers in transgender health.

20 Q.  What about Dr. Frank Fox, who we understand has or

21     will also be disclosed as an expert?  It's Frank G.

22     Fox.

23 A.  No.

24 Q.  And as we talk about your practice and the number of

25     transgender -- the patients you see who identify as

Dan H. Karasic, MD
7/13/2022

Page 38

1 transgender, I'm assuming transgender-related
2 issues, gender-related issues are something that you
3 would consider to be a specialty, right?
4 A.  Yes.
5 Q.  Did you receive any specialized training in
6 gender-related issues?
7       ATTY. GONZALEZ-PAGAN:  Sorry, just before you
8 finish the question, Dr. Karasic, if you can hold
9 off just a couple of seconds for me to lodge an
10 objection, I know that it's just -- I believe the
11 court reporter may appreciate it.  I would
12 appreciate it.  So if you just kind of hold off a
13 couple of seconds before answering.
14       THE WITNESS:  Yes, I will -- I will try.
15 Sorry.
16       ATTY. GONZALEZ-PAGAN:  Apologies, Stephanie.
17 Please.  I didn't mean to interrupt.
18       ATTY. BEDARD:  That's all right.  I'll repeat
19 my question.  We can have the weighted pause.
20 Q.  (BY ATTY. BEDARD) Dr. Karasic, did you receive any
21 specialized training in gender-related issues?
22 A.  Yes.  I did my psychiatry residency at UCLA, UCLA
23 Neuropsychiatric Institute, and I received my first
24 training in transgender care there with Robert
25 Stoller, who coined the term "gender identity." He

Page 39

1 had been working with transgender people at UCLA
2 since the 1950s.
3       And I also worked with -- received training
4 from Richard Green, who was a psychiatrist at UCLA
5 at that time.  He did the Feminine Boy Study at
6 UCLA.  And so I received training about
7 gender-nonconforming boys from his work.
8 Q.  Anything else?
9 A.  Well, yes.  So much of what I did as a faculty
10 member were trainings that I organized, of which
11 there were many.  I probably organized more
12 trainings on transgender health -- and more
13 educational sessions on transgender health over this
14 last 30 years at American Psychiatric Association
15 meetings, probably than anyone else.
16       But even if I were the chair of a session, I
17 was one of a panel of presenters.  And so I received
18 training, certainly, by -- from my peer
19 psychiatrists.
20       I was also faculty on an American Psychiatric
21 Association CME training with fellow psychiatrists.
22 So there were many opportunities over the years to
23 be educated by my peers as well.
24 Q.  And Dr. Karasic, is everything in the qualifications
25 section of your expert report accurate to the best

Page 40

1 of your knowledge?
2 A.  I believe so.
3 Q.  And is everything listed in your CV attached to your
4 expert disclosure accurate, to the best of your
5 knowledge?
6 A.  I believe so.
7 Q.  Are there any recent updates to your background or
8 qualifications that do not currently appear on your
9 CV?
10 A.  Well, I recently went from being a distinguished
11 fellow of the American Psychiatric Association to a
12 distinguished life fellow of the American
13 Psychiatric Association, which was just an
14 achievement I guess I got by surviving.  And I
15 don't -- since updating my CV -- since I'd worked
16 for one employer my entire career, it was always a
17 challenge updating my CV.  And since I retired
18 in 2020, it's not something I do very often.  I've
19 added some legal cases with expert witness work that
20 I've done since retirement.  But there's no doubt
21 that there are things that I've done that are not
22 listed on my CV.
23 Q.  Well, hopefully the recent change in your
24 designation for the APA means you no longer have to
25 pay dues.

Page 41

1 A.  I used to, but they changed that.  So now they have,
2 like, a semi-retired status.  But it was, until a
3 couple years ago, that when you reached that status,
4 that you no longer had to pay dues.  But the APA
5 decided -- I think psychiatrists are getting so old
6 that they decided that that was not a viable
7 proposition indefinitely.
8 Q.  Understood.
9       ATTY. BEDARD:  Omar, I am about to go into a
10 series of questions about a specific exhibit.  It
11 may be a good time to take a quick five-minute
12 break.  We're right at a hour mark, if that works
13 for everyone?
14       ATTY. GONZALEZ-PAGAN:  Yeah.  Five minutes is
15 fine.
16       THE VIDEOGRAPHER:  Okay.  We are going off the
17 record at 10:03.
18       (Break from 10:04 a.m. to 10:10 a.m.)
19       THE VIDEOGRAPHER:  We are back on the record at
20 10:10.
21       ATTY. BEDARD:  Dr. Karasic, I'm going to go
22 back now to Exhibit 2, which is your expert
23 disclosure, and I'm going to share my screen with
24 you.
25       THE WITNESS:  Okay.

Dan H. Karasic, MD
7/13/2022

Page 42

1  Q.  (BY ATTY. BEDARD) Can you see my screen?
2  A.  Yes.
3  Q.  So I'm going to go now in your expert report to
4      Paragraph 17.  And in Paragraph 17, I understand
5      from your disclosure that you conducted an interview
6      with C. P. on March 18th of 2022; is that correct?
7  A.  Yes.
8  Q.  And it was via Zoom?
9  A.  Yes.
10 Q.  And were C. P.'s parents present for part or all of
11     that interview?
12 A.  Yes.  C. P.'s parents were present at the beginning
13     and at the end, and in the middle portion of the two
14     hours, I was just with C. P.
15 Q.  And had you reviewed C. P.'s medical records prior
16     to March meeting with C. P.?
17 A.  Yes.
18 Q.  What about the records from Sharon Booker and the
19     Center for Child and Family Therapy?
20 A.  Yes.
21 Q.  And based on your review of those records and your
22     meeting with C. P., is it your understanding that
23     C. P. first met with Dr. Hatfield in 2016?
24 A.  Yes.
25 Q.  And C. P. was ten years old at that time, right?

Page 43

1  A.  C. P. in 2016 may have been 11.  I think 2016 --
2      C. P.'s year of birth is 2005 -- early 2005.  So 10
3      or 11.
4  Q.  And C. P. first received a puberty blocker that same
5      year, right?
6  A.  Yes.
7  Q.  And that was age 10 or 11?
8  A.  Yes.  I believe that was age 11 that C. P. received
9      the puberty blocker.
10 Q.  And then is it your understanding that C. P. then
11     started testosterone cream in 2017 at the age of 11
12     or 12?
13 A.  I think the testosterone cream was started just when
14     C. P. turned 13, is my recollection, so around
15     early 2018.
16 Q.  Is it your understanding that there was a period of
17     time in which C. P. was prescribed testosterone
18     cream, and then at one point switched to
19     testosterone injections?
20 A.  Yes.
21 Q.  Do you recall, from your review of the records and
22     meeting with C. P., when that was?  In other words,
23     how old C. P. was when he began the testosterone
24     injections?
25 A.  Let's see.  The testosterone cream was right

Page 44

1      around -- I think shortly after C. P. turned 13.
2      The -- I have reviewed the -- saw the record of when
3      the testosterone injections started, but I can't
4      remember whether C. P. was 13 or 14 at the time of
5      the first injection.
6  Q.  And then C. P. also received a bilateral mastectomy,
7      right?
8  A.  Yes.
9  Q.  And that was in 2019?
10 A.  And that was in 20-- let's see.  I think that
11     the -- yeah, I think it was maybe December of 2019.
12     Yeah, I think so.
13 Q.  Let's take a look further down in your expert
14     report.
15     ATTY. GONZALEZ-PAGAN:  Stephanie, just for the
16     sake of completeness, I believe, like, your Adobe
17     panel on the -- what would be right-hand side is
18     blocking a bit of the text.  Do you see the arrow in
19     the middle?  It can be collapsed.
20     ATTY. BEDARD:  Thank you.  Is that better?
21     ATTY. GONZALEZ-PAGAN:  Yes.
22 Q.  (BY ATTY. BEDARD) Dr. Karasic, can you see the full
23     text of the document I'm showing you right now?
24 A.  No.  Should I hide thumbnail video?
25 Q.  Is the Zoom screen blocking it?

Page 45

1  A.  Yes, partially.
2  Q.  You can move the Zoom screen portion around.
3  A.  Okay.  All right.  Okay.  Let's see.  I moved it
4      down, and it brought it down to the lower part of
5      the screen, so I'll just ask you to scroll up if you
6      need -- if I need --
7  Q.  Sure.  I'd be happy to do so.  So Dr. Karasic, I'm
8      looking at Paragraph 70 and 71 of your expert
9      report.  Does this help refresh your recollection as
10     to the dates of the various procedures and C. P.'s
11     age for each of those procedures?
12 A.  Yes.
13 Q.  And do you see in Paragraph 71, and I'm going to
14     read from your report now, where it says, "[C. P.]
15     states that Dr. Hatfield discussed the risks and
16     benefits of each intervention extensively with
17     [C. P.] and his parents."  Do you see that?
18 A.  Yes.
19 Q.  And would you agree with that statement?
20 A.  That is what I was told by Casey and his parents.
21 Q.  And I guess my question though, Dr. Karasic, is
22     understanding that that's what Casey told you --
23     what C. P. told you, would you agree with the
24     statement that Dr. Hatfield discussed the risks and
25     benefits of each intervention extensively with C. P.

Dan H. Karasic, MD
7/13/2022

Page 46

1   and his parents?

2   ATTY. GONZALEZ-PAGAN: Objection to form.

3   A. Well, the sentence says, "Casey states that

4   Dr. Hatfield discussed risks and benefits of each

5   intervention." So when I was doing my expert

6   statement, it was what Casey had told me.

7   But my recollection is, in reviewing the

8   medical records of Dr. Hatfield, that Dr. Hatfield

9   also documented having discussed risks and benefits

10   of interventions with C. P. and C. P.'s parents.

11   Q. (BY ATTY. BEDARD) And would you agree that that was

12   an extensive discussion of the risks and benefits?

13   ATTY. GONZALEZ-PAGAN: Objection. Form.

14   A. So the word "extensively" was from my discussion

15   with Casey and Casey's parents.

16   Q. (BY ATTY. BEDARD) Understood. But I'm asking you a

17   slightly separate question, perhaps inartfully. I'm

18   asking whether you agree that Dr. Hatfield's

19   discussion of the risks and benefits with C. P. and

20   his parents was extensive?

21   ATTY. GONZALEZ-PAGAN: Objection. Form.

22   A. My recollection is that there is documentation of

23   risks and benefits, including bone health and

24   fertility, that Dr. Hatfield charted. But the

25   characterization comes from the interview. I did

Page 47

1   not interview Dr. Hatfield to ask, you know, how

2   extensive the discussion of risks and benefits was.

3   I'm only relying on -- that it is documented in the

4   medical record.

5   Q. Let's turn now to paragraph 50 of your expert

6   report. Can you see that?

7   A. Yes.

8   Q. Good. And in Paragraph 50, you stated in your

9   report that, "As part of the treatment process for

10   gender dysphoria, patients provide informed consent

11   to their care." And you went on to state that,

12   "However, for gender-affirming medical care, there

13   is the additional safeguard of the assessment by a

14   mental health professional, who in addition to

15   diagnosing gender dysphoria, also assesses capacity

16   to consent and reviews the risks and benefits of

17   treatment with the patient," right?

18   A. Yes.

19   Q. So in other words, in any circumstance, patients

20   should provide informed consent to their care. But

21   when it comes to gender-affirming medical care, you

22   look for this additional safeguard of an assessment

23   by a mental health professional, right?

24   ATTY. GONZALEZ-PAGAN: Objection. Form.

25   A. Yes.

Page 48

1   Q. (BY ATTY. BEDARD) And part of what that mental

2   health professional would be assessing is the

3   patient's capacity to consent and whether those

4   risks and benefits are adequately understood by the

5   patient, right?

6   A. Yes. Now, in the case of a minor, the minor is

7   assenting and the parents are giving the informed

8   consent. And so the health professional should be

9   meeting with the patient and parents, in terms of

10   making sure they understand the risks and benefits

11   of the care being provided.

12   Q. And I'm looking now, Dr. Karasic, at Paragraph 75 of

13   your expert disclosure. Can you see that?

14   A. Yes.

15   Q. Now, I just want to make sure I understand what you

16   mean by this first sentence. You said, "No mental

17   health history other than gender dysphoria and

18   seeing a mental health professional before

19   gender-affirming care." What does that mean,

20   exactly?

21   A. So there was no history, for example, of C. P. being

22   treated with psychiatric medications or -- other

23   than there was mention of, I think in Dr. Hatfield's

24   note, of seeing a mental health person before and

25   being in a group before Dr. Hatfield saw C. P.

Page 49

1   But -- so I said, "seeing a mental health

2   professional," also including Sharon Booker for the

3   assessment for surgery. So that was the extent.

4   There was an assessment for attention

5   hyperactivity disorder done in 2021. But there had

6   not been any treatment for that. In my --

7   Q. And other than -- sorry, Dr. Karasic, go ahead.

8   A. Oh, I said, "in my recollection." That C. P. was

9   not being treated for that at the time of my

10   interview.

11   Q. Okay. Thank you. So other than the evaluation for

12   ADHD in 2021, is there any record in the medical

13   records you reviewed of C. P. ever meeting with a

14   psychiatrist?

15   A. No.

16   Q. Is there any record in the medical records that you

17   reviewed -- any evidence that C. P. met with a

18   psychologist either prior to, during, or after

19   receiving treatment?

20   A. I don't know Dr. Tutty's -- you know, what

21   Dr. Tutty's PhD was in. So I don't think I can

22   answer that part.

23   The one set of -- I believe that Sharon -- the

24   letter that I saw, Sharon Booker, is an LCSW.

25   Q. In other words, Sharon Booker is not a psychiatrist,

Dan H. Karasic, MD
7/13/2022

Page 50

1    right?

2 A.  Correct.

3 Q.  And Ms. Booker is also not a psychologist, right?

4 A.  Correct.

5 Q.  And what is the LCSW degree?  What does that stand

6    for?

7 A.  That's a licensed clinical social worker.

8 Q.  And what does that degree entail?

9        ATTY. GONZALEZ-PAGAN:  Objection.  Form.

10 A.  So --

11       ATTY. GONZALEZ-PAGAN:  Outside the scope.

12 A.  So becoming an LCSW means getting a master's degree

13    in social work and then doing many, many hours of

14    supervised work before being able to become

15    licensed.  So typically, a licensed clinical social

16    worker is somebody who is a mental health

17    professional.  Once they're licensed, they can do

18    that work as a mental health professional

19    independently.

20       ATTY. BEDARD:  Dr. Karasic, I am now going to

21    show you what has been marked as Defendant's

22    Exhibit 5.

23       (Exhibit 5 marked for identification.)

24 Q.  (BY ATTY. BEDARD) Can you see this exhibit?

25 A.  Yes.

Page 51

1 Q.  And I'm going to scroll down just so you can see the

2    entirety of the first page.

3 A.  Okay.

4 Q.  Have you seen this exhibit or this document before?

5 A.  Yes.

6 Q.  And what is it?

7 A.  So the Endocrine Society -- a committee of the

8    Endocrine Society wrote clinical practice guidelines

9    for endocrine treatment of people with gender

10    dysphoria.

11 Q.  Are there different versions of those guidelines?

12 A.  These are the guidelines that I'm familiar with.

13 Q.  What I meant was, you know, with the Standards of

14    Care for WPATH, you've got Version 6, Version 7,

15    Version 8.  For the Endocrine Society, are there

16    similar versions?

17 A.  I don't recall whether a committee of the Endocrine

18    Society had done guidelines before this.

19 Q.  But to the best of your knowledge, these are the

20    current guidelines for the Endocrine Society,

21    correct?

22 A.  Yes.

23 Q.  I'm turning now to Page 8 of Exhibit 5.  One second.

24    Turning now to Page 15 of Exhibit 5, do you see

25    the -- one second.  Okay.  Do you see the paragraph

Page 52

1    on Page 8 that begins with, "Because of the

2    psychological"?

3 A.  Yes.

4 Q.  Dr. Karasic, could you read that paragraph for me,

5    please?

6 A.  Yes.  "Because of the psychological vulnerability of

7    many individuals with [gender dysphoria or] gender

8    incongruence, it is important that mental health

9    care is available before, during, and sometimes

10    after transitioning.  For children and adolescents,

11    a [mental health professional] who has

12    training/expertise in child and adolescent gender

13    development (as well as child and adolescent

14    psychopathology) should make the diagnosis, because

15    assessing GD/gender incongruence in children and

16    adolescents is often extremely complex."

17 Q.  So Dr. Karasic, for the record, you just read a

18    paragraph from the Endocrine Society guidelines.

19    And I'll repeat my question, which was:  Do you

20    agree with the statement that you just read?

21 A.  In large part, I would say "yes."  I would say that

22    mental health professionals can include kind of

23    primary care providers as well.  So the WPATH has

24    kind of moved to having less distinguishing of

25    health professional versus mental health

Page 53

1    professional, in that primary care providers also

2    are providers of mental health care.

3 Q.  Dr. Karasic, did C. P. see a mental health

4    professional who has training or experience in child

5    and adolescent gender development as well as child

6    and adolescent psychopathology, as the guidelines

7    describe, before receiving a diagnosis of gender

8    dysphoria?

9        ATTY. GONZALEZ-PAGAN:  Object to form.

10 A.  Yes, I believe so.  Family medicine doctors consider

11    themselves mental health professionals, and if

12    you -- their, like, American Academy of Family

13    Physicians, I think it's called -- their

14    professional organizations make the point that most

15    mental healthcare providers -- most mental health

16    care is provided in primary care settings, and not

17    by psychiatrists.

18       And so a -- someone in family -- who is

19    board-certified in family medicine has received

20    extensive mental health training.  And so we

21    consider family medicine doctors as mental health

22    professionals.  And so in that regard, I would say

23    "yes" to your question.

24 Q.  (BY ATTY. BEDARD) Dr. Karasic, based on your review

25    of C. P.'s medical records and your discussion with

Dan H. Karasic, MD
7/13/2022

Page 54

1   C. P., who diagnosed C. P. with gender dysphoria?
2   A.  So the -- C. P. was diagnosed by Dr. Hatfield, later
3       was diagnosed by Sharon Booker, and I think was
4       diagnosed -- I think may have been charted by
5       Dr. Garza in some other medical records that I saw.
6       But I think the initial diagnosis was from
7       Dr. Hatfield.
8   Q.  And at the time of initial diagnosis by
9       Dr. Hatfield, was C. P. seeing a mental health
10      professional with training and experience in child
11      and adolescent psychopathology?
12  A.  So if -- that was part of my prior answer, that
13      family medicine doctors are considered mental health
14      professionals.  They are generalists, but they do
15      have expertise in internal medicine, pediatrics, and
16      psychiatry as part of their training.
17  Q.  Do you know whether Dr. Hatfield, specifically, has
18      training in child and adolescent psychopathology?
19  A.  I would assume that he does, because he's
20      board-certified in family medicine, and -- or I
21      assume he's board-certified in family medicine. But
22      board certification in family medicine includes, as
23      well as board certification in any specialty,
24      requirements of extensive training. And family
25      medicine doctors have that training in working with

Page 55

1       adults and working with children and in providing
2       mental health care.
3   Q.  And Dr. Karasic, did C. P. fulfill DSM-5 diagnostic
4       criteria for gender dysphoria?
5   A.  Yes, I believe so.  Remember, I am doing this
6       assessment not at the time that C. P. received these
7       interventions.  But it's my opinion that he did have
8       a DSM-5 diagnosis of gender dysphoria.
9   Q.  And what is your opinion based on?
10  A.  So C. P. had had persistent discomfort with his
11      gender role, with how he was perceived by others,
12      and with his body.  And that dysphoria had persisted
13      for more than six months.  And that he -- that the
14      distress was clinically significant, by -- as
15      described in the DSM.
16  Q.  Is there any other evidence from C. P.'s medical
17      records or from your interview with C. P. that
18      supports your opinion that C. P. fulfilled the DSM-5
19      diagnostic criteria for gender dysphoria?
20  A.  Yes.  I go into greater detail in my summary of my
21      examination of C. P.
22  Q.  And when you refer to the summary of your
23      examination of C. P., you're referring to the
24      section of your expert disclosure that discusses
25      that examination of C. P.?

Page 56

1   A.  Yes.
2   Q.  Great.  Just wanted to make sure we're on the same
3       page.  So in your opinion, Dr. Karasic, was C. P.
4       evaluated by a qualified mental health professional
5       before starting the puberty-blocking medication?
6   A.  Yes.
7   Q.  And who was that?
8   A.  That was Dr. Hatfield.
9   Q.  And was C. P. evaluated by a qualified mental health
10      professional before starting any testosterone
11      treatment?
12  A.  Yes.
13  Q.  And who was that?
14  A.  That was Dr. Hatfield.
15         ATTY. BEDARD:  Okay.  I'm going to show you
16      what has been marked as Defendant's Exhibit 7.
17         (Exhibit 7 marked for identification.)
18  Q.  (BY ATTY. BEDARD) Can you see that document?
19  A.  Yes.
20  Q.  And have you seen these medical records previously?
21  A.  Yes.
22  Q.  I'll be referring throughout the course of this
23      deposition, if I haven't yet, to the numbers that
24      appear either at the bottom middle or bottom
25      right-hand side of the page.  Those are referred to

Page 57

1       as Bates numbers.  Do you understand what I'm saying
2       when I say "Bates number"?
3   A.  Yes.
4   Q.  Okay, great.  So I'm scrolling now to Plaintiff's
5       Bates No. 990.
6          Have you previously reviewed this medical
7       record?
8   A.  I believe so, yes.
9   Q.  And this is a medical record from Dr. Jeffrey Kyllo
10      with the Polyclinic, right?
11  A.  Yes.
12  Q.  And this specific entry, this specific progress note
13      is dated April 30th of 2019, right?
14  A.  Yes.
15  Q.  I'm scrolling down within that consult note from
16      Dr. Kyllo.  It states that C. P. is being referred
17      by Dr. Hatfield for possible top surgery, right?
18  A.  Yes.
19  Q.  And do you see where it says further down in that
20      paragraph, "Has not had mental healthcare counseling
21      at this point"?
22  A.  Yes.
23  Q.  And at this point, C. P. had been taking puberty
24      blockers for several years, right?
25  A.  Yes.

Dan H. Karasic, MD
7/13/2022

Page 58

1  Q.  And C. P. had been on some form of testosterone for
2      several years, right?
3  A.  For -- well, for less time than that, for I think
4      over a year.  And this says gel at age 11 and
5      injections three months ago.
6          But one thing I would just distinguish is
7      between mental health counseling, which is
8      psychotherapy, versus having had a mental health
9      assessment.  And WPATH make that -- distinguishes
10     those two:  A mental health assessment is required
11     by WPATH; but psychotherapy is not required.
12 Q.  So tell me a bit about that distinction.  What is
13     the distinction, in your opinion, between mental
14     health counseling and a mental health assessment?
15 A.  Sure.  So by "counseling," I might use the word
16     "psychotherapy," because that's in -- certainly in
17     WPATH, makes a distinction between an assessment and
18     psychotherapy.  And both in Standards of Care 7 and
19     the upcoming Standards of Care 8, assessments are
20     required, but very specially WPATH says that
21     psychotherapy is not a requirement.
22         And so the assessment is done by the health
23     professional to make sure that the person has
24     persistent gender dysphoria, typically a
25     diagnosis -- DSM diagnosis of gender dysphoria, and

Page 59

1      that they understand the risks and benefits of
2      treatment, and that there's not a mental health or
3      medical condition that stands in the way of their
4      getting a good result from care.  So that's all part
5      of the assessment.
6          Psychotherapy is, you know, is a separate
7      process, though certainly some psychotherapists will
8      do mental health assessments.
9  Q.  And is it your understanding, based on your review
10     of the medical records, that Dr. Kyllo required
11     C. P. to undergo mental healthcare counseling prior
12     to his top surgery?
13 A.  I did not have that impression when I read that.  I
14     don't know if there's more to the document than what
15     is said here, but again, there's a distinction
16     between a mental health assessment and mental health
17     counseling, or mental health assessment and
18     psychotherapy.  And so, you know, I don't know
19     exactly in this context what the word "counseling"
20     is being used to refer to.  But commonly it refers
21     to psychotherapy, which is not a requirement to have
22     surgery.
23 Q.  Dr. Karasic, do you, in your practice, typically
24     recommend psychotherapy for transgender minors who
25     receive top surgery?

Page 60

1  A.  So it depends on the patient.
2  Q.  It's a sort of case-by-case analysis?
3  A.  Yes.
4  Q.  And what might it depend on?  What factors might it
5      depend on?
6  A.  It might depend on whether or not there's
7      co-occurring mental health concerns, and it might
8      depend on whether there is ambivalence, for example,
9      on the part of the patient.  So there are -- there
10     are certainly indicators of why psychotherapy might
11     be particularly important.
12         It -- you know, there are many people who can
13     benefit from psychotherapy anyway, but there's a
14     distinction between, you know, a recommendation or a
15     suggestion and a requirement of psychotherapy before
16     someone is given a letter to a surgeon, supporting
17     surgery.
18 Q.  And Dr. Karasic, do you typically recommend
19     psychotherapy prior to any hormone treatment,
20     including testosterone cream or injections?
21         ATTY. GONZALEZ-PAGAN:  Object to form.
22 A.  It's, again, on a case-by-case basis.  Now, I would
23     just say that in my practice as a psychiatrist, I
24     tend to see people who have co-occurred mental
25     illness.  And so very often, mental health care is

Page 61

1      necessary for co-occurring mental illness.
2  Q.  (BY ATTY. BEDARD) And Dr. Karasic, I appreciate you
3      walking me through the distinction that you've drawn
4      between mental health counseling and a mental health
5      assessment.  For the assessment portion of that,
6      which you have said is required by WPATH, does that
7      assessment need to follow certain specific criteria
8      that would be the same in every case?  Or is that an
9      individualized assessment?
10         ATTY. GONZALEZ-PAGAN:  Objection.  Form.
11 A.  So there are recommendations that are made in
12     trainings, for example, for what should be asked in
13     an assessment.  But ultimately, it is obtaining the
14     information that is required for a letter in
15     accordance of Standards of Care 7.
16         ATTY. BEDARD:  Dr. Karasic, I'm now going to
17     show you what has been marked as Defendant's
18     Exhibit 8.
19             (Exhibit 8 marked for identification.)
20 Q.  (BY ATTY. BEDARD) Can you see this document?
21 A.  Yes.
22 Q.  And do you see that these are records from the
23     Center for Child and Family Therapy?
24 A.  Yes.
25 Q.  Dr. Karasic, I am now on Bates No. Pritchard CFT

Dan H. Karasic, MD
7/13/2022

Page 62

1  00005 [sic]. Do you see that?
2  A.  Yes.
3  Q.  And this is an intake form from the Center of Child
4     and Family Therapy, correct?
5  A.  Yes.
6  Q.  And did you review this intake form prior to today?
7  A.  I don't recall.
8  Q.  But you reviewed the records for C. P. from the
9     Center of Child and Family Therapy as a whole, prior
10    to forming your expert opinion, right?
11 A.  Yes, that's my recollection.
12 Q.  So halfway through this intake form, do you see the
13    section that says "Reason for Referral"?
14 A.  Yes.
15 Q.  And what was the reason for the referral of C. P. to
16    Ms. Booker?
17 A.  It says, "assessment letter for reconstructive chest
18    surgery."
19 Q.  So in other words, the assessment letter was the
20    purpose of the visit? That's your understanding?
21 A.  Yes.
22 Q.  And then I'm scrolling down to the next page.  Do
23    you see where it says, "Treatment Goals"?
24 A.  Yes.
25 Q.  And what are the treatment goals listed?

Page 63

1  A.  "Provide an assessment [...] letter for gender
2     affirming reconstructive surgery."
3  Q.  So Dr. Karasic, writing a letter is not a treatment
4     goal, right?
5  A.  Well, it's -- there is -- it is providing an
6     assessment for care, which could be part of a
7     treatment plan, even if it's not -- and I mean, the
8     totality of, you know, of someone's care can be one
9     component, which it sounds like this -- in this
10    particular intake, was focused on that component.
11 Q.  And Dr. Karasic, is it your understanding, based on
12    speaking with C. P. and the review of his records,
13    particularly his records with the Center for Child
14    and Family Therapy, that he had two therapy sessions
15    with Ms. Booker?
16 A.  So yes.  My understanding is that there were two
17    sessions for the assessment for surgery.
18 Q.  And after those two sessions, Ms. Booker then wrote
19    a letter of support for his reconstructive surgery?
20 A.  Yes.
21 Q.  Did you review any records showing that Ms. Booker
22    conducted any follow-up assessments after the
23    surgery?
24 A.  I don't recall that from the records.  I think the
25    parents might have said something about some

Page 64

1  involvement that was considered or happened with
2  Sharon Booker afterwards, but I don't recall that
3  from the medical records.
4  Q.  Did you review any records showing that Ms. Booker
5     ever met with C. P. again after the surgery?
6  A.  I did not see any medical records regarding that.
7     ATTY. BEDARD:  All right.  Dr. Karasic, I am
8  now going to show you what has been marked as
9  Defendant's Exhibit 9.
10    (Exhibit 9 marked for identification.)
11 Q.  (BY ATTY. BEDARD) Can you see this document?
12 A.  Yes.
13 Q.  And have you seen this document before today?
14 A.  I believe so, yes.
15 Q.  Did you review this psychological evaluation of
16    C. P. in forming your expert opinion in this case?
17 A.  Yes. I believe I've reviewed it prior to -- right
18    prior to forming my expert opinion.
19 Q.  And for this type of evaluation, for something
20    entitled a "psychologist evaluation," is this
21    something where a physician would typically refer
22    C. P. for this type of evaluation?
23 A.  So my recollection is that this is related to
24    treatment of -- for attention deficit hyperactivity
25    disorder, and very commonly someone does get an

Page 65

1  evaluation from a psychologist for ADHD prior to
2  initiating treatment.
3     ATTY. BEDARD:  Omar, just as a sidebar, we may
4  be getting some background feedback from you again.
5     ATTY. GONZALEZ-PAGAN:  I apologize.  I'm
6  literally on vacation, so the connection is not the
7  best, but I apologize for the feedback.
8     ATTY. BEDARD:  No, that's okay.  It's a
9  reverberating sound.  I don't know how to describe
10 it.
11    ATTY. GONZALEZ-PAGAN:  I was writing.  It's a
12 tiny little desk.
13 Q.  (BY ATTY. BEDARD) Yeah.  Okay.  So for this type of
14    psychological evaluation, is this the type of
15    evaluation that you might see before someone
16    receives a diagnosis of gender dysphoria as well?
17 A.  My recollection of this evaluation is that it was
18    for attention deficit hyperactivity disorder, ADHD.
19 Q.  Understood.  That was the specific purpose for C. P,
20    I think I'm asking, perhaps inartfully, a broader
21    question which is:  Is this type of psychological
22    evaluation something that you might see prior to or
23    at the initiation of a diagnosis of gender
24    dysphoria?
25 A.  No, not typically.  So a general neuropsychological

Dan H. Karasic, MD
7/13/2022

Page 66

1 evaluation is not typically what you see prior to
2 care; rather, one might see an assessment that is
3 focused on the care that's being considered.
4 Q. And Dr. Karasic, I'm going back now to your expert
5 report and paragraph 75, specifically, of that
6 expert report.
7 A. Yeah.
8 Q. And in that second sentence of Paragraph 75, you
9 said, "Casey's ADHD diagnosis does not impact the
10 diagnosis of gender dysphoria nor the medical
11 necessity of treatment." What is the basis for that
12 opinion?
13 A. Sure. So when one is making a diagnosis of gender
14 dysphoria, it's based on the DSM criteria of gender
15 dysphoria. It's based on the symptoms of gender
16 dysphoria. And many people have ADHD. Some people
17 with ADHD also have gender dysphoria. Many do not.
18 Having ADHD does not, you know, mean that you can't
19 also have a diagnosis of gender dysphoria, and
20 indeed, many people have both.
21     And similarly, if somebody has gender
22 dysphoria, having ADHD does not mean that treatment
23 of gender dysphoria is not medically necessary.
24 Q. Dr. Karasic, we're at another hour mark, but before
25 we go off the record, I'm hearing what appear to be,

Page 67

1 like, instant messaging sounds. Do you have any
2 sort of message system in front of you right now?
3 A. I do not.
4     ATTY. GONZALEZ-PAGAN: Stephanie, those may be
5 my computer.
6     ATTY. BEDARD: Okay. So Omar, I don't know if
7 you're able to turn --
8     ATTY. GONZALEZ-PAGAN: I'll try to turn them
9 off.
10     ATTY. BEDARD: Yeah. If you could turn the
11 sounds off, that would be great.
12 Q. (BY ATTY. BEDARD) And Dr. Karasic, just before we go
13 off the record, have you communicated with anyone
14 during the course of the deposition so far today?
15 A. Not during the course of the deposition. During the
16 break, Omar called me and said, "You're doing
17 great." And that's pretty much, you know. But
18 during the -- while during -- you know, while we
19 were doing the deposition, I have received no
20 instant messages or any other communication.
21 Q. Understood. And did plaintiff's counsel say
22 anything to you during the break other than, "You're
23 doing great?"
24 A. I think he said maybe something to the effect of,
25 "You're doing great. Remember just answer the

Page 68

1 questions." So kind of typical lawyer
2 reinforcement.
3 Q. Did he say anything else?
4 A. He did not say anything else, and I didn't say
5 anything as well. It was a, you know, extremely
6 brief communication during the break.
7 Q. Did you discuss any documents when you were speaking
8 with plaintiff's counsel?
9 A. No.
10     ATTY. BEDARD: Okay. If we want to take a
11 short break, it's two -- sorry -- 11:03 Pacific. Do
12 you want to come back at 11:10?
13     ATTY. GONZALEZ-PAGAN: That works.
14     THE VIDEOGRAPHER: We are going off the record
15 at 11:04.
16         (Break from 11:04 a.m. to 11:13 a.m.)
17     THE VIDEOGRAPHER: We are back on the record at
18 11:13.
19 Q. (BY ATTY. BEDARD) Dr. Karasic, we've just taken a
20 short break. Did you speak with anyone during the
21 break?
22 A. No.
23 Q. Did you communicate with anyone via phone or email?
24 A. No.
25     ATTY. GONZALEZ-PAGAN: Objection to form.

Page 69

1 A. No.
2 Q. (BY ATTY. BEDARD) Did you review any documents
3 during the break?
4 A. No.
5 Q. Let's turn now to -- back to Exhibit 2, your expert
6 disclosure. And I'm looking specifically at
7 paragraphs 38 and 39. Can you see that document?
8 A. Yes.
9 Q. So in Paragraphs 38 and 39 of your report, you
10 discuss the reversibility or the irreversibility of
11 treatment. So Dr. Karasic, is it your expert
12 opinion that certain gender-related treatment are
13 reversible and others are irreversible?
14 A. Yes.
15 Q. So let's talk about that for a minute and sort of go
16 through some of these different procedures.
17     So first, for puberty blocking, is it your
18 understanding that puberty -- the impact of puberty
19 blockers is reversible?
20 A. Yes.
21     ATTY. GONZALEZ-PAGAN: Objection to form.
22 A. Yes.
23 Q. (BY ATTY. BEDARD) And in your report, you stated
24 that "once stopped, a patient immediately returns to
25 the stage of pubertal development that had begun

Dan H. Karasic, MD
7/13/2022

Page 70

1  when the treatment was initiated"; is that right?
2  A.  Yes.
3  Q.  So just so I understand this -- if a patient goes on
4      puberty blockers, do they immediately start puberty
5      again once they go off the blockers, or is there
6      typically a period of time before puberty would
7      start again?
8          ATTY. GONZALEZ-PAGAN:  Objection to form.
9  A.  Well, if -- if they go off puberty blockers, then
10     they can then have initiation of production of
11     hormones that can start the changes of puberty that,
12     you know, would have happened if puberty had not
13     been paused by the puberty blockers.
14 Q.  (BY ATTY. BEDARD) Understood.  But I guess what I'm
15     asking is if a patient goes off puberty blockers --
16     to the extent we know, if a patient goes off puberty
17     blockers, is there typically a delay before that
18     patient would begin puberty again?
19 A.  Well, they've already begun puberty, in that puberty
20     blockers are started at Tanner Stage II.  So
21     presumably, they would again be at -- when puberty
22     blockers are discontinued, they would be at Tanner
23     Stage II.  And then with their own production of sex
24     hormones, they could then progress in puberty.
25 Q.  So let me ask it a slightly different way, then.

Page 71

1  Let's say a patient goes onto puberty blockers and
2  then goes back off those puberty blockers.  You
3  testified that it is a reversible treatment, and the
4  patient will immediately go back to where they
5  started.  What I'm trying to understand is, is it an
6  immediate process?  So if someone goes off of
7  puberty blockers, will they immediately restart
8  where they previously left off in their puberty
9  development?  Or does it typically take some time
10 for puberty to restart?
11         ATTY. GONZALEZ-PAGAN:  Objection to form.
12 A.  So puberty is a process of development.  And so
13     the -- but the development of puberty can continue
14     again once the person has stopped puberty blockers.
15     There's certainly data -- you know, more data,
16     people starting and stopping puberty blockers, from
17     the treatment of central precocious puberty, in
18     which case people are on puberty blockers to delay
19     puberty so that the patient undergoes puberty with
20     their peers, and so when they have reached that
21     time, they're taken off puberty blockers, and then
22     they can proceed in puberty with their peers.
23         But of course, any development that they've had
24     before starting puberty blockers, you know, could
25     still be there.

Page 72

1  Q.  (BY ATTY. BEDARD) And then in your report, you also
2      discussed how certain treatments are irreversible.
3      And which treatment would you consider to be
4      irreversible?
5  A.  Well, WPATH labels partially reversible and
6      reversible treatments.  And hormones are -- can be
7      partially reversible, up to a point, in that
8      somebody who stops hormones could then -- for
9      example, if someone stopped puberty blockers and
10     hormones, could then proceed in puberty of their sex
11     assigned at birth, but they may have some changes
12     related to -- relating to having been on cross-sex
13     hormones.
14         And then surgery being mostly irreversible, you
15     know, there can be some attempts to reverse the
16     cosmetic result with chest surgery.  Certainly,
17     genital surgery is irreversible.
18 Q.  And a minute ago, Dr. Karasic, you mentioned Tanner
19     Stage II.  So what is Tanner staging?
20 A.  So Tanner staging is a I-to-V scale relating to
21     puberty, where Tanner Stage II is the start of
22     puberty, and people assigned female at birth, that
23     the development of breast buds is usually the
24     indicator.  And Tanner Stage V is having completed
25     puberty.  So pediatricians and pediatric

Page 73

1  endocrinologists stage where people are in puberty
2  on that I-to-V scale.
3  Q.  And what was the Tanner stage of C. P. at the
4      initial presentation to Dr. Hatfield?
5  A.  So because Casey -- so I did not examine Casey at
6      that time, but Casey had reported the very earliest
7      breast development, and -- around that time.  And so
8      with -- even though I saw somewhere in the medical
9      records, and I don't know, but from Casey's report,
10     there was -- it sounded like breast bud development,
11     which would have been Tanner Stage II, as Casey
12     started to have some discomfort with development in
13     his chest.
14 Q.  And was there some discrepancy you're referencing in
15     the medical records about the progression of breast
16     development?
17 A.  Yeah.  There was somewhere, I think, where breast --
18     where it may have said no breast buds.  I can't
19     remember where that was in the medical record.  But
20     clearly the impetus, as described by Casey, for
21     going to the doctor was starting to have these
22     changes.
23         And when you start to have those changes,
24     breast bud development specifically, that puts you
25     in Tanner Stage II.  Before that, Casey did not

Dan H. Karasic, MD
7/13/2022

Page 74

1   have, you know, discomfort with his chest.
2 Q.   And for someone who starts taking puberty blockers
3      at Tanner Stage II, are they considered to be
4      fertile or infertile at that point?
5 A.   So --
6         ATTY. GONZALEZ-PAGAN:  Objection to form.
7 A.   So my understanding is that fertility develops with
8      the progression of puberty, that there has been
9      concern about fertility if you, you know, if
10     somebody halts at Tanner Stage II, but really only
11     if they're going on to cross-sex hormones.  If
12     somebody stops puberty blockers, they just continue
13     progressing in puberty.  And when we look at people
14     with central precocious puberty, they still have
15     fertility, you know, after they have gone off of
16     puberty blockers.
17 Q.  (BY ATTY. BEDARD) And just in layman's terms for
18     myself, when we talk about central precocious
19     puberty, is that when someone starts undergoing
20     puberty at an earlier age than their peers, and
21     takes a puberty blocker?
22 A.  Yes.
23 Q.  Okay.  So you mentioned a second ago the impact on
24     fertility of taking some sort of hormone treatment
25     like testosterone.  So is someone who presents at

Page 75

1      Tanner Stage II and starts taking puberty blockers
2      and then goes on to take testosterone, are they
3      considered fertile at that point?
4 A.   So my understanding is that fertility can persist if
5      somebody has gone a little bit further into puberty.
6      But I also know that there have been trans men who
7      have been told they were not going to be fertile who
8      later had babies.  And so, you know, it may be a
9      determination of how far into puberty it's required
10     for them to, you know, to be fertile.
11        But there certainly is counseling of people if
12     they start puberty blockers, you know, early, that
13     if then they continue in transition, that that might
14     affect their -- you know, with hormonal transition,
15     that might affect their fertility.
16 Q.  Okay.  So in other words, when someone is about to
17     take puberty blockers, you would advise that there
18     be an informed consent process about the potential
19     impacts on fertility?
20 A.  Yes.
21 Q.  And the same would be true for hormone treatment
22     like testosterone, that there should be a process of
23     informed consent about that treatment and the
24     impacts on fertility?
25 A.  Yes.

Page 76

1 Q.   And you mentioned that there have been some concerns
2      in the medical and scientific community about the
3      impact on fertility.  Can you talk a little bit more
4      about that?
5         ATTY. GONZALEZ-PAGAN:  Objection to form.
6 A.   So just that if -- that the patient and their
7      parents are well informed that this course of
8      treatment of puberty blockers that are not halted
9      but then progressing on to cross-sex hormones, that
10     that may affect the person's fertility.  And so it's
11     important for the provider to have a discussion with
12     the patient and parents.
13 Q.  (BY ATTY. BEDARD) Dr. Karasic, I am now going to
14     show you what has been marked -- reshow you what has
15     previously been marked as Defendant's Exhibit 5.
16        Do you see the Paragraph -- I'm sorry, let me
17     back up.
18        This is what previously been marked as
19     Defendant's Exhibit 5, and it is the 2017 Endocrine
20     Society guidelines.  Do you understand that?
21 A.  Yes.
22 Q.  Okay.  And do you see the section on Page 11 that
23     starts with "Remarks"?
24 A.  Yes.
25 Q.  Okay.  Could you read that paragraph, please -- that

Page 77

1      first paragraph after "Remarks"?
2 A.   "Persons considering hormone use for gender
3      affirmation need adequate information about this
4      treatment in general and about fertility effects of
5      hormone treatment in particular to make an informed
6      and balanced decision.  Because young adolescents
7      may not feel qualified to make decisions about
8      fertility and may not fully understand the potential
9      effects of hormone interventions, informed consent
10     and protocol education should include parents, the
11     referring [mental health professionals], and other
12     members of the adolescent's support group.  To our
13     knowledge, there are no formally evaluated decision
14     aids available to assist in the discussion and
15     decision regarding the future fertility of
16     adolescents or adults beginning gender-affirming
17     treatment."
18 Q.  Do you agree with that statement, Dr. Karasic?
19 A.  Yes.
20 Q.  And do you agree specifically with the portion of
21     this statement from the Endocrine Society that says
22     "consent and protocol education should include
23     parents as well as the referring [mental health
24     professionals]"?
25 A.  Yes.

Dan H. Karasic, MD
7/13/2022

Page 78

1  Q.  Based on your review of the medical records and your
2      discussion with C. P., did Dr. Hatfield include a
3      referring mental health provider in his discussion
4      and decision-making about fertility with C. P.?
5          ATTY. GONZALEZ-PAGAN:  Object to form.
6  A.  Dr. Hatfield was the referring mental health
7      provider.
8  Q.  (BY ATTY. BEDARD) So let me ask it a different way,
9      then:  Did you see any discussion or any evidence in
10     the medical records, that Dr. Hatfield discussed the
11     impacts on fertility of starting puberty blockers?
12 A.  Yes. It's my recollection that there was
13     documentation that there was a discussion about
14     fertility.
15         ATTY. BEDARD:  Let me pull up those records for
16     you.
17         (Exhibit 10 marked for identification.)
18 Q.  (BY ATTY. BEDARD) So Dr. Karasic, can you see the
19     document that says, "CERTIFICATION OF THE AGENT FOR
20     THE CUSTODIAN OF RECORDS"?
21 A.  Yes.
22 Q.  And these are the documents -- the medical records
23     from the Polyclinic that you previously reviewed for
24     C. P.?
25 A.  Well, I can only see the little top part of it, but

Page 79

1      I'm assuming --
2  Q.  Let me scroll down a bit.
3  A.  Okay. Yes, that looks like the documents -- part of
4      the documents that I reviewed.
5  Q.  Do you recall where specifically in these medical
6      records Dr. Hatfield discussed the impacts on
7      fertility with C. P. and his parents?
8  A.  No. And I don't remember whether it was in notes
9      from Dr. Hatfield or with Dr. Garza. I just, you
10     know, I've reviewed these a while back, but my
11     recollection was somewhere there was a charting of a
12     fertility discussion. And that's just my
13     recollection.
14 Q.  Do you recall anything else about that discussion?
15 A.  No. I was not present for the discussion, so I
16     can't really say anything about it --
17 Q.  Understood.
18 A.  -- except the records that you have as well.
19 Q.  And in your conversation with C. P. in March of this
20     year, did you discuss with him whether there had
21     been a prior discussion with any of his providers
22     about the impact on fertility?
23 A.  Yes. And C. P. had specifically said that he had no
24     interest in bearing children. And so that he had
25     had that discussion with his providers, and his

Page 80

1      position was that he had no interest in ever bearing
2      children.
3  Q.  Dr. Karasic, what are the effects of puberty
4      blockers on bone density?
5  A.  So the data on that are really a mixed bag.  There
6      is concern if someone is on puberty blockers for too
7      long that that can affect bone density.  But
8      overall, bone density data on young people is kind
9      of mixed.  There was some data I recall reading that
10     people assigned male at birth who were transgender
11     had lower bone density before starting puberty
12     blockers.  Perhaps they were less physically active
13     than their cisgender peers.
14         So there is concern with bone density, and
15     particularly concern if people are on puberty
16     blockers for a very long time.  And there's concern
17     in adults for people who have hormone-blocking
18     without cross-sex hormones.
19         But when -- the long-range data that there's
20     been, like the Dutch have followed people over ten
21     years and concluded that there are transgender
22     people -- patients who receive cross-sex hormones --
23     presumably some have had puberty blockers first --
24     that they had -- that there was no effect that they
25     saw in the ten-year period on bone density.

Page 81

1          So there have been some reports of effects, but
2      I think that the general consensus is that then if
3      people are moving on to cross-sex hormones, that
4      that is not a long-range -- a long-term problem for
5      them.
6  Q.  Okay. So to make sure I understand that, the
7      concern, at least in part, might stem from someone
8      who is on a puberty blocker for a long time that
9      does not then start cross-sex hormones, right?
10 A.  Yes.
11 Q.  But the initiation of cross-sex hormones means that
12     the treatment at that point becomes at least
13     partially irreversible, right?
14         ATTY. GONZALEZ-PAGAN:  Objection to form.
15 A.  At least partially, yes.
16 Q.  (BY ATTY. BEDARD) So any impact on bone density that
17     occurred on puberty blockers alone is not something
18     that could then be reversed; is that right?
19         ATTY. GONZALEZ-PAGAN:  Objection.
20 A.  No, that's not true. Because first of all, the data
21     about bone density and development, is kind of all
22     over the place.  And then people given cross-sex
23     hormones, and it appears that their bone density is
24     stable in long-term follow-ups on cross-sex
25     hormones.

Dan H. Karasic, MD
7/13/2022

Page 82

1    And so while there's concern in that, you know,
2    it might be listed as a potential side effect in
3    given informed consent, and there are concerns some
4    people have had in reviewing some data; in fact the
5    data is kind of all over the place, and the
6    long-term impact on transgender people is, at least
7    according to the Dutch, that study of long-term --
8    that there is not an impact of, you know, long-term
9    cross-sex hormones on bone health.
10  Q.  (BY ATTY. BEDARD) Which is the Dutch study? Who
11   were the authors of that study?
12  A.  So there were a couple studies where the first
13   author -- so it was a big Dutch group. It was
14   Wiepjes. Wiepjes, W-i-e-p-j-e-s, was the author of
15   a couple of articles about a long-term follow-up on
16   bone health in patients who have transitioned in
17   Holland.
18  Q.  And have those studies focused on the impact of
19   minors taking puberty blockers?
20  A.  No. Those were focused on impact in adults. And at
21   least Wiepjes's. I don't think -- I think there's
22   maybe a little bit of data that the Dutch might be
23   publishing at some point on the group that went
24   through puberty blockers and then hormones and then
25   surgery. And perhaps that will include bone health.

Page 83

1    But I think Wiepjes looked at, like, ten years of
2    hormone treatment in adults.
3  Q.  So what data is out there, then, about the impact of
4    puberty blockers on minors in terms of the impacts
5    on bone density?
6  A.  So I don't think I can provide you with a literature
7    review of it. I can say my impressions and, you
8    know, maybe having looked at reviews, that different
9    people who have looked at it maybe have had somewhat
10   different results in terms of effect on bone
11   density; and that people who then progressed to
12   cross-sex hormones or, you know, presumably if
13   people stop cross-sex hormones and they get their --
14   the hormones from the sex they were assigned at
15   birth, that they have healthy bones.
16    The one thing I saw -- I think it was from
17   Wiepjes's, like, perhaps in -- trans women over 50
18   have bone health issues similar to cisgender women
19   over 50, as opposed to cisgender men over 50. But,
20   like, fracture rates were similar to cisgender
21   women. And before that, I think there was not a
22   difference. Yes.
23  Q.  So switching gears slightly. So when a minor starts
24   taking a puberty blocker, do we know the long-term
25   impacts on brain development?

Page 84

1  A.  So we certainly have experience with, you know, with
2    trans people who have had puberty blockers, as well
3    as cisgendered people who have puberty blockers.
4    But, you know, certainly more research, you know, is
5    something that I think, you know, could happen.
6    The issue is that people are on puberty
7    blockers typically for just a short period of time,
8    and so it might be even difficult to, you know, to
9    kind of measure, because then they're moving on to
10   cross-sex hormones.
11  Q.  Okay. But to make sure I understand that, at least
12   in this case for C. P., C. P. first had a Vantas
13   implant and then actually received a second Vantas
14   implant, right? So the puberty blockers actually
15   continued throughout the course of the hormone
16   treatment as well. It's not something that stopped
17   when hormone treatment began, right?
18  A.  That's true. There's often overlap. And -- but I
19   think when -- once somebody is receiving cross-sex
20   hormones, once C. P. was receiving testosterone,
21   C. P. was having the influence of testosterone on
22   development. And so the fact that estrogen was
23   being suppressed was not maybe as much of a, you
24   know, concern, in that people assigned male at birth
25   have predominantly testosterone and lower amounts of

Page 85

1    estrogen in their system during puberty.
2  Q.  So I have a similar question about a different
3    effect: If a minor starts taking a puberty blocker,
4    do we know the long-term impacts on body
5    composition -- body fat composition, I should say?
6  A.  So I don't know -- I don't think I could tell you
7    the studies on body fat composition, you know, for
8    people on puberty blockers. Certainly if people --
9    if somebody gets -- if somebody's assigned female at
10   birth, and then they start on testosterone later,
11   after starting on testosterone, they can have both a
12   building of muscle and a redistribution of fat that
13   could affect body fat content.
14  Q.  Dr. Karasic, I'm going to show you again Defendant's
15   Exhibit 5.
16    Can you see that screen?
17  A.  Yes.
18  Q.  And we are, again, looking at the 2017 Endocrine
19   Society guidelines, right?
20  A.  Yes.
21  Q.  Okay. On Page 3 of the Endocrine Society
22   guidelines, do you see the paragraph that's marked
23   2.4 -- Paragraph 2.4?
24  A.  Yes.
25  Q.  Okay. Could you read that paragraph, please?

Dan H. Karasic, MD
7/13/2022

Page 86

1  A.  "In adolescents who request sex hormone treatment
2      (given that this is a partly irreversible
3      treatment), we recommend initiating treatment using
4      a gradually increasing dose schedule after a
5      multidisciplinary team of medical and MHPs has
6      confirmed the persistence of GD/gender incongruence
7      and sufficient mental capacity to give informed
8      consent, which most adolescents have by age 16."
9  Q.  Dr. Karasic, do you agree with that statement?
10 A.  Well, I am a psychiatrist and not an
11     endocrinologist, but this is my understanding of
12     the, you know, consensus of the endocrinologists who
13     wrote this statement.
14 Q.  Based on your review of C. P.'s medical records and
15     your conversation with C. P., did Dr. Hatfield
16     follow this guideline and include a
17     multidisciplinary team of medical and MHPs to
18     confirm the persistence of gender incongruence and
19     sufficient mental capacity to give informed consent?
20 A.  So it's been a little while since I've reviewed the
21     entire guidelines, but I believe elsewhere they
22     say -- they speak to a preference for a
23     multidisciplinary team, but also recognize that
24     multidisciplinary teams are not always available.
25         And I think it speaks to a difference between

Page 87

1      the European gender clinics and, to some extent,
2      perhaps academic medical centers that have gender
3      teams in the US. But in the US, most transgender
4      care is provided in private practice settings, and
5      there is no multidisciplinary team present. There
6      can be referrals to people from other disciplines,
7      but just health care is structured a little bit
8      differently than in the European gender clinics.
9  Q.  Was C. P. 16 years or older at the time of providing
10     consent to testosterone therapy?
11 A.  No. But remember, C. P.'s parents consented and
12     C. P. assented.
13 Q.  Was C. P. 16 years or older at the time of providing
14     consent for the bilateral mastectomy surgery?
15 A.  No.
16 Q.  What is the grading of evidence for a reference
17     range of 320 to 1000 MGDLs for testosterone for
18     trans males in the Endocrine Society guidelines?
19 A.  Well, I would ask you to repeat your question, but I
20     don't really think that it's my place to be reciting
21     back what's in the endocrine guidelines.
22 Q.  Are you aware of the grading of evidence?
23 A.  There is a grading of evidence. You were asking for
24     a specific grade on a specific question within that
25     and asking if I know that off the top of my head,

Page 88

1      and so my answer would be "no."
2  Q.  And do you know the grading of evidence for a
3      mastectomy procedure for adolescent trans males in
4      the ESG?
5  A.  I can't tell you what the grades given in the
6      Endocrine Society guidelines.
7  Q.  And do you believe, in your opinion, that an
8      11-year-old would have the capacity and maturity and
9      judgment to understand what it is like to be
10     sterilized as an adult?
11         ATTY. GONZALEZ-PAGAN: Object to form.
12 A.  So remember that the parents are providing consent
13     certainly with the assent of the minor, and with
14     discussion of the rest of the team. But I would
15     also say that starting a puberty blocker at age 11
16     isn't in and of itself sterilizing.
17         It could be sterilizing if somebody were
18     transitioning further. But an 11-year-old could
19     start puberty blockers and then go off of puberty
20     blockers and still be fertile.
21 Q.  (BY ATTY. BEDARD) So thinking more about this
22     informed consent for a mastectomy in particular,
23     would a proper informed consent form for that
24     surgical procedure contain a warning that a patient
25     is likely to lose the ability to breast-feed?

Page 89

1  A.  So I don't know what might be on a given form, but I
2      think that, you know, it's reasonable for that to be
3      part of a discussion of anyone who has a mastectomy,
4      whether they're transgender or cisgender. You know,
5      just that they know that they, you know, may very
6      well not be able to breast-feed, whether that's a
7      cisgender woman who is having a mastectomy for, you
8      know, for whatever medical reason, or a transgender
9      person.
10 Q.  But in other words, you would recommend, in your
11     professional judgment, that an informed consent form
12     for a mastectomy, regardless of the circumstances,
13     should include information that the patient is
14     likely to lose the ability to breast-feed, right?
15         ATTY. GONZALEZ-PAGAN: Objection.
16     Mischaracterizes testimony.
17 A.  Yeah. I think I said in my testimony I don't know
18     about construction of a form, but I think that
19     should be part of the discussion in informed
20     consent, you know, making clear that the person, you
21     know, won't be able to breast-feed.
22         In the case of C. P., C. P. was very clear that
23     he never wanted to parent. And even now, as an
24     older teen, continues to be very clear about that.
25     And I doubt he would be breast-feeding anyone else's

Dan H. Karasic, MD
7/13/2022

Page 90

1  baby.
2      And so in this case, you know, it should be
3  part of the discussion, but it's not necessarily,
4  you know, a kind of a deal-breaker for an individual
5  patient if they're not thinking of parenting. And,
6  you know, of course people can parent and feed their
7  infants in other ways.
8      ATTY. BEDARD: Dr. Karasic, I am going to show
9  you what has previously been marked as Defendant's
10  Exhibit 3. And these are the Polyclinic records
11  that were recently produced to us and then produced
12  to plaintiffs.
13  Q.  (BY ATTY. BEDARD) And I'm going to scroll in,
14  because I can see you squinting here. I don't want
15  you to have to do that. Can you see that okay?
16  A.  Yes.
17  Q.  Okay. And this is the page we previously discussed.
18  That is C. P.'s informed consent for his bilateral
19  mastectomy, correct?
20  A.  Yes.
21  Q.  Okay. I'm going to scroll down to the different
22  provisions in the consent form. And let me know
23  when you want me to keep scrolling so that you've
24  been able to review the entire form.
25  A.  Okay. Okay. Yeah, I can only see down to Line 6,

Page 91

1  so if you could scroll up after that.
2  Q.  Sure.
3  A.  Okay. I've read it.
4  Q.  Okay. Was C. P. informed, prior to the bilateral
5  mastectomy, that he would lose the ability to
6  breast-feed?
7  A.  So one can't tell from the form. This was a form
8  that was signed, but it does not necessarily say
9  everything that was part of a discussion. C. P. did
10  have a discussion with Sharon Booker and presumably
11  with Dr. Hatfield. And so hopefully there, you
12  know, was a thorough discussion of the risks and
13  benefits of surgery, but not everything is listed on
14  this form.
15  Q.  So Dr. Karasic, I hear you saying "hopefully" that
16  those conversations took place.
17  A.  Mm-hmm.
18  Q.  But is there any evidence in the medical records
19  themselves that any of C. P.'s providers discussed
20  the impact on C. P.'s ability to breast-feed?
21  A.  I don't recall. When I talked with C. P. about --
22  C. P. and C. P.'s parents had said that there was a
23  thorough discussion of risks and benefits of the
24  treatments they received, but I don't recall whether
25  there was documentation elsewhere in the medical

Page 92

1  record of that.
2      And given that C. P. was -- has been pretty
3  emphatic from early on about never wanting to bear
4  children, my guess is that there wasn't -- it was
5  not, you know -- I would say hopefully it was
6  discussed, but it was not, you know, a consideration
7  by C. P. or C. P.'s parents in making the decision.
8  Q.  And at the bottom of the page here for this consent
9  form for the bilateral mastectomy, do you see the
10  date is December 10th of 2019?
11  A.  Yes.
12  Q.  And C. P. was 14 years old at that point in time,
13  right?
14  A.  Yes. About three months, I think, before becoming
15  15.
16  Q.  So at age 14, C. P. signed the consent form for the
17  mastectomy procedure, right?
18  A.  And one of C. P.'s parents.
19  Q.  Signed as a witness, right?
20  A.  Well, that's how this particular -- it looks like
21  this is a form that was -- the one that was signed
22  may well have been one meant for adults, because the
23  parent is not just a witness when there's consent
24  for any care by a minor.
25      So the, you know, the form does say "Witness

Page 93

1  Signature," but in fact, the informed consent was
2  really being given by the parent.
3  Q.  And Dr. Karasic, have you seen any evidence in the
4  medical records that C. P. was evaluated to ensure
5  that there was capacity to make fully informed
6  decisions and specifically to consent to surgical
7  treatment?
8  A.  So that, I don't recall. But remember, the consent
9  is being given by the parent. And the minor is --
10  is assenting. And so they should have an
11  understanding of what's happening, but the informed
12  consent is being given by the adult parent.
13  Q.  So I understand that typically a minor would be
14  assenting and the parent would be consenting. But
15  as we sit here looking at this consent form,
16  Casey -- sorry, C. P., the minor, is the one who
17  actually signed the form on the patient signature
18  line, right?
19  A.  Well, you have the same form that, you know, you're
20  showing me the form. I see where it was signed.
21  But I think they just used a form to be signed that
22  was a stock form for adults, I assume, because it
23  says "patient" and "witness." If this was a form
24  that was meant for minors, it's not a
25  well-constructed form, because the consent is -- the

Dan H. Karasic, MD
7/13/2022

Page 94

1    informed consent is done by the parent and the
2    patient assents. And if the form was constructed
3    some other way, it's not the best, you know,
4    constructed form.
5  Q. So Dr. Karasic, we're about at that hour mark again.
6    Do you want to keep going? Do you want to keep
7    plugging away? Would you prefer to take a break?
8    What's your preference?
9  A. Well, how many more hours are you guessing this is
10    going to be?
11        ATTY. GONZALEZ-PAGAN: Can we go off the
12    record, Stephanie, just to discuss?
13        ATTY. BEDARD: Sure. That's fine.
14        THE VIDEOGRAPHER: We're going off the record
15    at 12:03.
16        (Break from 12:03 p.m. to 12:47 p.m.)
17        THE VIDEOGRAPHER: We are back on the record at
18    12:47.
19  Q. (BY ATTY. BEDARD) Great. Dr. Karasic, did you speak
20    with anyone during the break?
21  A. No.
22  Q. And did you review any documents during the break?
23  A. No.
24  Q. All right. So I'm going to show you what has been
25    marked as Defendant's Exhibit 10. Can you see that

Page 95

1    document?
2  A. Yes.
3  Q. Great. And just as a refresher, Defendant's
4    Exhibit 10 are the records from the Polyclinic that
5    we previously discussed during your deposition. So
6    I'm turning now to Bates No. 13.
7        So Dr. Karasic, do you see the progress note in
8    the middle of the page from Dr. Hatfield from
9    June 9th of 2018?
10  A. Yes.
11  Q. And it appears from this progress note that
12    Dr. Hatfield had tested C. P.'s testosterone levels,
13    right?
14  A. Yes.
15  Q. After undertaking that test, did he prescribe any
16    medication for C. P.?
17  A. It looks like from the note, yes.
18  Q. And what was that medication?
19  A. Well, it looks like it was a testosterone cream.
20    And he also said, "We will include a small
21    amount of estradiol to improve bone growth."
22  Q. And what is your understanding of why estradiol
23    would be prescribed in these circumstances?
24  A. So I don't think I can comment on that. I'm a
25    psychiatrist, and I wasn't -- also wasn't the person

Page 96

1    making that decision. So perhaps better to ask
2    Dr. Hatfield.
3  Q. Understood. So let me try to ask it a different
4    way. What hormone is primarily responsible for the
5    growth of breast tissue?
6  A. So breast tissue is primarily a response to
7    estrogen.
8  Q. Okay. And what hormone, then, is important for
9    ensuring things like normal bone growth and bone
10    density that we previously discussed?
11        ATTY. GONZALEZ-PAGAN: Objection. Form.
12  A. So both testosterone and estradiol can support bone
13    health.
14  Q. (BY ATTY. BEDARD) And am I correct in understanding
15    that testosterone is converted into estradiol in the
16    bone?
17  A. I'm not -- I don't think I'm going to extend my
18    expertise into the effects -- the relative effects
19    of estradiol and testosterone on bone health and
20    bone growth.
21  Q. Okay. So you are not offering any opinion in this
22    case on any testosterone levels that C. P. may have
23    had?
24        ATTY. GONZALEZ-PAGAN: Objection. Form.
25  A. I'm not offering expertise in this case on the

Page 97

1    proper approach, hormonally, related to bone growth.
2  Q. (BY ATTY. BEDARD) Well, I guess I'm asking a
3    slightly different question: Are you offering an
4    opinion in this case as to whether the medications
5    provided to C. P. were appropriate under his
6    specific circumstances?
7  A. Yes.
8  Q. Okay. So are lab reference ranges important for a
9    physician to use to determine if a lab value is
10    normal or abnormal?
11        ATTY. GONZALEZ-PAGAN: Objection. Form.
12  A. Yes. Lab values are important, and also clinical
13    effect.
14  Q. (BY ATTY. BEDARD) And do lab ranges differ for males
15    and females?
16  A. Yes.
17  Q. And does a person's gender identity change what's
18    the normal range of their lab values?
19  A. In one regard, which is when people have
20    transitioned. And certainly I know in adults who
21    have transitioned, there are target ranges by their
22    primary care physicians of bringing hormones into --
23    within the target range of the gender to which they
24    identify, as opposed to the sex assigned at birth.
25  Q. And can erythrocytosis -- am I pronouncing it

Dan H. Karasic, MD
7/13/2022

Page 98

1    correctly if I say "erythrocytosis," Dr. Karasic?
2        ATTY. GONZALEZ-PAGAN: Stephanie, I apologize,
3    you spoke fairly quickly there, and I was having a
4    hard time understanding you. So I don't know -- at
5    least for my edification, I couldn't understand what
6    you just asked.
7        ATTY. BEDARD: Sure.
8    Q.  (BY ATTY. BEDARD) Let me ask it this way:
9    Dr. Karasic, what is the medical term for someone
10   with a high red blood cell count?
11   A.  Oh, okay. So you were -- it sounds like you were
12   referring to erythrocytosis when you were asking --
13   I think that's the word that you were using?
14   Q.  It is, yes. I just wanted to make sure I was
15   pronouncing it correctly.
16   A.  Yeah, okay.
17   Q.  So erythrocytosis?
18   A.  Yes.
19   Q.  Okay. So can erythrocytosis be dangerous to a
20   patient?
21   A.  Yes. If somebody has, like, a polycythemia -- if
22   somebody has a really high red blood cell count,
23   that can be harmful.
24   Q.  And can testosterone cause erythrocytosis?
25   A.  So yeah, it can cause polycythemia, I think is how

Page 99

1    they would refer to it. But yes, testosterone can
2    cause an increase in red blood cell count, and that
3    has risk.
4    Q.  And are you aware that in the Framington [sic]
5    study, the younger female group hematocrit levels
6    above 45 had an increased risk of cardiovascular
7    disease, myocardial infection, and death?
8        ATTY. GONZALEZ-PAGAN: Objection. Lack of
9    foundation.
10   A.  Yeah, I am not aware of the details of the
11   Framingham study, in terms of red blood cell count.
12   I guess I'll leave it at that.
13   Q.  (BY ATTY. BEDARD) If a patient does develop
14   erythrocytosis, should the amount of testosterone
15   given to that patient be decreased?
16   A.  It depends in -- at least where I've seen it happen
17   has been in adult patients, and usually the
18   recommendation is to give blood regularly. And that
19   brings it down to the normal range.
20   Q.  So turning back now to Exhibit 10. I'm looking now
21   at the lab notes at the top of the page. Do you see
22   where it says 45.5 percent?
23   A.  Yes.
24   Q.  And is it your understanding that the normal
25   reference range is between 35 to 44 percent?

Page 100

1    A.  Well, the reference range from this lab on the
2    result says 37.5 to 51. So I think the reference
3    range can vary by lab.
4    Q.  What's your understanding of the normal reference
5    range?
6    A.  Somewhere around that. I think there's a
7    different -- slightly different reference range
8    for -- for men and women. And -- but yeah, I guess
9    I would...
10   Q.  And are you aware of the condition known as
11   polycystic ovarian syndrome, or PCOS?
12   A.  Yes.
13   Q.  And is it your understanding that PCOS has been
14   associated with things like insulin resistance or
15   metabolic syndromes or diabetes?
16       ATTY. GONZALEZ-PAGAN: Objection to form.
17   A.  Yes.
18   Q.  (BY ATTY. BEDARD) And would it be important for a
19   physician to help a patient with PCOS lower their
20   testosterone levels to prevent those complications?
21   A.  I don't think I'm going to comment as an expert on
22   the best treatments of PCOS.
23   Q.  One second, Dr. Karasic. Okay.
24       Dr. Karasic, are you aware that in 2019, the
25   Centers for Medicare and Medicaid Services issued a

Page 101

1    decision memo on gender dysphoria and gender
2    reassignment surgery?
3    A.  What year did you say?
4    Q.  2019.
5    A.  That the -- that CMS -- well, CMS has made a few
6    statements. So you might need to show me which one
7    that is in 2019. I know that they made a statement
8    in 2015.
9        ATTY. BEDARD: Sure. Let's take a look at it.
10   So I'm showing you what has been marked
11   as Defendant's Exhibit 11.
12       (Exhibit 11 marked for identification.)
13   Q.  (BY ATTY. BEDARD) Can you see this document?
14   A.  Yes. Yeah, I believe this was --
15   Q.  And all --
16   A.  I believe this was 2015 that this decision was made.
17   Q.  Oh, you know what? Thank you, Dr. Karasic. The
18   date on here is August 30th of 2016. Do you see
19   that?
20   A.  Oh, okay. 2016, I'm sorry.
21   Q.  We were both wrong, so. You were closer than I was.
22   A.  Yeah.
23   Q.  So now that we know we're talking about the same
24   document here, have you seen this same document
25   previously?

Dan H. Karasic, MD
7/13/2022

**Page 102**

1  A.  Yes.
2  Q.  Okay.  And you've had the opportunity to previously
3      review it?
4  A.  Not lately.
5  Q.  So I'm going to go down to the Decision section of
6      this exhibit.  And do you see where it says section
7      "IX.  Decision"?
8  A.  Yes.
9  Q.  Okay.  Could you please, Dr. Karasic, read the first
10     full paragraph, starting with "Currently"?
11 A.  "Currently, the local Medicare Administrative
12     Contractors determine coverage of gender
13     reassignment surgery on a case-by-case basis.  We
14     have received a complete, formal request to make a
15     national coverage determination on surgical remedies
16     for gender identity disorder (GID), now known as
17     gender dysphoria.  The Centers for Medicare &
18     Medicaid Services (CMS) is not issuing a National
19     Coverage Determination (NCD) at this time on gender
20     reassignment surgery for Medicare beneficiaries with
21     gender dysphoria because the clinical evidence is
22     inconclusive for the Medicare population."
23 Q.  And what's your response to that statement, that the
24     clinical evidence is inconclusive?
25 A.  Yes.  So I remembered it -- yeah, now it would

**Page 103**

1      be 2016, actually -- because I was part of a group
2      that responded when this came out.  We were at the
3      WPATH conference in Amsterdam in 2016 when it came
4      out and we disagreed.  Of note, the CMS had lifted
5      the categorical exclusion transgender care two years
6      earlier, in 2014.
7          In this statement, they say that clinical
8      evidence is inconclusive for the Medicare
9      population, which is primarily the elderly, but also
10     disabled -- some disabled people.  And indeed, there
11     was not a lot of research on people with Medicare,
12     because people with Medicare had difficulty
13     accessing surgery at this time.
14         So I do think that within that paragraph,
15     noting that they're talking about Medicare
16     beneficiaries -- which are specifically the elderly
17     and some disabled people.  Whereas they had, two
18     years earlier, lifted the CMS exclusion overall on
19     payment, they were asking to do this on a --
20     continue doing it on a case-by-case basis for now
21     while more information is gathered on -- for
22     gender-affirming surgery in people on Medicare.
23 Q.  Let's look for a second, then, at the studies
24     referenced in this decision.
25 A.  Mm-hmm.

**Page 104**

1  Q.  I'm looking now at the section of this decision memo
2      titled "Quality of Studies Reviewed."  And let's
3      look now at the second full paragraph discussing the
4      studies reviewed.  Could you read that paragraph for
5      me that starts with "Of the 33 studies reviewed"?
6  A.  Okay.  "Of the 33rd studies reviewed, published
7      results were conflicting -- some were positive;
8      [some] were negative.  Collectively, the evidence is
9      inconclusive for the Medicare population.  The
10     majority of studies were non-longitudinal,
11     exploratory type studies (i.e. in a preliminary
12     state of investigation or hypothesis generating), or
13     did not include concurrent controls or testing prior
14     to and after surgery.  Several reported positive
15     results but the potential issues noted (...) reduced
16     strength and confidence.  After careful assessment,
17     we identified six studies that could provide useful
18     information.  Of these, the four best designed and
19     conducted studies that assessed quality of life
20     before and after surgery using validated (albeit
21     non-specific) psychometric studies did not
22     demonstrate clinically significant changes or
23     differences in psychometric test results after GRS."
24 Q.  Thank you, Dr. Karasic.  So while I understand you
25     were saying that CMS's decision is specific to the

**Page 105**

1      Medicare population, at least this specific
2      decision, the concerns voiced in this paragraph
3      don't have to do with the fact that the studies were
4      related or were not related to Medicare, right?
5          ATTY. GONZALEZ-PAGAN:  Objection.
6      Mischaracterizes the document.
7  A.  It says "collectively the evidence is inconclusive
8      for the Medicare population."  And you know, because
9      until two years earlier there was a specific
10     exclusion of paying for transgender care in the
11     Medicare population, it wouldn't have been possible
12     for there to be studies of that.
13         However, some of the studies they cite are from
14     other countries.  And since then, there have been
15     more studies about effects of gender-affirming care.
16     And so I wouldn't say that these -- the studies they
17     cite are the totality of evidence.
18     I would also say that the differences in
19     psychometric test results, I would certainly have to
20     look at each study to see what they meant by that,
21     but there has been evidence of people having
22     improved body image, less gender dysphoria, and less
23     depression, less suicidality in a number of studies
24     since then.  So I wouldn't say this is an exhaustive
25     review of the studies in that regard.

Dan H. Karasic, MD
7/13/2022

Page 106

1  Q.  (BY ATTY. BEDARD) And Dr. Karasic, do you reference
2      this CMS decision memo in your report?
3  A.  No. It's not original research. It was, you know,
4      some members of the CMS staff, not people involved
5      in transgender care, who had come up with this. And
6      there was some communication between our group and
7      theirs. But it was not original research, it was
8      one, you know, review that was focused on the
9      Medicare population at that time in 2016.
10         ATTY. BEDARD: Dr. Karasic, I'm now going to
11      show you what has been marked as Defendant's
12      Exhibit 12.
13         (Exhibit 12 marked for identification.)
14  Q.  (BY ATTY. BEDARD) Can you see that document?
15  A.  Yes.
16  Q.  And have you seen this document before?
17  A.  Yes.
18  Q.  What is this document?
19  A.  This is a document, it says, by the Counsel for
20      Choices in Health Care in Finland.
21  Q.  And what is your understanding of the Counsel for
22      Choices in Health Care in Finland?
23  A.  It's a committee in Finland.
24  Q.  And did that committee adopt a recommendation on
25      treatment methods for gender dysphoria for minors?

Page 107

1  A.  My understanding -- and I guess from reading the
2      full document as well -- that they had -- that they
3      did make some recommendations.
4  Q.  Okay. Well, I'm going to scroll down here and ask
5      you to read the second-to-last paragraph, beginning
6      with "Surgical treatments."
7  A.  Yes. Now, I don't know in this case --
8  Q.  If you could actually read it for the record, that
9      would be great.
10  A.  Okay. "Surgical treatments are not part of the
11      treatment methods for dysphoria caused by
12      gender-related conflicts in minors. The initiation
13      and monitoring, like, of hormonal treatments must be
14      centralized at the research clinics on gender
15      identity at HUS and TAYS.
16         "Research data" -- do you want the
17      remainder? -- "Research data on the treatment of
18      gender dysphoria due to gender identity conflicts in
19      minors is limited. COHERE considers that, moving
20      forward, multi-professional clinics specializing in
21      the diagnostics and treatment of gender identity
22      conflicts at HUS and TAYS should collect extensive
23      information on the diagnostic process and the
24      effects of different treatment methods on the mental
25      wellbeing, social capacity and quality of life of

Page 108

1      children and youth. There is also a need for more
2      information on the disadvantages of procedures and
3      on people who regret them."
4  Q.  Dr. Karasic, what is your response to this
5      recommendation by COHERE Finland?
6  A.  You know, health care across the world is diverse,
7      and different places take different approaches. I
8      know that in the wake of some maybe controversies
9      and like Bell v. Tavistock in the UK, that there was
10      questioning of care for minors. And that -- and
11      this Finish committee seems to be responding to
12      that. But it also is -- it's just one committee's
13      response.
14  Q.  Would you agree that research data on the treatment
15      dysphoria due to gender identity conflicts in minors
16      is limited?
17  A.  I think that there's -- there is quite a bit of
18      data, and so it just depends how one defines
19      "limited." Always great to have more data, but we
20      also do have a substantial amount of information,
21      not only from studies, but from many decades of
22      minors receiving gender-affirming care.
23  Q.  Would you agree that there is a need for more
24      information on the disadvantages of procedures and
25      on people who regret them?

Page 109

1  A.  Well, we have a lot of information showing very
2      little regret. It's, of course, always good to have
3      more information. I cite in my report a study by
4      Bustos of several thousand -- a review of several
5      thousand cases within various studies, showing a
6      regret rate of about 1 percent.
7         Kaiser of Northern California reviewed recently
8      all of its cases of chest surgery in transmasculine
9      youth since 2013, and there were two cases of regret
10      out of, I think, just over 200 surgeries that
11      they've done. So about 1 percent.
12         So we know that regret exists, and it's good
13      for us to have more knowledge about regret. But we
14      also know that it is relatively uncommon.
15  Q.  Dr. Karasic, this report from COHERE Finland is
16      dated from 2020, right?
17  A.  Yes.
18  Q.  Did you include that report or reference it in your
19      disclosure?
20  A.  No, I didn't -- I don't know if there would be any
21      reason to. It was not original research of any
22      sort; it was one committee's view on how to proceed
23      in Finland.
24  Q.  Did you include any other committee position
25      statements in your report?

Dan H. Karasic, MD
7/13/2022

Page 110

1  A.  I included the fact that many large American
2      organizations, like the American Medical
3      Association, American Psychiatric Association,
4      American Psychological Association, support
5      gender-affirming care. That within the US, there is
6      widespread support for gender-affirming care for
7      both minors and adults.
8  Q.  But in other words, the fact that a position is made
9      by a professional organization as compared to
10     original research was not a reason to not include
11     something in your report, right?
12 A.  Well, that's true --
13         ATTY. GONZALEZ-PAGAN: Object to form.
14 A.  -- but I view something a little bit different in
15     terms of -- a policy statement for two clinics in
16     Finland doesn't, to me, seem to have the same weight
17     as, for example, WPATH, which includes experts from
18     around the world, including many from Europe.
19 Q.  (BY ATTY. BEDARD) Dr. Karasic, I'm going to show you
20     what has now been marked as -- hold please, one
21     second -- Defendant's Exhibit 13.
22         (Exhibit 13 marked for identification.)
23 Q.  (BY ATTY. BEDARD) Can you see this document?
24 A.  Yes.
25 Q.  Have you seen this document before?

Page 111

1  A.  Yes.
2  Q.  And what is this document?
3  A.  So this was -- this is a document regarding the
4      treatment of gender dysphoria in minors at a
5      hospital called Astrid Lindgren in the Stockholm
6      area.
7  Q.  And what is your understanding of the Astrid
8      Lindgren Children's Hospital role in the provision
9      of gender care?
10 A.  Okay. So I know a little bit more about Sweden than
11     Finland. I -- in my -- the Standards of Care 8
12     mental health chapter that I led, we do have -- one
13     of the experts is from Sweden.
14         So -- and when I was there in -- either
15     speaking in the clinic in 2009, or I was a keynote
16     speaker at the Scandinavian Transgender Health
17     Conference that included Swedish and Finish people
18     in 2013, I did meet a psychologist from Astrid
19     Lindgren. So -- but my understanding is that they
20     were providing transgender care to minors, and then
21     there was some controversy in Sweden, both regarding
22     Bell v. Tavistock, and I think there was a TV show
23     in Sweden.
24         And according to my colleague, who's head of
25     the gender program at Karolinska Institute, there

Page 112

1      was also a real shortage of staff. And a decision
2      was made -- so there were already long waits -- a
3      decision was made that they would only continue --
4      they would continue providing care to people who had
5      already started puberty blockers. So people who
6      were already enrolled in care could continue in
7      care.
8          That new patients, in order to receive care,
9      would have to join a study. And the study was to
10     gather more information, basically, on
11     gender-affirming care in minors.
12 Q.  And you've referenced a couple of times,
13     Dr. Karasic, the Bell v. Tavistock decision. Can
14     you tell us more about that?
15 A.  Yeah. So my understanding of the case was that it
16     related to the ability of minors to consent in the
17     UK. And there was a person who I think had
18     de-transitioned who was, I think, Keira Bell.
19         And there was an initial court case about the
20     validity of consent that put an effective halt for a
21     little while on minors getting care in the UK, and
22     then it was reversed. And so a higher court, I
23     presume, reversed the case. And so it no longer has
24     any effect -- any legal effect in the UK.
25 Q.  Were you personally involved in that case in the UK?

Page 113

1  A.  No.
2  Q.  And it's your understanding that the current status
3      of that case is that there is no longer a block or
4      ban or halt on the provision of gender-related care
5      for minors?
6  A.  In the UK, right.
7  Q.  In the UK?
8  A.  Yeah. Yes.
9  Q.  And you have referenced that case in the context of
10     several other European studies that we've also
11     discussed. And so what is your understanding of how
12     that case may have impacted -- may have impacted the
13     provision of gender-related care for minors in other
14     countries?
15         ATTY. GONZALEZ-PAGAN: Objection to form.
16     Misrepresents the nature of the exhibits.
17 A.  Okay. Well, I say that just because that was my
18     understanding, having talked to the -- you know, I
19     was already in discussion, regular discussion with
20     my Standards of Care 8 chapter, with the head of the
21     gender clinic at Karolinska Institute, which was the
22     clinic for adults. She had previously introduced me
23     to somebody from Astrid Lindgren years ago. And so
24     in our conversations, I just -- you know, I asked
25     what was going on in Sweden while this was

Dan H. Karasic, MD
7/13/2022

Page 114

1    happening, so a while back.
2        And she had said that there was, you know, as
3    head of her program, that there was political
4    pressure that was related to this lawsuit in the UK.
5    I think as well as a television program -- an
6    episode of a television program in Sweden. And so
7    she had said this was -- what happened at Astrid
8    Lindgren was reactive to those things going on.
9  Q.  (BY ATTY. BEDARD) So circling back, then, to the
10   Astrid Lindgren decision --
11 A.  Mm-hmm.
12 Q.  -- is your understanding, is that decision is to no
13   longer provide puberty blockers, testosterone or
14   hormone treatment, and gender-care related surgery
15   to minors outside of the clinical trial setting?
16 A.  So my understanding is that they were continuing --
17   they will continue -- they would continue to provide
18   care to anyone who had already been admitted to
19   their program.
20       So anyone already part of their program would
21   continue to get puberty blockers and hormones. And
22   that new patients, in order to access care at Astrid
23   Lindgren, would have to enroll in a clinical trial.
24   Basically, they would get their care, but it would
25   be observed, you know, data would be collected in

Page 115

1    that clinical trial.
2  Q.  Understood. Okay. So let's go back, then, to that
3    exhibit, to the Astrid Lindgren guidelines. Can you
4    see the document again, Exhibit 13?
5  A.  Yes.
6  Q.  And I'm going to direct you to the last full
7    paragraph on the first page from the guidelines that
8    begins with "these treatments." Do you see that
9    paragraph?
10 A.  "These treatments" -- okay.
11 Q.  Yeah, I'll scroll up.
12 A.  Yeah.
13 Q.  Okay. Could you read that photograph for us?
14 A.  "These treatments are potentially fraught with
15   extensive and irreversible adverse consequences such
16   as cardiovascular disease, osteoporosis,
17   infertility, increased cancer risk, and thrombosis.
18   This makes it challenging to assess the risk/benefit
19   for the individual patient, and even more
20   challenging for minors or their guardians to be in
21   the position of an informed stance regarding these
22   treatments."
23 Q.  So Dr. Karasic, what is your response to this
24   guideline?
25       ATTY. GONZALEZ-PAGAN: Objection to form.

Page 116

1  A.  Or if you mean that paragraph, I think that -- well,
2    I disagree with it. And I think that even the, you
3    know, director of the gender program at Karolinska
4    Institute would disagree.
5        That because there are -- it lists things
6    that -- where there is controversy or discussion
7    perhaps in adults but certainly not in youth,
8    there's no evidence of increased cardiovascular
9    disease in youth; osteoporosis, while there's, you
10   know, variable data in terms of bone density,
11   osteoporosis is really a disease of much older
12   people; infertility, you know, we've discussed, is
13   something that can happen with, you know, people
14   over the course of transitioning, but is not
15   necessarily, you know, something if somebody's
16   entering a program for puberty blockers that could
17   still be fertile if they stopped the puberty
18   blockers; increased cancer risk, there's no evidence
19   of that in minors; or thrombosis.
20       And so each of these are potential side effects
21   of concern that are, you know, discussed and
22   followed in adults. And certainly in adults, one,
23   you know, discusses risks and benefits of treatment,
24   like any treatment. But they're not really
25   applicable to minors, nor are they more of a concern

Page 117

1    than -- or a concern that necessarily outweighs the
2    benefits of treatment, such that certainly
3    transgender care in adults. One weighs risks and
4    benefits, and, you know, and people have been
5    consenting, you know, to that as adults to that
6    care.
7        But this conflates the various potential
8    concerns of adverse consequences in adults with a
9    decision in youth.
10 Q.  (BY ATTY. BEDARD) Well, Dr. Karasic, I think what I
11   understand you saying is that some of these side
12   effects, such as cardiovascular disease or
13   osteoporosis, typically present in adults rather
14   than in minors, right?
15 A.  Yes.
16 Q.  Okay. So let me ask it this way, then. Let's take
17   cardiovascular disease, for example. Are there
18   studies of adults who received gender-related
19   treatments, therapies, as minors on the long-term
20   impacts of those treatments once they become adults?
21 A.  Well, the Dutch are saying they're going to be
22   releasing more long-term research as it happens.
23   Long-term research of, let's say, somebody -- if
24   somebody started on puberty blockers when they're 12
25   years old. And hip fractures don't tend to happen

Dan H. Karasic, MD
7/13/2022

Page 118

1 until people are at least in their 50s. So we would
2 have to wait 40 years before someone's enrolled in
3 the study and when we might have a full picture of
4 its impact on hip fractures.
5     So it's difficult to -- to say, with the
6 exception of the Dutch, because they did start some
7 people on puberty blockers in the 1980s, you know,
8 that we need to wait for, you know, 40 years to see.
9     But for example, in adults, I mentioned the
10 Wiepjes study that, you know, that in terms of bone
11 fractures, there doesn't seem to be an impact before
12 age 50. And then in -- or in people -- or in trans
13 men. And that for trans women, their risk is closer
14 to cisgender women as opposed to cisgender men once
15 they're in their 50s.
16     But we're not, from our -- you know, American
17 longitudinal research is going to take quite a long
18 time before we can see the people started on puberty
19 blockers in America at age 12, whether -- what, you
20 know, what all -- all of, you know, like, the
21 research into what happens when they're elderly. So
22 in the meantime, we try to explain risks and
23 benefits of interventions to people.
24     There has been mixed data on cardiovascular
25 disease in trans people. Some of it may be related

Page 119

1 to things other than hormones, like increased
2 smoking. I know one study.
3     And so, you know, these are all areas of
4 interest or areas of research, but the -- the fact
5 that there could be potential long-term side effects
6 of one particular intervention has to be weighed
7 against the benefits, like we do for anything. You
8 know, we know that serotonin reuptake inhibitors,
9 long-term use of them can increase the use of hip
10 fractures. But it's rare that people are given
11 informed consent, even for that with SSRIs.
12     So, you know, this is part of the work that we
13 do with all of our patients whenever we prescribe
14 anything, is to try to give them a full picture of
15 the risks and benefits.
16 Q. Dr. Karasic, I'm going to show you now what has been
17     marked as Defendant's Exhibit 14. As I get this
18     pulled up, are you aware of who Dr. Hilary Cass is?
19 A. Yes.
20 Q. And who is she?
21 A. My understanding is that she is leading an ongoing
22     process of evaluating transgender care for minors in
23     the UK.
24 Q. And have you reviewed any reports released from her
25     research?

Page 120

1 A. Yeah. So it's -- my understanding is that she is
2     doing a -- that she's done an interim report with
3     recommendations for improving and even expanding
4     care in the UK. And so it's not original research,
5     in terms of providing outcomes of interventions, but
6     she's trying to make an assessment of care as it is
7     in the UK and how it might be improved.
8 Q. And she was appointed by the NHS to make that
9     assessment and to provide that report, right?
10 A. That's my understanding.
11     ATTY. GONZALEZ-PAGAN: Objection. Form.
12     ATTY. BEDARD: Let's take a look at that
13     report.
14     (Exhibit 14 marked for identification.)
15 Q. (BY ATTY. BEDARD) I'm showing you what's been marked
16     as Defendant's Exhibit 14. Can you see that?
17 A. Yes.
18 Q. And is this the interim report you were referring
19     to?
20 A. Yes.
21 Q. It's dated February of this year, of 2022, right?
22 A. Yes.
23 Q. Do you see the section starting with "Existing
24     evidence base," on the bottom of Page 18?
25 A. Yes. I see just the first part of the sentence

Page 121

1     there, because the lower --
2 Q. Okay.
3 A. Yeah, okay.
4 Q. And can you read that first paragraph for me,
5     beginning with 1.23?
6 A. Yes. "Evidence on the appropriate management of
7     children and young people with gender incongruence
8     and dysphoria is inconclusive both nationally and
9     internationally."
10 Q. And what is your response to this statement and
11     Dr. Cass's interim report?
12 A. Well, she says "inconclusive," and the question is
13     inconclusive as to what?
14 Q. Well, you have read this interim report, right?
15 A. Well, I don't remember everything that was said, but
16     it sounds like -- well, it says that she says that
17     it's inconclusive.
18     So the question as to what -- when I say
19     appropriate -- it's saying "evidence on the
20     appropriate management," so that doesn't necessarily
21     mean that's inconclusive whether or not to provide
22     care or not to provide care. It's -- the question
23     is, "What's the appropriate course? What's the
24     appropriate strategy to provide care?" And I
25     believe elsewhere in the study, it refers to, for

Dan H. Karasic, MD
7/13/2022

Page 122

1    example, the long waits to get care. So appropriate
2    management might be easing access to care, not just
3    restricting it.
4  Q. And do you reference Dr. Cass's interim report in
5    your disclosure?
6  A. No.
7  Q. Okay. And why not?
8  A. It's not -- it's a government review of transgender
9    care for minors in the UK. It's not a study of the,
10   you know, of interventions or their response, or of
11   surveys in their response to -- of trans people to
12   get care. A government --
13 Q. But, Dr. Karasic --
14 A. It's an interim government report that mostly is
15   talking about, like, how to proceed in the UK.
16 Q. But Dr. Karasic, you do not fully rely on what you
17   refer to as "original studies" in your report,
18   right?
19 A. Well, I also rely on 30 years of clinical experience
20   and the experience of my peers. We have been
21   working with transgender youth for decades, using
22   the information that was available at the time.
23   Each additional bit of information is interesting
24   and helpful, but we don't rely on one particular
25   study or report.

Page 123

1         ATTY. BEDARD: Dr. Karasic, I'm now going to
2    show you what has been marked at Defendant's
3    Exhibit 15.
4         (Exhibit 15 marked for identification.)
5  Q. (BY ATTY. BEDARD) And as I do so, have you -- let me
6    back up.
7         Are you aware that this year, the State of
8    Florida released a Medicaid report on gender
9    dysphoria?
10 A. Yes.
11 Q. And have you reviewed that report?
12 A. Just very superficially. I looked at who was
13   involved, and it seemed to me that it was really a
14   political sham as opposed to any serious report. It
15   was -- one of the reports was from a Canadian
16   dentist, and another was from an expert on
17   pedophilia, who has admitted in court that he has
18   never cared for a transgender minor.
19         And so it seemed like they were selecting
20   people from Canada who had never cared for -- never
21   provided transgender care, to justify a political
22   maneuver that had nothing to do with trans care. So
23   it really didn't seem worth my while to read it in
24   any more detail. I thought it was a ridiculous
25   effort.

Page 124

1  Q. So let me show you what's been marked as Defendant's
2    Exhibit 15. Is this the report you're referring to?
3  A. Yeah, I think so. I saw something in it where it
4    listed the people who were doing individual reports.
5    And so -- but I assume that that was it.
6  Q. Okay. Well, let me scroll down, because I do want
7    to make sure we are talking about the same report.
8    Is there a specific section of this report that
9    would be helpful to look at?
10 A. No, I can't say I reviewed the whole report in
11   detail, because just looking at it, as I said, I
12   saw -- from what I saw, it did not seem like anyone
13   who was involved, that I could see, were people who
14   had something to contribute to the discussion in
15   transgender health. But rather, it was really more
16   of a political scheme.
17 Q. So Dr. Karasic, I guess I'm just -- I'm trying to
18   understand. The criticisms that I have heard you
19   voice today are in part -- of this specific report,
20   are in part based on the contributors to the report,
21   right?
22 A. Right. I may have skimmed over a little bit of the
23   contents, but I can't say I've read the whole thing
24   in detail, nor that it would -- that there would be
25   a reason for me to do so, in terms of -- you know,

Page 125

1    certainly in terms of the -- even the original
2    expert report that I provided, I believe, was before
3    this came out. And I can't imagine that there's
4    anything there that, because -- yeah, I did, you
5    know, there was, like, a little update recently, but
6    I had done the expert statement a while back, before
7    this came out, and there wasn't anything that
8    seemed, you know, that it would contribute to any
9    change in my opinion.
10 Q. So just so we're on the same page, Dr. Karasic, are
11   the comments that you've made about the document
12   that's in front of us as Exhibit 15 specifically, or
13   are you not sure whether or not you have previously
14   reviewed this exhibit prior to today?
15         ATTY. GONZALEZ-PAGAN: Object to form. Asked
16   and answered.
17 A. As I said, I think I reviewed it very briefly, but
18   did not -- you know, to see if there was anything
19   useful in there, and concluded that there wasn't.
20   You can feel free to bring up a paragraph, if you'd
21   like, and I'm happy to comment on that paragraph.
22 Q. (BY ATTY. BEDARD) Sure. And before I do so, I do
23   want to better understand, because I think part of
24   the -- some of the comments that you've made today
25   have to do with the contributors to this report or

Dan H. Karasic, MD
7/13/2022

Page 126

1 to a similar report. So is there a section of this
2 report you looked at that describes who contributed
3 to the report?
4 A. I did -- I read something where it looked like there
5 was a pair of contributors that were led by a
6 Canadian dentist, and then there was one by James
7 Cantor who -- James Cantor is an expert on
8 pedophilia, but has not provided, as he's admitted
9 in court, has not ever provided transgender care.
10 So here, when you go to Attachment C and
11 Attachment D: Attachment C is from the dentist, the
12 Canadian dentist; and Attachment D is from James
13 Cantor, a Canadian pedophilia researcher and maybe
14 advocate for understanding and acceptance? And --
15 which seemed a curious choice of expert, because he
16 has never provided care for any transgender minors,
17 as he has, you know, admitted in court.
18 Q. And are you familiar with the assessments cited as
19 Attachments E, F, and G?
20 A. Well, Dr. Lappert, I believe, was involved, I think
21 in making an expert statement on a previous case.
22 And -- but also it just -- it seemed to me that
23 these were political choices, as opposed to anyone
24 who's ever done, you know, people who have actually
25 taken care of a trans person or done actual research

Page 127

1 working with trans people. It seemed like a -- not
2 a serious document, to me.
3 Q. So for the -- for the doctors referenced in
4 Attachments E, F, and G -- so Dr. Van Meter,
5 Dr. Lappert, and Dr. Donovan -- do you know whether
6 they have ever treated patients who have --
7 A. So first of all, I did want -- I did want to say --
8 Q. Sorry, Dr. Karasic, if you can just wait one second
9 until I finish my question before you answer, that
10 would be great.
11 A. Sorry.
12 Q. I know it's tough, with the remote depo in
13 particular. Just -- I'll restate my question.
14 For Dr. Van Meter, Dr. Lappert, and
15 Dr. Donovan, do you know whether they treat patients
16 who identify as transgender?
17 A. So I'm sorry I interrupted, I had wanted to finish
18 my comment about the previous authors, which I do
19 believe I read enough of it that James Cantor did
20 support transgender care for adults -- that he was
21 raising questions about transgender care for youth.
22 Lappert, I think, was an expert in a case I was
23 involved in. You'll have to move everything up a
24 little bit for me to see more.
25 Q. Sure.

Page 128

1 A. I don't know who G. Kevin Donovan is. Never heard
2 of Quentin Van Meter.
3 Q. Understood. So I'm scrolling down now to Page 3 of
4 this report, Dr. Karasic.
5 A. Yes.
6 Q. And there is a paragraph starting with, "Following a
7 review." Could you read that paragraph for us?
8 A. "Following a review of available literature,
9 clinical guidelines, and coverage by other insurers
10 and nations, Florida Medicaid has determined that
11 the research supporting sex reassignment surgery is
12 insufficient to demonstrate efficacy and safety. In
13 addition, numerous studies, including the reports
14 provided by the clinical and technical experts
15 listed above, identify poor methods and the
16 certainty of irreversible physical changes.
17 Considering the weak evidence supporting the use of
18 puberty suppression, cross-sex hormones, and
19 surgical procedures when compared to stronger
20 research demonstrating the permanent effects they
21 cause, these treatments do not conform to GAPMS and
22 are experimental and investigational."
23 Q. And Dr. Karasic, what is your response to that
24 statement?
25 A. I think this entire report is just ridiculous. It's

Page 129

1 not a serious effort, from even skimming over it.
2 There's nothing serious about it. It is -- it was
3 an attempt by Governor DeSantis to shut down
4 transgender care in a purely political move in the
5 same way that Florida has been playing politics on
6 LGBT issues more broadly.
7 And it's a shame that low-income people, the
8 people on Medicaid in Florida, have to suffer
9 because of this political grandstanding. And that
10 they couldn't find any real experts, and so they
11 found these fake experts to back this up.
12 Q. If we could take --
13 A. I mean, I think it's kind of even -- I think it's
14 even kind of shameful for you to, like, present this
15 to me as a serious document, because it so obviously
16 is not. So I mean, obviously you can present
17 whatever you want, but this -- you know, the Cass
18 report or Finland -- you know, people have their own
19 point of views. But what's going on in Florida is
20 not -- nothing in that paragraph has any meaning
21 beyond the politics of what's going on in Florida
22 right now.
23 ATTY. BEDARD: Dr. Karasic, why don't we take a
24 five-minute break? Let's reconvene at 5:00 p.m.
25 Eastern, 2:00 p.m. Pacific.

Dan H. Karasic, MD
7/13/2022

Page 130

```
1      THE WITNESS: Okay.
2      ATTY. BEDARD: Does that work for everyone
3  else?
4      THE VIDEOGRAPHER: Okay. We're going off the
5  record at 1:53.
6      (Break from 1:53 p.m. to 2:01 p.m.)
7      THE VIDEOGRAPHER: We are back on the record at
8  2:01.
9  Q. (BY ATTY. BEDARD) Dr. Karasic, did you look at any
10  documents during our most recent break?
11 A. No.
12 Q. And did you speak with anyone via phone, email, text
13  during our most recent break?
14 A. No.
15 Q. And is there anything you'd like to clarify in your
16  deposition testimony today?
17 A. Not that I can think of.
18 Q. I have no further questions, Dr. Karasic. I
19  appreciate your time today, and enjoyed speaking
20  with you.
21 A. Great. Thank you.
22      ATTY. GONZALEZ-PAGAN: Thank you, Stephanie.
23  Dr. Karasic, I'm going to have a couple of follow-up
24  questions on redirect just now, if you will.
25
```

Page 131

```
1      EXAMINATION
2  BY ATTY. GONZALEZ-PAGAN:
3  Q. You were shown an exhibit, I believe it is
4  Exhibit 14, from the defendants, a Cass -- a
5  preliminary report by Dr. Hilary Cass in the UK. Do
6  you recall that?
7  A. Yes.
8  Q. Okay. I'm going to try to share my screen here.
9  Can you see the screen, Dr. Karasic?
10 A. Yes.
11 Q. I'll try to zoom a bit here. And Dr. Karasic, if
12  you can read the second paragraph that begins with
13  "I have heard."
14 A. "I have heard that young service users are
15  particularly worried that I will suggest that
16  services should be reduced or stopped. I want to
17  assure you that this is absolutely not the case --
18  the reverse the true. I think that more services
19  are needed for you, closer to where you live. The
20  GIDS staff are working incredibly hard and doing
21  their very best to see you as quickly as possible,
22  but providing supportive care is not something that
23  can be rushed -- each young person needs enough time
24  and space for their personal needs to be met. So
25  with the best will in the world, one service is not
```

Page 132

```
1  going to be able to respond to the growing demand in
2  a timely way."
3  Q. Dr. Karasic, from that statement, does it seem that
4  Dr. Cass is recommending that care be reduced or
5  stopped for gender-dysphoric youth in the
6  United Kingdom?
7  A. No.
8  Q. I'm going to just move to another page, if you will.
9  This is Page 15 of the PDF. Dr. Karasic, do you see
10  the paragraph that's numbered 1.5?
11 A. Yes.
12 Q. Do you mind reading that into the record?
13 A. "The review is not able to provide definitive advice
14  on the use of puberty blockers and
15  feminizing/masculinising [sic] hormones at this
16  stage, due to gaps in the evidence base; however,
17  recommendations will be developed as our research
18  programme progresses."
19 Q. Dr. Karasic, is it your understanding that the Cass
20  review from February of 2022 is making any
21  recommendations as to the provision of
22  gender-affirming care, such as puberty blockers and
23  hormones at this time?
24 A. My understanding is they are not.
25 Q. Okay. And is it your understanding that the review
```

Page 133

```
1  is actually ongoing?
2  A. Yes.
3  Q. Dr. Karasic, you were previously shown what's been
4  marked as Defendant's Exhibit 13, where --
5  pertaining to a statement by the Astrid Lindgren
6  Children's Hospital. Do you recall that?
7  A. Yes.
8  Q. To your knowledge, is that statement peer-reviewed?
9  A. No.
10 Q. And that statement pertains to solely one hospital;
11  is that correct?
12 A. That statement is specific to Astrid Lindgren
13  Hospital.
14 Q. Okay. And do you recall discussing side effects
15  from hormone treatments such as cardiovascular
16  disease, osteoporosis, infertility, increased cancer
17  risk, and thrombosis?
18 A. That was brought up in this deposition, yes.
19 Q. Okay. Dr. Karasic, are the side effects of the
20  provision of hormones unique when -- because they're
21  being provided for the treatment of gender
22  dysphoria?
23 A. No. So hormones that are provided for other
24  purposes also can cause side effects. As a matter
25  of fact, almost everything we prescribe has a
```

Dan H. Karasic, MD
7/13/2022

Page 134

1   potential for side effects.
2       THE WITNESS: I lost you for a moment.
3       ATTY. GONZALEZ-PAGAN: Apologies.
4   Q.  (BY ATTY. GONZALEZ-PAGAN) Every medical treatment
5       has risks and benefits; is that right?
6   A.  Yes.
7   Q.  Dr. Karasic, to your knowledge, is the -- well, let
8       me go back.
9           Dr. Karasic, do you recall reviewing a summary
10      of a recommendation by COHERE? Do you recall that?
11  A.  Yes.
12  Q.  Okay.  That is a summary of a report; is that
13      correct?
14  A.  Yes.
15  Q.  Okay.  But it's not the full report; is that right?
16  A.  Yes.
17  Q.  That is also -- is the summary of the recommendation
18      by COHERE peer-reviewed?
19  A.  No.
20  Q.  Okay.  And COHERE is a governmental entity in
21      Finland; is that correct?
22  A.  That's my understanding, is it's a governmental
23      committee of some sort.
24  Q.  All right.  Dr. Karasic, do you recall going through
25      Exhibit 10 -- where is Exhibit 10? -- an informed

Page 135

1   consent form, a consent form regarding surgery?
2   A.  Yes.
3       ATTY. GONZALEZ-PAGAN: Stephanie, I apologize.
4   If you can recall for me which exhibit it is, that
5   ASA informed consent form, it might make it move
6   faster.  But if not, I can find it.
7       ATTY. BEDARD: No, that's fine.  I can pull it
8   up for you, if you'd like.
9       ATTY. GONZALEZ-PAGAN: That'd be great.  Thank
10  you.  I really appreciate it.
11      ATTY. BEDARD: It's the most recent Polyclinic
12  records.
13      ATTY. GONZALEZ-PAGAN: Correct, yeah.  I'm not
14  sure if it's 5 or 10.
15      ATTY. BEDARD: No, it's 10.  Do you want me to
16  share my screen?
17      ATTY. GONZALEZ-PAGAN: If you don't mind, that
18  would be appreciated.
19      ATTY. BEDARD: Sure.  No, it's not 10.  It's 3.
20      ATTY. GONZALEZ-PAGAN: Yeah, it's 3.  Yeah,
21  okay, that's what I was --
22      ATTY. BEDARD: It's 3, and I'm happy to share
23  my screen.  I will be the one with control -- I
24  don't think I can share control, so you'll just have
25  to let me know where you want to go.

Page 136

1       ATTY. GONZALEZ-PAGAN: It's all right.  I
2   can -- if you wouldn't mind, stop sharing.  I have
3   it in front of me.  I apologize.
4       ATTY. BEDARD: Okay.
5   Q.  (BY ATTY. GONZALEZ-PAGAN) Dr. Karasic, do you
6       remember being shown a Consent for Surgery form from
7       the Polyclinic earlier today?
8   A.  Yes.
9   Q.  I'm going to share my screen with you.  Can you see
10      that?
11  A.  Yes.
12  Q.  Okay.  Dr. Karasic, and I know that it's a bit
13      fuzzy, but if you could read Paragraph 11?
14  A.  "The above treatment or procedure has been explained
15      to me in a way that I understand.  I realize that
16      there may be alternative procedures or methods of
17      treatment, and that there are risks to the procedure
18      or treatment proposed."
19  Q.  Thank you.  From your understanding, is it --
20      actually, and if you don't mind reading the next
21      sentence thereafter, beginning "in signing"?
22  A.  "In signing this consent, you acknowledge that you
23      have been informed about the risks and benefits for
24      this surgery/procedure, and accept responsibility
25      for the clinical decisions that were made along with

Page 137

1   the financial costs of all future treatments."
2   Q.  Based on your review of this document and those
3       sentences, is it your understanding that risk and
4       consequences of the surgery -- in this case, a
5       bilateral mastectomy -- were discussed with C. P.
6       and his parents?
7   A.  Yes.  It seems like there's an acknowledgment of it.
8       The form is a fairly generic form, but it
9       includes -- they're acknowledging that there has
10      been a discussion.  So I wouldn't view the form as a
11      discussion, but rather the acknowledgment that a
12      discussion has taken place.
13  Q.  Thank you.  And earlier, you were asked some
14      questions about the fact that C. P.'s father signed
15      under the "Witness Signature" line.  Do you recall
16      that?
17  A.  Yes.
18  Q.  Isn't it true that there's a third signature just
19      below the witness signature for a Sue
20      Harrington, RN?
21  A.  Yes.  Can you scroll up?  Just because it's being
22      blocked by my --
23  Q.  Can you see that now?
24  A.  Yeah.  So it looks like there's a witness signature
25      below, on the third line.  And so, again, it was a

Dan H. Karasic, MD
7/13/2022

Page 138

1    stock form, I assume, for adults.  So it didn't have
2    a parent signature like forms typically do when
3    they're for procedures on minors.
4  Q.  Is it your understanding, then, that there's at
5    least a parent who could provide consent, a minor
6    who could provide assent, and a distinct witness,
7    all of whom have signed this form?
8  A.  Yes.
9  Q.  All right.  Dr. Karasic, earlier you were asked some
10    questions about the effects of puberty blockers on
11    bone density.  Do you recall that?
12  A.  Yes.
13  Q.  Are the effects of puberty blockers on bone density
14    primarily a concern when the production of sex
15    hormones is being blocked and no other sex hormones
16    are being provided?
17  A.  It's primarily a concern --
18        ATTY. BEDARD:  Object to form.
19  A.  It's primarily a concern when there is long-term
20    use.  For example, some adults who might be without
21    either testosterone or estrogen, there can be a
22    long-term concern for osteoporosis.  And so the data
23    for short-term use in youth were not generally --
24    even if there's some change in bone density where
25    the data's mixed, we're not -- it's not really a

Page 139

1    concern in terms of the function of the bone, then,
2    because from the data we have, fractures don't
3    become an issue for people until -- fractures due to
4    osteoporosis become an issue for people much later
5    in life.
6  Q.  (BY ATTY. GONZALEZ-PAGAN)  Does the provision of sex
7    hormones, whether because the puberty blockers have
8    been stopped or they've been provided in an
9    exogenous manner, dissipate the concern about bone
10    density?
11        ATTY. BEDARD:  Object to form.
12  A.  Yeah.  So as I said, there's variable data in terms
13    of what happened in bone density in people provided
14    puberty blockers.  And -- but bone density tends to
15    increase again with the start of gender-affirming
16    hormones, such that people have bone growth that
17    appears equivalent to that of the gender to which
18    they've transitioned.
19        ATTY. GONZALEZ-PAGAN:  Thank you, Dr. Karasic.
20    No more questions, and I'll stop sharing the screen.
21        ATTY. BEDARD:  I have no further questions
22    either.
23        THE VIDEOGRAPHER:  Okay.  That concludes the
24    deposition.  The time is 2:16 p.m.  We are going off
25    the record.

Page 140

1        ATTY. GONZALEZ-PAGAN:  We will read.
2        THE COURT REPORTER:  And orders, Counsel?
3        ATTY. BEDARD:  Let's say non-expedited for now,
4    and if need be, I'll circle up with our team and let
5    you know as soon as possible if that changes.
6        ATTY. GONZALEZ-PAGAN:  The same for us.
7        (Deposition concluded at 2:17 p.m.)
8        (Signature reserved.)
9            -----
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 141

1            Nelson Court Reporters, Inc.
2            6513 132nd Avenue NE, #184
              Kirkland, Washington 98033
              production@nelsonreporters.com
3            www.nelsonreporters.com
4
5            July 25, 2022
6  To:    Omar Gonzalez-Pagan
          Lambda Legal Defense and Education Fund, Inc.
7         120 Wall Street, 19th Floor
          New York, NY 10005-3919
8
9  Re:  Pritchard, et al, v. BCBS of Illinois
      Deposition of:  Dan H. Karasic, MD
10    Date Taken:  July 13, 2022
      Cause No.:  3:20-cv-06145-RJB
11
12        Enclosed are the Correction & Signature page.
13  Instruct the deponent to review the deposition, record
    any corrections on the Correction page, and sign it.
14        The above referenced transcript must be read
    and the Correction & Signature page signed within 30
15  days of this notice or before the trial date, whichever
    occurs first.
16        If the Correction & Signature page are not
    signed within that time period, signature will be deemed
17  waived for all purposes.
18        After the Correction & Signature page are
    signed, please forward to:
19
          Nelson Court Reporters Production Department
20        production@nelsonreporters.com
21
    Thank you,
22  Sierra Zanghi, RSR, CCR
    CCR No. 22004202
23
24
25

Dan H. Karasic, MD
7/13/2022

Page 142

```
1              CORRECTION AND SIGNATURE PAGE
2    Re:  Pritchard, et al, v. BCBS of Illinois
     Deposition of:  Dan H. Karasic, MD
3    Date Taken:  July 13, 2022
     Cause No.:  3:20-cv-06145-RJB
4
5         I, DAN H. KARASIC, MD, have read the within
     transcript taken July 13, 2022, and the same is true and
     accurate, except for any changes and/or corrections, if
6    any, as follows:
7
8    PAGE/LINE       CORRECTION               REASON
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
21      Signed at _____  _____
                    City              State
22
23      _____  _____
        Dan H. Karasic, MD         Date
24
25   See: Wash. Reports 34A, Rule 30(e), USCA 28, Rule 30(e)
```

Page 143

```
1              C E R T I F I C A T E
2
     STATE OF WASHINGTON )
3                        ) ss.
     COUNTY OF SNOHOMISH )
4
5         I, Sierra Zanghi, Certified Court Reporter in and
     for the State of Washington, reported the within and
6    foregoing deposition of Dan H. Karasic, MD on Wednesday,
     July 13, 2022; that pursuant to RCW 5.28.010 the witness
7    was first by me duly sworn; that said examination was
     taken by me in shorthand and thereafter under my
8    supervision transcribed; that in accordance with CR
     30(e), the witness was given the opportunity to examine,
9    read, and sign the deposition within 30 days, upon its
     completion and submission, unless waiver of signature was
10   indicated in the record; and that same is a full, true
     and correct record of the testimony of said witness,
11   including all questions, answers, and objections, if any,
     of counsel.
12
          I further certify that I am not a relative or
13   employee or attorney or counsel of any of the parties,
     nor am I financially interested in the outcome of the
14   cause.
15        This transcript and billing has been
     prepared/submitted for final preparation and delivery in
16   accordance with all Washington State laws, court rules,
     and regulations.
17
          Rules regulating formatting and equal terms
18   requirements have been adhered to.  Alterations, changes,
     fees, or charges that violate any of these provision are
19   not authorized by me and are not at my direction or with
     my knowledge.
20
          IN WITNESS WHEREOF I have set my hand this 25th day of
21   July, 2022.
22
23
24          _____
            SIERRA ZANGHI, RSR,
25          WA CCR NO. 22004262
```

Nelson Court Reporters, Inc.
www.nelsonreporters.com

142..143

Dan H. Karasic, MD
7/13/2022

## Exhibits

**Exhibit 1** 3:13 8:24,25

**Exhibit 2** 3:14 17:20,21,22 41:22 69:5

**Exhibit 3** 3:16 21:21 22:2 90:10

**Exhibit 5** 3:18 50:22,23 51:23,24 76:15,19 85:15

**Exhibit 7** 3:20 56:16,17

**Exhibit 8** 3:23 61:18,19

**Exhibit 9** 4:2 64:9,10

**Exhibit 10** 4:4 78:17 94:25 95:4 99:20 134:25

**Exhibit 11** 4:6 101:11,12

**Exhibit 12** 4:7 106:12,13

**Exhibit 13** 4:9 110:21,22 115:4 133:4

**Exhibit 14** 4:11 119:17 120:14,16 131:4

**Exhibit 15** 4:13 123:3,4 124:2 125:12

---
-
---

**--o0o--** 5:7

---
**0**
---

**000001-000011** 3:24

**000001-000078** 4:5

**00005** 62:1

**000112-000155** 3:17

**000982-001003** 3:21

**003064-003075** 4:3

---
**1**
---

**1** 3:13 8:24,25 109:6,11

**1.23** 121:5

**1.5** 132:10

**10** 4:4 43:2,7 78:17 94:25 95:4 99:20 134:25 135:14, 15,19

**100** 35:18

**1000** 87:17

**101** 4:6

**106** 4:7

**10:03** 41:17

**10:04** 41:18

**10:10** 41:18,20

**10th** 9:11 92:10

**11** 3:24 4:6 43:1,3,7,8,11 58:4 76:22 88:15 101:11,12 136:13

**11-year-old** 88:8,18

**110** 4:9

**112** 4:12

**11:03** 68:11

**11:04** 68:15,16

**11:10** 68:12

**11:13** 68:16,18

**12** 4:7 43:12 106:12,13 117:24 118:19

**12/6/2021** 4:2

**120** 4:11 29:20,25 30:10

**123** 4:13

**12:03** 94:15,16

**12:47** 94:16,18

**13** 3:3 4:9 5:1 43:14 44:1,4 95:6 110:21,22 115:4 133:4

**131** 3:9

**13th** 5:8

**14** 4:11 44:4 92:12,16 119:17 120:14,16 131:4

**140** 29:20,25 30:10

**15** 4:13 51:24 92:15 123:3,4 124:2 125:12 132:9

**16** 86:8 87:9,13

**17** 3:14 30:24 42:4

**18** 36:9 120:24

**18th** 42:6

**1950s** 39:2

**1980s** 118:7

**1991** 24:4

**1:53** 130:5,6

---
**2**
---

**2** 3:14 4:8 17:20,21,22 41:22 69:5

**2.4** 85:23

**20** 30:17

**20-** 44:10

**200** 109:10

**2000s** 27:9

**2001** 27:8

**2003** 26:7

**2005** 43:2

**2009** 27:13 111:15

**2010** 15:5

**2011** 26:10 27:13

**2012** 15:6

**2013** 109:9 111:18

**2014** 12:5 14:10,24 27:14 28:13 103:6

**2015** 101:8,16

**2016** 42:23 43:1 101:18,20 103:1,3 106:9

**2017** 3:18 28:9 43:11 76:19 85:18

**2018** 27:14 28:11,13 43:15 95:9

**2019** 44:9,11 57:13 92:10 100:24 101:4,7

**2020** 17:6 24:10,13,18 25:16,17 26:7 35:11 36:8 40:18 109:16

**2021** 17:8 20:25 49:5,12

**2022** 3:3 4:11,13 5:2,8 42:6 120:21 132:20

**21** 3:16

**22** 3:22

**250** 35:20

**27th** 10:11

**2:00** 129:25

**2:01** 130:6,8

**2:16** 139:24

**2:17** 140:7

---
**3**
---

**3** 3:16 4:10 21:21 22:2 85:21 90:10 128:3 135:19,20,22

**30** 22:11 39:14 122:19

**30th** 57:13 101:18

**320** 87:17

**33** 104:5

**33rd** 104:6

**35** 3:19 99:25

**37.5** 100:2

**38** 69:7,9

**39** 69:7,9

**3:20-cv-06145-rjb** 3:2 5:13

---
**4**
---

**40** 118:2,8

**425-391-6809** 5:19

**44** 99:25

**45** 99:6

Dan H. Karasic, MD
7/13/2022

**45.5** 99:22

**46** 3:17 4:14

---

**5**

**5** 3:18 50:22,23 51:23,24
76:15,19 85:15 135:14

**5/1/2021** 4:9

**50** 3:15,18 47:5,8 83:17,19
118:12

**50s** 118:1,15

**51** 100:2

**56** 3:20

**5:00** 129:24

---

**6**

**6** 3:8 51:14 90:25

**6/16/2020** 4:7

**6/16/2022** 3:14

**61** 3:23

**64** 4:2

---

**7**

**7** 3:20 27:12 51:14 56:16,17
58:18 61:15

**7/13/2022** 3:13

**70** 45:8

**71** 45:8,13

**75** 30:2 31:2 48:12 66:5,8

**75-percent** 29:23

**78** 4:4,5

---

**8**

**8** 3:13,23 28:19,23,25 29:14,
21,22 30:13,15 31:11,25
32:2,5 51:15,23 52:1 58:19
61:18,19 111:11 113:20

**8/30/2016** 4:6

**86** 8:18

**8th** 9:12

---

**9**

**9** 3:13 4:2 64:9,10

**94110** 8:19

**950** 5:17

**98027** 5:18

**990** 57:5

**9:00** 5:2

**9:01** 5:9

**9th** 95:9

---

**A**

**a.m.** 5:2,9 41:18 68:16

**ability** 88:25 89:14 91:5,20
112:16

**abnormal** 97:10

**absolute** 7:11

**absolutely** 131:17

**academic** 32:8,18 87:2

**academics** 32:12

**Academy** 34:8,9 53:12

**accept** 136:24

**acceptance** 126:14

**accepted** 4:13 16:8

**access** 114:22 122:2

**accessing** 103:13

**accordance** 61:15

**accurate** 39:25 40:4

**achieved** 25:16

**achievement** 40:14

**achieving** 29:2

**acknowledge** 136:22

**acknowledging** 137:9

**acknowledgment** 137:7,
11

**active** 27:24 28:6 34:6
80:12

**actual** 126:25

**added** 40:19

**addition** 13:6 14:24 20:3
24:17 28:22 33:1 47:14
128:13

**additional** 47:13,22 122:23

**address** 8:16

**addressed** 27:24

**addresses** 33:15

**adequate** 77:3

**adequately** 48:4

**ADHD** 21:2 49:12 65:1,18
66:9,16,17,18,22

**Administrative** 102:11

**admission** 14:20

**admitted** 14:17 114:18
123:17 126:8,17

**Adobe** 44:16

**adolescent** 52:12,13 53:5,6
54:11,18 88:3

**adolescent's** 77:12

**adolescents** 52:10,16
77:6,16 86:1,8

**adopt** 106:24

**adult** 88:10 93:12 99:17

**adults** 28:19 36:13,14 55:1
77:16 80:17 82:20 83:2
92:22 93:22 97:20 110:7
113:22 116:7,22 117:3,5,8,
13,18,20 118:9 127:20
138:1,20

**advance** 10:3

**adverse** 115:15 117:8

**advice** 132:13

**advise** 75:17

**advocate** 126:14

**affect** 75:14,15 76:10 80:7
85:13

**affirmation** 77:3

**affirmatively** 7:18

**affirming** 63:2

**age** 43:7,8,11 45:11 58:4
74:20 86:8 88:15 92:16
118:12,19

**AGENT** 78:19

**agree** 45:19,23 46:11,18
52:20 77:18,20 86:9 108:14,
23

**agreed** 31:2,3

**agreement** 29:16

**ahead** 12:19 49:7

**aids** 77:14

**albeit** 104:20

**Alberta** 16:5

**Alliance** 26:9,13

**alternative** 136:16

**ambivalence** 60:8

**America** 118:19

**American** 26:23 34:6,8,9,
17 35:3,4,6 39:14,20 40:11,
12 53:12 110:1,2,3,4 118:16

**amount** 24:10,12 95:21
99:14 108:20

**amounts** 84:25

**Amsterdam** 103:3

**analysis** 60:2

**Angeles** 23:24

**answering** 38:13

**APA** 40:24 41:4

**Apologies** 38:16 134:3

**apologize** 12:19 65:5,7
98:2 135:3 136:3

Dan H. Karasic, MD
7/13/2022        Index: appearance..bilateral

**appearance** 16:10

**appears** 81:23 95:11
139:17

**applicable** 116:25

**apply** 32:3,6

**appointed** 120:8

**appreciated** 135:18

**approach** 97:1

**approaches** 108:7

**approval** 29:2,3,9,11,13,20,
23 30:9

**approved** 29:23 31:9

**April** 57:13

**area** 111:6

**areas** 119:3,4

**arrow** 44:18

**articles** 82:15

**ASA** 135:5

**aspect** 19:8

**aspects** 19:6 33:9

**assent** 88:13 138:6

**assented** 87:12

**assenting** 48:7 93:10,14

**assents** 94:2

**assess** 115:18

**assessed** 104:19

**assesses** 47:15

**assessing** 48:2 52:15

**assessment** 47:13,22 49:3,
4 55:6 58:9,10,14,17,22
59:5,16,17 61:5,7,9,13
62:17,19 63:1,6,17 66:2
104:16 120:6,9

**assessments** 58:19 59:8
63:22 126:18

**assigned** 72:11,22 80:10
83:14 84:24 85:9 97:24

**assist** 18:25 77:14

**assisted** 19:3,8,13

**associate** 32:23

**Association** 26:23,24 34:6,
18 35:4,5,6 39:14,21 40:11,
13 110:3,4

**assume** 8:13 54:19,21
93:22 124:5 138:1

**assuming** 38:1 79:1

**assure** 131:17

**Astrid** 4:10 111:5,7,18
113:23 114:7,10,22 115:3
133:5,12

**attached** 40:3

**Attachment** 126:10,11,12

**Attachments** 126:19 127:4

**attempt** 129:3

**attempts** 72:15

**attended** 23:21

**attention** 22:10 49:4 64:24
65:18

**Attorney** 5:15

**atty** 3:8,9 5:22,25 6:13 8:22
9:1 11:9,15,18,20 12:24
15:12,14,16 16:1,3 17:22
18:11,16,18,20,21 20:6,9
21:19,22 25:4,13 27:7,18,21
28:12,16,20 30:12 31:10
34:21 35:1,8 38:7,16,18,20
41:9,14,21 42:1 44:15,20,
21,22 46:2,11,13,16,21
47:24 48:1 50:9,11,20,24
53:9,24 56:15,18 60:21
61:2,10,16,20 64:7,11 65:3,
5,8,11,13 67:4,6,8,10,12
68:10,13,19,25 69:2,21,23
70:8,14 71:11 72:1 74:6,17
76:5,13 78:5,8,15,18 81:14,
16,19 82:10 88:11,21 89:15
90:8,13 94:11,13,19 96:11,
14,24 97:2,11,14 98:2,7,8
99:8,13 100:16,18 101:9,13
105:5 106:1,10,14 110:13,
19,23 113:15 114:9 115:25

117:10 120:11,12,15 123:1,
5 125:15,22 129:23 130:2,9,
22 131:2 134:3,4 135:3,7,9,
11,13,15,17,19,20,22 136:1,
4,5 138:18 139:6,11,19,21
140:1,3,6

**August** 101:18

**author** 29:5 82:13,14

**authorizes** 23:6

**authors** 28:25 29:7,21
30:14 31:1,4 82:11 127:18

**aware** 37:9 87:22 99:4,10
100:10,24 119:18 123:7

---

**B**

**babies** 75:8

**baby** 90:1

**bachelor's** 23:23

**back** 11:21 23:9 30:4 31:7,
21 36:3 41:19,22 66:4
68:12,17 69:5 71:2,4 76:17
79:10 87:21 94:17 99:20
114:1,9 115:2 123:6 125:6
129:11 130:7 134:8

**background** 23:18,20 40:7
65:4

**backtrack** 16:9

**bag** 80:5

**balanced** 77:6

**ban** 113:4

**Baptist** 14:14,17

**Barn** 4:10

**base** 120:24 132:16

**based** 42:21 53:24 55:9
59:9 63:11 66:14,15 78:1
86:14 124:20 137:2

**basically** 112:10 114:24

**basing** 10:22

**basis** 60:22 66:11 102:13
103:20

**Bates** 3:16,21,23 4:2,4
11:17 57:1,2,5 61:25 95:6

**bear** 92:3

**bearing** 79:24 80:1

**Bedard** 3:8 5:15,22,23 6:13,
15 8:22 9:1 11:15,20 15:12,
14,16 16:3 17:22 18:16,20,
21 20:9 21:22 25:13 27:21
28:12,20 31:10 35:8 38:18,
20 41:9,21 42:1 44:20,22
46:11,16 48:1 50:20,24
53:24 56:15,18 61:2,16,20
64:7,11 65:3,8,13 67:6,10,
12 68:10,19 69:2,23 70:14
72:1 74:17 76:13 78:8,15,18
81:16 82:10 88:21 90:8,13
94:13,19 96:14 97:2,14
98:7,8 99:13 100:18 101:9,
13 106:1,10,14 110:19,23
114:9 117:10 120:12,15
123:1,5 125:22 129:23
130:2,9 135:7,11,15,19,22
136:4 138:18 139:11,21
140:3

**began** 25:17 43:23 84:17

**begin** 70:18

**beginning** 42:12 77:16
107:5 121:5 136:21

**begins** 11:17 52:1 115:8
131:12

**begun** 69:25 70:19

**behalf** 12:14 14:22

**Bell** 108:9 111:22 112:13,18

**beneficiaries** 102:20
103:16

**benefit** 60:13

**benefits** 45:16,25 46:4,9,
12,19,23 47:2,16 48:4,10
59:1 91:13,23 116:23 117:2,
4 118:23 119:7,15 134:5
136:23

**bibliography** 10:6 11:12

**big** 18:1 82:13

**bilateral** 23:6 44:6 87:14

Dan H. Karasic, MD
7/13/2022

90:18 91:4 92:9 137:5

**birth** 43:2 72:11,22 80:10 83:15 84:24 85:10 97:24

**bit** 16:9 23:17,20 44:18 58:12 75:5 76:3 79:2 82:22 87:7 108:17 110:14 111:10 122:23 124:22 127:24 131:11 136:12

**block** 113:3

**blocked** 137:22 138:15

**blocker** 43:4,9 74:21 81:8 83:24 85:3 88:15

**blockers** 57:24 69:19 70:4, 5,9,13,15,17,20,22 71:1,2,7, 14,16,18,21,24 72:9 74:2, 12,16 75:1,12,17 76:8 78:11 80:4,6,12,16,23 81:17 82:19,24 83:4 84:2,3,7,14 85:8 88:19,20 112:5 114:13, 21 116:16,18 117:24 118:7, 19 132:14,22 138:10,13 139:7,14

**blocking** 44:18,25 69:17

**blood** 98:10,22 99:2,11,18

**Blue** 3:2 5:12,23 6:16 21:3, 4,6

**board** 27:5,14,22,24 28:11, 13 37:14,17 54:22,23

**board-certified** 53:19 54:20,21

**body** 11:19 55:12 85:4,5,7, 13 105:22

**bone** 46:23 80:4,7,8,11,14, 25 81:16,21,23 82:9,16,25 83:5,10,18 95:21 96:9,12, 16,19,20 97:1 116:10 118:10 138:11,13,24 139:1, 9,13,14,16

**bones** 83:15

**Booker** 20:13,16 36:24 37:3 42:18 49:2,24,25 50:3 54:3 62:16 63:15,18,21 64:2,4 91:10

**bottom** 23:10 56:24 92:8

120:24

**Boulevard** 5:18

**Boy** 39:5

**boys** 39:7

**brain** 83:25

**Brandt** 13:1

**break** 7:23 8:2,5 12:10 41:12,18 67:16,22 68:6,11, 16,20,21 69:3 94:7,16,20,22 129:24 130:6,10,13

**breast** 72:23 73:7,10,15,17, 18,24 96:5,6

**breast-feed** 88:25 89:6,14, 21 91:6,20

**breast-feeding** 89:25

**briefly** 125:17

**bring** 30:3 125:20

**bringing** 97:22

**brings** 99:19

**broader** 33:12 65:20

**broadly** 129:6

**brought** 45:4 133:18

**bud** 73:10,24

**buds** 72:23 73:18

**building** 85:12

**business** 5:17

**Bustos** 109:4

---

**C**

**Cabading** 14:14

**Cal** 14:14,17

**California** 5:2 8:18 24:5 109:7

**called** 25:7 29:15 53:13 67:16 111:5

**Canada** 123:20

**Canadian** 15:8 16:4,10

123:15 126:6,12,13

**cancer** 115:17 116:18 133:16

**Cantor** 126:7,13 127:19

**capacity** 13:2 14:3,7,9 15:2, 18,24 16:22 28:15 47:15 48:3 86:7,19 88:8 93:5 107:25

**caption** 18:13

**cardiovascular** 99:6 115:16 116:8 117:12,17 118:24 133:15

**care** 12:6 13:4 21:8 26:1,5, 12,14 27:12 28:19,23 29:12, 13,14,21,22 30:8,13,14,15, 16 31:11,25 32:2,5 33:9 38:24 47:11,12,20,21 48:11, 19 51:14 52:9,23 53:1,2,16 55:2 58:18,19 59:4 60:25 61:15 63:6,8 66:2,3 87:4,7 92:24 97:22 103:5 105:10, 15 106:5,20,22 108:6,10,22 110:5,6 111:9,11,20 112:4, 6,7,8,11,21 113:4,13,20 114:18,22,24 117:3,6 119:22 120:4,6 121:22,24 122:1,2,9,12 123:21,22 126:9,16,25 127:20,21 129:4 131:22 132:4,22

**cared** 123:18,20

**career** 36:15 40:16

**careful** 104:16

**carried** 19:7

**carrying** 19:9

**case** 6:22 14:12,13,15,21,24 15:5,16 16:5 17:1,3,4,5,7, 10,23 19:4,5 37:6,10 48:6 61:8 64:16 71:18 84:12 89:22 90:2 96:22,25 97:4 107:7 112:15,19,23,25 113:3,9,12 126:21 127:22 131:17 137:4

**case-by-case** 60:2,22 102:13 103:20

**cases** 12:22 13:3,6,23 14:1,

5,7,25 15:1 19:10 25:10 40:19 109:5,8,9

**Casey** 6:22 45:20,22 46:3,6, 15 73:5,6,11,20,25 93:16

**Casey's** 46:15 66:9 73:9

**Cass** 4:11 119:18 129:17 131:4,5 132:4,19

**Cass's** 121:11 122:4

**categorical** 103:5

**caused** 107:11

**cell** 98:10,22 99:2,11

**Center** 3:20,23 20:17 36:25 42:19 61:23 62:3,9 63:13

**centers** 87:2 100:25 102:17

**central** 29:17 71:17 74:14, 18

**centralized** 107:14

**certainty** 128:16

**certification** 54:22,23 78:19

**Certified** 5:5

**CF** 16:5

**CFT** 3:24 61:25

**chair** 28:8 39:16

**challenge** 40:17

**challenging** 115:18,20

**change** 40:23 97:17 125:9 138:24

**changed** 41:1

**chapter** 28:17,18,20,24,25 29:4,6,7,9,11,18 30:17,24 31:14 111:12 113:20

**chapters** 28:8 30:17,20 32:4

**characterization** 46:25

**charted** 46:24 54:4

**charting** 79:11

**charts** 35:16

Dan H. Karasic, MD
7/13/2022

Index: chest..controls

chest 62:17 72:16 73:13
74:1 109:8

CHI 20:10

child 3:21,23 20:17 36:25
42:19 52:12,13 53:4,5
54:10,18 61:23 62:3,9 63:13

children 52:10,15 55:1
79:24 80:2 92:4 108:1 121:7

Children's 4:10 111:8
133:6

choice 126:15

choices 106:20,22 126:23

circle 11:21 140:4

circling 114:9

circumstance 47:19

circumstances 89:12
95:23 97:6

cisgender 36:14 80:13
83:18,19,20 89:4,7 118:14

cisgendered 84:3

cite 105:13,17 109:3

cited 20:2 126:18

City 17:8

clarify 11:9,15 16:24 130:15

clarity 11:14 18:11

clear 89:20,22,24

clinic 25:10,11 26:1,7,14
111:15 113:21,22

clinical 3:18,19 50:7,15
51:8 97:12 102:21,24 103:7
114:15,23 115:1 122:19
128:9,14 136:25

clinically 37:16 55:14
104:22

clinicians 32:13

clinics 24:17 25:9,22,24
26:3 87:1,8 107:14,20
110:15

closer 101:21 118:13
131:19

CME 39:21

CMS 4:6 101:5 102:18
103:4,18 106:2,4

CMS's 104:25

co-author 27:11

co-founder 26:8

co-lead 26:8

co-occurred 60:24

co-occurring 60:7 61:1

COHERE 4:7 107:19 108:5
109:15 134:10,18,20

coined 38:25

collapsed 44:19

colleague 111:24

collect 10:2 107:22

collected 10:25 11:11
114:25

collectively 104:8 105:7

College 23:24

comment 30:21 95:24
100:21 125:21 127:18

comments 30:1 31:5
125:11,24

committee 28:23 30:14
32:1,2 51:7,17 106:23,24
108:11 109:24 134:23

committee's 108:12
109:22

committees 27:9,10

commonly 27:1 59:20
64:25

communicate 68:23

communicated 67:13

communication 67:20
68:6 106:6

community 76:2

compared 22:7 110:9
128:19

competitive 32:4

complete 19:22 102:14

completed 72:24

completeness 11:10 44:16

complex 52:16

complications 100:20

component 63:9,10

composition 85:5,7

computer 67:5

concern 74:9 80:6,14,15,16
81:7 82:1 84:24 116:21,25
117:1 138:14,17,19,22
139:1,9

concerns 60:7 76:1 82:3
105:2 117:8

concluded 80:21 125:19
140:7

concludes 139:23

concurrent 104:13

condition 59:3 100:10

conducted 42:5 63:22
104:19

conference 28:8,9 31:15,
18 103:3 111:17

conferences 28:1

confidence 104:16

confirm 86:18

confirmed 86:6

conflates 117:7

conflicting 104:7

conflicts 107:12,18,22
108:15

conform 128:21

confused 8:8

connection 65:6

consensus 29:13 81:2
86:12

consent 22:12,25 23:5

47:10,16,20 48:3,8 75:18,23
77:9,22 82:3 86:8,19 87:10,
14 88:12,22,23 89:11,20
90:18,22 92:8,16,23 93:1,6,
8,12,15,25 94:1 112:16,20
119:11 135:1,5 136:6,22
138:5

consented 87:11

consenting 93:14 117:5

consequences 115:15
117:8 137:4

consideration 92:6

considered 31:2 54:13
64:1 66:3 74:3 75:3

considers 107:19

constructed 94:2,4

construction 89:18

consult 57:15

consultation 28:3 30:25

consulting 26:1

cont'd 3:25 4:1

content 85:13

contents 124:23

context 59:19 113:9

continue 24:12 71:13 74:12
75:13 103:20 112:3,4,6
114:17,21

continued 84:15

continues 89:24

continuing 114:16

contracted 5:16

Contractors 102:12

contribute 124:14 125:8

contributed 126:2

contributors 124:20
125:25 126:5

control 135:23,24

controls 104:13

Dan H. Karasic, MD
7/13/2022 Index: controversies..Dimensions

controversies 108:8

controversy 111:21 116:6

convenience 11:7

conversation 79:19 86:15

conversations 91:16
113:24

converted 96:15

copy 11:7

Corporation 3:16 21:24

correct 34:3 42:6 50:2,4
51:21 62:4 90:19 96:14
133:11 134:13,21 135:13

correctly 6:18 29:10 33:10
98:1,15

cosmetic 72:16

costs 137:1

counsel 5:20,23 6:1 9:9,13,
25 10:3,10,18 11:1,16 21:12
22:4 27:16 34:23,24 67:21
68:8 106:19,21 140:2

counseling 57:20 58:7,14,
15 59:11,17,19 61:4 75:11

count 98:10,22 99:2,11

countries 105:14 113:14

couple 12:5 38:9,13 41:3
82:12,15 112:12 130:23

court 5:5,11 6:3,4 7:20 15:8,
20,21 16:4,23 17:12 27:16,
20 34:23 35:2 38:11 112:19,
22 123:17 126:9,17 140:2

cover 34:1

coverage 102:12,15,19
128:9

cream 43:11,13,18,25 60:20
95:19

criteria 33:19 55:4,19 61:7
66:14

criticisms 124:18

Cross 3:2 5:12,23 6:16
21:4,6

cross-sex 72:12 74:11 76:9
80:18,22 81:3,9,11,22,24
82:9 83:12,13 84:10,19
128:18

Crouch 13:1

curious 126:15

current 8:16 31:10 35:9
36:1 51:20 113:2

CUSTODIAN 78:20

CV 17:7 32:3 40:3,9,15,17,
22

——————

**D**

——————

Dan 3:7,13,14 5:4,10 6:7
24:22

dangerous 98:19

data 71:15 80:5,8,9,19
81:20 82:4,5,22 83:3
107:16,17 108:14,18,19
114:25 116:10 118:24
138:22 139:2,12

data's 138:25

date 92:10 101:18

dated 57:13 109:16 120:21

dates 45:10

de-transitioned 112:18

deal-breaker 90:4

deals 33:8

death 99:7

decades 108:21 122:21

December 44:11 92:10

decided 41:5,6

decision 4:6 15:6 77:6,13,
15 92:7 96:1 101:1,16
102:5,7 103:24 104:1,25
105:2 106:2 112:1,3,13
114:10,12 117:9

decision-making 78:4

decisions 77:7 93:6 136:25

decreased 99:15

defendant 17:17

Defendant's 8:24 17:20,22
22:1 50:21 56:16 61:17 64:9
76:15,19 85:14 90:9 94:25
95:3 101:11 106:11 110:21
119:17 120:16 123:2 124:1
133:4

defendants 131:4

defense 5:15 10:10 11:16

deficit 49:4 64:24 65:18

defines 108:18

definitive 132:13

degree 23:23 24:14 25:16
32:14,17,19 33:17 50:5,8,12

degrees 23:22 32:21

delay 70:17 71:18

Delphi 29:1,9,11,16,20
30:4,9 31:7

demand 132:1

demonstrate 104:22
128:12

demonstrating 128:20

density 80:4,7,8,11,14,25
81:16,21,23 83:5,11 96:10
116:10 138:11,13,24
139:10,13,14

dentist 123:16 126:6,11,12

Department 13:15 25:23

depend 60:4,5,6,8

depends 60:1 99:16 108:18

depo 127:12

deposed 12:1,2,4,6,8,12,
13,21 13:7,9 14:11 16:6
17:11 25:12

deposition 3:13 5:3,10,14
6:24 7:6,8,18,24 9:3 10:3
14:2,6,8 15:3 16:12,23
56:23 67:14,15,19 95:5
130:16 133:18 139:24 140:7

depression 105:23

Desantis 129:3

describe 53:7 65:9

describes 126:2

designation 40:24

designed 104:18

desk 65:12

detail 55:20 123:24 124:11,
24

details 13:13 99:10

determination 4:14 75:9
102:15,19

determine 97:9 102:12

determined 128:10

develop 99:13

developed 132:17

development 52:13 53:5
69:25 71:9,12,13,23 72:23
73:7,10,12,16,24 81:21
83:25 84:22

develops 74:7

diabetes 100:15

diagnosed 54:1,2,3,4

diagnoses 27:10

diagnosing 47:15

diagnosis 52:14 53:7 54:6,
8 55:8 58:25 65:16,23 66:9,
10,13,19

diagnostic 55:3,19 107:23

diagnostics 107:21

differ 97:14

difference 83:22 86:25

differences 104:23 105:18

differently 87:8

difficult 84:8 118:5

difficulty 103:12

Dimensions 26:6

Dan H. Karasic, MD
7/13/2022                    Index: direct..entirety

direct 115:6

director 116:3

directors 27:15,23

disabled 103:10,17

disadvantages 108:2,24

disagree 116:2,4

disagreed 31:6 103:4

disciplines 87:6

disclosed 10:10 37:21

disclosure 10:10,16 17:23
40:4 41:23 42:5 48:13 55:24
69:6 109:19 122:5

disclosures 37:10

discomfort 55:10 73:12
74:1

discontinued 70:22

discrepancy 73:14

discuss 68:7 69:10 79:20
94:12

discussed 14:5 15:1 16:11
31:21,24 45:15,24 46:4,9
72:2 78:10 79:6 90:17 91:19
92:6 95:5 96:10 113:11
116:12,21 137:5

discusses 55:24 116:23

discussing 104:3 133:14

discussion 46:12,14,19
47:2 53:25 76:11 77:14
78:2,3,9,13 79:12,14,15,21,
25 88:14 89:3,19 90:3 91:9,
10,12,23 113:19 116:6
124:14 137:10,11,12

disease 99:7 115:16 116:9,
11 117:12,17 118:25 133:16

disorder 49:5 64:25 65:18
102:16

dissipate 139:9

distinct 138:6

distinction 58:12,13,17
59:15 60:14 61:3

distinguish 58:6

distinguished 26:22 40:10,
12

distinguishes 58:9

distinguishing 52:24

distress 55:14

District 5:10,11

diverse 108:6

doctor 34:8 73:21

doctors 53:10,21 54:13,25
127:3

document 10:14 11:6,22
12:3 18:13 21:23 22:18
29:17 30:15 31:20 44:23
51:4 56:18 59:14 61:20
64:11,13 69:7 78:19 95:1
101:13,24 105:6 106:14,16,
18,19 107:2 110:23,25
111:2,3 115:4 125:11 127:2
129:15 137:2

documentation 46:22
78:13 91:25

documented 46:9 47:3

documents 10:2,16,21,22,
25 11:2,4,11 19:19,21 20:4
21:10 68:7 69:2 78:22 79:3,
4 94:22 130:10

Donovan 127:5,15 128:1

dose 86:4

doubt 40:20 89:25

draft 18:9,22

drafted 30:22,23

drafters 30:6

drafting 10:15 29:8

draw 22:10

drawn 61:3

Drew 17:7

DSM 27:10 55:15 58:25
66:14

DSM-5 55:3,8,18

duces 3:13

due 107:18 108:15 132:16
139:3

dues 40:25 41:4

duly 6:7

Dutch 80:20 82:7,10,13,22
117:21 118:6

dysphoria 4:10,14 47:10,
15 48:17 51:10 52:7 53:8
54:1 55:4,8,12,19 58:24,25
65:16,24 66:10,14,15,16,17,
19,22,23 101:1 102:17,21
105:22 106:25 107:11,18
108:15 111:4 121:8 123:9
133:22

_____

E

_____

earlier 74:20 103:6,18 105:9
136:7 137:13 138:9

earliest 73:6

early 43:2,15 75:12 92:3

easier 7:13 22:17

easiest 18:7

easing 122:2

Eastern 129:25

easy 7:12

edification 98:5

editors 28:24 29:18 30:25

educated 39:23

education 77:10,22

educational 23:18,20
37:18 39:13

effect 13:20 67:24 80:24
82:2 83:10 85:3 97:13
112:24

effective 112:20

effects 77:4,9 80:3 81:1
96:18 105:15 107:24 116:20
117:12 119:5 128:20
133:14,19,24 134:1 138:10,
13

efficacy 128:12

effort 123:25 129:1

elderly 103:9,16 118:21

Ele 9:22

elected 28:11

eligible 31:22

else's 89:25

email 68:23 130:12

emeritus 24:8

emotional 13:19

emphatic 92:3

employed 24:6,9

employer 40:16

employment 24:20

end 42:13

ended 29:18

endocrine 3:18 33:2,5,8,
11,15,16,18 34:2,11 51:7,8,
9,15,17,20 52:18 76:19
77:21 85:18,21 87:18,21
88:6

endocrinologist 86:11

endocrinologists 33:21
34:10,13 73:1 86:12

endocrinology 3:19 33:6,
8,17,23,24 34:12

engaged 13:18

enjoyed 130:19

enroll 114:23

enrolled 112:6 118:2

ensure 22:17 93:4

ensuring 96:9

entail 50:8

entering 116:16

entire 40:16 86:21 90:24
128:25

entirety 51:2

Dan H. Karasic, MD
7/13/2022                    Index: entitled..format

entitled 64:20

entity 134:20

entry 57:12

episode 114:6

equivalent 15:22 29:5
139:17

era 7:8,10

erythrocytosis 97:25 98:1,
12,17,19,24 99:14

ESG 88:4

essentially 13:19 25:13

estradiol 95:21,22 96:12,
15,19

estrogen 84:22 85:1 96:7
138:21

et al 3:2 5:12

Ettner 37:6,9,15

Europe 110:18

European 87:1,8 113:10

evaluated 56:4,9 77:13
93:4

evaluating 119:22

evaluation 4:2 20:24 49:11
64:15,19,20,22 65:1,14,15,
17,22 66:1

evidence 49:17 55:16 78:9
87:16,22,23 88:2 91:18 93:3
102:21,24 103:8 104:8
105:7,17,21 116:8,18
120:24 121:6,19 128:17
132:16

examination 3:8,9 6:12
55:21,23,25 131:1

examine 73:5

exception 118:6

exclusion 103:5,18 105:10

exhaustive 105:24

exhibit 3:13,14,16,18,20,23
4:2,4,6,7,9,11,13 8:2,24,25
9:1 15:11 17:20,21,22 18:16

21:21 22:2 41:10,22 50:22,
23,24 51:4,23,24 56:16,17
61:18,19 64:9,10 69:5
76:15,19 78:17 85:15 90:10
94:25 95:4 99:20 101:11,12
102:6 106:12,13 110:21,22
115:3,4 119:17 120:14,16
123:3,4 124:2 125:12,14
131:3,4 133:4 134:25 135:4

exhibits 3:25 113:16

Existing 120:23

exists 109:12

exogenous 139:9

expanding 120:3

expect 24:12

experience 53:4 54:10 84:1
122:19,20

experimental 128:22

expert 3:14 10:9 11:7,23
12:20,21 13:2,3,8 14:6,8,11,
21 15:2,17,24 16:5,7,13,17,
25 17:3,5,11,23 19:4,10
37:10,21 39:25 40:4,19
41:22 42:3 44:13 45:8 46:5
47:5 48:13 55:24 62:10
64:16,18 66:4,6 69:5,11
100:21 123:16 125:2,6
126:7,15,21 127:22

expertise 54:15 96:18,25

experts 37:6 110:17 111:13
128:14 129:10,11

explain 118:22

explained 136:14

explanatory 29:4

exploratory 104:11

extend 16:24 96:17

extensive 46:12,20 47:2
53:20 54:24 107:22 115:15

extensively 45:16,25 46:14

extent 27:5,22 49:3 70:16
87:1

extremely 52:16 68:5

F

facility's 20:19

fact 82:4 84:22 93:1 105:3
110:1,8 119:4 133:25
137:14

factors 60:4

faculty 24:4,7,11,17 25:7,
15,18,19 39:9,20

Fain 12:25 19:5

fairly 98:3 137:8

fake 129:11

familiar 33:2 36:20 37:1,3
51:12 126:18

family 3:21,23 20:17 34:7,8
36:25 42:19 53:10,12,18,19,
21 54:13,20,21,22,24 61:23
62:4,9 63:14

faster 135:6

fat 85:5,7,12,13

father 137:14

February 4:11 120:21
132:20

feed 90:6

feedback 65:4,7

feel 7:24 8:9 77:7 125:20

fellow 26:22 39:21 40:11,12

fellowship 24:3 26:16,17

female 72:22 85:9 99:5

females 97:15

Feminine 39:5

feminizing/masculinising
132:15

fertile 74:4 75:3,7,10 88:20
116:17

fertility 46:24 74:7,9,15,24
75:4,15,19,24 76:3,10 77:4,
8,15 78:4,11,14 79:7,12,22

field 10:20

finalized 19:17

financial 137:1

find 129:10 135:6

fine 8:7 15:12 17:25 35:23
41:15 94:13 135:7

finish 7:25 8:1 38:8 108:11
111:17 127:9,17

finished 29:8

Finland 4:8 106:20,22,23
108:5 109:15,23 110:16
111:11 129:18 134:21

Firwood 5:18

five-minute 41:11 129:24

flag 7:25

Florida 4:13 123:8 128:10
129:5,8,19,21

focused 26:3 33:7 63:10
66:3 82:18,20 106:8

follow 61:7 86:16

follow-up 63:22 82:15
130:23

follow-ups 81:24

Folwell 12:25

Forest 17:8

form 16:1 20:6 25:4 27:7,19
28:16 30:12 35:1 46:2,13,21
47:24 50:9 53:9 58:1 60:21
61:10 62:3,6,12 68:25 69:21
70:8 71:11 74:6 76:5 78:5
81:14 88:11,23 89:1,11,18
90:22,24 91:7,14 92:9,16,
21,25 93:15,17,19,20,21,22,
23,25 94:2,4 96:11,24 97:11
100:16 110:13 113:15
115:25 120:11 125:15
135:1,5 136:6 137:8,10
138:1,7,18 139:11

formal 26:11 102:14

formally 77:13

format 15:3

Dan H. Karasic, MD
7/13/2022

forming 62:10 64:16,18

forms 138:2

forward 107:20

found 14:18 129:11

foundation 99:9

Fox 37:20,22

fracture 83:20

fractures 117:25 118:4,11 119:10 139:2,3

frame 22:6

Framingham 99:11

Framington 99:4

Franciscan 20:10

Francisco 5:2 8:18 13:14, 15 24:5 25:23

Frank 37:20,21

fraught 115:14

free 7:24 125:20

frequent 8:6

front 11:4,6,22 15:25 16:10 67:2 125:12 136:3

fulfill 55:3

fulfilled 55:18

full 11:19 32:7,11,16,22 44:22 102:10 104:3 107:2 115:6 118:3 119:14 134:15

full-time 24:9

fully 77:8 93:5 122:16

function 139:1

future 77:15 137:1

fuzzy 136:13

### G

GAPMS 128:21

gaps 132:16

Garza 20:10,12 54:5 79:9

gather 112:10

gathered 103:21

GD/GENDER 52:15 86:6

gears 83:23

gel 58:4

gender 4:9,14 26:9,10 33:9 34:11 38:25 47:10,15 48:17 51:9 52:7,12 53:5,7 54:1 55:4,8,11,19 58:24,25 63:1 65:16,23 66:10,13,14,15,17, 19,21,23 77:2 86:18 87:1,2, 8 97:17,23 101:1 102:12,16, 17,19,21 105:22 106:25 107:14,18,21 108:15 111:4, 9,25 113:21 116:3 121:7 123:8 133:21 139:17

gender-affirming 47:12,21 48:19 77:16 103:22 105:15 108:22 110:5,6 112:11 132:22 139:15

gender-care 114:14

gender-dysphoric 132:5

gender-nonconforming 39:7

gender-related 13:4,23 20:4 26:5 33:7,11,13,14 38:2,6,21 69:12 107:12 113:4,13 117:18

general 13:14 65:25 77:4 81:2

generalists 54:14

generally 4:13 34:13 138:23

generating 104:12

generic 137:8

genital 72:17

GID 102:16

GIDS 131:20

give 8:5 22:5 31:14 36:10 86:7,19 99:18 119:14

giving 48:7

Glass 17:8

goal 63:4

goals 62:23,25

Gonzalez-pagan 3:9 5:25 6:1 9:14 11:9,18 16:1 18:11, 18 19:3 20:6 21:19 25:4 27:7,17,18 28:16 30:12 34:21,24 35:1 38:7,16 41:14 44:15,21 46:2,13,21 47:24 50:9,11 53:9 60:21 61:10 65:5,11 67:4,8 68:13,25 69:21 70:8 71:11 74:6 76:5 78:5 81:14,19 88:11 89:15 94:11 96:11,24 97:11 98:2 99:8 100:16 105:5 110:13 113:15 115:25 120:11 125:15 130:22 131:2 134:3, 4 135:3,9,13,17,20 136:1,5 139:6,19 140:1,6

good 5:22,25 6:14,20 16:24 41:11 47:8 59:4 109:2,12

government 28:4 122:8,12, 14

governmental 134:20,22

governments 28:4

Governor 129:3

grade 87:24

grades 88:5

grading 87:16,22,23 88:2

gradually 86:4

grandstanding 129:9

great 7:3,17 8:4,12,16 9:3 10:13 11:20 17:14 18:7,20 22:25 23:9 56:2 57:4 67:11, 17,23,25 94:19 95:3 107:9 108:19 127:10 130:21 135:9

greater 55:20

Green 39:4

grew 29:14

ground 7:9

group 30:22 37:1 48:25 77:12 82:13,23 99:5 103:1 106:6

groups 33:25

growing 132:1

growth 95:21 96:5,9,20 97:1 139:16

GRS 104:23

guardians 115:20

guess 28:22 40:14 45:21 70:14 92:4 97:2 99:12 100:8 107:1 124:17

guessing 94:9

guideline 3:18 4:9 86:16 115:24

guidelines 51:8,11,12,18, 20 52:18 53:6 76:20 85:19, 22 86:21 87:18,21 88:6 115:3,7 128:9

### H

half 36:7

halfway 62:12

halt 112:20 113:4

halted 76:8

halts 74:10

Hamburger 9:22 12:24

hand 7:25

handwritten 4:3

happen 84:5 99:16 116:13 117:25

happened 64:1 70:12 114:7 139:13

happening 93:11 114:1

happy 22:16 45:7 125:21 135:22

hard 22:15 98:4 131:20

harmful 98:23

Harrington 137:20

Hatfield 20:12 36:20 42:23 45:15,24 46:4,8,24 47:1 48:25 54:2,7,9,17 56:8,14

57:17 73:4 78:2,6,10 79:6,9
86:15 91:11 95:8,12 96:2

**Hatfield's** 46:18 48:23

**Haven** 23:25

**head** 7:19 35:14 87:25
111:24 113:20 114:3

**health** 10:20 19:23,25
20:10,14 25:23 26:1,9,13,
14,18,25 28:18,19 31:14
32:8,10,11,12,17,25 34:11
37:19 39:12,13 46:23 47:14,
23 48:2,8,17,18,24 49:1
50:16,18 52:8,11,22,25
53:2,3,11,15,20,21 54:9,13
55:2 56:4,9 58:7,8,10,14,22
59:2,8,16,17 60:7,25 61:4
77:11,23 78:3,6 82:9,16,25
83:18 87:7 96:13,19 106:20,
22 108:6 111:12,16 124:15

**health-related** 32:8

**healthcare** 28:2 37:19
53:15 57:20 59:11

**healthy** 83:15

**hear** 29:9 34:25 91:15

**heard** 6:14 124:18 128:1
131:13,14

**hearing** 66:25

**helpful** 122:24 124:9

**hematocrit** 99:5

**hesitate** 35:21

**hide** 44:24

**high** 98:10,22

**higher** 112:22

**Hilary** 119:18 131:5

**hip** 117:25 118:4 119:9

**history** 48:17,21

**HIV/AIDS** 26:19

**hold** 35:23 38:8,12 110:20

**Holland** 82:17

**hormonal** 4:9 75:14 107:13

**hormonally** 97:1

**hormone** 60:19 74:24
75:21 77:2,5,9 83:2 84:15,
17 86:1 96:4,8 114:14
133:15

**hormone-blocking** 80:17

**hormones** 70:11,24 72:6,8,
10,13 74:11 76:9 80:18,22
81:3,9,11,23,25 82:9,24
83:12,13,14 84:10,20 97:22
114:21 119:1 128:18
132:15,23 133:20,23 138:15
139:7,16

**hospital** 4:10 111:5,8
133:6,10,13

**hour** 8:5 41:12 66:24 94:5

**hours** 42:14 50:13 94:9

**human** 15:7,8,21 16:10

**HUS** 107:15,22

**hyperactivity** 49:5 64:24
65:18

**hypothesis** 104:12

---

**I**

**I-TO-V** 72:20 73:2

**i.e** 104:11

**ICD** 27:10

**identification** 8:25 17:21
21:21 50:23 56:17 61:19
64:10 78:17 101:12 106:13
110:22 120:14 123:4

**identified** 104:17

**identify** 5:20 36:1 37:25
97:24 127:16 128:15

**identity** 38:25 97:17 102:16
107:15,18,21 108:15

**II** 70:20,23 72:19,21 73:11,
25 74:3,10 75:1

**Illinois** 3:2 5:13,24 6:16
21:4,7

**illness** 60:25 61:1

**image** 105:22

**imagine** 31:18,19 125:3

**immediately** 69:24 70:4
71:4,7

**imminently** 31:13

**impact** 66:9 69:18 74:23
76:3 79:22 81:16 82:6,8,18,
20 83:3 91:20 118:4,11

**impacted** 113:12

**impacts** 75:19,24 78:11
79:6 83:4,25 85:4 117:20

**impetus** 73:20

**implant** 84:13,14

**important** 7:10 52:8 60:11
76:11 96:8 97:8,12 100:18

**impression** 59:13

**impressions** 83:7

**improve** 95:21

**improved** 105:22 120:7

**improving** 120:3

**in-court** 16:16,20

**inartfully** 46:17 65:20

**include** 20:9 52:22 77:10,22
78:2 82:25 86:16 89:13
95:20 104:13 109:18,24
110:10

**included** 13:7 110:1 111:17

**includes** 11:17,19 54:22
110:17 137:9

**including** 14:13 46:23 49:2
60:20 110:18 128:13

**inconclusive** 102:22,24
103:8 104:9 105:7 121:8,12,
13,17,21

**incongruence** 52:8,15
86:6,18 121:7

**increase** 99:2 119:9 139:15

**increased** 99:6 115:17
116:8,18 119:1 133:16

**increasing** 86:4

**incredibly** 131:20

**indefinitely** 41:7

**independently** 50:19

**indicator** 72:24

**indicators** 60:10

**individual** 90:4 115:19
124:4

**individualized** 61:9

**individuals** 19:12 52:7

**infants** 90:7

**infection** 99:7

**infertile** 74:4

**infertility** 115:17 116:12
133:16

**influence** 84:21

**information** 61:14 77:3
89:13 103:21 104:18 107:23
108:2,20,24 109:1,3 112:10
122:22,23

**informed** 47:10,20 48:7
75:18,23 76:7 77:5,9 82:3
86:7,19 88:22,23 89:11,19
90:18 91:4 93:1,5,11 94:1
115:21 119:11 134:25 135:5
136:23

**inhibiters** 119:8

**initial** 54:6,8 73:4 112:19

**initiated** 70:1

**initiating** 65:2 86:3

**initiation** 65:23 70:10 81:11
107:12

**injection** 44:5

**injections** 43:19,24 44:3
58:5 60:20

**injured** 13:15

**inside** 28:2

**instances** 16:3,12,15

**instant** 67:1,20

Dan H. Karasic, MD
7/13/2022

Institute 24:2 38:23 111:25
113:21 116:4

insufficient 128:12

insulin 100:14

insurers 128:9

intake 62:3,6,12 63:10

interest 79:24 80:1 119:4

interesting 122:23

interface 32:9

interim 120:2,18 121:11,14
122:4,14

internal 33:22 54:15

international 28:3

internationally 121:9

interrupt 38:17

interrupted 127:17

intervention 45:16,25 46:5
119:6

interventions 46:10 55:7
77:9 118:23 120:5 122:10

interview 42:5,11 46:25
47:1 49:10 55:17

introduced 113:22

introducing 22:1

investigation 104:12

investigational 128:22

involve 13:23

involved 12:8 17:15 19:4
25:11 27:9,11 28:24 29:20
30:19 106:4 112:25 123:13
124:13 126:20 127:23

involvement 27:3,5,22
28:14 64:1

involves 28:18

irreversibility 69:10

irreversible 69:13 72:2,4,
14,17 81:13 86:2 115:15
128:16

Issaquah 5:18

issue 84:6 139:3,4

issued 100:25

issues 13:4,24 20:4 27:25
33:7,11,13,14,15 38:2,6,21
83:18 104:15 129:6

issuing 102:18

IX 102:7

_____

J

James 126:6,7,12 127:19

Jeffrey 23:6 36:22 57:9

join 112:9

joined 12:24 27:8

Journal 3:19

judgment 88:9 89:11

July 3:3 5:1,8 9:11,12

June 4:13 10:11 95:9

justify 123:21

_____

K

Kadel 12:25 19:5

Kaiser 109:7

Karasic 3:7,13,15 5:4,10
6:7,14,18 8:16,22 10:7
11:10,17,21,25 12:11 15:16
17:10,19 18:21 21:10,22
22:16 23:17 24:22 27:21
33:1 35:8 38:8,20 39:24
41:21 44:22 45:7,21 48:12
49:7 50:20 52:4,17 53:3,24
55:3 56:3 59:23 60:18 61:2,
16,25 63:3,11 64:7 66:4,24
67:12 68:19 69:11 72:18
76:13 77:18 78:18 80:3
85:14 86:9 90:8 91:15 93:3
94:5,19 95:7 98:1,9 100:23,
24 101:17 102:9 104:24
106:1,10 108:4 109:15
110:19 112:13 115:23
117:10 119:16 122:13,16

123:1 124:17 125:10 127:8
128:4,23 129:23 130:9,18,
23 131:9,11 132:3,9,19
133:3,19 134:7,9,24 136:5,
12 138:9 139:19

Karolinska 111:25 113:21
116:3

Keira 112:18

Kevin 36:20 128:1

keynote 111:15

kind 10:22 19:7,9 29:2,16
38:12 52:22,24 68:1 80:8
81:21 82:5 84:9 90:4
129:13,14

Kingdom 132:6

knowledge 35:25 40:1,5
51:19 77:13 109:13 133:8
134:7

Kurt 5:15

Kyllo 23:6 36:22 57:9,16
59:10

_____

L

lab 97:8,9,12,14,18 99:21
100:1,3

labels 72:5

Lack 99:8

Lambda 6:2 19:6,10,12,16

Lappert 126:20 127:5,14,22

large 29:14 52:21 110:1

largely 33:21

larger 22:13 28:23 30:15

late 27:9

law 32:10

lawsuit 12:8,9 114:4

lawyer 68:1

lawyers 32:9

layman's 74:17

LCSW 49:24 50:5,12

lead 28:17,21 29:4 30:24

leading 119:21

leave 15:15 99:12

led 30:24 111:12 126:5

left 71:8

legal 6:2 9:19,25 19:6,11,
13,17 40:19 112:24

letter 20:14 49:24 60:16
61:14 62:17,19 63:1,3,19

levels 95:12 96:22 99:5
100:20

LGBT 129:6

LGBTQ 26:15

licensed 50:7,15,17

life 26:22 40:12 104:19
107:25 139:5

lifted 103:4,18

limited 107:19 108:16,19

Lindgren 4:10 111:5,8,19
113:23 114:8,10,23 115:3
133:5,12

lines 25:14

link 30:20

list 12:3 19:22

listed 9:8 12:20 40:3,22
62:25 82:2 91:13 124:4
128:15

lists 116:5

literally 65:6

literature 20:3 83:6 128:8

litigation 13:18,20 17:15
25:11

live 16:15,19,23 131:19

local 102:11

located 8:20 25:3

lodge 38:9

long 80:7,16 81:8 112:2

118:17 122:1

**long-range** 80:19 81:4

**long-term** 81:4,24 82:6,7,8, 15 83:24 85:4 117:19,22,23 119:5,9 138:19,22

**longer** 40:24 41:4 112:23 113:3 114:13

**longitudinal** 118:17

**looked** 36:11 83:1,8,9 123:12 126:2,4

**Los** 23:24

**lose** 88:25 89:14 91:5

**lost** 134:2

**lot** 103:11 109:1

**low-income** 129:7

**lower** 45:4 80:11 84:25 100:19 121:1

---

**M**

**M.D.** 3:13,15

**MA** 4:2

**made** 17:23 61:11 101:5,7, 16 110:8 112:2,3 125:11,24 136:25

**majority** 104:10

**make** 6:20,24 7:21 8:10,14 10:8,13 11:13 30:5 33:10 48:15 52:14 53:14 56:2 58:9,23 77:5,7 81:6 84:11 93:5 98:14 102:14 107:3 120:6,8 124:7 135:5

**makes** 58:17 115:18

**making** 48:10 66:13 89:20 92:7 96:1 126:21 132:20

**male** 80:10 84:24

**males** 87:18 88:3 97:14

**management** 121:6,20 122:2

**maneuver** 123:22

**manner** 139:9

**March** 42:6,16 79:19

**mark** 41:12 66:24 94:5

**marked** 8:23,25 17:20,21 21:21 22:1 50:21,23 56:16, 17 61:17,19 64:8,10 76:14, 15,18 78:17 85:22 90:9 94:25 101:10,12 106:11,13 110:20,22 119:17 120:14,15 123:2,4 124:1 133:4

**mastectomy** 23:7 44:6 87:14 88:3,22 89:3,7,12 90:19 91:5 92:9,17 137:5

**master's** 50:12

**material** 21:6

**matter** 5:12 34:1 133:24

**maturity** 88:8

**MD** 3:7 5:4 24:22

**meaning** 16:23 129:20

**means** 30:9 40:24 50:12 81:11

**meant** 51:13 92:22 93:24 105:20

**meantime** 118:22

**measure** 84:9

**Medicaid** 4:13 100:25 102:18 123:8 128:10 129:8

**medical** 3:20 4:13 20:3,7,8, 9 25:25 36:19 42:15 46:8 47:4,12,21 49:12,16 53:25 54:5 55:16 56:20 57:6,9 59:3,10 64:3,6 66:10 73:8, 15,19 76:2 78:1,10,22 79:5 86:5,14,17 87:2 89:8 91:18, 25 93:4 98:9 110:2 134:4

**medically** 66:23

**Medicare** 100:25 102:11, 17,20,22 103:8,11,12,15,22 104:9 105:1,4,8,11 106:9

**medication** 56:5 95:16,18

**medications** 48:22 97:4

**medicine** 23:25 33:22 34:7, 9 53:10,19,21 54:13,15,20, 21,22,25

**meet** 111:18

**meeting** 9:22,24 42:16,22 43:22 48:9 49:13

**meetings** 9:8,10,18 39:15

**member** 26:20,23 27:4,8 28:15,17 31:22 32:6,7,15,16 33:16,18 34:11,17,20,22 35:3,4,6 39:10

**members** 9:19 30:10,18 32:1,11,13,20,22 77:12 106:4

**membership** 31:22,24,25 32:23,24

**memo** 4:6 101:1 104:1 106:2

**men** 75:6 83:19 100:8 118:13,14

**mental** 20:14 25:25 26:13, 14,18 28:18 31:14 47:14,23 48:1,16,18,24 49:1 50:16,18 52:8,11,22,25 53:2,3,11,15, 20,21 54:9,13 55:2 56:4,9 57:20 58:7,8,10,13,14 59:2, 8,11,16,17 60:7,24,25 61:1, 4 77:11,23 78:3,6 86:7,19 107:24 111:12

**mention** 48:23

**mentioned** 13:8 14:10,25 15:17 17:9 25:1 26:16 72:18 74:23 76:1 118:9

**message** 67:2

**messages** 67:20

**messaging** 67:1

**met** 42:23 49:17 64:5 131:24

**metabolic** 100:15

**Metabolism** 3:19

**Meter** 127:4,14 128:2

**methods** 106:25 107:11,24 128:15 136:16

**MGDLS** 87:17

**MHPS** 86:5,17

**middle** 42:13 44:19 56:24 95:8

**mind** 34:15 132:12 135:17 136:2,20

**mine** 12:7 13:14,18

**minor** 6:23 48:6 83:23 85:3 88:13 92:24 93:9,13,16 123:18 138:5

**minors** 4:9 36:6,8,12 59:24 82:19 83:4 93:24 106:25 107:12,19 108:10,15,22 110:7 111:4,20 112:11,16, 21 113:5,13 114:15 115:20 116:19,25 117:14,19 119:22 122:9 126:16 138:3

**minute** 6:15 35:9 69:15 72:18

**minutes** 41:14

**Mischaracterizes** 89:16 105:6

**Misrepresents** 113:16

**mixed** 80:5,9 118:24 138:25

**Mm-hmm** 91:17 103:25 114:11

**modified** 31:8

**modify** 30:3

**moment** 23:19 34:23 134:2

**money** 25:7

**monitoring** 107:13

**Montezuma** 8:18

**months** 55:13 58:5 92:14

**Montreal** 31:15

**morning** 5:22,25 6:14

**move** 45:2 127:23 129:4 132:8 135:5

**moved** 45:3 52:24

**moving** 81:3 84:9 107:19

multi-professional 107:20

multidisciplinary 86:5,17, 23,24 87:5

muscle 85:12

myocardial 99:7

_____ N _____

names 9:20 12:22

national 102:15,18

nationally 121:8

nations 128:10

nature 113:16

NCD 102:19

necessarily 90:3 91:8 116:15 117:1 121:20

necessity 66:11

needed 131:19

negative 104:8

Nelson 6:4

Neuropsychiatric 24:2 38:23

neuropsychological 65:25

NHS 120:8

NIMH 24:3

non-expedited 140:3

non-longitudinal 104:10

non-specific 104:21

nonvoting 32:24

normal 96:9 97:10,18 99:19,24 100:4

Northern 109:7

Northwest 5:17

note 48:24 57:12,15 95:7, 11,17 103:4

noted 104:15

notes 4:3 79:8 99:21

noticed 5:14

noting 103:15

November 3:18

number 5:19 19:21 20:1 27:25 35:24 37:24 57:2 105:23

numbered 132:10

numbers 35:13,22 36:10 56:23 57:1

numerous 128:13

nursing 14:17

_____ O _____

oath 7:3 35:21

Object 28:16 30:12 53:9 60:21 78:5 88:11 110:13 125:15 138:18 139:11

objection 16:1 20:6 25:4 27:7,17,18 34:21,24 35:1 38:10 46:2,13,21 47:24 50:9 61:10 68:25 69:21 70:8 71:11 74:6 76:5 81:14,19 89:15 96:11,24 97:11 99:8 100:16 105:5 113:15 115:25 120:11

observed 114:25

obtained 24:14

obtaining 61:13

Occidental 23:24

occurred 81:17

offering 96:21,25 97:3

officer 13:16

Ohio 17:3

older 87:9,13 89:24 116:11

Omar 5:25 18:16 19:3,4,8, 12,16 41:9 65:3 67:6,16

one-third 36:12,13,14

ongoing 119:21 133:1

Ontario 15:4,7,22

opinion 10:21,22 14:21 55:7,9,18 56:3 58:13 62:10 64:16,18 66:12 69:12 88:7 96:21 97:4 125:9

opportunities 39:22

opportunity 30:3 31:7 102:2

opposed 83:19 97:24 118:14 123:14 126:23

order 112:8 114:22

orders 140:2

organization 28:7 33:6,20 34:5 110:9

organizations 26:21 28:4 34:19 53:14 110:2

organized 28:10 39:10,11

organizing 28:1

original 31:4 106:3,7 109:21 110:10 120:4 122:17 125:1

originally 30:23

osteoporosis 115:16 116:9,11 117:13 133:16 138:22 139:4

outcomes 120:5

outweighs 117:1

ovarian 100:11

overlap 33:25 84:18

overlapped 24:3

overlaps 19:24

_____ P _____

P.'s 20:8 23:11 36:19 42:10, 12,15 43:2 45:10 46:10 53:25 55:16 86:14 87:11 90:18 91:19,20,22 92:7,18 95:12 137:14

P.-specific 20:21

p.m. 94:16 129:24,25 130:6

139:24 140:7

Pacific 68:11 129:25

pages 3:13,15,17,19,22,24 4:3,5,6,8,10,12,14

paid 24:13

pair 126:5

panel 39:17 44:17

paper 11:7,21 29:5

papers 9:8 20:1

paragraph 18:9 42:4 45:8, 13 47:5,8 48:12 51:25 52:4, 18 57:20 66:5,8 76:16,25 77:1 85:22,23,25 102:10 103:14 104:3,4 105:2 107:5 115:7,9 116:1 121:4 125:20, 21 128:6,7 129:20 131:12 132:10 136:13

paragraphs 69:7,9

parent 23:15 89:23 90:6 92:23 93:2,9,12,14 94:1 138:2,5

parenting 90:5

parents 42:10,12 45:17,20 46:1,10,15,20 48:7,9 63:25 76:7,12 77:10,23 79:7 87:11 88:12 91:22 92:7,18 137:6

Park 17:8

part 9:22 24:16 30:13 34:4 42:10 45:4 47:9 48:1 49:22 52:21 54:12,16 59:4 60:9 63:6 78:25 79:3 81:7 89:3, 19 90:3 91:9 103:1 107:10 114:20 119:12 120:25 124:19,20 125:23

partially 45:1 72:5,7 81:13, 15

partly 86:2

past 25:2

patient 12:6,7 13:13,18 23:10,12 25:10 47:17 48:5,9 60:1,9 69:24 70:3,15,16,18 71:1,4,19 76:6,12 88:24 89:13 90:5 93:17,23 94:2

**98:20** 99:13,15 100:19 115:19

**patient's** 48:3

**patients** 26:2,15 35:12,18, 20 36:1,4,5,7,14 37:25 47:10,19 80:22 82:16 99:17 112:8 114:22 119:13 127:6, 15

**pause** 38:19

**paused** 70:13

**pay** 40:25 41:4

**paying** 105:10

**payment** 103:19

**PCOS** 100:11,13,19,22

**PDF** 22:11 132:9

**pediatric** 33:24 72:25

**pediatrician** 34:9

**pediatricians** 72:25

**pediatrics** 33:23 34:10 54:15

**pedophilia** 123:17 126:8,13

**peer** 39:18

**peer-reviewed** 133:8 134:18

**peers** 39:23 71:20,22 74:20 80:13 122:20

**people** 26:12,18 29:20 30:1, 19,24 31:3,5 32:2,11,21,24 33:21 34:4 39:1 51:9 60:12, 24 66:16,20 71:16,18 72:22 73:1 74:13 75:11 80:8,10, 15,17,20,22 81:3,22 82:4,6 83:9,11,13 84:2,3,6,24 85:8 87:6 90:6 97:19 103:10,11, 12,17,22 105:21 106:4 108:3,25 111:17 112:4,5 116:12,13 117:4 118:1,7,12, 18,23,25 119:10 121:7 122:11 123:20 124:4,13 126:24 127:1 129:7,8,18 139:3,4,13,16

**perceived** 55:11

**percent** 30:2 31:2 99:22,25 109:6,11

**perfectly** 8:7

**perform** 23:6

**period** 43:16 70:6 80:25 84:7

**permanent** 128:20

**persist** 75:4

**persisted** 55:12

**persistence** 86:6,18

**persistent** 55:10 58:24

**person** 7:13 13:20 48:24 58:23 71:14 89:9,20 95:25 112:17 126:25 131:23

**person's** 76:10 97:17

**personal** 131:24

**personally** 17:14 112:25

**Persons** 77:2

**pertaining** 133:5

**pertains** 133:10

**Phd** 4:2 49:21

**phone** 5:19 68:23 130:12

**photograph** 115:13

**physical** 128:16

**physically** 80:12

**physician** 12:14 13:10,17, 22 16:14,17 25:2,12 64:21 97:9 100:19

**physicians** 24:23 36:16 53:13 97:22

**picked** 7:20

**picture** 118:3 119:14

**PLA** 3:21 4:2

**place** 5:6,17 81:22 82:5 87:20 91:16 137:12

**places** 108:7

**plaintiff** 6:21 14:22 17:15 20:5

**plaintiff's** 10:3,17 11:1 21:12 22:4 37:5 57:4 67:21 68:8

**plaintiffs** 6:1,21 90:12

**plan** 31:17 63:7

**playing** 129:5

**plugging** 94:7

**point** 36:10 43:18 53:14 57:21,23 72:7 74:4 75:3 81:12 82:23 92:12 129:19

**POL** 3:16 4:5

**police** 13:15,16

**policies** 21:9

**policy** 110:15

**political** 114:3 123:14,21 124:16 126:23 129:4,9

**politics** 129:5,21

**Polyclinic** 3:16,21 4:4 20:11 21:11 22:3,7 36:17 57:10 78:23 90:10 95:4 135:11 136:7

**polycystic** 100:11

**polycythemia** 98:21,25

**poor** 128:15

**population** 102:22 103:9 104:9 105:1,8,11 106:9

**portion** 42:13 45:2 61:5 77:20

**position** 80:1 109:24 110:8 115:21

**positive** 104:7,14

**potential** 75:18 77:8 82:2 104:15 116:20 117:7 119:5 134:1

**potentially** 115:14

**practice** 3:18 12:7,15 24:15,17,19,21,24 25:3,5,6, 7,14,15,18,19,21,25 35:9,11 36:16 37:1,24 51:8 59:23 60:23 87:4

**precocious** 71:17 74:14,18

**predominantly** 84:25

**prefer** 94:7

**preference** 86:22 94:8

**preliminary** 104:11 131:5

**prepare** 9:6 18:22

**preparing** 10:15 18:25 19:14,19 21:4

**prescribe** 95:15 119:13 133:25

**prescribed** 43:17 95:23

**present** 9:17 28:14 42:10, 12 79:15 87:5 117:13 129:14,16

**presentation** 73:4

**presenters** 39:17

**presents** 74:25

**pressure** 114:4

**presume** 112:23

**pretty** 67:17 92:2

**prevent** 100:20

**previous** 29:12 30:16 126:21 127:18

**previously** 12:1 13:9 16:11 21:16,17 22:8 25:1 26:16 37:13 56:20 57:6 71:8 76:15,18 78:23 90:9,17 95:5 96:10 101:25 102:2 113:22 125:13 133:3

**primarily** 96:4,6 103:9 138:14,17,19

**primary** 10:22 11:2 24:19 30:6 52:23 53:1,16 97:22

**principal** 5:17

**prior** 14:18 19:7,10 27:19 36:19 42:15 49:18 54:12 59:11 60:19 62:6,9 64:17,18 65:1,22 66:1 79:21 91:4 104:13 125:14

**Pritchard** 3:2,16,23 4:5 6:22 61:25

Case 1:23-cv-00864-LCB-LPA   Document 182-1   Filed 12/03/24   Page 54 of 61

private 24:15,19,21,23
25:3,5,6,14,17,20,24 35:9,
11 87:4

problem 81:4

procedure 88:3,24 92:17
136:14,17

procedures 45:10,11 69:16
108:2,24 128:19 136:16
138:3

proceed 71:22 72:10
109:22 122:15

proceedings 5:5 12:24

process 29:15,16 30:5 31:8
32:4 47:9 59:7 71:6,12
75:18,22 107:23 119:22

produced 90:11

production 11:16 70:10,23
138:14

Productions 5:16

professional 4:13 26:20,24
32:8,18 33:5 34:19 47:14,23
48:2,8,18 49:2 50:17,18
52:11,25 53:1,4,14 54:10
56:4,10 58:23 89:11 110:9

professionals 32:12,25
52:22 53:11,22 54:14 77:1,
24

professor 24:8

program 111:25 114:3,5,6,
19,20 116:3,16

programme 132:18

progress 57:12 70:24 95:7,
11

progressed 83:11

progresses 132:18

progressing 74:13 76:9

progression 73:15 74:8

Project 26:10,13

projects 37:18

pronouncing 6:17 97:25
98:15

proper 88:23 97:1

proposed 136:18

proposition 41:7

protocol 77:10,22

provide 10:2,17,25 47:10,
20 63:1 83:6 104:17 114:13,
17 120:9 121:21,22,24
132:13 138:5,6

provided 10:5 11:11,13,16
14:8,21 15:2 16:7,12,15,19,
21 17:1,10 19:9 20:7 21:12
22:4 28:3 37:10 48:11 53:16
87:4 97:5 123:21 125:2
126:8,9,16 128:14 133:21,
23 138:16 139:8,13

provider 76:11 78:3,7

providers 28:2 37:19 52:23
53:1,2,15 79:21,25 91:19

providing 13:3 14:2,6 28:1
55:1 63:5 87:9,13 88:12
111:20 112:4 120:5 131:22

Province 15:4,7

provinces 15:8

provision 21:8 26:4 111:8
113:4,13 132:21 133:20
139:6

provisions 90:22

psychiatric 26:23 34:6
35:5,6 39:14,20 40:11,13
48:22 110:3

psychiatrist 25:22 26:6
34:7 39:4 49:14,25 60:23
86:10 95:25

psychiatrists 39:19,21
41:5 53:17

psychiatry 24:1,8,14 25:16
38:22 54:16

psychological 4:2 20:24
35:3 52:2,6 64:15 65:14,21
110:4

psychologist 49:18 50:3
64:20 65:1 111:18

Psychology 34:18

psychometric 104:21,23
105:19

psychopathology 52:14
53:6 54:11,18

psychotherapists 59:7

psychotherapy 58:8,11,
16,18,21 59:6,18,21,24
60:10,13,15,19

pubertal 69:25

puberty 43:4,9 57:23 69:17,
18 70:4,6,9,11,12,13,15,16,
18,19,21,24 71:1,2,7,8,10,
12,13,14,16,17,18,19,21,22,
24 72:9,10,21,22,25 73:1
74:2,8,12,13,14,16,19,20,21
75:1,5,9,12,17 76:8 78:11
80:3,6,11,15,23 81:8,17
82:19,24 83:4,24 84:2,3,6,
14 85:1,3,8 88:15,19 112:5
114:13,21 116:16,17 117:24
118:7,18 128:18 132:14,22
138:10,13 139:7,14

puberty-blocking 56:5

public 25:23 31:17

published 104:6

publishing 82:23

pull 22:13 78:15 135:7

pulled 119:18

pulling 18:1

purely 129:4

purpose 62:20 65:19

purposes 133:24

put 30:1 112:20

puts 73:24

Q

qualifications 23:18 39:24
40:8

qualified 56:4,9 77:7

quality 104:2,19 107:25

Quentin 128:2

question 7:19 8:8,13,14
16:24 18:22 34:16 36:24
38:8,19 45:21 46:17 52:19
53:23 65:21 85:2 87:19,24
97:3 121:12,18,22 127:9,13

questioning 8:1 108:10

questions 41:10 68:1
127:21 130:18,24 137:14
138:10 139:20,21

quick 31:21 41:11

quickly 98:3 131:21

R

raise 7:24

raising 127:21

range 87:17 97:18,23 99:19,
25 100:1,3,5,7

ranges 97:8,14,21

rare 119:10

rate 109:6

rates 83:20

reached 41:3 71:20

reactive 114:8

read 10:19 34:15 45:14
52:4,17,20 59:13 76:25
85:25 91:3 102:9 104:4
107:5,8 115:13 121:4,14
123:23 124:23 126:4 127:19
128:7 131:12 136:13 140:1

reading 19:23,25 80:9
107:1 132:12 136:20

real 112:1 129:10

realize 136:15

reason 18:4 36:10 62:13,15
89:8 109:21 110:10 124:25

reasonable 89:2

reassignment 101:2
102:13,20 128:11

Dan H. Karasic, MD
7/13/2022

recall 12:23 13:21 14:1,15 17:4 20:11,23 21:7 24:11 43:21 51:17 62:7 63:24 64:2 79:5,14 80:9 91:21,24 93:8 131:6 133:6,14 134:9,10,24 135:4 137:15 138:11

receive 29:22 38:5,20 59:25 80:22 112:8

received 21:11 22:3 23:22,23 29:24 30:2 38:23 39:3,6,17 43:4,8 44:6 53:19 55:6 67:19 84:13 91:24 102:14 117:18

receives 65:16

receiving 49:19 53:7 84:19,20 108:22

recent 12:3 40:7,23 130:10,13 135:11

recently 12:12 21:11 40:10 90:11 109:7 125:5

reciting 87:20

recognize 86:23

recollection 43:14 45:9 46:7,22 49:8 62:11 64:23 65:17 78:12 79:11,13

recommend 59:24 60:18 86:3 89:10

recommendation 4:7 60:14 99:18 106:24 108:5 134:10,17

recommendations 61:11 107:3 120:3 132:17,21

recommending 132:4

reconstructive 62:17 63:2,19

reconvene 129:24

record 11:10,14 23:3 41:17,19 44:2 47:4 49:12,16 52:17 57:7,9 66:25 67:13 68:14,17 73:19 92:1 94:12,14,17 107:8 130:5,7 132:12 139:25

records 3:16,20,23 4:4 20:7,8,9,18,19,21 21:3 22:2,

7 36:19 42:15,18,21 43:21 46:8 49:13,16 53:25 54:5 55:17 56:20 59:10 61:22 62:8 63:12,13,21,24 64:3,4,6 73:9,15 78:1,10,15,20,22 79:6,18 86:14 90:10 91:18 93:4 95:4 135:12

red 98:10,22 99:2,11

redirect 130:24

redistribution 85:12

reduced 104:15 131:16 132:4

refer 9:13 11:8 20:18 22:7 55:22 59:20 64:21 99:1 122:17

reference 22:6 87:16 97:8 99:25 100:1,2,4,7 106:1 109:18 122:4

referenced 14:22 103:24 112:12 113:9 127:3

references 10:5

referencing 73:14

referral 62:13,15

referrals 87:6

referred 27:1 56:25 57:16

referring 6:23,25 9:14 10:8 17:24 32:1 55:23 56:22 77:11,23 78:3,6 98:12 120:18 124:2

refers 25:19 59:20 121:25

refresh 45:9

refresher 95:3

regard 28:6 53:22 97:19 105:25

regional 28:7

regret 108:3,25 109:2,6,9,12,13

regular 113:19

regularly 99:18

reinforcement 68:2

related 12:9 34:12 64:23 72:12 97:1 105:4 112:16 114:4,14 118:25

relating 12:5,6 27:10,25 72:12,20

relative 96:18

release 31:17,18

released 31:13,20 119:24 123:8

releasing 117:22

relied 11:2

rely 122:16,19,24

relying 47:3

remainder 107:17

Remarks 76:23 77:1

remedies 102:15

remember 9:20 13:13 14:13 44:4 55:5 67:25 73:19 79:8 87:11 88:12 93:8 121:15 136:6

remembered 5:1 102:25

reminder 15:14

remote 5:3,14 7:8,17 127:12

repeat 18:22 38:18 52:19 87:19

rephrase 8:9

report 3:14 9:8 10:23 11:2,7,23 12:1,20 13:8 17:3,5,9,11 18:10,23 19:7,14,17,20 20:2 21:5 23:19 39:25 42:3 44:14 45:9,14 47:6,9 66:5,6 69:9,23 72:1 73:9 106:2 109:3,15,18,25 110:11 120:2,9,13,18 121:11,14 122:4,14,17,25 123:8,11,14 124:2,7,8,10,19,20 125:2,25 126:1,2,3 128:4,25 129:18 131:5 134:12,15

reported 73:6 104:14

reporter 5:5 6:4 7:21 27:16,20 34:23 35:2 38:11 140:2

Reporters 6:4

reports 16:25 17:1 19:8 37:5 81:1 119:24 123:15 124:4 128:13

represent 11:1

represented 6:16

request 86:1 102:14

required 58:10,11,20 59:10 61:6,14 75:9

requirement 32:14,17 58:21 59:21 60:15

requirements 54:24

research 84:4 103:11 106:3,7 107:14,16,17 108:14 109:21 110:10 117:22,23 118:17,21 119:4,25 120:4 126:25 128:11,20 132:17

researcher 126:13

reserved 140:8

reshow 76:14

reside 8:17

residency 24:3 38:22

resistance 100:14

respond 132:1

responded 103:2

responding 108:11

response 96:6 102:23 108:4,13 115:23 121:10 122:10,11 128:23

responsibility 29:6 136:24

responsible 96:4

rest 88:14

restart 71:7,10

restate 127:13

restricting 122:3

restructuring 28:7

result 59:4 72:16 100:2

results 83:10 104:7,15,23 105:19

retired 24:9,18 26:8 40:17

retirement 40:20

returns 69:24

reuptake 119:8

reverberating 65:9

reverse 72:15 131:18

reversed 81:18 112:22,23

reversibility 69:10

reversible 69:13,19 71:3 72:5,6,7

review 4:11 19:17,19,24 20:4,24 21:3 35:16 42:21 43:21 53:24 59:9 62:6 63:12,21 64:4,15 69:2 78:1 83:7 86:14 90:24 94:22 102:3 105:25 106:8 109:4 122:8 128:7,8 132:13,20,25 137:2

reviewed 9:7 10:17 19:21 20:1,7,15,22 21:6 22:8 23:17 37:5 42:15 44:2 49:13,17 57:6 62:8 64:17 78:23 79:4,10 86:20 104:2, 4,5,6 109:7 119:24 123:11 124:10 125:14,17

reviewer 29:25

reviewing 36:19 46:7 82:4 134:9

reviews 47:16 83:8

revoked 14:19

Richard 39:4

ridiculous 123:24 128:25

right-hand 44:17 56:25

rights 15:7,8,21 16:11

risk 99:3,6 115:17 116:18 118:13 133:17 137:3

risk/benefit 115:18

risks 45:15,24 46:4,9,12,19, 23 47:2,16 48:4,10 59:1

91:12,23 116:23 117:3 118:22 119:15 134:5 136:17,23

RN 137:20

Robert 38:24

role 55:11 111:8

Royal 5:16

rules 7:9

rushed 131:23

Rutledge 13:1

**S**

safeguard 47:13,22

safety 128:12

sake 44:16

San 5:2 8:18 13:14,15 24:5 25:23

scale 72:20 73:2

Scandinavian 111:16

Schechter 37:7,9,15

schedule 36:11 86:4

scheme 124:16

school 14:17,18 23:25

schools 23:21

Schultz 5:16

scientific 76:2

scope 33:12 50:11

screen 8:23 18:1,12 22:13, 14,16 41:23 42:1 44:25 45:2,5 85:16 131:8,9 135:16,23 136:9 139:20

scroll 18:4 45:5 51:1 79:2 90:13,21 91:1 107:4 115:11 124:6 137:21

scrolling 23:5 57:4,15 62:22 90:23 128:3

second-to-last 107:5

seconds 38:9,13

section 39:25 55:24 62:13 76:22 102:5,6 104:1 120:23 124:8 126:1

selecting 28:25 123:19

self-insurance 21:9

semi-retired 41:2

sense 7:21 8:10,14

sentence 46:3 48:16 66:8 120:25 136:21

sentences 137:3

separate 46:17 59:6

September 31:16,20

series 41:10

serotonin 119:8

service 131:14,25

services 26:18 100:25 102:18 131:16,18

session 39:16

sessions 39:13 63:14,17, 18

set 49:23

setting 16:9 114:15

settings 53:16 87:4

sex 70:23 72:10 83:14 86:1 97:24 128:11 138:14,15 139:6

shaking 7:19

sham 123:14

shame 129:7

shameful 129:14

shaped 10:21

share 8:22,23 41:23 131:8 135:16,22,24 136:9

sharing 15:11 18:4 21:20 136:2 139:20

Sharon 20:13 36:24 42:18 49:2,23,24,25 54:3 64:2 91:10

Shield 3:2 5:12,24 6:16 21:4,7

short 68:11,20 84:7

short-term 138:23

shortage 112:1

shortly 14:18 44:1

show 17:19 18:13 21:14 50:21 56:15 61:17 64:8 76:14 85:14 90:8 94:24 101:6 106:11 110:19 111:22 119:16 123:2 124:1

showing 21:23 44:23 63:21 64:4 93:20 101:10 109:1,5 120:15

shown 18:12 131:3 133:3 136:6

shows 18:12,18

shut 129:3

sic 62:1 99:4 132:15

side 44:17 56:25 82:2 116:20 117:11 119:5 133:14,19,24 134:1

sidebar 65:3

Sierra 5:4 6:4

signature 23:11,12,14 93:1, 17 137:15,18,19,24 138:2 140:8

signed 91:8 92:16,19,21 93:17,20,21 137:14 138:7

significant 55:14 104:22

signing 136:21,22

similar 51:16 83:18,20 85:2 126:1

similarly 66:21

Simply 7:19

sit 93:15

sitting 9:14

skimmed 124:22

skimming 129:1

Dan H. Karasic, MD
7/13/2022          Index: slightly..surgical

slightly 46:17 70:25 83:23
97:3 100:7

small 22:14 24:10,12 95:20

smoking 119:2

SOC 28:25

social 20:14 50:7,13,15
107:25

Society 3:18 33:2,5,8,11,
15,16,18 34:2,12 51:7,8,15,
18,20 52:18 76:20 77:21
85:19,21 87:18 88:6

solely 133:10

solution 22:22

somebody's 85:9 116:15

someone's 63:8 118:2

sort 32:14 60:2 67:2 69:15
74:24 109:22 134:23

sound 65:9

sounded 73:10

sounds 63:9 67:1,11 98:11
121:16

space 131:24

speak 7:14 68:20 86:22
94:19 130:12

speaker 111:16

speaking 63:12 68:7
111:15 130:19

speaks 86:25

specialized 38:5,21

specializing 107:20

specially 58:20

specialty 26:17 38:3 54:23

specific 8:1 20:5 26:17 30:7
35:24 41:10 57:12 61:7
65:19 87:24 97:6 104:25
105:1,9 124:8,19 133:12

specifically 26:3 33:7
54:17 66:5 69:6 73:24 77:20
79:5,23 93:6 103:16 125:12

speculate 35:21

spoke 98:3

spoken 17:2

squinting 90:14

SSRIS 119:11

stable 81:24

staff 106:4 112:1 131:20

stage 69:25 70:20,23 72:19,
21,24 73:1,3,11,25 74:3,10
75:1 132:16

staging 72:19,20

stance 115:21

stand 50:5

standards 4:14 27:12
28:19,23 29:12,13,14,21,22
30:7,13,14,15,16 31:11,25
32:2,5 51:13 58:18,19 61:15
111:11 113:20

stands 59:3

start 12:11 70:4,7,11 72:21
73:23 75:12 81:9 85:10
88:19 118:6 139:15

started 24:4,19 26:10 35:11
36:8 43:11,13 44:3 70:20
71:5 73:12 112:5 117:24
118:18

starting 14:18 56:5,10
71:16,24 73:21 78:11 80:11
85:11 88:15 102:10 120:23
128:6

starts 74:2,19 75:1 76:23
83:23 85:3 104:5

state 47:11 104:12 123:7

stated 47:8 69:23

statement 9:7 10:6,8,15
16:5,7 17:24 21:8 29:3,22,
23,25 30:2,3,7,10,11,21,23
31:1,5,6,8 32:3 45:19,24
46:6 52:20 77:18,21 86:9,13
101:7 102:23 103:7 110:15
121:10 125:6 126:21 128:24
132:3 133:5,8,10,12

statements 29:1,17,19
101:6 109:25

states 45:15 46:3 57:16

statistics 35:15

status 31:10 41:2,3 113:2

stem 81:7

step 31:21

Stephanie 5:15,23 6:15
11:10 15:10 21:19 38:16
44:15 67:4 94:12 98:2
130:22 135:3

sterilized 88:10

sterilizing 88:16,17

Steve 4:2

stock 93:22 138:1

Stockholm 111:5

Stoller 38:25

stop 83:13 136:2 139:20

stopped 21:20 69:24 71:14
72:9 84:16 116:17 131:16
132:5 139:8

stopping 71:16

stops 72:8 74:12

strategy 121:24

Street 8:18

strength 104:16

stronger 128:19

structured 25:20 87:7

student 32:20,21

studies 82:12,18 85:7
103:23 104:2,4,5,6,10,11,
17,19,21 105:3,12,13,15,16,
23,25 108:21 109:5 113:10
117:18 122:17 128:13

study 39:5 82:7,10,11 99:5,
11 105:20 109:3 112:9
118:3,10 119:2 121:25
122:9,25

subject 34:1

submitted 29:19

subpoena 3:13 9:3

substantial 108:20

Sue 137:19

suffer 129:8

sufficient 86:7,19

suggest 131:15

suggestion 60:15

suicidality 105:23

suing 13:14

summary 55:20,22 134:9,
12,17

superficially 123:12

supermajority 29:3

supervised 50:14

support 63:19 77:12 96:12
110:4,6 127:20

supporting 60:16 128:11,
17

supportive 131:22

supports 55:18

suppose 35:16

supposed 32:7

suppressed 84:23

suppression 128:18

surgeon 60:16

surgeries 109:10

surgery 22:12 23:1 49:3
57:17 59:12,22,25 60:17
62:18 63:2,17,19,23 64:5
72:14,16,17 82:25 87:14
91:13 101:2 102:13,20
103:13,22 104:14,20 109:8
114:14 128:11 135:1 136:6
137:4

surgery/procedure
136:24

surgical 88:24 93:6 102:15
107:6,10 128:19

Dan H. Karasic, MD
7/13/2022

surveys 122:11

surviving 40:14

swear 6:5

Sweden 111:10,13,21,23
113:25 114:6

Swedish 111:17

switched 43:18

switching 83:23

sworn 6:7

symptoms 66:15

syndrome 100:11

syndromes 100:15

system 67:2 85:1

---

T

T-SCAN 3:16 21:23

Tacoma 5:11

takes 74:21

taking 26:1,12 31:21 57:23
74:2,24 75:1 82:19 83:24
85:3

talk 7:12 25:13 31:14 35:8
37:24 69:15 74:18 76:3

talked 16:22 91:21 113:18

talking 10:13 22:6 101:23
103:15 122:15 124:7

Tanner 70:20,22 72:18,19,
20,21,24 73:3,11,25 74:3,10
75:1

target 97:21,23

Tavistock 108:9 111:22
112:13

TAYS 107:15,22

team 9:19 26:9,10,12 86:5,
17,23 87:5 88:14 140:4

teams 86:24 87:3

technical 128:14

tecum 3:13

teen 89:24

television 114:5,6

Tema 4:10

ten 29:19 42:25 80:20 83:1

ten-year 80:25

tend 8:4 15:15 60:24 117:25

term 38:25 98:9

terms 34:1,2 48:9 74:17
83:4,10 99:11 110:15
116:10 118:10 120:5 124:25
125:1 139:1,12

test 95:15 104:23 105:19

tested 95:12

testified 6:10 15:5 16:4
17:12 25:1 71:3

testify 15:4 16:7

testifying 15:17,24

testimony 13:3 14:2,6,8
15:2 16:13,16,20,21,23
89:16,17 130:16

testing 104:13

testosterone 43:11,13,17,
19,23,25 44:3 56:10 58:1
60:20 74:25 75:2,22 84:20,
21,25 85:10,11 87:10,17
95:12,19 96:12,15,19,22
98:24 99:1,14 100:20
114:13 138:21

text 29:4 44:18,23 130:12

That'd 135:9

therapies 117:19

therapy 3:21,23 20:17
36:25 42:19 61:23 62:4,9
63:14 87:10

thing 18:9 58:6 83:16
124:23

things 40:21 96:9 100:14
114:8 116:5 119:1

thinking 88:21 90:5

thought 123:24

thousand 109:4,5

thrombosis 115:17 116:19
133:17

thumbnail 44:24

time 5:9,20 7:23 12:6 22:18
24:15 25:5,15 28:6 39:5
41:11 42:25 43:17 44:4 49:9
54:8 55:6 58:3 70:6 71:9,21
73:6,7 80:16 81:8 84:7 87:9,
13 92:12 98:4 102:19
103:13 106:9 118:18 122:22
130:19 131:23 132:23
139:24

timely 132:2

times 8:7 12:2,4,5,12,13,16,
18,20,21 13:11 25:3 112:12

tiny 65:12

tissue 96:5,6

title 18:13

titled 104:2

today 5:8 7:4 8:20 9:4,6,15
10:4 11:5,22 12:2 17:2
21:13 22:5 35:24 62:6 64:13
67:14 124:19 125:14,24
130:16,19 136:7

Today's 6:3

token 8:12

told 45:20,22,23 46:6 75:7

top 21:24 22:12 35:14 57:17
59:12,25 78:25 87:25 99:21

totality 63:8 105:17

tough 127:12

train 37:18

trained 24:1 33:21

training 38:5,21,24 39:3,6,
18,21 53:4,20 54:10,16,18,
24,25

training/expertise 52:12

trainings 28:1 39:10,12
61:12

trans 26:7 75:6 83:17 84:2
87:18 88:3 118:12,13,25
122:11 123:22 126:25 127:1

transgender 10:20 14:16,
19 19:23,25 21:8 26:12,25
32:10 36:1,4,5,7,12,13
37:19,25 38:1,24 39:1,12,13
59:24 80:10,21 82:6 87:3
89:4,8 103:5 105:10 106:5
111:16,20 117:3 119:22
122:8,21 123:18,21 124:15
126:9,16 127:16,20,21
129:4

transgender-related 26:4
38:1

transition 75:13,14

transitioned 82:16 97:20,
21 139:18

transitioning 52:10 88:18
116:14

transmasculine 109:8

treat 127:15

treated 48:22 49:9 127:6

treating 12:14 13:9,17,22
14:2 16:13,16,17 25:2,12

treatment 4:9,14 47:9,17
49:6,19 51:9 56:11 59:2
60:19 62:23,25 63:3,7 64:24
65:2 66:11,22 69:11,12 70:1
71:3,17 72:3 74:24 75:21,23
76:8 77:4,5,17 81:12 83:2
84:16,17 86:1,3 93:7 106:25
107:11,17,21,24 108:14
111:4 114:14 116:23,24
117:2 133:21 134:4 136:14,
17,18

treatments 72:2,6 91:24
100:22 107:6,10,13 115:8,
10,14,22 117:19,20 128:21
133:15 137:1

trial 16:15 114:15,23 115:1

tribunal 15:7,25 16:4,11

true 75:21 81:20 84:18
110:12 131:18 137:18

Dan H. Karasic, MD
7/13/2022

truth 6:8,9

turn 47:5 67:7,8,10 69:5

turned 36:9 43:14 44:1

turning 51:23,24 95:6 99:20

Tutty 4:2

Tutty's 49:20,21

TV 111:22

two-thirds 36:4

type 18:9 64:19,22 65:13, 14,21 104:11

typical 36:2 68:1

typically 50:15 58:24 59:23 60:18 64:21 65:25 66:1 70:6,17 71:9 84:7 93:13 117:13 138:2

**U**

U.S. 5:10

UCLA 24:1 38:22 39:1,4,6

UCSF 24:7,9,11,13,16 25:8, 9,22 26:9,14

UK 108:9 112:17,21,24,25 113:6,7 114:4 119:23 120:4, 7 122:9,15 131:5

ultimately 29:6 61:13

uncommon 109:14

undergo 59:11

undergoes 71:19

undergoing 74:19

understand 7:3,6 11:25 12:10 28:12 30:5 33:10 35:10 37:20 42:4 48:10,15 57:1 59:1 70:3 71:5 76:20 77:8 81:6 84:11 88:9 93:13 98:5 104:24 117:11 124:18 125:23 136:15

understanding 20:16 31:12 33:20 42:22 43:10,16 45:22 59:9 62:20 63:11,16 69:18 74:7 75:4 86:11 93:11 95:22 96:14 98:4 99:24

100:4,13 106:21 107:1 111:7,19 112:15 113:2,11, 18 114:12,16 119:21 120:1, 10 126:14 132:19,24,25 134:22 136:19 137:3 138:4

understood 6:25 8:13 35:23 41:8 46:16 48:4 65:19 67:21 70:14 79:17 96:3 115:2 128:3

undertaking 95:15

unique 133:20

United 132:6

University 14:14 23:25 24:5

upcoming 58:19

update 125:5

updates 40:7

updating 40:15,17

USCF 26:13

users 131:14

USPATH 28:9,10

**V**

vacation 65:6

validated 104:20

validity 112:20

values 97:12,18

Van 127:4,14 128:2

Vantas 84:12,13

variable 116:10 139:12

vary 100:3

version 22:19 27:12 30:8 51:14,15

versions 51:11,16

versus 52:25 58:8

viable 41:6

video 5:16 7:20 44:24

videoconference 5:3

view 109:22 110:14 137:10

views 129:19

visit 62:20

voice 124:19

voiced 105:2

Volume 5:9

vulnerability 52:6

**W**

W-I-E-P-J-E-S 82:14

wait 118:2,8 127:8

waits 112:2 122:1

wake 108:8

walk 13:10 16:14 27:3

walking 61:3

wanted 6:20,24 11:13 22:5, 10 56:2 89:23 98:14 127:17

wanting 92:3

warning 88:24

Washington 5:18

ways 90:7

weak 128:17

Wednesday 5:1

week 22:3 36:3,11

weigh 30:21

weigh-in 30:9

weighed 119:6

weighing 30:11

weighs 117:3

weight 110:16

weighted 38:19

well-constructed 93:25

wellbeing 107:25

Western 5:11

widely 10:19

widespread 110:6

Wiepjes 82:14 83:1 118:10

Wiepjes's 82:21 83:17

woman 14:16 89:7

women 83:17,18,21 100:8 118:13,14

word 46:14 58:15 59:19 98:13

words 43:22 47:19 49:25 62:19 75:16 89:10 110:8

work 7:15 24:11,13,16 25:8, 21 32:9 34:10 39:7 40:19 50:13,14,18 119:12 130:2

worked 24:18 25:8 29:7 36:16 37:12,15,16,17 39:3 40:15

worker 50:7,16

worker's 20:14

working 19:10 24:4 32:21 39:1 54:25 55:1 122:21 127:1 131:20

works 20:17 30:6 41:12 68:13

world 26:24 108:6 110:18 131:25

worried 131:15

worth 123:23

WPATH 27:1,4,10,15,23 28:10,13,15 31:15,22,23,24 32:6,7,15,16,22 33:1 34:2,4, 14,17 35:7 37:14 51:14 52:23 58:9,11,17,20 61:6 72:5 103:3 110:17

WPATH's 27:11

writing 29:1,4 63:3 65:11

written 27:12

wrong 101:21

wrote 51:8 63:18 86:13

Dan H. Karasic, MD
7/13/2022

### X

**XY** 15:4,16

### Y

**Yale** 23:25

**year** 24:2 31:16 35:12 43:2,
5 58:4 79:20 101:3 120:21
123:7

**years** 12:3,7 13:12 27:6
39:14,22 41:3 42:25 57:24
58:2 80:21 83:1 87:9,13
92:12 103:5,18 105:9
113:23 117:25 118:2,8
122:19

**young** 77:6 80:8 121:7
131:14,23

**younger** 99:5

**youth** 26:7 108:1 109:9
116:7,9 117:9 122:21
127:21 132:5 138:23

### Z

**Zanghi** 5:4 6:4

**zoom** 5:3,14 7:7,10,13
22:14,16 42:8 44:25 45:2
131:11