**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
VICTOR VOE, et al.,           )
                              )
          Plaintiffs,         )
                              )
          v.                  )        1:23CV864
                              )
THOMAS MANSFIELD, et al.,     )
                              )
          Defendants.         )
```

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Plaintiffs' Motion for
Entry of Protective Order (Docket Entry 112).  (See Docket Entry
dated Aug. 12, 2024.)  "[P]ursuant to Federal Rules of Civil
Pro[cedure] 26(c) and 45, and Local Civil Rule 26.2, [the instant
Motion requests] entry of the protective order attached to th[e
instant M]otion."  (Docket Entry 112 at 1 (referring to Docket
Entry 112-1).)  The proposed order attached to the instant Motion
first describes the relief sought by Plaintiffs as follows:  "No
response is required [to] Request No. 11 within Intervenor-
Defendants' subpoenas directed to the University of North Carolina
('UNC') Health Care System, UNC Hospitals, or UNC-Chapel Hill[
(collectively, the 'UNC Entities').]"  (Docket Entry 112-1 at 1.)
Secondarily, that proposed order would have the Court, "in the
alternative, . . . reserve a decision on [the instant] Motion until
[the UNC Entities] ha[ve] either responded without objection to the
subpoenas, or ha[ve] sought relief from the subpoenas through a

motion that will be considered at the same time as th[e instant M]otion." (Id. at 2.) Because Plaintiffs have not established their entitlement to a protective order as to Request No. 11 and the UNC Entities have not requested relief from that request in the four months that have passed since Plaintiffs filed the instant Motion, the Court will deny the instant Motion.[1]

<u>INTRODUCTION</u>

Plaintiffs Vanessa, Vance, and Victor Voe (pseudonyms of two parents and their transgender minor child), along with Plaintiff Dr. Riley Smith (a doctor with UNC School of Medicine's Department

---

1  A magistrate judge may "hear and determine any pretrial matter pending before the [C]ourt, except [for eight specified motions]," 28 U.S.C. § 636(b)(1)(A), as to which (absent consent of the parties) a magistrate judge must make "recommendations for the disposition, by a [district] judge," 28 U.S.C. § 636(b)(1)(B); <u>see also</u> Fed. R. Civ. P. 72(a) ("When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision."); Fed. R. Civ. P. 72(b)(1) (providing that, "magistrate judge[s] must enter a recommended disposition" in cases "when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense"). "[A] routine pretrial discovery motion . . . is not included in this list of [excepted/]dispositive motions." <u>Jordan v. Commissioner, Miss. Dep't of Corr.</u>, 947 F.3d 1322, 1327 (11th Cir. 2020); <u>see also</u> <u>Escalante v. Anderson Cnty. Sheriff's Dep't</u>, 698 F. App'x 754, 755 (4th Cir. 2017) (deeming Federal Rule of Civil Procedure 72(a) applicable to "magistrate judge['s] . . . ruling granting [a] motion for a protective order"); <u>United States ex rel. Davis v. Prince</u>, 753 F. Supp. 2d 561, 565 (E.D. Va. 2010) (describing dispute about protective order during discovery "[a]s a nondispositive matter" entrusted to magistrate judges for decision under Section 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a)). As a result, the undersigned Magistrate Judge will issue an order (not a recommendation) as to the instant Motion.

2

of Family Medicine) and two nonprofit organizations (Plaintiffs PFLAG, Inc. and American Association of Physicians for Human Rights) commenced this action by filing a Complaint against the Chief Executive Officer and 13 members of the North Carolina Medical Board, as well as the North Carolina Department of Health and Human Services and its Secretary. (See Docket Entry 1 at 2 & n.1, 6-11; see also Docket Entry 44 at 1 (permitting Voe Plaintiffs to proceed pseudonymously).) The Complaint principally

> pray[s] that this Court . . . [(A) e]nter a judgment declaring that [North Carolina] House Bill 808 . . . both on its face and as applied to Plaintiffs . . . violates the Equal Protection Clause of the Fourteenth Amendment by discriminating against (1) transgender adolescents and their parents . . . on the basis of sex and transgender status, and (2) the parents of transgender children with regards to (a) their exercise of the right to parental autonomy and (b) their ability to secure necessary medical care for their children that other parents can obtain based on sex and transgender status . . .[,] violates the Due Process Clause of the Fourteenth Amendment by infringing upon parents' fundamental right to make decisions concerning the care of their children, and . . . violates Section 1557 of the Affordable Care Act by discriminating against transgender adolescents on the basis of sex, . . . [and (B) i]ssue preliminary and permanent injunctions enjoining Defendants . . . from implementing or enforcing [North Carolina House Bill 808.]

(Docket Entry 1 at 54-55; see also Docket Entry 14 at 2 ("seek[ing] a preliminary injunction enjoining Defendants . . . from enforcing Sections 1 and 3 of [North Carolina House Bill 808]").)

Without opposition from the parties (see Docket Entry 28 at 2), the Court (per the undersigned Magistrate Judge) granted the request of North Carolina Senate President Pro Tempore Philip E.

3

Berger and North Carolina Speaker of the House of Representatives Timothy K. Moore to intervene as Defendants (see Text Order dated Oct. 24, 2023). Plaintiffs thereafter requested "leave to add [another pseudonymous family] as named plaintiffs in a First Amended Complaint" (Docket Entry 46 at 2), with "a new claim under the Medicaid Act[]" (id.), which request the Court (per the undersigned Magistrate Judge) granted (see Text Order dated Nov. 20, 2023; see also Docket Entry 49 at 7-8 (describing new Plaintiffs in First Amended Complaint), 65 (enlarging relief demand to include declaration that North Carolina House Bill 808 "violates the Medicaid Act[]"); Docket Entry 50 at 1 (allowing new Plaintiffs to "proceed in this action under the pseudonyms 'Joy Doe,' 'Jennifer Doe,' and 'James Doe'")). Defendants and Intervenor-Defendants subsequently answered. (See Docket Entries 54, 55, 56.)

Discovery on the merits of Plaintiffs' claims and Defendants'/ Intervenor-Defendants' defenses began on January 24, 2024 (with a scheduled conclusion date of August 30, 2024). (See Docket Entry 67 at 2 (proposing that "commencement date of discovery will be upon entry of the scheduling order"), 3 ("The date for the completion of all discovery (general and expert) is August 30, 2024."); Text Order dated Jan. 24, 2024 (adopting Docket Entry 67 as Scheduling Order with clarifications that did not alter proposed discovery start and end dates); see also Docket Entry 52 at 1 (documenting, on November 29, 2023, agreement of Plaintiffs and

4

Intervenor-Defendants "to take depositions during the preliminary injunction stage of certain individuals"); Text Order dated July 17, 2024 (extending deadline for "parties to complete all depositions [to] 09/13/2024").) Prior to the commencement of discovery, "[t]he parties agree[d to a Stipulated Confidentiality Agreement and Protective] Order [which] control[s] the disclosure, dissemination, and use of confidential material produced in discovery." (Docket Entry 60 at 2.) Later, during the discovery period, "the [p]arties agreed to tender [a] proposed HIPAA Qualified Protective Order for the Court's review" (Docket Entry 104 at 2), which the Court then adopted (see Docket Entry 105).

On July 29, 2024, Plaintiffs filed the instant Motion (see Docket Entry 112 at 3), "objecti[ng] to a subpoena Defendant-Intervenors intend[ed] to serve on th[e UNC E]ntities" (id. at 1) and asserting that a "protective order is necessary to protect against Defendant-Intervenors' request for privileged, irrelevant, and highly-sensitive medical and mental health records of non-parties who are minors" (id. at 1-2 (emphasis omitted); see also Docket Entry 113 at 1 ("Specifically, Plaintiffs move for a protective order from Request No. 11 contained within subpoenas served on th[e UNC E]ntities seeking sensitive mental health and medical records of non-party patients treated by Plaintiff Dr. Riley Smith.")). Intervenor-Defendants responded (see Docket Entry 115) and Plaintiffs replied (see Docket Entry 117).

5

<u>DISCUSSION</u>

"First things first — [the Court] must decide what law to apply." <u>Lott v. Levitt</u>, 556 F.3d 564, 567 (7th Cir. 2009). Plaintiffs expressly filed the instant Motion "pursuant to Federal Rules of Civil Pro[cedure] 26(c) and 45, and Local Civil Rule 26.2" (Docket Entry 112 at 1; <u>accord</u> Docket Entry 113 at 1). That Local Rule sets requirements for motions wherein "a party . . . seek[s] entry of a protective order to shield information <u>provided in discovery</u> from dissemination," M.D.N.C. LR 26.2(a) (emphasis added), but the instant Motion does <u>not</u> "seek entry of a protective order to shield information <u>provided in discovery</u> from dissemination," <u>id.</u> (emphasis added).[2] Rather, the instant Motion

---

2 Nor do Plaintiffs need such a protective order, because (as the Introduction shows) — at the request of the parties — the Court already has entered two different "protective order[s] to shield information provided in discovery from dissemination," M.D.N.C. LR 26.2(a). (<u>See</u> Docket Entries 60, 105.) Notably, the first of those protective orders, inter alia, (A) authorizes "[a]ny party or non-party producing [d]iscovery [m]aterial in this action [to] designate . . . sensitive personal information not generally disclosed to the public . . . as [p]rotected [m]aterial" (Docket Entry 60 at 2-3; <u>see also id.</u> at 3 (permitting "parties . . . to designate as [p]rotected [m]aterial any . . . information . . . the parties deem to be confidential")), and (B) allows "use[ of designated information] . . . <u>solely</u> for the purpose of prosecution or defense of this action" (<u>id.</u> at 4 (emphasis added); <u>see also id.</u> ("The parties, their attorneys, and anyone else acting on their behalf shall take such precautions with [p]rotected [m]aterial as are necessary to strictly maintain its confidentiality . . . .")). Moreover, those "confidentiality obligations . . . shall survive any settlement, judgment, or other disposition or conclusion of this action, and all appeals therefrom." (<u>Id.</u> at 11; <u>see also id.</u> ("This [p]rotective [o]rder shall continue in full force and effect, and shall be binding upon the parties and all parties to (continued...)

seeks to prevent the provision of information in discovery, i.e., Plaintiffs want to bar Intervenor-Defendants from obtaining any information via "Request No. 11 contained within subpoenas served on three [UNC] entities" (Docket Entry 113 at 1). Local Rule 26.2 thus affords no basis for the relief sought in the instant Motion.

---

2(...continued)
whom [p]rotected [m]aterial has been disclosed, both during and after the pendency of this case unless or until the designating party agrees in writing or the [C]ourt orders the disclosure of the [p]rotected [m]aterial.").) In addition, "[w]ithin sixty (60) days after the final resolution of this matter, . . . the parties [have] agree[d] to return . . . or destroy the original and any copies of any [p]rotected [m]aterial produced." (Id.) Likewise, the second of those protective orders, "in accordance with the Health Insurance Portability and Accountability Act of 1996 ('HIPAA') and the regulations promulgated thereunder, . . . limit[s] the[] use or disclosure" (Docket Entry 105 at 1) of "[p]rotected [h]ealth [i]nformation ('PHI')" (id. at 2 (some internal quotation marks omitted)) solicited "through a subpoena" (id. at 3), including by "[p]rohibit[ing] parties from using or disclosing PHI for any purpose other than the prosecution and defense of this matter" (id. at 4) and by "[r]equir[ing] the parties at the end of the litigation] to securely destroy the original and all copies of PHI or to return them to the disclosing entity" (id.). Given all those court-ordered restrictions on Intervenor-Defendants' use of any sensitive information they might secure via the subpoena request at issue, Plaintiffs' contention that denial of the instant Motion would "permit[ Intervenor-Defendants] to create a registry of transgender adolescents with gender dysphoria in the state" (Docket Entry 113 at 13), which "prospect should give great pause and cause grave alarm" (id.), appears to "lack[] a good faith basis, suggesting that it was calculated to 'cause unnecessary delay, or needlessly increase the cost of litigation,'" Kitchings v. Integral Consulting Servs., Inc., Civ. Action No. 19-3374, 2021 WL 3418838, at *4 (D. Md. Aug. 5, 2021) (unpublished) (quoting Fed. R. Civ. P. 11(b)(1)). Any further such "shrill rhetoric . . . generat[ing] much heat and little light," Century Graphics Corp. v. Harris Graphics Corp., Civ. Action No. 86-5375, 1987 WL 25132, at *1 (E.D. La. Nov. 23, 1987) (unpublished), will "give [the Court] great pause" (Docket Entry 113 at 13) and may result in proceedings which "cause [those responsible] grave alarm" (id.).

Turning to the two remaining legal bases cited by Plaintiffs for the instant Motion, "Federal Rules of Civil Procedure 26(c) and 45" (Docket Entry 112 at 1; accord Docket Entry 113 at 1), the former Rule states, in pertinent part, that (A) "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending," Fed. R. Civ. P. 26(c)(1) (emphasis added), whereupon (B) "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including [by] . . . forbidding the . . . discovery . . . [or] forbidding inquiry into certain matters, or limiting the scope of . . . discovery to certain matters," id. The salient provisions of the latter Rule specify that, "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies; or [that] subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A).

## Standing

In opposition to the instant Motion, Intervenor-Defendants have argued that "Plaintiffs do 'not have standing to challenge a subpoena issued to a nonparty' – here, the UNC [E]ntities – 'unless [Plaintiffs] claim[] some personal right or privilege in the information sought by the subpoena.'" (Docket Entry 115 at 11 (quoting Trustees of Purdue Univ. v. Wolfspeed, Inc., No.

8

1:21CV840, 2023 WL 4316300, at *1 (M.D.N.C. July 3, 2023) (unpublished), which, in turn, quotes United States v. Idema, 118 F. App'x 740, 744 (4th Cir. 2005)).) According to Intervenor-Defendants, "Plaintiffs cannot obtain a protective order for the subpoenas issued to the UNC [E]ntities because [Plaintiffs] have disclaimed any personal right or privilege in the information they seek to protect." (Id. at 11-12.) In reply, Plaintiffs have not contended that they all possess standing to pursue the instant Motion under Federal Rules of Civil Procedure 26(c)(1) and 45(d)(3)(A); instead, they assert only that "[Plaintiff] Dr. Smith has standing to protect the rights of his non-party minor patients under either Rule." (Docket Entry 117 at 2 (emphasis added).)

Despite Plaintiffs' assertion that Federal Rules of Civil Procedure 26(c)(1) and 45(d)(3)(A) grant Plaintiff Dr. Smith "standing to protect the rights of his non-party minor patients" (id.) – rather than his own "personal right or privilege in the information sought by the subpoena," Idema, 118 F. App'x at 744 – Plaintiffs elsewhere have agreed that, to obtain relief under Federal Rule of Civil Procedure 45, Plaintiff Dr. Smith must "claim some personal right or privilege in the information sought by the subpoena" (Docket Entry 117 at 2 (emphasis added) (internal brackets and quotation marks omitted)). But, Plaintiffs have insisted, "[Plaintiff] Dr. Smith meets this requirement" (id.), because "[t]hese subpoenas seek sensitive medical records that

9

[Plaintiff] Dr. Smith created in the course of providing medical care to a vulnerable population" (id. at 2-3 (emphasis added)). Further analysis on this front therefore requires review of the actual text of the challenged subpoena request, which directs the UNC Entities to "[p]roduce all [d]ocuments and [c]ommunications from January 2023 to the present relating to the mental and medical health records of [Plaintiff] Dr. Riley Smith's minor patients who are both above the age of 11 years old and have been diagnosed with or treated for Gender Dysphoria or a [r]elated [c]ondition." (Docket Entry 113-1 at 11.)[3]

The foregoing language confirms that Request No. 11 does not extend only to "medical records that [Plaintiff] Dr. Smith created" (Docket Entry 117 at 2); indeed, Plaintiffs have pointed out that "Request No. 11 is not limited to treatment for gender-affirming care" (Docket Entry 113 at 12; see also id. (construing Request No. 11 to "cover every mental health and medical record for any purpose, whether for regular check-ups, the flu, asthma, a broken bone, or any other health need")). Furthermore, Plaintiff Dr. Smith's affidavits establish that he did not create every medical record responsive to Request No. 11. (See Docket Entry 14-8 at 4 (confirming that UNC Entities possess medical records pertaining to

_____

3 Pin cites to this document and other documents filed as attachments/exhibits to motions and/or memoranda refer to the page numbers that appear in the footer appended to such documents upon their docketing in the CM/ECF system (not any internal pagination).

10

Plaintiff Dr. Smith's transgender patients created by other medical providers); Docket Entry 45-7 at 4 (acknowledging that Plaintiff Dr. Smith does not serve as "primary care physician" for all his minor, transgender patients).) Accordingly, for purposes of Federal Rule of Civil Procedure 45(d)(3)(A), Plaintiff Dr. Smith possesses standing to challenge Request No. 11 solely to vindicate his "personal right or privilege in," Idema, 118 F. App'x at 744, any "medical records that [he] created" (Docket Entry 117 at 2).

Next, to support the assertion that Plaintiff Dr. Smith "has [Federal] Rule [of Civil Procedure] 26 standing" (Docket Entry 117 at 3), Plaintiffs have offered this argument:

> Under [Federal] Rule [of Civil Procedure] 26(c), "a party may move for a protective order <u>to protect itself</u> from 'annoyance, embarrassment, oppression, or undue burden or expense,' regardless of whether the moving party is seeking to prevent disclosure of information by a nonparty, as long as the moving party can tie the protected information to an interest listed in the rule." *Firetrace USA, LLC v. Jesclard*, [No. CV-07-2001,] 2008 WL 5146691, at *2 (D. Ariz. Dec. 8, 2008) [(unpublished)]. . . .
>
> [Plaintiff] Dr. Smith satisfies [Federal] Rule [of Civil Procedure] 26 because he can tie the protected information to an interest listed in the rule. Requiring [the] UNC [Entities] to turn over sensitive medical information of [Plaintiff] Dr. Smith's patients creates serious risk of harm to [Plaintiff] Dr. Smith's relationship with those patients, and courts have recognized that such risk of disrupting relationships can establish a [Federal] Rule [of Civil Procedure] 26(c) interest. *E.g.*, *Duenez v. Tidewater Boats, LLC*, [C/A No. 3:20-972,] 2021 WL 1947291, at *4 n.3 (D.S.C. May 14, 2021) [(unpublished)]; *Charleston Equities, Inc. v. Winslett*, [C/A No. 3:17-137,] 2018 WL 5778301, at *2 (D.S.C. Jan. 24, 2018) [(unpublished)].

11

(Docket Entry 117 at 3-4 (emphasis added) (some internal quotation marks and citations omitted).)

The two decisions from the District of South Carolina cited by Plaintiffs shed little, if any, light on the issue before the Court. The earlier of those two decisions involved a dispute over the payment of a loan deficiency, in which the defendant, "the guarantor of the loan," Charleston Equities, 2018 WL 5778301, at *1, "served eight subpoenas to [] non-parties," id., half of whom "[we]re related sister entities," id., commonly controlled by the same two individuals who also "control[led] and manage[d] . . . the plaintiff," id. While "address[ing] whether [the plaintiff] ha[d] standing to ask th[e c]ourt to quash th[ose ] subpoenas," id. at *2, the Charleston Equities Court declared (A) that "[Federal] Rule [of Civil Procedure] 26(c) allows for a party to move for a protective order to protect from '"annoyance, embarrassment, oppression, or undue burden or expense"' regardless of whether the moving party is seeking to prevent the disclosure of information by a party, 'as long as the moving party can tie the protected information to an interest listed in the rule,'" id. (quoting HDSherer LLC v. Natural Molecular Testing Corp., 292 F.R.D. 305, 307-08 (D.S.C. 2013), in turn quoting Firetrace USA, 2008 WL 5146691, at *2), and (B) that, "[t]here, as in HDSherer, it [wa]s more than likely that the subpoenas w[ould] cause a degree of harm to [the plaintiff's] business relationship," id.; see also

12

HDSherer, 292 F.R.D. at 307-08 (concluding that "subpoenas [served] on eighteen of [the d]efendant's customers" for business records about "payment issues," which engendered "extreme[] sensitiv[ity]" and "fear of being associated . . . with allegations of healthcare fraud and abuse," would "more than likely . . . cause a degree of harm to [the d]efendant's customer relationships" (internal quotation marks omitted)).

In the more recent of the two decisions cited by Plaintiffs on this point, which arose from an "employment discrimination case," *Duenez*, 2021 WL 1947291, at *1, the plaintiff, who served subpoenas on multiple non-party, government agencies "requesting information about [the d]efendants' hiring and employment practices, particularly regarding the hiring and employment of illegal immigrants . . . and [the d]efendants' use or misuse of the Employment Eligibility Verification ('E-Verify') system," id. at *2, "d[id] not appear to dispute [the d]efendants' standing to seek a protective order pursuant to Fed[eral] R[ule of] Civ[il] P[rocedure] 26(c)," id. at 4 n.3. The *Duenez* Court nonetheless decreed "that [t]here, as in *HDSherer* and *Charleston Equities*, it [wa]s more than likely that the subpoenas w[ould] cause a degree of harm to [the] defendants' business relationship," id. (internal brackets and quotation marks omitted), which "suffic[ed] to satisfy the interest requirement of [Federal] Rule [of Civil Procedure] 26(c)," id. (internal quotation marks omitted).

Duenez and Charleston Equities (like HDSherer) thus broadly (but without much analysis) conclude that a federal court should entertain a business-entity-party's request for a protective order invalidating subpoenas served on non-party government agencies, other business entities, or customers who deal with that business-entity-party, whenever that court deems it "likely that the subpoenas w[ould] cause a degree of harm to [that] business relationship," id. (emphasis added); accord Charleston Equities, 2018 WL 5778301, at *2; HDSherer, 292 F.R.D. at 308, presumably because such harm qualifies as "annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(c)(1). A significant question exists about the correctness of that conclusion, as indicated by the other decision quoted by Plaintiffs in the excerpt above (on which, as a prior citation reflects, the HDSherer Court also relied), see Firetrace USA, 2008 WL 5146691, at *1-2 (ruling that the defendants' challenge to "[non]-party subpoenas [served] on three of [the d]efendants' vendors" for documents regarding, inter alia, "communications with potential or actual customers of [one of the d]efendant[s] . . . relating to their business transactions" and "communications with [government agencies] relating to [the d]efendants" did "not raise protected interests cognizable under [Federal] Rule[ of Civil Procedure] 26(c)"); however, even if the Court accepted the conclusion reached in Duenez, Charleston Equities, and HDSherer – about standing under

14

Federal Rule of Civil Procedure 26(c)(1) for business-entity-parties to challenge non-party subpoenas that might impact business relationships – the commercial costs at the core of those decisions bear little resemblance to the inter-personal interests asserted by Plaintiff Dr. Smith here (see Docket Entry 117 at 4 (pointing to "[Plaintiff] Dr. Smith['s averments that] he has 'developed a close relationship with both his adolescent patients and their parents,'" which has resulted in said patients "'shar[ing] personal details about their li[v]e[s] with him'" and their parents seeking "'guidance on how to support their children's well-being'" (internal brackets omitted) (quoting Docket Entry 14-8 at 9 and Docket Entry 45-7 at 4, respectively))).

And, even if the Court viewed the business-based harms addressed in Duenez, Charleston Equities, and HDSherer as indistinguishable from the socio-emotional concerns of Plaintiff Dr. Smith, additional problems would remain with Plaintiffs' expansive theory of standing under Federal Rule of Civil Procedure 26(c)(1). First, although Plaintiffs have highlighted evidence that Plaintiff Dr. Smith "has 'developed a close relationship with both his adolescent patients and their parents' and 'intentionally built relationships of trust with them'" (id. (internal brackets and citations omitted) (quoting Docket Entry 14-8 at 9 and Docket Entry 45-7 at 4, respectively)), Plaintiffs have not provided any evidentiary basis for the Court to conclude that disclosure by

15

persons other than Plaintiff Dr. Smith of medical records he neither created nor possesses would cause his minor patients (or their parents) to distrust him or to lose their feelings of closeness to him (see id. (citing only Duenez and Charleston Equities in support of assertion that response by UNC Entities to Request No. 11 "is likely to cause harm to [Plaintiff] Dr. Smith's relationship with his minor patients, which is enough to give him standing to challenge these subpoenas")). In the absence of any such evidence, the Court declines to make any such assumption; "[t]o conclude otherwise would require [the Court] to ascribe an irrationality to th[ose individuals] which . . . objective respect for [them] will not permit," Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs, 552 F.2d 498, 506 (3d Cir. 1977).

Second, the rule provision in question authorizes "[a] party or any person from whom discovery is sought [to] move for a protective order," Fed. R. Civ. P. 26(c)(1) (emphasis added), which Plaintiffs read as granting standing to (1) "[a] party," id., and (2) "any person from whom discovery is sought," id. However, the best reading of that language permits the filing of such motions only by (A) "[a] party or any person," id., (B) "from whom discovery is sought," id. In that regard, "[u]nder conventional rules of grammar, 'when there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire

series.'"   _Facebook, Inc. v. Duguid_, 592 U.S. 395, 402 (2021) (internal brackets omitted) (quoting A. Scalia & B. Garner, Reading Law:  The Interpretation of Legal Texts 147 (2012)).[4]  "The [United States Supreme] Court often applies this interpretive rule, usually referred to as the 'series-qualifier canon.'"   _Id._ at 403.

"Here, the series-qualifier canon recommends qualifying both antecedent [nouns] . . . with the [modifying] phrase [that follows them]."  _Id._  "To begin, the modifier at issue immediately follows a concise, integrated clause: ['[a] party or any person'].   The clause hangs together as a unified whole, using the word 'or' to connect two [nouns] that share a common [verb, 'move']."   _Id._ (internal citations and some quotation marks omitted).   "It would be odd to apply the modifier (['from whom discovery is sought']) to only a portion of this cohesive preceding clause."  _Id._[5]

For all these reasons, the Court concludes that Federal Rule of Civil Procedure 26(c)(1) does not afford Plaintiffs (including

---

4 "[T]he rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose."  _Nielsen v. Preap_, 586 U.S. 392, 408 (2019) (internal citation and quotation marks omitted); _see also_ _Wellin v. Wellin_, Nos. 2:13CV1831, 2:13CV3595, 2:14CV4067, 2016 WL 8653023, at *3 (D.S.C. Nov. 14, 2016) (unpublished) ("The district courts are bound by the rules of statutory construction in interpreting the Federal Rules of Civil Procedure."), _recommendation adopted_, 2017 WL 1247918 (D.S.C. Mar. 31, 2017) (unpublished).

5 "[T]his interpretation does not conflict with the so-called rule of the last antecedent. . . .  Th[e Supreme] Court has declined to apply th[at grammar] rule where, like here, the modifying clause appears after an integrated list."  _Facebook_, 592 U.S. at 404 (internal quotation marks omitted).

17

Plaintiff Dr. Smith) a broader source of relief from Request No. 11 than Federal Rule of Civil Procedure 45(d)(3)(A).[6]  As previously discussed, that latter rule provision allows Plaintiff Dr. Smith to challenge Request No. 11 solely to vindicate his "personal right or privilege in," Idema, 118 F. App'x at 744, any "medical records that [he] created" (Docket Entry 117 at 2).

Psychotherapist Privilege

With the standing question resolved, the Court must address the substance of Plaintiff Dr. Smith's objections to Request No. 11, beginning with the contention that "Intervenor[-Defendants] are not entitled to [the requested mental health] records[ of Plaintiff Dr. Smith's minor patients] because they are protected by the psychotherapist-patient privilege."  (Docket Entry 113 at 8.)  In civil cases involving federal law claims (like this one), "the federal law of privilege applies." Virmani v. Novant Health Inc.,

---

6 In fact, "[e]ven without resolving the applicability of the [above-discussed,] modifying phrase in [Federal Rule of Civil Procedure 26(c)(1)], the Court [has] read[] the rest of th[at] Rule to require, at the least, that the movant seeks personal relief, and not relief for some third party that has not made a similar plea before the Court." Trustees of Purdue Univ., 2023 WL 4316300, at *2; see also Eichenwald v. Rivello, 321 F. Supp. 3d 562, 564 (D. Md. 2018) ("A motion to quash, or for a protective order, should generally be made by the person from whom the documents or things are requested.  This general rule applies whenever a party challenges a subpoena . . . .  The [c]ourt has found no cases . . . that depart from this general rule – that a party lacks standing to challenge a subpoena issued to a third-party except when the party has some interest (personal, proprietary, privilege, or so forth) in the information sought." (emphasis added) (internal citations and quotation marks omitted)).

18

259 F.3d 284, 286 n.3 (4th Cir. 2001). As a result, absent contrary command in "the United States Constitution; a federal statute; or rules prescribed by the Supreme Court," Fed. R. Evid. 501 (bullet points omitted), "[t]he common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege," id. Exercising that authority, "[t]he United States Supreme Court has recognized a psychotherapist-patient privilege, finding that psychotherapy serves 'a public good of transcendent importance.'" United States v. Bolander, 722 F.3d 199, 221 (4th Cir. 2013) (emphasis added) (quoting Jaffee v. Redmond, 518 U.S. 1, 11 (1996)).

"Like all testimonial or evidentiary privileges, the psychotherapist-patient privilege must be strictly construed." Id. at 222 (emphasis added); see also Herbert v. Lando, 441 U.S. 153, 175 (1979) ("Evidentiary privileges in litigation are not favored . . . . [T]hese exceptions to the demand for every man's evidence are not . . . expansively construed, for they are in derogation of the search for truth." (internal quotation marks omitted)). Of particular import, "as the Supreme Court in *Jaffee* made clear, the privilege only extends to those psychotherapists who are being consulted for diagnosis and treatment . . . ." Bolander, 722 F.3d at 223 (emphasis added) (citing Jaffee, 518 U.S. at 15); see also Equal Emp. Opportunity Comm'n v. Nichols Gas & Oil, Inc., 256 F.R.D. 114, 119 (W.D.N.Y. 2009) ("*Jaffee* makes clear that the

19

psychotherapist-patient privilege extends only to communications between a patient and a licensed mental-health professional during the course of treatment . . . .”). Moreover, “[t]he burden rests on the person invoking the privilege to demonstrate its applicability . . . .” Bolander, 722 F.3d at 222.

Given that authority, the Court agrees with Intervenor-Defendants that Plaintiffs have not “demonstrate[d the psychotherapist privilege’s] applicability,” id., to any “medical records that [Plaintiff] Dr. Smith created” (Docket Entry 117 at 2), “because, at a minimum, Plaintiffs have failed to carry their burden of establishing that [Plaintiff] Dr. Smith is a ‘licensed psychotherapist’” (Docket Entry 115 at 20 (quoting Brooks v. St. Charles Hotel Operating, LLC, Civ. Action No. 23-208, 2024 WL 3370580, at *5 (D. Md. Feb. 12, 2024) (unpublished))). (See Docket Entry 14-8 at 1 (averring that Plaintiff Dr. Smith is “licensed to practice medicine in North Carolina and [is] board certified in family medicine” without claiming specialization in psychotherapy); see also Docket Entry 45-7 at 1 (documenting Plaintiff Dr. Smith’s description of himself as “a family medicine doctor”).) Notably, Plaintiffs do not contest the fact that “[Plaintiff] Dr. Smith is not a psychotherapist” (Docket Entry 117 at 5), but instead counter that “at least some of his medical records contain notes and records from mental healthcare professionals, which is what triggers the privilege to begin with” (id.).

20

The conclusory, unsworn statement that Plaintiff Dr. Smith gathered and then intermingled with his own records unspecified "notes and records from mental healthcare professionals" (id.) does not establish that any such records qualify for protection under the psychotherapist privilege, as only "<u>confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment</u> are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence," <u>Jaffee</u>, 518 U.S. at 15 (emphasis added).[7]  Put another way, (A) not everything generically called a mental health record "memorialize[s] actual communications between the patient and the psychotherapist," <u>In re DD</u>, No. 2024-11, 2024 WL 4635603, at *4 (A.F. Ct. Crim. App. Oct. 31, 2024) (unpublished) (internal quotation marks omitted) (discussing Military Rule of Evidence codifying psychotherapist privilege), and (B) patients' "non-communicative mental health records pertaining to [their] diagnoses and treatment[s ]are not privileged," <u>Perrot v. Kelly</u>, No. 18CV10147, 2024 WL 1719888, at *5 (D. Mass. Apr. 22, 2024) (unpublished); <u>see also</u> <u>United States v.</u>

---

7 According to one of Plaintiff Dr. Smith's declarations, if his minor transgender patients receive care from a "therapist [who] is, like [Plaintiff Dr. Smith], within the UNC health system[, Plaintiff Dr. Smith] will review the therapist's notes, and if the therapist is outside of the UNC health system [Plaintiff Dr. Smith] will communicate with the[] therapist by phone or email." (Docket Entry 14-8 at 4-5.)  That averment falls short of attesting that Plaintiff Dr. Smith obtained <u>confidential communications</u> his patients made to their therapists and says nothing about whether he incorporated any such communications into his own records.

Ghane, 673 F.3d 771, 782 (8th Cir. 2012) ("In its discussion of the contours of the psychotherapist-patient privilege, the [Jaffee] Court only contemplated information gleaned during actual psychotherapy sessions . . . ."); Boudreau ex rel. Boudreau v. Ryan, No. 00C5392, 2001 WL 1001156, at *3 (N.D. Ill. Aug. 24, 2001) (unpublished) ("The psychotherapist-patient privilege is a limited one that applies only to certain mental health records, that is, confidential communications made to a psychotherapist or to a licensed social worker in the course of psychotherapy.").

In a final effort to sustain an objection to Request No. 11 based on the psychotherapist privilege, Plaintiffs have pointed to decisions "extend[ing it] to communications with 'other licensed physicians, including general practitioners, if they are dealing with a mental, as opposed to a physical, health issue.'" (Docket Entry 117 at 5 (internal brackets and ellipsis omitted) (quoting Couser v. Somers, No. 18-1221, 2022 WL 343659, at *7 (D. Kan. Feb. 4, 2022) (unpublished)); see also id. at 6 (additionally citing Shakerdge v. Tradition Fin. Servs., Inc., No. 3:16CV1940, 2017 WL 4694167, at *3 n.1 (D. Conn. Oct. 19, 2017) (unpublished), and Finley v. Johnson Oil Co., 199 F.R.D. 301, 303 (S.D. Ind. 2001)).) Plaintiffs would have this Court similarly (A) extend the psychotherapist privilege to Plaintiff Dr. Smith, in his role as a family medicine practitioner who "discusses mental health issues with his minor transgender patients" (id. at 6 (citing Docket Entry

22

45-7 at 4 and Docket Entry 117-1 at 14)), and (B) rule records of those discussions "thus protected by the privilege" (id.). The Court will not do so, as such an extension/ruling would not comport with the justification for the psychotherapist privilege endorsed in Jaffee and would not comply with the commands of the Supreme Court and the Fourth Circuit for courts to strictly construe privileges (including the psychotherapist privilege).

Regarding the first of those matters, the Supreme Court recognized the psychotherapist privilege because "[e]ffective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears." Jaffee, 518 U.S. at 10 (emphasis added). Consistent with that rationale, although the Jaffee Court not only held "that [the] psychotherapist privilege cover[ed] confidential communications made to licensed psychiatrists and psychologists," id. at 15, but also that it "extend[ed] to confidential communications made to licensed social workers," id., the Jaffee Court qualified that extension by specifying that the privilege only applied "to confidential communications made to licensed social workers in the course of psychotherapy," id. (emphasis added). Indeed, the Jaffee Court's focus on protection for the particular practice of psychotherapy by psychotherapists (whether licensed as psychiatrists, psychologists, or social workers) echoes throughout the decision. See, e.g., id.

23

at 10-11 (discussing need for confidentiality when "individuals consult psychotherapists" and citing Federal Rules of Evidence Advisory Committee's endorsement of privilege "protecting confidential communications between a psychotherapist and her patient" (emphasis added)), 12 (voicing concern about "chill[ing]" communication "between psychotherapists and their patients" (emphasis added)), 14 (observing "that the States rapidly recognized the wisdom of the [psychotherapist privilege] as the field of psychotherapy developed" (emphasis added)).

And, to underscore that focal point, the Supreme Court named the privilege it "recognized [as] a psychotherapist privilege," id. at 18 (emphasis added); see also, e.g., id. at 4 (framing "question [before the Supreme Court as] whether it is appropriate for federal courts to recognize a 'psychotherapist privilege' under Rule 501 of the Federal Rules of Evidence" (emphasis added)), 11 ("[T]he psychotherapist privilege serves the public interest . . . ." (emphasis added)). Lest any doubt remain about the restriction of the privilege at issue to licensed psychotherapists, the Jaffee Court wrote that restriction into its express holding: "[W]e hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." Id. at 15 (emphasis added).

24

Plaintiff Dr. Smith therefore cannot invoke the psychotherapist privilege based on his assertion that, in the course of his family medicine practice, he "discusses mental health issues with his minor transgender patients" (Docket Entry 117 at 6), because (as previously documented) he has tendered no evidence of any specialization or expertise in psychotherapy, see Stokes v. IKEA US Retail, LLC, No. 1:22CV1377, 2023 WL 1970476, at *5 n.7 (D. Md. Feb. 13, 2023) (unpublished) ("[T]he psychotherapist-patient privilege does not extend to include medical providers who are not psychotherapists, even if the treatment sought from the medical provider was a referral to a mental health professional or a prescription for medication to treat depression or anxiety." (internal quotation marks omitted)); Doe v. Sarah Lawrence Coll., No. 19 Civ. 10028, 2021 WL 197132, at *8 (S.D.N.Y. Jan. 20, 2021) (unpublished) (holding that doctor's "records mention[ing the p]laintiff's mental health status or treatment, including diagnoses, therapy with [a therapist], and psychiatric medications, . . . must be disclosed," because such records did "not fall within the psychotherapist-patient privilege, as [said doctor] was a pediatrician without a license in psychotherapy or mental health expertise"); Bruno v. CSX Transp., Inc., 262 F.R.D. 131, 133-34 (N.D.N.Y. 2009) (ruling, as to "primary care physician's medical records relating to [the plaintiff's] . . . mental health treatments," that "no privilege exists to protect this information

25

from disclosure"); <u>United States v. Witt</u>, 542 F. Supp. 696, 698 (S.D.N.Y. 1982) (declining to apply psychotherapist privilege to "general practitioner" who "claim[ed] that he [wa]s a psychotherapist . . . because he was 'engaged in the diagnosis and treatment of a mental or emotional condition'" and noting that "the nature of [said doctor's] practice . . ., insofar as it ha[d] been revealed to the [c]ourt, [wa]s not what one commonly thinks of as a psychiatric practice"), <u>aff'd</u>, No. 82-1274, 697 F.2d 301 (2d Cir. Aug. 10, 1982) (table); Anne Bowen Poulin, <u>The Psychotherapist-Patient Privilege after Jaffe v. Redmond: Where Do We Go from Here?</u>, 76 Wash. U. L.Q. 1341, 1351 (1998) ("The federal privilege should [] extend to communications to a licensed medical doctor only if the communications occurred in the course of psychotherapy and a substantial portion of the physician's practice is devoted to treating psychiatric, mental, or emotional problems.").[8]

---

8 Plaintiff Dr. Smith has averred that he maintains a broad-based medical practice, not one devoted to psychotherapy in particular or even mental health treatment more generally. (<u>See</u> Docket Entry 14-8 at 2 ("I provide outpatient primary care to patients of all ages, from prenatal and infant care to geriatric care. I also provide inpatient care, such as delivering babies and caring for hospitalized adults."), 3 ("I view gender-affirming medical care as a routine part of the health care I provide as a family medicine doctor, just like the prenatal care, monitoring for patients with diabetes, and other care I offer to my patients."); <u>see also</u> <u>id.</u> at 2 (referencing "gender-affirming hormone therapy," but not psychotherapy, as example of "gender-affirming medical care" Plaintiff Dr. Smith offers), 5 (detailing "hormone treatment medications that [Plaintiff Dr. Smith] prescribe[s]"); Docket Entry 45-7 at 5 (discussing Plaintiff Dr. Smith's provision of asthma inhalers and performance of circumcisions).)

Nor can the Court simply convert the psychotherapist privilege delimited by the Supreme Court into the broader, doctors-who-discuss-mental-health-issues privilege proposed by Plaintiffs; to the contrary, the Fourth Circuit has decreed that, "[l]ike all testimonial or evidentiary privileges, the psychotherapist-patient privilege must be strictly construed," Bolander, 722 F.3d at 222 (emphasis added); see also United States v. Lara, 850 F.3d 686, 690 (4th Cir. 2017) ("[F]ederal courts recognize a testimonial privilege for psychotherapist-patient communications. . . . We have strictly construed this privilege . . . ." (internal quotation marks omitted)); Helsabeck v. Fabyanic, 173 F. App'x 251, 257 (4th Cir. 2006) ("The Federal Rules of Evidence do not recognize a physician-patient privilege where, as here, subject matter jurisdiction is based on federal law."). That decree follows the Supreme Court's mandate that such "[e]videntiary privileges," Herbert, 441 U.S. at 175, "are not . . . expansively construed, for they are in derogation of the search for truth," id. (internal quotation marks omitted); see also University of Penn. v. Equal Emp. Opportunity Comm'n, 493 U.S. 182, 189 (1990) ("[A]lthough Rule 501 manifests a congressional desire . . . to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, we are disinclined to exercise this authority expansively." (internal citation omitted)); Trammel v. United States, 445 U.S. 40, 50 (1980) (holding privileges "must be strictly construed").

27

In sum, Plaintiffs have not carried "[t]he[ir] burden [as] the person[s] invoking the [psychotherapist] privilege to demonstrate its applicability," <u>Bolander</u>, 722 F.3d at 222.[9]

<u>Other Objections</u>

Anticipating that possible determination, Plaintiffs also have argued that, "even if not protected by the psychotherapist-patient privilege, the mental health and medical records Intervenor[-Defendants] seek are irrelevant and not proportional to the needs of the case." (Docket Entry 113 at 11 (all-caps and bold font omitted); <u>see also</u> <u>id.</u> at 12 ("Request No. 11 is breathtakingly overbroad . . . .").) However, as Intervenor-Defendants responded, "Plaintiffs cannot obtain a protective order on th[ose] grounds . . .: 'Irrelevance and overbreadth do not count among the grounds on which a court may issue a protective order.'" (Docket Entry 115 at 12 (internal brackets omitted) (quoting <u>Trustees of Purdue Univ.</u>, 2023 WL 4316300, at *2).) Instead (and in light of the prior ruling on standing), for any "medical records that [Plaintiff] Dr. Smith created" (Docket Entry 117 at 2), "[t]he [C]ourt may, for good cause, issue an order to protect [him] from annoyance, embarrassment, oppression, or undue burden or expense," Fed. R. Civ. P. 26(c)(1), and "must quash or modify a subpoena that . . . subjects [him] to undue burden," Fed. R. Civ. P. 45(d)(3)(A).

---

9 Given that conclusion, the Court need not address Intervenor-Defendants' alternative argument that "Plaintiffs have waived such privilege" (Docket Entry 115 at 21).

"The Court does not find that [Plaintiffs] ha[ve] sufficiently asserted [Plaintiff Dr. Smith's] _own_ annoyance, embarrassment, oppression, or undue burden or expense," Trustees of Purdue Univ., 2023 WL 4316300, at *3 (emphasis added) (internal quotation marks omitted), as their discussion of relevance and proportionality/ overbreadth instead identifies potential impacts on:

1) Plaintiff Dr. Smith's minor transgender patients (or their families) (see Docket Entry 113 at 12 ("[M]edical records frequently have sensitive and personal health information about [a patient's] family members, which heightens the sensitivity of those records . . . ."), 13 ("[T]he identities of transgender minors who have not brought suit and are not parties to this litigation are even more sensitive." (emphasis omitted)), 14 (inveighing against "sweeping intrusion into [transgender minors'] sensitive mental health and medical records"), 15 ("Intervenor[-Defendants] have not established that the sensitive mental health and medical records of non-party minors themselves are sufficiently necessary to outweigh the harm of disclosure."));[10] and

_____

10 As discussed in relation to standing, Plaintiffs have not presented evidence that Plaintiff Dr. Smith's minor transgender patients – whom he has described as "thoughtful, resilient, and remarkable in every way" (Docket Entry 14-8 at 3) – will lose their trust in him if the UNC Entities comply with subpoenas served on them. Plaintiff Dr. Smith therefore cannot convert any "annoyance, embarrassment, oppression, or undue burden," Fed. R. Civ. P. 26(c)(1), his patients might experience into his "own annoyance, embarrassment, oppression, or undue burden," Trustees of Purdue Univ., 2023 WL 4316300, at *3 (internal quotation marks omitted).

2) the UNC Entities (see id. at 13 (citing authority recognizing that "a request for all documents relating to a subject" unduly burdens "the recipient of the request" (internal quotation marks omitted)), 15-16 ("[C]ourts must give a subpoena recipient's non-party status special weight . . . ." (internal quotation marks omitted))).

Simply put, Plaintiff Dr. Smith "does not explain how these subpoenas will result in annoyance, embarrassment, oppression, or an undue burden or expense to him. [He] argues against these subpoenas on behalf of [other] persons . . . . Plaintiff[s] ha[ve thus] failed to . . . carry [their] burden under [Federal] Rule[s of Civil Procedure] 26(c)[(1) and/or 45(d)(3)(A)]." Eichenwald v. Rivello, 321 F. Supp. 3d 562, 565 (D. Md. 2018) (internal brackets, citation, emphasis, and quotation marks omitted). Nonetheless:

> [O]n its own, the [C]ourt must limit the frequency or extent of discovery otherwise allowed by the[ Federal R]ules [of Civil Procedure] . . . if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the proposed discovery is outside the scope permitted by [Federal] Rule [of Civil Procedure] 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added); see also Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any

30

nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . .").

The record before the Court does <u>not</u> support a determination that Request No. 11 runs afoul of those limitations. Starting with "unreasonabl[e] cumulative[ness] or duplicative[ness]," Fed. R. Civ. P. 26(b)(2)(C)(i), availability of information from "other source[s] that [are] more convenient, less burdensome, or less expensive," <u>id.</u>, and/or prior "opportunity to obtain the information," Fed. R. Civ. P. 26(b)(2)(C)(ii), as explained by Intervenor-Defendants – in response to Plaintiffs' argument that "Intervenor[-Defendants'] purported need for the requested documents [wa]s belied by the broad swath of documents already produced by Plaintiffs" (Docket Entry 113 at 7; <u>see also</u> <u>id.</u> at 8 ("[T]he two [pseudonymous] Plaintiff families in this case are producing all medical records and all mental health records for those minor[ Plaintiffs] relating to their diagnosis of, and treatment for, gender dysphoria." (emphasis omitted))) – "none of those documents relate to [Plaintiff] Dr. Smith's patients" (Docket Entry 115 at 17), "on whose behalf [he] is suing" (<u>id.</u> at 2 (citing Docket Entry 71 at 8, for its allegation that "[Plaintiff] Dr. Smith is bringing claims in his personal capacity on behalf of his patients"); <u>see also</u> Docket Entry 45-7 at 1 (setting out Plaintiff Dr. Smith's explanation that he "assert[s] claims on behalf of [his] patients . . . because many of [his] patients are hindered

from asserting claims on their own"); Docket Entry 115 at 19 ("There is no indication that [Plaintiff] Victor Voe or [Plaintiff] Joy Doe is [Plaintiff] Dr. Smith's patient . . . .")).

Further, Plaintiff Dr. Smith has refused and/or disclaimed the ability to provide Intervenor-Defendants with information about the patients on whose behalf he has sued. (See, e.g., Docket Entry 117-1 at 10 (memorializing refusal by Plaintiff Dr. Smith to answer deposition question about age of patients he has "decline[d] to provide" gender-affirming, hormone treatment because of North Carolina House Bill 808); Docket Entry 120-5 at 32-34 ("respond[ing] that . . . [Plaintiff] Dr. Smith has no documents . . . in his personal possession, custody, or control" responsive to production request for "[d]ocuments and [c]ommunications relating to the approximately 31 adolescent patients discussed in [his first] declaration," while maintaining objections to said request based on physician-patient privilege under North Carolina law and "fundamental privacy interests of his patients" (emphasis added) (internal quotation marks omitted)), 37-38 (same as to production request for "[d]ocuments and [c]ommunications relating to the approximately 29 adolescent patients discussed in [Plaintiff] Dr. [] Smith's supplemental declaration" (internal quotation marks omitted)); Docket Entry 120-6 at 18-19 (same as to production request for "patient-intake forms"), 25-26 (same as to production request for "[d]ocuments reflecting the results within

32

the past 5 years of any follow-up with patients or former patients who received [p]uberty [b]lockers, [c]ross-sex [h]ormones, or other treatments for a [g]ender [t]ransition").)

As to "the scope [of discovery] permitted by [Federal] Rule [of Civil Procedure] 26(b)(1)," Fed. R. Civ. P. 26(b)(2)(C), Request No. 11 appears "relevant to [Plaintiff Dr. Smith's] claim[s] . . . and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1). Specifically, to support his claims in this action, Plaintiff Dr. Smith has made numerous, wide-ranging, and detailed averments about his minor transgender patients, including:

1) as of October 7, 2023 (see Docket Entry 14-8 at 11), he served as "the primary care provider for . . . 65 [] transgender [patients]" (id. at 3), of whom "approximately 31 . . . [we]re adolescents" (id.);

2) as of November 16, 2023 (see Docket Entry 45-7 at 8), "approximately 29 of [his] transgender patients [we]re adolescents who require gender-affirming care" (id. at 3), of whom "19 . . . receiv[ed] hormone therapy" (id.);

3) "[s]everal of [his] transgender patients rely on Medicaid to fund their health care" (Docket Entry 14-8 at 3; see also Docket Entry 45-7 at 3 (averring that, as of November 16, 2023, "six [of his transgender adolescent patients] rely on Medicaid and need that Medicaid coverage to fund their gender-affirming health care"), 4 ("[B]ecause of Section 3 of [North Carolina House Bill 808], . . .

33

four transgender adolescent Medicaid patients are unable to receive the health coverage they need for their gender-affirming care."));

4) he "ha[s] seen the immense positive changes that gender-affirming hormones bring to [his adolescent transgender patients'] wellbeing" (Docket Entry 14-8 at 3; see also id. at 8 (indicating that, due to his treatment, all his transgender "[a]dolescent patients become happier and more confident"), 10 ("[I]n my experience, when patients receive this care, they thrive."); Docket Entry 45-7 at 3 (averring to "observ[ation] firsthand [of] how beneficial gender-affirming care is for transgender individuals"));

5) "[w]hen treating transgender patients under 18, . . . [he] require[s] that the patient be diagnosed with [g]ender [d]ysphoria . . . and that they are assessed as clinically appropriate prior to initiating medical treatment" (Docket Entry 14-8 at 4);

6) "[f]or patients under the age of 18, [he] also require[s] . . . written consent to treatment from at least one parent or guardian" (id.);

7) "[a]fter hormone therapy is initiated, [he] typically will see the patient again in about a month" (id. at 5; see also id. ("At minimum, I will see the patient again two months after that, and then again every three months. These appointments continue for several years."));

8) "[a]t these appointments, [he] ask[s] the patient to describe, among other things, what changes they've experienced; how

they are feeling about those changes, including whether they are experiencing any discomfort with the changes" (id.);

9) he "also monitor[s] the patient's laboratory tests every three months" (id.);

10) "[t]o date, none of [his] transgender patients have expressed to [him] that they regret . . . receiving gender-affirming medical treatment" (id.);

11) "[t]he hormone treatment medications that [he] prescribe[s his] transgender patients are also commonly used among cisgender patients for a variety of reasons" (id.);

12) North Carolina House Bill 808, "if permitted to remain in effect, will significantly and severely compromise the health of [his] patients" (id. at 8), by causing, inter alia, "depression, self-harm, suicidal ideation and suicide attempts" (id.);

13) he "ha[s] already seen the impact of [North Carolina House Bill 808] on patients' wellbeing" (id. at 9);

14) he "ha[s] patients who have not yet started hormone therapy, but who are ready to do so" (id.) and "initiating treatment is time sensitive given . . . its significant, life-saving benefits" (id.), yet North Carolina House Bill 808 "blocks [him] from being able to do so" (id.; see also Docket Entry 45-7 at 3-4 ("I have had to deny gender affirming care to at least three of my patients due to [North Carolina House Bill 808]. They are transgender adolescents who have established care with me and with

35

whom I have had multiple appointments. . . . As a result of [North Carolina House Bill 808] taking effect, I have been unable to prescribe their medically necessary hormone therapy . . . ."), 5 ("The reason I am currently not providing medically necessary gender affirming care is because Sections 1 and 3 of [North Carolina House Bill 808] prohibit it."));

15) "psychological stress . . . for [his] patients[] has been exacerbated significantly due to North Carolina House Bill 808" (Docket Entry 45-7 at 2);

16) his "transgender patients who are minors often share personal details about their life with [him] – including information about how they feel about their bodies, their mental health, how they are treated in school, and . . . suicidal ideation and self-harm" (id. at 4); and

17) he "ha[s] observed a decrease in the number of transgender minor patients who have established care with [him] since [North Carolina House Bill 808] took effect" (id. at 7).

Via Request No. 11, Intervenor-Defendants reasonably have attempted to test those (and other of Plaintiff Dr. Smith's) averments by requesting that the UNC Entities "[p]roduce all [d]ocuments and [c]ommunications from January 2023 to the present relating to the mental and medical health records of [Plaintiff] Dr. [] Smith's minor patients who are both above the age of 11 years old and have been diagnosed with or treated for Gender

36

Dysphoria or a [r]elated [c]ondition" (Docket Entry 113-1 at 11).

Plaintiffs have insisted that Intervenor-Defendants do not "need th[ose requested] records to 'verify the accuracy of [Plaintiff] Dr. Smith's assertions' about his patients" (Docket Entry 117 at 11 (quoting Docket Entry 115 at 8)), because "[Plaintiff] Dr. Smith's statements in this case are not 'assertions'; they are sworn declarations and deposition testimony" (id.). "Yet, a witness's credibility is always an issue." Wood v. Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992); see also Simmons, Inc. v. Pinkerton's, Inc., 762 F.2d 591, 605 (7th Cir. 1985) ("[A] witness'[s] credibility is always an important consideration."), abrogation on other grounds recognized, Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 425 n.12 (7th Cir. 2015).

Per that principle, Intervenor-Defendants properly have posited that "[t]he Federal Rules [of Civil Procedure] do not require [them] simply to take Plaintiffs' word that whatever [Plaintiff] Dr. Smith says is true" (Docket Entry 115 at 14); rather, Intervenor-Defendants (like any litigants) retain the right to gather and to bring before the "finder of fact . . . all evidence which might bear on the accuracy and truth of a witness'[s] testimony," United States v. Abel, 469 U.S. 45, 52 (1984); see also United States v. Hammond, 821 F. App'x 203, 208-09 (4th Cir. 2020) ("Evidence concerning a witness's credibility is relevant . . . ."); United States v. Ramos-Cruz, 667 F.3d 487, 507

37

n.3 (4th Cir. 2012) (Floyd, J., concurring in part and concurring in the judgment) ("A witness's credibility is always potentially at issue, depending on what, if anything, the [opposing party] learns about the witness."); United States v. Green, 617 F.3d 233, 251 (3d Cir. 2010) ("Indeed, evidence concerning a witness's credibility is always relevant, because credibility is always at issue . . . ."); South Broward Hosp. Dist. v. Elap Servs., LLC, No. 20CV61007, 2021 WL 9347048, at *2 (S.D. Fla. Dec. 17, 2021) (unpublished) ("[A] party is generally entitled to test the accuracy and completeness of statements and assertions made by a party opponent in a sworn declaration."); Burnett v. Ocean Props., Ltd., No. 2:16CV359, 2017 WL 3262163, at *4 (D. Me. July 31, 2017) (unpublished) ("[F]or purposes of discovery, a party need not accept a witness's testimony at face value."); Allen v. Brown, 185 F. Supp. 3d 1, 7 (D.D.C. 2016) ("[The p]laintiffs should not have to accept the statements in [a defendant's] declaration at face value without having the opportunity to conduct document discovery . . . ."); Ventrassist Pty. Ltd. v. Heartware, Inc., 377 F. Supp. 2d 1278, 1288 (S.D. Fla. 2005) (ruling that parties "are not required to simply accept the averments in the [d]eclarations [from opposing parties] at face value," but "may [use] the other discovery tools available to [them] – such as . . . document requests . . . – [to] reveal facts at odds with those set forth in the [d]eclarations").

38

Neither do proportionality concerns arise from the fact that "Request No. 11 is not limited to treatment for gender-affirming care" (Docket Entry 113 at 12). Plaintiff Dr. Smith has made sweeping (and, at times, vague) pronouncements about the mental and physical health of his minor transgender patients, as well as the care he provides. (<u>See, e.g.</u>, Docket Entry 14-8 at 4 (averring that all Plaintiff Dr. Smith's minor transgender patients received "assess[ments] as clinically appropriate prior to initiating medical treatment"), 5 (attesting to frequency of Plaintiff Dr. Smith's visits with minor transgender patients and reviews of "laboratory tests"), 8 (asserting that Plaintiff Dr. Smith's treatment makes his minor transgender patients "happier and more confident," but that operation of North Carolina House Bill 808 will cause them "depression, self-harm, suicidal ideation and suicide attempts"), 9 (declaring that Plaintiff Dr. Smith "ha[s] already seen the impact of [North Carolina House Bill 808] on patients' wellbeing"), 10 (maintaining that, "when [Plaintiff Dr. Smith's minor transgender] patients receive this care, they thrive"); Docket Entry 45-7 at 2 (reporting that "psychological stress . . . for [Plaintiff Dr. Smith's] patients[] has been exacerbated significantly due to North Carolina House Bill 808"), 4 (claiming that Plaintiff Dr. Smith's "transgender patients who are minors often share personal details about . . . their mental health . . . and suicidal ideation and self-harm").) Intervenor-

39

Defendants properly may inspect the UNC Entities' records to verify (or to contextualize) such averments. See, e.g., Allen, 185 F. Supp. 3d at 7; Ventrassist, 377 F. Supp. 2d at 1288.

"[T]he proper scope of discovery in any case is a function of the nature of that case." Waters v. United States Capitol Police Bd., 216 F.R.D. 153, 159 (D.D.C. 2003). In this instance, Request No. 11's reach as to the records of Plaintiff Dr. Smith's minor transgender patients held by the UNC Entities merely mirrors what Intervenor-Defendants rightly have described as "Plaintiffs' willingness to use those minor patients' mental health and medical information whenever it might benefit Plaintiffs' case." (Docket Entry 115 at 2.)[11] Request No. 11 thus remains proportional, even giving the "nonparty status [of the UNC Entities and Plaintiff Dr. Smith's patients] special weight . . . [and applying] an even more demanding and sensitive inquiry than the one governing discovery

_____

11 That consideration, as well as the fact that Request No. 11 – included in subpoenas issued on August 1, 2024 (see Docket Entry 113-1 at 2) – only sought records dating back 19 months (see id. at 11), offsets the concern that "[a] request for all documents 'relating to' a subject is usually subject to criticism as overbroad since . . . all documents 'relate' to all others in some remote fashion," Massachusetts v. United States Dep't of Health & Hum. Servs., 727 F. Supp. 35, 36 n.2 (D. Mass. 1989) (emphasis added). Moreover, as discussed in Footnote 2 and emphasized by Intervenor-Defendants, worries about the privacy interests of Plaintiff Dr. Smith's minor transgender patients "are remedied by the parties' protective order which allows [non]-parties like [the] UNC [Entities] to identify documents as [c]onfidential or [a]ttorney's [e]yes [o]nly" (Docket Entry 115 at 18 (internal quotation marks omitted); see also id. (noting that, "[i]f it becomes necessary to file any of those documents, then that could be done under seal or with redactions")).

generally," <u>Virginia Dep't of Corr. v. Jordan</u>, 921 F.3d 180, 189 (4th Cir. 2019) (internal quotation marks omitted). More precisely, Request No. 11 has not caused Plaintiff Dr. Smith's patients and the UNC Entities to "be drawn into the parties' dispute without some good reason," <u>id.</u> To the contrary (as previously documented and properly noted by Intervenor-Defendants), Plaintiff Dr. Smith drew his patients and employer into this case first by "presum[ing] to represent dozens of minor patients and seek[ing] a statewide injunction on their behalf" (Docket Entry 115 at 10) and then by answering discovery into those matters by "claim[ing] that such information is within the possession, custody, or control of [the] UNC [Entities]" (<u>id.</u> at 7 (emphasis omitted)). Under these circumstances, the Court does not deem "the proposed discovery [] outside the scope permitted by [Federal] Rule [of Civil Procedure] 26(b)(1)," Fed. R. Civ. P. 26(b)(2)(C)(iii).[12]

_____

12 Along with its inclusion of relevance and proportionality limits, the definition of the permissible scope of discovery also incorporates an exclusion for privileged material. <u>See</u> Fed. R. Civ. P. 26(b)(1). For reasons elucidated at length above, the Court has determined that the record does not support Plaintiff Dr. Smith's interposition of the psychotherapist privilege as to any of the records responsive to Request No. 11 which he created. Nor – without knowing more about the larger universe of records responsive to Request No. 11 possessed by the UNC Entities – could the Court conclude that said (or any other) privilege would attach to any such material. Of interest in that regard, despite the passage of more than four months since Plaintiffs proposed that the Court defer resolution of the instant Motion until the UNC Entities "ha[d] sought relief from the subpoenas through a motion that [the Court could] consider[] at the same time as th[e instant M]otion" (Docket Entry 112-1 at 2; <u>see also</u> Docket Entry 113 at 3 ("[The] (continued...)

Plaintiffs' standing to contest Request No. 11 in the subpoenas served on the UNC Entities extends only as far as Plaintiff Dr. Smith's interest in vindicating his "personal right or privilege in," <u>Idema</u>, 118 F. App'x at 744, any "medical records that [he] created" (Docket Entry 117 at 2). As to the objections Plaintiff Dr. Smith raised within those confines, he failed (A) to carry his "burden [as] the person invoking the [psychotherapist] privilege to demonstrate its applicability," <u>Bolander</u>, 722 F.3d at 222, and (B) to "sufficiently assert[ his] own annoyance, embarrassment, oppression, or undue burden or expense," <u>Trustees of Purdue Univ.</u>, 2023 WL 4316300, at *3 (internal quotation marks omitted). Finally, exercising "its own . . . [responsibility to] limit the . . . extent of discovery," Fed. R. Civ. P. 26(b)(2)(C), if a discovery demand exceeds specified bounds, <u>see id.</u>, the Court finds no basis to block Request No. 11.

**IT IS THEREFORE ORDERED** that the instant Motion (Docket Entry 112) is **DENIED**.

_/s/ L. Patrick Auld_
**L. Patrick Auld**
**United States Magistrate Judge**

December 16, 2024

---

12(...continued)
UNC [Entities] will have [their] own significant objections to Intervenor[-Defendants'] highly sensitive request . . . .")), the UNC Entities have filed no such motion (<u>see</u> Docket Entries dated July 29, 2024, to present). The Court will delay no longer to adjudicate the instant Motion.